UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RONNIE JONES, ET AL., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | )    NO. 05-11832-GAO |
| | ) |
| CITY OF BOSTON, ET AL., | ) |
| | ) |
| Defendants. | ) |

## FIRST AMENDED AND SUPPLEMENTAL COMPLAINT AND JURY DEMAND

### Introduction

1.      This is a civil rights action to redress the deprivation of rights guaranteed by the Constitutions and laws of the United States and the Commonwealth of Massachusetts.  Pursuant to the Boston Police Department's Substance Abuse Policy, the defendants have, since 1999, unlawfully based employment decisions upon the results of a flawed, imprecise, unreliable, arbitrary, and racially biased mandatory drug test performed on hair samples (the "Hair Test").

2.      The plaintiffs have no objection to the concept of the mandatory drug-testing of law enforcement officers and applicants for employment as law enforcement officers.  The plaintiffs contend, however, that the defendants' use of the Hair Test is unlawful because, among other reasons, it (a) has a disparate, adverse, and discriminatory impact on Boston police officers and applicants of color; (b) is used despite the availability of alternative testing methods and procedures that would have less disparate, adverse, and discriminatory impact on Boston police officers and applicants of color; and (c) constitutes discrimination on the basis of a false and erroneous perception that the plaintiffs had a disability.

3.      Upon information and belief, there are currently no government-mandated guidelines for testing hair samples for the presence of illegal drugs.  Nor are there such guidelines concerning collection procedures or cut-off levels for the Hair Test used by the

defendants.   In addition, scientific studies demonstrate that the procedures used by the defendants to test hair samples for the presence of illegal drugs are flawed, imprecise, arbitrary, unreliable, and inherently biased against people of color.  For example, upon information and belief, the procedures and methods used in performing the Hair Test cannot identify whether a result that is positive for the presence of illegal drugs is due to ingestion or to external contamination from environmental exposure.   In addition, the Hair Test has an inherent propensity to yield "false positives"[1] on hair samples taken from persons of color because of the composition of the hair itself and other factors.  Indeed, upon information and belief, the Society of Forensic Toxicologists considers the testing of hair samples for the presence of illegal drugs to be too unreliable to be used in making individual employment decisions.

4.    Seven of the plaintiffs are former Boston police officers -- "former," because they were wrongfully terminated on the basis of their allegedly positive results on the Hair Test.  One plaintiff is a police officer who is still with the Boston Police Department but who, on the basis of her allegedly positive Hair Test, was wrongfully forced to choose between termination and signing documents falsely stating that she had requested drug rehabilitation treatment and agreeing to, among other things, undergo such treatment at her own expense.  Another plaintiff is a police cadet who was wrongfully terminated on the basis of her allegedly positive result on the Hair Test.  Another plaintiff was denied employment altogether on the basis of her allegedly positive Hair Test.  The plaintiff officers who were terminated each served with distinction, including commendations and medals, for between 4 and 28 years; collectively, for nearly 100 years.  The plaintiff officer still with the Boston Police Department has served for approximately 18 years and the plaintiff cadet had served for approximately 4 years prior to her wrongful termination.

5.    Each of the plaintiffs vehemently denies using illegal drugs.   The plaintiffs'

---

[1] Hair Test results described herein as "false positive" and "allegedly positive" are results reported as "positive" for an illegal drug, although the person identified as having tested positive did not ingest the illegal drug reported in the result.

2

allegedly positive results on the Hair Test is the ***only*** "evidence" of illegal drug use by the plaintiffs that was considered by the defendants in making their adverse employment decisions against them. All but two of the plaintiffs obtained results negative for the presence of illegal drugs in independent hair drug tests performed soon after the allegedly positive result on the Hair Test used by the defendants. Indeed, the independent hair drug tests of some of the plaintiffs were performed by the very same laboratory that performed the Hair Tests on which they had allegedly tested positive. In the case of one plaintiff, the negative and allegedly positive results were obtained from tests performed by the very same laboratory on hair samples taken on the very same day.

6.    The defendants' use of the Hair Test in making employment decisions disproportionately and adversely impacts police officers and applicants of color and constitutes unlawful discrimination on the basis of race as well as on the basis of a false and erroneous perception of a disability. As a consequence of the defendants' policies, customs, practices, and conduct with respect to the implementation, execution, administration, supervision, related training, and use of the Hair Test in making employment decisions, the plaintiffs have been terminated from their employment with the Boston Police Department or have been forced to sign documents falsely stating that they have requested drug rehabilitation treatment and agreeing to undergo such treatment at their own expense. The result is the ruination of the lives, careers, and reputations of the plaintiffs.

7.    Among the damages that the plaintiffs have suffered and continue to suffer as a consequence of the defendants' policies, customs, practices, and conduct are, without limitation, loss of compensation, benefits, seniority, and employment opportunities, lost careers, damaged reputations, loss of standing in the community, humiliation, mental pain, anguish, and severe emotional distress.

### Jurisdiction and Venue

8.    The plaintiffs' civil rights claims are based upon Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e, *et. seq.*; Title I of the Americans with Disabilities Act of

1990, codified at 42 U.S.C. § 12101, *et seq.*; 42 U.S.C. § 1981; 42 U.S.C. § 1983; the Fourteenth Amendment to the United States Constitution; Mass. Gen. Laws ch. 151B; Mass. Gen. Laws ch. 93, § 103; Mass. Gen. Laws ch. 12, §§ 11H and 11I; Articles 1, 10, 11, and 12, and Article of Amendment 114 of the Massachusetts Declaration of Rights.  This Court has subject matter jurisdiction over the plaintiffs' claims pursuant to Mass. Gen. Laws ch. 212, §§ 3, 4; Mass. Gen. Laws ch. 231A, § 1; Mass. Gen. Laws ch. 12, §§ 11H, 11I; 28 U.S.C. § 1343; and 42 U.S.C. § 12117.

9.      All plaintiffs have exhausted the necessary administrative prerequisites.  Prior to filing this civil action, each plaintiff timely filed written Charges of Discrimination, asserting claims of discrimination, with the Massachusetts Commission Against Discrimination and the Equal Employment Opportunity Commission ("EEOC").  This civil action is filed within three years of the discriminatory acts alleged in this Complaint and within 90 days of Right to Sue letters from the EEOC.

10.      Venue is proper in Suffolk County pursuant to Mass. Gen. Laws ch. 223, § 1.

## Parties

11.      Defendant City of Boston ("City") is a municipality of the Commonwealth of Massachusetts and owns, operates, manages, controls, and is responsible for the actions of the Boston Police Department.  The City is an "employer" within the meanings of 42 U.S.C. § 2000e, 42 U.S.C. § 12111(5), and Mass. Gen. Laws Chapter 151B, and is subject to suit under all of the claims alleged in this Complaint.

12.      Defendant Boston Police Department ("BPD") is a paramilitary law enforcement organization of the City.  The BPD is an "employer" within the meanings of Title VII, 42 U.S.C. § 2000e, 42 U.S.C. § 12111(5), and Mass. Gen. Laws ch. 151B and is subject to suit under all of the claims alleged in this Complaint.

13.      Defendant Kathleen O'Toole is the current Commissioner of the BPD.  As is relevant to this Complaint, Commissioner O'Toole is responsible for making, implementing, permitting, and overseeing the BPD's (a) policy decisions; (b) customs and practices; (c) training

4

and supervision of BPD employees; and (d) acts and omissions with respect to all allegations and claims set forth in this Complaint. Commissioner O'Toole is sued in her official capacity.

14.    Plaintiff Ronnie Jones is an African-American male who resided in Suffolk County, Massachusetts during all times relevant to this Complaint. He joined the BPD in 1983 and provided approximately nineteen years of service until he was wrongfully terminated on or about August 9, 2002. Officer Jones had an excellent service record that was free of warnings or disciplinary actions related to drug abuse. He had taken and passed a mandatory annual drug test every year that it was administered prior to the Hair Test upon which his termination was based.

15.    Plaintiff Richard Beckers is an African-American male who resided in Suffolk County, Massachusetts during all times relevant to this Complaint. He joined the BPD in 1989 and provided approximately thirteen years of service until he was wrongfully terminated on or about August 9, 2002. Officer Beckers had an excellent service record that was free of warnings or disciplinary actions related to drug abuse. He had taken and passed a mandatory annual drug test every year that it was administered prior to the Hair Test upon which his termination was based.

16.    Plaintiff Walter Washington is an African-American male who resided in Suffolk County, Massachusetts during all times relevant to this Complaint. He joined the BPD in 1989 and provided approximately fourteen years of service until he was wrongfully terminated on or about April 22, 2003. Officer Washington had an excellent service record that was free of warnings or disciplinary actions related to drug abuse. During his service, Officer Washington received the BPD Medal of Honor twice, as well as the Hanna Award for valor and numerous letters of commendation from the BPD. He had taken and passed a mandatory annual drug test every year that it was administered prior to the Hair Test upon which his termination was based.

17.    Plaintiff William Earl Bridgeforth is an African-American male who resided in Suffolk County, Massachusetts during all times relevant to this Complaint. During the time of the acts complained of herein, he was a resident of Suffolk County, Massachusetts. He joined the BPD in 1989 and provided approximately fourteen years of service before he was wrongfully

terminated on or about September 11, 2003.  Officer Bridgeforth had an excellent service record that was free of warnings or disciplinary actions related to drug abuse.  He had taken and passed a mandatory annual drug test every year that it was administered prior to a Hair Test upon which the defendants based their adverse employment decisions, including the decision to terminate his employment.

18.    Plaintiff Shawn N. Harris is an African-American male who resided in Suffolk County, Massachusetts during all times relevant to this Complaint.  He joined the BPD in 1999 and provided approximately four years of service before he was wrongfully terminated on or about April 22, 2003.  Officer Harris had an excellent service record that was free of warnings or disciplinary actions related to drug abuse.  During his service, Officer Harris received the BPD Medal of Honor, as well as the Hanna Award for valor; a commendation from prior Boston Police Commissioner Paul Evans; and several letters of appreciation from community residents. He had taken and passed a mandatory annual drug test every year that it was administered prior to the Hair Test upon which his termination was based.

19.    Plaintiff Eugene Wade is an African-American male who resided in Suffolk County, Massachusetts during all times relevant to this Complaint.  He joined the BPD in 1975. He was promoted to sergeant in 1985 and to sergeant-detective in 1992.   He provided approximately 28 years of service before he was wrongfully terminated on or about February 6, 2003.  Sergeant-Detective Wade had an excellent service record that was free of warnings or disciplinary actions related to drug abuse.  He had taken and passed a mandatory annual drug test every year that it was administered prior to the Hair Test upon which his termination was based.

20.    Plaintiff George C. Downing, Jr. is an African-American male who resided in Suffolk County, Massachusetts during all times relevant to this Complaint.  He joined the BPD in 1995 and provided approximately eight years of service before he was wrongfully terminated on or about January 6, 2004.  Officer Downing had an excellent service record that was free of warnings or disciplinary actions related to drug abuse.  He had taken and passed a mandatory annual drug test every year that it was administered prior to the Hair Test upon which his

LITDOCS/636659.1

termination was based.

21.    Plaintiff Clararise Bristow is an African-American female who resided in Suffolk County, Massachusetts during all times relevant to this Complaint.  The BPD extended an offer of employment to Ms. Bristow in December 2002, but wrongfully refused to make her a permanent offer a short time later, based upon the same Hair Test administered to the other plaintiffs.

22.    Plaintiff Rachelle Couch is an African American female who resided in Suffolk County, Massachusetts during all times relevant to this Complaint.  She joined the BPD in 1987 and has provided approximately 18 years of service.  She had taken and passed a mandatory annual drug test every year that it was administered prior to the Hair Test upon which the defendants based their adverse employment decisions.  Officer Couch continues to serve as a Boston Police officer, despite having allegedly tested positive on the Hair Test because, but only because, in order to keep her job, she signed documents falsely stating that she had requested drug rehabilitation treatment and agreeing to, among other things, undergo such treatment.

23.    Plaintiff Keri Hogan is an African American female who resided in Suffolk County, Massachusetts during all times relevant to this Complaint.  She was commissioned as a police cadet by the BPD in 2001 and provided approximately 4 years of service before she was wrongfully terminated in 2005.  Ms. Hogan had an excellent service record that was free of warnings or disciplinary actions related to drug abuse.  She had taken and passed a mandatory annual drug test every year that it was administered prior to the Hair Test upon which her termination was based.

24.    The Massachusetts Association of Minority Law Enforcement Officers ("MAMLEO") represents the interests of all BPD law enforcement personnel and applicants of color, including the interests of the plaintiffs and others who have been, or may be, adversely affected by the Hair Test.  MAMLEO has offices in Suffolk County, Massachusetts.

**Factual Allegations**

**The BPD's Substance Abuse Policy and the Challenged Hair Test**

25.    Beginning in 1999, the Hair Test has been administered annually to all sworn uniformed employees of the BPD, pursuant to the BPD's Substance Abuse Policy, as stated in BPD Rule 111, dated December 17, 1998 (the "Substance Abuse Policy").[2]    The BPD purportedly instituted the mandatory Hair Test in order to detect unlawful drug use that allegedly took place during the previous weeks or months.

26.    Although union representatives agreed to the Hair Test as part of collective bargaining agreements, this consent was secured on the basis of the defendants' misrepresentations that the Hair Test would be "conducted through a fair, reasonable, and objective hair analysis testing system," Substance Abuse Policy(V)(G), and without the union representatives' knowledge of the arbitrary, unreliable, unfair, and discriminatory nature and use of the Hair Test.

27.    The Substance Abuse Policy specifically states that the "[t]he [BPD] agrees that it will establish and adhere to written collection and testing procedures for hair samples"; that "[t]hese procedures shall be fair and reasonable so as to ensure the accuracy and integrity of the test and process"; and that [t]hese written procedures will be appended to this Rule and become incorporated thereto."  Substance Abuse Policy(V)(G).

28.    The Hair Test is administered by the City's Occupational Health Department (the "Health Department").  Among other things, Health Department personnel are responsible for collecting hair samples and transmitting them to the laboratory for testing.

29.    With respect to officers already employed by the BPD, the Substance Abuse Policy requires that the Hair Test be administered annually during the thirty-day period before or after the police officer's birthday.  The BPD determines the date for the test and notifies the officer several days in advance.  The Hair Test also applies to all applicants for the position of

---

[2]Although the Hair Test on BPD patrol officers began in 1999, testing of the detectives, sergeant-detectives, and superior officers was implemented in succession, starting in the year 2000.

sworn police officer with the BPD.

30.    According to the Substance Abuse Policy, the BPD uses the Hair Test to determine "the presence of these five drugs, classes of drugs, or their metabolites:  marijuana metabolites, cocaine metabolites, opiate metabolites, phencyclidine (PCP), and amphetamines." Substance Abuse Policy(V)(G).  The Substance Abuse Policy provides that hair samples are to be collected by Health Department personnel and sent for testing by a licensed laboratory certified to test hair samples for the presence of illegal drugs.

31.    The BPD contracts exclusively with Psychemedics Corporation ("Psychemedics") to perform the Hair Test on samples collected by Health Department personnel and to report the results.  Upon information and belief, Psychemedics is not certified to test hair for the presence of illegal drugs, as required by the Substance Abuse Policy.

32.    Under the procedures utilized by Psychemedics and the defendants, a hair sample provided to Psychemedics by the Health Department is initially tested by radioimmunoassay.  If this test yields a positive result for the presence of illegal drugs, Psychemedics then tests the sample using a combination of chromatography and mass spectrometry methodologies.  If there is again a positive result, this is reported to the BPD's Medical Review Officer, pursuant to the Substance Abuse Policy.  Although the Substance Abuse Policy does not specify cut-off levels for distinguishing between positive and negative results with respect to the presence of illegal drugs in hair samples, Psychemedics reports a finding of cocaine at a level of 5ng/10mg or more as a positive result and lower levels of cocaine as a negative result.[3]  Pursuant to the Substance Abuse Policy, if the affected officer cannot provide an alternative medical explanation for the positive result, the Medical Review Office reports the Hair Test as positive for the presence of illegal drugs to the BPD.

33.    The Substance Abuse Policy provides that, in the event that a positive result is reported to the BPD, the affected officer may request an additional "Safety Net" test within 72

---

[3]A nanogram ("ng") is one billionth of a gram; a milligram ("mg") is one thousandth of a gram.

hours of receipt of the initial test results. Under the procedures utilized by Psychemedics and the defendants for the "Safety Net" test, a second hair sample is to be taken from the same body site as the original hair sample. The same tests are performed on the new sample as on the original sample, but a lower cut-off level is used to distinguish between positive and negative results. Although the Substance Abuse Policy does not specify cut-off levels for distinguishing between positive and negative results with respect to the presence of drugs on the Safety Net test, Psychemedics currently reports a finding of cocaine at a level of 0.2ng/10mg or more as a positive result and lower levels of cocaine as a negative result on the Safety Net test. Psychemedics previously used a cut-off level of 2.0ng/10mg on the Safety Net test, which is an order of magnitude higher than the current cut-off level. Pursuant to the Substance Abuse Policy, the affected officer must pay for the Safety Net test and its review by the Medical Review Officer unless the result on the Safety Net test is negative.

34.     A sworn officer or applicant whose Hair Test is reported to the BPD as positive is subject to termination or denial of employment, as the case may be. In the case of a sworn officer who tests positive on the Hair Test for the first time, the Substance Abuse Policy provides that the BPD may offer an alternative to termination: a 45-day suspension without pay and execution of a "Rehabilitation Agreement." This Agreement falsely states that the officer has requested drug rehabilitation treatment and agrees to undergo such treatment at his or her own expense, and requires placement in an administrative position; suspension of weapon-carrying privileges until a treatment provider certifies recovery; and submission to follow-up random drug testing for the next three years.

**Problems with the HairTest**

35.     According to the defendants, each of the plaintiffs tested positive for cocaine on an initial Hair Test and on a follow-up Safety Net test performed by Psychemedics. Each of the eight sworn-officer plaintiffs had excellent service records during their employment with the BPD (ranging from 4 to 28 years), and none had previously been the subject of a past complaint for behavior indicative of illegal drug use. The same is true of the former police cadet. For

10

several years prior to the Hair Test that precipitated their wrongful discharge, each of the eight sworn-officer plaintiffs had submitted to a mandatory annual drug test, including a Hair Test. The same is true of the former police cadet.  All of these previous tests had been negative and each of the plaintiffs vehemently denies using illegal drugs.

36.    All but two of the plaintiffs obtained results negative for the presence of illegal drugs in independent hair drug tests performed soon after their allegedly positive Hair Test results were reported.  Indeed, the independent hair drug tests of some of the plaintiffs were performed by the very same laboratory that performed the Hair Tests on which they had allegedly tested positive.  That is, the very same laboratory returned both negative and allegedly positive results on hair samples taken from these plaintiffs.  In the case of one plaintiff, the negative and allegedly positive results were obtained from tests performed by the very same laboratory on hair samples taken on the very same day.  In the case of another plaintiff, the negative and allegedly positive results were obtained from tests performed on hair samples taken only one day apart.  The defendants have failed and refused to consider independent tests indicating that the plaintiffs were drug-free at the time of the Hair Test that falsely and erroneously indicated illegal drug use.

37.    Although each of the eight sworn-officer plaintiffs was offered an opportunity to avoid termination by signing the Rehabilitation Agreement, this Agreement requires an admission of illegal drug use; drug treatment; placement in an administrative position; suspension of weapon-carrying privileges until a treatment provider certifies recovery; and submission to follow-up random drug testing for the next three years.  Six of the officers refused because they did not use illegal drugs.  These officers were terminated.  The two remaining officers accepted the Rehabilitation Agreement, notwithstanding that they did not use illegal drugs, in order to keep their jobs.  Of these two officers, one was reinstated after losing 45 days of pay and accompanying benefits.   The other officer who accepted the Rehabilitation Agreement was reinstated.  However, this officer was terminated after he allegedly tested

positive on the Hair Test one year later, despite the fact that he had tested negative on ten or eleven random urine tests during that year.

38.    Upon information and belief, there are currently no government-mandated guidelines for testing hair samples for the presence of illegal drugs.  Nor are there such guidelines concerning collection procedures or cut-off levels for the Hair Test used by the defendants.[4]

39.    The defendants rely exclusively on the work of one laboratory, Psychemedics, to perform all Hair Tests for the BPD and have rejected all independent tests that refute the results of the Hair Test.

40.    Although the FDA has approved other methods of testing for the presence of illegal drugs (using blood and urine), upon information and belief, the FDA has not approved the procedures used by the defendants and Psychemedics to test hair samples for the presence of illegal drugs.

41.    Forensic toxicologists have reported on the inability of repeated wash procedures to remove completely external cocaine contamination from the dark, coarse hair of African-Americans.  Upon information and belief, the Society of Forensic Toxicologists considers the testing of hair samples for the presence of illegal drugs to be too unreliable to be used in making individual employment decisions.

42.    Upon information and belief, the defendants had knowledge, at least as early as 2002, that the reliability of the procedures they had chosen to use for the Hair Test was questionable in view of the fact that an increasing number of long-term officers of color were testing positive for cocaine on the Hair Test, even though they had excellent service records; no

---

[4]The Mandatory Guidelines for Federal Workplace Drug Testing Programs, initially published by the HHS in the Federal Register on April 11, 1988 (53 FR 11970-89) and extensively revised in the Federal Register on June 9, 1994 (59 FR 29908-31), establish scientific and technical guidelines for federal drug-testing programs, as well as standards for certification of laboratories engaged in urine drug-testing for federal agencies.  A second revision to the Mandatory Guidelines regarding opiate testing was published in the Federal Register on September 30, 1997 (62 FR 51118-19).  Upon information and belief, draft Guidelines are in the process of being finalized.

history of illegal drug use; and denied using illegal drugs. The defendants nevertheless continue to use the Hair Test; administered in the same way; performed and interpreted by the same laboratory; and with the same disparate, adverse, and discriminatory consequences for officers and applicants of color in the terms and conditions of their employment.

43.    The Hair Test is rife with flaws. For example, the defendants have failed to ensure that personnel responsible for collecting the hair samples and transmitting them to Psychemedics are sufficiently trained to follow the procedures necessary to ensure the integrity of the hair samples used in the Hair Test and that the hair samples provided to Psychemedics are of sufficient length and quantity to comply with the testing protocol.

44.    The Hair Test is unreliable, imprecise, and arbitrary. Scientific studies have demonstrated flaws in the procedures used to test hair samples for the presence of illegal drugs as well as the hair drug test's inherent bias against people of color -- i.e., the propensity of the test to yield false positives on hair samples taken from persons of color. Moreover, upon information and belief, results obtained by laboratory analysis of the same hair sample can vary by more than 40 percent.

45.    Upon information and belief, the defendants are aware of these studies but refuse to take remedial steps. Although officers who never ingested illegal drugs have tested positive on the Hair Test, and although a disproportionate number of officers and applicants of color are being adversely affected by the Hair Test in the terms and conditions of their employment, the defendants will not suspend or modify its use in making employment decisions.

46.    The BPD has denied "that race, specifically African-American, is a factor in drug testing results and can cause a positive drug test result [on the Hair Test]." The BPD also refuses to acknowledge that hair samples used in the Hair Test may be contaminated from external exposure, as might occur, for example, during the performance of job duties; as a result of unsanitary collection, transmission, preparation, or testing procedures; or because of errors in the chain of custody.

47.    The defendants afford no meaningful opportunity for an officer or applicant who

allegedly tests positive on the Hair Test to prove his or her innocence with respect to alleged illegal drug use. Despite scientific evidence demonstrating the unreliability of procedures used to test hair samples for the presence of illegal drugs and the hair drug test's inherent bias against people of color, the BPD refuses to consider independent test results that refute the Hair Test results and to give sufficient credence and weight to the affected officer's or applicant's record, even when the record strongly negates the possibility of illegal drug use.

48.    The Hair Test used by the defendants is discriminatory in its nature and its effect and has had, and continues to have, a disparate, adverse, and discriminatory impact on police officers and applicants of color. Because of this discrimination, a hostile work environment for people of color has been created by and within the BPD.

49.    Upon information and belief, alternative testing methods and procedures exist that would have less disparate, adverse, and discriminatory impact on officers and applicants of color in the terms and conditions of their employment, but the defendants have failed and refused to utilize them.

50.    As a consequence of the defendants' policies, customs, practices, and conduct with respect to the implementation, execution, administration, supervision, related training, and use of the Hair Test, the plaintiffs have been stripped of their livelihoods; suffered the loss of compensation, benefits, seniority, and opportunities for employment and promotion; seen their reputations and careers destroyed; and endured humiliation, loss of standing in the community, and extreme emotional distress.

### Count I

### Violation of 42 U.S.C. § 2000e, *et seq.* and Mass. Gen. Laws. ch. 151B
### (Discrimination on the Basis of Race)

51.    Plaintiffs repeat and re-allege the facts contained in the foregoing paragraphs.

52.    Plaintiffs are members of a class protected by 42 U.S.C. § 2000e and Mass. Gen. Laws. ch. 151B and are qualified for employment by the BPD.

53.    As alleged above, the plaintiffs have satisfied the necessary administrative

14

prerequisites to the filing of a civil action asserting claims arising under 42 U.S.C. § 2000e and Mass. Gen. Laws. ch. 151B.

54.    As alleged above, the defendants have failed and refused to (a) give any meaningful consideration to independent test results that show the affected officer or applicant to be drug-free at the time the Hair Test yielded a false positive result or to service records that show no indication of illegal drug use; and (b) utilize alternative methods and procedures with respect to drug testing and its use in making employment decisions that would have less disparate, adverse, and discriminatory impact on officers and applicants of color.

55.    As alleged above, the defendants' policies, customs, practices, and conduct (including intentional conduct) with respect to the implementation, execution, administration, supervision, related training, and use of the Hair Test in making employment decisions constitute unlawful discrimination on the basis of race against the plaintiffs, in violation of 42 U.S.C. § 2000e and Mass. Gen. Laws. ch. 151B and also constitute part of the defendants' pattern and practice of discrimination on the basis of race, including but not limited to the following:  (a) the use of a mandatory drug test (the Hair Test) that discriminates against employees and applicants on the basis of race; (b) the creation of a hostile work environment for people of color; (c) the disparate, adverse, and discriminatory alteration of the terms and conditions of the plaintiffs' employment; (d) the harassment of the plaintiffs based on race; and (e) the failure and refusal to utilize alternative methods and procedures with respect to drug testing and its use in making employment decisions that would have less disparate, adverse, and discriminatory impact on officers and applicants of color in the terms and conditions of their employment.

56.    As alleged above, the plaintiffs have suffered and continue to suffer injuries and damages as a result of the defendants' policies, customs, practices and conduct, for which the defendants are liable under the provisions of 42 U.S.C. § 2000e and Mass. Gen. Laws. ch. 151B in an amount to be proven at trial, including compensatory and punitive damages, back pay with interest, front pay, sick leave, disability leave, vacation leave, reimbursement for all lost compensation, seniority, Social Security, pre-judgment interest, and all other entitlements and

15

emoluments provided by 42 U.S.C. § 2000e and Mass. Gen. Laws. ch. 151B.

### Count II

### Violation of 42 U.S.C. § 1981 and Mass. Gen. Laws ch. 93, § 103
### ((Discrimination on the Basis of Race)

57.     Plaintiffs repeat and re-allege the facts contained in the foregoing paragraphs.

58.     Plaintiffs are members of a class protected by 42 U.S.C. § 1981 and Mass. Gen. Laws ch. 93, § 103.

59.     At all relevant times, the defendants acted under color of state law with respect to their policies, customs, practices, and conduct (including intentional conduct) concerning the implementation, execution, administration, supervision, related training, and use of the Hair Test in making employment decisions.

60.     As alleged above, the defendants have a policy, custom, and practice of failing and refusing to (a) give any meaningful consideration to independent test results that show the affected officer or applicant to be drug-free at the time the Hair Test yielded a false positive result or to service records that show no indication of illegal drug use; and (b) utilize alternative methods and procedures with respect to drug testing and its use in making employment decisions that would have less disparate, adverse, and discriminatory impact on officers and applicants of color.

61.     As alleged above, the defendants' policies, customs, practices, and conduct (including intentional conduct) constitute unlawful discrimination on the basis of race against the plaintiffs with respect to (a) the making, performance, modification, and termination of contracts; (b) the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship; and (c) the enjoyment of the full and equal benefit of all laws as enjoyed by white citizens, as guaranteed by 42 U.S.C. § 1981 and Mass. Gen. Laws ch. 93, § 103.

62.     As alleged above, the defendants' policies, customs, practices, and conduct (including intentional conduct) has, among other things, damaged the good names, reputations, honor, and integrity of the plaintiffs; lowered the plaintiffs' standing in the community; deprived

16

the plaintiffs' of employment and related compensation and benefits; and foreclosed employment opportunities for the plaintiffs.

63.     As alleged above, the plaintiffs have suffered and continue to suffer injuries and damages as a result of the defendants' policies, customs, practices, and conduct, for which the defendants are liable under the provisions of 42 U.S.C. § 1981 and Mass. Gen. Laws ch. 93, § 103 in an amount to be proven at trial, including compensatory and punitive damages in the full amount permitted by law.

### Count III

### Violation of 42 U.S.C. § 1983 and the Fourteenth Amendment Equal Protection Clause (Discrimination on the Basis of Race)

64.     Plaintiffs repeat and re-allege the facts contained in the foregoing paragraphs.

65.     At all relevant times, the defendants acted under color of state law with respect to their policies, customs, and practices, and conduct (including intentional conduct) concerning the implementation, execution, administration, supervision, related training, and use of the Hair Test in making employment decisions.

66.     As alleged above, the defendants have a policy, custom, and practice of failing and refusing to (a) give any meaningful consideration to independent test results that show the affected officer or applicant to be drug-free at the time the Hair Test yielded a false positive result or to service records that show no indication of illegal drug use; and (b) utilize alternative methods and procedures with respect to drug testing and its use in making employment decisions that would have less disparate, adverse, and discriminatory impact on officers and applicants of color in the terms and conditions of their employment, as compared with other, similarly situated BPD employees and applicants.

67.     As alleged above, the defendants' policies, customs, practices, and conduct concerning the implementation, execution, administration, supervision, related training, and use of the Hair Test in making employment decisions constitutes intentional discrimination on the basis of race against the plaintiffs, in violation of 42 U.S.C. § 1983 and the Fourteenth

17

Amendment Equal Protection Clause.

68.     As alleged above, the defendants' policies, customs, practices, and conduct have, among other things, damaged the good names, reputations, honor, and integrity of the plaintiffs; lowered the plaintiffs' standing in the community; deprived the plaintiffs of employment and related compensation and benefits; and foreclosed employment opportunities for the plaintiffs.

69.     As alleged above, the plaintiffs have suffered and continue to suffer injuries and damages as a result of the defendants' policies, customs, practices, and conduct, for which the defendants are liable under the provisions of 42 U.S.C. § 1983 in an amount to be proven at trial.

**Count IV**

**Violation of 42 U.S.C. § 1983 and the Fourteenth Amendment**
**(Due Process)**

70.     Plaintiffs repeat and re-allege the facts contained in the foregoing paragraphs.

71.     At all relevant times, the defendants acted under color of state law with respect to their policies, customs, and practices concerning the implementation, execution, administration, supervision, related training, and use of the Hair Test in making employment decisions.

72.     As alleged above, the Hair Test used by the defendants to screen BPD officers and applicants for illegal drug use is, flawed, unreliable, imprecise, arbitrary, and inherently biased against people of color -- i.e., the Hair Test has a propensity to yield false positives on hair samples taken from persons of color.

73.     As alleged above, the defendants have a policy, custom, and practice of failing and refusing to (a) give any meaningful consideration to independent test results that show the affected officer or applicant to be drug-free at the time the Hair Test yielded a false positive result or to service records that show no indication of illegal drug use; and (b) utilize alternative methods and procedures with respect to drug testing and its use in making employment decisions that would have less disparate, adverse, and discriminatory impact on officers and applicants of color in the terms and conditions of their employment.

74.     As alleged above, the defendants' policies, customs, practices, and conduct are

arbitrary and capricious in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment Due Process Clause.

75.     As alleged above, the defendants' policies, customs, practices, and conduct have deprived the plaintiffs of a fair opportunity to have evidence considered that indicates that they were drug free at the time of the Hair Test that resulted in the defendants' adverse employment decisions against them, in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment Due Process Clause.

76.     As alleged above, the defendants' policies, customs, practices, and conduct have, among other things, damaged the good names, reputations, honor, and integrity of the plaintiffs; lowered the plaintiffs' standing in the community; deprived the plaintiffs' of employment and related compensation and benefits; and foreclosed employment opportunities for the plaintiffs.

77.     As alleged above, the plaintiffs have suffered and continue to suffer injuries and damages as a result of the defendants' policies, customs, practices, and conduct, for which the defendants are liable under the provisions of 42 U.S.C. § 1983 in an amount to be proven at trial.

## Count V

### Violation of 42 U.S.C. § 1983
### (Failure to Train and Supervise)

78.     Plaintiffs repeat and re-allege the facts contained in the foregoing paragraphs.

79.     At all relevant times, the defendants acted under color of state law with respect to their policies, customs, and practices concerning the implementation, execution, administration, supervision, related training, and use of the Hair Test in making employment decisions.

80.     At all relevant times, the defendants were and are responsible for, among other things, the training and supervision of personnel charged with administering and performing the procedures involved in the Hair Test and were and are obligated by law to ensure that the implementation, execution, administration, supervision, related training, and use of the Hair Test in making employment decisions (including the defendants' policies, customs, and practices concerning the foregoing) are consistent with the Constitution and laws of the United States.

81.     As alleged above, the defendants' policies, customs, practices, and conduct have deprived the plaintiffs of rights guaranteed by 42 U.S.C. § 1983, 42 U.S.C. § 1981, 42 U.S.C. § 2000e, U.S.C. § 12112, and the Fourteenth Amendment to the United States Constitution, and the defendants have acted with deliberate indifference to the defendants' deprivations of the plaintiffs' constitutional and statutory rights.

82.     As alleged above, the defendants' policies, customs, practices, and conduct have, among other things, damaged the good names, reputations, honor, and integrity of the plaintiffs; lowered the plaintiffs' standing in the community; deprived the plaintiffs' of employment and related compensation and benefits; and foreclosed employment opportunities for the plaintiffs.

83.     As alleged above, the plaintiffs have suffered and continue to suffer injuries and damages as a result of the defendants' policies, customs, practices, and conduct, for which the defendants are liable under the provisions of 42 U.S.C. § 1983 in an amount to be proven at trial.

### Count VI

**Violation of 42 U.S.C. § 12101, *et seq.*, Mass. Gen. Laws ch. 151B**
**Mass. Gen. Laws ch. 93, § 103, and Article of Amendment 114**
**to the Massachusetts Declaration of Rights**
**(Disability Discrimination)**

84.     Plaintiffs repeat and re-allege the facts contained in the foregoing paragraphs.

85.     Plaintiffs are members of a class protected by 42 U.S.C. §§ 12102(2), 12111(8), 12112, and 12114; Mass. Gen. Laws ch. 151B; Mass. Gen. Laws ch. 93, § 103, and Article of Amendment 114 to the Massachusetts Declaration of Rights, and able to perform the essential functions of their jobs without accommodation.

86.     As a consequence of the plaintiffs' allegedly positive Hair Test results, the defendants falsely and erroneously regarded the plaintiffs as having a disability that substantially limited a major life activity, even though the plaintiffs had no such disability and were able to perform the essential functions of their jobs without accommodation.

87.     As a consequence of the plaintiffs' allegedly positive Hair Test results, the defendants treated the plaintiffs in a disparate, adverse, and discriminatory manner — as

compared with other BPD employees and applicants for employment — on the basis of the defendants' false and erroneous perception that the plaintiffs had a disability that substantially limited a major life activity, even though the plaintiffs had no such disability.

88.    As a result of the Hair Test, the defendants terminated or denied employment to the plaintiffs on the basis of the defendants' false and erroneous perception of a disability, even though the plaintiffs had no such disability.

89.    As alleged above, the defendants' conduct has deprived the plaintiffs of their right to be free from discrimination on the basis of disability as guaranteed by 42 U.S.C. § 12112, Mass. Gen. Laws ch. 151B, Mass. Gen. Laws ch. 93, § 103, and Article of Amendment 114 to the Massachusetts Declaration of Rights.

90.    As alleged above, the defendants' conduct has, among other things, (a) interfered with the plaintiffs' contractual rights; (b) deprived the plaintiffs of their rights with respect to the enjoyment of the full and equal benefit of all laws as enjoyed by white citizens; (c) damaged the good names, reputations, honor, and integrity of the plaintiffs; (d) lowered the plaintiffs' standing in the community; (e) deprived the plaintiffs' of employment and related compensation and benefits; and (f) foreclosed employment opportunities for the plaintiffs.

91.    As alleged above, the plaintiffs have suffered and continue to suffer injuries and damages as a result of the defendants' conduct, for which the defendants are liable under the provisions of 42 U.S.C. § 12112, Mass. Gen. Laws ch. 151B, Mass. Gen. Laws ch. 93, § 103, and Article of Amendment 114 to the Massachusetts Declaration of Rights in an amount to be proven at trial, including compensatory and punitive damages to the full extent permitted by law.

### Count VII

### Violation of Mass. Gen. Laws. ch. 12, §§ 11H, 11I and Rights Guaranteed by Massachusetts and Federal Law

91.    Plaintiffs repeat and re-allege the facts contained in the foregoing paragraphs.

92.    At all relevant times, the defendants acted under color of state law with respect to their policies, customs, and practices concerning the implementation, execution, administration,

supervision, related training, and use of the Hair Test in making employment decisions.

93.    As alleged above, the defendants' policies, customs, practices, and conduct have deprived the plaintiffs of rights guaranteed by Mass. Gen. Laws. ch. 12, §§ 11H, 11I, 42 U.S.C. § 2000e; 42 U.S.C. § 1981; 42 U.S.C. § 1983; 42 U.S.C. § 12112; the Fourteenth Amendment to the United States Constitution; Mass. Gen. Laws ch. 151B; Mass. Gen. Laws ch. 93, § 103; and Articles 1, 10, 11, and 12 of, and Article of Amendment 114 to, the Massachusetts Declaration of Rights.

94.    As alleged above, the defendants have used or attempted to use threats, intimidation, and coercion in interfering with, attempting to interfere with, and depriving the plaintiffs of rights guaranteed by Mass. Gen. Laws ch. 12, §§ 11H and 11I ; 42 U.S.C. § 2000e; 42 U.S.C. § 1981; 42 U.S.C. § 1983; 42 U.S.C. § 12112; the Fourteenth Amendment to the United States Constitution; Mass. Gen. Laws ch. 151B; Mass. Gen. Laws ch. 93, § 103; and Articles 1, 10, 11, and 12 of, and Article of Amendment 114 to, the Massachusetts Declaration of Rights.

95.    As alleged above, the defendants' policies, customs, practices, and conduct have, among other things, damaged the good names, reputations, honor, and integrity of the plaintiffs; lowered the plaintiffs' standing in the community; deprived the plaintiffs' of employment and related compensation and benefits; and foreclosed employment opportunities for the plaintiffs.

96.    As alleged above, the plaintiffs have suffered and continue to suffer injuries and damages as a result of the defendants' conduct in violation of Mass. Gen. Laws ch. 12, §§ 11H and 11I; 42 U.S.C. § 2000e; 42 U.S.C. § 1981; 42 U.S.C. § 1983; 42 U.S.C. § 12111; the Fourteenth Amendment to the United States Constitution; Mass. Gen. Laws ch. 151B; Mass. Gen. Laws ch. 93, § 103; and Articles 1, 10, 11, and 12 of, and Article of Amendment 114 to, the Massachusetts Declaration of Rights, for which the defendants are liable under the provisions of Mass. Gen. Laws. ch. 12, §§ 11H and 11I in an amount to be proven at trial.

**Count VIII**

**Declaratory Judgment, Mass. Gen. Laws ch. 231A**

97.    Plaintiffs repeat and re-allege the facts contained in the foregoing paragraphs.

98.    As alleged above, there is an actual controversy between the plaintiffs and the defendants concerning the lawfulness of the defendants' policies, customs, practices, and conduct with respect to the implementation, execution, administration, supervision, related training, and use of the Hair Test in making employment decisions.

99.    Pursuant to Mass. Gen. Laws ch. 231A, § 1, the plaintiffs are entitled to a declaratory judgment stating that the defendants have violated rights guaranteed them by 42 U.S.C. § 2000e; 42 U.S.C. § 1981; 42 U.S.C. § 1983; 42 U.S.C. § 12112; the Fourteenth Amendment to the United States Constitution; Mass. Gen. Laws ch. 151B; Mass. Gen. Laws ch. 93, § 103; Mass. Gen. Laws ch. 12, §§ 11H and 11I; Articles 1, 10, 11, and 12 of, and Article of Amendment 114 to, the Massachusetts Declaration of Rights.

100.    The plaintiffs also are entitled to further relief as may be warranted under Mass. Gen. Laws ch. 231A, § 5.

**Count IX**

**Permanent Injunction**

101.    Plaintiffs repeat and re-allege the facts contained in the foregoing paragraphs.

102.    The defendants' policies, customs, practices, and conduct with respect to the implementation, execution, administration, supervision, related training, and use of the Hair Test in making employment decisions is in violation of rights guaranteed to the plaintiffs by 42 U.S.C. § 2000e; 42 U.S.C. § 1981; 42 U.S.C. § 1983; 42 U.S.C. § 12112; the Fourteenth Amendment to the United States Constitution; Mass. Gen. Laws ch. 151B; Mass. Gen. Laws ch. 93, § 103; Mass. Gen. Laws ch. 12, §§ 11H and 11I; Articles 1, 10, 11, and 12 of, and Article of Amendment 114 to, the Massachusetts Declaration of Rights.

103.    Absent the granting of permanent injunctive relief, enjoining the defendants' unlawful policies, customs, practices, and conduct, the plaintiffs will continue to be irreparably

harmed by said unlawful policies, customs, practices, and conduct, for which there is no adequate remedy at law.

PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE

WHEREFORE, plaintiffs pray that this Court:

(a)    enter judgment against the defendants and in favor of the plaintiffs on all counts of the Complaint;

(b)    enter judgment against the defendants declaring that the policies, customs, practices, and conduct set forth in this Complaint are in violation of 42 U.S.C. § 2000e; 42 U.S.C. § 1981; 42 U.S.C. § 1983; 42 U.S.C. §§ 12112; the Fourteenth Amendment to the United States Constitution; Mass. Gen. Laws ch. 151B; Mass. Gen. Laws ch. 93, § 103; Mass. Gen. Laws ch. 12, §§ 11H and 11I; Articles 1, 10, 11, and 12 of, and Article of Amendment 114 to, the Massachusetts Declaration of Rights;

(c)    issue a permanent injunction enjoining the defendants from further violating the plaintiffs' rights asserted in this Complaint;

(d)    order the defendants to make the plaintiffs whole by providing appropriate back pay with interest, front pay, sick leave, disability leave, vacation leave and reimbursement for all lost compensation and benefits, Social Security, pre-judgment interest, seniority, and all other entitlements and emoluments in an amount to be proven at trial and to take other affirmative steps immediately to eliminate the effects of the discriminatory and otherwise unlawful policies, customs, practices, and conduct set forth in this Complaint;

(e)    order the defendants immediately to (i) reinstate the plaintiffs, with seniority and with all required adequate protective measures in place, to the positions that they would now occupy but for the defendants' unconstitutional and otherwise unlawful policies, customs, practices, and conduct; and (ii) adjust the plaintiffs' wage rate, salary, bonuses, seniority, and benefits to the levels that they would enjoy but for said unconstitutional and otherwise unlawful policies, customs, practices, and conduct;

(f)    award the plaintiffs compensatory and punitive damages to the full extent permitted by law;

(g)    award the plaintiffs reasonable attorneys' fees, costs, and expenses incurred in pursuing this action to the full extent permitted by law;

(h)    retain jurisdiction over this action until the defendants have fully complied with the orders of this Court and require the defendants to file such reports as is necessary to supervise such compliance; and

(i)    grant such other, further relief that the Court deems just and proper.

24

Respectfully submitted,

**Ronnie Jones, Richard Beckers, Walter Washington, William Earl Bridgeforth, Shawn N. Harris, Eugene Wade George C. Downing, Jr., Clararise Bristow, Rachelle Couch, Keri Hogan, and the Massachusetts Association of Minority Law Enforcement Officers,**

By their attorneys,

_____
Nadine Cohen, BBO # 090040
Lawyers' Committee for Civil Rights
  Under Law of the Boston Bar Association
294 Washington Street, Suite 443
Boston, Massachusetts 02108
(617) 482-1145

_____/s/ Rheba Rutkowski_____
Paul Robertson, BBO # 562421
Rheba Rutkowski, BBO # 632799
Rachael Splaine Rollins, BBO # 641972
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA 02110
(617) 951-8000

_____
Maricia Woodham, BBO # 600886
SABEL & SABEL, P.C.
Hillwood Office Center
2800 Zelda Road; Ste. 100-5
Montgomery, AL 36106
(334) 271-2770

Dated:  April 7, 2006

LITDOCS/636659.1