UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| RONNIE JONES, RICHARD BECKERS, WALTER R. WASHINGTON, WILLIAM E. BRIDGEFORTH, SHAWN N. HARRIS, EUGENE WADE, GEORGE C. DOWNING, JR., CLARARISE BRISTOW, RACHELLE COUCH, KERI HOGAN AND THE MASSACHUSETTS ASSOCIATION OF MINORITY LAW ENFORCEMENT OFFICERS, | ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 05-11832-GAO |

Plaintiffs,                    )

v.                                        )

CITY OF BOSTON, BOSTON POLICE
DEPARTMENT, and KATHLEEN O'TOOLE,
as she is Commissioner of the Boston Police
Department,

Defendants.                    )
_____)

## DEFENDANTS' MEMORANDUM IN SUPPORT OF
## MOTION FOR A PROTECTIVE ORDER

The Defendant, City of Boston (hereafter, "Defendant" or "City"), seeks a two-fold

protective order.  First, the City seeks an order prohibiting the depositions of eight non-party

police officers who have received positive hair drug test results, followed by negative safety net

results (hereafter "safety net negative officers") because (1) these non-party officers' deposition

testimony bears no relevance on any material issue in this litigation's first phase of discovery; (2)

depositions of these nonparty officers on such personal, irrelevant matters as their possible use of

illicit drugs constitutes an unnecessary intrusion of these non-parties' privacy; and (3)

depositions of these nonparty officers amounts to harassment, is burdensome to the City, and contravenes the very purposes for this litigation's streamlined two-phase discovery.

Additionally, the City seeks protection from the proposed depositions of 15 former and current employees, including the incumbent Police Commissioner (who has only held the position since December 2006), because these depositions duplicate other already completed discovery, is cumulative of other evidence, and since the information in the possession of these individuals does not pertain to the main issue to be addressed in the first phase of this litigation – namely, whether the hair drug test is accurate and reliable – the burdensomeness of the proposed discovery greatly outweighs its probative value[1].

## I.     BACKGROUND

### A.     Overview of Plaintiffs' Claims and Phased Discovery

This case is based on claims made by individual officers and MAMLEO, an organization "represent[ing] the interests of all BPD law enforcement personnel and applicants of color" (First Amended and Supplemental Complaint, ¶ 24). Plaintiffs allege that the hair testing program in place at the BPD is "flawed" and results in "racially biased" results, and is unlawful because it has a disparate impact on officers and candidates of color, used despite the availability of alternative testing methods and procedures, and constitutes discrimination. (First Amended and Supplemental Complaint, ¶ ¶ 1, 2). By agreement of the parties, and to reduce the voluminous nature to anticipated discovery, the Court and the parties have divided the discovery events of the case into roughly two stages, the first dealing with issues impacting the claims common to all parties, namely, whether the hair drug test is accurate and reliable ("Phase One"), and the issues peculiar to each individual plaintiff during the second ("Phase Two").

---

[1] Plaintiffs' have noticed these depositions, but characterize them as tentative pending completion of the depositions already scheduled. Defendants move with regard to these depositions to avoid piecemeal litigation on this issue.

B.    <u>Completed "Phase One" Discovery To Date</u>

At this juncture, the Defendants have completed significant discovery during Phase One of discovery. The defendants not only have answered the plaintiff's extensive interrogatories, but have also made numerous former and current employees available for depositions. To date, six depositions of the Defendants have been completed, including the depositions of two former Police Commissioners and the former Acting Police Commissioner. These individuals testified regarding their knowledge about the reasons the hair drug test was implemented, the scope of discipline imposed for a first and subsequent failure, and the procedures whereby hair is collected for testing.

Former Police Commissioner Paul F. Evans, former Police Commissioner Kathleen O'Toole, former Acting Police Commissioner and former Superintendent in command of the Bureau of Internal Investigations Albert Goslin, and Captain Detective Thomas Dowd were deposed. All three former Commissioners testified to the policy reasons underlying the Department's use of a hair drug test, and testified that they had no personal knowledge regarding the science used to determine the hair drug test results. (Exhibit A, Goslin Dep. At 24-25, 27 – 30). Former Commissioner Evans, Superintendent Goslin and Dowd testified that the use of the hair drug test had been the subject of negotiations with the Department's sworn unions, and that the discipline imposed for drug test failures is itself a matter of contract between the Department and the unions. (Ex. A, Goslin Dep. At 22, 27-29; Exhibit B, Evans Dep. at 6-9, 11-19, 40, 43-44; Exhibit C, O'Toole Dep. at 21-22, 30-31, 33-34).

Roberta Mullan, Director of Occupational Health, was deposed. Ms. Mullan has been the primary person involved in the hair collection procedures at the Department. She testified as to the training she received on hair collection, the training given to the staff in her unit who

perform hair collection, the storage and security provisions maintained in the unit to prohibit tampering with the hair samples, and the process by which officers are noticed to submit to the hair test. She testified that she has no personal knowledge regarding the science used to test the hair samples. (Exhibit F, Mullan Dep., at 30 – 33, 42 – 45  54 – 57, 58 – 61, 170 - 173, 178 – 181).

Sergeant Detective Marisela Perez, keeper of records for the Bureau of Internal Investigations, was deposed regarding the process by which the Department is informed of an officer's hair test result (Exhibit D, Perez Dep. at 18, 26-27, 33, 41-42), the maintenance of records regarding hair testing in the Internal Affairs Division (Ex. D at 26-33, 88), and as to conversations she had with individuals who were notified that they had failed the hair test (Ex. D at 18, 24). She, too, testified that she does not have personal knowledge regarding the science involved in hair testing (Ex. D,. 13-17, 34-35).

The City has provided Plaintiffs with voluminous documentary evidence, including but not limited to arbitration awards affirming the use of the hair drug test and supporting challenges to its reliability, testimony of City and Union experts offered at arbitration;  the test support documents for each plaintiff, a chart indicating each officer who has failed the hair drug test with the resulting discipline, race and gender of each, and drug(s) indicated by the test; all documents reflecting officers who failed the hair drug test and passed a safety net test, along with race, gender and drug(s) indicated; strength reports of the BPD's sworn population from 1998 to the present, scientific articles in the City's  possession, and all documents regarding the City's relationship with the hair drug testing lab, Psychemedics[2].

---

[2] Plaintiffs have noticed the deposition of Psychemedics, but, on information and belief, the deposition has not been scheduled pending resolution of disputes over documents between Plaintiffs and Psychemedics.

C.    **Additional Discovery Sought By Plaintiffs**

In addition to the above, the plaintiffs have noticed seven (7) depositions of former Department personnel, including a third prior commander of the Bureau of Internal Investigations, the former Keeper of Records for the Bureau of Internal Investigations (drug test results); the former Director of Human Resources, former Deputy Director of Labor Relations, two former Counsel to the Office of Labor Relations, and the former Chief of the Bureau of Administrative Services.

II.    **STANDARD OF REVIEW**

This court has broad discretion in "shaping the parameters of pretrial discovery". Aponte-Torres v. University of Puerto Rico, 445 F.3d 50, 59 (1st Cir. 2006). Pursuant to Fed. R. Civ. P. 26(b):

> Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. Fed. R. Civ. P. 26(b)(1).

A discovery request that is relevant may be limited if the court finds that it is "unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive…" Fed. R. Civ. P. 26(b)(2). A protective order may issue if, for good cause shown the order is required to protect a person from "annoyance, embarrassment, oppression, or undue burden or expense…" Fed. R. Civ. P. 26(c). As the party moving for a protective order, the City has the burden of showing the existence of good cause for

issuance of the protective order.  <u>Church of Scientology of Boston v. Internal Revenue Service</u>, 138 F.R.D. 9 (D. Mass. 1990), and cases cited.

Discovery, like all matters of procedure, has ultimate and necessary boundaries. <u>Oppenheimer Fund v. Sanders</u>, 437 U.S. 340, 351 (1977).  Accordingly, a "court should develop the parameters of ⋯ discovery ⋯ by carefully weighing the interests involved . . . ." Fed.R.Civ.P. 26(b)(1).  Rule 26(c) confers broad powers on the court to preclude discovery even though the materials are within the scope of 26(b),  <u>Santiago v. Fenton</u>, 891 F.2d 373, 379 (1st Cir. 1989), and allows courts to impose limitations on pre-trial discovery.  See <u>Amistar Jet Charter, Inc. v. Singal Composites</u>, 244 F.3d 189, 192 (1st. Cir. 2001).

In fact, "Fed.R.Civ.P. 26(b)(1) was added to tailor discovery to the issues involved in the particular case and prevent <u>over discovery</u>."   <u>Hoyt v. Connare</u>,  202 F.R.D. 71, *73 -76 (D.N.H. 1996), <u>citing</u> <u>Mack v. Great Atlantic and Pacific Tea Co., Inc</u>., 871 F.2d 179, 187 (1st Cir. 1989) (citing Fed.R.Civ.P. 26 Advisory Committee's Notes (1983 amendments)) (emphasis added). The parties themselves "have a[n] obligation to tailor [discovery requests] to suit the particular exigencies of the litigation.  They ought not to be permitted to use broadswords where scalpels will suffice, nor to undertake wholly exploratory operations in the vague hope that something helpful will turn up." <u>Mack v. Great Atlantic & Pacific Tea Co., Inc.</u>, 871 F.2d 179, 187 (1st Cir. 1989).  So-called "fishing expeditions" are prohibited.  See <u>Ameristar Jet Charter, Inc. v. Singal Composites</u>, 244 F.3d 189, 192 (1st Cir. 2001).

II.     **GOOD CAUSE EXISTS TO BAR THE PLAINTIFFS' DEPOSITIONS OF NON-PARTY POLICE OFFICERS DURING PHASE ONE OF DISCOVERY BECAUSE SUCH DEPOSITION TESTIMONY IS NOT ONLY IRRELEVANT AND IMMATERIAL BUT ALSO CONSTITUTES AN UNWARRANTED INVASION OF THESE NON-PARTY OFFICERS' PRIVACY.**

Those officers who received safety net negative results ought not to be subject to deposition. The "safety net negative" officers have a reasonable expectation that their personal privacy will not be invaded. The Department Rule establishing hair drug testing assures officers who first test positive, then receive a safety net negative result, will not be subject to discipline, and a record of the initial drug failure will not be maintained by Internal Affairs (thus will not be used as the basis for any adverse employment action against them). See Exh. E, BPD Rule 111. "Safety net negative" officers therefore have a reasonable expectation that they will not be subject to deposition on the possible reasons why they initially failed the hair drug test. See Doe v. Town of Plymouth, 825 F.Supp. 1102, 1107 (D. Mass. 1993) (the Constitution protects an individual interest in avoiding disclosure of personal matters, and the constitutional right to privacy is implicated by the disclosure of a broad range of information). The officers' expectation of privacy "encompasses an interest in avoiding disclosure of personal matters." Borucki v. Ryan, 827 F.2d 836, 839 (1st Cir. 1987). The information plaintiffs seek to inquire into constitutes information concerning each non-party officer's potential drug use (and thus, their participation in criminal activity). This type of information – particularly when the deponent is an active and non-party police officer – is sensitive, highly personal, and, absent any compelling need, should be protected from disclosure.[3]

Public policy, as developed in applicable state legislation, also favors protecting employees from a baseless fishing expedition into their personal lives. Under the Commonwealth's Freedom of Information Act, M. G.L. c. 4 § 7, information "of a highly personal nature" is usually exempt from public disclosure. See Attorney General v. Assistant

---

[3] The Department is in an awkward position of seeking to protect officers from disclosure of criminal activity – something the Department would normally be interested in identifying itself. However, as is clear on the record of this case, the hair drug test is the product of collective bargaining negotiations and the safety net provisions of the resulting negotiated rule forbids the Department from taking corrective action against an officer who initially tests positive, then receives a negative result on the safety net.

Comm'r of the Real Property Dept. of Boston, 380 Mass. 623, 626, n.2 (1989).  Accordingly, the courts protect personal information from disclosure, recognizing the heightened privacy interests implicated.   See Fitzgerald v. Morrison, 14 Mass.L.Rptr. 283, 2002 WL 389872 (Mass. Super.2002) (Donohue, J.); Wakefield Teachers Association v. School Committee of Wakefield, et al., 431 Mass. 792, 731 N.E.2d 63 (2000)( disclosure of public school teacher's disciplinary records prohibited because they comprise "part of an individual's personnel information" and are thus, absolutely exempt from disclosure pursuant to M.G.L. c. 4, §7).

Additionally, General Laws c. 214, § 1B, inserted by St.1974, c. 193, § 1, also protects against disclosure because that statute, in pertinent part, provides that "[a] person shall have a right against unreasonable, substantial or serious interference with his privacy."   The Massachusetts Supreme Judicial has interpreted this statute "to proscribe the required disclosure of facts about an individual that are of a highly personal or intimate nature when there exists no legitimate, countervailing interest."  Bratt v. International Business Machines Corp.  392 Mass. 508, *517-518 (1984); see, Cort v. Bristol-Myers Co., 385 Mass. 300, 307-308 (1982).

While the parties have executed a Confidentiality Agreement in this case, there is no protection – short of an order prohibiting the taking of these depositions – that would adequately protect the safety net negative non-party officers' privacy rights. The deposition of these individuals would undoubtedly inquire into the details of their personal lives, and would seek to discover when, and under what circumstances, the non-party officers' had experienced substance abuse or exposure to illicit drugs.

There is no reason why these officers should be forced to answer questions of this nature in this litigation.  "[W]hile discovery is usually broad," there is no reason to believe that the need for the deposition testimony of these officers,  "even if marginally relevant, outweigh[s] the

privacy interests of these individuals." Whittingham v. Amherst College, supra at 127-128, citing Miles v. Boeing, Co., 154 F.R.D. 112, 115 (E.D. Pa. 1994). These officers are not parties to the case. There is no good faith reason to believe that they can offer any information into the testing process or the scientific procedures that are used by the testing lab. Deposing these officers, under these circumstances, falls well beyond the lines of "over discovery" and amounts to harassment. The court should order that this discovery not be had.

### III.   GOOD CAUSE EXISTS TO BAR THE PLAINTIFFS' FIFTEEN ADDITIONAL DEPOSITIONS OF FORMER AND CURRENT POLICE DEPARTMENT EMPLOYEES BECAUSE THEIR TESTIMONY IS NOT ONLY IRRELEVANT, BUT ALSO DUPLICATIVE OF ALREADY COMPLETED EXTENSIVE PHASE ONE DISCOVERY.

The City also opposes the proposed depositions of 15 present and former personnel, in addition to the twelve depositions already conducted or noticed. Presumably, plaintiffs wish to depose every individual who has had a role in the implementation of the hair drug test since its negotiated acceptance, in 1999. The City submits that this proposed discovery is unreasonably cumulative or duplicative of depositions already completed Phase One discovery. For example, plaintiffs have noticed the depositions of Robert Harrington and Marie Donahue. Harrington is the current Superintendent commanding the Bureau of Internal Investigations, and has held that position since approximately June 2006. Harrington undoubtedly can speak to the disciplinary penalties imposed for violations of the hair drug policy during the roughly seven months that he has been in the position, repeating the testimony already offered by Goslin (and anticipated to be offered by the two former commanders currently noticed and/or deposed, James Hussey and Thomas Dowd). Likewise, Donahue, who is the Deputy of the Bureau of Internal Investigations, may also speak to the discipline imposed. However, since it is a matter of record that the hair drug test and the penalties associated therewith were negotiated with the sworn police unions and

codified in Rule 111, it is difficult to see that additional testimony on the disciplinary process is necessary.

Nor, the City stresses, does this testimony illuminate the issue that plaintiffs have identified as the main reason for their bringing this suit. None of the Department employees, past or present, are scientists; none have been identified by the Department as having specialized knowledge with regard to the science underlying the hair test process. The City submits that under these circumstances, it is unreasonable and vexatious to force the City to incur the cost and inconvenience of submitting to 15 depositions of lay witnesses who do nothing to advance to the ultimate issue in this litigation.

IV.    **CONCLUSION**

"The discovery rules are not intended as a broad license to mount serial fishing expeditions." Aponte-Torres v. University of Puerto Rico, 445 F.3d at 59.   Since the depositions of the safety net officers is not relevant to the issues in this case and would expose them to annoyance, embarrassment, oppression,  and further, as the depositions of multiple past and present employees would expose the City to undue burden and expense, see Fed. R. Civ. P. 26(c), the City respectfully requests that the discovery not be had.

**ORAL ARGUMENT REQUESTED**

Respectfully submitted,

DEFENDANTS CITY OF BOSTON,
BOSTON POLICE DEPARTMENT, AND
KATHLEEN O'TOOLE

By their attorneys,


  /s/ Mary Jo Harris
Mary Jo Harris, BBO # 561484
Morgan, Brown & Joy, LLP
200 State Street
Boston, MA 02109-2605
(617) 523-6666


  /s/ Helen G. Litsas
Helen G. Litsas, BBO# 644848
City of Boston Law Department
City Hall, Room 615
Boston, MA 02210
(617) 635-4023


Dated: January 29, 2007

## **CERTIFICATE OF SERVICE**

I, Mary Jo Harris, hereby certify that this document was forwarded to counsel for the Plaintiffs on this date by hand.


_/s/ Mary Jo Harris_____
Mary Jo Harris


## **7.1 Certification**


Undersigned counsel certifies that pursuant to LR, D. Mass. 7.1(a)(2), she contacted Plaintiffs' counsel and we were unable to resolve or narrow the issue prior to filing the above motion.

1/29/07                                    /s/ Mary Jo Harris
Date: _____          _____
                                              Mary Jo Harris

EXHIBIT A

Page 1

VOLUME:  1

PAGES:  1-60

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

RONNIE JONES, ET AL.          ) CIVIL ACTION

      PLAINTIFFS,          ) NO.:  05-11832-GAO

V.                            )

CITY OF BOSTON, ET AL.,       )

      DEFENDANTS.               )

_____)

[TRANSCRIPT IS DESIGNATED CONFIDENTIAL]

DEPOSITION OF ALBERT GOSLIN

DATE:        JANUARY 8, 2007

TIME:        10:05 A.M.

PLACE:       BINGHAM MCCUTCHEN, LLP

             150 FEDERAL STREET

             BOSTON, MA  02110

Case 1:05-cv-11832-GAO    Document 36-2    Filed 01/29/2007    Page 3 of 23

1/8/07 DEPOSITION OF ALBERT GOSLIN          RE:      RONNIE JONES, ET AL. V. CITY OF BOSTON, ET AL.

7 (Pages 22 to 25)

Page 22

1      A: Well, since I don't know a lot about the science at
2   all, it's a process that was I believe researched. It was a
3   process that was agreed to by Unions who I suspect did due
4   diligence in doing the research before they agreed to enter into
5   a contract utilizing this particular process. So based on those
6   kind of things a lot of people seem to be satisfied with it.
7      Q: Part of your earlier statement was "it's a strong
8   indicator that it's fair and accurate". What do you mean by
9   that?
10     A: I think over a period of time there's been an awful
11  lot of people who have been tested and it seems to withstand
12  some level of scrutiny over those numbers of years with the
13  number of people that have taken it. I'm not aware of a lot of
14  people who have objected to the process.
15     Q: What kind of scrutiny?
16     A: Well, the fact that some samples are taken, they're
17  examined in some scientific fashion and returned with a high
18  degree of negative results through the vast majority of people
19  who have taken the test on numerous occasions. I think that
20  over time people get satisfied with a process that seems to
21  work.
22     Q: Has anyone ever complained to you that the hair drug
23  test was not accurate?
24     A: I think on a couple of occasions, I can't recall

Page 23

1   specifically, I was present for someone signing a settlement
2   agreement in my presence had mentioned that they didn't think it
3   was accurate or weren't satisfied with the results of it. I
4   believe that's probably happened on a couple of occasions but I
5   don't have a specific memory of who it was.
6      Q: So you don't know who it was?
7      A: No.
8      Q: Was that the only time someone complained to you about
9   the accuracy of the hair drug test?
10     A: Yes. I believe so, yes.
11     Q: Are you aware of any general controversy surrounding
12  the reliability of the hair drug test?
13        MS. HARRIS: Objection. You may answer.
14     A: General controversy? I wouldn't say I know of a
15  general controversy. I think there is some controversy. As
16  characterizing it as being general to mean a lot of individuals,
17  I'm not aware of that.
18     Q: Are you aware of any controversy surrounding the
19  reliability of the hair drug test?
20        MS. HARRIS: Objection.
21     A: Yeah, I've heard that there's individuals who are not
22  satisfied with the process.
23     Q: Are those the only controversies of which you are
24  aware?

Page 24

1      A: Yes. I've never heard of any external controversy.
2      Q: Have you or anyone under your direction ever conducted
3   any research or done anything to investigate the controversies
4   that you've heard of in the past concerning the hair drug test?
5         MS. HARRIS: Objection.
6      A: No.
7      Q: When you were the Acting Police Commissioner did you
8   ever consider abolishing the hair drug test?
9      A: No.
10     Q: Why not?
11     A: Well, first of all, I was the Acting Police
12  Commissioner. I didn't think it would be appropriate for me to
13  consider anything of that magnitude.
14     Q: Do you believe that the hair drug test should be
15  abolished?
16     A: No.
17     Q: Why not?
18     A: I think it accurately reflects the results that we
19  receive.
20     Q: Did you play any role at all in the Department's
21  decision to continue using the hair drug test?
22     A: I did not.
23     Q: Does the Boston Police Department believe that the
24  hair drug test is conclusive evidence of drug use?

Page 25

1         MS. HARRIS: Objection.
2      A: I believe so, yes.
3      Q: Why?
4      A: For the same basic reasons. We've had it, it seems to
5   be a very reliable mechanism to determine whether people have
6   been using certain types of drugs.
7      Q: Do you believe that the urine test is reliable?
8      A: To some extent.
9      Q: What do you mean by that?
10     A: Well, my understanding is it's only valid for a very
11  short period of time. I think there's probably potential to
12  mask it, to dilute it, to do things that wouldn't give you the
13  sample that you're necessarily looking for when you requested
14  the sample be provided.
15     Q: Do you believe the that hair drug test is more
16  reliable than the urine test?
17     A: I do.
18     Q: Why?
19     A: I think it measures, significantly measures a sampling
20  that would be difficult to change, dilute. It seems to cover,
21  as I understand it, a significant amount of time in terms of
22  when the drugs could have been utilized. I think it's just more
23  detailed, more accurate, reliable.
24     Q: Do you know what time frame or window of detection,

1/8/07 DEPOSITION OF ALBERT GOSLIN          RE:      RONNIE JONES, ET AL. V. CITY OF BOSTON, ET AL.

8 (Pages 26 to 29)

### Page 26

1  what the period of the window of detection is for the hair drug
2  test?
3      A: I understand it goes back and accurately reports about
4  three months previous to use.
5      Q: Do you know what the time frame is for the urine test?
6      A: I think I've had conversations that tell me several
7  days, possibly.
8      Q: Conversations with who?
9      A: Just general conversations with people in talking
10 about urine versus hair. I probably had conversations with
11 several people over the years but I can't say I had a
12 conversation with this person, or that person, or another person
13 but just kind of in general.
14     Q: Earlier you stated that the hair drug test is hard to
15 dilute. What do you mean by that?
16     A: Well, as far as I know I don't know of anything you
17 can do to a sampling of hair that I'm aware of that would have
18 an opportunity to change whatever is in the hair sample.
19     Q: So what is your basis for stating that the hair drug
20 test is hard to dilute?
21     A: I just can't think of a way that someone, once they've
22 given a sample of their hair, could have an ability to change
23 whatever is in that sample.
24     Q: So that statement is not based on any research?

### Page 27

1      A: No scientific, no just my own belief.
2      Q: Have you ever read any scientific articles or
3  materials of any kind regarding the hair drug test?
4      A: I have not.
5      Q: Have you ever directed anyone to read such materials?
6      A: I have not.
7      Q: Why not?
8      A: I wasn't in a position to have to do that. I believe
9  that as the process had been in place for a number of years I
10 was never in a positive within the organization back when the
11 process was accepted and put in place to have done it then. All
12 these years later I relied on the fact that folks had done, I
13 assumed they had done enough research, both from the Department
14 side and from the labor side to feel comfortable with what that
15 process looked like.
16     Q: Have you ever seen any of the research that you're
17 referring to?
18     A: No, I have not personally, no.
19     Q: So what do you base your opinion with regards to your
20 statement that the hair drug test is reliable?
21     MS. HARRIS: I'll object to being asked and
22 answered. You can answer.
23     Q: Do you believe that the hair drug test is reliable?
24     A: I do.

### Page 28

1      Q: What do you base that opinion on?
2      MS. HARRIS: Objection. Go ahead.
3      A: I believe that we have taken a number of samples of
4  folks' hairs over the years, samples of hair and we've examined
5  them, not we but the folks that do those kinds of things we
6  examined those and reported back to us in a fashion consistent
7  with appropriate protocols. There seems to be, as far as I can
8  see from folks that I engage with that it's been accepted by a
9  majority of the people that I know that have to submit to it and
10 are satisfied with the results that come from the submission of
11 those samples.
12     MS. WEBSTER: Please mark this as the next
13 exhibit.
14     (Exhibit No. 4 Marked)
15     MS. WEBSTER: Please take a moment to review
16 what's been marked as exhibit number 4.
17     (Pause While Witness Reviews Document)
18     Q: Have you had a chance to review this document?
19     A: Yes.
20     Q: Do you recognize this document?
21     A: I've seen it before, yes.
22     Q: What is it?
23     A: It's an article that appeared in the Globe written by
24 Suzanne Smalley, July 30th of '06.

### Page 29

1      Q: Who is Suzanne Smalley?
2      A: Suzanne Smalley is a Globe Staff Reporter.
3      Q: do you remember being interviewed by Suzanne Smalley?
4      A: I do.
5      Q: Let's turn to page 2 of the article. The fifth
6  paragraph from the bottom of the page up reads, "Goslin said it
7  is not fair to compare the department to other law enforcement
8  agencies, he said typically use a less sophisticated
9  urinalysis test that does not detect drugs taken more than a few
10 days before the test." Did I read that correctly?
11     A: Yes.
12     Q: What was your basis for stating that the hair test is
13 more sophisticated?
14     A: I think as I stated earlier, because of the fact that
15 it's a sample, it's hair. I believe it would be difficult to do
16 anything to it, to dilute, to change, to alter it significantly
17 and it seems to measure a much broader time frame in terms of
18 which elicit substance could be in someone's system. The
19 testing, opposed to urine which has a shorter window, my belief
20 is it would have been a more sophisticated form of testing
21 because it did measure that time frame and it also seemed to be
22 something that would be more difficult to change the makeup of
23 the sample.
24     Q: On page 2 the next paragraph down also reads, "He said

Case 1:05-cv-11832-GAO    Document 36-2    Filed 01/29/2007    Page 5 of 23

1/8/07 DEPOSITION OF ALBERT GOSLIN          RE:      RONNIE JONES, ET AL. V. CITY OF BOSTON, ET AL.

9 (Pages 30 to 33)

Page 30

1  the Boston Police method of testing officers' hair is more
2  reliable and can catch drug use dating back three months. `I
3  would expect our rate to be higher,' Goslin said in an
4  interview." What did you mean by the statement that you would
5  "expect our rate to be higher"?
6      A: Well, we're testing annually and it's hair based on my
7  former belief, my belief that I stated earlier, and the fact
8  that it was done annually as opposed to randomly and some
9  departments use random and use urine. I thought based on the
10  fact that we are getting tested annually and some departments
11  may not, that we would probably have a higher rate of failure
12  than some departments when they weren't testing their officers
13  necessarily every single year.
14      Q: You referred to some departments. Are you aware of
15  any other Police Departments that use hair drug testing?
16      A: I'm not.
17      Q: What departments are you referring to when you say,
18  "some departments"?
19      A: What I'm talking about is we had some conversations,
20  and I can't give you a specific name, with LA, New York. New
21  York I believe told us at the time they were urine but they were
22  going to hair. I believe that was told to me. LA I believe was
23  considering hair but had not gone there at that point. I'm not
24  sure if they're there now, to tell you the truth.

Page 31

1      Q: You don't remember when these conversations took
2  place?
3      A: I would think right around or just before this article
4  was written.
5      Q: And you don't remember who you spoke to?
6      A: No.
7      Q: Was anyone else from the Boston Police Department
8  privy to those conversations?
9      A: There could have been someone sitting there when I was
10  having a conversation. I don't have a specific memory.
11      Q: Was this an in face conversation or over the phone?
12      A: Over the phone, as was this interview.
13      Q: Can you remember consulting with any other Police
14  Departments about the hair drug test?
15      A: I didn't, no.
16      Q: Anyone under your direction consult with Police
17  Departments about the hair drug test?
18      A: It may have been at my direction to contact New York
19  and LA but I don't believe anyone else.
20      Q: You don't remember any other conversations with Police
21  Departments?
22      A: No.
23      Q: When you had these conversations with representatives
24  from the LA and New York Police Departments what role did you

Page 32

1  have at the Boston Police Department?
2      A: The conversations were, and it wasn't, again it wasn't
3  direct conversations I had where, I had someone reach out and
4  provide this. Who specifically on my staff I had do that, I
5  really don't recall. I was the Acting Police Commissioner so as
6  a request of Suzanne Smalley on this interview based on whatever
7  story she was writing for whatever reason she was writing it,
8  she had contacted us and expected to have an interview with me
9  based on my position.
10      Q: Did you reach out the LA and New York Police
11  Departments, or have someone under your direction do so, only
12  because of this article?
13      A: Yes.
14      Q: But you never did so before?
15      A: No.
16      Q: In your role as Acting Police Commissioner did you
17  attend any meetings or participate in any phone conferences
18  regarding the hair drug test?
19      A: I did not.
20      Q: Did you receive any regular memos of any sort
21  regarding the hair drug tests when you were Acting Police
22  Commissioner?
23      A: No.
24      Q: Any other position?

Page 33

1      A: Memos. No, pretty much anything that I was contacted
2  about with respect to hair drug testing would have been the
3  results of those tests. A series of reports as to the results
4  of people. I mean people are taking this test pretty much every
5  day, so those results come back routinely as would the
6  positives. So beyond that, not really.
7      Q: Let's go back to the conversations that took place
8  with the New York and LA Police Departments. Do you remember
9  who you asked to make those calls?
10      A: I don't.
11      Q: Let's turn back to the Globe article we were just
12  reviewing and turn to page 3. Take a look at the second
13  paragraph. This paragraph reads, "Fifty-seven percent of
14  officers who failed an initial drug test since 1999 were African
15  American, which troubles critics who believe blacks are more
16  likely to get false position results because of the texture of
17  their hair. Last year, seven former Boston Police Officers all
18  African American who lost their jobs because of what they say
19  were false positives sued the department, alleging the hair test
20  is biased. The suit is pending." Did  read that correctly?
21      A: As I see it.
22      Q: What percentage of the total number of people tested
23  since 1999 were African American?
24      MS. HARRIS: Objection.

EXHIBIT B

PAUL F. EVANS                    CondenseIt™                    11/13/03

---

**Page 1**

```
                    VOLUME:  1
                    PAGES:  1-67
                    EXHIBITS:  None

        COMMONWEALTH OF MASSACHUSETTS

        COMMISSION AGAINST DISCRIMINATION

-------------------------------x
                              :
RONNIE JONES and              :
RICHARD BECKERS,              :
        Complainants          :  DOCKET NOS.
                              :  03-BEM-00357
        vs.                   :  03-BEM-00359
                              :
CITY OF BOSTON POLICE         :
DEPARTMENT,                   :
        Respondent            :
                              :
-------------------------------x
```

DEPOSITION of BOSTON POLICE COMMISSIONER

PAUL F. EVANS, taken on behalf of the Complainants,

before Corinne J. Turra, Registered Professional

Reporter, Certified Shorthand Reporter No. 129793,

and Notary Public within and for the Commonwealth

of Massachusetts, at the offices of the Lawyers'

Committee For Civil Rights Under Law Of The Boston

Bar Association, 294 Washington Street, Suite 443,

Boston, Massachusetts, on Thursday, November 13,

2003, commencing at 8:32 a.m.

---

**Page 2**

```
1   APPEARANCES:

2       LAWYERS' COMMITTEE FOR CIVIL RIGHTS
        UNDER LAW OF THE BOSTON BAR ASSOCIATION
3       (By Maricia Woodham, Esquire),
        294 Washington Street, Suite 443,
4       Boston, Massachusetts  02108,
        Telephone:  617-988-0610,
5           For the Complainants;

6       BOSTON POLICE DEPARTMENT
        OFFICE OF THE LEGAL ADVISOR
7       (By Mary Jo Harris, Esquire
        and Margaret M. Buckley, Esquire),
8       One Schroeder Plaza,
        Boston, Massachusetts  02120,
9       Telephone:  617-343-4550,
            For the Respondent.
10

11
        ALSO PRESENT:  Richard Beckers.
12

13

14

15

16

17

18

19

20

21

22

23

24
```

---

**Page 3**

```
1                    I N D E X

2
    WITNESS        DIRECT CROSS REDIRECT  RECROSS
3
    BOSTON POLICE
4   COMMISSIONER
    PAUL F. EVANS      4
5

6

7

8       ----

9

10

11

12

13  ***  REPORTER'S NOTE:  There were no exhibits marked
14                         at the deposition.
15

16

17

18

19

20

21

22

23

24
```

---

**Page 4**

```
1                    STIPULATIONS

2           It is hereby stipulated and

3    agreed by and between counsel for the

4    respective parties that the deposition

5    is to be read and signed, but that the

6    notarization of the deponent's signature

7    is waived.

8           It is further stipulated and

9    agreed that all objections, except as to the

10   form of the questions, are reserved to the

11   time of public hearing or trial.

12       BOSTON POLICE COMMISSIONER PAUL F. EVANS,

13   being first duly sworn, was examined and

14   testified as follows:

15                 DIRECT EXAMINATION

16   Q.   (By Ms. Woodham)  Good morning,

17   Commissioner Evans.  My name is Maricia Woodham, and I

18   am one of the attorneys who represents Richard Beckers

19   and Ronnie Jones in matters that we have filed before

20   the MCAD.

21           Just give you a little bit of

22   background for the deposition.  I know you've been

23   deposed before.  But I'd appreciate if you'd answer

24   all of your questions verbally yes or no.
```

---

Page 5

1    If you need a break, just let me know,
2  and I'll be happy to give you one.
3    If at any time you don't understand my
4  question, just ask me to repeat it, and I'll be glad
5  to do so.
6    If you answer my question, I'm going to
7  assume that you understood my question. Okay?
8    A. Yes.
9    Q. Okay. Would you state your name for the
10  record.
11    A. Paul F Evans.
12    Q. And where are you currently employed?
13    A. Boston Police Department.
14    Q. And how long have you worked for the Boston
15  Police Department?
16    A. Approximately 32 years and 11 months.
17    Q. How long have you been Commissioner?
18    A. Oh, just six weeks short of 10 years.
19    Q. You'll be leaving this position as of
20  tomorrow; is that correct?
21    A. I will.
22    Q. And where will you be going?
23    A. I'm going to London to work for the home
24  office in a position called the Director of Police

Page 6

1  Standards.
2    Q. Do you know how long you'll be there?
3    A. I have a three-year contract.
4    Q. Okay. Did you review any documents in
5  preparation for your deposition today?
6    A. No.
7    Q. Did you meet with anyone in preparation for
8  your deposition today outside of your legal counsel?
9    A. No.
10    Q. Did you speak with anyone outside of your
11  legal counsel in preparation for your deposition
12  today?
13    A. No.
14    Q. When did the Department begin using the hair
15  follicle tests as a means for drug testing?
16    A. I believe January 1st of '99.
17    Q. And who made the decision to begin using
18  this test?
19    A. The decision came about as a result of
20  contract negotiations.
21    Q. And when did the contract negotiations
22  regarding the use of this test begin?
23    A. I think the negotiations would have taken
24  place probably in, again, I don't have exact dates,

Page 7

1  but I think it would have been early in '98 where a
2  contract would have been reached, and we allowed time
3  and notice, at least six months, before we actually
4  implemented the drug testing.
5    Q. And who were you in contract negotiations
6  with?
7    A. The patrolmen's association was the big
8  union that, in essence, agreed to the, yes, agreed to
9  the drug testing. The other unions, I think, if
10  memory serves me correctly, an arbitrator, they had,
11  they went to arbitration. An arbitrator ruled for,
12  for drug testing for them, the same policy that the
13  patrolmen agreed to.
14    Q. And how many unions are there within the
15  Boston Police Department?
16    A. Four sworn unions and other civilian unions.
17  The drug-testing policy applies to the sworn unions
18  and management types of civilian personnel.
19    Q. What do you mean when you say "management
20  types of civilian personnel"?
21    A. Well, I'm a civilian. I am, I take the drug
22  test. My legal advisor would take the drug test. My
23  head of administrative services, Bill Good, would.
24  The higher-level civilians we also do testing on.

Page 8

1    Q. Can you describe the process of how the
2  decision was made to actually use the drug test?
3    A. Well, at the time the Department had a
4  reasonable-suspicion standard for testing. That was a
5  result of a United, a Massachusetts Supreme Court case
6  entitled Guiney vs. Roache, where the Department had
7  tried to institute random drug testing and the Court
8  ruled that it was an unreasonable search and seizure.
9    So then at some point we negotiated the
10  issue of drug testing. I believe we came to some type
11  of an agreement, not while I was Commissioner, for
12  reasonable suspicion and two strikes and you're out.
13  I think that was implemented in early '95, if my
14  memory serves me correctly.
15    And I think in the life of that, there
16  was very, very few supervisors who detected drug use
17  and, in fact, the reasonable suspicion, there was a
18  lot of, when it did happen, it was severely challenged
19  and what-have-you. So you just didn't have, I felt in
20  my mind we weren't addressing the drug problem in the
21  Department. So it was part of the negotiations in the
22  1998 contract.
23    Q. So it was the Department -- so was it the
24  Department who first brought up using the hair drug

COB 0001852

Page 9

1 test?
2    A. Well, the Department brought that up only
3 after the patrol officers' union adamantly refused to
4 consider random urine sampling. They figured that was
5 a -- they went back to Guiney vs. Roache and said they
6 had won that; that random drug testing was a violation
7 of their constitutional rights. And we were in bitter
8 contract negotiations. So obviously we're looking to
9 resolve these bitter negotiations.
10      I was aware of other departments that
11 utilized hair testing, and suggested can we do hair
12 testing at periods, announced periods, if you will, a
13 month before and a month after their birthdays.
14    Q. And what other departments were you aware of
15 that was using the hair drug test?
16    A. At the time I was aware of, of a number of
17 them. I'm not exactly certain which ones may have. I
18 think New York might have been doing it at the time.
19    Q. And did you consult with the New York Police
20 Department surrounding the hair drug test?
21    A. I didn't personally, no.
22    Q. Did you have anyone at your direction
23 consult with the New York Police Department regarding
24 the hair drug test?

Page 10

1    A. I think we did. Others would have looked
2 into it as it became a potential way of settling the
3 contract and dealing with an issue that I felt needed
4 to be dealt with.
5    Q. And who would these others be that would
6 have consulted with the New York Police Department?
7    A. Probably people within the Bureau of
8 Administrative Services. They're the personnel, human
9 resources type people who would have been responsible
10 for that type of policy implementation.
11    Q. And how big is this bureau?
12    A. It's the administrative. They take care of
13 budgets. They will examine officers for injuries and
14 what-have-you. Off the top of my head, I don't know
15 how many personnel are actually in it, but it's mostly
16 administrative, mostly civilian.
17    Q. Did you direct any others to consult with
18 the New York Police Department surrounding the hair
19 drug test?
20    A. I think -- I'm not saying I looked -- in
21 principle we looked at the whole idea of is this, is
22 this an alternative to the random urine sample, and
23 that was explored. Exactly who was talked to, who was
24 not talked to, I, I know we looked at it and felt it

Page 11

1 was a conclusive way to go to determine drug use.
2    Q. Would you, did you make any notes
3 memorializing who you directed to consult with these
4 other individuals or other police departments?
5    A. No.
6    Q. Did the Bureau of Administrative Services
7 provide you with a report after consulting with the
8 New York Police Department?
9    A. They may have. I don't recall.
10    Q. And if they did, where would you have kept
11 that report?
12    A. I would envision it would be in Bureau of
13 Administrative Services. Obviously, you know, at some
14 point we entered into contracts. I would imagine that
15 there's paperwork that exists relative to that.
16    Q. And are we still talking about the 1998-'99
17 time frame or would this have been before that time?
18    A. I, certainly there was a stalemate, and
19 drugs was an issue that I felt needed to be addressed.
20 So there would have been a period prior to the signing
21 of the contract where this issue was explored by the
22 Department for its feasibility and its validity. We
23 sat down and we negotiated that with the union.
24      At some point we did a demonstration,

Page 12

1 and I was the individual who was demonstrated on. I
2 was the first one to do the drug test, if you will.
3 And union representatives watched the procedure.
4    Q. And when did this demonstration occur?
5    A. I would, sometime in '98 prior to the actual
6 implementation in January of '99.
7    Q. So how long prior to the 1998 contract
8 negotiations did the Department begin discussing the
9 hair test?
10    A. It would have been during 1998. I don't
11 have the exact dates.
12    Q. And how many unions were present at the
13 demonstration?
14    A. My best recollection would be it was the
15 only union that had at that point agreed to the
16 contract. We actually, I think patrol officers, the
17 largest union, they had a representative or two who
18 watched it. I went down to personnel, they snipped my
19 hair, and they went through the whole procedure.
20    Q. And the representatives from the patrol
21 officers' union who witnessed the demonstration, were
22 they police officers or were they attorneys?
23    A. Yes. Police. I don't recall if there
24 were -- I don't think there, I don't believe there

Page 13

1  were attorneys there. But, you know, much of this
2  would have been also memorialized by the Labor
3  Relations office of the Police Department in addition
4  to personnel because of the ongoing negotiations, and
5  the implementation would always have labor issues, so
6  they were probably present also.
7      Q. Were there any considerations given to the
8  patrolmen's union in exchange for the use of the hair
9  test?
10     A. Absolutely. They got a contract. I think
11 they got the Quinn Bill, which was a major raise. So
12 if you look back at what the contract was, we received
13 other things. I think we got performance evaluations,
14 and we received the right to do regular hair testing
15 on a yearly basis of all our personnel. In exchange,
16 I think they got a raise. It was like a four-, maybe
17 a six-year contract, where we were allowed to do hair
18 testing commencing in '99.
19     Q. Is the patrolmen's union still under this
20 contract?
21     A. Their contract has expired, but the contract
22 continues to live as we negotiate the next contract.
23     Q. And has hair testing, is hair testing a part
24 of the current contract negotiations?

Page 14

1      A. At some point I think they put issues on the
2  table. At some point I saw the mention of hair
3  testing, but no specifics. Just generally the whole
4  drug testing, I think, would be more appropriate as
5  something they've put on the table, but I'm not aware
6  of any elaboration as to what they, what they intend
7  to do further, and I don't think the negotiations have
8  really gotten down to be that specific, to my
9  knowledge.
10     Q. Okay. Did you or anyone at your direction
11 consult with any forensic scientists prior to the
12 implementation of this hair drug test?
13     A. I'm certain my people did as to validity. I
14 would have been informed at the time of those tests to
15 ensure that they were valid tests, that the process we
16 were entering into would withstand scrutiny and that
17 was state of the art. I'm sure all of that was done
18 because it was a part of the ongoing negotiations.
19        The patrol officers were concerned
20 about this test and what-have-you, so part of our
21 responsibility prior to signing the contract was to
22 convince them that, in fact, this was a valid process,
23 a scientifically-valid process.
24     Q. And when you say "my people" who are you

Page 15

1  referring to?
2      A. Well, that would have been the labor people
3  and the people that were negotiating the contract, and
4  I'm sure they reached out to the various experts. I
5  don't have firsthand knowledge of who, but this would
6  be the way it would work.
7      Q. And who are you referring to when you say
8  the "labor people"?
9      A. Well, I think at the time -- we've had a
10 turnover at Labor Relations over the years. I think
11 the deputy at that time would have been Deputy
12 Superintendent John Ferguson, who has since retired.
13        I'm not certain who the lawyer that
14 would have been working out of Labor Relations at that
15 time during the negotiation process. But certainly
16 there would have been City Hall lawyers.
17        There would have been, I would think
18 during this process in the ordinary course of
19 business, outside people who were experts that were
20 just informing people of how the process worked.
21        I mean that would be standard, when
22 you're entering into this type of new drug-testing
23 process, that there would be a lot of questions, and I
24 would think there were a lot of questions, and those

Page 16

1  obviously were answered to the patrol officers'
2  satisfaction.
3      Q. And who succeeded Mr. Ferguson?
4      A. Deputy Superintendent John Sullivan, who has
5  also since retired.
6      Q. And when did Mr. Ferguson retire?
7      A. Geez, I, John's been gone maybe two and a
8  half, three years now. I'd have, I'd be speculating,
9  and I have to actually get you the dates.
10     Q. So Mr. Ferguson was present at the time that
11 the tests -- in January, '99; is that correct?
12     A. John would have been there then. John was
13 involved in the negotiating process. He would have
14 been my representative at the labor negotiations as
15 the deputy superintendent. John assisted in educating
16 the officers how the practice would proceed. I think
17 we put out some brochures for people, just where to go
18 for help, that type of thing, prior to the actual
19 implementation.
20     Q. And did Mr. Ferguson provide you with any
21 type of report with respect to his contact with
22 forensic scientists?
23     A. I don't recall.
24     Q. Did you direct any other individuals to

COB 0001855

PAUL F. EVANS                    CondenseIt™                    11/13/03

Page 17

1  consult with forensic scientists regarding the hair
2  drug tests?
3      A. John would have been the lead person in
4  Labor Relations, and it would have, you know, again,
5  it would have been a hand-in-hand operation with the
6  people at the Bureau of Administrative Services and
7  City Hall labor negotiations who were all working to
8  get a contract.
9      Q. Is there a lead person at the Bureau of
10 Administrative Services?
11     A. I'm not certain. That may have been, Bill
12 Good has been the head of Bureau of Administrative
13 Services now for some time. It may have been Bill
14 Good. I just -- 10 years, the time -- I'm not
15 certain.
16         THE WITNESS: Who was there before Bill
17 Good, do you remember?
18         MS. HARRIS: I can't tell you.
19         THE WITNESS: Oh, okay.
20     A. I don't remember.
21     Q. Okay. I understand. Is Mr. Good still
22 employed with the Department?
23     A. Yes.
24     Q. You mentioned brochures previously. What

Page 18

1  brochures were handed out? Well, can you describe
2  these brochures for me.
3      A. There was concern that this was a far
4  greater test, and that it, you know, it had the
5  ability to detect for longer period of time than
6  random urine. So we wanted to make sure all our
7  officers were aware of it, if they had problems, that
8  they could get the necessary help. And I think there
9  was a concerted effort by management to educate and
10 alert officers as to what was coming and, if they had
11 a problem, get help.
12     Q. And did the Department retain copies of
13 these brochures?
14     A. I know we had them. I know they were
15 distributed. Whether or not copies still exist I'm
16 not certain.
17     Q. If they did still exist, where would they be
18 kept?
19     A. Hopefully some of them would still be in
20 Labor.
21     Q. And where is the Labor Relations' office?
22     A. The third floor of Boston Police
23 headquarters.
24     Q. Now, you testified that it would have been

Page 19

1  either Mr. Ferguson or people in Labor Relations who
2  would have consulted with any scientists regarding the
3  hair drug test. Did you direct anyone to conduct any
4  research as to the scientific validity of the hair
5  drug test?
6      A. I, again, there was a process that we were
7  going through that we had to assure people. I'm
8  certain that occurred. But who did what I'm not
9  certain of.
10     Q. And did you ever receive any document, any
11 reports or documentation regarding the validity of
12 the, the scientific validity of the hair drug test?
13     A. Over the years I've received copies,
14 numerous studies that have been done that support the
15 validity of the drug test. A number of studies. In
16 fact, that's one of the things that we've done is
17 collect a number of studies that support the validity.
18     Q. Okay. And who did you receive these studies
19 from?
20     A. Many of them coming right out of the legal
21 department.
22     Q. And did you keep copies of these studies?
23     A. Yes.
24     Q. And where are they kept?

Page 20

1      A. Legal.
2      Q. So you personally do not have copies of
3  these studies?
4      A. No.
5      Q. How many studies did you review?
6      A. I don't know off the top of my head.
7      Q. Do you recall any of the scientists involved
8  in these studies?
9      A. No.
10     Q. Now, prior to the use of the hair test, what
11 methods of drug testing had the Department used?
12     A. We used what had been contractually provided
13 for. That was urinalysis. If a supervisor had
14 reasonable suspicion that an officer was under the
15 influence of drugs, he would contact, I think at the
16 time it was SmithKline, who would arrange for a urine
17 test.
18     Q. As a result of using the hair drug test, has
19 urinalysis been abandoned by the Department?
20     A. No.
21     Q. And why not?
22     A. Urinalysis still exist. The rule hasn't
23 changed. They're still, supervisors still have the
24 ability, based on reasonable suspicion, to test

COB 0001856

Page 21

1  officers who they believe may be under the influence
2  of drugs. From a practical standpoint, I am totally
3  unaware of any reasonable suspicion test since we --
4  that I'm aware of right now, off the top of my head.
5     Now, having said that, part of the
6  contract is that anytime an officer tests positive
7  under the hair test, as part of the rehabilitation
8  agreement, they're subjected to random urine tests for
9  three years after testing positive. So urinalysis
10  still plays a role in the Department, but it plays a
11  role in the rehabilitation agreement.
12     Q. Since the Department began using the hair
13  drug test in '99, have you or anyone under your
14  direction consulted with any other police departments
15  around the country that use the hair drug test?
16     A. Periodically we go to major city chiefs and
17  it will come up, the issue of drug testing, and we'll
18  talk about it, and we'll talk about how we do it and
19  what-have-you. We'll exchange maybe conversation.
20  And we'll look at each other's policies. That's
21  something, that occurs.
22     Q. Okay. And what other major cities have you
23  discussed these policies with?
24     A. The one that comes readily to mind I think

Page 22

1  is New York. I'm sure there's others, but New York
2  comes to mind.
3     Q. And who would go on these periodic visits to
4  the major cities?
5     A. Well, there would be, I'd have discussions
6  at what would be called major city chiefs' meetings
7  where, you know, the issue of drug testing certainly
8  was an issue in the '90's. Drug testing was an issue,
9  period. So we'd talk about, how the various ways
10  departments did drug testing and what-have-you. So
11  I'd be involved in that.
12     Q. Okay. But I'm talking about since the hair
13  test has been used by the Department, have you or
14  anyone under your direction contacted any other major
15  city police departments with respect to the hair drug
16  test.
17     A. I'm not aware.
18     Q. Did you receive any advice from the New York
19  Police Department regarding the hair drug test?
20     A. I didn't. I didn't. Whether or not my
21  people did, I'm not certain.
22     Q. And when you say your "people," you're
23  talking about the Bureau of Administrative Services
24  and the Labor Relations Department?

Page 23

1     A. During the negotiation process, if they
2  reached out and received advice, I'm not, I'm not
3  specifically aware of that.
4     Q. How many people are employed in the Labor
5  Relations Department?
6     A. How many are employed today?
7     Q. Well, in, let's start in 1998 at the time
8  that you were negotiating the contract.
9     A. Normally it could run from three to,
10  normally three to five. How many were during these
11  negotiations I'm not certain.
12     Q. And are these individuals attorneys or
13  they're just civilians?
14     A. Labor Relations is usually a sworn member of
15  the Department, a command staff member who has the
16  rank of deputy superintendent for the last number of
17  years, an attorney, and usually a couple of maybe
18  secretaries and aides. So usually there's between
19  five people possibly during the entire tenure I've
20  been there.
21     Q. Okay. Outside of the studies that you
22  testified that you had received from the legal
23  department regarding the validity of the hair drug
24  test, did you review any other literature regarding

Page 24

1  this test?
2     A. I'm certain prior to implementation I had to
3  be convinced that this was a valid test. The City was
4  committing major money, a major commitment on its end
5  to secure a contract. So I'm -- we wouldn't do that
6  based on a, a flimsy look at, well, a process that we
7  weren't certain could withstand scrutiny. So there
8  would have been an in-depth look at is this a valid
9  process, one that would be upheld.
10     Q. But did you review any, any literature?
11     A. Well, I'm certain I did. I mean somebody --
12  I was the one that suggested hair testing. Certainly
13  I would want to make sure that that process was a
14  valid process, and somebody, whether I reviewed it or
15  verbally people assured me that on based on their
16  research it was. Who those people were, I can't say
17  at this time. But certainly it would have happened.
18     Q. Can you recall anything specific that you
19  actually reviewed with respect to this hair test?
20     A. No.
21     Q. Do you keep any files regarding the hair
22  test?
23     A. I would have at some point. I would keep
24  files that would list the failures. I kept a file

COB 0001857

CondenseIt™

Page 37

1  asking people, you know, is this a valid study. And
2  we'd be constantly collecting more and more data that
3  would, in fact, support that this is a valid
4  scientific study that has not been refuted by any
5  credible source.
6     Q. Okay. And specifically about the one
7  individual study that you said that you recall
8  regarding the potential bias with respect to the hair
9  testing, did you speak with anyone specifically
10  regarding the individual who wrote that study or the
11  study itself?
12     A. I think we had experts. I can't say which
13  specifically. But it would come up about what about
14  this. That has been refuted. I think it may have
15  been from our vendor Psychemedics. It may have been
16  from our expert that works, Sevalaka or whatever his
17  name is.
18        But, you know, obviously, as we had
19  these meetings, I had a concern. I would constantly
20  want to be absolutely a hundred-percent certain that
21  in fact this was a valid process, and made it clear to
22  people, you know scientifically that it's not, then
23  I will cease. To this date, nobody has shown me
24  anything credible that says it's not a valid

Page 38

1  scientific process.
2     Q. And did MAMLEO provide you with any
3  scientific studies?
4     A. No. Not any credible valid. They may have
5  referenced some reports, but none that have come to
6  what I consider to be credible.
7     Q. And how did you determine that information
8  that MAMLEO provided to you was not credible?
9     A. Well, first, I'm not sure if they ever did.
10  In the course they made allegations. I'm not sure if
11  I've ever received any studies at all from them that
12  say it's not.
13        Again, if I had received some, it would
14  have had my immediate attention, and I would have gone
15  to the experts to say, Hey, where are we with this.
16  Is this an issue. Is this a concern.
17     Q. And what experts would you have gone to?
18     A. Whoever's out there. I mean, you know,
19  we're talking about people losing their jobs here.
20  And I am not cavalier about that. I want to be
21  assured, when people are losing their jobs, that, in
22  fact, it's a valid process, that there's no flaws in
23  the process. So whenever concerns arose as to the
24  validity of the process, I would do whatever I had to

Page 39

1  do to make sure, contact all the experts, and make
2  sure that we were on solid ground.
3     Q. Okay. I appreciate that, and I'm just
4  trying to get the names of the experts that you
5  consulted with.
6     A. You know, normally I'd go to my legal people
7  and say, there's an issue, there's a concern, there's
8  an allegation. I want to be assured. In many
9  instances, at least in one instance, I think the
10  vendor came in, and I had issues, and we addressed
11  those issues. Now, that probably would have been in
12  the last two years or so. But I don't have specific
13  dates and I don't have specific names.
14     Q. And when you referenced the "vendor" are you
15  talking about Psychemedics?
16     A. Yes.
17     Q. And you mentioned an expert, Selavaka. Is
18  that Carl Selavaka?
19     A. Yes.
20     Q. And did Mr. Selavaka attend any of the
21  meetings that you had with MAMLEO or Mr. Alkins?
22     A. I believe he was present at least one
23  meeting.
24     Q. And do you know where Mr. Selavaka resides?

Page 40

1     A. No.
2     Q. Does Mr. Selavaka have a contract with the
3  Department?
4     A. I'm not sure.                    COB 0001861
5     Q. Do you know whether he's employed by the
6  Department?
7     A. Whether we use him as an expert, there's --
8  I know we brought him in on that particular instance.
9  Whether or not we paid him or he's on our payroll, I'm
10  not certain.
11     Q. How many drugs does the Department request
12  be tested with this hair drug test?
13     A. I think that's, that's pursuant to the
14  contract. I think we're allowed to test for certain
15  drugs, and we test for those drugs. I'm not sure how
16  many.
17     Q. Do you know who decides the thresholds for
18  what a positive test would be for these drugs?
19     A. I think that decision was made by the
20  contract. And in this particular instance, I think
21  during the contact process, they agreed on industry
22  standards to the best of my knowledge.
23     Q. And do you know what is meant by "industry
24  standards"?

**PAUL F. EVANS**                    CondenseIt™                    11/13/03

Page 41

1    A. Whatever the existing industry feel are the
2  appropriate levels for detecting drug use.
3    Q. Do you know what the industry standards are
4  for cocaine?
5    A. No.
6    Q. But you indicated this information would be
7  included in the contract; is that correct?
8        MS. HARRIS: I'll object, but you can
9  answer.
10    A. No. It would not. It would, what the
11  actual numbers were wouldn't be in the contract, but I
12  think, if my memory serves me correctly, parties to
13  the contract agreed that industry standards would set
14  the level, to the best of my recollection.
15    Q. Okay. And do you know whether industry
16  standards was defined at any point for the officers?
17    A. I don't believe so.
18    Q. Who decided what the specific procedures for
19  passing and failing the test would be?
20    A. The procedures would have been the vendor
21  would have advised us as to appropriate chains of
22  custodies to ensure that the test was not compromised
23  and it was a valid test. So I'm sure that as we went
24  down that road, we had to be assured of the

Page 42

1  appropriate chain of custody and what-have-you.
2        So I would believe that, having
3  never been involved in that, that would probably have
4  been a recommendation from Psychemedics to ensure the
5  validity of the test to make sure that the processes
6  for testing were, were correct.
7    Q. Does the Department have a contract with
8  Psychemedics?
9    A. Yes.
10    Q. And when did the Department enter into the
11  contract with Psychemedics?
12    A. Probably during '98, because we had, I
13  believe we commenced right after January 2nd, 1999.
14  So we would have entered a contract sometime probably
15  in '98.
16    Q. And what is the term or duration of that
17  contract with Psychemedics?
18    A. No idea.
19    Q. Who's involved -- strike that. How did the
20  Department arrive at selecting Psychemedics as its
21  vendor?
22    A. I have no idea.
23    Q. Did you direct anyone to investigate any
24  laboratories regarding this hair drug test?

Page 43

1    A. No. I think we decided on hair testing, and
2  then go out and find out who does it, whose, who is
3  certified to do it and what-have-you. That, I would
4  not get into the fine workings of that, other than
5  we're committing to this, it's a valid process, who's
6  out there.
7    Q. And who would you direct to find out who's
8  out there conducting this hair drug test?
9    A. In the ordinary course, that would fall on
10  the Bureau of Administrative Services. That, yes,
11  mostly that would be their responsibility.
12    Q. Would it be the responsibility of any other
13  individual or entity within the Department?
14    A. They may be aided by the Labor Relations.
15  They may be aided by City Hall. I'm not sure at this
16  point who else may have been involved in that.
17        MS. HARRIS: I'm going to suggest,
18  answer on your personal knowledge. It's easier for
19  everybody in the long run if you're not guessing.
20    Q. Who may have aided at City Hall in the
21  contacting or investigation of --
22    A. No idea.
23    Q. -- of the test. When you were referring to
24  "City Hall," who were you referring to?

Page 44

1    A. Well, during contract negotiations it would
2  have been somebody like Mike Reagan was involved in
3  the negotiations of the contract. So, you know,
4  getting the contract completed, hair testing was part
5  of that.
6    Q. And who is Mike Reagan?
7    A. He would have been the City's, City Hall's
8  director of Labor Relations.
9    Q. And is he an attorney?
10    A. Yes.
11    Q. Is, do you know whether Mr. Reagan is still
12  with City Hall?
13    A. No, he isn't.                COB 0001862
14    Q. Do you know where he is?
15    A. I think he's down in Connecticut someplace.
16    Q. So is it safe to say that you did not
17  personally arrive at the decision to use Psychemedics
18  as the vendor?
19    A. Yes.
20    Q. Also, would it be safe to say that you did
21  not -- strike that.
22        Do you know whether anyone under your
23  direction contacted any other vendor outside of
24  Psychemedics regarding this hair drug test?

EXHIBIT C

Case 1:05-cv-11832-GAO    Document 36-2    Filed 01/29/2007    Page 16 of 23

10/12/06 DEPOSITION OF KATHLEEN O'TOOLE    RE: RONNIE JONES, ET AL. V. CITY OF BOSTON, ET AL.

Page 1

VOLUME:  1

PAGES:  1-111

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

RONNIE JONES, ET AL.           ) CIVIL ACTION

     PLAINTIFFS,              ) NO.:  05-11832-GAO

V.                             )

CITY OF BOSTON, ET AL.,        )

     DEFENDANTS.               )

_____ )

DEPOSITION OF KATHLEEN O'TOOLE

DATE:    OCTOBER 12, 2006

TIME:    10:06 A.M.

PLACE:   BINGHAM MCCUTCHEN, LLP

        150 FEDERAL STREET

        BOSTON, MA   02110

Page 21

1    using other types of testing if the Union agreed?

2        A:  When it was first brought to my attention M.A.M.L.E.O.

3    said generally that, people from M.A.M.L.E.O. said generally

4    that they thought the test was biased and they asked me to look

5    into it to determine if I would consider other options.  You

6    know, if I would research it to determine if in fact the test

7    was biased.  I think my first response was I know this was the

8    subject of collective bargaining.  I know that collective

9    bargaining took place long before my appointment as Police

10   Commissioner.  I felt strongly that drug testing, a drug testing

11   policy had to be in place in any police organization and that

12   I'd explore their concerns about the hair drug testing policy.

13   Again, I didn't know much about, or I didn't know anything about

14   the science but I said I would go back to police headquarters

15   and talk to the lawyers, talk to the people in labor relations,

16   talk to the people in HR to determine how this policy evolved

17   and whether or not it was the appropriate policy for our agency.

18       Q:  Part of what you just said is that you would explore?

19       A:  Absolutely.  I was open-minded.  I thought it was

20   really important.  That's why I had the meetings with

21   M.A.M.L.E.O. to listen to their issues, not just the hair drug

22   testing policy but many other issues that were of concern to

23   them or of mutual concern to us and keep the lines of

24   communication open.  I was always very open-minded.

10/12/06 DEPOSITION OF KATHLEEN O'TOOLE    RE: RONNIE JONES, ET AL. V. CITY OF BOSTON, ET AL.

Page 22

1    Q:  Please describe how you explored whether the test was

2    biased?

3        A:  I went back in to talk to, I generally had staff

4    meetings every day.  I remember having discussions with people

5    from the legal department, with Sandra Debow who is a lawyer for

6    Labor Relations.  I don't remember exactly who I spoke to but I

7    remember talking to Sandra.  I remember talking to people in our

8    legal department.  I remember talking to Ed Callahan in our HR

9    Department because they all collectively would have the history

10   on this.  So I learned that, yes it was negotiated as part of

11   the collective bargaining process in the late 90s.  The Union at

12   that point was opposed to urine testing.  That somehow hair was

13   agreed on and that in return for the drug testing the hair drug

14   testing policy, the Union got the Quinn bill.  I also asked

15   about the science and I was told that the attorneys felt that it

16   would --

17           MS. HARRIS:  I'm going to object and instruct the

18   witness that any attorney-client communications are

19   confidential.

20       A:  I guess I would just finish by saying that I asked

21   questions about the science as well, in addition to how the

22   policy evolved and why it was hair.  I also asked about the

23   science because M.A.M.L.E.O. was questioning the reliability of

24   the test and asking why we didn't have a urine test versus a

Page 30

1    felt very strongly that a drug testing policy needed to be in

2    place and that the Union and management negotiated this prior to

3    my arrival and at the end of the day let the scientists sort it

4    out.  I think that was the conclusion that I came to and again

5    we reached a point where we couldn't discuss it anymore because

6    it was in litigation.

7        Q:  Did any of the individuals with whom you spoke about

8    hair testing voice any concerns about the hair tests?

9            MS. HARRIS:  I would object and again just instruct

10   you that any attorney-client communications are privileged.  So

11   to the extent that you can answer without revealing those

12   communications, you can answer.

13       A:  I'll just say I was very open-minded about it because

14   I didn't know anything about it.  So when the issue was first

15   raised by M.A.M.L.E.O. I went back and talked to different

16   staff.  I was surprised at the level of confidence they had in

17   the methodology.  They obviously had spent a lot of time in

18   briefings over the years prior to and since the implementation

19   of the policy.  I was surprised at their level of confidence in

20   the process.

21       Q:  Why were you surprised?

22       A:  Well, they were very emphatic about, the people I

23   spoke to obviously had a great deal of confidence in the vendor

24   and in the process and were quick to tell me that this was what

10/12/06 DEPOSITION OF KATHLEEN O'TOOLE          RE: RONNIE JONES, ET AL. V. CITY OF BOSTON, ET AL.

Page 31

1    was negotiated with the Union; that the Union opted for this as

2    opposed to urine testing; that they were adamantly opposed to

3    urine testing during the negotiations process; and that since

4    then the science had been challenged on several occasions but

5    never successfully.  They felt confident that this was the best

6    method.  So initially I was very open-minded about it, you know,

7    why not explore other options but then learned that other

8    options had been explored and that the conclusion was reached

9    that this was the best method at the time the test was

10   implemented and following that.

11        Q:  What other options were explored?

12        A:  Well, apparently, and again I wasn't part of the

13   process.

14             MS. HARRIS:  Then I'll object.  We don't want you to

15   guess.  So if you're reporting what people have informed you,

16   again leaving aside attorney-client communications, that's fine.

17   We're looking just for your personal knowledge.

18             THE WITNESS:  I was just told that the urine option

19   was explored and that the Union was adamantly opposed to it back

20   in the late 90s and that's why the department explored the hair

21   testing option.

22        Q:  Earlier you referred to a vendor.  Who was that

23   vendor?

24        A:  I wouldn't know how to spell this or I'm not even sure

10/12/06 DEPOSITION OF KATHLEEN O'TOOLE    RE: RONNIE JONES, ET AL. V. CITY OF BOSTON, ET AL.

Page 33

1    A: No. Back in 1979 I'm not sure what the science was

2    but we went through an entire physical, including urine testing.

3    I'm not sure whether a drug test was conducted or not.

4    Q: Did you take a urine test when you first joined the

5    police force?

6    A: It was a complete physical and it did involve urine

7    testing. I don't know whether they tested for drugs back in

8    those days or not.

9    Q: When you were a police officer was drug use among

10   fellow officers a major problem?

11   A: That would be hard for me to say. Substance abuse has

12   always been a concern in the business. I think alcohol abuse

13   during my early days on the job was more prevalent but I'm sure

14   there were people then who were abusing other substances as

15   well.

16   Q: If we could go back to the hair drug test and the

17   negotiations. Were any negotiations concerning the hair drug

18   test still ongoing when you took the position of Police

19   Commissioner?

20   A: No.

21   Q: Did you play any role in the department's decision to

22   continue using the hair drug test?

23       MS. HARRIS: Objection. You can answer.

24   A: It was part of the ongoing collective bargaining

Page 34

1    agreement.  The only discussions I had about it were discussions

2    that evolved as a result of M.A.M.L.E.O. raising it as an issue

3    to me in meetings.

4        Q:  **The discussions you described earlier?**

5        A:  Right.  I'm sure that we had to --

6            MS. HARRIS:  No guessing, please.

7            THE WITNESS:  No guessing.  I don't know how often

8    the vendor had to renegotiate the contract, but I signed

9    hundreds and hundreds of contracts during my tenure there and

10   very well could have signed one.  There wasn't any discussion

11   about whether or not to continue it. It was clearly a policy

12   that was in place and an ongoing policy when I became Police

13   Commissioner.

14       Q:  **So around the time in which you were having those**

15   **meetings with M.A.M.L.E.O. and people from the Labor Relations**

16   **and Human Resources, did you review any former Police**

17   **Commissioner Evans' files concerning the hair drug test?**

18           MS. HARRIS:  I'll object.

19       A:  No.

20       Q:  **What was the answer?**

21       A:  No.

22       Q:  **Do you know if those files were available for your**

23   **review?**

24           MS. HARRIS:  Objection.

Case 1:05-cv-11832-GAO    Document 36-2    Filed 01/29/2007    Page 23 of 23

10/12/06 DEPOSITION OF KATHLEEN O'TOOLE    RE: RONNIE JONES, ET AL. V. CITY OF BOSTON, ET AL.

Page 66

1      Q: Do you know if the Police Department keeps a file of

2   studies concerning the scientific validity of the hair test?

3      A: I do not know.

4      Q: Does the Police Department have any scientists on

5   staff to evaluate the research and studies concerning the

6   validity of the hair test?

7      A: Not that I'm aware of.

8      Q: Did you or anyone at your direction conduct any

9   research as to the scientific validity of the hair test?

10     A: I deferred to the lawyers and the people in Human

11  Resources to manage the policy.

12     Q: Do you know if they conducted any research as to the

13  scientific validity of the hair test, either the lawyers or the

14  folks at Human Resources?

15     A: I'm not aware of any that they conducted while I was

16  Police Commissioner.

17     Q: Are you aware of any studies that they conducted

18  before you became Police Commissioner?

19     A: I don't know who conducted the studies but they

20  obviously felt comfortable with the science. That's what they

21  told me when I became Police Commissioner.

22         MR. BAKER: Let's start marking a few exhibits here.

23   I'm going to mark this as exhibit 8. If you could just take a

24  moment to review the document.

EXHIBIT D

Case 1:05-cv-11832-GAO    Document 36-3    Filed 01/29/2007    Page 2 of 42

1/8/07 DEPOSITION OF MARISELA PEREZ          RE:     RONNIE JONES, ET AL. V. CITY OF BOSTON, ET AL.

Page 1

VOLUME:  1

PAGES:  1-96

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

RONNIE JONES, ET AL.            ) CIVIL ACTION

      PLAINTIFFS,            ) NO.:  05-11832-GAO

V.                             )

CITY OF BOSTON, ET AL.,        )

      DEFENDANTS.              )

_____)

    [TRANSCRIPT IS DESIGNATED CONFIDENTIAL]

    DEPOSITION OF MARISELA PEREZ

DATE:     JANUARY 8, 2007

TIME:     2:04 P.M.

PLACE:    BINGHAM MCCUTCHEN, LLP

        150 FEDERAL STREET

        BOSTON, MA  02110

4 (Pages 10 to 13)

| Page 10 |
|---|
| 1   you're in now before he did. Is that correct? |
| 2       A: Yes, that's correct. |
| 3       Q: What documents were left by Jay Devlin that you |
| 4   reviewed with your attorneys in preparing for today's |
| 5   deposition? |
| 6       A: There were some documents that were left that were |
| 7   explanations of the hair analysis process and related documents. |
| 8       Q: Can you be more specific? |
| 9       A: I can't be more specific and be accurate, no. |
| 10      Q: Do you know what this explanation of the hair analysis |
| 11  process is? |
| 12      A: Yes. |
| 13      Q: I'll refer to it as that if that's acceptable? |
| 14      A: Yes. |
| 15      Q: Do you know who drafted the documents? |
| 16      A: No. |
| 17      Q: Do you know if they were documents that were on Boston |
| 18  Police Department letterhead, for example? |
| 19      A: They weren't. |
| 20      Q: Do you know if they were documents that were on |
| 21  Psychemedics' letterhead or Psychemedics documents? |
| 22      A: Some of them were Psychemedics documents, yes. |
| 23      Q: Do you know if the documents describe how the hair |
| 24  test is to be conducted |

| Page 11 |
|---|
| 1       A: Some of them, yes. |
| 2       Q: Approximately how many documents? |
| 3       A: I don't know. |
| 4       Q: And then the other category of documents that you said |
| 5   you reviewed for today's deposition were from databases? |
| 6       A: Excel spreadsheets, yes. |
| 7       Q: How many different Excel spreadsheets? |
| 8       A: Three, four, perhaps. |
| 9       Q: Were the Excel spreadsheets printed from a database? |
| 10      A: Yes. |
| 11      Q: Could you describe the databases or database? |
| 12      A: One is a Excel spreadsheet of every officer who has |
| 13  failed our drug test policy. It's a violation of Rule 111. And |
| 14  the other ones were some databases that Jay had left of I |
| 15  believe recruit officers who had failed. |
| 16      Q: Any other spreadsheets or databases? |
| 17      A: No. |
| 18      Q: Did you speak with anyone other than your attorneys |
| 19  about your deposition here today? |
| 20      A: No. |
| 21      Q: Have you ever been deposed before? |
| 22      A: Yes. |
| 23      Q: How many times? |
| 24      A: I don't know, six, seven. |

| Page 12 |
|---|
| 1       Q: Every time you've been deposed has that been in your |
| 2   capacity as an employee of the Boston Police Department? |
| 3       A: Yes. |
| 4       Q: Did any of those cases concern claims of |
| 5   discrimination? |
| 6       A: No. |
| 7       Q: Just real generally if you can give me, and if you |
| 8   have to go example by example or if you can just speak to all |
| 9   the depositions at once, what were those cases about? |
| 10      A: I was deposed on a rape case where the woman was |
| 11  alleging the house should have been protected by her landlord |
| 12  and it was a civil case. I had the police related case. |
| 13      Q: Can I just interrupt for one second, it will help? |
| 14      A: Yes. |
| 15      Q: Were any of those cases civil cases other than the one |
| 16  you just mentioned or were they all criminal cases? |
| 17      A: They were civil cases that were a result of criminal |
| 18  cases. |
| 19      Q: All of them? |
| 20      A: I'm not sure. |
| 21      Q: Were any of the cases brought by current or former |
| 22  police officers as to their employment at the Police Department? |
| 23      A: No. |
| 24      Q: Have you ever been a party to a lawsuit before? |

| Page 13 |
|---|
| 1       A: Could you clarify, please? |
| 2       Q: Have you ever been sued before? |
| 3       A: No. |
| 4       Q: Have you ever sued anyone before? |
| 5       A: Yes. |
| 6       Q: Can you describe what the case was about where you |
| 7   sued someone, or cases? |
| 8       A: Yes. My son had a head injury. |
| 9           MR. BAKER: That's good enough for that. |
| 10      Q: Was there another case? |
| 11      A: I had an injury. |
| 12      Q: So they were personal injury cases? |
| 13      A: Yes. |
| 14      Q: Anything else? |
| 15      A: No. |
| 16      Q: Have you ever been arrested or convicted of a crime? |
| 17      A: No. |
| 18      Q: Describe your educational background? |
| 19      A: I have a Bachelor's Degree in Political Science. I |
| 20  have a Master's Degree in Criminal Justice and I have doctoral |
| 21  work toward a Psy D degree. |
| 22      Q: Can you spell that? |
| 23      A: Psy D. It's a doctorate in psychology, not a |
| 24  doctorate in the philosophy of psychology. |

1/8/07 DEPOSITION OF MARISELA PEREZ    RE:    RONNIE JONES, ET AL. V. CITY OF BOSTON, ET AL.

5 (Pages 14 to 17)

Page 14

1    Q: Where did you complete your course work for your B.A.
2 in Political Science?
3    A: Stonehill.
4    Q: What year did you graduate?
5    A: 1975.
6    Q: And your Master's in, was it Criminal Justice?
7    A: Yes.
8    Q: Where did you complete your course work for that?
9    A: Western New England.
10    Q: Western New England University?
11    A: Yes, College.
12    Q: What year did you get your Master's Degree?
13    A: 2000.
14    Q: Did you have any particular concentration within
15 criminal justice or was it criminal justice generally?
16    A: Generally.
17    Q: Did you write a thesis?
18    A: No.
19    Q: For your doctoral work, where are you taking that?
20    A: Where was I taking it?
21    Q: Where were you taking it?
22    A: Mass. School of Psychology.  Was it Mass. School of
23 Psychology?  My mind just went blank.  Professional Psychology,
24 I'm sorry.  Massachusetts School of Professional Psychology.

Page 15

1    Q: Did you have a particular focus?
2    A: No.
3    Q: When did you start working for the Boston Police
4 Department?
5    A: November, 1977.
6    Q: Between the time that you graduated from Stonehill,
7 was that in 1975?
8    A: (No verbal response).
9    Q: And when you started at the Boston Police Department,
10 did you hold any other positions?
11    A: I did.
12    Q: Where did you work?
13    A: I worked for the State of Massachusetts.
14    Q: Was that from 1975 to 1977?
15    A: Yes.
16    Q: What was your position?
17    A: I was a social worker.
18    Q: When you started working at the Boston Police
19 Department in November, 1977 what was your first position?
20    A: I was a patrol officer.
21    Q: How long did you have that position?
22    A: I was in patrol from 1977 to 1983.
23    Q: And then what was your next position after 1983?
24    A: I was a detective assigned to the sexual assault unit.

Page 16

1    Q: How long did you hold that position?
2    A: 1983 to 1986.
3    Q: What position did you hold next?
4    A: I was a uniform patrol sergeant from 1986 to 1991.
5    Q: What did you do then?
6    A: I was a Sergeant Detective in Internal Affairs from
7 1991 to 1997, I'm sorry, 1996.
8    Q: What position did you hold next?
9    A: From 1997 to 1999 I was Sergeant Detective in Area
10 E-13.
11    Q: What did you do next?
12    A: I was injured for 22 months.
13    Q: When did you return to work?
14    A: 2001.
15    Q: What position did you hold when you returned?
16    A: I worked for the computer crime division.
17    Q: How many years or months?
18    A: Once.
19    Q: What did you do next?
20    A: I went to work for the Bureau of Internal
21 Investigations.
22    Q: This is in 2002?
23    A: It was actually at the end of 2001.
24    Q: What position did you hold at that time?

Page 17

1    A: I was a Sergeant Detective with the Bureau of Internal
2 Investigations.
3    Q: Is that the position you still hold today?
4    A: Yes.
5    Q: Have you held it continuously since the end of 2001?
6    A: Yes.
7    Q: What are your responsibilities in the position you
8 hold today?
9    A: I audit.  I make recommendations for policy for the
10 Department based on my findings from audits.  I monitor hair
11 testing for the Department.  I am keeper of the records for hair
12 testing for the Department.  I monitor several databases.  I
13 assist the Superintendent for the Division and anything that he
14 might need.
15    Q: Is that it?
16    A: I think so.
17    Q: Have those responsibilities changed at the end of
18 2001?
19    A: I inherited, I did not always have all those.  I
20 inherited the hair testing responsibilities.
21    Q: From, Mr. Devlin?
22    A: Yes.
23    Q: In what year?
24    A: 2004.

Case 1:05-cv-11832-GAO    Document 36-3    Filed 01/29/2007    Page 5 of 42

1/8/07 DEPOSITION OF MARISELA PEREZ    RE:    RONNIE JONES, ET AL. V. CITY OF BOSTON, ET AL.

6 (Pages 18 to 21)

Page 18

1    Q: Do you remember what month?
2    A: Late summer.
3    Q: I think one of the things you said was you monitor the
4 hair testing program. Is that fair to say?
5    A: Yes.
6    Q: Other than your role as keeper of the records of the
7 hair testing, what does that involve?
8    A: I ensure that any officers who fail the drug test are
9 given all the appropriate paperwork which gives them all their
10 rights, all their contractual rights. I ensure that they are
11 served properly by Internal Affairs officers. If they sign the
12 Settlement and Rehabilitation Agreements, I then take their
13 Department issued property from them. I contact their
14 supervisors and let them know that these officers are being
15 suspended and I work with the Medical Unit to make sure they're
16 aware these officers have been suspended so that they can do
17 whatever it is they do in regards to officers who have failed
18 the drug test.
19    Q: Anything else?
20    A: I don't think so.
21    Q: When you took over the hair testing piece from Mr.
22 Devlin in the late summer of 2004, did you receive records that
23 he had kept as keeper of the records?
24    A: Yes, I did.

Page 19

1    Q: And do those go all the way back to 1999?
2    A: I believe they do.
3    Q: And you still have those records today?
4    A: Yes.
5    Q: Who do you report to directly?
6    A: For certain things I report directly to Superintendent
7 Robert Harrington and for others I report to Lieutenant
8 Detective John Fedorchuk.
9    Q: On hair testing who do you report to?
10    A: Superintendent Robert Harrington.
11    Q: And before Robert Harrington it was Albert Goslin?
12    A: Yes.
13    Q: Was there anyone else in the position before Albert
14 Goslin when you were there?
15    A: Superintendent Dowd was there before and I never
16 reported to him.
17    Q: Was that before you were involved with the hair
18 testing?
19    A: Yes.
20    Q: Who reports to you today?
21    A: No one.
22    Q: Is there anyone that assists you in your role as
23 recordkeeper of the hair testing documents?
24    A: I have a clerk.

Page 20

1    Q: Other than a clerk?
2    A: No.
3    Q: What's the name of the clerk?
4    A: Bernadette Falzone.
5    Q: And with regard to the hair testing documents and
6 you're monitoring of the hair test, what does Ms. Falzone do?
7
8    A: She might copy documents for me.
9    Q: Anything else?
10    A: No.
11    Q: Have you taken the hair test before?
12    A: Yes.
13    Q: How many times?
14    A: Since 1999 every year.
15    Q: Have you ever tested positive?
16    A: No.
17    MR. BAKER: I'd like to mark this as exhibit 2.
18 Just take a moment to review what's being marked as exhibit 2
19 and let me know when you're ready.
20    (Exhibit No. 2 Marked)
21    THE WITNESS: I'm ready.
22    Q: Have you seen the document that's been marked as
23 exhibit 2 before?
24    A: Yes, I have.

Page 21

1    Q: Just for the record, what is the record that's been
2 marked as exhibit 2?
3    A: It's a set of interrogatories.
4    Q: And it includes the defendants' answers to the
5 plaintiffs' first set of interrogatories?
6    A: It does.
7    Q: Did you review the defendants' answers to the
8 plaintiffs' first set of interrogatories before signing them?
9    A: Yes.
10    Q: And that is your signature on page 24?
11    A: That's my signature.
12    Q: What did you do to verify that the answers to
13 interrogatories "1," 3." and "6." were accurate before you
14 signed them?
15    A: I read them.
16    Q: Were you done with your answer?
17    A: Yes.
18    Q: Did you consult any documents, for example, to
19 determine that the answers to interrogatories "1," 3." and "6."
20 were accurate?
21    A: I believe I submitted some documents in response.
22    Q: Did you also review documents to verify the accuracy
23 of the answers to "1," 3." and "6."
24    A: I submitted them and yes I reviewed them.

8 (Pages 26 to 29)

Page 26

1  for police officer Rachelle Couch that was taken, the date of
2  collection for her hair test was 6/9/2005 and it gives the
3  result as positive.
4      Q: And the document is drafted by who?
5      A: By Dr. Benjamin Hoffman.
6      Q: And Mr. Hoffman is with Concentra?
7      A: He's the medical review officer for Concentra.
8      Q: And he used to be at Business Health Management.
9  Correct?   A: I believe.  Well, he's the medical review
10 officer anyway.
11     Q: Do you receive a medical review officer report which
12 is what this document is called, for every single hair test?
13     A: Yes, I do.
14     Q: And it says whether that test was positive or
15 negative?
16     A: Yes.
17     Q: What do you do with the document after you receive it?
18     A: I file it.
19     Q: Anything else?
20     A: I send copies of positive results to the officer.
21     Q: So if the officer tests positive they actually get a
22 copy of this document?
23     A: Yes, they do.
24     Q: Does anyone else get a copy of it as well, other than

Page 27

1  the officer if the person is positive?
2      A: Not from me.
3      Q: So you don't send something to their supervisor, for
4  example?
5      A: No.
6      Q: Do you notify the supervisor that the person tested
7  positive?
8      A: Yes, I do.
9      Q: How do you do that?
10     A: By phone.
11     Q: Why does the officer get a copy of the medical review
12 officer report?
13     A: It's procedure.
14     Q: Why does the supervisor not get a copy of the medical
15 review officer report?
16     A: It's a medical report.
17     Q: So it's a privacy concern?
18     A: To a certain extent.  I believe it may be contractual.
19     Q: Does the information go in a database or does it just
20 go in a file?
21     A: Certain information goes in a database.
22     Q: Looking at this document, what information would go in
23 a database?
24     A: The name, the result, the date, the drug, type.

Page 28

1      Q: For example, cocaine?
2      A: Yes.
3      Q: Any other information?
4      A: No.
5      Q: When you said date, is that the date that the test was
6  taken, or the hair was collected, rather?
7      A: I believe the date I use is the date of notification
8  of failure.
9      Q: Just so I understand, is that when you learn of the
10 notification of failure or when the officer learns it?
11     A: When I learn of the notification of failure.
12     Q: You mentioned the result goes into a database.  What
13 does that mean?
14     A: That it was positive.
15     Q: So for example, you don't know the actual amount of
16 drug in the hair was.  You just know if it's pos or negative if
17 you look at the database.  Is that correct?
18     A: If you look at the database, yes.
19     Q: If the person is negative does that go in the
20 database?
21     A: No.
22     Q: If the result is negative what happens to the
23 information?
24     A: If it's negative there's no indication on the database

Page 29

1  it was ever positive.
2      Q: What happens to the information?
3      A: Do you mean the sheet itself?
4      Q: No, not the sheet itself.  Does the fact that the
5  person was negative go into any database anywhere?
6      A: I have to think.  No, because I don't keep a record of
7  negatives.
8      Q: Do you know if Mr. Devlin kept a record of negatives?
9      A: I don't know.
10     Q: So in every instance, whether the result is positive
11 or negative, this piece of paper goes into a file.  Correct?
12     A: Yes.
13     Q: What file is that?
14     A: (No verbal response.)
15     Q: Can you describe the file?
16     A: If it's positive I keep hard copies of this in a file
17 case in my office.  If it's negative they get filed into IAD
18 personnel case files.
19     Q: Is that Internal Affairs Division, IAD?
20     A: Yes, it is.
21     Q: Is there one Internal Affairs Division file for every
22 person in the Department?
23     A: Everyone has one.
24     Q: So for example, if a person received a negative result

1/8/07 DEPOSITION OF MARISELA PEREZ     RE:     RONNIE JONES, ET AL. V. CITY OF BOSTON, ET AL.

9  (Pages 30 to 33)

| Page 30 | Page 32 |
|---|---|
| 1  this would be located in that person's individual file? | 1      Q:  What do you do with the documents that you receive |
| 2      A:  If we finish the filing, yes. | 2  from Psychemedics regarding hair test results? |
| 3      Q:  What do you mean by that? | 3      A:  This document is received if an officer has failed |
| 4      A:  Sometimes we get a little bit backed up in doing the | 4  only.  So this is then placed in the files contained in my |
| 5  filing. | 5  office for officers who have violated Rule 111.  The officer |
| 6      Q:  Do you always eventually do the filing? | 6  gets a copy of this as well and I maintain a copy for our file. |
| 7      A:  Yes. | 7      Q:  As with the document that we just looked at marked |
| 8      Q:  How backed up are you now? | 8  "COB2955", do you send this type of document from Psychemedics |
| 9      A:  Six months, maybe. | 9  to anyone other than the officer? |
| 10      Q:  If I wanted to look at all of the files showing | 10      A:  No. |
| 11  negative test results starting six months ago and before, what | 11      Q:  If you can look at the document marked "2959" which is |
| 12  would I need to do? | 12  a couple more pages in? |
| 13      A:  Call me. | 13      A:  Yes. |
| 14      Q:  What would you do? | 14      Q:  Do you receive a document like this from Benjamin |
| 15      A:  I have all of them collected by date that I receive | 15  Hoffman when a person tests positive? |
| 16  them in a box waiting to be filed. | 16      A:  I actually receive it from Concentra. |
| 17          MR. BAKER:  Sorry.  My question was confusing. | 17      Q:  You do receive this type of document, though? |
| 18      Q:  If I wanted to go before six months, let's say it's | 18      A:  Yes. |
| 19  been filed in six months old or more, what would you need to do | 19      Q:  And you receive this type of document if a person is |
| 20  to gather the negative test results for documents that have | 20  positive for the drug? |
| 21  already been filed? | 21      A:  Yes. |
| 22      A:  What would I need to do? | 22      Q:  Do you receive it if the person is negative for the |
| 23      Q:  What process would you need to go through to get them? | 23  drug? |
| 24      A:  Just walk next door across to Internal Affairs, open | 24      A:  Not this particular document.  Well, if it's negative |

| Page 31 | Page 33 |
|---|---|
| 1  the personnel files for whatever person that I was looking for | 1  for a safety net test, yes I do. |
| 2  and I would pull it out of the file which are filed | 2      Q:  Who do you send the document to? |
| 3  alphabetically by office. | 3      A:  To the officer. |
| 4      Q:  Are they organized within the file according to hair | 4      Q:  Anyone else? |
| 5  test results and everything else, or are they just lumped | 5      A:  Yes. |
| 6  together with all the Internal Affairs' files? | 6      Q:  Who else? |
| 7      A:  They're not Internal Affairs' files.  They're a | 7      A:  Legal.  Our legal department. |
| 8  personnel file within Internal Affairs.  They don't contain IAD | 8      Q:  Is that because it's a safety net document? |
| 9  records. | 9      A:  Yes. |
| 10      Q:  But they contain hair test results? | 10      Q:  Do you track the information in a database? |
| 11      A:  Yes, they contain hair test results. | 11      A:  Yes. |
| 12      Q:  I guess what my question is, is you go into the | 12      Q:  Do you do it if it comes back negative?  Do you track |
| 13  person's Internal Affairs file.  Is there a file within that | 13  information in the database if the safety net comes back |
| 14  that just says "hair test results"? | 14  negative? |
| 15      A:  No. | 15      A:  No. |
| 16      Q:  So the hair test results are intermixed with all of | 16      Q:  Can you flip to the next document marked "2960" and, |
| 17  the other documents that are in the file? | 17  unlike the document we just looked at, "2959", this document |
| 18      A:  Yes. | 18  doesn't say anything about safety net test.  Correct? |
| 19      Q:  If you look a couple of pages in to a document marked | 19      A:  Correct. |
| 20  "2957", do you receive this type of document? | 20      Q:  Do you receive a copy of this type of document for |
| 21      A:  Yes. | 21  every hair test that's taken? |
| 22      Q:  So you receive documents from Psychemedics regarding | 22      A:  Yes. |
| 23  hair test results? | 23      Q:  Even if a person is negative for the drug? |
| 24      A:  Yes. | 24      A:  Yes. |

10 (Pages 34 to 37)

|  | Page 34 |
|---|---|
| 1 | Q: Who do you send the document to? |
| 2 | A: No one. |
| 3 | Q: No one? |
| 4 | A: No one. |
| 5 | Q: The officer doesn't get a copy of it? |
| 6 | A: No. |
| 7 | MR. BAKER: I think that's it for this exhibit. |
| 8 | Q: Do you believe the hair test is accurate? |
| 9 | A: Yes, I do. |
| 10 | Q: Why? |
| 11 | A: The information that I've read documenting the |
| 12 | acceptable of the hair test by Psychemedics appears to be to me |
| 13 | scientifically sound. That's one reason. Secondly, officers |
| 14 | speak to me when they fail the drug test. Many of them have |
| 15 | admitted to me that they have taken drugs giving some credence |
| 16 | to it. All those officers who test negative none of them have |
| 17 | ever said it wasn't accurate. So I have to take that as some |
| 18 | evidence of accuracy also. |
| 19 | Q: Anything else? |
| 20 | A: No. |
| 21 | Q: The first one was information that you read. The |
| 22 | information that you have read indicates that the Psychemedics |
| 23 | hair test appears to be scientifically sound. Is that what you |
| 24 | said? |

|  | Page 35 |
|---|---|
| 1 | A: Yes. |
| 2 | Q: What information have you read in that regard? |
| 3 | A: I've read that Psychemedics does, and I'm not sure if |
| 4 | I can say this scientifically but that your body, when you |
| 5 | ingest drugs that your body produces a side effect. It |
| 6 | metabolizes it and produces metabolites in your system which |
| 7 | subsequently show up in the hair. Sometimes the actual parent |
| 8 | drug is also present. So I believe that, yes that seems like |
| 9 | that would make sense. |
| 10 | Q: Have you read any scientific journal articles about |
| 11 | that process? |
| 12 | A: I can't remember. |
| 13 | Q: Can you remember what you have read about that process |
| 14 | that you just described? |
| 15 | A: Do you mean the specific articles? |
| 16 | Q: The specific articles or the name of the publication, |
| 17 | whatever information you can recall? |
| 18 | A: No. |
| 19 | Q: Do you know if you've read anything prepared by |
| 20 | Psychemedics? |
| 21 | A: Yes. |
| 22 | Q: Can you think of anything you've read about the |
| 23 | scientific validity of the hair test that wasn't drafted by |
| 24 | Psychemedics? |

|  | Page 36 |
|---|---|
| 1 | A: Yes. |
| 2 | Q: What? |
| 3 | A: I can't remember the name of that article but I have |
| 4 | read something to the affect and it wasn't by Psychemedics, it |
| 5 | was about hair testing in general, not their particular process. |
| 6 | Q: Do you remember approximately when it was published? |
| 7 | A: No. |
| 8 | Q: Do you remember who published it? |
| 9 | A: No. |
| 10 | Q: Do you know if it was in a scientific journal? |
| 11 | A: No. |
| 12 | Q: Do you have a copy of it? |
| 13 | A: No. |
| 14 | Q: Did you read it online? |
| 15 | A: Some things, yes. |
| 16 | Q: You mentioned that many officers who test positive on |
| 17 | the hair test admit to taking drugs after you tell them the |
| 18 | result? |
| 19 | A: I don't know if I said many, at least some. |
| 20 | Q: Since you took over the hair testing responsibility |
| 21 | for Mr. Devlin in the late summer of 2004, do you know how many |
| 22 | people have tested positive on the hair test? |
| 23 | A: No. Not exactly, no. |
| 24 | Q: Do you know approximately? |

|  | Page 37 |
|---|---|
| 1 | A: 15, 20 maybe. |
| 2 | Q: Of those 15 to 20 do you know approximately how many |
| 3 | told you or admitted that they used drugs? |
| 4 | A: Seven, eight. |
| 5 | Q: Did any of the approximately 15 or 20 deny using |
| 6 | drugs? |
| 7 | A: Yes. |
| 8 | Q: How many? |
| 9 | A: The remainder, seven, eight, maybe 10, 12. |
| 10 | Q: So more have denied it than admitted it other than |
| 11 | those that tested positive? |
| 12 | A: Yes. |
| 13 | Q: Do you remember the names of any of the individuals |
| 14 | who denied it? |
| 15 | A: Yes. |
| 16 | Q: What were the names? |
| 17 | A: Rachelle Couch denied it. Jack Loan denied it. |
| 18 | Q: What was the last name? |
| 19 | A: Loan. |
| 20 | MR. BAKER: I'll strike the question for now and go |
| 21 | into later when we're looking at a document. That might make it |
| 22 | easier to jog your memory. |
| 23 | Q: Other than the documents that we just read or the |
| 24 | documents we just looked at from Psychemedics in exhibit 3, have |

Case 1:05-cv-11832-GAO    Document 36-3    Filed 01/29/2007    Page 9 of 42

1/8/07 DEPOSITION OF MARISELA PEREZ        RE:     RONNIE JONES, ET AL. V. CITY OF BOSTON, ET AL.

11 (Pages 38 to 41)

Page 38

1  you ever corresponded with anyone from Psychemedics, other than
2  that type of document with the transmission of the hair test
3  results?
4      A:  Could you define "correspond"?
5      Q:  Have you ever e-mailed, exchanged emails with anyone
6  from Psychemedics?
7      A:  The company itself?
8      Q:  Anyone from the company itself?
9      A:  Other than Dr. Hoffman who I believe works for
10  Concentra?
11      MR. BAKER:  Right.
12      THE WITNESS:  No.
13      Q:  Have you ever spoken with anyone from Psychemedics?
14      A:  No.
15      Q:  Have you ever met anyone from Psychemedics?
16      A:  Does an attorney count?
17      MR. BAKER:  Yes.
18      THE WITNESS:  An attorney and I'm not sure if he was
19  Concentra or Psychemedics.
20      Q:  What was the attorney's name?
21      A:  I have no idea.
22      Q:  Was it a man or a woman?
23      A:  Male.
24      Q:  In what context did you meet him?

Page 39

1      A:  At an arbitration hearing.
2      Q:  What was the name of the arbitration hearing?
3      A:  Do you mean what particular officers?
4      MR. BAKER:  Yes.
5      THE WITNESS:  Richie Beckers and an Irish female.  I
6  can't remember her last name.
7      Q:  Did you testify in the case?
8      A:  Yes.
9      Q:  On what subjects did you testify?
10      A:  Keeper of the records.
11      Q:  Anything else?
12      A:  No.
13      Q:  If I mentioned the name William Thistle does that jog
14  your memory as to the name of the attorney?
15      A:  Not really.
16      Q:  Do you receive what you discussed with the attorney
17  from Psychemedics?
18      A:  The merits of the case.
19      Q:  And with regard to that what did you discuss?
20      A:  I believe that the Boston Police, the BPPA had a
21  witness and we discussed basically the merit of his testimony.
22      MS. HARRIS:  Could we take a break for just one
23  second?  I want to make sure that we know the identity of
24  whoever she is talking to.

Page 40

1      (Off the Record at 2:58 p.m.)
2      (Resume at 3:06 p.m.)
3      Q:  We were discussing a conversation you had with an
4  attorney from Psychemedics at an arbitration hearing for Mr.
5  Beckers and someone else. That was one conversation.  Right?
6      A:  Yes, but it wasn't Mr. Beckers.  That was the wrong
7  case.  It was George Downing.
8      Q:  Did you also testify in a case concerning Mr. Beckers?
9      A:  No, that was an error in the name.  I'm sorry.
10      Q:  Other than Mr. Downing's arbitration, have you
11  testified in any other arbitration cases concerning the hair
12  test?
13      A:  No.
14      Q:  You said you talked about the merits of the case with
15  the attorney from Psychemedics.  Could you be more specific?
16      A:  There was a person who was testifying for the BPPA on
17  behalf of the police officers whose name is Kidwell about his
18  view of the validity of the hair test and his view, I believe,
19  of how darker haired people retain drugs in their hair for
20  longer amounts of time and we were talking about his particular
21  testimony.
22      Q:  Kidwell's particular testimony?
23      A:  Yes.
24      Q:  Do you receive if the attorney for Psychemedics worked

Page 41

1  for Psychemedics or if he was outside counsel for Psychemedics
2  in a law firm?
3      A:  I don't remember.
4      Q:  Did you discuss the issue of external contamination of
5  hair with the attorney from Psychemedics?
6      A:  No.
7      Q:  Have you ever read any scientific articles or any
8  articles period about the external contamination of hair with
9  drugs and its relation to hair with drug testing?
10      A:  I believe the Psychemedics articles refer to it and
11  that's why they do the hair washing.
12      Q:  Can you describe the hair washing you just referenced?
13      A:  I can't remember the process now.
14      Q:  Did Dr. Kidwell testify in George Downing's case as to
15  the scientific validity of Psychemedics' hair washing procedures
16  or process?
17      A:  Not that I remember.
18      Q:  Do you play any role at all in determining whether to
19  renew the Psychemedics contract each year?
20      A:  Absolutely not.
21      Q:  We touched upon it earlier, but with regard to safety
22  net test results when a result comes back as negative on a
23  safety net test result does your database already reflect the
24  positive initial test?

1/8/07 DEPOSITION OF MARISELA PEREZ          RE:          RONNIE JONES, ET AL. V. CITY OF BOSTON, ET AL.

12 (Pages 42 to 45)

Page 42

1    A: Yes.

2    **Q: So what happens to the database reflecting the**

3  **positive initial test when the safety net test comes back**

4  **negative?**

5    A: I remove that particular name.

6    **Q: When you say you remove it what do you do?**

7    A: I remove the name. I delete it from the database.

8    **Q: Is the database essentially an Excel spreadsheet?**

9    A: Yes, exactly.

10   **Q: So you go into the Excel spreadsheet, you highlight**

11 **the row with the person's name and drug test results and you hit**

12 **delete?**

13   A: Yes.

14   **Q: But you also forward a copy of the records on to**

15 **another department in the Police Department?**

16   A: Yes.

17   **Q: What department is that?**

18   A: To the Legal Advisor's office.

19   **Q: Who would the individual be in the Legal Advisor's**

20 **office that you forward that information to?**

21   A: I hand carry them to Margaret Buckley.

22   **Q: Has Ms. Buckley been the same individual through the**

23 **time that you've been there?**

24   A: Yes.

Page 43

1    (Exhibit No. 4 Marked)

2    MR. BAKER: Please take a moment to review what's

3  been marked as exhibit 4. While you're reviewing that I'll just

4  describe what this is for the record. We've had marked as

5  exhibit 4 on the first page, although it's hard to read on the

6  copy we have, it says, "Hair Drug Testing: Fact v. Fiction."

7  The exhibit itself is a ten page document but we're looking at

8  pages 1 through 5 because pages 6 through 10 are a duplicate of

9  pages 1 through 5. At the end of page 5 it says, "2005 Boston

10  Police Department All Rights Reserved".

11   (Pause While Witness Reviews Document)

12   THE WITNESS: These five pages.

13   MR. BAKER: Yes.

14   **Q: Have you had a chance to review it?**

15   A: Yes.

16   **Q: Have you seen this document before?**

17   A: I don't know if I saw this particular ever.

18   **Q: Do you know if there is or was a document on the**

19 **Boston Police Department's internal web page that was called**

20 **Hair Drug Testing: Fact v. Fiction?**

21   A: I don't remember.

22   **Q: Do you know if there is or was a document in the**

23 **Boston Police Department's internal web page that was a Q&A on**

24 **the hair drug test?**

Page 44

1    A: I don't remember.

2    **Q: If we look at the first paragraph it says, "Since the**

3  **introduction of hair drug testing in January of 1999, the**

4  **Department has conducted over 6,804 hair tests on samples**

5  **provided by police officers. Only forty-five officers have**

6  **tested positive in that time, out of the approximately 2,200**

7  **sworn officers who have been tested annually." Did you have any**

8  **responsibility at all for putting that sentence in this document**

9  **together?**

10   A: No, I have not.

11   MR. BAKER: I'd like to look back at the

12  interrogatories marked as exhibit 2 and if you can turn to page

13  9 which is interrogatory number "3." and the answer to

14  interrogatory number "3." I'll just read it for the record.

15  Interrogatory "3." states, "Please identify and describe the

16  race, hair color, rank, years of service, department or

17  deployment, Hair Test results (including for positive results,

18  the illegal drug reported as present), and employment status of

19  BPD personnel or candidates for employment for each year during

20  the relevant time period (including year-to-date information for

21  the year 2006), and state whether the employee signed a

22  Rehabilitation Agreement, as described in Boston Police

23  Department Rule 111."

24   **Q: Did I read that correctly?**

Page 45

1    A: Yes, you did.

2    **Q: The answer says, "Defendant refers to documents Bates**

3  **stamped number 7032." Did I read that correctly?**

4   A: Yes, you did.

5   **Q: Is this one of the interrogatories that you signed as**

6  **to having knowledge of the answer?**

7   A: Yes.

8   MR. BAKER: If you can hang on to Interrogatory

9  number "3." there while we have marked exhibit 5.

10   (Exhibit No. 5 Marked)

11   **Q: Please take a moment to review the document that's**

12 **been marked as exhibit 5. It's a four page document with the**

13 **first page "COB7032" and it runs through "COB7035"**

14 **consecutively. Just let me know when you've reviewed it?**

15   A: I'm done.

16   **Q: Again, the interrogatory we just looked at says,**

17 **"Defendant refers to documents Bates stamped number "7032". Are**

18 **these the documents that you intended to be referring to when**

19 **you submitted the answer to this interrogatory?**

20   A: No.

21   **Q: When you signed the answer to the interrogatory as to**

22 **number "3." what documents were you looking at or what document**

23 **were you referring to as document numbered "7032"?**

24   A: It was a spreadsheet that has all the officers who

EXHIBIT E



**DEPARTMENT**

**Special Order Number:** 98-46

ALL BUREAUS, DISTRICTS
AREAS, DIVISIONS, OFFICES,
SECTIONS AND UNITS

**Copies To:** ALL SUPERINTENDENTS,
DEPUTY SUPERINTENDENTS,
AND DIRECTORS

———————— December 17, 1998 ————————

**SUBJECT:    RULE 111, SUBSTANCE ABUSE POLICY**

Effective immediately, **Rule 111, Substance Abuse Policy**, issued January 18, 1995, is hereby rescinded in its entirety and replaced by the attached Rule.  The revisions to **Rule 111, Substance Abuse Policy** are as followed:

- Section V Paragraph G

- Appendix D, Procedures for Annual Hair Testing

Commanding Officers shall ensure that this order and the attached Rule are posted on Department bulletin boards until **Rule 111, Substance Abuse Policy,** has been issued to each member of the Department in their command.

Paul F. Evans
Police Commissioner

MENTION AT ROLL CALLS • POST UNTIL:
Indefinite

COB 0008115

Boston Police Department    –    **Rules and Procedures**

**RULE 111**
**December 11, 1998**

SUBSTANCE ABUSE POLICY

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | INTRODUCTION | 2 |
| II. | DEFINITIONS | 3 |
| III. | AUTHORIZED USE OF PRESCRIPTION MEDICINE | 5 |
| IV. | PROHIBITED CONDUCT | 5 |
| V. | TESTING | 6 |
| VI. | CONSEQUENCES OF A POSITIVE TEST | 8 |
| VII. | CONSEQUENCES OF VIOLATION OF THE POLICY | 8 |
| Appendix A | REFERRAL PROCEDURES FOR SUPERVISORS | 9 |
| Appendix B | REHABILITATION AGREEMENT | 11 |
| Appendix C | PROCEDURES FOR DRUG TESTING | 13 |
| Appendix D | PROCEDURES FOR ANNUAL HAIR TESTING | 26 |

COB 0008116

Boston Police Department                              Rules and Procedures

**RULE 111**

---

## I. INTRODUCTION

To ensure a safe, healthful and productive work environment, to protect the health and welfare of the citizens of the City of Boston, and to assure compliance with the Federal Drug-Free Workplace Act of 1988, the Department has adopted this policy to address drug and alcohol abuse by sworn personnel. These procedures provide the Department with reasonable measures to ensure drug or alcohol use does not jeopardize the public or the Department's ability to serve its citizens.

It is the general intent of the policy to create a humanitarian program. Treatment and discipline are both important aspects of the plan. Drug and alcohol testing, which will be part of the program, is intended in part as a means of identifying those who need help. In fact, the testing components of the program will not be instituted until this policy has been in effect for 60 days. This two month delay is intended to allow all sworn personnel who currently have a substance abuse problem time to take appropriate actions to correct that problem prior to implementation of the procedures described below. Prior to the implementation of this policy, all Officers will receive up to three hours educational training in the effects of drugs and alcohol in general as well as in the workplace. The training shall also include a review of this policy. All such training will occur on Department time.

The Department will not tolerate any drug or alcohol use which could affect an Officer's job performance. The citizens of the City of Boston have a right to expect that sworn personnel will carry out their duties in a safe and reliable manner, free from the effects of drug or alcohol use. This policy replaces, except where contrary to contractual obligations, any and all earlier policies or procedures based on or expanding upon the Drug-Free Workplace Act, but it does not replace or in any way supplant any other policies or procedures including, but not limited to, the Boston Police Department's rules and procedures.

These procedures are significantly more comprehensive than the Federal Drug-Free Workplace Act requirements. The Boston Police Department must, by law, comply with that Act and report our drug-free workplace activities to the Federal government. The Act requires the adoption of a policy, some training, informing sworn personnel of the availability of help, and requiring sworn personnel to report convictions for drug crimes committed on the job. The intent of the Act is admirable, but the Department believes much more must be done than these minimal requirements. There are four important ways in which these procedures are broader and more effective than the Drug-Free Workplace Act:

- we emphasize treatment and counseling rather than just discipline in many cases;

COB 0008117

**Boston Police Department**    ·    **Rules and Procedures**

**RULE 111**

---

- we will employ drug and alcohol testing procedures in great part to overcome the user's denial that a problem exists, so that we may protect the public and provide help and treatment as appropriate;

- we are requiring that all sworn personnel attend comprehensive awareness and training programs;

- we are setting up a supervisor support phone system so that those who will be applying these procedures day-by-day can do so effectively, comfortably, and legally.

These procedures apply to all sworn personnel and, where contracts specifically allow, to Department contractors. The Department reserves the right to modify these procedures in whole or in part in accordance with law and contractual procedures.

## II. DEFINITIONS

A) <u>Controlled Substance</u> - any drug included in Schedules I through V, as defined by Section 802(6) of Title 21 of the United States Code (21 USC 802(6)), the possession of which is unlawful under Chapter 13 of that title, or any drug included within the definition of "Controlled substance" in Chapter 94C of the Massachusetts General Laws (for example, but not limited to: cocaine, marijuana, valium, morphine, anabolic steroids). The term does not include the use of prescribed drugs which have been legally obtained and are being used for the purpose for which they were prescribed.

B) <u>Illegally-Used Drug</u> - any prescribed drug which is legally obtainable but has not been legally obtained or is not being used for prescribed purposes, all designer drugs not listed in the Controlled Substances Act (for example, but not limited to: MDA, fentanyl), and any other over-the-counter or non-drug substances (for example, but not limited to: airplane glue) being used for other than their intended purpose.

C) <u>Alcohol</u> - colorless, volatile and flammable liquid that is the intoxicating agent in fermented and distilled liquors. It includes, but is not limited to, beer, wine and liquor. It does not include alcohol used in chemical processing, cleaning or testing.

D) <u>Department Property</u> - includes buildings, offices, facilities, equipment, vehicles, land, and parking lots owned, loaned, utilized or leased by the Department. It also includes any other site at which business of the Department is transacted whether on or away from Department owned, loaned, or leased property.

E) <u>Accident</u> - an unplanned, unexpected and unintended event which a) occurs on Department property, on Department business, or during working hours, and b) initially appears to have been caused wholly or partially by an Officer, and c) results in either i) a fatality, ii) bodily injury requiring medical treatment away from the scene of the event, or iii) damage to property in excess of $2,500; an unplanned, unexpected and unintended discharge of a firearm is also an "accident".

COB 0008118

Boston Police Department    -    **Rules and Procedures**

**RULE 111**

---

F) <u>Drug Paraphernalia</u> - any item which is clearly intended for use for the administering, transferring, manufacturing, testing or storing of a controlled substance and which is not authorized or intended for use in the course of legitimate law enforcement activities.

G) <u>Reasonable Suspicion of Drug and/or Alcohol Use</u> - the reasonable suspicion standard for drug testing of sworn personnel is based upon a specific objective fact(s) and reasonable inferences drawn from that fact(s) in light of experience that the individual may be involved in the use of any illegally-used drug, controlled substance, or alcohol. Examples would include one or more of the following:

1. Observable phenomena, such as direct observation of on-duty alcohol use or possession and/or direct observation of on-duty or off-duty use or possession of illicit drugs, and/or the on-duty display of behaviors which appear to be indicative of the use of any illegally-used drug, controlled substance, or alcohol and are not attributable to other factors;

2. a pattern of abnormal conduct, erratic behavior or deteriorating work performance, including but not limited to, frequent absenteeism, excessive tardiness, or frequent accidents, not attributable to other factors and which appears to be related to drug and/or alcohol abuse;

3. arrest, indictment, or conviction for a drug-related offense;

4. newly discovered evidence that the Officer has tampered with a prior drug/alcohol test;

5. repeated or flagrant violations of the Department's rules and procedures which are determined by a supervisor to pose a substantial risk of injury or property damage and which are not attributable to other factors and appear to be related to drug and/or alcohol abuse;

6. causing an accident (as defined in definition E. above).

The above examples are not all inclusive, but are intended to be illustrative. Though not a sign or symptom of substance abuse, accidental discharge of a firearm is such a serious event that it can contribute, when substantiated by more direct evidence, to a finding of reasonable suspicion. The symptoms of being affected by a drug or by alcohol are not confined to those consistent with misbehavior, nor to obvious impairment of physical or mental ability, such as slurred speech or difficulty in maintaining balance. Although reasonable suspicion does not require certainty, mere "hunches" are not sufficient to meet this standard.

H) <u>Under the Influence of an Unauthorized Controlled Substance, Illegally-used Drug and/or Alcohol</u> - The presence of a .04 alcohol content in the blood, or a verified positive drug test, at levels specified by the National Institute of Drug Abuse (NIDA), for an unauthorized controlled substance or an illegally-used drug.

COB 0008119

Boston Police Department                            **Rules and Procedures**

**RULE 111**

---

I) <u>Medical Review Officer (MRO)</u> - A licensed physician responsible for receiving laboratory drug testing results who has knowledge of substance abuse disorders and has appropriate medical training to interpret and evaluate a positive test relative to the Officer's medical history and other relevant biomedical information.

## III  AUTHORIZED USE OF PRESCRIPTION MEDICINE

Sworn personnel undergoing prescribed medical treatment with any drug must report the drug used to their supervisor, pursuant to Rule 102 and a determination made as to the Officer's ability to perform his duty according to that rule.

## IV.  PROHIBITED CONDUCT

The following conduct by sworn personnel is prohibited:

A) Unauthorized use, possession, manufacture, distribution, dispensation or sale of a controlled substance, illegally-used drug, drug paraphernalia, or alcohol on Department property, on Department business, in Department supplied vehicles, in vehicles being used for Department purposes, or during working hours;

B) Unauthorized storage in a desk, locker, automobile or other repository on Department property of any illegally-used drug, controlled substance, drug paraphernalia, or alcohol;

C) Being under the influence of an unauthorized controlled substance, illegally-used drug or alcohol on Department property, on Department business, in Department supplied vehicles or vehicles being used for Department business or during working hours;

D) Possession, use, manufacture, distribution, dispensation or sale of illegally-used drugs or controlled substances while off duty;

E) Switching or adulterating any urine or blood sample;

F) Refusing consent to testing or refusing to submit a breath, urine, or blood sample for testing (except as regards "Condition of Promotion" testing);

G) Failing to adhere to the terms of any Rehabilitation Agreement (sample attached) which the Officer has signed;

H) Conviction under any drug or alcohol statute;

I) Failure to immediately notify the Department of any arrest or conviction under any drug or alcohol statute;

J) Failure to notify a supervisor of the use of a prescription drug;

K) Refusing to sign a) a receipt for the Department's Substance Abuse Policy, b) the Consent and Release Form, c) the Chain of Custody Form, or d) a Rehabilitation Agreement;

COB 0008120

Boston Police Department                          **Rules and Procedures**

**RULE 111**

---

## V. TESTING

Sworn personnel of the Boston Police Department will be tested for drugs and/or alcohol under the following circumstances:

A) <u>Reasonable Suspicion of Drug and/or Alcohol Use</u>:  Sworn personnel will be tested for drugs and/or alcohol when a supervisor who has been trained in making determinations of reasonable suspicion has made such a determination.  Referrals for reasonable suspicion testing will be made using the procedures set forth in Appendix A of these procedures.

B) <u>Follow-up Testing</u> - Sworn personnel referred by the Department to treatment, and who undergoes any form of treatment for substance abuse, will be subject to unannounced testing for a period of thirty-six months following a return to full duties (which shall be subject to a medical certification that the Officer is qualified to safely carry a weapon).

C) <u>Pre-Employment Testing</u> - All applicants for the position of Sworn Police Officer will be required to submit to a drug test.  The Department will not knowingly employ as a Sworn Police Officer any individual who actively abuses alcohol, an illegally-used drug or a controlled substance.  All applicants for the position of Sworn Police Officer will be advised in connection with their application for employment that, prior to being offered a position, they will be required to submit to a drug screen.  Failure to consent to such a test, or a verified positive result, will disqualify the applicant for employment in a position subject to pre-employment testing.

D) <u>Probation Period Testing</u> - All Probationary personnel are subject to drug testing during their probation period without prior warning and at random intervals.

E) <u>Condition of Promotion/Rating/Appointment Testing</u> - Sworn personnel who are offered a promotion/appointment and/or a detective rating will be required to submit to a drug test.  A negative test result shall be a condition of such promotion and/or rating.  Sworn personnel may refuse to submit to such a drug test without penalty or risk of disciplinary procedures, however such refusal shall be considered a declination of the offer of promotion.

F) <u>Assignment to Special Unit Testing</u> - Sworn personnel, upon assignment to specialized units as identified by the Commissioner, shall be required to submit to a drug test.  Such units include: Command Staff, Drug Control, Anti-corruption, Explosive Ordnance Unit, Hazardous Materials Unit, Entry and Apprehension Team, Ballistics Unit, Range, and Organized Crime.  This form of testing shall also be applicable upon assignment to any outside agency.

G) <u>Annual Drug Testing (Hair)</u> – This provision only applies to those bargaining units that have agreed to such testing.

COB 0008121

Boston Police Department                                    Rules and Procedures

RULE 111

In a joint desire to achieve and maintain a work force that is 100% drug free and in further recognition that the Department has not yet achieved such goal, the parties agree that all sworn personnel shall be subject to an annual drug test to be conducted through a fair, reasonable, and objective hair analysis testing system. Each Officer shall submit to an annual test on or within thirty (30) calendar days of each Officer's birthday. The Department shall schedule each examination and so notify each Officer as far in advance as practicable. Hair testing does not contemplate or include testing for alcohol.

The Department agrees that it will establish and adhere to written collection and testing procedures for hair samples. These procedures shall be fair and reasonable so as to ensure the accuracy and integrity of the test and process. These written procedures will be appended to this Rule and become incorporated thereto. The union, should it so request, shall meet with the Department in order to discuss issues relative to the collection and testing process. Nothing contained herein alters the current policy as it relates to other drug/alcohol testing, procedures, or requirements.

Drug tests will consist of determinations of the presence of these five drugs, classes of drugs, or their metabolites: marijuana metabolites, cocaine metabolites, opiate metabolites, phencyclidine (PCP), and amphetamines. In the course of testing for Reasonable Suspicion of Drug and/or Alcohol Use, other drugs or their metabolites may be tested for if their particular use is suspected. Such other drugs may include, but need not be limited to: lysergic acid diethylamide (LSD), methaqualone, barbiturates, and benzodiazepines. All urine testing will be performed under the guidelines described in Appendix C "Procedures for Drug Testing". These procedures call for the use of an immunoassay screen (i.e. "EMIT") with all positives tested for confirmation using Gas Chromatography/Mass Spectrometry (GC/MS) technology. In a GC/MS test, the specimen is heated and the vapors are passed through a column of absorbent material, where traces of the drugs separate into colored bands (gas chromatography). A mass spectrometer then analyzes the precise chemical composition of each band. GC/MS is generally considered to be the most conclusive method of confirming the presence of a drug in urine. [1] GC/MS results are accepted as evidence in criminal cases. Positive GC/MS results are first communicated to a Medical Review Officer (MRO) who investigates the possibility of a legitimate explanation of the test result.

Where reasonable suspicion exists to test for alcohol, the Officer shall be given the option of submitting to either a breath screen test or a blood alcohol test. All breath screen tests shall be administered by a certified collection site facility utilizing DOT approved equipment and DOT procedures. All blood alcohol tests shall be administered by a certified collection site facility following procedures identified in Appendix C for identification and chain-of-custody safeguards.

---

[1]  National Institute on Drug Abuse, Research Monograph 73 - "Urine Testing for Drugs of Abuse", 1986.

COB 0008122

Boston Police Department            Rules and Procedures

**RULE 111**

---

## VI. CONSEQUENCES OF A POSITIVE TEST

ILLICIT DRUGS

Sworn personnel who receive a verified positive test result for <u>illicit drugs</u> will be subject to termination. However, where the Officer's only violation is a positive test for illicit drug use and it is the Officer's first offense, the Commissioner shall offer voluntary submission to the following alternative program:

- up to a 45 day suspension without pay,

- execution of a Rehabilitation Agreement and submission to treatment/rehabilitation,

- placement in an administrative position and suspension of weapon carrying privileges upon return to work following suspension until certified by the treatment provider to be recovering and able to safely carry weapons, and

- submission to follow-up testing as described in section V(B) above.

Note that failure to comply with the terms of the Rehabilitation Agreement either during or after the suspension period would constitute a separate violation of this policy and shall result in a recommendation of termination.

ALCOHOL OR ILLEGALLY-USED DRUGS

Sworn personnel who test positive for <u>alcohol or illegally-used drugs</u> shall be subject to disciplinary procedures up to and including termination. However, the first time an Officer tests positive for alcohol or illegally used drugs, the Officer shall be offered and the Officer shall sign a Rehabilitation Agreement and the Officer shall receive up to a 5 day suspension. Note that refusing to sign the Rehabilitation Agreement under these circumstances constitutes a separate violation of this policy. Sworn personnel who sign the Rehabilitation Agreement and undergo treatment will be assigned administrative duties and have their weapon carrying privileges suspended until such time as they are certified, by the treatment provider, to be recovering and able to safely carry weapons, at which time the disciplinary procedures being held in abeyance shall not be served. A record of the original disciplinary action, as well as successful completion of rehabilitation, shall remain in the Officer's medical personnel file. They will also be subject to Follow-Up drug testing as described in V(B) above.

## VII. CONSEQUENCES OF VIOLATION OF THE POLICY

Any violation of the Substance Abuse Policy shall lead to disciplinary action up to and including termination. The severity of the action chosen will depend on the circumstances of each case. The Commissioner may, at his discretion, suspend any disciplinary action while an Officer is undergoing substance abuse treatment subject to a

COB 0008123

Rehabilitation Agreement (see "Consequences of a Positive Test" above). Refusing to sign a Rehabilitation Agreement shall result in a recommendation of termination.

Refusing to submit to a drug or alcohol test (except as regards Condition of Promotion testing), or switching or adulterating any blood or urine sample, shall result in a recommendation of termination.

Failure to adhere to the terms of the rehabilitation agreement shall result in disciplinary action up to and including termination.

Appendix A

## REFERRAL PROCEDURES FOR SUPERVISORS

The Department's supervisors are responsible for being alert to declining job performance, erratic behavior or other symptoms of possible substance abuse. Whenever a supervisor who has been trained in the making of determinations of reasonable suspicion of drug and/or alcohol use (as defined in Section II of these procedures) makes such a determination the following steps will be taken:

A) The supervisor will document in writing all circumstances, information and facts leading to and supporting his/her suspicion. At a minimum, the report will include appropriate dates and times of suspect behavior, reliable/credible sources of information, rationale leading to referral for testing and the action(s) taken.

B) Prior to referring an Officer for testing, the supervisor will discuss the problem with the Officer in a private location with one witness, preferably another supervisor, present. Caution will be taken not to accuse the Officer of substance abuse, but the Officer will be presented with instances of questionable behavior. If the Officer does not have an acceptable explanation for his questioned behavior, the supervisor will continue with the procedures set forth in this section. Nothing in this procedure is intended to prevent the Officer from invoking any Weingarten rights the Officer may have.

C) The supervisor shall consult with a second supervisor of a higher rank and they shall jointly decide whether to refer an Officer for testing. All persons involved in the decision-making process will have received training in the identification of actions, appearance, and conduct which are indicative of the use of alcohol and/or drugs.

D) In those cases where the supervisor determines that the person's behavior causes a potential threat of harm to himself or others, the Officer will be immediately removed from the work site and where there is no other misconduct resulting in suspension the Officer shall be placed on administrative leave and shall be subject to customary restrictions of such leave.

E) Once a determination has been made to refer an Officer for testing, it will be the responsibility of the supervisor to advise the Officer of such decision and to escort the Officer to a collection facility. The supervisor should remain with the Officer at the

COB 0008124

Boston Police Department         _                    **Rules and Procedures**

**RULE 111**

---

collection site facility until testing is concluded. In the event that leaving the scene and/or remaining with the Officer is not feasible, the supervisor will 1) arrange transportation to the collection facility (the Officer will be instructed not to drive a vehicle), 2) notify the collection facility that the Officer is being sent for testing, 3) request that the collection facility notify the supervisor when collection procedures are completed, 4) arrange transportation for the Officer following the collection process, and 5) notify the Officer that he or she is not to return to work pending receipt of the test results by the Office of Internal Investigation.

F)  Upon conclusion of the examination, the supervisor will ensure that the Officer is escorted to his destination. The supervisor will direct the Officer not to drive himself to his destination. The Officer will be relieved from duty pending receipt by the Office of Internal Investigation of the test results and the Officer will be notified of this change in status.

G)  If the Officer tests negative for drugs or alcohol, the Officer will be compensated for any regularly scheduled hours he or she would have worked during the suspension period.

H)  In those cases where a supervisor discovers an Officer who possesses what appears to be a controlled substance, illegally-used drug or alcohol, he or she will proceed as described above for instances where reasonable suspicion exists, and, if the substance in question appears to be a controlled substance or illegally-used drug, will in addition perform the following steps:

1)  Immediately confiscate the substance and all equipment or paraphernalia directly employed with the substance. Wrap them in any available clean material (e.g. paper towel, copier paper, handkerchief). The supervisor will keep the package on his or her person or where he or she can be absolutely sure it cannot be tampered with and shall strive to process the materials as soon as possible.

2)  As soon as the supervisor can, he or she will put the wrapped materials, still in the wrapping, into a large envelope and seal the envelope completely. The supervisor's initials will be written over the seam of the envelope in several places.

3)  The supervisor will write the Officer's name, his or her own name, and the date at the top of the envelope, will promptly notify his or her commanding officer, and will turn the envelope over as soon as possible to the Office of Internal Investigation. The supervisor will witness the signing and dating of the envelope by the person to whom he or she turns it over.

4)  All persons who subsequently and for whatever reason have possession of the envelope will sign and date it in the presence of the previous supervisor.

COB 0008125

**Boston Police Department**                          **Rules and Procedures**

**RULE 111**

---

5) The Office of Internal Investigations will be responsible for delivering the substance to the Division of Food and Drug for analysis. Pending delivery the substance will be secured appropriately.

Appendix B

**REHABILITATION AGREEMENT**

Name:_____        Date:_____

Department:_____

Dear _____:

On _____, 19 ___, the Boston Police Department agreed to your request to seek counseling and referral to a rehabilitation program for alcohol and/or drug abuse. The following conditions apply to your rehabilitation program:

1. You must authorize your treatment provider to provide proof to the Office of Internal Investigation of enrollment in a rehabilitation program and proof of attendance at all required sessions on a monthly basis. Your attendance will be monitored closely and the Office of Internal Investigations will initiate appropriate disciplinary action up to and including termination if you do not regularly attend all sessions.

2. You must adhere to all of the requirements of the drug or alcohol treatment or counseling program in which you are enrolled.

3. If you are absent from work during the rehabilitation period without prior authorization, you must promptly submit a written doctor's certificate explaining the reason for such absence. The Department will take disciplinary action if you are absent as a result of alcohol or drug use.

4. You will pay for all costs of rehabilitation which are not covered under the employee's health plan.

5. During the thirty-six months following the completion of your rehabilitation program, the Department will test you for alcohol and/or drug use on a random basis. The Department will take prompt disciplinary action if you refuse to submit to testing or if you test positive during this period.

6. You must meet all established standards of conduct and job performance. The Department will institute appropriate disciplinary action if your on-the-job conduct or job performance is unsatisfactory.

7. Failure to comply with all of the above conditions will result in the institution of appropriate disciplinary action, up to and including termination. Furthermore, rehabilitation personnel will notify the Department in writing or appear for testimony

COB 0008126

**Boston Police Department** _       **Rules and Procedures**

**RULE 111**

at administrative, civil service and superior court hearings in the event an Officer has not complied with the designated rehabilitation program.

I hereby voluntarily agree to all of the above conditions and authorize my treatment provider to provide the Office of Internal Investigation with proof of my enrollment and attendance at the recommended rehabilitation program.  I sign this rehabilitation agreement of my own free will, and without duress.

_____          _____
Officer's Name                   Commanding Officer's Name


_____          _____
Officer's Signature              Commanding Officer's Signature


_____          _____
Date                             Date

COB 0008127

Boston Police Department          –                    **Rules and Procedures**

**RULE 111**

---

Appendix C

**PROCEDURES FOR DRUG TESTING**

All drug tests administered pursuant to the Department's Substance Abuse Policy will be conducted in strict accordance with the following procedures:

1) Laboratory Qualifications: The Boston Police Department (the Department) has retained a certified laboratory under the Department of Health and Human Services (HHS) Mandatory Guidelines for federal workplace drug testing programs. The use of a certified laboratory ensures that the highest standards of forensic toxicology are being met.

2) Controlled Substances: The following drugs will be tested for:

      a) Marijuana
      b) Cocaine
      c) Opiates
      d) Amphetamines
      e) Phencyclidine
      f) others as appropriate.

3) Security and Chain of Custody: The selected laboratory will maintain strict security at its laboratory facilities and will strictly adhere to the chain of custody procedures mandated by DOT and HHS. This will include:

   a. Use of a standard drug testing custody and control form;

   b. Use of a clean, single-use specimen bottle that is securely wrapped until filled with the specimen, or use of a clean, single-use collection container that is securely wrapped until utilized;

   c. Use of a tamperproof sealing system designed to ensure against undetected opening and the use of a specimen bottle with a unique identifying number which is identical to the number appearing on the custody and control form;

   d. Use of a shipping container in which the specimen and related paperwork may be transferred and which can be sealed and initialed to prevent undetected tampering;

   e. Written procedures, instructions and training to ensure the integrity of the process shall be provided to collection personnel.

4) Specimen Collection Procedures:

   a. All specimens will be collected at designated collection sites which have necessary personnel certified by the laboratory in accordance with NIDA standards, materials, equipment and supervision to provide for specimen collection, security, temporary storage facilities, and shipping or transportation to the laboratory;

Page 13

COB 0008128

Boston Police Department                          Rules and Procedures

**RULE 111**

---

b.  Procedures for collecting urine specimens shall allow individual privacy unless there is reason to believe a person may alter or substitute the specimen to be provided. The following are the exclusive grounds constituting reason to believe an individual may alter or substitute a specimen:

    (1) The Officer presents a specimen which falls outside normal temperature range (32.5°-37.7°C/90.5°-99.8°F); and

        a) The person refuses to provide a measurement of oral body temperature; or,

        b) Oral body temperature varies by more than 1°C/1.8°F from the temperature of the specimen.

    (2) The last urine specimen provided by the Officer was determined by the laboratory to have a specific gravity of less than 1.003 and a creatinine concentration below .2g/L;

    (3) The collection site person observes conduct clearly and unequivocally indicating an attempt to substitute or adulterate the sample (e.g. substitute urine in plain view, blue dye in the specimen presented, etc.); or,

    (4) The Officer has previously been determined to have used a controlled substance without medical authorization and the test was being conducted under Department procedures providing for follow-up testing upon or after return to service.

In any case where a determination is made by a collection site person to observe a specimen collection, a higher-level supervisor of the collection site person, or the Office of Internal Investigation, shall review and concur in such decision in advance. All direct observation shall be conducted by a person of the same gender as the person providing the specimen. In any case where collection is monitored [2] by non-medical personnel, the person shall be the same gender as the person providing the specimen.

c.  The following procedures shall be used to ensure the integrity and identity of the specimen.

    1.  Toilet bluing agents will be placed in the toilet tanks whenever possible so the reservoir remains blue. Where practical, there shall be no other source of water in the enclosure where urination occurs. If there is another source of water, it shall be effectively secured or monitored so as to ensure it is not used as a source for diluting the specimen.

---

[2]   A collection site person "monitors" a collection for this purpose only if he or she is in close proximity to the Officer as the Officer provides the sample, such that the collection site person can hear the Officer's actions.

COB 0008129

Boston Police Department                    **Rules and Procedures**

**RULE 111**

---

2. Upon arriving at the collection site, the Officer to be tested shall present the collection site person with proper identification to ensure that he/she is positively identified as the person selected for testing (e.g., by presenting a driver's license or other photo ID, or by identification by the Office of Internal Investigation). If the Officer's identity cannot be established, the collection site person shall not proceed with the collection, and the Office of Internal Investigation shall be notified. If requested by the Officer, the collection site person shall show his or her identification to the Officer.

3. If the Officer scheduled to be tested fails to arrive at the collection site at the assigned time, the collection site person shall contact the Office of Internal Investigation to obtain guidance on the action to be taken.

4. The Officer to be tested will be required to remove any unnecessary outer garments (e.g., a coat or jacket) that might conceal items or substances that could be used to tamper with or adulterate the urine specimen. The collection site person shall ensure that all personal belongings such as purses or briefcases remain with the outer garments. The Officer may retain his or her wallet. If requested, the collection site person shall provide the Officer with a receipt for any personal belongings.

5. The Officer shall be instructed to wash and dry his/her hands prior to urination.

6. After washing his/her hands, the Officer shall remain in the presence of the collection site person and shall not have access to any water fountain, faucet, soap dispenser, cleaning agent or any other materials which could be used to adulterate the specimen.

7. The Officer may provide his/her specimen in the privacy of a stall or otherwise partitioned area that allows for individual privacy. The collection person shall provide the Officer with a specimen bottle or collection container, as applicable.

8. The collection site person shall note any unusual behavior or appearance of the Officer which may indicate the sample may have been tampered with on the urine custody and control form.

9. Upon receiving the specimen from the Officer, the collection site person shall determine if it contains at least 60 milliliters of urine. If the Officer is unable to provide 60 milliliters of urine, the collection site person shall direct the Officer to drink fluids and, after a reasonable time, again attempt to provide a complete sample using a fresh specimen bottle or a fresh collection container. The original specimen shall be discarded. If the Officer is still unable to provide a complete specimen, the following rules apply:

Page 15

COB 0008130

Boston Police Department                                         **Rules and Procedures**

**RULE 111**

---

a) In the case of a reasonable cause test, the Officer shall remain at the collection site and continue to consume reasonable quantities of fluids until the specimen has been provided or until the expiration of a period up to 8 hours from the beginning of the collection procedure.

b) In the case of a pre-employment test or other test not for cause, the Office of Internal Investigation may elect to proceed as specified in 9.(a) above (consistent with any restrictions on hours of service) or may elect to discontinue the collection and conduct a subsequent collection at a later time to be scheduled by the Office of Internal Investigation.

c) If the Officer cannot provide a complete sample within the up to 8-hour period or at the subsequent collection, as applicable, then the MRO shall refer the Officer for a medical evaluation to develop pertinent information concerning whether the Officer's inability to provide a specimen is genuine or constitutes a refusal to provide a specimen.[3] The medical evaluator shall report his or her findings to the MRO. Upon completion of the examination, the MRO shall report his or her conclusions to the Office of Internal Investigation in writing.

10. Immediately after the specimen is collected, the collection site person shall measure the temperature of the specimen. The temperature measuring device used must accurately reflect the temperature of the specimen and not contaminate the specimen. The time from urination to temperature measure is critical and in no case shall exceed 4 minutes.

11. A specimen temperature outside the range of 32.5° - 37.7°C/90.5° -99.8°F constitutes a reason to believe that the Officer has altered or substituted the specimen in accordance with paragraph 4)b(1) above. This may be cause for the Officer to be required to provide another specimen under direct observation. In such cases, the Officer supplying the specimen may volunteer to have his or her oral temperature taken to provide evidence to counter the reason to believe the Officer may have altered or substituted the specimen.

12. Immediately after the specimen is collected, the collection site person shall also inspect the specimen to determine its color and look for any signs of contaminants. Any unusual findings shall be noted on the custody and control form.

13. All specimens suspected of being adulterated shall be forwarded to the laboratory for testing.

---

[3]   Such a referral is not necessary in pre-employment testing where the Department does not wish to hire the person.

COB 0008131

Boston Police Department                              **Rules and Procedures**

**RULE 111**

14. Whenever there is reason to believe that a particular Officer has altered or substituted the specimen as provided in paragraph 4)b(1) or (3) above, a second specimen shall be obtained as soon as possible under the direct observation of a collection site person of the same gender.

15. After the urine specimen is provided, both the Officer being tested and the collection site person shall keep the specimen in view at all times prior to its being sealed and labeled. The specimen shall be sealed (by placement of a tamperproof seal over the bottle cap and down the sides of the bottle) and labeled in the presence of the Officer. If the specimen is transferred to a second bottle, the collection site person shall request the Officer to observe the transfer of the specimen and the placement of the tamperproof seal over the bottle cap and down the sides of the bottle.

16. The collection site person, in the presence of the Officer, shall place securely on the bottle an identification label which contains the date, the Officer's specimen number and any other identifying information provided or required by the Department. If separate from the label, the tamperproof seal shall also be applied.

17. The Officer shall, in the presence of the collection site person, initial the identification label on the specimen bottle for the purpose of certifying that it is the specimen collected from him or her.

18. The collection site person shall, in the presence of the Officer, enter on the drug testing custody and control form all information identifying the specimen. The collection site person shall sign the form certifying that the collection was accomplished according to the procedures described herein.

19. The Officer shall be asked to read and sign a statement on the drug testing custody and control form certifying that the specimen identified as having been collected from him or her is in fact the specimen he or she provided. He or she will also have the opportunity to set forth on the form information concerning medications taken or administered in the past 30 days.

20. The Officer will also be required to read and sign a consent and release form authorizing the collection of the specimen, analysis of the specimen for designated controlled substances and release of the test results to the Office of Internal Investigation.

21. The collection site person shall complete the chain of custody portion of the drug testing custody and control form to indicate receipt of the specimen from the Officer and shall certify proper completion of the collection process. If the specimen is not immediately prepared for shipment, the collection person shall ensure that it is appropriately safeguarded during temporary storage.

Page 17

COB 0008132

**Boston Police Department** _    **Rules and Procedures**

**RULE 111**

---

22. While any part of the above chain of custody procedures is being performed, the urine specimen and custody documents must remain under the control of the involved collection site person.

23. The collection site person shall not leave the collection site in the interval between presentation of the specimen by the Officer and securement of the sample with an identifying label bearing the Officer's specimen identification number and seal initialled by the Officer. If it becomes necessary for the collection person to leave during this interval, the collection shall be nullified and (at the election of the Office of Internal Investigation) a new collection begun.

24. To the maximum extent possible, the collection site personnel shall keep the Officer's specimen bottle within sight both before and after the Officer has urinated. After the specimen is collected it shall be properly sealed and labeled.

25. Collection site personnel shall arrange to ship the collected specimen to the drug testing laboratory. The specimens shall be placed in shipping containers designed to minimize the possibility of damage during shipment (e.g., specimen boxes and/or padded mailers) and those containers shall be securely sealed to eliminate the possibility of undetected tampering. On the tape sealing the container, the collection site person shall sign and enter the date the specimens were sealed in the shipping containers for shipment. The collection site person shall ensure that the chain of custody documentation is attached or enclosed in each container sealed for shipment to the drug testing laboratory.

26. If the Officer refuses to cooperate with the collection process, the collection site person shall inform the Office of Internal Investigation and shall document the non-cooperation on the drug testing custody and control form.

27. If the sample is being collected from an Officer in need of medical attention (e.g., as part of a post-accident test given in an emergency medical facility), necessary medical attention shall not be delayed in order to collect the specimen.

28. A chain of custody form (and a laboratory internal chain of custody document, where applicable) shall be used for maintaining control and accountability of each specimen from the point of collection to final disposition of the specimen. The date and purpose shall be documented on the form each time a specimen is handled or transferred and every individual in the chain shall be identified. Every effort shall be made to minimize the number of persons handling specimens.

COB 0008133

Boston Police Department                          **Rules and Procedures**

**RULE 111**

---

5) Laboratory Procedures:

   a.  Drug testing laboratories shall be secure at all times and shall have in place
       sufficient security measures to control access to the premises and to ensure no
       unauthorized personnel handle the specimens or gain access to the laboratory
       process or areas where records are stored.

   b.  Laboratories shall use chain of custody procedures to maintain control and
       accountability of specimens from receipt through completion of testing, reporting
       of results during storage, and continuing until final disposition of specimens.  The
       date and purpose shall be documented on an appropriate chain of custody form
       each time a specimen is handled or transferred and every individual in the chain
       shall be identified.  Accordingly, authorized technicians shall be responsible for
       each urine specimen or aliquot [4] in their possession and shall sign and complete
       chain of custody forms for those specimens or aliquots as they are received.

   c.  1) When a shipment of specimens is received, laboratory personnel shall inspect
       each package for evidence of possible tampering and compare information on
       specimen bottles within each package to the information on the accompanying
       chain of custody forms.  Any direct evidence of tampering or discrepancies in the
       information on specimen bottles and the Department's chain of custody forms
       attached to the shipment shall be immediately reported to the Office of Internal
       Investigation and shall be noted on the laboratory's chain of custody form which
       shall accompany the specimens while they are in the laboratory's possession.

       2) Specimen bottles generally shall be retained within the laboratory's accession
       area until all analyses have been completed.  Aliquots and the laboratory's chain
       of custody forms shall be used by laboratory personnel for conducting initial and
       confirmatory tests.

   d.  Specimens that do not receive an initial test within 7 days of arrival at the
       laboratory shall be placed in secure refrigeration units.  Temperatures shall not
       exceed 6°C.  Emergency power equipment shall be available in case of prolonged
       power failure.

   e.  Laboratory facilities for urine drug testing will normally process specimens by
       grouping them into batches.  When conducting either initial or confirmatory tests,
       every batch shall contain an appropriate number of standards for calibrating the
       instrumentation and a minimum of 10 percent controls.  Both quality control and
       blind performance test samples shall appear as ordinary samples to laboratory
       analysts.

   f.  1) The initial test shall use an immunoassay which meets the requirements of the
       Food and Drug Administration for commercial distribution.  The following initial

---

[4]   An aliquot is that portion of the urine specimen used for testing.

COB 0008134

Boston Police Department    -    **Rules and Procedures**

**RULE 111**

---

cutoff levels shall be used when screening specimens to determine whether they are negative for these five drugs or classes of drugs:

|  | Initial Test Cutoff Levels (ng/ml)[5] |
|---|---|
| Marijuana metabolites | 100 |
| Cocaine metabolites | 300 |
| Opiate metabolites | 300[6] |
| Phencyclidine | 25 |
| Amphetamines | 1,000 |

2) These cutoff levels are subject to change by the HHS as advances in technology or other considerations warrant identification of these substances at other concentrations. For drugs not listed in f.(1) above, cutoff levels to be used shall, when available, be those then specified by the HHS.

g.  1) All specimens identified as positive on the initial test shall be confirmed using gas chromatography/mass spectrometry (GC/MS) techniques at the cutoff levels listed in this paragraph for each drug. All confirmations shall be by quantitative analysis.

|  |  | Confirmatory test cutoff levels (ng/ml) |
|---|---|---|
| Marijuana metabolite[7] |  | 15 |
| Cocaine metabolite[8] |  | 150 |
| Opiates: | Morphine | 300 |
|  | Codeine | 300 |
| Phencyclidine |  | 25 |

---

5    ng = nanograms
    ml = milliliters
6    25 ng/ml if immunoassay specific for free morphine
7    Delta-9-tetrahydrocannabinol-9-carboxylic acid
8    Benzoylecgonine

Boston Police Department — | **Rules and Procedures**

**RULE 111**

| | | |
|---|---|---|
| Amphetamines: | Amphetamine | 500 |
| | Methamphetamine | 500 |

2) These cutoff levels are subject to change by the HHS as advances in technology or other considerations warrant identification of these substances at other concentrations. For drugs not listed in g.(1) above, cutoff levels to be used shall, when available, be those then specified by the HHS.

h. 1) The laboratory shall report test results to the MRO within an average of 5 working days after receipt of the specimen by the laboratory. Before any test result is reported (the results of initial tests, confirmatory tests, or quality control data), it shall be reviewed and the test certified as an accurate report by the responsible individual. The report shall identify the drugs/metabolites tested for, whether positive or negative, the specimen number assigned by the Department, and the drug testing laboratory specimen identification number (accession number).

2) The laboratory shall report as negative all specimens that are negative on the initial test or negative on the confirmatory test. Only specimens confirmed positive shall be reported positive for a specific drug.

3) The MRO may request from the laboratory and the laboratory shall provide quantification of test results. The MRO shall report whether the test is positive or negative to the Office of Internal Investigation and may report the drug(s) for which there was a positive test, but shall not disclose the quantification of test results to the Office of Internal Investigation.

4) The laboratory may transmit results to the MRO by various electronic means (for example, teleprinters, facsimile, or computer) in a manner designed to ensure confidentiality of the information. Results may not be provided verbally by telephone. The laboratory and the MRO must ensure the security of the data transmission and limit access to any data transmission, storage, and retrieval system.

5) The laboratory shall send only to the MRO the original or a certified true copy of the drug testing custody and control form (part 2), which, in the case of a report positive for drug use, shall be signed (after the required certification block) by the individual responsible for day-to-day management of the drug testing laboratory or the individual responsible for attesting to the validity of the test reports, and attached to which shall be a copy of the test report.

6) The laboratory shall provide to the Superintendent, Chief of the Office of Internal Investigation a monthly statistical summary of urinalysis testing of sworn personnel and shall not include in the summary any personal identifying information. Initial and confirmation data shall be included from test results

Page 21

Boston Police Department                                    Rules and Procedures

**RULE 111**

---

reported within that month. Normally this summary shall be forwarded by registered or certified mail not more than 14 calendar days after the end of the month covered by the summary.

Monthly reports shall not include data from which it is reasonably likely that information about sworn personnel's tests can be readily inferred. If necessary, in order to prevent the disclosure of such data, the laboratory shall not send a report until data are sufficiently aggregated to make such an inference unlikely. In any month in which a report is withheld for this reason, the laboratory will so inform the Office of Internal Investigation in writing.

7) Unless otherwise instructed by the Office of Internal Investigation in writing, all records pertaining to a given urine specimen shall be retained by the drug testing laboratory for a minimum of 2 years.

i.  Long term frozen storage (-20°C or less) ensures that positive urine specimens will be available for any necessary retest during administrative or disciplinary proceedings. The laboratory shall retain and place in properly secured long term frozen storage for a minimum of 1 year all specimens confirmed positive, in their original labeled specimen bottles. Within this 1 year period, the Office of Internal Investigation may request the laboratory to retain the specimen for an additional period of time, but if no such request is received the laboratory may discard the specimen after the end of 1 year, except that the laboratory shall be required to maintain any specimens known to be under legal challenge for an indefinite period.

j.  Because some analytes deteriorate or are lost during freezing and/or storage, quantification for a retest is not subject to a specific cutoff requirement but must provide data sufficient to confirm the presence of the drug or metabolite. 

k.  The drug testing laboratory shall maintain and make available for at least 2 years documentation of all aspects of the testing process. This 2 year period may be extended upon written notification by the Office of Internal Investigation. The required documentation shall include personnel files on all individuals authorized to have access to specimens; chain of custody documents; quality assurance/quality control records; procedure manuals; all test data (including calibration curves and any calculations used in determining test results); reports; performance records on performance testing; performance on certification inspections; and hard copies of computer-generated data. The laboratory shall maintain documents for any specimen known to be under legal challenge for an indefinite period.

6) Reporting and Review of Results

a.  An essential part of the drug testing program is the final review of confirmed positive results from the laboratory. A positive test result does not automatically

COB 0008137

Boston Police Department    _    **Rules and Procedures**

**RULE 111**

identify an Officer/applicant as having used drugs in violation of Department policy. An individual with a detailed knowledge of possible alternate medical explanations is essential to the review of results. This review shall be performed by the Medical Review Officer (MRO) prior to the transmission of the results to the Office of Internal Investigation. The MRO review shall include review of the chain of custody to ensure that it is complete and sufficient on its face. The duties of the MRO with respect to negative results are purely administrative.

b.  1) The MRO shall be a licensed physician with knowledge of substance abuse disorders who has been approved by the NIDA certified laboratory retained by the City.

2) The MRO shall not be an employee of the laboratory conducting the drug test.

3) The role of the MRO is to review and interpret confirmed positive test results obtained through the Department's testing program. In carrying out this responsibility, the MRO shall examine alternate medical explanations for any positive test result. This action may include conducting a medical interview and review of the Officer's medical history, or review of any other relevant biomedical factors. The MRO shall review all medical records made available by the tested Officer when a confirmed positive test could have resulted from legally prescribed medication. The MRO shall not, however, consider the results of urine samples that are not obtained or processed in accordance with the procedures set forth herein.

c.  1) Prior to making a final decision to verify a positive test result for an Officer, the MRO shall give the Officer an opportunity to discuss the test result with him or her.

2) The MRO shall contact the Officer directly, on a confidential basis, to determine whether the Officer wishes to discuss the test result. A staff person under the MRO's supervision may make the initial contact, and a medically licensed or certified staff person may gather information from the Officer. Except as provided in paragraph (c)(5) of this section, the MRO shall talk directly with the Officer before verifying a test as positive.

3) If, after making all reasonable efforts and documenting them, the MRO is unable to reach the Officer directly, the MRO shall contact the Office of Internal Investigation who shall direct the individual to contact the MRO as soon as possible. If it becomes necessary to reach the Officer through the Office of Internal Investigation, the Internal Affairs Division shall employ procedures that ensure, to the maximum extent practicable, that the requirement that the Officer contact with the MRO is held in confidence.

COB 0008138

Boston Police Department

Rules and Procedures

RULE 111

---

4) If, after making all reasonable efforts, the Office of Internal Investigation is unable to contact the Officer, the Department may place the Officer on administrative leave with pay.

5) The MRO may verify a test as positive without having communicated directly with the Officer about the test in two circumstances:

(a) The Officer expressly declines the opportunity to discuss the test; or,

(b) The Office of Internal Investigation has successfully made and documented a contact with the Officer and instructed the Officer to contact the MRO and more than five days have passed since the date the Officer was successfully contacted by the Office of Internal Investigation.

6) If a test is verified positive under the circumstances specified in paragraph (5)(b) of this section, the Officer may present to the MRO information documenting that serious illness, injury, or other circumstances unavoidably prevented the Officer from timely contacting the MRO. The MRO, on the basis of such information, may reopen the verification, allowing the Officer to present information concerning a legitimate explanation for the confirmed positive test. If the MRO concludes that there is a legitimate explanation, the MRO declares the test to be negative as per (f) below.

7) Following verification of a positive test result, the MRO shall refer the case to the Office of Internal Investigation.

d. Before the MRO verifies a confirmed positive result for opiates, he or she shall determine that there is clinical evidence -- in addition to the urine test --of unauthorized use of any opium, opiate, or opium derivative (e.g., morphine/codeine). (This requirement does not apply if GC/MS confirmation testing for opiates confirms the presence of 6-monoacetylmorphine).

e. Should any question arise as to the accuracy or validity of a positive test result, only the MRO is authorized to order a reanalysis of the original sample and such retests are authorized only at laboratories certified by HHS and which may be selected by the Officer as long as such laboratory is certified by NIDA utilizing the same certification levels referred to in the "Laboratory Procedures", paragraph 5, subparagraph (g) of this policy   The MRO shall authorize a reanalysis of the original sample if requested to do so by the Officer within 72 hours of the Officer's having received actual notice of the positive test. If the retest is negative, the MRO shall declare the final result to be negative.

f. If the MRO determines there is a legitimate medical explanation for the positive test result, the MRO shall report the test result to the Office of Internal Investigation as negative and shall include in the report a list of all prescription medications being used by the Officer.

Page 24

Boston Police Department            –                    **Rules and Procedures**

**RULE 111**

---

g.  Additionally, the MRO, based on review of inspection reports, quality control data, multiple samples, and other pertinent results, may determine that the result is scientifically insufficient for further action and declare the test specimen negative. In this situation the MRO may request reanalysis of the original sample before making this decision. The laboratory shall assist in this review process as requested by the MRO by making available the individual responsible for day-to-day management of the urine drug testing laboratory or other employee who is a forensic toxicologist or who had equivalent forensic experience in urine drug testing, to provide specific consultation as required by the Department.

h.  Except as provided in this paragraph, the MRO shall not disclose to any third party any medical information provided by the Officer to the MRO as a part of the testing verification process.

   1) The MRO may disclose such information to the Office of Internal Investigation only if in the MRO's reasonable medical judgment the information indicates that continued performance by the Officer of his or her safety sensitive function could pose a significant safety risk.

   2) Before obtaining medical information from the Officer as part of the verification process, the MRO shall inform the Officer that information may be disclosed to third parties as provided in this paragraph and the identity of any parties to whom information may be disclosed.

7)  Protection of Sworn Personnel Records

   Department contracts with laboratories require that the laboratory maintain sworn personnel test records in confidence. The contracts will provide that the laboratory shall disclose information related to a positive drug test only to the Office of Internal Investigation.

8)  Individual Access to Test and Laboratory Certification Results

   Any Officer who is the subject of a drug test conducted under this policy shall, upon written request to the Chief, Office of Internal Investigations, have access to any records relating to his or her drug test and any records relating to the results of any relevant certification, review, or revocation-of-certification proceedings.

   Positive test results for drug and/or alcohol shall be retained by the Department and processed as in the same manner as are any violations of Department Rules and Procedures. Documentation leading up to or supporting a decision to test where the test is positive shall be retained and/or processed in the same manner as any violation of Department Rules and Procedures. Documentation leading up to a decision to test where the test is negative shall be filed separately with the Superintendent, Chief of the Office of Internal Investigations and shall remain confidential.

Page 25

COB 0008140

Boston Police Department — Rules and Procedures

**RULE 111**

Appendix D
## PROCEDURES FOR ANNUAL HAIR TESTING

A)  **Tracking System** – The Department shall develop and maintain a tracking system that ensures each Officer who is subject to Annual Testing will undergo a hair test as required by Rule 111, sec. V, para. G.

B)  **Notification to Submit** – The Department shall provide to Commanding Officers a listing of those Officers who shall be required to submit to an annual hair test. The Commanding Officer or his/her designee shall notify the Officer when he/she shall submit to the test at Occupational Health Services.

C)  **Collection Personnel** – Certified employees of the Occupational Health Services Unit shall perform all hair sample collections.

D)  **Identification of Officer's Identity** – The Officer's identity shall be verified by checking the driver's license or other photo identification. The Department, including personnel from the Occupational Health Services Unit, may do a visual identification of the Officer, however this must be noted on the Test Request Form.

E)  **Completing the Test Request Form** – The Test Request Forms (TRF) are pre-printed forms that are coded specifically to the Department. The collection personnel shall fill out the form in the presence of the Officer. The TRF includes information such as the collector's identity, the Test Subject Identification Number, and where the sample was collected (ex., crown of head, nape of the neck).

F)  **Completing the Sample Acquisition Card (SAC)** – The SAC is a card that will hold the hair sample during transportation. A foil used for collection is included with the card. These steps may occur prior to or after the collection of the hair sample and shall be completed in the presence of the Officer.

   1) The collection personnel shall sign and date the SAC. The collection personnel shall write the Test Subject Identification Number on the SAC. This number must match the number listed on the TRF.

   2) The collection personnel shall place the bar code from the TRF on the SAC to ensure the two documents are identified with one another.

G)  **Collecting the Hair Sample** – The collection personnel shall complete each of the following steps in the presence of the Officer.

   1) The collection personnel will grasp a small lock of hair approximately ½ inch wide by one strand deep when held flat and cut the sample close to the scalp. If the head hair is not available other body hair shall be collected.

**Boston Police Department**   –        **Rules and Procedures**

**RULE 111**

---

2) The sample is then placed in the foil with the root ends extending approximately ¼ inch. The foil is pressed together, trapping the sample inside. If the hair is long, the collection personnel will wrap the remaining hair around the foil.

3) The collection personnel shall place the sample inside the SAC, sign and date the integrity seal, and place the integrity seal over the designated spot on the SAC.

4) The Officer shall initial the SAC in the space provided.

5) The Officer shall complete the Donor Certification section of the TRF that includes the Officer's name and telephone number. In the comments section, the donor may provide additional information for the Medical Review Officer (MRO), (ex., use of prescription medicine or an additional phone number where the MRO can contact the Officer if the need arises).

6) The copy of the TRF that contains the Donor Certification section shall be separated from the TRF and placed in a sealed envelope addressed to the MRO. The Officer shall initial and date the sealed envelope. The sealed envelope shall be kept in a secured area until sent to the MRO, at the next regularly scheduled pick-up using an overnight carrier.

7) The collection personnel shall place the SAC and a copy of the TRF into the collection pouch and seal the pouch.

8) The Officer shall initial and date the collection pouch in the space provided.

H) **Storing and Shipping the Sample** – The sealed collection pouch shall be kept in a secured area until sent to the laboratory, at the next regularly scheduled pick-up using an overnight carrier.

I) **Licensed Laboratory** – The sample shall be tested at a licensed laboratory that is certified to perform hair testing.

J) **Review of Test Result by an authorized Medical Review Officer (MRO)** – All hair sample drug test results shall be reviewed by an authorized MRO prior to the transmission of the test results to the Commanding Officer, Bureau of Internal Investigations (BII)

1) The duties of the MRO with respect to positive test results are to review and interpret confirmed, positive test results obtained through the Department's annual hair testing program. In carrying out this responsibility, the MRO shall examine alternative medical explanations for any positive test result. This action may include conducting a medical interview and review of the Officer's medical history, or review of any other relevant biomedical factors. The MRO shall review all medical records made available by the tested Officer when a positive test could have resulted from legally prescribed medication. The

Page 27

COB 0008142

Boston Police Department    —    **Rules and Procedures**

**RULE 111**

---

MRO shall not, however, consider the results for hair samples that are not obtained or processed in accordance with the procedures set forth herein.

2) Prior to making a final decision to verify a positive test result for an Officer, the MRO shall give the Officer an opportunity to discuss the test result with him. For example, there may be a legitimate positive test result for the use of legally prescribed or dispensed medication such as codeine for coughs, narcotic analgesics for pain, tetrahydrocannobinol for cancer, cocaine as a vasoconstrictive anesthetic, etc. It is important to note that it is highly unlikely that a medically acceptable explanation will be found for the presence of cocaine or marijuana.

3) The MRO shall contact the Officer directly, on a confidential basis, to determine whether the employee wishes to discuss the test result. A staff person under the MRO's supervision may make the initial contact, and a medically licensed or certified staff person may gather information from the employee. Except as provided in Paragraph J(5) of this Section, the MRO shall talk directly with the employee before verifying a test as positive.

4) If after making all reasonable efforts and documenting them, the MRO is unable to reach the Officer directly, the MRO shall contact BII who shall contact the Officer and direct him to contact the MRO as soon as possible. If it becomes necessary to reach the Officer through BII, the Bureau shall employ procedures that ensure, to the maximum extent practicable, that the requirement that the Officer contact with the MRO is held in confidence.

5) The MRO may verify a test result as positive without having communicated directly with the Officer in three circumstances.

   a) If the Officer expressly declines the opportunity to discuss the test result, the test shall be reported as positive.

   b) If BII has successfully made and documented a contact with the Officer and instructed the Officer to contact the MRO and more than five calendar days have passed since the date the Officer was successfully contacted by BII and the Officer has not contacted the MRO, the test shall be reported as positive.

   c) If after making all reasonable efforts and documenting them, BII has not been able to contact the Officer and fourteen calendar days have passed since BII's first documented attempt to contact the Officer, the test shall be reported as positive.

6) The MRO shall report to BII any samples that were not suitable for testing. When BII receives a test result that indicates the hair specimen was an inadequate specimen and/or was not testable for any other reason, BII shall contact the Officer and require him/her to provide another specimen for

Page 28

COB 0008143

Boston Police Department       -                    **Rules and Procedures**

**RULE 111**

---

testing provided the collection occurs on or within thirty (30) calendar days of that Officer's birthday.

7) The MRO shall report whether the verified test result is positive or negative to BII. If the MRO, in his/her sole medical opinion, concludes there is a legitimate medial explanation for the positive test result, the MRO shall report the test result as negative to BII.

8) BII shall notify each Officer who receives a positive test result and the provisions of Rule 111 shall apply.

K)  **Safety-Net Tests** – If an Officer receives a positive, confirmed hair test result, the Officer may request a safety-net test. The safety-net test must be performed under the same or more stringent procedures as recommended by the manufacturer.

1) To request the safety-net test, the Officer must submit a written request to the Commanding Officer, BII within 72 hours of being notified by BII of the positive test result. BII shall notify Occupational Health that a safety-net test has been requested, and Occupational Health shall schedule the safety-net test forthwith. The Officer must pay for the costs of the safety-net test and the MRO review, payable by check made out to the City of Boston at the time of the sample collection.

2) For Officers who have requested a safety-net test, the Department shall immediately place the Officer on administrative duty pending the outcome of the safety-net test. While on administrative duty the Officer shall not carry a firearm and shall not be eligible for overtime or details.

3) If the result of the safety-net test result is negative, the Officer shall be reimbursed for the costs of the safety-net test and the MRO review and shall be made whole, e.g., paid for any overtime or details he/she would have been eligible to perform pursuant to the current collective bargaining agreement. Likewise, said hours shall be recorded and posted pursuant to the current collective bargaining agreement. In addition, the Officer's IAD file shall be expunged of the prior positive test result that led to the safety-net test.

L)  **Access and Storing of Test Results** - Any Officer who is the subject of a hair test conducted under this procedure shall, upon written request to the Commanding Officer, BII, have access to any and all record(s) relating to his/her hair test result that is/are in the possession of the Department. Such results and records are confidential medical information and shall not be disclosed without the Officer's consent except to the extent necessary to effectuate the purposes of the Department's Substance Abuse Policy. Positive hair test results shall be retained by the Department and processed in the same manner as any violations of Department Rules and Procedures.

Page 29

COB 0008144

**Boston Police Department**                                    **Rules and Procedures**

**RULE 111**

M)     **Applicability of Rule 111-** The hair testing procedures are effective pursuant to the collective bargaining agreement. Nothing contained herein alters the current Substance Abuse Policy as it relates to other drug/alcohol testing, procedures, or requirements, e.g., switching, adulterating or refusing to be tested are prohibited by Section IV of Rule 111.

COB 0008145

EXHIBIT F

Case 1:05-cv-11832-GAO    Document 36-4    Filed 01/29/2007    Page 2 of 7

1/5/07 DEPOSITION OF ROBERTA MULLAN          RE:      RONNIE JONES, ET AL. V. CITY OF BOSTON, ET AL.

9 (Pages 30 to 33)

Page 30

1    A: Psychemedics Corporation.
2    Q: When did the police department begin using
3 Psychemedics to detect drugs?
4    A: Back in '97 or '98 when we started the pre-employment
5 process.
6    Q: And the City of Boston police department has used
7 Psychemedics for hair testing ever since?
8    A: Yes.
9    Q: Do you know if Psychemedics is certified to perform
10 hair testing?
11    A: To the best of my knowledge they are.
12    Q: Do you know who certified Psychemedics to perform hair
13 testing?
14    A: No.
15    Q: Do you know when Psychemedics received it's
16 certification to perform hair testing?
17    A: No.
18    Q: Are you familiar with the mandatory guidelines for
19 federal workplace drug testing?
20    A: I'm familiar with the fact that they exist.
21    Q: Are you aware that the federal government certifies
22 lags to do urine testing?
23    A: I understood that, yes.
24    Q: Do you know if the federal government certifies labs

Page 31

1 to do hair testing?
2    A: I don't know that.
3    Q: Do you know if hair testing is one of the types or
4 methods of drug testing that's allowed under the mandatory
5 guidelines for federal workplace drug testing?
6    A: I don't know that.
7    Q: Do you know if Psychemedics is a laboratory certified
8 to meet the standards of the mandatory guidelines for federal
9 workplace drug testing?
10    A: I don't know that.
11    MR. BAKER: We're up to 4.
12    (Exhibit No. 4 Marked)
13    MR. BAKER: Just take a moment to look at this
14 document while I get oriented here.
15    (Pause While Witness Reviews Document)
16    MR. BAKER: Just for the record, what we've marked
17 as exhibit 4 appears to be a December 7, 1998 fax from Erin Wall
18 to Roberta Mullan with 'RE:' line, "CERTIFICATION".
19    THE WITNESS: Okay.
20    Q: Have you seen that documents that we've marked as
21 exhibit 4 before?
22    A: I may have. I don't recall specifically.
23    MR. BAKER: I'm sure your attorney has told you this
24 before but if you don't recall, that's a perfectly acceptable

Page 32

1 answer.
2    THE WITNESS: I don't recall.
3    MR. BAKER: We're not asking you to speculate.
4    Q: The document says, "To: Roberta Million" but the
5 spelling is different from your name. Do you know whether or
6 not that refers to you or not?
7    A: I'm sure it does.
8    Q: Do you know who Erin Wall is?
9    A: No, I don't.
10    Q: Do you know who, and I'm going to butcher his name,
11 but John Ciarlo, C-i-a-r-l-o, is?
12    A: Yes, I do.
13    Q: Who is Joan Ciarlo?
14    A: He was a representative of Psychemedics.
15    Q: Do you know what his job was at Psychemedics or what
16 responsibilities he had?
17    A: He may have either been a marketing or sales
18 representative. That's all I know about him.
19    Q: Do you know why Erin Wall sent this fax to you?
20    A: I don't know who she is.
21    Q: It says, "PER REQUEST OF JOHN CIARLO". Do you recall
22 speaking with Mr. Ciarlo about what's been marked as exhibit 4?
23    A: I spoke to Mr. Ciarlo on many occasions. I'm not sure
24 that I specifically requested this. I can't recall.

Page 33

1    Q: Let's go to the first attachment to the fax. I'm
2 going to be referring to Bates numbers off and on throughout the
3 day. They're in the bottom right hand corner generally of the
4 document. For example, this one says, "COB" and it means City
5 of Boston, so it was produced by the defendants, "0006485". Do
6 you see that?
7    A: Yes, I do.
8    Q: This is a document that's called, "Department of
9 Health and Human Services Health Care Financing Administration
10 CLIA LABORATORY CERTIFICATE OF COMPLIANCE". Do you know what
11 this document is?
12    A: I see it. It says, "Certificate of Compliance" but I
13 don't know much more than that about it.
14    Q: The certificate doesn't say that Psychemedics is
15 certified to perform hair testing, does it?
16    A: Repeat that again, please.
17    Q: The certificate doesn't say that Psychemedics is
18 certified to perform hair testing, does it?
19    A: It does not say that specifically.
20    Q: The next page of the fax is marked Bates number
21 "COB6486", Certificate of Achievement from the College of
22 American Pathologists", or at least that's what it says on the
23 document. Do you know what this document is?
24    A: Certificate of Achievement, just as it says.

1/5/07 DEPOSITION OF ROBERTA MULLAN    RE:    RONNIE JONES, ET AL. V. CITY OF BOSTON, ET AL.

12 (Pages 42 to 45)

Page 42

1      (Exhibit No. 7 Marked)
2      MR. BAKER: What we've had marked as exhibit 7 is
3  Section 807.39 of Title 21 of the Code of Federal Regulations.
4  This section reads, "Misbranding by reference to establishment
5  registration or to registration number. Registration of a
6  device establishment or assignment of a registration number does
7  not in any way denote approval of the establishment or its
8  products. Any representation that creates an impression of
9  official approval because of registration or possession of a
10  registration number is misleading and constitutes misbranding."
11     **Q: Did I read that correctly?**
12     A: Yes.
13     **Q: According to this, isn't it correct that a statement**
14  **that Psychemedics' hair test had been approved or certified by**
15  **the FDA would constitute a violation of CFR Title 21, Part**
16  **807.39?**
17     MS. HARRIS: Objection.
18     A:  Could you repeat that again, please.
19     MR. BAKER: Sure.
20     **Q: According to this document, and I guess also the**
21  **document that we just looked at which was Psychemedics' 510(k)**
22  **premarket notification, isn't it correct that the statement that**
23  **Psychemedics hair test had been approved or certified by the FDA**
24  **would constitute a violation of CFR Title 21, Part 807.39?**

Page 43

1      MS. HARRIS: I'll object. Go ahead.
2  A: I don't know.
3     **Q: Did you ever examine whether it would be lawful for**
4  **Psychemedics to state that its hair test had been officially**
5  **certified?**
6  A: I did not.
7     **Q: Do you know if anyone at the police department ever**
8  **examined whether it would be lawful for Psychemedics to state**
9  **that its hair test had been officially certified or approved?**
10
11  A: I don't know that.
12     (Exhibit No. 8 Marked)
13     MR. BAKER: Just take a moment to review what's been
14  marked as exhibit 8.
15     (Pause While Witness Reviews Document)
16     MR. BAKER: It's very hard to read on the copy that
17  I provided but just to describe it for the record, at the top
18  left of the document it says, "Hair Drug Testing: Fact v.
19  Fiction".
20     **Q: Have you had a moment to look at the document?**
21  A: I have.
22     **Q: If you look at the last page it is dated, "2005" or it**
23  **says, "@ 2005 Boston Police Department. All rights reserved."**
24  **Do you see that?**

Page 44

1  A: Yes.
2     **Q: Have you seen this document in the Department's**
3  **internal web page?**
4  A: Yes, I have.
5     **Q: Do you know if this document is posted on the internal**
6  **web page today?**
7  A: I don't know that it is.
8     **Q: Do you know when the last time you saw it on the**
9  **internal web page?**
10  A: The last time I saw it was the first time it come out.
11     **Q: When was that?**
12  A: Maybe three years ago.
13     **Q: Does anyone in the police department have access to**
14  **the internal web page?**
15  A: I don't know that.
16     **Q: You have access to the internal web page?**
17  A: Yes, I do.
18     **Q: Do you know if police officers have access to the**
19  **internal web page?**
20  A: I believe some do. I'm not sure they all do.
21     **Q: Do you know if the City drafted the language in what's**
22  **been marked as exhibit 8, the City or the police department?**
23  A: I don't know who drafted it.
24     **Q: So you don't know if it was drafted by anyone in the**

Page 45

1  police department?
2  A: I don't know that.
3     **Q: Do you recall doing any research or investigation for**
4  **the statements that are made in exhibit 8?**
5  A: I don't recall doing any investigation.
6     **Q: Do you recall directing anyone to do an investigation**
7  **of the statements made in the exhibit 8?**
8  A: No.
9     **Q: The document starts by stating that, "Since the**
10  **introduction of hair drug testing in January of 1999, the**
11  **Department has conducted over 6,804 hair tests on samples**
12  **provided by police officers. Only forty-five officers have**
13  **tested positive in that time, out of the approximately 2,200**
14  **sworn officers who have been tested annually." Did I read that**
15  **correctly?**
16  A: Yes.
17     **Q: Where does the police department keep its statistics**
18  **concerning the total number of people who have taken the drug**
19  **test?**
20  A: I have a database that we use for scheduling. It
21  doesn't specifically extract a date or how many have been done.
22     **Q: Do you know how someone would be able to make a**
23  **representation that the Department has conducted over 6,804 hair**
24  **tests?**

1/5/07 DEPOSITION OF ROBERTA MULLAN      RE:     RONNIE JONES, ET AL. V. CITY OF BOSTON, ET AL.

15 (Pages 54 to 57)

---

Page 54

1    A: That they were reliable.

2    **Q: Anything else?**

3    A: No.

4    **Q: What basis did you decide that Psychemedics was**

5    **reliable for hair testing?**

6    A: From my perspective, reliability meant that we got

7    results without any due. The shipping was fine. It seemed to

8    be a smooth process.

9    **Q: When you use the word reliability in terms of**

10   **Psychemedics does that mean accurate in terms of the result?**

11   A: No, that doesn't. Strictly from an operational

12   standpoint from my perspective.

13   **Q: Have you ever looked at whether or not Psychemedics'**

14   **hair testing results are accurate?**

15   A: I presume they're accurate.

16   **Q: Have you ever done any investigation to determine**

17   **whether they're accurate?**

18   A: That's a scientific investigation that I wouldn't be

19   able to undertake.

20   **Q: Do you know if anyone at the police department has**

21   **ever investigated whether Psychemedics' hair testing is**

22   **accurate?**

23   A: I don't know that.

24   **Q: Looking back at the document that's been marked as**

---

Page 55

1    exhibit 8, looking at the bottom it says, "Psychemedics has

2    conducted well over two million hair drug tests." Do you see

3    that?

4    A: Yes.

5    **Q: And then it says, "Because it conducts so many hair**

6    **tests, Psychemedics' procedures and technology have been heavily**

7    **challenged and have consistently been upheld in every court in**

8    **which they have been challenged." Did I read that correctly?**

9    A: Yes.

10   **Q: Do you know how many times a judge or jury in the**

11   **United States has upheld Psychemedics' procedures as**

12   **scientifically valid?**

13   A: I do not know that.

14   **Q: Do you know whether the police department has ever**

15   **done any investigation as to the representation that**

16   **Psychemedics' procedures and technology have been heavily**

17   **challenged and have consistently been upheld in every court in**

18   **which they have been challenged?**

19   A: I don't know that.

20   **Q: Turn to the next page there's a section called,**

21   **"Testing" about halfway down?**

22   A: Yes.

23   **Q: Can you just take a moment to review those paragraphs**

24   **there? There's three paragraphs.**

---

Page 56

1    (Pause While Witness Reviews Document)

2    A: Yes.

3    **Q: Have you ever seen a copy of Psychemedics' policies**

4    **and procedures manual for performing the hair test?**

5    A: No.

6    **Q: Do you know if the police department has a copy of**

7    **Psychemedics' policies and procedures manual for performing the**

8    **hair test?**

9    A: I don't know that.

10   **Q: At the bottom of the page there's a section that**

11   **starts and it goes on to the top of the next page that's called,**

12   **"Cutoff levels." It says, "All drugs are screened at specific**

13   **cutoff level. The cutoff level is established by the laboratory**

14   **and industry standards, and ensures that low levels of drugs**

15   **from external or passive contamination will not result in a**

16   **positive drug test." Are there any government approved cutoff**

17   **levels for hair testing?**

18   A: I don't think I know that.

19   **Q: I guess you go to the next page the fourth question**

20   **states, "Can I test positive from an external or environmental**

21   **contamination or exposure to drugs?" The answer starts, "No."**

22   **Do you know who drafted the answer to this question, number**

23   **"4."?**

24   A: No.

---

Page 57

1    **Q: The next paragraph that starts, "For external**

2    **contamination, (having drugs on your hair) Psychemedics has an**

3    **elaborate `washing' process, which includes washing the hair**

4    **sample multiple times and testing the wash water for the**

5    **presence of drugs before any testing on the hair sample begins."**

6    **Did I read that correctly?**

7    A: Yes.

8    **Q: Does anyone at the police department know about the**

9    **procedures that Psychemedics uses for its washing process?**

10   A: Did you ask does anyone? I don't know that.

11   **Q: I take it you don't know what procedures Psychemedics**

12   **uses for its wash?**

13   A: I do not know.

14   **Q: Do you know if anyone at the police department has**

15   **compared Psychemedics' washing process to alternative washing**

16   **processes that could be used to remove external contamination of**

17   **hair?**

18   A: I don't know that.

19   **Q: Do you know if Psychemedics has changed its washing**

20   **process since the police department began using the test in 1999**

21   **for all officers?**

22   A: I don't know that.

23   **Q: The next page number "5." question reads, "Is there a**

24   **race bias in hair testing?" Just take a moment to review the**

---

Case 1:05-cv-11832-GAO    Document 36-4    Filed 01/29/2007    Page 5 of 7

1/5/07 DEPOSITION OF ROBERTA MULLAN        RE:      RONNIE JONES, ET AL. V. CITY OF BOSTON, ET AL.

16  (Pages 58 to 61)

Page 58

1  answer to that question.
2      (Pause While Witness Reviews Document)
3      A: Yes.
4      Q: The answer begins, again the question is, "Is there a
5  race bias in hair testing?" And the answer begins, "No. There
6  is a misguided theory that race is a factor in drug testing
7  results, and that it could possibly cause a positive drug test
8  result. This theory is scientifically invalid, and has
9  mis-characterized the original theory regarding hair color." Do
10  you know who drafted this section?
11      A: I do not.
12      Q: Do you know if the police department has ever
13  investigated whether the theory that race is a factor in drug
14  testing is scientifically valid?
15      A: I do not.
16      Q: The last paragraph of this section do you see where it
17  refers to Alicia McDonnell?
18      A: Yes.
19      Q: Do you know who Ms. McDonnell is?
20      A: She was an attorney that worked with us.
21      Q: Do you know if she in fact had copies of every study
22  ever published concerning whether hair testing has a race bias,
23  color bias or texture bias?
24      A: I do not know.

Page 59

1      Q: Have you ever read any scientific studies regarding
2  hair testing?
3      A: I read one that I can, in the race bias issue?
4      Q: Any issue regarding hair testing?
5      A: I may have read a couple.
6      Q: What were the topics addressed in the studies?
7      A: The two that I recall is the race bias issue along
8  with drug testing of I believe DEA agents.
9      Q: Do you know if that was the narcotics unit of the
10  Miami Dade County Police Department?
11      A: It may have been. I'm not sure what unit it was,
12  actually.
13      Q: What was the other study about the hair testing that
14  you recall reading?
15      A: I may have done some internet search initially but I
16  really don't recall.
17      Q: When would you have done an internet search?
18      A: Back in '97, '98.
19      Q: Was that before the police department started using
20  the hair test?
21      A: Prior to using it for pre-employment, yes.
22      Q: And pre-employment was the first use of the hair test.
23  Correct?
24      A: Yes.

Page 60

1      Q: You said you recall reading a study about DEA agents
2  or narcotics unit. Do you know why you read the study?
3      A: I read that study because I believe the MRO had a
4  question on a positive drug test for a police officer who said
5  that he worked in the drug unit when in fact he didn't. It just
6  piqued my curiosity.
7      Q: Just for clarification, the police officer that you're
8  referring to as someone on the drug unit or wasn't on the drug
9  unit, was that a police officer at the Boston Police Department?
10      A: Yes.
11      Q: The Boston Police Department has a drug control
12  division?
13      A: It does.
14      Q: Is that what it's called?
15      A: A drug unit, I think. It might be drug control unit.
16      Q: How many officers are there in the drug unit?
17      A: I have no idea.
18      Q: Has an officer on the drug unit on the Boston Police
19  Department ever tested positive for drugs?
20      A: Not to my knowledge.
21      Q: I'll admit that I'm clueless about what someone in the
22  drug unit would do but I take it that they would handle drugs?
23      A: I would think so, yes.
24      Q: Do they have training on how to handle drugs?

Page 61

1      A: I don't know that.
2      MR. BAKER: I'm going to go on to another topic. We
3  can take a break now if you'd like, or I can keep going.
4      THE WITNESS: That's fine. I'm okay.
5      (Exhibit No. 9 Marked)
6      Q: I believe this is just a one page document but if you
7  just take a moment to review it?
8      (Pause While Witness Reviews Document)
9      A: Yes.
10      Q: Just for the record, it's a June 16, 1998 document
11  from Roberta Mullan, Principal Administrative Assistant
12  Occupational Health Services Unit to William Good, Chief Bureau
13  of Administrative Affairs with a "RE:" line "DRUG TESTING
14  STATISTICS PRE-SCREENING FOR RECRUIT APPLICANTS". Have you seen
15  this document before?
16      A: Yes.
17      Q: Just for the record, can you describe what this
18  document is?
19      A: It was a response to a request for information, how
20  many drug tests we did during certain periods of time and to
21  extract how many positives from those drug tests that we had.
22      Q: Who made the request for information?
23      A: I have to assume it was Bill Good. That's who it was
24  directed to. William Good, excuse me.

1/5/07 DEPOSITION OF ROBERTA MULLAN          RE:          RONNIE JONES, ET AL. V. CITY OF BOSTON, ET AL.

44 (Pages 170 to 173)

Page 170

1  **1997?**
2      A: We had a refresher by a new representative who was
3  coming in to be a train the trainer type of person. I'm not
4  sure when that was but that was a few years ago.
5      **Q: Are you the only person responsible for training**
6  **employees of the Occupational Health Services Unit and human**
7  **resources to collect hair samples?**
8      A: I have allowed my staff under my supervision to help
9  train new employees that come into my office.
10     **Q: Let me clarify my question. I asked who is**
11 **responsible for training, let's just refer to those three**
12 **individuals from the Human Resources Department and the**
13 **individuals in Occupational Health Services Unit, let's refer to**
14 **them as the collectors. Who is responsible the collectors?**
15     A: I am.
16     **Q: Are you the only person responsible for training the**
17 **collectors?**
18     A: I'm responsible to make sure that they're trained
19 appropriately. Some of my staff who are already trained and
20 certified help assist in training new employees.
21     **Q: Who at Psychemedics trained you to collect hair**
22 **samples in 1997?**
23     A: I'm not absolutely certain. I know John Ciarlo was
24 there. I don't know how much interaction or what role he

Page 171

1  actually played in that training. There was someone else there
2  but I'm not sure who it was.
3      **Q: Can you please describe for me what your training**
4  **entailed?**
5      A: The training entailed how to determine how much hair
6  to take from a person, where to take the hair from a person, how
7  to do it so that we did it in the most appropriate way possible,
8  meaning that we're not scalping people, making them bald and how
9  to fill out the paperwork.
10     **Q: How are you trained to cut hair? Did someone act as a**
11 **guinea pig or how were you trained?**
12     A: Yes. We had people in the office that subjected
13 themselves to allowing us to cut their hair.
14     **Q: People at Psychemedics' office?**
15     A: No, at my office. They came onsite to do it.
16     **Q: Do you know who those people were?**
17     A: At the time, no.
18     **Q: How many times did you receive that training to**
19 **collect hair samples?**
20     A: Once with official training and the second time there
21 was a refresher course that they brought a new person in to
22 train us.
23     **Q: Who is "they"?**
24     A: Psychemedics.

Page 172

1      **Q: Do you remember when the refresher course was held?**
2      A: No.
3      **Q: Was it within the past three years?**
4      A: No, it was longer than that I think. I'm not really
5  sure.
6      **Q: Your training session, how long was that training**
7  **session with Psychemedics to collect hair samples?**
8      A: I don't know.
9      **Q: Did you take any exams as part of the training?**
10     A: They have a written exam in the back of their training
11 manual that we took to get certified.
12     **Q: Did they distribute any manuals, brochures, or**
13 **literature of any kind as part of the training?**
14     A: They gave us training manuals.
15     **Q: What were the training manuals about, generally?**
16     A: How to collect a hair sample, how to fill out the
17 paperwork. That's it.
18     **Q: As part of this training did they assign any homework**
19 **or short assignments of any kind?**
20     A: The only thing they asked us to do is to view a video
21 which was a videotape which also showed the collection
22 procedure. That's it.
23     **Q: When you were trained as a trainer who else was**
24 **trained with you?**

Page 173

1      A: No one.
2      **Q: So it was just you?**
3      A: Yes.
4      **Q: How many instructors again from Psychemedics?**
5      A: I believe there was two people there but I'm not sure
6  which role they played. One was an instructor and I don't know
7  that John Ciarlo had any role in it. I'm not sure, just to
8  oversee it.
9      **Q: Did you read the Psychemedics training manual in its**
10 **entirety?**
11     A: Yes.
12     MS. WEBSTER: I'd like to mark this as the next
13 exhibit.
14     (Exhibit No. 44 Marked)
15     MS. WEBSTER: Please take a moment to review the
16 document that's just been marked as exhibit 44.
17     THE WITNESS: Yes.
18     **Q: Have you seen these documents before?**
19     A: Yes.
20     **Q: Are they from your file?**
21     A: I believe they are.
22     **Q: The top of this document, numbered "COB0031297" reads,**
23 **"RULE 111 TRAINING SCHEDULE"?**
24     A: Yes.

1/5/07 DEPOSITION OF ROBERTA MULLAN          RE:      RONNIE JONES, ET AL. V. CITY OF BOSTON, ET AL.

46 (Pages 178 to 181)

Page 178

1  it in conjunction with the training video to learn how to
2  collect samples. Once you have reviewed this manual and feel
3  comfortable with the sample collection process, please take some
4  time to complete the Sample Collection Examination found at the
5  end of this manual. Upon successful completion of this exam, we
6  will send you a Collection Certification Certificate. This
7  certification process does not have to be completed prior to
8  collecting samples." Did I read this correctly?
9      A: You did.
10     Q: What is the training video referenced in the statement
11 I just read to you?
12     A: It's a short video, ten minutes maybe of how to
13 collect a hair sample.
14     Q: Did Psychemedics provide you with copies or a copy of
15 that video?
16     A: Yes.
17     Q: Where do you keep that copy?
18     A: In my office.
19     Q: Did you distribute that video to any of your
20 employees?
21     A: They all see it.
22     Q: But they don't have their own copies?
23     A: No, they do not.
24     Q: When did they see the video?

Page 179

1      A: Prior to their certification.
2      Q: Would you characterize the collection process as easy?
3      A: Yes.
4      Q: Why?
5      MS. HARRIS: Just for clarification, you mean the
6  physical collection?
7      MS. WEBSTER: Collecting hair.
8      A: Yes, it's a short process. It's certainly less
9  cumbersome than a urine sample for us. Once you know how to
10 snip the hair and how much to take, it's very simple.
11     MS. WEBSTER: I'd like to mark this as the next
12 exhibit, please.
13     (Exhibit No. 47 Marked)
14     MS. WEBSTER: Ms. Mullan, please take a moment to
15 review the document that has just been marked as exhibit 47.
16     (Pause While Witness Reviews Document)
17     THE WITNESS: Yes.
18     Q: Do you recognize these documents?
19     A: I do.
20     Q: What are they?
21     A: They are the actual sample collection examinations
22 from myself and three other members of my staff, I believe.
23     Q: Who are those members from your staff?
24     A: Darlene Filetti, former members of my staff; Mary

Page 180

1  Howe, Denise Sullivan.
2      Q: Let me just go back to describe this. This is a
3  August 13, 1998 fax from you to Psychemedics. Is that correct?
4      A: Yes.
5      Q: Were you sending this fax to a particular individual
6  at Psychemedics?
7      A: No.
8      Q: In terms of the hair test was there a contact person
9  that you dealt with at Psychemedics on a regular basis?
10     A: The only person that I really had contact with was
11 John Ciarlo who was the sales rep for the area.
12     Q: But you weren't sending this fax to John Ciarlo?
13     A: No, I was not.
14     Q: The first page of this fax number "COB0026849" on the
15 bottom of the page it reads, "I would appreciate your review and
16 issuance of certificates as soon as practicable. Thank you. for
17 your cooperation in this matter." Did I read that correctly?
18     A: You did.
19     Q: In the sentence I just read were you referring to
20 collection certificates for the hair drug test?
21     A: Yes.
22     Q: What is a collection certificate?
23     A: It's a collection certificate, it's a certificate
24 certifying that we have passed their test.

Page 181

1      Q: Passed whose test?
2      A: Psychemedics' written test.
3      Q: Why did you want the collection certificates as soon
4  as practicable?
5      A: So that we could have them on file.
6      Q: Why did you want them on file?
7      A: Because we should. We wanted to be certified.
8      Q: So do you believe that it's necessary to have the
9  collection certificates?
10     MS. HARRIS: To collect hair?
11     Q: Do you believe that it's necessary to have the
12 collection certificates in order to collect hair samples?
13     A: I think it's good to have them.
14     Q: Please turn to the next page of this document which is
15 numbered "COB0026850" and this document includes a heading that
16 reads, "SAMPLE COLLECTION EXAMINATION".
17     A: Yes.
18     Q: I believe you mentioned it earlier but what is a
19 Sample Collection Examination?
20     A: It's a written test that's in the back of the training
21 manual that we fill out and forward to Psychemedics for
22 certification.
23     Q: Who drafts the Sample Collection Examination?
24     A: I don't know.