# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **RONNIE JONES, ET AL.,** | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | )   CIVIL ACTION |
| | )   NO.  05-11832-GAO |
| **CITY OF BOSTON, ET AL.,** | ) |
| | )   **HEARING REQUESTED** |
| **Defendants.** | ) |
| | ) |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL PSYCHEMEDICS CORPORATION TO PRODUCE ITS STANDARD OPERATING PROCEDURES FOR TESTING HAIR SAMPLES FOR DRUGS OF ABUSE

Nadine Cohen, BBO # 090040
Lawyers' Committee for Civil Rights
  Under Law of the Boston Bar Association
294 Washington Street, Suite 443
Boston, Massachusetts 02108
(617) 482-1145

Maricia Woodham, BBO # 600886
SABEL & SABEL, P.C.
Hillwood Office Center
2800 Zelda Road; Ste. 100-5
Montgomery, AL 36106
(334) 271-2770

Louis A. Rodriques, BBO # 424720
Rheba Rutkowski, BBO # 632799
Raquel J. Webster, BBO # 658796
Robert B. Baker, BBO # 654023
Eric A. Heining, BBO # 664900
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA 02110
(617) 951-8000

Counsel for Plaintiffs

Dated:  May 15, 2007

<u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ............................................................................................................... 3

    A.    Procedural History of Plaintiffs' Efforts to Request The SOPs............................ 3

    B.    The SOPs Are The Most Critical Documents in This Case ................................ 6

        1.    The Importance of Psychemedics' "Wash Procedures" ........................... 6

        2.    The Importance of Psychemedics' Initial And "Safety-Net" Hair
            Test Procedures ....................................................................................... 9

ARGUMENT .................................................................................................................. 10

CONCLUSION................................................................................................................ 13

i

<u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 190 F.R.D. 287 (D. Mass. 2000) ...........................11

*Ares-Serono, Inc. v. Organon Int'l B.V.*, 151 F.R.D. 215 (D. Mass. 1993) ......................11, 12, 13

*Bailey v. Dart Container Corp. of Mich.*, 980 F. Supp. 560 (D. Mass. 1997)..........................12,13

*Brazburg v. Hayes*, 408 U.S. 665 (1972) ....................................................................................10

*Compagnie Francaise d'Assurance Pour le Commerce Exterieur* v. *Phillips Petroleum Co.*, 105 F.R.D. 16 (S.D.N.Y. 1984) ......................................................................................5

*FDIC v. Ogden Corp.*, 202 F.3d 454 (1st Cir. 2000) ....................................................................11

*Federal Open Market Committee v. Merrill*, 443 U.S. 340 (1979) ...............................................11

*GTE Prods. Corp. v. Gee*, 112 F.R.D. 169 (D. Mass. 1986) ....................................................12, 13

*General Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d 1204 (8th Cir. 1973) ...................................5

*Horizons Titanium Corp. v. Norton Co.*, 290 F.2d 421 (1st Cir. 1961)........................................13

*ITT Electro-Optical Prods. Div. of ITT Corp. v. Electronic Tech. Corp.*, 161 F.R.D. 228 (D. Mass. 1995)....................................................................................................................11

*Kelling v. Bridgestone/Firestone, Inc.*, 157 F.R.D. 496 (D. Kan. 1994) .......................................12

*Kleinerman v. United States Postal Service*, 100 F.R.D. 66 (D. Mass. 1983)...............................11

*Obiajulu v. City of Rochester*, 166 F.R.D. 293 (W.D.N.Y. 1996).................................................12

*United States v. Nixon*, 418 U.S. 683 (1974) ...............................................................................10

*White v. Beloginis*, 53 F.R.D. 480 (S.D.N.Y. 1971) .......................................................................5

### STATE CASES

*In the Matter of Roche*, 411 N.E.2d 466 (Mass. 1980)................................................................10

ii

TABLE OF AUTHORITIES
(continued)

Page

**FEDERAL STATUTES**

CFR Title 21 ................................................................................................................................7

Fed. R. Civ. P. 25(d) ....................................................................................................................1

Fed. R. Civ. P. 26(c)(7)..............................................................................................................13

ACTIVE/72003172.4

## PRELIMINARY STATEMENT

This is a civil rights action concerning the defendants'[1] flawed, imprecise, unreliable, arbitrary, and racially biased mandatory drug test performed on hair samples (the "Hair Test"). As plaintiffs have alleged, the Hair Test is unlawful because, among other reasons, it (a) has a disparate, adverse, and discriminatory impact on Boston police officers and applicants of color; (b) is used despite the availability of alternative testing methods and procedures that would have less disparate, adverse, and discriminatory impact on Boston police officers and applicants of color; and (c) constitutes discrimination on the basis of a false and erroneous perception that the plaintiffs used drugs.

Since the Hair Test was implemented in January 1999, the defendants have contracted exclusively with Psychemedics Corporation ("Psychemedics"), a company exclusively engaged in testing hair for drugs of abuse, to perform the Hair Test on hair samples submitted to Psychemedics by the Boston Police Department ("BPD"). While plaintiffs do not oppose mandatory drug testing, they maintain that the Hair Test performed by Psychemedics is unreliable and scientifically flawed in that Psychemedics' procedures are inadequate to exclude external contamination of hair samples as the reason for a positive result on the Hair Test. Plaintiffs also maintain that the Hair Test performed by Psychemedics has a disparate, adverse, and discriminatory impact on Boston police officers and applicants of color because these officers and applicants are more likely to have a "false positive" on the Hair Test than other officers and applicants. To prove these aspects of their case, Plaintiffs intend to call an expert witness to demonstrate that Psychemedics' hair testing procedures are unreliable and scientifically flawed. Plaintiffs also intend to call an expert witness to demonstrate that the Hair

---

[1] The defendants are the City of Boston, the Boston Police Department, and Edward Davis ("Mr. Davis"), Commissioner of the Boston Police Department (collectively referred to herein as "defendants"). Plaintiffs initiated this action against the City of Boston, the Boston Police Department, and former Boston Police Department Commissioner Kathleen O'Toole ("Ms. O'Toole"). Plaintiffs sued Ms. O'Toole in her official capacity. Mr. Davis has replaced Ms. O'Toole as Commissioner of the Boston Police Department. Therefore, pursuant to Fed. R. Civ. P. 25(d), Mr. Davis "is automatically substituted as a party" for Ms. O'Toole.

Test has a disparate, adverse, and discriminatory impact on Boston police officers and applicants of color.

On November 3, 2006, plaintiffs caused a subpoena to be issued and served on Psychemedics, for the purpose of obtaining for their experts the evidence necessary to prove plaintiffs' allegations, to which Psychemedics objected. A copy of the plaintiffs' subpoena to Psychemedics is attached hereto as Exhibit A. Although plaintiffs and Psychemedics have progressed in resolving some of Psychemedics' objections to the subpoena, Psychemedics will not back down on its refusal to produce its Standard Operating Procedures ("SOPs") used in performing the Hair Test.[2]

It is beyond dispute that important aspects of this case turn on the scientific validity of Psychemedics' hair testing procedures and, therefore, there can be no dispute that Psychemedics' SOPs are indispensable to the prosecution of this case. For example, unlike urine samples, hair specimens tested for drugs are subject to passive external contamination by drugs before the sample is taken for drug testing. Psychemedics advertises to its customers, including the defendants, that its "wash procedures" are effective at removing such external contamination. In reliance on Psychemedics, defendants take the same position. Plaintiffs must know what Psychemedics' "wash procedures" are in order to demonstrate why they are not effective in eliminating passive external contamination as the cause for a positive result on the Hair Test.

In the face of a compelling need for Psychemedics' SOPs, and despite several efforts by plaintiffs to address Psychemedics' concerns, Psychemedics continues to hide behind blanket,

---

[2] As set forth in an April 13, 2007 letter from plaintiffs' counsel to counsel for Psychemedics following an April 11, 2007 meet-and-confer conference call (attached hereto as Exhibit B), Psychemedics has agreed to produce documents that would satisfy many of plaintiffs' document requests. However, Psychemedics still has not produced any of these documents. During the same meet-and-confer discussion, Psychemedics' counsel agreed to reconsider many of its objections to plaintiffs' document requests. In the event that Psychemedics either refuses to produce the documents it agreed to produce on April 11, 2007 and/or refuses to produce sufficient documents in response to the requests it has agreed to reconsider, plaintiffs reserve their rights to file another motion to compel, seeking an order directing Psychemedics to produce documents and information in addition to the SOPs.

ACTIVE/72003172.4

conclusory objections of burden and confidentiality.  For the reasons set forth below, the Court should compel Psychemedics to fulfill its obligation under the subpoena to produce the SOPs subject to the Order Governing The Production And Exchange of Confidential Information ("Protective Order") already in place in this litigation.

## BACKGROUND

**A.    Procedural History of Plaintiffs' Efforts to Request The SOPs**

Six of plaintiffs' document requests specifically focus on Psychemedics' SOPs, defined as follows:

> Psychemedics' Standard Operating Procedures include any documents describing the policies and procedures followed by Psychemedics in testing hair for cocaine, including, but not limited to: Psychemedics' Laboratory Polices and Procedures Manual and any updates thereto; Psychemedics' procedures for chain of custody and updates thereto; Psychemedics' procedures for sample aliquoting and updates thereto; Psychemedics' procedures for preparation [of samples] for an immunoassay and updates thereto; Psychemedics' procedures for immunoassay and updates thereto; Psychemedics' criteria for a positive immunoassay and updates thereto; Psychemedics' confirmation procedures and updates thereto; Psychemedics' [confirmation and immunoassay] calibration curve[s] and updates thereto; Psychemedics' method of generation of the calibration curve[s] (line forced through zero, least squares, weighted least squares, etc.) and updates thereto; Psychemedics' criteria for a poor calibration curve and updates thereto; Psychemedics' procedures for a poor sample and updates thereto; Psychemedics' procedures for subtraction of blank values and updates thereto; Psychemedics' procedures for the amount of internal standard and updates thereto; Psychemedics' procedures for quality control and updates thereto; and Psychemedics' procedures for confirmation positive and updates thereto.

Specifically, plaintiffs requested:

- Psychemedics' Standard Operating Procedures in effect between January 1, 1994 and the present.[3] (Document Request 5)

---

[3] Upon information and belief, Psychemedics made some important changes in their SOPs in approximately 1999, not long after the BPD began to use the Hair Test.  If Psychemedics were to produce its comparison data and other information regarding the changes to the SOPs in 1999, plaintiffs would agree to withdraw their request for SOPs during the period 1994-1998.

ACTIVE/72003172.4

- All documents and communications concerning changes to Psychemedics' Standard Operating Procedures between January 1, 1994 and the present. (Document Request 6)

- All documents and communications concerning Psychemedics' Standard Operating Procedures between January 1, 1994 and the present. (Document Request 7)

- All documents and communications concerning the policies, procedures, methods, and standards used by Psychemedics in testing hair samples for the presence of illegal drugs, including cocaine, between January 1, 1994 and the present. (Document Request 8)

- Documents concerning Psychemedics decision to use Liquid Chromatography/Mass Spectrometry/Mass Spectrometry (LC/MS/MS) instead of gas chromatography/mass spectrometry (GC/MS) for analyzing hair samples to detect cocaine, including, but not limited to, documents concerning the relative costs of liquid chromatography to gas chromatography to test hair for cocaine. The time period for this request is January 1, 1994 to the present. (Document Request 9)

- All documents and communications concerning the standards, methods, procedures, and criteria to be applied in connection with all aspects of the Hair Test, including the collection, transmission, storage, and testing of the samples, and the analysis confirmation, and reporting of the test results. (Document Request 10)

On November 17, 2006, Psychemedics' counsel responded in writing to the subpoena, objecting to each specific request contained therein. A copy of Psychemedics' November 17, 2006 objections to the plaintiffs' subpoena is attached hereto as Exhibit C. Psychemedics stated that plaintiffs' requests concerning the SOPs were "unduly burdensome." However, as with plaintiffs' other document requests, Psychemedics made no effort to explain why the requests were burdensome or how the requests could be narrowed to alleviate Psychemedics' claimed undue burden. Psychemedics also objected that the SOPs contained "trade secrets and confidential, proprietary information," again, without articulating any basis for its blanket assertions. Psychemedics still has not produced any documents in response to the subpoena.

In a February 28, 2007 letter (attached hereto as Exhibit D), plaintiffs' counsel described in detail why Psychemedics' blanket, conclusory objections to the subpoena were unsatisfactory and again requested production of the documents identified in the subpoena. In particular,

plaintiffs stated that Psychemedics had not articulated a sufficient basis for withholding the SOPs, and that plaintiffs would be forced to move this Court to compel production of the SOPs if Psychemedics did not comply with its discovery obligations.

On April 11, 2007, counsel for plaintiffs and Psychemedics conferred via telephone in an effort to resolve Psychemedics' objections to the subpoena. Psychemedics maintained its objections to plaintiffs' requests for the SOPs, asserting that the SOPs were Psychemedics' most confidential documents and that Psychemedics would not produce them voluntarily. To address Psychemedics' undue-burden objection, plaintiffs suggested that Psychemedics might at first produce only the table of contents to the SOPs so that plaintiffs might determine whether it is possible to narrow their requests further. Psychemedics refused, indicating that its primary objection regarding the SOPs related to the alleged confidentiality of the documents, rather than to any purported undue burden.[4]

As they had in the February 28, 2007 letter to Psychemedics regarding its objections to the subpoena, plaintiffs' counsel then reminded Psychemedics' counsel that this Court had issued a Protective Order that would protect the confidentiality of its SOPs. Psychemedics' counsel responded that no confidentiality order could allay its concerns, since, if Psychemedics produced

---

[4] Because it appears that confidentiality is the only objection Psychemedics is now asserting for its failure to produce its SOPs, the Argument section below deals only with this narrow issue. To the extent Psychemedics seeks to renew its undue-burden objection, Psychemedics' blanket assertion is also insufficient to justify its refusal to produce the SOPs. Psychemedics cannot seriously maintain that production of the SOPs would be unduly burdensome. Moreover, its objections are too generalized and conclusory to overcome Psychemedics' duty to comply with the subpoena. *See, e.g., General Dynamics Corp. v. Selb Mfg. Co.,* 481 F.2d 1204, 1212 (8th Cir. 1973), (stating that the producing party has the burden to demonstrate good cause for the issuance of an order quashing a subpoena, and claims of harm have to be based on more than stereotypical and conclusory statements); *Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.,* 105 F.R.D. 16, 42 (S.D.N.Y. 1984) (holding that conclusory allegations of undue burden were insufficient grounds to object to request for production); *White v. Beloginis,* 53 F.R.D. 480, 481 (S.D.N.Y. 1971) (finding that an entity cannot escape its obligation to produce documents in response to a legally valid discovery request by simply intoning the familiar refrain that the requests are burdensome, oppressive, or overly broad).

the SOPs to plaintiffs, it would be producing the SOPs to a "competitor." Plaintiffs' counsel disagreed, stating that the plaintiffs are not competitors, and, moreover, the Protective Order prohibits documents produced pursuant thereto to be used for purposes other than this litigation. Plaintiffs then informed counsel to Psychemedics that, if Psychemedics persisted in refusing to produce the SOPs or to provide specific facts to support its objections, then Plaintiffs would be left with no choice but to file a motion to compel production of the SOPs.

On April 13, 2007, Plaintiffs sent Psychemedics a letter formally stating Plaintiffs' intention to file such a motion. *See* Exhibit B. Psychemedics still has not produced the SOPs.

## B.     The SOPs Are The Most Critical Documents in This Case

Psychemedics has published numerous studies defending the validity of its Hair Test.[5] Psychemedics uses its conclusions from these studies in marketing its Hair Test, and defendants rely on the same conclusions to defend the validity of the Hair Test. To the extent Psychemedics actually uses the SOPs described in its published studies, Psychemedics' SOPs are not confidential and Psychemedics cannot hide behind its blanket, conclusory confidentiality objections in refusing to produce its SOPs. On the other hand, to the extent Psychemedics does not use the SOPs described in its published studies, plaintiffs have a compelling need for Psychemedics actual SOPs in order to challenge the validity of the Hair Test.

### 1.     The Importance of Psychemedics' "Wash Procedures"

Psychemedics tests hair samples for the presence of cocaine, marijuana, opiates (including heroin and oxycodone), methamphetamine, Ecstasy (MDMA), Eve (MDEA) and

---

[5] *See, e.g.,*, Thomas Cairns, Virginia Hill, Michael Schaffer & William Thistle, *Removing and identifying drug contamination in the analysis of hair*, 145 Forensic Sci. J. 97, 108 (June 26, 2004) ("The studies described here demonstrate successful decontamination and/or identification of samples exposed to environmental drug in a variety of scenarios . . . . No contamination scenario . . . . created difficulties for the decontamination procedures in distinguishing contaminated samples from samples positive through drug ingestion. Clearly, however, without washing, essentially all of the samples reported in this paper would be positive by virtue of containing drug above the cutoff levels."); Thomas Cairns, Virginia Hill, Michael Schaffer & William Thistle, *Levels of cocaine and its metabolites in washed hair of demonstrated cocaine users and workplace subjects*, 145 Forensic Sci. J. 175 (June 26, 2004); Werner A. Baumgartner & Virginia Hill, *Sample Preparation Techniques*, 63 Forensic Sci. J. (Dec. 10, 1992).

ACTIVE/72003172.4

phencyclidine (PCP).  To market its Hair Test for these drugs, Psychemedics had to receive "510(k) clearance" for each of the drugs from the Food and Drug Administration ("FDA").  The 510(k) application process requires a showing that a device is "substantially equivalent" to a device already on the market.[6]  Therefore, in its 510(k) applications, Psychemedics provided the results of some of its studies comparing the effectiveness of its Hair Test to other drug tests already on the market (e.g., urine testing).

One of the problems with the Hair Test is external contamination.  Psychemedics claims to have a procedure to mitigate external contamination that consists of washing the hair with buffer a number of times, saving the last wash for subsequent analysis by radioimmunoassay (which measures drug and metabolites together), dissolving the hair, and analyzing specific drugs and metabolites in the hair by an instrumental assay that can discern what drug and metabolite is present.  In its publicly available 510(k) application for marketing its Hair Test for morphine, Psychemedics described its "Studies of Washing to Remove External Contamination":

> To test the efficacy of wash procedures, 33 opiate-negative samples were contaminated with morphine by the most severe method of soaking in a concentrated solution of morphine.  These samples were then washed for 15 minutes at 37ºC with dry isopropanol, then three times for 30 minutes and twice for 60 minutes in phosphate buffer (.01  M, pH 5.5) containing 0.1% albumin. The hair was then digested by the Long Digest method.  The morphine content of the washes and the digest was determined by the Wash and the Long Digest RIA assays, respectively.  After subtraction of 5 times the drug content of the 5th wash from the digest, all contaminated samples were below the cut-off value of 2 ng/ 10mg hair.

See Psychemedics RIA Opiate Assay, "Summary of Safety and Effectiveness Data" at p. 9 (Dec. 11, 2000), available at, http://www.fda.gov/cdrh/pdf/k000851.pdf (accessed on May 10, 2007). This description may be a good start for anyone seeking to challenge the efficacy of the "wash

---

[6] The 510(k) clearance process does not involve independent testing by the FDA, and 510(k) clearance is not the equivalent of official approval or certification of a device.  In fact, it would be illegal to claim that a 510(k) cleared hair drug test was officially certified.  See CFR Title 21, Part 807.39 ("Registration of a device establishment or assignment of a registration number does not in any way denote approval of the establishment or its products.  Any representation that creates an  impression of official approval because of registration or possession of a registration number is misleading and constitutes misbranding.").

ACTIVE/72003172.4

procedure" in eliminating external contamination as the cause for a positive Hair Test result, but it does not describe every step of a "wash procedure."  Moreover, aside from the description of its "wash procedure" in its 510(k) application, Psychemedics has published no fewer than six different descriptions of its "wash procedures."[7]  Thus, one reason plaintiffs need Psychemedics' SOPs is to determine which of its published "wash procedures" it used to test plaintiffs' hair. There are several other problematic, unknown variables in Psychemedics' Hair Test, relating not only to the "wash procedures," but the Hair Test more generally.[8]

By occasionally publishing its "wash procedures" to defend its Hair Test and refusing to disclose its SOPs so that others can assess the validity of the Hair Test, Psychemedics clearly is trying to cultivate an image of scientific validity without subjecting itself to the rigors of the scientific process and peer review.  As Drs. Kidwell and Smith noted: "Many times, other authors have tried to test [Psychemedics' published SOPs for its wash] procedures, but they have been criticized by individuals associated with commercial [hair] testing for not following the exact procedures, which seem to change frequently."  *Id.*

---

[7] *See* David A. Kidwell and Frederick P. Smith, Analytical and Practical Aspects of Drug Testing in Hair, *Passive Exposure, Decontamination Procedures, Cutoffs, and Bias: Pitfalls in the Interpretation of Hair Analysis Results for Cocaine Use* at 43-45 (Pascal Kintz ed., Taylor and Francis Group, LLC 2007) (describing the differences in various wash procedures used commercially by Psychemedics and noting that "[i]t is apparent from Table 2.1 that the procedures have varied substantially over the years, frequently without adjusting any of the cutoffs for the various wash criteria").

[8] For example, higher or lower levels of cocaine may be reported depending on the cross-reactivity of the immunoassay used by Psychemedics.  Psychemedics provided cross-reactivity data for an immunoassay in its 510(k) clearance materials, but the cross-reactivity of the immunoassay in Psychemedics' current Hair Test is unknown and without the exact immunoassay it is impossible to reproduce Psychemedics' Hair Test.  As another example, it is crucial to know what Psychemedics does when it detects a very low immunoassay value, and, more importantly, what the limit of detection is for Psychemedics' immunoassay test, how that limit is determined, and what cocaine-like substances the immunoassay detects.  There are similar unknowns regarding the detection limits and other criteria Psychemedics applies in its LC/MS/MS analysis.

Psychemedics (and defendants) cannot have it both ways. If Psychemedics' Hair Test is so infallible that it can form the sole basis of an adverse employment decision, then it must be subject to review by those who claim to have tested positive without ever having ingested drugs.

**2.    The Importance of Psychemedics' Initial And "Safety-Net" Hair Test Procedures**

Aside from the "wash procedures" and the unknown, problematic variables that go into Psychemedics' determination that a hair sample is positive or negative for a drug, plaintiffs need to know, at a minimum, the procedures used for Psychemedics' initial Hair Test as compared to its "Safety-Net" Hair Test. According to the BPD's "Procedures For Annual Hair Testing," "[i]f an Officer receives a positive, confirmed hair test result, the Officer may request a safety-net test. The safety-net test must be performed under the same or more stringent procedures as recommended by the manufacturer."[9] Psychemedics has lowered its "cutoff level" for the Safety-Net test since the BPD implemented the Hair Test in 1999.[10]

Even though the cutoff level for the Safety-Net test is 25 times lower than the initial test, the defendants have produced drug test results for eight BPD officers who tested "positive" on Psychemedics' initial test, but "negative" on Psychemedics' Safety-Net test. Moreover, while approximately 70 percent of the BPD's officers are Caucasian, only one of the eight BPD officers to test negative on a Safety-Net test is Caucasian. Psychemedics' SOPs are critical to

---

[9] A copy of the BPD's "Procedures For Annual Hair Testing" are attached hereto at Appendix D to Exhibit 1 of Exhibit A.

[10] A cutoff level is the minimum concentration of drugs or metabolites that must be present in a hair specimen in order for the result to be positive. Because the federal government has not adopted hair testing for its drug-testing program, there are no government approved cutoff levels for the Hair Test. Therefore, Psychemedics sets the cutoff level for the Hair Test according to whatever level it unilaterally deems to be appropriate. Since the inception of the test, Psychemedics has used a confirmation cutoff for an initial test of 5 nanograms ("ng") per 10 milligrams ("mg"). Initially, in 1999, the cutoff level for the Safety-Net Hair Test was 1ng/10mg. However, shortly after the BPD's implementation of the Hair Test, Psychemedics moved to a cutoff level for the Safety-Net test of 0.2ng/10mg. Therefore, the cutoff level for the Safety-Net test is now 25 times lower than the cutoff level for the initial test.

9

plaintiffs' assessment of this phenomenon, which supports plaintiffs' allegations and undermines the contentions of Psychemedics and the defendants concerning the Hair Test.

If, for example, Psychemedics procedures for the Safety-Net test are the same as its procedures for the initial test, then the defendants and Psychemedics' arguments for a valid scientific explanation for the negative Safety-Net test results will be seriously in doubt. Conversely, if Psychemedics applies different assumptions, calculations and assays to its Safety-Net Hair Test than its initial test, plaintiffs need to know what those differences are in order to assess how it is possible to ever test negative on a Safety-Net Hair Test. This case is about whether a drug test can differentiate between passive, external exposure and ingestion of drugs, and whether the imprecision of that drug test has a disparate, adverse, and discriminatory impact on Boston police officers and applicants of color. If the plaintiffs are to have there day in court, they must have an opportunity to test both subjects. The SOPs are the key to what is behind the curtain.

## ARGUMENT

Both the state and federal courts have recognized the fundamental principle that the public has the right to every man's evidence. *United States v. Nixon*, 418 U.S. 683, 709 (1974) ("The need to develop all relevant facts in the adversary system is both fundamental and comprehensive."); *Brazburg v. Hayes*, 408 U.S. 665, 688 (1972) (relying upon principle that the public has a right to every person's evidence); *In the Matter of Roche*, 411 N.E.2d 466, 473 (Mass. 1980) (invoking principle that the need to develop all relevant facts is fundamental to adversary system). "Exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." *Nixon*, 418 U.S. at 710. This general principle is embodied in Federal Rule of Civil Procedure 26(b)(1), which provides that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the

identity and location of persons having knowledge of any discoverable matter." The SOPs are directly relevant and must be produced because plaintiffs need them to show, among other things, why Psychemedics' "wash procedures" are not adequate in eliminating passive, external contamination of hair with drugs as the cause of a positive hair test result.

With the federal policy strongly favoring production of all relevant documents, courts have recognized limited exceptions for the protection of highly sensitive trade secrets or other proprietary information. However, there exists no blanket privilege that protects proprietary information or trade secrets from discovery. As the Supreme Court and various courts in this district have held, "there is no absolute privilege for trade secrets and similar confidential information." *Federal Open Market Committee v. Merrill*, 443 U.S. 340, 362 (1979). *See, e.g., ITT Electro-Optical Prods. Div. of ITT Corp. v. Electronic Tech. Corp.*, 161 F.R.D. 228, 231 (D. Mass. 1995) ("trade secrets should be disclosed, unless they are privileged or the subpoenas are unreasonable, oppressive, annoying or embarrassing"); *Ares-Serono, Inc. v. Organon Int'l B.V.*, 151 F.R.D. 215, 219 (D. Mass. 1993) (acknowledging that there is no absolute privilege for trade secrets or other confidential information); *Kleinerman v. United States Postal Service*, 100 F.R.D. 66, 69 (D. Mass. 1983) ("Although [one] may have a legitimate interest in protecting its trade secrets, that interest must yield to the right of the plaintiff to discover the full truth of the facts involved in the issues of the case . . . . [where] the issues cannot be fairly adjudicated unless this information is available.") (internal quotations and citations omitted).

As a general matter, the party asserting a privilege has the burden of establishing by a fair preponderance of the evidence that it applies. *See, e.g., FDIC v. Ogden Corp.*, 202 F.3d 454, 460 (1st Cir. 2000) (stating that the burden to establish an applicable privilege rests with the party resisting discovery); *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 190 F.R.D. 287, 289 (D. Mass. 2000) (holding that the party claiming the protection of a privilege bears the burden of demonstrating, by a fair preponderance of the evidence, not only that the privilege applies, but also that it has not been waived). Like generalized assertions of privilege, generalized claims of confidentiality fail to meet the burden borne by a party resisting production of requested

discovery materials. *See, e.g. Obiajulu v. City of Rochester*, 166 F.R.D. 293, 295 (W.D.N.Y. 1996) (holding that a general claim of privilege, be it work product or attorney client, is an inadequate response to a discovery request); *Kelling v. Bridgestone/Firestone, Inc.*, 157 F.R.D. 496, 497 (D. Kan. 1994) (finding that plaintiff's blanket claim that bank records sought were "confidential," in response to a defense motion to allow the use of these records in connection with motion to disqualify counsel, was insufficient to support a claim of privilege or confidentiality). Here, Psychemedics has made no attempt whatsoever to establish that the requested documents contain trade secrets or other proprietary information, and its blanket assertions of confidentiality are insufficient.[11]

In evaluating whether to grant a motion to compel or a motion to quash a subpoena, where the party resisting discovery asserts that disclosure of proprietary information will result in harm, the court must weigh the right of the party seeking discovery "to examine relevant evidence against the right of [the party resisting discovery] to protect its trade secrets and confidential data." *Ares-Serono*, 151 F.R.D. at 220 (citing *GTE Prods. Corp. v. Gee*, 112 F.R.D. 169, 172 (D. Mass. 1986) (balancing risk of competitive injury against need for information)). Admittedly, "[w]here . . . parties are business competitors, there is a greater need for confidentiality [because] [t]he risk of competitive injury is particularly high when the opposing party is a business competitor." *Bailey v. Dart Container Corp. of Mich.*, 980 F. Supp. 560, 582-83 (D. Mass. 1997) (requiring production of confidential business information to competitor under protective order limiting access of information to one in-house attorney and one in-house expert who must sign affidavits agreeing to be bound by the terms of the protective order).

---

[11] With respect to its SOPs, Psychemedics takes contradictory positions depending on the situation. As set forth in plaintiffs' counsel's April 13, 2007 letter to Psychemedics' counsel, Psychemedics has made various public representations concerning its "wash procedures" in publicly available correspondence and documents with the FDA without making any representation that it had not disclosed all relevant aspects of its "wash procedures" to the FDA. Now, after its device has been cleared by the FDA, Psychemedics claims that its SOPs are confidential. In light of its prior public representations, Psychemedics blanket, conclusory assertion that its SOPs are proprietary and confidential is, at best, questionable.

However, because Fed. R. Civ. P. 26(c)(7) allows a court to offer protection in the form of a protective order, "there is a particularly heavy burden upon [the party resisting discovery]." *Horizons Titanium Corp. v. Norton Co.*, 290 F.2d 421, 425 (1st Cir. 1961) (footnote and citations omitted). Plaintiffs and are in no way, shape or form business competitors of Psychemedics. Accordingly, Psychemedics' claimed basis for resisting production is unavailing.

Finally, even where the producing party has demonstrated that the requested documents are proprietary and confidential and established that it would be harmed by freely turning over the requested documents, courts will order the production of the confidential, proprietary information while granting a protective order limiting the disclosure of such information. *See, e.g.*, *Bailey*, 980 F. Supp. at 583 ("protective order with the provisions requiring in house counsel and experts to sign an affidavit agreeing to be bound by the terms of the [protective] order sufficiently protects [competitor's] interests while allowing [party] access to relevant information"); *Ares-Serono*, 151 F.R.D. at 220 (finding restriction of confidential documents "to outside litigation counsel, independent experts, paralegals and clerical employees" sufficient to protect competitive interests); *GTE Prods. Corp. v. Gee*, 112 F.R.D. at 170-72 (holding that trade secrets must be produced to opposing party's attorney who is prohibited from disclosing to client). To the extent Psychemedics has any genuine concerns regarding the confidentiality of the documents sought by Plaintiffs, this Court's existing Confidentiality Order protects the interests of third parties producing documents, including Psychemedics.

## CONCLUSION

For all the foregoing reasons, the Court should grant the plaintiffs' motion and issue an order compelling Psychemedics to comply with its discovery obligations under the Federal Rules of Civil Procedure by immediately producing its SOPs as requested by document requests 5-10 of the plaintiffs' November 3, 2006 subpoena to Psychemedics. Further, Psychemedics should be ordered to pay the plaintiffs' costs, including attorneys' fees, incurred in bringing this Motion,

in an amount to be determined upon submission of an affidavit setting forth such costs.  A form

of proposed Order is submitted as Exhibit A to the plaintiffs' Motion.

Respectfully submitted,

**Ronnie Jones, Richard Beckers, Walter Washington, William Earl Bridgeforth, Shawn N. Harris, Eugene Wade George C. Downing, Jr., Clararise Bristow, and the Massachusetts Association of Minority Law Enforcement Officers,**

By their attorneys,

/s/ Robert B. Baker
Louis A. Rodriques, BBO # 424720
Rheba Rutkowski, BBO # 632799
Raquel J. Webster, BBO # 658796
Robert B. Baker, BBO # 654023
Eric A. Heining, BBO # 664900
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA  02110
(617) 951-8000

Nadine Cohen, BBO # 090040
Lawyers' Committee for Civil Rights
  Under Law of the Boston Bar Association
294 Washington Street, Suite 443
Boston, Massachusetts 02108
(617) 482-1145

Marcia Woodham, BBO # 600886
SABEL & SABEL, P.C.
Hillwood Office Center
2800 Zelda Road; Ste. 100-5
Montgomery, AL 36106
(334) 271-2770

Dated May 15, 2007

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on May 15, 2007, a true copy of the above document was served upon the attorney of record for each other party by first class mail and electronically via the ECF/CM.  In addition, I hereby certify that, on May 15, 2007, a true copy of the above document was served upon counsel for Psychemedics, J. Allen Holland, Jr., by hand delivery.

/s/ <u>Robert B. Baker</u>

ACTIVE/72003172.4

Exhibit A

OAO 88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT
### DISTRICT OF  MASSACHUSETTS

Ronnie Jones, et al.

V.

City of Boston et al.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] 05-11832-GAO

TO: Psychemedics Corporation
125 Nagog Park
Acton, MA 01720

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Bingham McCutchen LLP / 150 Federal Street / Boston, MA 02110 | 1/10/2007 - 9:00 a.m. |

YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Schedule A attached hereto, which also also list topics of examination for the deposition on January 10, 2007

| PLACE | DATE AND TIME |
|---|---|
| Bingham McCutchen LLP / 150 Federal Street / Boston, MA 02110 | 12/1/2006 - 9:00 a.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Robert Baker*   Attorney for Plaintiffs | 11/3/06 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Robert B. Baker / Bingham McCutchen LLP / 150 Federal Street, Boston, MA 02110 / Phone (617) 951-8000

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1]If action is pending in district other than district of issuance, state district under case number.

American LegalNet, Inc.
www.USCourtForms.com

provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

American LegalNet, Inc.
www.USCourtForms.com

88 (Rev 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | |
|---|---|
| DATE  11/3/06 | PLACE  125 Naqoq Park |

SERVED: Psychemedics Corporation

| | |
|---|---|
| SERVED ON (PRINT NAME)  Bill THistle | MANNER OF SERVICE  Hand |

| | |
|---|---|
| SERVED BY (PRINT NAME)  Matthew Morris | TITLE  Process Server |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on 11/3/06

SIGNATURE OF SERVER

11 Beacon St., Boston, MA
ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall 'sh or modify the subpoena if it

(i) fails to allow reasonable time for compliance,
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the

www.USCourtForms.com

## SCHEDULE A

### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RONNIE JONES, et al.<br>Plaintiffs, | NO. 05-11832-GAO |
| vs. | SUBPOENA<br>(Fed. R. Civ. P. 45(a)) |
| CITY OF BOSTON, et al. | |
| Defendants. | |

## DEFINITIONS AND INSTRUCTIONS

1.     "Defendants" refers to any or all of the defendants in the above-captioned action – the City of Boston, the Boston Police Department, and Kathleen O'Toole (in her official capacity as Commissioner of the Boston Police Department), including any successors-in-interest, predecessors-in-interest, and any present or former agents, servants, employees, attorneys, consultants, and any other persons acting on behalf of any of them.

2.     "Plaintiffs" refers to Ronnie Jones, Richard Beckers, Walter R. Washington, William E. Bridgeforth, Shawn N. Harris, Eugene Wade, George C. Downing, Jr., Clararise Bristow, Rachelle Couch, Keri Hogan, and the Massachusetts Association of Minority Law Enforcement Officers ("MAMLEO").

3.     "You" or "Psychemedics" refers to Psychemedics Corporation, including any successors-in-interest, predecessors-in-interest, and any present or former agents, servants, employees, attorneys, consultants, and any other person acting on its behalf.

4.     "Person" means any natural person or any business, legal, or governmental entity or association, or other organization; or employee, agent or representative of any of the foregoing.

5.    "Hair Test" means the mandatory annual drug test performed on hair samples as described in Boston Police Department Rule 111V(G), which is attached hereto as Exhibit 1.

6.    "Hair Specimens" means samples of the Plaintiffs' hair that were taken by Defendants and analyzed by Psychemedics in connection with the Hair Test.  The hair sample collection process is described at part G of Appendix D to Rule 111.

7.    "Psychemedics' Hair Testing" are Psychemedics' tests, methods, policies, and/or procedures for analyzing hair samples to detect cocaine.

8.    Psychemedics' Standard Operating Procedures include any documents describing the policies and procedures followed by Psychemedics in testing hair for cocaine, including, but not limited to: Psychemedics' Laboratory Polices and Procedures Manual and any updates thereto; Psychemedics' procedures for chain of custody and updates thereto; Psychemedics' procedures for sample aliquoting and updates thereto; Psychemedics' procedures for preparation for an immunoassay and updates thereto; Psychemedics' procedures for immunoassay and updates thereto; Psychemedics' criteria for a positive immunoassay and updates thereto; Psychemedics' confirmation procedures and updates thereto; Psychemedics' calibration curve and updates thereto; Psychemedics' method of generation of the calibration curve (line forced through zero, least squares, weighted least squares, etc.) and updates thereto; Psychemedics' criteria for a poor calibration curve and updates thereto; Psychemedics' procedures for a poor sample and updates thereto; Psychemedics' procedures for subtraction of blank values and updates thereto; Psychemedics' procedures for the amount of internal standard and updates thereto; Psychemedics' procedures for quality control and updates thereto; and Psychemedics' procedures for confirmation positive and updates thereto.

9.    "Communication" means the transmittal of information in any form, including any oral or written transmittal or information, or request for information, made from one

person to another person, whether made in person, by telephone, by electronic mail, or by any other means, and includes any documents made only for the purpose of recording a communication, idea, statement, opinion, or belief.

10.    "Concerning" means referring to, regarding, referring to, describing, summarizing, evidencing, or constituting.

11.    A document that "concerns," "refers to," or "relates to" a given subject matter means any document that constitutes, contains, embodies, reflects, identifies, states, references, deals with, or is in any way pertinent to that subject, including, without limitation, documents concerning the presentation of other documents.

12.    "Document" means those things described in Fed. R. Civ. P. 34(a) and Local Rule 26.5 (attached hereto as Exhibit 2), including without limitation the original and each draft or otherwise non-identical copy of such document, all writings, graphics, printed matter, recordings of any kind, including audiotape, videotape, and all information retrievable from computer systems, including electronic mail, in the actual or constructive possession, custody, care or control of Psychemedics, its attorneys, or other persons or entities acting on behalf of Psychemedics.

13.    The singular form shall include the plural and vice versa, wherever such dual construction will serve to bring within the scope of these requests any answer or response which otherwise would not be brought within its scope.

14.    The words "and" and "or" shall be construed both conjunctively and disjunctively, and each shall include the other, wherever such dual construction will serve to bring within the scope of these interrogatories any answer or response which otherwise would not be brought within its scope.

15.    If you have no documents responsive to a particular request, you must so state. If any document that would have been produced in response to any request for production was, but is no longer, in the defendants' possession or custody or subject to the

defendants' control, in addition to stating any information requested concerning such document of which defendants have knowledge, state the present location of such document.

16.     If you object to any request in part, you shall respond fully to the extent to which there is no objection to the request, and shall set forth specifically the grounds upon which the objection is based.

17.     If you refuse to produce any document requested herein on the grounds of privilege, work product, or otherwise, please set forth in the written response to the request as to each such document: its author(s), and address(es), the person(s) to whom copies were furnished, its date, its general subject matter, and the basis for the refusal to produce the requested material.

18.     Documents shall be produced in their original file folders, or, in lieu thereof, any writing on the file folders from which documents are taken shall be copied and appended to such documents.  Documents shall be produced as they are kept in the usual course of business or organized and labeled to correspond with each numbered paragraph and each lettered subparagraph of this request for production in response to which such documents are being produced.

19.     Unless otherwise indicated, the time period covered by these requests is from January 1, 1998 to the date of your response.

20.     These requests for production are continuing in nature, and as additional information becomes available to you after service of your original responses hereto, you are requested to promptly submit supplemental responses setting forth such additional information in full.

## Requested Documents And Things To Be Produced

1.  All documents and communications between Psychemedics and Defendants.

2.  All documents and communications between Psychemedics and any present or former agents, servants, employees, attorneys, consultants of the Department of Health and Human Services or the Substance Abuse and Mental Health Services Administration, including, but not limited to, all documents and communications between Psychemedics and Robert Stephenson.

3.  All marketing materials concerning Psychemedics' Hair Testing.

4.  All documents and communications concerning the Plaintiffs, the Hair Test, the Defendants, or the Hair Specimens.

5.  Psychemedics' Standard Operating Procedures in effect between January 1, 1994 and the present.

6.  All documents and communications concerning changes to Psychemedics' Standard Operating Procedures between January 1, 1994 and the present.

7.  All documents and communications concerning Psychemedics' Standard Operating Procedures between January 1, 1994 and the present.

8.  All documents and communications concerning the policies, procedures, methods, and standards used by Psychemedics in testing hair samples for the presence of illegal drugs, including cocaine, between January 1, 1994 and the present.

9.  Documents concerning Psychemedics decision to use Liquid Chromatography/Mass Spectrometry/Mass Spectrometry (LC/MS/MS) instead of gas chromatography/mass spectrometry (GC/MS) for analyzing hair samples to detect cocaine, including, but not limited to, documents concerning the relative costs of liquid chromatography to gas chromatography to test hair for cocaine. The time period for this request is January 1, 1994 to the present.

10. All documents and communications concerning the standards, methods, procedures, and criteria to be applied in connection with all aspects of the Hair Test,

including the collection, transmission, storage, and testing of the samples, and the analysis confirmation, and reporting of the test results.

11.    All documents and communications concerning Psychemedics' funding of, sponsorship of, or other contribution to any study concerning the scientific validity of testing hair to detect drugs of abuse, including, but not limited to, documents and communications concerning Psychemedics' funding of, sponsorship of, or other contribution to any study concerning whether the testing of hair to detect drugs of abuse, including cocaine, depends on the race of the person tested and/or his or her hair color or hair texture. The time period for this request is January 1, 1994 to the present.

12.    All documents and communications concerning Psychemedics' funding of any organization or entity that concerns itself with the testing of hair to detect drugs of abuse, including cocaine. The time period for this request is January 1, 1994 to the present.

13.    All documents and communications concerning Psychemedics' funding of travel and expenses for any university professor or other scholar to attend a conference concerning the testing of hair to detect drugs of abuse, including cocaine. The time period for this request is January 1, 1994 to the present.

14.    All documents concerning Psychemedics' funding of any scientific journals. The time period for this request is January 1, 1994 to the present.

15.    All documents and communications concerning Psychemedics' compliance with 21 CFR Part 809.40(c), which requires that a laboratory testing hair for drugs of abuse "shall have, and shall be recognized as having, adequate capability to reliably perform the necessary screening and confirmatory tests, including adequate capability to perform integrity checks of the biological specimens for possible adulteration."

16.    All documents and communications concerning Psychemedics' certification in the area of toxicology by the Health Care Financing Administration, the College of

American Pathologists, or any other organization with deemed status in the area of toxicology.

17.    All documents and communications concerning Psychemedics' status as a licensed laboratory certified to perform hair testing.  This request includes, but is not limited to, Psychemedics' Clinical Laboratory Improvement Amendments of 1998 (CLIA) Application for Certification.

18.    All documents and communications concerning correspondence between the Food and Drug Administration ("FDA") and Psychemedics relating to the litigation matter initiated in 1995 before the United States Court of Appeals for the First Circuit, styled *Psychemedics Corporation v. Food and Drug Administration*, Case No. 95-2357.  This request includes, but is not limited to, all documents concerning the resolution of this litigation and the FDA's decision, on March 26, 1996, to withdraw its November 20, 1995 letter to Psychemedics, notifying Psychemedics that its PDT-909 Personal Drug Testing Service (K954493) device was not substantially equivalent to any legally marketed predicate device and that any commercial distribution of the device would be in violation of the Federal Food, Drug, and Cosmetic Act.  The time period for this request is January 1, 1994 to the present.

19.    All documents and communications concerning the following statement in the September 11, 2002 Consent Motion for Voluntary Dismissal ("the Consent Motion") that resolved the litigation matter initiated in 2000 before the United States Court of Appeals for the District of Columbia Circuit, styled *Psychemedics Corporation v. Donna E. Shalala, Jane E. Henney, M.D., and Food and Drug Administration*, Case No. 00-1199: "The parties have in fact continued their discussions, and the agency has taken actions with respect to Psychemedics' laboratory testing services.  Based on those discussions and agency actions, Psychemedics – with Respondents' consent – respectfully requests that this case be voluntarily dismissed without prejudice, each party to bear its own costs."  This request

seeks documents concerning the "discussions and agency actions" described in the Consent Motion other than the FDA's decision to provide 510K clearance to Psychemedics to market all five of its assays for testing hair for drugs of abuse.

20.    All documents and communications supporting Psychemedics' statements in its Memorandum of Points and Authorities In Support of Defendant Psychemedics Corporation's Motion For Summary Judgment in the California Superior Court matter (San Mateo, 2002, Civ No. 427728) *Lois D. Boyd v. Psychemedics* that:

a.    "Throughout the process, Psychemedics met the federal and state requirements to perform hair testing for drugs...."

b.    Psychemedics "followed standard laboratory procedures...."

c.    "[T]he Federal Food and Drug Administration has evaluated the proprietary procedures used by Psychemedics in conducting hair analysis for drugs of abuse and has cleared Psychemedics' procedures as accurate and reliable."

d.    "[T]he FDA cleared Psychemedics' test and procedures as accurate and reliable."

e.    "The U.S. Department of Health and Human Services, the Centers for Medicare and Medicaid Services, under the Federal Clinical Laboratory Improvement Amendments (CLIA) and California have authorized Psychemedics to perform forensic toxicology drug testing... Those authorizations are the only requirements Psychemedics needed to have in order to analyze the samples of Boyd's hair that Anderson Chevrolet collected and sent to Psychemedics."

   f. "The CLIA certificate and the California license demonstrate that Psychemedics did not have a defective drug test and testing procedures."

21. All documents concerning Psychemedics' participation in any study sponsored or administered by the Society.For Hair Testing, the Substance Abuse and Mental Health Services Administration, or RTI International, including, but not limited to, the results of any such study.

22. All documents and communications concerning any contract, agreement, or other document concerning the terms of the relationships between Psychemedics and the Defendants, including but not limited to documents concerning the negotiation, drafting, or performance of such contracts, agreements, or other documents.

23. Samples of Hair Specimens taken from each of the Plaintiffs sufficient in size to allow for independent DNA testing by another laboratory to be performed on the samples produced.

24. All documents sufficient to identify the particular facilities and persons involved in the Hair Tests performed on samples taken from the Plaintiffs, including the location of sampling, storage, and testing facilities; the names, affiliations, employment status, and whereabouts of all persons who collected, handled, transmitted, tested, processed, prepared, or analyzed plaintiffs' Hair Specimens, and all persons who were involved in record-keeping, data collection, analysis, interpretation or reporting of test results.

25. All documents and communications concerning the training and supervision of persons involved in the collections and transmission of hair samples to Psychemedics; the performance and conduct of the Hair Test and related data collection and record-keeping; and the analysis, interpretation, and reporting of Hair Test Results.

26.    All documents and communications concerning Psychemedics' status as a certified laboratory to perform hair testing as described in Rule 111, Appendix D of Defendants' Substance Abuse Policy (attached hereto as <u>Exhibit 1</u>).

27.    All documents and communications concerning the identity, qualifications, employment status, and employment history of the Medical Review Officer(s) who provided services to the Defendants in conjunction with the Hair Test during the relevant time period.

28.    All documents and communications concerning the scientists and/or experts consulted by Psychemedics concerning the Hair Test. The time period for this request is January 1, 1994 to the present.

29.    All documents and communications concerning the cut-off levels for cocaine for the initial hair test. The time period for this request is January 1, 1994 to the present.

30.    All documents and communications concerning the determination of and any changes made to the cut-off levels for cocaine applicable to the Hair Test, including the Safety Net Test, where "cut-off levels" means the value at which a result of the Hair Test is reported as positive for the presence of illegal drugs and below which a result is reported as negative for the presence of illegal drugs. The time period for this request is January 1, 1994 to the present.

31.    All documents and communications concerning whether Psychemedics' Hair Testing has a racial, hair texture, or hair color bias, including documents and communications concerning whether the likelihood of a positive test result is correlated with a person's race, hair texture, or hair color.

32.    All documents and communications concerning whether Psychemedics' Hair Testing is affected by a person's passive exposure to drugs of abuse, including cocaine.

33.    All documents concerning Psychemedics' procedures for determining the color of a hair sample, including, but not limited to, Psychemedics' procedures for determining the natural hair color of a hair sample.

34.    All documents and communications concerning how results of the Hair Test are

transmitted from Psychemedics to the Defendants.

    35.    All documents and communications concerning how long Psychemedics retains hair samples, test results, and records after submitting the test results to the Defendants.

    36.    All documents and communications concerning the race, hair texture, hair color, and test result of Boston Police Department personnel who were tested for drugs, including cocaine, on the initial hair and/or safety-net hair test(s).

    37.    All documents concerning the race, hair texture, hair color, and test result of persons who Psychemedics tested for drugs, including cocaine.

    38.    All documents and communications concerning any instance in which a Hair Test reported as positive for one or more illegal drugs was deemed to be erroneous or inconclusive as to the question whether the person had actually ingested any illegal drug, including cocaine.

    39.    All documents and communications concerning whether contamination, passive exposure, bias of any kind, sample handling, record keeping, interpretation, or any other factors or phenomena do affect or might affect the results of Psychemedics' Hair Testing or the accurate, objective, neutral, and unbiased reporting Psychemedics' Hair Testing results, including all documents and communications concerning any presentation, discussion, analysis, assessment, or evaluation of potential or actual bias or disparate impact, based upon race or any other factor, related to Psychemedics' Hair Testing and all documents and communications concerning any discussion, analysis, assessment, or evaluation of alternative drug testing methods with less potential or actual bias or disparate impact that that associated with or related to Psychemedics' Hair Testing.

    40.    All documents and communications concerning the accuracy and reliability – or lack thereof – of all aspects of Psychemedics' Hair Testing , including the standards, methods, procedures, and criteria to be applied in the collection, transmission, storage, and testing of the samples; the analysis interpretations, confirmation, and reporting of the test results; and the retention of samples and records after Psychemedics' Hair Testing results are reported to the

Defendants.

41.     All documents and communications concerning complaints, grievances, petitions, or lawsuits concerning the Hair Test, hair drug testing in general, or Psychemedics' Hair Testing.

## TOPICS OF EXAMINATION

The deposition will cover the following topics:

1.    Authenticity and contents of documents produced by Psychemedics in response to this subpoena *duces tecum*.

2.    Psychemedics' Hair Testing.

3.    The policies and procedures for Psychemedics' Hair Testing, including, but not limited to, Psychemedics' Standard Operating Procedures.

4.    Changes to the policies and procedures for Psychemedics' Hair Testing, including, but not limited to, Psychemedics' Standard Operating Procedures.

5.    Plaintiffs' Hair Specimens.

6.    Psychemedics' marketing materials.

7.    The contracts, agreements, or other documents concerning the terms of the relationship between Psychemedics and the Defendants.

8.    Documents and communications between Psychemedics and Defendants.

9.    Documents and communications between Psychemedics and any present or former agents, servants, employees, attorneys, consultants of the Department of Health and Human Services or the Substance Abuse and Mental Health Services Administration.

10.    Documents and communications concerning the Plaintiffs, the Hair Test, the Defendants, or the Hair Specimens.

11.    Psychemedics' status as a certified laboratory to perform hair testing as described in Rule 111, Appendix D of Defendants' Substance Abuse Policy.

12.    Psychemedics' compliance with 21 CFR Part 809.40(c), which requires that a laboratory testing hair for drugs of abuse "shall have, and shall be recognized as having, adequate capability to reliably perform the necessary screening and confirmatory tests, including adequate capability to perform integrity checks of the biological specimens for possible adulteration."

13.    Psychemedics' certification in the area of toxicology by the Health Care Financing Administration, the College of American Pathologists, or any other organization with deemed status in the area of toxicology.

14.    Psychemedics' status as a licensed laboratory certified to perform hair testing. This request includes, but is not limited to, Psychemedics' Clinical Laboratory Improvement Amendments of 1998 (CLIA) Application for Certification.

15.    The litigation matter initiated in 1995 before the United States Court of Appeals for the First Circuit, styled *Psychemedics Corporation v. Food and Drug Administration*, Case No. 95-2357.

16.    The litigation matter initiated in 2000 before the United States Court of Appeals for the District of Columbia Circuit, styled *Psychemedics Corporation v. Donna E. Shalala, Jane E. Henney, M.D., and Food and Drug Administration*, Case No. 00-1199.

17.    The litigation matter initiated in 2002 before the California Superior Court in San Mateo, styled *Lois D. Boyd v. Psychemedic*s, Case No. 427728.

18.    The identity of all persons who are responsible for handling or who have handled Plaintiffs' Hair Specimens.

19.    The name and location of the laboratories and the identity of the Psychemedics' representatives who performed Psychemedics' Hair Testing on the Hair Specimens.

20.    The identity, qualifications, employment status, and employment history of the Medical Review Officer(s) who provided services to Defendants in conjunction with the Hair Test during the relevant time period.

21.    The scientists and/or experts consulted by Psychemedics concerning Psychemedics' Hair Testing .

22.    An explanation of why Psychemedics uses liquid chromatography instead of gas chromatography ("GC/MS") as GC/MS is the only approved confirmation for federally mandated urine testing.

23.   The cut-off levels for the initial Hair Test from January 1, 1994 to the present.

24.   The cut-off levels for the safety-net Hair Test from January 1, 1994 to the present.

25.   The racial, hair texture, or hair color bias of Psychemedics' Hair Testing.

26.   The effect of external contamination on Psychemedics' Hair Testing.

27.   Bias in Psychemedics' Hair Testing concerning passive exposure.

28.   Knowledge of Psychemedics in the external contamination of hair.

29.   The effect of hair color on passive exposure.

30.   Changes to the Psychemedics' Standard Operating Procedures and their effect on the ability to distinguish passive exposure from actual drug use.

31.   Psychemedics' procedures for determining the color of a hair sample, including, but not limited to, Psychemedics' procedures for determining the natural hair color of a hair sample.

32.   The practice by which the results of Psychemedics' Hair Testing are transmitted from Psychemedics to the Defendants.

33.   The length of time that Psychemedics retains hair samples, test results, and records after submitting the test results to the Defendants.

34.   The name, race, hair texture, hair color, and test result of Boston Police Department personnel who were tested for drugs on the initial hair and/or safety-net hair test(s).

35.   The race, hair texture, hair color, and test result of persons who were tested for drugs on any Psychemedics' initial hair and/or safety-net drug test(s).

36.   Positive results on a Psychemedics' Hair Test where a person did not ingest a drug of abuse, including cocaine.

37.   The reliability of Psychemedics' Hair Testing.

38.   Complaints, grievances, or petitions from anyone concerning Psychemedics' Hair Testing.

# Exhibit 1

Exhibit 1



Exhibit 2

**To:**  ALL BUREAUS, DISTRICTS
AREAS, DIVISIONS, OFFICES,
SECTIONS AND UNITS

*Special Order Number:*

*Copies To:*  ALL SUPERINTENDENTS,
DEPUTY SUPERINTENDENTS,
AND DIRECTORS

SUBJECT:   RULE 111, SUBSTANCE ABUSE POLICY

*Effective immediately, Rule 111, Substance Abuse Policy,* issued January 18, 1995, is
hereby rescinded in *its entirety and replaced by the attached Rule.*

Commanding Officers shall ensure that this order and the attached Rule are posted on
Department bulletin boards until **Rule 111, Substance Abuse Policy,** has been issued to
each member of the Department in their command.

Paul F. Evans
Police Commissioner

MENTION AT ROLL CALLS • POST UNTIL:

COB 0005756

Boston Police Department

Rules and Procedures

**RULE 111**
December 11, 1998

SUBSTANCE ABUSE POLICY

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | INTRODUCTION | 2 |
| II. | DEFINITIONS | 3 |
| III. | AUTHORIZED USE OF PRESCRIPTION MEDICINE | 5 |
| IV. | PROHIBITED CONDUCT | 5 |
| V. | TESTING | 6 |
| VI. | CONSEQUENCES OF A POSITIVE TEST | 8 |
| VII. | CONSEQUENCES OF VIOLATION OF THE POLICY | 8 |
| Appendix A | REFERRAL PROCEDURES FOR SUPERVISORS | 9 |
| Appendix B | REHABILITATION AGREEMENT | 11 |
| Appendix C | PROCEDURES FOR DRUG TESTING | 13 |
| Appendix D | PROCEDURES FOR ANNUAL HAIR TESTING | 26 |

COB 0005757

Boston Police Department

Rules and Procedures

RULE 111

---

## I. INTRODUCTION

To ensure a safe, healthful and productive work environment, to protect the health and welfare of the citizens of the City of Boston, and to assure compliance with the Federal Drug-Free Workplace Act of 1988, the Department has adopted this policy to address drug and alcohol abuse by sworn personnel. These procedures provide the Department with reasonable measures to ensure drug or alcohol use does not jeopardize the public or the Department's ability to serve its citizens.

It is the general intent of the policy to create a humanitarian program. Treatment and discipline are both important aspects of the plan. Drug and alcohol testing, which will be part of the program, is intended in part as a means of identifying those who need help. In fact, the testing components of the program will not be instituted until this policy has been in effect for 60 days. This two month delay is intended to allow all sworn personnel who currently have a substance abuse problem time to take appropriate actions to correct that problem prior to implementation of the procedures described below. Prior to the implementation of this policy, all Officers will receive up to three hours educational training in the effects of drugs and alcohol in general as well as in the workplace. The training shall also include a review of this policy. All such training will occur on Department time.

The Department will not tolerate any drug or alcohol use which could affect an Officer's job performance. The citizens of the City of Boston have a right to expect that sworn personnel will carry out their duties in a safe and reliable manner, free from the effects of drug or alcohol use. This policy replaces, except where contrary to contractual obligations, any and all earlier policies or procedures based on or expanding upon the Drug-Free Workplace Act, but it does not replace or in any way supplant any other policies or procedures including, but not limited to, the Boston Police Department's rules and procedures.

These procedures are significantly more comprehensive than the Federal Drug-Free Workplace Act requirements. The Boston Police Department must, by law, comply with that Act and report our drug-free workplace activities to the Federal government. The Act requires the adoption of a policy, some training, informing sworn personnel of the availability of help, and requiring sworn personnel to report convictions for drug crimes committed on the job. The intent of the Act is admirable, but the Department believes much more must be done than these minimal requirements. There are four important ways in which these procedures are broader and more effective than the Drug-Free Workplace Act:

- we emphasize treatment and counseling rather than just discipline in many cases;

COB 0005758

Page 2

Boston Police Department

Rules and Procedures

RULE 111

- we will employ drug and alcohol testing procedures in great part to overcome the user's denial that a problem exists, so that we may protect the public and provide help and treatment as appropriate;

- we are requiring that all sworn personnel attend comprehensive awareness and training programs;

- we are setting up a supervisor support phone system so that those who will be applying these procedures day-by-day can do so effectively, comfortably, and legally.

These procedures apply to all sworn personnel and, where contracts specifically allow, to Department contractors. The Department reserves the right to modify these procedures in whole or in part in accordance with law and contractual procedures.

## II. DEFINITIONS

A) <u>Controlled Substance</u> - any drug included in Schedules I through V, as defined by Section 802(6) of Title 21 of the United States Code (21 USC 802(6)), the possession of which is unlawful under Chapter 13 of that title, or any drug included within the definition of "Controlled substance" in Chapter 94C of the Massachusetts General Laws (for example, but not limited to: cocaine, marijuana, valium, morphine, anabolic steroids). The term does not include the use of prescribed drugs which have been legally obtained and are being used for the purpose for which they were prescribed.

B) <u>Illegally-Used Drug</u> - any prescribed drug which is legally obtainable but has not been legally obtained or is not being used for prescribed purposes, all designer drugs not listed in the Controlled Substances Act (for example, but not limited to: MDA, fentanyl), and any other over-the-counter or non-drug substances (for example, but not limited to: airplane glue) being used for other than their intended purpose.

C) <u>Alcohol</u> - colorless, volatile and flammable liquid that is the intoxicating agent in fermented and distilled liquors. It includes, but is not limited to, beer, wine and liquor. It does not include alcohol used in chemical processing, cleaning or testing.

D) <u>Department Property</u> - includes buildings, offices, facilities, equipment, vehicles, land, and parking lots owned, loaned, utilized or leased by the Department. It also includes any other site at which business of the Department is transacted whether on or away from Department owned, loaned, or leased property.

E) <u>Accident</u> - an unplanned, unexpected and unintended event which a) occurs on Department property, on Department business, or during working hours, and b) initially appears to have been caused wholly or partially by an Officer, and c) results in either i) a fatality, ii) bodily injury requiring medical treatment away from the scene of the event, or iii) damage to property in excess of $2,500; an unplanned, unexpected and unintended discharge of a firearm is also an "accident".

COB 0005759

Boston Police Department                                    Rules and Procedures

RULE 111

F) Drug Paraphernalia - any item which is clearly intended for use for the administering, transferring, manufacturing, testing or storing of a controlled substance and which is not authorized or intended for use in the course of legitimate law enforcement activities.

G) Reasonable Suspicion of Drug and/or Alcohol Use - the reasonable suspicion standard for drug testing of sworn personnel is based upon a specific objective fact(s) and reasonable inferences drawn from that fact(s) in light of experience that the individual may be involved in the use of any illegally-used drug, controlled substance, or alcohol. Examples would include one or more of the following:

   1. Observable phenomena, such as direct observation of on-duty alcohol use or possession and/or direct observation of on-duty or off-duty use or possession of illicit drugs, and/or the on-duty display of behaviors which appear to be indicative of the use of any illegally-used drug, controlled substance, or alcohol and are not attributable to other factors;

   2. a pattern of abnormal conduct, erratic behavior or deteriorating work performance, including but not limited to, frequent absenteeism, excessive tardiness, or frequent accidents, not attributable to other factors and which appears to be related to drug and/or alcohol abuse;

   3. arrest, indictment, or conviction for a drug-related offense;

   4. newly discovered evidence that the Officer has tampered with a prior drug/alcohol test;

   5. repeated or flagrant violations of the Department's rules and procedures which are determined by a supervisor to pose a substantial risk of injury or property damage and which are not attributable to other factors and appear to be related to drug and/or alcohol abuse;

   6. causing an accident (as defined in definition E. above).

The above examples are not all inclusive, but are intended to be illustrative. Though not a sign or symptom of substance abuse, accidental discharge of a firearm is such a serious event that it can contribute, when substantiated by more direct evidence, to a finding of reasonable suspicion. The symptoms of being affected by a drug or by alcohol are not confined to those consistent with misbehavior, nor to obvious impairment of physical or mental ability, such as slurred speech or difficulty in maintaining balance. Although reasonable suspicion does not require certainty, mere "hunches" are not sufficient to meet this standard.

H) Under the Influence of an Unauthorized Controlled Substance, Illegally-used Drug and/or Alcohol - The presence of a .04 alcohol content in the blood, or a verified positive drug test, at levels specified by the National Institute of Drug Abuse (NIDA), for an unauthorized controlled substance or an illegally-used drug.

COB 0005760

Boston Police Department

Rules and Procedures

RULE 111

I) <u>Medical Review Officer (MRO)</u> - A licensed physician responsible for receiving laboratory drug testing results who has knowledge of substance abuse disorders and has appropriate medical training to interpret and evaluate a positive test relative to the Officer's medical history and other relevant biomedical information.

## III AUTHORIZED USE OF PRESCRIPTION MEDICINE

Sworn personnel undergoing prescribed medical treatment with any drug must report the drug used to their supervisor, pursuant to Rule 102 and a determination made as to the Officer's ability to perform his duty according to that rule.

## IV. PROHIBITED CONDUCT

The following conduct by sworn personnel is prohibited:

A) Unauthorized use, possession, manufacture, distribution, dispensation or sale of a controlled substance, illegally-used drug, drug paraphernalia, or alcohol on Department property, on Department business, in Department supplied vehicles, in vehicles being used for Department purposes, or during working hours;

B) Unauthorized storage in a desk, locker, automobile or other repository on Department property of any illegally-used drug, controlled substance, drug paraphernalia, or alcohol;

C) Being under the influence of an unauthorized controlled substance, illegally-used drug or alcohol on Department property, on Department business, in Department supplied vehicles or vehicles being used for Department business or during working hours;

D) Possession, use, manufacture, distribution, dispensation or sale of illegally-used drugs or controlled substances while off duty;

E) Switching or adulterating any urine or blood sample;

F) Refusing consent to testing or refusing to submit a breath, urine, or blood sample for testing (except as regards "Condition of Promotion" testing);

G) Failing to adhere to the terms of any Rehabilitation Agreement (sample attached) which the Officer has signed;

H) Conviction under any drug or alcohol statute;

I) Failure to immediately notify the Department of any arrest or conviction under any drug or alcohol statute;

J) Failure to notify a supervisor of the use of a prescription drug;

K) Refusing to sign a) a receipt for the Department's Substance Abuse Policy, b) the Consent and Release Form, c) the Chain of Custody Form, or d) a Rehabilitation Agreement;

COB 0005761

Page 5

Boston Police Department

Rules and Procedures

RULE 111

## V. TESTING

Sworn personnel of the Boston Police Department will be tested for drugs and/or alcohol under the following circumstances:

A) <u>Reasonable Suspicion of Drug and/or Alcohol Use</u>:  Sworn personnel will be tested for drugs and/or alcohol when a supervisor who has been trained in making determinations of reasonable suspicion has made such a determination. Referrals for reasonable suspicion testing will be made using the procedures set forth in Appendix A of these procedures.

B) <u>Follow-up Testing</u> - Sworn personnel referred by the Department to treatment, and who undergoes any form of treatment for substance abuse, will be subject to unannounced testing for a period of thirty-six months following a return to full duties (which shall be subject to a medical certification that the Officer is qualified to safely carry a weapon).

C) <u>Pre-Employment Testing</u> - All applicants for the position of Sworn Police Officer will be required to submit to a drug test. The Department will not knowingly employ as a Sworn Police Officer any individual who actively abuses alcohol, an illegally-used drug or a controlled substance. All applicants for the position of Sworn Police Officer will be advised in connection with their application for employment that, prior to being offered a position, they will be required to submit to a drug screen. Failure to consent to such a test, or a verified positive result, will disqualify the applicant for employment in a position subject to pre-employment testing.

D) <u>Probation Period Testing</u> - All Probationary personnel are subject to drug testing during their probation period without prior warning and at random intervals.

E) <u>Condition of Promotion/Rating/Appointment Testing</u> - Sworn personnel who are offered a promotion/appointment and/or a detective rating will be required to submit to a drug test. A negative test result shall be a condition of such promotion and/or rating. Sworn personnel may refuse to submit to such a drug test without penalty or risk of disciplinary procedures, however such refusal shall be considered a declination of the offer of promotion.

F) <u>Assignment to Special Unit Testing</u> - Sworn personnel, upon assignment to specialized units as identified by the Commissioner, shall be required to submit to a drug test. Such units include: Command Staff, Drug Control, Anti-corruption, Explosive Ordnance Unit, Hazardous Materials Unit, Entry and Apprehension Team, Ballistics Unit, Range, and Organized Crime. This form of testing shall also be applicable upon assignment to any outside agency.

G) <u>Annual Drug Testing (Hair)</u> – This provision only applies to those bargaining units that have agreed to such testing.

COB 0005762

Boston Police Department

Rules and Procedures

RULE 111

In a joint desire to achieve and maintain a work force that is 100% drug free and in further recognition that the Department has not yet achieved such goal, the parties agree that all sworn personnel shall be subject to an annual drug test to be conducted through a fair, reasonable, and objective hair analysis testing system. Each Officer shall submit to an annual test on or within thirty (30) calendar days of each Officer's birthday. The Department shall schedule each examination and so notify each Officer as far in advance as practicable. Hair testing does not contemplate or include testing for alcohol.

The Department agrees that it will establish and adhere to written collection and testing procedures for hair samples. These procedures shall be fair and reasonable so as to ensure the accuracy and integrity of the test and process. These written procedures will be appended to this Rule and become incorporated thereto. The union, should it so request, shall meet with the Department in order to discuss issues relative to the collection and testing process. Nothing contained herein alters the current policy as it relates to other drug/alcohol testing, procedures, or requirements.

Drug tests will consist of determinations of the presence of these five drugs, classes of drugs, or their metabolites: marijuana metabolites, cocaine metabolites, opiate metabolites, phencyclidine (PCP), and amphetamines. In the course of testing for Reasonable Suspicion of Drug and/or Alcohol Use, other drugs or their metabolites may be tested for if their particular use is suspected. Such other drugs may include, but need not be limited to: lysergic acid diethylamide (LSD), methaqualone, barbiturates, and benzodiazepines. All urine testing will be performed under the guidelines described in Appendix C "Procedures for Drug Testing". These procedures call for the use of an immunoassay screen (i.e. "EMIT") with all positives tested for confirmation using Gas Chromatography/Mass Spectrometry (GC/MS) technology. In a GC/MS test, the specimen is heated and the vapors are passed through a column of absorbent material, where traces of the drugs separate into colored bands (gas chromatography). A mass spectrometer then analyzes the precise chemical composition of each band. GC/MS is generally considered to be the most conclusive method of confirming the presence of a drug in urine. [1] GC/MS results are accepted as evidence in criminal cases. Positive GC/MS results are first communicated to a Medical Review Officer (MRO) who investigates the possibility of a legitimate explanation of the test result.

Where reasonable suspicion exists to test for alcohol, the Officer shall be given the option of submitting to either a breath screen test or a blood alcohol test. All breath screen tests shall be administered by a certified collection site facility utilizing DOT approved equipment and DOT procedures. All blood alcohol tests shall be administered by a certified collection site facility following procedures identified in Appendix C for identification and chain-of-custody safeguards.

---

[1] National Institute on Drug Abuse, Research Monograph 73 - "Urine Testing for Drugs of Abuse", 1986.

COB 0005763

Page 7

Boston Police Department

Rules and Procedures

RULE 111

## VI.  CONSEQUENCES OF A POSITIVE TEST

ILLICIT DRUGS

Sworn personnel who receive a verified positive test result for <u>illicit drugs</u> will be subject to termination.  However, where the Officer's only violation is a positive test for illicit drug use and it is the Officer's first offense, the Commissioner shall offer voluntary submission to the following alternative program:

- up to a 45 day suspension without pay,

- execution of a Rehabilitation Agreement and submission to treatment/rehabilitation,

- placement in an administrative position and suspension of weapon carrying privileges upon return to work following suspension until certified by the treatment provider to be recovering and able to safely carry weapons, and

- submission to follow-up testing as described in section V(B) above.

Note that failure to comply with the terms of the Rehabilitation Agreement either during or after the suspension period would constitute a separate violation of this policy and shall result in a recommendation of termination.

ALCOHOL OR ILLEGALLY-USED DRUGS

Sworn personnel who test positive for <u>alcohol or illegally-used drugs</u> shall be subject to disciplinary procedures up to and including termination.  However, the first time an Officer tests positive for alcohol or illegally used drugs, the Officer shall be offered and the Officer shall sign a Rehabilitation Agreement and the Officer shall receive up to a 5 day suspension.  Note that refusing to sign the Rehabilitation Agreement under these circumstances constitutes a separate violation of this policy.  Sworn personnel who sign the Rehabilitation Agreement and undergo treatment will be assigned administrative duties and have their weapon carrying privileges suspended until such time as they are certified, by the treatment provider, to be recovering and able to safely carry weapons, at which time the disciplinary procedures being held in abeyance shall not be served.  A record of the original disciplinary action, as well as successful completion of rehabilitation, shall remain in the Officer's medical personnel file.  They will also be subject to Follow-Up drug testing as described in V(B) above.

## VII.  CONSEQUENCES OF VIOLATION OF THE POLICY

Any violation of the Substance Abuse Policy shall lead to disciplinary action up to and including termination.  The severity of the action chosen will depend on the circumstances of each case.  The Commissioner may, at his discretion, suspend any disciplinary action while an Officer is undergoing substance abuse treatment subject to a

COB 0005764

Boston Police Department

Rules and Procedures

**RULE 111**

Rehabilitation Agreement (see "Consequences of a Positive Test" above). Refusing to sign a Rehabilitation Agreement shall result in a recommendation of termination.

Refusing to submit to a drug or alcohol test (except as regards Condition of Promotion testing), or switching or adulterating any blood or urine sample, shall result in a recommendation of termination.

Failure to adhere to the terms of the rehabilitation agreement shall result in disciplinary action up to and including termination.

Appendix A

**REFERRAL PROCEDURES FOR SUPERVISORS**

The Department's supervisors are responsible for being alert to declining job performance, erratic behavior or other symptoms of possible substance abuse. Whenever a supervisor who has been trained in the making of determinations of reasonable suspicion of drug and/or alcohol use (as defined in Section II of these procedures) makes such a determination the following steps will be taken:

A) The supervisor will document in writing all circumstances, information and facts leading to and supporting his/her suspicion. At a minimum, the report will include appropriate dates and times of suspect behavior, reliable/credible sources of information, rationale leading to referral for testing and the action(s) taken.

B) Prior to referring an Officer for testing, the supervisor will discuss the problem with the Officer in a private location with one witness, preferably another supervisor, present. Caution will be taken not to accuse the Officer of substance abuse, but the Officer will be presented with instances of questionable behavior. If the Officer does not have an acceptable explanation for his questioned behavior, the supervisor will continue with the procedures set forth in this section. Nothing in this procedure is intended to prevent the Officer from invoking any Weingarten rights the Officer may have.

C) The supervisor shall consult with a second supervisor of a higher rank and they shall jointly decide whether to refer an Officer for testing. All persons involved in the decision-making process will have received training in the identification of actions, appearance, and conduct which are indicative of the use of alcohol and/or drugs.

D) In those cases where the supervisor determines that the person's behavior causes a potential threat of harm to himself or others, the Officer will be immediately removed from the work site and where there is no other misconduct resulting in suspension the Officer shall be placed on administrative leave and shall be subject to customary restrictions of such leave.

E) Once a determination has been made to refer an Officer for testing, it will be the responsibility of the supervisor to advise the Officer of such decision and to escort the Officer to a collection facility. The supervisor should remain with the Officer at the

COB 0005765

Boston Police Department

Rules and Procedures

RULE 111

collection site facility until testing is concluded. In the event that leaving the scene and/or remaining with the Officer is not feasible, the supervisor will 1) arrange transportation to the collection facility (the Officer will be instructed not to drive a vehicle), 2) notify the collection facility that the Officer is being sent for testing, 3) request that the collection facility notify the supervisor when collection procedures are completed, 4) arrange transportation for the Officer following the collection process, and 5) notify the Officer that he or she is not to return to work pending receipt of the test results by the Office of Internal Investigation.

F) Upon conclusion of the examination, the supervisor will ensure that the Officer is escorted to his destination. The supervisor will direct the Officer not to drive himself to his destination. The Officer will be relieved from duty pending receipt by the Office of Internal Investigation of the test results and the Officer will be notified of this change in status.

G) If the Officer tests negative for drugs or alcohol, the Officer will be compensated for any regularly scheduled hours he or she would have worked during the suspension period.

H) In those cases where a supervisor discovers an Officer who possesses what appears to be a controlled substance, illegally-used drug or alcohol, he or she will proceed as described above for instances where reasonable suspicion exists, and, if the substance in question appears to be a controlled substance or illegally-used drug, will in addition perform the following steps:

1) Immediately confiscate the substance and all equipment or paraphernalia directly employed with the substance. Wrap them in any available clean material (e.g. paper towel, copier paper, handkerchief). The supervisor will keep the package on his or her person or where he or she can be absolutely sure it cannot be tampered with and shall strive to process the materials as soon as possible.

2) As soon as the supervisor can, he or she will put the wrapped materials, still in the wrapping, into a large envelope and seal the envelope completely. The supervisor's initials will be written over the seam of the envelope in several places.

3) The supervisor will write the Officer's name, his or her own name, and the date at the top of the envelope, will promptly notify his or her commanding officer, and will turn the envelope over as soon as possible to the Office of Internal Investigation. The supervisor will witness the signing and dating of the envelope by the person to whom he or she turns it over.

4) All persons who subsequently and for whatever reason have possession of the envelope will sign and date it in the presence of the previous supervisor.

COB 0005766

Boston Police Department

Rules and Procedures

RULE 111

5) The Office of Internal Investigations will be responsible for delivering the substance to the Division of Food and Drug for analysis. Pending delivery the substance will be secured appropriately.

Appendix B

## REHABILITATION AGREEMENT

Name:_____     Date:_____

Department:_____

Dear _____:

On        , 19  ., the Boston Police Department agreed to your request to seek counseling and referral to a rehabilitation program for alcohol and/or drug abuse. The following conditions apply to your rehabilitation program:

1. You must authorize your treatment provider to provide proof to the Office of Internal Investigation of enrollment in a rehabilitation program and proof of attendance at all required sessions on a monthly basis. Your attendance will be monitored closely and the Office of Internal Investigations will initiate appropriate disciplinary action up to and including termination if you do not regularly attend all sessions.

2. You must adhere to all of the requirements of the drug or alcohol treatment or counseling program in which you are enrolled.

3. If you are absent from work during the rehabilitation period without prior authorization, you must promptly submit a written doctor's certificate explaining the reason for such absence. The Department will take disciplinary action if you are absent as a result of alcohol or drug use.

4. You will pay for all costs of rehabilitation which are not covered under the employee's health plan.

5. During the thirty-six months following the completion of your rehabilitation program, the Department will test you for alcohol and/or drug use on a random basis. The Department will take prompt disciplinary action if you refuse to submit to testing or if you test positive during this period.

6. You must meet all established standards of conduct and job performance. The Department will institute appropriate disciplinary action if your on-the-job conduct or job performance is unsatisfactory.

7. Failure to comply with all of the above conditions will result in the institution of appropriate disciplinary action, up to and including termination. Furthermore, rehabilitation personnel will notify the Department in writing or appear for testimony

COB 0005767

Boston Police Department

Rules and Procedures

**RULE 111**

at administrative, civil service and superior court hearings in the event an Officer has not complied with the designated rehabilitation program.

I hereby voluntarily agree to all of the above conditions and authorize my treatment provider to provide the Office of Internal Investigation with proof of my enrollment and attendance at the recommended rehabilitation program. I sign this rehabilitation agreement of my own free will, and without duress.

_____                _____
Officer's Name                                  Commanding Officer's Name


_____                _____
Officer's Signature                             Commanding Officer's Signature


_____                _____
Date                                            Date

COB 0005768

Page 12

Boston Police Department

Rules and Procedures

RULE 111

Appendix C

## PROCEDURES FOR DRUG TESTING

All drug tests administered pursuant to the Department's Substance Abuse Policy will be conducted in strict accordance with the following procedures:

1) Laboratory Qualifications: The Boston Police Department (the Department) has retained a certified laboratory under the Department of Health and Human Services (HHS) Mandatory Guidelines for federal workplace drug testing programs. The use of a certified laboratory ensures that the highest standards of forensic toxicology are being met.

2) Controlled Substances: The following drugs will be tested for:

   a) Marijuana
   b) Cocaine
   c) Opiates
   d) Amphetamines
   e) Phencyclidine
   f) others as appropriate.

3) Security and Chain of Custody: The selected laboratory will maintain strict security at its laboratory facilities and will strictly adhere to the chain of custody procedures mandated by DOT and HHS. This will include:

   a. Use of a standard drug testing custody and control form;

   b. Use of a clean, single-use specimen bottle that is securely wrapped until filled with the specimen, or use of a clean, single-use collection container that is securely wrapped until utilized;

   c. Use of a tamperproof sealing system designed to ensure against undetected opening and the use of a specimen bottle with a unique identifying number which is identical to the number appearing on the custody and control form;

   d. Use of a shipping container in which the specimen and related paperwork may be transferred and which can be sealed and initialed to prevent undetected tampering;

   e. Written procedures, instructions and training to ensure the integrity of the process shall be provided to collection personnel.

4) Specimen Collection Procedures:

   a. All specimens will be collected at designated collection sites which have necessary personnel certified by the laboratory in accordance with NIDA standards, materials, equipment and supervision to provide for specimen collection, security, temporary storage facilities, and shipping or transportation to the laboratory;

COB 0005769

Boston Police Department

Rules and Procedures

RULE 111

b. Procedures for collecting urine specimens shall allow individual privacy unless there is reason to believe a person may alter or substitute the specimen to be provided. The following are the exclusive grounds constituting reason to believe an individual may alter or substitute a specimen:

(1) The Officer presents a specimen which falls outside normal temperature range (32.5°-37.7°C/90.5°-99.8°F); and

    a) The person refuses to provide a measurement of oral body temperature; or,

    b) Oral body temperature varies by more than 1°C/1.8°F from the temperature of the specimen.

(2) The last urine specimen provided by the Officer was determined by the laboratory to have a specific gravity of less than 1.003 and a creatinine concentration below .2g/L;

(3) The collection site person observes conduct clearly and unequivocally indicating an attempt to substitute or adulterate the sample (e.g. substitute urine in plain view, blue dye in the specimen presented, etc.); or,

(4) The Officer has previously been determined to have used a controlled substance without medical authorization and the test was being conducted under Department procedures providing for follow-up testing upon or after return to service.

In any case where a determination is made by a collection site person to observe a specimen collection, a higher-level supervisor of the collection site person, or the Office of Internal Investigation, shall review and concur in such decision in advance. All direct observation shall be conducted by a person of the same gender as the person providing the specimen. In any case where collection is monitored [2] by non-medical personnel, the person shall be the same gender as the person providing the specimen.

c. The following procedures shall be used to ensure the integrity and identity of the specimen.

1. Toilet bluing agents will be placed in the toilet tanks whenever possible so the reservoir remains blue. Where practical, there shall be no other source of water in the enclosure where urination occurs. If there is another source of water, it shall be effectively secured or monitored so as to ensure it is not used as a source for diluting the specimen.

---

[2]  A collection site person "monitors" a collection for this purpose only if he or she is in close proximity to the Officer as the Officer provides the sample, such that the collection site person can hear the Officer's actions.

COB 0005770

Boston Police Department

Rules and Procedures

**RULE 111**

2. Upon arriving at the collection site, the Officer to be tested shall present the collection site person with proper identification to ensure that he/she is positively identified as the person selected for testing (e.g., by presenting a driver's license or other photo ID, or by identification by the Office of Internal Investigation). If the Officer's identity cannot be established, the collection site person shall not proceed with the collection, and the Office of Internal Investigation shall be notified. If requested by the Officer, the collection site person shall show his or her identification to the Officer.

3. If the Officer scheduled to be tested fails to arrive at the collection site at the assigned time, the collection site person shall contact the Office of Internal Investigation to obtain guidance on the action to be taken.

4. The Officer to be tested will be required to remove any unnecessary outer garments (e.g., a coat or jacket) that might conceal items or substances that could be used to tamper with or adulterate the urine specimen. The collection site person shall ensure that all personal belongings such as purses or briefcases remain with the outer garments. The Officer may retain his or her wallet. If requested, the collection site person shall provide the Officer with a receipt for any personal belongings.

5. The Officer shall be instructed to wash and dry his/her hands prior to urination.

6. After washing his/her hands, the Officer shall remain in the presence of the collection site person and shall not have access to any water fountain, faucet, soap dispenser, cleaning agent or any other materials which could be used to adulterate the specimen.

7. The Officer may provide his/her specimen in the privacy of a stall or otherwise partitioned area that allows for individual privacy. The collection person shall provide the Officer with a specimen bottle or collection container, as applicable.

8. The collection site person shall note any unusual behavior or appearance of the Officer which may indicate the sample may have been tampered with on the urine custody and control form.

9. Upon receiving the specimen from the Officer, the collection site person shall determine if it contains at least 60 milliliters of urine. If the Officer is unable to provide 60 milliliters of urine, the collection site person shall direct the Officer to drink fluids and, after a reasonable time, again attempt to provide a complete sample using a fresh specimen bottle or a fresh collection container. The original specimen shall be discarded. If the Officer is still unable to provide a complete specimen, the following rules apply:

COB 0005771

Page 15

Boston Police Department

Rules and Procedures

RULE 111

a) In the case of a reasonable cause test, the Officer shall remain at the collection site and continue to consume reasonable quantities of fluids until the specimen has been provided or until the expiration of a period up to 8 hours from the beginning of the collection procedure.

b) In the case of a pre-employment test or other test not for cause, the Office of Internal Investigation may elect to proceed as specified in 9.(a) above (consistent with any restrictions on hours of service) or may elect to discontinue the collection and conduct a subsequent collection at a later time to be scheduled by the Office of Internal Investigation.

c) If the Officer cannot provide a complete sample within the up to 8-hour period or at the subsequent collection, as applicable, then the MRO shall refer the Officer for a medical evaluation to develop pertinent information concerning whether the Officer's inability to provide a specimen is genuine or constitutes a refusal to provide a specimen.[3] The medical evaluator shall report his or her findings to the MRO. Upon completion of the examination, the MRO shall report his or her conclusions to the Office of Internal Investigation in writing.

10. Immediately after the specimen is collected, the collection site person shall measure the temperature of the specimen. The temperature measuring device used must accurately reflect the temperature of the specimen and not contaminate the specimen. The time from urination to temperature measure is critical and in no case shall exceed 4 minutes.

11. A specimen temperature outside the range of 32.5° - 37.7°C/90.5° -99.8°F constitutes a reason to believe that the Officer has altered or substituted the specimen in accordance with paragraph 4)b(1) above. This may be cause for the Officer to be required to provide another specimen under direct observation. In such cases, the Officer supplying the specimen may volunteer to have his or her oral temperature taken to provide evidence to counter the reason to believe the Officer may have altered or substituted the specimen.

12. Immediately after the specimen is collected, the collection site person shall also inspect the specimen to determine its color and look for any signs of contaminants. Any unusual findings shall be noted on the custody and control form.

13. All specimens suspected of being adulterated shall be forwarded to the laboratory for testing.

---

[3]  Such a referral is not necessary in pre-employment testing where the Department does not wish to hire the person.

COB 0005772

Boston Police Department                                Rules and Procedures

                                                        RULE 111

14. Whenever there is reason to believe that a particular Officer has altered or
    substituted the specimen as provided in paragraph 4)b(1) or (3) above, a
    second specimen shall be obtained as soon as possible under the direct
    observation of a collection site person of the same gender.

15. After the urine specimen is provided, both the Officer being tested and the
    collection site person shall keep the specimen in view at all times prior to its
    being sealed and labeled. The specimen shall be sealed (by placement of a
    tamperproof seal over the bottle cap and down the sides of the bottle) and
    labeled in the presence of the Officer. If the specimen is transferred to a
    second bottle, the collection site person shall request the Officer to observe the
    transfer of the specimen and the placement of the tamperproof seal over the
    bottle cap and down the sides of the bottle.

16. The collection site person, in the presence of the Officer, shall place securely
    on the bottle an identification label which contains the date, the Officer's
    specimen number and any other identifying information provided or required
    by the Department. If separate from the label, the tamperproof seal shall also
    be applied.

17. The Officer shall, in the presence of the collection site person, initial the
    identification label on the specimen bottle for the purpose of certifying that it
    is the specimen collected from him or her.

18. The collection site person shall, in the presence of the Officer, enter on the
    drug testing custody and control form all information identifying the
    specimen. The collection site person shall sign the form certifying that the
    collection was accomplished according to the procedures described herein.

19. The Officer shall be asked to read and sign a statement on the drug testing
    custody and control form certifying that the specimen identified as having
    been collected from him or her is in fact the specimen he or she provided. He
    or she will also have the opportunity to set forth on the form information
    concerning medications taken or administered in the past 30 days.

20. The Officer will also be required to read and sign a consent and release form
    authorizing the collection of the specimen, analysis of the specimen for
    designated controlled substances and release of the test results to the Office of
    Internal Investigation.

21. The collection site person shall complete the chain of custody portion of the
    drug testing custody and control form to indicate receipt of the specimen from
    the Officer and shall certify proper completion of the collection process. If the
    specimen is not immediately prepared for shipment, the collection person shall
    ensure that it is appropriately safeguarded during temporary storage.

COB 0005773

22. While any part of the above chain of custody procedures is being performed, the urine specimen and custody documents must remain under the control of the involved collection site person.

23. The collection site person shall not leave the collection site in the interval between presentation of the specimen by the Officer and securement of the sample with an identifying label bearing the Officer's specimen identification number and seal initialled by the Officer. If it becomes necessary for the collection person to leave during this interval, the collection shall be nullified and (at the election of the Office of Internal Investigation) a new collection begun.

24. To the maximum extent possible, the collection site personnel shall keep the Officer's specimen bottle within sight both before and after the Officer has urinated. After the specimen is collected it shall be properly sealed and labeled.

25. Collection site personnel shall arrange to ship the collected specimen to the drug testing laboratory. The specimens shall be placed in shipping containers designed to minimize the possibility of damage during shipment (e.g., specimen boxes and/or padded mailers) and those containers shall be securely sealed to eliminate the possibility of undetected tampering. On the tape sealing the container, the collection site person shall sign and enter the date the specimens were sealed in the shipping containers for shipment. The collection site person shall ensure that the chain of custody documentation is attached or enclosed in each container sealed for shipment to the drug testing laboratory.

26. If the Officer refuses to cooperate with the collection process, the collection site person shall inform the Office of Internal Investigation and shall document the non-cooperation on the drug testing custody and control form.

27. If the sample is being collected from an Officer in need of medical attention (e.g., as part of a post-accident test given in an emergency medical facility), necessary medical attention shall not be delayed in order to collect the specimen.

28. A chain of custody form (and a laboratory internal chain of custody document, where applicable) shall be used for maintaining control and accountability of each specimen from the point of collection to final disposition of the specimen. The date and purpose shall be documented on the form each time a specimen is handled or transferred and every individual in the chain shall be identified. Every effort shall be made to minimize the number of persons handling specimens.

COB 0005774

Boston Police Department

Rules and Procedures

**RULE 111**

5) Laboratory Procedures:

   a.  Drug testing laboratories shall be secure at all times and shall have in place sufficient security measures to control access to the premises and to ensure no unauthorized personnel handle the specimens or gain access to the laboratory process or areas where records are stored.

   b.  Laboratories shall use chain of custody procedures to maintain control and accountability of specimens from receipt through completion of testing, reporting of results during storage, and continuing until final disposition of specimens. The date and purpose shall be documented on an appropriate chain of custody form each time a specimen is handled or transferred and every individual in the chain shall be identified. Accordingly, authorized technicians shall be responsible for each urine specimen or aliquot [4] in their possession and shall sign and complete chain of custody forms for those specimens or aliquots as they are received.

   c.  1) When a shipment of specimens is received, laboratory personnel shall inspect each package for evidence of possible tampering and compare information on specimen bottles within each package to the information on the accompanying chain of custody forms. Any direct evidence of tampering or discrepancies in the information on specimen bottles and the Department's chain of custody forms attached to the shipment shall be immediately reported to the Office of Internal Investigation and shall be noted on the laboratory's chain of custody form which shall accompany the specimens while they are in the laboratory's possession.

      2) Specimen bottles generally shall be retained within the laboratory's accession area until all analyses have been completed. Aliquots and the laboratory's chain of custody forms shall be used by laboratory personnel for conducting initial and confirmatory tests.

   d.  Specimens that do not receive an initial test within 7 days of arrival at the laboratory shall be placed in secure refrigeration units. Temperatures shall not exceed 6°C. Emergency power equipment shall be available in case of prolonged power failure.

   e.  Laboratory facilities for urine drug testing will normally process specimens by grouping them into batches. When conducting either initial or confirmatory tests, every batch shall contain an appropriate number of standards for calibrating the instrumentation and a minimum of 10 percent controls. Both quality control and blind performance test samples shall appear as ordinary samples to laboratory analysts.

   f.  1) The initial test shall use an immunoassay which meets the requirements of the Food and Drug Administration for commercial distribution. The following initial

---

[4] An aliquot is that portion of the urine specimen used for testing.

COB 0005775

Boston Police Department

Rules and Procedures

RULE 111

cutoff levels shall be used when screening specimens to determine whether they
are negative for these five drugs or classes of drugs:

|  | Initial Test Cutoff Levels (ng/ml)[5] |
|---|---|
| Marijuana metabolites | 100 |
| Cocaine metabolites | 300 |
| Opiate metabolites | 300[6] |
| Phencyclidine | 25 |
| Amphetamines | 1,000 |

2) These cutoff levels are subject to change by the HHS as advances in technology
or other considerations warrant identification of these substances at other
concentrations.  For drugs not listed in f.(1) above, cutoff levels to be used shall,
when available, be those then specified by the HHS.

g.  1) All specimens identified as positive on the initial test shall be confirmed using
gas chromatography/mass spectrometry (GC/MS) techniques at the cutoff levels
listed in this paragraph for each drug.  All confirmations shall be by quantitative
analysis.

|  |  | Confirmatory test cutoff levels (ng/ml) |
|---|---|---|
| Marijuana metabolite[7] |  | 15 |
| Cocaine metabolite[8] |  | 150 |
| Opiates: | Morphine | 300 |
|  | Codeine | 300 |
| Phencyclidine |  | 25 |

---

[5]   ng = nanograms
     ml = milliliters
[6]   25 ng/ml if immunoassay specific for free morphine
[7]   Delta-9-tetrahydrocannabinol-9-carboxylic acid
[8]   Benzoylecgonine

COB 0005776

Boston Police Department

Rules and Procedures

RULE 111

| Amphetamines: | Amphetamine | 500 |
| | Methamphetamine | 500 |

2) These cutoff levels are subject to change by the HHS as advances in technology or other considerations warrant identification of these substances at other concentrations. For drugs not listed in g.(1) above, cutoff levels to be used shall, when available, be those then specified by the HHS.

h. 1) The laboratory shall report test results to the MRO within an average of 5 working days after receipt of the specimen by the laboratory. Before any test result is reported (the results of initial tests, confirmatory tests, or quality control data), it shall be reviewed and the test certified as an accurate report by the responsible individual. The report shall identify the drugs/metabolites tested for, whether positive or negative, the specimen number assigned by the Department, and the drug testing laboratory specimen identification number (accession number).

2) The laboratory shall report as negative all specimens that are negative on the initial test or negative on the confirmatory test. Only specimens confirmed positive shall be reported positive for a specific drug.

3) The MRO may request from the laboratory and the laboratory shall provide quantification of test results. The MRO shall report whether the test is positive or negative to the Office of Internal Investigation and may report the drug(s) for which there was a positive test, but shall not disclose the quantification of test results to the Office of Internal Investigation.

4) The laboratory may transmit results to the MRO by various electronic means (for example, teleprinters, facsimile, or computer) in a manner designed to ensure confidentiality of the information. Results may not be provided verbally by telephone. The laboratory and the MRO must ensure the security of the data transmission and limit access to any data transmission, storage, and retrieval system.

5) The laboratory shall send only to the MRO the original or a certified true copy of the drug testing custody and control form (part 2), which, in the case of a report positive for drug use, shall be signed (after the required certification block) by the individual responsible for day-to-day management of the drug testing laboratory or the individual responsible for attesting to the validity of the test reports, and attached to which shall be a copy of the test report.

6) The laboratory shall provide to the Superintendent, Chief of the Office of Internal Investigation a monthly statistical summary of urinalysis testing of sworn personnel and shall not include in the summary any personal identifying information. Initial and confirmation data shall be included from test results

COB 0005777

Page 21

Boston Police Department                          Rules and Procedures

RULE 111

reported within that month. Normally this summary shall be forwarded by registered or certified mail not more than 14 calendar days after the end of the month covered by the summary.

Monthly reports shall not include data from which it is reasonably likely that information about sworn personnel's tests can be readily inferred. If necessary, in order to prevent the disclosure of such data, the laboratory shall not send a report until data are sufficiently aggregated to make such an inference unlikely. In any month in which a report is withheld for this reason, the laboratory will so inform the Office of Internal Investigation in writing.

7) Unless otherwise instructed by the Office of Internal Investigation in writing, all records pertaining to a given urine specimen shall be retained by the drug testing laboratory for a minimum of 2 years.

i.  Long term frozen storage (-20°C or less) ensures that positive urine specimens will be available for any necessary retest during administrative or disciplinary proceedings. The laboratory shall retain and place in properly secured long term frozen storage for a minimum of 1 year all specimens confirmed positive, in their original labeled specimen bottles. Within this 1 year period, the Office of Internal Investigation may request the laboratory to retain the specimen for an additional period of time, but if no such request is received the laboratory may discard the specimen after the end of 1 year, except that the laboratory shall be required to maintain any specimens known to be under legal challenge for an indefinite period.

j.  Because some analytes deteriorate or are lost during freezing and/or storage, quantification for a retest is not subject to a specific cutoff requirement but must provide data sufficient to confirm the presence of the drug or metabolite.

k.  The drug testing laboratory shall maintain and make available for at least 2 years documentation of all aspects of the testing process. This 2 year period may be extended upon written notification by the Office of Internal Investigation. The required documentation shall include personnel files on all individuals authorized to have access to specimens; chain of custody documents; quality assurance/quality control records; procedure manuals; all test data (including calibration curves and any calculations used in determining test results); reports; performance records on performance testing; performance on certification inspections; and hard copies of computer-generated data. The laboratory shall maintain documents for any specimen known to be under legal challenge for an indefinite period.

6)  Reporting and Review of Results

a.  An essential part of the drug testing program is the final review of confirmed positive results from the laboratory. A positive test result does not automatically

COB 0005778

Page 22

Boston Police Department                              Rules and Procedures

RULE 111

---

identify an Officer/applicant as having used drugs in violation of Department
policy. An individual with a detailed knowledge of possible alternate medical
explanations is essential to the review of results. This review shall be performed
by the Medical Review Officer (MRO) prior to the transmission of the results to
the Office of Internal Investigation. The MRO review shall include review of the
chain of custody to ensure that it is complete and sufficient on its face. The duties
of the MRO with respect to negative results are purely administrative.

b.  1) The MRO shall be a licensed physician with knowledge of substance abuse
    disorders who has been approved by the NIDA certified laboratory retained by the
    City.

    2) The MRO shall not be an employee of the laboratory conducting the drug test.

    3) The role of the MRO is to review and interpret confirmed positive test results
    obtained through the Department's testing program. In carrying out this
    responsibility, the MRO shall examine alternate medical explanations for any
    positive test result. This action may include conducting a medical interview and
    review of the Officer's medical history, or review of any other relevant biomedical
    factors. The MRO shall review all medical records made available by the tested
    Officer when a confirmed positive test could have resulted from legally prescribed
    medication. The MRO shall not, however, consider the results of urine samples
    that are not obtained or processed in accordance with the procedures set forth
    herein.

c.  1) Prior to making a final decision to verify a positive test result for an Officer,
    the MRO shall give the Officer an opportunity to discuss the test result with him
    or her.

    2) The MRO shall contact the Officer directly, on a confidential basis, to
    determine whether the Officer wishes to discuss the test result. A staff person
    under the MRO's supervision may make the initial contact, and a medically
    licensed or certified staff person may gather information from the Officer. Except
    as provided in paragraph (c)(5) of this section, the MRO shall talk directly with
    the Officer before verifying a test as positive.

    3) If, after making all reasonable efforts and documenting them, the MRO is
    unable to reach the Officer directly, the MRO shall contact the Office of Internal
    Investigation who shall direct the individual to contact the MRO as soon as
    possible. If it becomes necessary to reach the Officer through the Office of
    Internal Investigation, the Internal Affairs Division shall employ procedures that
    ensure, to the maximum extent practicable, that the requirement that the Officer
    contact with the MRO is held in confidence.

COB 0005779

Boston Police Department                           Rules and Procedures

RULE 111

    4) If, after making all reasonable efforts, the Office of Internal Investigation is unable to contact the Officer, the Department may place the Officer on administrative leave <u>with</u> pay.

    5) The MRO may verify a test as positive without having communicated directly with the Officer about the test in two circumstances:

        (a) The Officer expressly declines the opportunity to discuss the test; or,

        (b) The Office of Internal Investigation has successfully made and documented a contact with the Officer and instructed the Officer to contact the MRO and more than five days have passed since the date the Officer was successfully contacted by the Office of Internal Investigation.

    6) If a test is verified positive under the circumstances specified in paragraph (5)(b) of this section, the Officer may present to the MRO information documenting that serious illness, injury, or other circumstances unavoidably prevented the Officer from timely contacting the MRO. The MRO, on the basis of such information, may reopen the verification, allowing the Officer to present information concerning a legitimate explanation for the confirmed positive test. If the MRO concludes that there is a legitimate explanation, the MRO declares the test to be negative as per (f) below.

    7) Following verification of a positive test result, the MRO shall refer the case to the Office of Internal Investigation.

d.  Before the MRO verifies a confirmed positive result for opiates, he or she shall determine that there is clinical evidence — in addition to the urine test —of unauthorized use of any opium, opiate, or opium derivative (e.g., morphine/codeine). (This requirement does not apply if GC/MS confirmation testing for opiates confirms the presence of 6-monoacetylmorphine).

e.  Should any question arise as to the accuracy or validity of a positive test result, only the MRO is authorized to order a reanalysis of the original sample and such retests are authorized only at laboratories certified by HHS and which may be selected by the Officer as long as such laboratory is certified by NIDA utilizing the same certification levels referred to in the "Laboratory Procedures", paragraph 5, subparagraph (g) of this policy The MRO shall authorize a reanalysis of the original sample if requested to do so by the Officer within 72 hours of the Officer's having received actual notice of the positive test. If the retest is negative, the MRO shall declare the final result to be negative.

f.  If the MRO determines there is a legitimate medical explanation for the positive test result, the MRO shall report the test result to the Office of Internal Investigation as negative and shall include in the report a list of all prescription medications being used by the Officer.

COB 0005780

Page 24

Boston Police Department                                    Rules and Procedures

RULE 111

---

g. Additionally, the MRO, based on review of inspection reports, quality control data, multiple samples, and other pertinent results, may determine that the result is scientifically insufficient for further action and declare the test specimen negative. In this situation the MRO may request reanalysis of the original sample before making this decision. The laboratory shall assist in this review process as requested by the MRO by making available the individual responsible for day-to-day management of the urine drug testing laboratory or other employee who is a forensic toxicologist or who had equivalent forensic experience in urine drug testing, to provide specific consultation as required by the Department.

h. Except as provided in this paragraph, the MRO shall not disclose to any third party any medical information provided by the Officer to the MRO as a part of the testing verification process.

1) The MRO may disclose such information to the Office of Internal Investigation only if in the MRO's reasonable medical judgment the information indicates that continued performance by the Officer of his or her safety sensitive function could pose a significant safety risk.

2) Before obtaining medical information from the Officer as part of the verification process, the MRO shall inform the Officer that information may be disclosed to third parties as provided in this paragraph and the identity of any parties to whom information may be disclosed.

7) Protection of Sworn Personnel Records

Department contracts with laboratories require that the laboratory maintain sworn personnel test records in confidence. The contracts will provide that the laboratory shall disclose information related to a positive drug test only to the Office of Internal Investigation.

8) Individual Access to Test and Laboratory Certification Results

Any Officer who is the subject of a drug test conducted under this policy shall, upon written request to the Chief, Office of Internal Investigations, have access to any records relating to his or her drug test and any records relating to the results of any relevant certification, review, or revocation-of-certification proceedings.

Positive test results for drug and/or alcohol shall be retained by the Department and processed as in the same manner as are any violations of Department Rules and Procedures. Documentation leading up to or supporting a decision to test where the test is positive shall be retained and/or processed in the same manner as any violation of Department Rules and Procedures. Documentation leading up to a decision to test where the test is negative shall be filed separately with the Superintendent, Chief of the Office of Internal Investigations and shall remain confidential.

COB 0005781

Page 25

Boston Police Department

Rules and Procedures

RULE 111

Appendix D
## PROCEDURES FOR ANNUAL HAIR TESTING

A) **Tracking System** – The Department shall develop and maintain a tracking system that ensures each Officer who is subject to Annual Testing will undergo a hair test as required by Rule 111, sec. V, para. G.

B) **Notification to Submit** – The Department shall provide to Commanding Officers a listing of those Officers who shall be required to submit to an annual hair test. The Commanding Officer or his/her designee shall notify the Officer when he/she shall submit to the test at Occupational Health Services.

C) **Collection Personnel** – Certified employees of the Occupational Health Services Unit shall perform all hair sample collections.

D) **Identification of Officer's Identity** – The Officer's identity shall be verified by checking the driver's license or other photo identification. The Department, including personnel from the Occupational Health Services Unit, may do a visual identification of the Officer, however this must be noted on the Test Request Form.

E) **Completing the Test Request Form** – The Test Request Forms (TRF) are pre-printed forms that are coded specifically to the Department. The collection personnel shall fill out the form in the presence of the Officer. The TRF includes information such as the collector's identity, the Test Subject Identification Number, and where the sample was collected (ex., crown of head, nape of the neck).

F) **Completing the Sample Acquisition Card (SAC)** – The SAC is a card that will hold the hair sample during transportation. A foil used for collection is included with the card. These steps may occur prior to or after the collection of the hair sample and shall be completed in the presence of the Officer.

　1) The collection personnel shall sign and date the SAC. The collection personnel shall write the Test Subject Identification Number on the SAC. This number must match the number listed on the TRF.

　2) The collection personnel shall place the bar code from the TRF on the SAC to ensure the two documents are identified with one another.

G) **Collecting the Hair Sample** – The collection personnel shall complete each of the following steps in the presence of the Officer.

　1) The collection personnel will grasp a small lock of hair approximately ½ inch wide by one strand deep when held flat and cut the sample close to the scalp. If the head hair is not available other body hair shall be collected.

COB 0005782

Page 26

Boston Police Department                                    Rules and Procedures

RULE 111

2) The sample is then placed in the foil with the root ends extending approximately ¼ inch. The foil is pressed together, trapping the sample inside. If the hair is long, the collection personnel will wrap the remaining hair around the foil.

3) The collection personnel shall place the sample inside the SAC, sign and date the integrity seal, and place the integrity seal over the designated spot on the SAC.

4) The Officer shall initial the SAC in the space provided.

5) The Officer shall complete the Donor Certification section of the TRF that includes the Officer's name and telephone number. In the comments section, the donor may provide additional information for the Medical Review Officer (MRO), (ex., use of prescription medicine or an additional phone number where the MRO can contact the Officer if the need arises).

6) The copy of the TRF that contains the Donor Certification section shall be separated from the TRF and placed in a sealed envelope addressed to the MRO. The Officer shall initial and date the sealed envelope. The sealed envelope shall be kept in a secured area until sent to the MRO, at the next regularly scheduled pick-up using an overnight carrier.

7) The collection personnel shall place the SAC and a copy of the TRF into the collection pouch and seal the pouch.

8) The Officer shall initial and date the collection pouch in the space provided.

H) **Storing and Shipping the Sample** – The sealed collection pouch shall be kept in a secured area until sent to the laboratory, at the next regularly scheduled pick-up using an overnight carrier.

I) **Licensed Laboratory** – The sample shall be tested at a licensed laboratory that is certified to perform hair testing.

J) **Review of Test Result by an authorized Medical Review Officer (MRO)** – All hair sample drug test results shall be reviewed by an authorized MRO prior to the transmission of the test results to the Commanding Officer, Bureau of Internal Investigations (BII)

1) The duties of the MRO with respect to positive test results are to review and interpret confirmed, positive test results obtained through the Department's annual hair testing program. In carrying out this responsibility, the MRO shall examine alternative medical explanations for any positive test result. This action may include conducting a medical interview and review of the Officer's medical history, or review of any other relevant biomedical factors. The MRO shall review all medical records made available by the tested Officer when a positive test could have resulted from legally prescribed medication. The

COB 0005783

MRO shall not, however, consider the results for hair samples that are not obtained or processed in accordance with the procedures set forth herein.

2) Prior to making a final decision to verify a positive test result for an Officer, the MRO shall give the Officer an opportunity to discuss the test result with him. For example, there may be a legitimate positive test result for the use of legally prescribed or dispensed medication such as codeine for coughs, narcotic analgesics for pain, tetrahydrocannobinol for cancer, cocaine as a vasoconstrictive anesthetic, etc. It is important to note that it is highly unlikely that a medically acceptable explanation will be found for the presence of cocaine or marijuana.

3) The MRO shall contact the Officer directly, on a confidential basis, to determine whether the employee wishes to discuss the test result. A staff person under the MRO's supervision may make the initial contact, and a medically licensed or certified staff person may gather information from the employee. Except as provided in Paragraph J(5) of this Section, the MRO shall talk directly with the employee before verifying a test as positive.

4) If after making all reasonable efforts and documenting them, the MRO is unable to reach the Officer directly, the MRO shall contact BII who shall contact the Officer and direct him to contact the MRO as soon as possible. If it becomes necessary to reach the Officer through BII, the Bureau shall employ procedures that ensure, to the maximum extent practicable, that the requirement that the Officer contact with the MRO is held in confidence.

5) The MRO may verify a test result as positive without having communicated directly with the Officer in three circumstances.

   a) If the Officer expressly declines the opportunity to discuss the test result, the test shall be reported as positive.

   b) If BII has successfully made and documented a contact with the Officer and instructed the Officer to contact the MRO and more than five calendar days have passed since the date the Officer was successfully contacted by BII and the Officer has not contacted the MRO, the test shall be reported as positive.

   c) If after making all reasonable efforts and documenting them, BII has not been able to contact the Officer and fourteen calendar days have passed since BII's first documented attempt to contact the Officer, the test shall be reported as positive.

6) The MRO shall report to BII any samples that were not suitable for testing. When BII receives a test result that indicates the hair specimen was an inadequate specimen and/or was not testable for any other reason, BII shall contact the Officer and require him/her to provide another specimen for

COB 0005784

Boston Police Department                                      Rules and Procedures

RULE 111

testing provided the collection occurs on or within thirty (30) calendar days of
that Officer's birthday.

7) The MRO shall report whether the verified test result is positive or negative to
BII. If the MRO, in his/her sole medical opinion, concludes there is a
legitimate medial explanation for the positive test result, the MRO shall report
the test result as negative to BII.

8) BII shall notify each Officer who receives a positive test result and the
provisions of Rule 111 shall apply.

K)    **Safety-Net Tests** – If an Officer receives a positive, confirmed hair test result, the
Officer may request a safety-net test. The safety-net test must be performed under
the same or more stringent procedures as recommended by the manufacturer.

1) To request the safety-net test, the Officer must submit a written request to the
Commanding Officer, BII within 72 hours of being notified by BII of the
positive test result. BII shall notify Occupational Health that a safety-net test
has been requested, and Occupational Health shall schedule the safety-net test
forthwith. The Officer must pay for the costs of the safety-net test and the
MRO review, payable by check made out to the City of Boston at the time of
the sample collection.

2) For Officers who have requested a safety-net test, the Department shall
immediately place the Officer on administrative duty pending the outcome of
the safety-net test. While on administrative duty the Officer shall not carry a
firearm and shall not be eligible for overtime or details.

3) If the result of the safety-net test result is negative, the Officer shall be
reimbursed for the costs of the safety-net test and the MRO review and shall
be made whole, e.g., paid for any overtime or details he/she would have been
eligible to perform pursuant to the current collective bargaining agreement.
Likewise, said hours shall be recorded and posted pursuant to the current
collective bargaining agreement. In addition, the Officer's IAD file shall be
expunged of the prior positive test result that led to the safety-net test.

L)    **Access and Storing of Test Results** - Any Officer who is the subject of a hair test
conducted under this procedure shall, upon written request to the Commanding
Officer, BII, have access to any and all record(s) relating to his/her hair test result
that is/are in the possession of the Department. Such results and records are
confidential medical information and shall not be disclosed without the Officer's
consent except to the extent necessary to effectuate the purposes of the
Department's Substance Abuse Policy. Positive hair test results shall be retained
by the Department and processed in the same manner as any violations of
Department Rules and Procedures.

COB 0005785

Boston Police Department                                  Rules and Procedures

                                                                    RULE 111

M)     Applicability of Rule 111- The hair testing procedures are effective pursuant to
       the collective bargaining agreement. Nothing contained herein alters the current
       Substance Abuse Policy as it relates to other drug/alcohol testing, procedures, or
       requirements, e.g., switching, adulterating or refusing to be tested are prohibited
       by Section IV of Rule 111.

COB 0005786

Exhibit 2

# Exhibit 2

to make copies, compilations, abstracts or summaries. A specification shall be in sufficient detail to permit the interrogating party to locate and to identify, as readily as can the party served, the records from which the answer may be ascertained.

(As amended Dec. 27, 1946, eff. Mar. 19, 1948; Mar. 30, 1970, eff. July 1, 1970; Apr. 29, 1980, eff. Aug. 1, 1980; Apr. 22, 1993, eff. Dec. 1, 1993.)

**Rule 34. Production of Documents and Things and Entry Upon Land for Inspection and Other Purposes**

(a) SCOPE. Any party may serve on any other party a request (1) to produce and permit the party making the request, or someone acting on the requestor's behalf, to inspect and copy, any designated documents (including writings, drawings, graphs, charts, photographs, phonorecords, and other data compilations from which information can be obtained, translated, if necessary, by the respondent through detection devices into reasonably usable form), or to inspect and copy, test, or sample any tangible things which constitute or contain matters within the scope of Rule 26(b) and which are in the possession, custody or control of the party upon whom the request is served; or (2) to permit entry upon designated land or other property in the possession or control of the party upon whom the request is served for the purpose of inspection and measuring, surveying, photographing, testing, or sampling the property or any designated object or operation thereon, within the scope of Rule 26(b).

(b) PROCEDURE. The request shall set forth, either by individual item or by category, the items to be inspected, and describe each with reasonable particularity. The request shall specify a reasonable time, place, and manner of making the inspection and performing the related acts. Without leave of court or written stipulation, a request may not be served before the time specified in Rule 26(d).

The party upon whom the request is served shall serve a written response within 30 days after the service of the request. A shorter or longer time may be directed by the court or, in the absence of such an order, agreed to in writing by the parties, subject to Rule 29. The response shall state, with respect to each item or category, that inspection and related activities will be permitted as requested, unless the request is objected to, in which event the reasons for the objection shall be stated. If objection is made to part of an item or category, the part shall be specified and inspection permitted of the remaining parts. The party submitting the request may move for an order under Rule 37(a) with respect to any objection to or other failure to respond to the request or any part thereof, or any failure to permit inspection as requested.

A party who produces documents for inspection shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the request.

(c) PERSONS NOT PARTIES. A person not a party to the action may be compelled to produce documents and things or to submit to an inspection as provided in Rule 45.

## RULE 26.5    UNIFORM DEFINITIONS IN DISCOVERY REQUESTS

**(a) Incorporation by Reference and Limitations.** The full text of the definitions set forth in paragraph (c) is deemed incorporated by reference into all discovery requests, but shall not preclude

(1) the definition of other terms specific to the particular litigation;

(2) the use of abbreviations; or

(3) a narrower definition of a term defined in paragraph (c).

**(b) Effect on Scope of Discovery.** This rule is not intended to broaden or narrow the scope of discovery permitted by the Federal Rules of Civil Procedure.

**(c) Definitions.** The following definitions apply to all discovery requests:

(1) *Communication.* The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

(2) *Document.* The term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Fed. R. Civ. P. 34(a). A draft or non-identical copy is a separate document within the meaning of this term.

(3) *Identify (With Respect to Persons).* When referring to a person, "to identify" means to give, to the extent known, the person's full name, present or last known address, and, when referring to a natural person, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

(4) *Identify (With Respect to Documents).* When referring to documents, "to identify" means to give, to the extent known, the

(a) type of document;

(b) general subject matter;

(c) date of the document; and

(d) author(s), addressee(s), and recipient(s).

(5) *Parties.* The terms "plaintiff" and "defendant" as well as a party's full or abbreviated name or a pronoun referring to a party mean the party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates. This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

(6) *Person.* The term "person" is defined as any natural person or any business, legal, or governmental entity or association.

33

(7) *Concerning.* The term "concerning" means referring to, describing, evidencing, or constituting.

(8) *State the Basis.* When an interrogatory calls upon a party to "state the basis" of or for a particular claim, assertion, allegation, or contention, the party shall

> (a) identify each and every document (and, where pertinent, the section, article, or subparagraph thereof), which forms any part of the source of the party's information regarding the alleged facts or legal conclusions referred to by the interrogatory;

> (b) identify each and every communication which forms any part of the source of the party's information regarding the alleged facts or legal conclusions referred to by the interrogatory;

> (c) state separately the acts or omissions to act on the part of any person (identifying the acts or omissions to act by stating their nature, time, and place and identifying the persons involved) which form any part of the party's information regarding the alleged facts or legal conclusions referred to in the interrogatory; and

> (d) state separately any other fact which forms the basis of the party's information regarding the alleged facts or conclusions referred to in the interrogatory.

*Adopted effective October 1, 1992.*

Exhibit B

**BINGHAM McCUTCHEN**

Robert B. Baker
Direct Phone:  (617) 951-8873

April 13, 2007

<u>**Via U.S. Mail and Facsimile**</u>

J. Allen Holland, Jr.
Lynch, Brewer, Hoffman & Fink, LLP
101 Federal Street, 22nd Floor
Boston, MA 02110-1800
Facsimile: (617) 951-0811

Bingham McCutchen LLP
150 Federal Street
Boston, MA
02110-1726

617.951.8000
617.951.8736 fax

bingham.com

Boston
Hartford
London
Los Angeles
New York
Orange County
San Francisco
Silicon Valley
Tokyo
Walnut Creek
Washington

**Re:     Jones, et al. v. City of Boston, et al., Case Number 05-11832:
         Subpoena to Psychemedics Corporation ("Psychemedics")**

Dear Mr. Holland:

I write to follow-up concerning the meet-and-confer conference call we had on April 10th to discuss the plaintiffs' subpoena to Psychemedics.  Thank you for taking the time to discuss the plaintiffs' document requests with Raquel Webster, Eric Heining and I. Although we "agreed to disagree" on some of the discovery that plaintiffs believe is very significant to this case, I feel we made significant progress in resolving many of the plaintiffs' requests.  As I said several times during the call (and as I wrote in my February 28th letter to you), the plaintiffs endeavor, wherever possible, to limit the burden to Psychemedics in complying with their requests.  In some instances, you were able to describe the burden to Psychemedics in responding to a request and plaintiffs were able to offer a narrower production to satisfy much of the substance of a particular request. With this spirit of collegiality, the plaintiffs hope to significantly narrow the issues that must be resolved by the court.

As I mentioned on the conference call, plaintiffs will be able to withdraw some of their requests based on either defendants' relatively recent document productions, or Psychemedics' compromises on other requests.  These are the requests that are still potentially outstanding:

**Request 1**: ("All documents and communications between Psychemedics and Defendants.")  Psychemedics agrees to produce its contracts with the defendants, all communications related to its contracts with the defendants, and any general communications with the defendants.  Psychemedics will not produce individual test results for all of the defendants' employees who have ever taken the hair test because, to the extent that such responsive documents exist, it would require the review of approximately 600 boxes of documents located in California that contain test results and that are not organized by Psychemedics' client.  However, you will undertake to determine whether Psychemedics has records confirming the total number of tests it has performed for the defendants.  If there are any such summary documents (e.g., billing records), Psychemedics will produce them.

J. Allen Holland, Jr.
April 13, 2007
Page 2

Bingham McCutchen LLP
bingham.com

**Request 2**: ("All documents and communications between Psychemedics and any present or former agents, servants, employees, attorneys, consultants of the Department of Health and Human Services or the Substance Abuse and Mental Health Services Administration, including, but not limited to, all documents and communications between Psychemedics and Robert Stephenson."). You asked if there was some way in which plaintiffs could narrow this discovery request. I offered to narrow the request to responsive documents concerning the proposed federal drug testing guidelines that, if ever adopted, would include hair testing. You said that you would discuss this compromise with your client. Plaintiffs will decide whether to move to compel the production of responsive documents after you get back to me.

**Request 3**: ("All marketing materials concerning Psychemedics' Hair Testing."). You explained that it would be very burdensome to gather and produce all of Psychemedics' marketing materials. However, Psychemedics agrees to produce all marketing materials that it has sent to the defendants.

**Request 4**: ("All documents and communications concerning the Plaintiffs, the Hair Test, the Defendants, or the Hair Specimens."). In addition to responsive documents that Psychemedics agrees to produce in response to other requests, Psychemedics has collected and agrees to produce responsive documents concerning each of the individually named plaintiffs.

**Request 5-10** (Psychemedics Standard Operating Procedures): You asserted that Psychemedics' Standard Operating Procedures ("SOP") are its most confidential documents and Psychemedics would never agree to produce its SOP voluntarily. To the extent it would be possible for plaintiffs to review the table of contents of Psychemedics SOP to focus on particular sections of the SOP central to their claims, I offered to try and reduce any burden on Psychemedics by starting with the table of contents to the SOP. You responded that the issue is really more one of confidentiality than undue burden. I noted that there is a very comprehensive confidentiality order in place in this case, but you argued that no order could adequately protect Psychemedics' interests because plaintiffs would need to provide Psychemedics' SOP to a "competitor." I disagreed that plaintiffs would be turning any documents over to a "competitor," but, regardless, the confidentiality order requires third-parties receiving document productions (including experts) to agree to the terms of the confidentiality order and specifically restricts use of confidential documents in any scenario you might be suggesting. I also note, and presume that you are aware, that Psychemedics has made various representations concerning its wash procedures in publicly available correspondence and documents with the FDA, SAMHSA, and others without making any representation that it has not disclosed all material aspects of its wash procedures on the grounds of confidentiality. We agreed to disagree on these requests, and plaintiffs will be filing a motion to compel.

J. Allen Holland, Jr.
April 13, 2007
Page 3

**Request 11**: ("All documents and communications concerning Psychemedics' funding of, sponsorship of, or other contribution to any study concerning the scientific validity of testing hair to detect drugs of abuse, including, but not limited to, documents and communications concerning Psychemedics' funding of, sponsorship of, or other contribution to any study concerning whether the testing of hair to detect drugs of abuse, including cocaine, depends on the race of the person tested and/or his or her hair color or hair texture. The time period for this request is January 1, 1994 to the present."). Psychemedics agrees to produce the documents that are responsive to this request.

**Request 12**: ("All documents and communications concerning Psychemedics' funding of any organization or entity that concerns itself with the testing of hair to detect drugs of abuse, including cocaine. The time period for this request is January 1, 1994 to the present."). Psychemedics agrees to produce the documents that are responsive to this request.

**Request 13**: ("All documents and communications concerning Psychemedics' funding of travel and expenses for any university professor or other scholar to attend a conference concerning the testing of hair to detect drugs of abuse, including cocaine. The time period for this request is January 1, 1994 to the present."). Psychemedics agrees to produce the documents that are responsive to this request.

**Request 14**: ("All documents concerning Psychemedics' funding of any scientific journals. The time period for this request is January 1, 1994 to the present."). You represented that Psychemedics has no documents responsive to this request. If Psychemedics will confirm this representation in writing, plaintiffs will not move to compel the production of responsive documents.

**Requests 15-17**: (documents and communications concerning Psychemedics' status as a licensed and certified laboratory). Psychemedics agrees to produce all its licenses and certifications.

**Request 21**: ("All documents concerning Psychemedics' participation in any study sponsored or administered by the Society For Hair Testing, the Substance Abuse and Mental Health Services Administration, or RTI International, including, but not limited to, the results of any such study."). You did not think Psychemedics had participated in any studies that are relevant to this litigation. I described my understanding that Psychemedics participated in at least one study by SAMHSA and/or RTI concerning the effectiveness of wash procedures in addressing the external contamination of hair samples. I also explained why this issue is relevant and important to this case. You will follow-up with Psychemedics regarding what documents are available that are responsive to this request. Plaintiffs will decide whether to move to compel the production of responsive documents after you get back to me.

Bingham McCutchen LLP
bingham.com

J. Allen Holland, Jr.
April 13, 2007
Page 4

**Request 22**: ("All documents and communications concerning any contract, agreement, or other document concerning the terms of the relationships between Psychemedics and the Defendants, including but not limited to documents concerning the negotiation, drafting, or performance of such contracts, agreements, or other documents."). Psychemedics agrees to produce the documents that are responsive to this request.

**Request 23**: ("Samples of Hair Specimens taken from each of the Plaintiffs sufficient in size to allow for independent DNA testing by another laboratory to be performed on the samples produced."). Psychemedics agrees to produce the individual plaintiffs' hair samples after the plaintiffs and defendants agree to some procedure for dealing with these samples since they would likely be destroyed by DNA testing. I agreed that this is a reasonable approach. In the meantime, you agreed to inform the plaintiffs regarding how much of their hair samples remain in Psychemedics control.

**Request 24**: ("All documents sufficient to identify the particular facilities and persons involved in the Hair Tests performed on samples taken from the Plaintiffs, including the location of sampling, storage, and testing facilities; the names, affiliations, employment status, and whereabouts of all persons who collected, handled, transmitted, tested, processed, prepared, or analyzed plaintiffs' Hair Specimens, and all persons who were involved in record-keeping, data collection, analysis, interpretation or reporting of test results."). Psychemedics has collected and agrees to produce responsive documents concerning each of the individually named plaintiffs.

**Request 26**: ("All documents and communications concerning Psychemedics' status as a certified laboratory to perform hair testing as described in Rule 111, Appendix D of Defendants' Substance Abuse Policy."). Psychemedics agrees to produce the documents that are responsive to this request.

**Requests 29 and 30**: ("All documents and communications concerning the cut-off levels for cocaine for the initial hair test. The time period for this request is January 1, 1994 to the present."; "All documents and communications concerning the determination of and any changes made to the cut-off levels for cocaine applicable to the Hair Test, including the Safety Net Test, where "cut-off levels" means the value at which a result of the Hair Test is reported as positive for the presence of illegal drugs and below which a result is reported as negative for the presence of illegal drugs. The time period for this request is January 1, 1994 to the present."). Psychemedics agrees to produce documents responsive to this request that it provided to the defendants.

Bingham McCutchen LLP

bingham.com

J. Allen Holland, Jr.
April 13, 2007
Page 5

**Request 31 and 32**:  ("All documents and communications concerning whether Psychemedics' Hair Testing has a racial, hair texture, or hair color bias, including documents and communications concerning whether the likelihood of a positive test result is correlated with a person's race, hair texture, or hair color."; "All documents and communications concerning whether Psychemedics' Hair Testing is affected by a person's passive exposure to drugs of abuse, including cocaine.").  Psychemedics agrees to produce any studies it has that are responsive to these requests.  You also described that it would be a huge burden on Psychemedics to try and collect every document sent to Psychemedics concerning these issues.  I inquired as to how difficult it would be to produce any responsive documents drafted by Psychemedics, as well as any documents Psychemedics has already collected in a file (e.g., a file of documents concerning hair color or race bias issues).  You agreed to inquire with Psychemedics whether to agree to produce documents responsive to these narrower criteria.  To the extent Psychemedics has performed or participated in any responsive studies (published or unpublished), plaintiffs will also need any documents in Psychemedics possession, custody or control concerning discussions on the design of these studies and all published and unpublished results.  We did not discuss the specifics of what you meant when you said you would produce responsive "studies," so please take these specifics into consideration in deciding what Psychemedics will agree to produce in response to this request.  Plaintiffs will decide whether to move to compel the production of responsive documents after you get back to me.

**Request 33**:  ("All documents concerning Psychemedics' procedures for determining the color of a hair sample, including, but not limited to, Psychemedics' procedures for determining the natural hair color of a hair sample.").  You represented that Psychemedics does record the hair color (although not necessarily the natural hair color) and texture of all hair samples for chain of custody reasons.  In response to my inquiry, you also represented that Psychemedics does not collect aggregate hair color and texture data in any database.  If Psychemedics will confirm these representations in writing, plaintiffs will not move to compel the production of responsive documents except to the extent they are covered by Psychemedics' SOP.

**Request 36**:  ("All documents and communications concerning the race, hair texture, hair color, and test result of Boston Police Department personnel who were tested for drugs, including cocaine, on the initial hair and/or safety-net hair test(s).").  You again represented that Psychemedics never records the race of person whose hair sample it is testing.  We also referred back to the issues we discussed with respect to Request 1 concerning the total number of tests performed by Psychemedics for the defendants.  You thought Psychemedics could locate some summary documents (e.g., billing records) concerning the total number of tests, and, if available, Psychemedics will produce these summary documents.

Bingham McCutchen LLP

bingham.com

J. Allen Holland, Jr.
April 13, 2007
Page 6

**Request 37**: ("All documents concerning the race, hair texture, hair color, and test result of persons who Psychemedics tested for drugs, including cocaine."). You represented again that Psychemedics does not collect responsive data concerning the race of its test subjects, and Psychemedics does not collect aggregate hair color and texture data in any database. If Psychemedics will confirm these representations in writing, plaintiffs will not move to compel the production of responsive documents.

Bingham McCutchen LLP
bingham.com

**Request 38**: ("All documents and communications concerning any instance in which a Hair Test reported as positive for one or more illegal drugs was deemed to be erroneous or inconclusive as to the question whether the person had actually ingested any illegal drug, including cocaine."). You represented that there are no documents responsive to this request. If Psychemedics will confirm this representation in writing, plaintiffs will not move to compel the production of responsive documents.

**Request 39 and 40**: ("All documents and communications concerning whether contamination, passive exposure, bias of any kind, sample handling, record keeping, interpretation, or any other factors or phenomena do affect or might affect the results of Psychemedics' Hair Testing or the accurate, objective, neutral, and unbiased reporting Psychemedics' Hair Testing results, including all documents and communications concerning any presentation, discussion, analysis, assessment, or evaluation of potential or actual bias or disparate impact, based upon race or any other factor, related to Psychemedics' Hair Testing and all documents and communications concerning any discussion, analysis, assessment, or evaluation of alternative drug testing methods with less potential or actual bias or disparate impact that that associated with or related to Psychemedics' Hair Testing."; All documents and communications concerning the accuracy and reliability – or lack thereof – of all aspects of Psychemedics' Hair Testing , including the standards, methods, procedures, and criteria to be applied in the collection, transmission, storage, and testing of the samples; the analysis interpretations, confirmation, and reporting of the test results; and the retention of samples and records after Psychemedics' Hair Testing results are reported to the Defendants."). Psychemedics agrees to produce studies responsive to these requests. Psychemedics also agrees to produce communications related to those studies that are responsive to these requests. I also asked that you consider the approach discussed with respect to Requests 31 and 32, which would include any responsive documents drafted by Psychemedics, as well as any documents Psychemedics has already collected in file. You will inquire with Psychemedics whether to agree to produce documents responsive to these narrower criteria. Plaintiffs will decide whether to move to compel the production of responsive documents after you get back to me.

J. Allen Holland, Jr.
April 13, 2007
Page 7

Bingham McCutchen LLP
bingham.com

**Request 41**: ("All documents and communications concerning complaints, grievances, petitions, or lawsuits concerning the Hair Test, hair drug testing in general, or Psychemedics' Hair Testing."). You represented that grievance are "constantly" brought against Psychemedics, so Psychemedics would not produce any documents unless plaintiffs could narrow the request. You also represented that Psychemedics does not formally track its grievances. You were also relatively certain that Psychemedics does not track complaints concerning hair color or race bias. I asked that you confirm whether and how Psychemedics formally tracks complaints against it. I also told you that this request is relevant because the defendants and Psychemedics have stated many times that the hair test has been "upheld by the courts" without elaborating on precisely what that means.[1] After you follow-up on this issue, Plaintiffs will decide whether to move to compel the production of responsive documents.

Please let me know as soon as possible if you think I have misconstrued the details of our meet-and-confer on April 11th. Finally, you thought you would be able to produce the documents Psychemedics has agreed to produce and get back to me on outstanding issues in about two weeks. If your time frame changes, please let me know.

Very truly yours,

Robert B. Baker

Enclosure

cc:     Rheba Rutkowski, Esq.
        Raquel Webster, Esq.
        Eric Heining, Esq.

---

[1] *See, e.g.,* Psychemedics RIA Opiate Assay, Summary of Safety and Effectiveness Data ("Test results have routinely been upheld in the courts.").

Exhibit C

# LYNCH, BREWER, HOFFMAN & FINK, LLP

### ATTORNEYS AT LAW

OWEN B. LYNCH
EDWARD S. BREWER, JR °
ALAN R. HOFFMAN
PETER W. FINK*
J. ALLEN HOLLAND, JR
ELIZABETH A. ZELDIN†
JOHN P. DENNIS‡
STEVEN L. SCHRECKINGER
TAMARA S. WOLFSON
PATRICK J. KINNEY, JR.
PHYLLIS ZELERMYER WALD
ANNE HOFFMAN
DALE C. KERESTER
JENNIFER C. PLATT
CHRISTINE B. WHITMAN*°
KAREN TOSH°*
THOMAS J. CLEMENS
KARIN I. McEWEN†
HARVEY NOSOWITZ
ANNE ROBBINS
JANE M. GUEVREMONT
SONIA J. KWON*

101 FEDERAL STREET, 22ND FLOOR
BOSTON, MASSACHUSETTS 02110-1800

TELEPHONE (617) 951-0800
FAX (617) 951-0811
http://www.lynchbrewer.com

^ALSO ADMITTED IN AL
ˉALSO ADMITTED IN CT
*ALSO ADMITTED IN FL
ˊALSO ADMITTED IN KY
ˋALSO ADMITTED IN ME
§ALSO ADMITTED IN NH
ˀALSO ADMITTED IN NJ
†ALSO ADMITTED IN NY
*ALSO ADMITTED IN SC

November 17, 2006

**VIA HAND DELIVERY**
Robert B. Baker, Esq.
Bingham McCutchen
150 Federal Street
Boston, MA 02110

      Re:    **Ronnie Jones, et al. v. City of Boston, et al.**
              **Civil Action No. 051182-GAO; Deposition Subpoena to Psychemedics**
              **Corporation**

Dear Mr. Baker:

As we discussed, I represent Psychemedics Corporation ("Psychmedics") in connection with the subpoena issued to you by Psychemedics Corporation. Pursuant to FRCP 45(c)(2)(B), I am writing to object to the production of certain documents sought in that subpoena, as detailed below. Psychmedics further objects to this subpoena in its entirety, except as it relates to the plaintiffs in this case, as it appears to seek documents which are not reasonably calculated to lead to the discovery of admissible evidence and are designed to cause Psychmedics to incur unreasonable burden and expense.

Request No. 1

Psychemedics objects to this request insofar as it seeks documents and communication related to individuals other than the plaintiffs on the ground that the production of these materials would violate the privacy rights of those non-parties. Psychmedics further objects to this request for production on the ground that it is overly broad and unduly burdensome. Finally, Psychemedics objects to certain communication between it and the defendants' attorneys on the grounds that the defendants have asserted the attorney-client and/or work product privileges with respect to certain materials. I will provide you with a privilege log with respect to all documents covered by this privilege claim.

Robert B. Baker, Esq.
November 17, 2006
Page 2

Request No. 2

     Psychmedics objects to this request on the grounds that the documents sought contain trade secrets and confidential, proprietary information. Psychemedics further objects to this request on the ground that it is overly broad and unduly burdensome.

Request No. 3

     Psychemedics objects to this request on the ground that it is overly broad and unduly burdensome.

Request No. 4

     Psychemedics objects to this request insofar as it seeks documents and communication related to individuals other than the plaintiffs on the ground that the production of these materials would violate the privacy rights of those non-parties. Psychmedics further objects to this request for production on the ground that it is overly broad and unduly burdensome. Finally, Psychemedics objects to certain communication between it and the defendants on the grounds that the defendants have asserted the attorney-client and/or work product privileges with respect to certain materials. I will provide you with a privilege log with respect to all documents covered by this privilege claim.

Request No. 5

     Psychemedics objects to this request on the grounds that the documents sought contain trade secrets and confidential, proprietary information. Psychemedics further objects to this request on the ground that the request is unduly burdensome.

Request No. 6

     Psychemedics objects to this request on the grounds that the documents sought contain trade secrets and confidential, proprietary information. Psychemedics further objects to this request on the ground that the request is unduly burdensome.

Request No. 7

     Psychemedics objects to this request on the ground that the documents sought contain trade secrets and confidential, proprietary information. Psychemedics further objects to this request on the ground that it is overly broad and unduly burdensome.

Robert B. Baker, Esq.
November 17, 2006
Page 3

Request No. 8

     Psychemedics objects to this request on the ground that the documents sought contain trade secrets and confidential, proprietary information. Psychemedics further objects to this request on the ground that it is overly broad and unduly burdensome.

Request No. 9

     Psychemedics objects to this request on the ground that the documents sought contain trade secrets and confidential, proprietary information. Psychemedics further objects to this request on the ground that it is overly broad and unduly burdensome.

Request No. 10

     Psychemedics objects to this request on the ground that the documents sought contain trade secrets and confidential, proprietary information. Psychemedics further objects to this request on the ground that it is overly broad and unduly burdensome.

Request No. 11

     Psychemedics objects to this request on the grounds that it is overly broad and unduly burdensome. Psychmedics further objects to this request on the ground that the documents sought contain confidential information.

Request No. 12

     Psychemedics objects to this request on the grounds that it is overly broad and unduly burdensome. Psychmedics further objects to this request on the ground that the documents sought contain confidential information.

Request No. 13

     Psychemedics objects to this request on the grounds that it is overly broad and unduly burdensome. Psychmedics further objects to this request on the ground that the documents sought contain confidential information.

Request No. 14

     Psychemedics objects to this request on the grounds that it is overly broad and unduly burdensome. Psychmedics further objects to this request on the ground that the documents sought contain confidential information.

Robert B. Baker, Esq.
November 17, 2006
Page 4

Request No. 15

    Psychemedics objects to this request on the grounds that the documents sought contain trade secrets and confidential, proprietary information.  Psychemedics further objects to this request on the ground that the request is unduly burdensome.

Request No. 16

    Psychemedics objects to this request on the grounds that the documents sought contain trade secrets and confidential, proprietary information.  Psychemedics further objects to this request on the ground that the request is unduly burdensome.

Request No. 17

    Psychemedics objects to this request on the grounds that the documents sought contain trade secrets and confidential, proprietary information.  Psychemedics further objects to this request on the ground that the request is unduly burdensome.

Request No. 18

    Psychemedics objects to this request on the grounds that the documents sought contain trade secrets and confidential, proprietary information.  Psychemedics further objects to this request on the ground that the request is unduly burdensome.

Request No. 19

    Psychemedics objects to this request on the grounds that the documents sought contain trade secrets and confidential, proprietary information.  Psychemedics further objects to this request on the ground that the request is unduly burdensome.

Request No. 20

    Psychemedics objects to this request on the grounds that it is overly broad and unduly burdensome.  Psychemedics further objects to this request insofar as it seeks documents protected by the attorney-client and work-product privileges.

Request No. 21

    Psychemedics objects to this request for production of documents on the grounds that it is overly broad and unduly burdensome.  Psychemedics further objects to this request on the grounds that the documents sought contain trade secrets and confidential, proprietary information.

Robert B. Baker, Esq.
November 17, 2006
Page 5

Request No. 22

Psychmedics objects to this request insofar as it seeks documents other than the relevant agreements on the grounds that it is overly broad and unduly burdensome.

Request No. 23

Psychemedics will make hair samples available for inspection. However, if you want a sample for destructive testing, we need to reach an agreement on this satisfactory to all parties.

Request No. 25

Psychemedics objects to this request on the grounds that it is overly broad and unduly burdensome. Psychmedics further objects to this request on the ground that the documents sought contain confidential information.

Request No. 26

Psychemedics objects to this request on the grounds that it is overly broad and unduly burdensome. Psychemedics further objects to this request on the ground that the documents sought contain confidential information.

Request No. 27

Psychmedics objects to this request insofar as it seeks personal, confidential information of a non-party.

Request No. 28

Psychemedics objects to this request on the grounds that the documents sought contain trade secrets and confidential, proprietary information. Psychemedics further objects to this request on the grounds that it is overly broad and unduly burdensome.

Request No. 29

Psychemedics objects to this request on the grounds that the documents sought contain trade secrets and confidential, proprietary information. Psychemedics further objects to this request on the grounds that it is overly broad and unduly burdensome.

Robert B. Baker, Esq.
November 17, 2006
Page 6

Request No. 30

Psychemedics objects to this request on the grounds that the documents sought contain trade secrets and confidential, proprietary information. Psychemedics further objects to this request on the grounds that it is overly broad and unduly burdensome.

Request No. 31

Psychemedics objects to this request on the grounds that the documents sought contain trade secrets and confidential, proprietary information. Psychemedics further objects to this request on the grounds that it is overly broad and unduly burdensome.

Request No. 32

Psychemedics objects to this request on the grounds that the documents sought contain trade secrets and confidential, proprietary information. Psychemedics further objects to this request on the grounds that it is overly broad and unduly burdensome.

Request No. 33

Psychemedics objects to this request on the grounds that the documents sought contain trade secrets and confidential, proprietary information. Psychemedics further objects to this request on the grounds that it is overly broad and unduly burdensome.

Request No. 36

Psychemedics objects to this request on the grounds that it is overly broad and unduly burdensome. Psychemedics further objects to this request on the grounds that the production of these documents would violate the privacy rights of third parties.

Request No. 37

Psychemedics objects to this request on the grounds that it is overly broad and unduly burdensome. Psychemedics further objects to this request on the grounds that the production of these documents would violate the privacy rights of third parties.

Request No. 38

Psychemedics objects to this request on the grounds that it is overly broad and unduly burdensome. Psychemedics further objects to this request on the grounds that the production of these documents would violate the privacy rights of third parties.

Robert B. Baker, Esq.
November 17, 2006
Page 7

Request No. 39

Psychemedics objects to this request on the grounds that the documents sought contain confidential, proprietary information and trade secrets. Psychemedics further objects to this request on the grounds that it is overly broad and unduly burdensome.

Request No. 40

Psychemedics objects to this request on the grounds that the documents sought contain confidential, proprietary information and trade secrets. Psychemedics further objects to this request on the grounds that it is overly broad and unduly burdensome.

Request No. 41

Psychemedics objects to this request on the grounds that the documents sought contain confidential, proprietary information and trade secrets. Psychemedics further objects to this request on the grounds that it is overly broad and unduly burdensome. Moreover, the documents sought may contain attorney-client or work product privileged materials.

As we discussed, your requests appear to seek virtually every piece of paper generated by Psychemedics over the last twelve years, including all documents related to millions of drug tests performed by Psychemedics since January 1, 1994. I am certainly willing to discuss producing documents which are responsive to some of the objected to requests if these requests are reasonably tailored to address issues in this case.

Very truly yours,

J. Allen Holland, Jr.

cc:    Mary Jo Harris, Esq. (via telecopier)
       Helen G. Litsas, Esq. (via telecopier)
       Psychemedics Corporation

JAH/rmr/249427_1

Exhibit D

BINGHAM McCUTCHEN

Robert B. Baker
Direct Phone: (617) 951-8873

February 28, 2007

**Via U.S. Mail and Facsimile**

J. Allen Holland, Jr.
Lynch, Brewer, Hoffman & Fink, LLP
101 Federal Street, 22nd Floor
Boston, MA 02110-1800
Facsimile: (617) 951-0811

Bingham McCutchen LLP
150 Federal Street
Boston, MA
02110-1726

617.951.8000
617.951.8736 fax

bingham.com

Boston
Hartford
London
Los Angeles
New York
Orange County
San Francisco
Silicon Valley
Tokyo
Walnut Creek
Washington

Re:    **Jones, et al. v. City of Boston, et al., Case Number 05-11832**

Dear Mr. Holland:

Bingham McCutchen LLP ("Bingham McCutchen") represents the plaintiffs in the above-referenced matter. This letter responds to your November 17, 2006 letter objecting to all of the document requests set forth in plaintiffs' November 3, 2006 subpoena to Psychemedics Corporation ("Psychemedics"), and is an attempt to address Psychemedics' failure to properly respond to plaintiffs' subpoena. Please treat this letter as plaintiffs' satisfaction of Local Rule 7.1(a)(2)'s requirement to make a good faith effort to resolve or narrow discovery issues in advance of filing a motion to compel. Also, please contact me at your earliest convenience to discuss whether we can resolve any of these outstanding discovery issues without the need for motion practice.

**All of The Requested Documents Are Relevant to This Case**

In your letter, you assert the general objection that the subpoena "seek[s] documents which are not reasonably calculated to lead to the discovery of admissible evidence…" As you consider whether Psychemedics will stand by its objections and force plaintiffs to file a motion to compel, plaintiffs urge you to consider the applicable standard for relevance. Federal Rule of Civil Procedure 26(b)(1) provides that "Parties may obtain discovery regarding any matter, not privileged, **that is relevant to the claim or defense of any party**, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter." (emphasis added). A copy of the First Amended And Supplemental Complaint And Jury Demand ("Complaint") and Defendants' Answer to The First Amended And Supplemental Complaint ("Answer") are attached hereto as Exhibit A and Exhibit B, respectively. All of the subpoenaed documents are relevant (and must be produced) because they pertain to the allegation that plaintiffs were damaged because defendants' relied on Psychemedics scientifically flawed, racially biased, and uncertified hair test. More specifically:

J. Allen Holland, Jr.
February 28, 2007
Page 2

Bingham McCutchen LLP
bingham.com

- "The [Boston Police Department] contracts exclusively with Psychemedics Corporation ("Psychemedics") to perform the Hair Test on samples collected by Health Department personnel and to report the results. Upon information and belief, Psychemedics is not certified to test hair for the presence of illegal drugs, as required by the Substance Abuse Policy."[1]  (Complaint at ¶ 31);

- Upon information and belief, there are currently no government-mandated guidelines for testing hair samples for the presence of illegal drugs. Nor are there such guidelines concerning collection procedures or cut-off levels for the Hair Test used by the defendants." (Complaint at ¶ 38);

- "Although the FDA has approved other methods of testing for the presence of illegal drugs (using blood and urine), upon information and belief, the FDA has not approved the procedures used by the defendants and Psychemedics to test hair samples for the presence of illegal drugs." (Complaint at ¶ 40);

- "defendants' use of the Hair Test… has a disparate, adverse, and discriminatory impact on Boston police officers and applicants of color…"[2] (Complaint at ¶ 2);

---

[1] Defendants' deny the allegation that Psychemedics is not certified to test hair for the presence of illegal drugs, as required by the Substance Abuse Policy. Thus, documents concerning Psychemedics' certification are relevant and must be produced. *See, e.g.,* Document Request Numbers 15 ("All documents and communications concerning Psychemedics' compliance with 21 CFR Part 809.40(c)…"), 16 ("All documents and communications concerning Psychemedics' certification in the area of toxicology by the Health Care Financing Administration, the College of American Pathologists, or any other organization with deemed status in the area of toxicology."), 17 ("All documents and communications concerning Psychemedics' status as a licensed laboratory certified to perform hair testing. This request includes, but is not limited to, Psychemedics' Clinical Laboratory Improvement Amendments of 1998 (CLIA) Application for Certification."), and 26 ("All documents and communications concerning Psychemedics' status as a certified laboratory to perform hair testing as described in Rule 111, Appendix D of Defendants' Substance Abuse Policy."). Psychemedics objects to each of these requests on the grounds that they are "overly broad and unduly burdensome," and "contain trade secrets and confidential, proprietary information." These abusive, conclusory objections are addressed below.

[2] Defendants' deny the allegation that Psychemedics' hair testing has a disparate, adverse, and discriminatory impact on Boston police officers and applicants of color. Therefore, documents concerning whether Psychemedics' hair testing has a disparate impact on persons of color are relevant and must be produced. *See, e.g.,* Document Request Numbers 11 ("All documents and communications concerning Psychemedics' funding of,

(Footnote Continued on Next Page.)

J. Allen Holland, Jr.
February 28, 2007
Page 3

Bingham McCutchen LLP

bingham.com

- "defendants' use of the Hair Test is unlawful because... [the Hair Test] is used despite the availability of alternative testing methods and procedures that would have less disparate, adverse, and discriminatory impact on Boston police officers and applicants of color..." (Complaint at ¶ 2);

- "scientific studies demonstrate that the procedures used by the defendants to test hair samples for the presence of illegal drugs are flawed, imprecise, arbitrary, unreliable, and inherently biased against people of color. For example, upon information and belief, the procedures and methods used in performing the Hair Test cannot identify whether a result that is positive for the presence of illegal drugs is due to ingestion or to external contamination from environmental exposure. In addition, the Hair Test has an inherent propensity to yield 'false positives'[3] on hair samples taken from persons of color because of the composition of the hair itself and other factors."[4] (Complaint at ¶ 3);

---

(Footnote continued from Previous Page.)

sponsorship of, or other contribution to any study concerning the scientific validity of testing hair to detect drugs of abuse..."); 31 ("All documents and communications concerning whether Psychemedics' Hair Testing has a racial, hair texture, or hair color bias, including documents and communications concerning whether the likelihood of a positive test result is correlated with a person's race, hair texture, or hair color."); 33 ("documents concerning Psychemedics' procedures for determining the color of a hair sample, including, but not limited to, Psychemedics' procedures for determining the natural hair color of a hair sample."); 36 ("All documents and communications concerning the race, hair texture, hair color, and test result of Boston Police Department personnel who were tested for drugs, including cocaine, on the initial hair and/or safety-net hair test(s)."); and 37 ("All documents concerning the race, hair texture, hair color, and test result of persons who Psychemedics tested for drugs, including cocaine."). Once again, Psychemedics objects to these requests on the grounds that they are "overly broad and unduly burdensome," and "contain trade secrets and confidential, proprietary information." These abusive, conclusory objections are addressed below.

[3] Hair Test results described herein as "false positive" and "allegedly positive" are results reported as "positive" for an illegal drug, although the person identified as having tested positive did not ingest the illegal drug reported in the result.

[4] Defendants' deny the allegations that Psychemedics' hair testing is flawed, imprecise, arbitrary, unreliable, and cannot identify whether a result that is positive for the presence of illegal drugs is due to ingestion or to external contamination from environmental exposure. Therefore, documents concerning these allegations are relevant and must be produced. *See, e.g.,* Document Request Numbers 5 ("Psychemedics' Standard Operating Procedures in effect between January 1, 1994 and the present."); 6 ("All documents and

(Footnote Continued on Next Page.)

J. Allen Holland, Jr.
February 28, 2007
Page 4

Bingham McCutchen LLP
bingham.com

_____

(Footnote continued from Previous Page.)

communications concerning changes to Psychemedics' Standard Operating Procedures between January 1, 1994 and the present."), 7 ("All documents and communications concerning Psychemedics' Standard Operating Procedures between January 1, 1994 and the present."), 8 ("All documents and communications concerning the policies, procedures, methods, and standards used by Psychemedics in testing hair samples for the presence of illegal drugs, including cocaine, between January 1, 1994 and the present."), 9 ("Documents concerning Psychemedics decision to use Liquid Chromatography/Mass Spectrometry/Mass Spectrometry (LC/MS/MS) instead of gas chromatography/mass spectrometry (GC/MS) for analyzing hair samples to detect cocaine, including, but not limited to, documents concerning the relative costs of liquid chromatography to gas chromatography to test hair for cocaine. The time period for this request is January 1, 1994 to the present."), 10 ("All documents and communications concerning the standards, methods, procedures, and criteria to be applied in connection with all aspects of the Hair Test, including the collection, transmission, storage, and testing of the samples, and the analysis confirmation, and reporting of the test results."); 21 ("All documents concerning Psychemedics' participation in any study sponsored or administered by the Society For Hair Testing, the Substance Abuse and Mental Health Services Administration, or RTI International, including, but not limited to, the results of any such study."), 29 ("All documents and communications concerning the cut-off levels for cocaine for the initial hair test. The time period for this request is January 1, 1994 to the present."), 30 ("All documents and communications concerning the determination of and any changes made to the cut-off levels for cocaine applicable to the Hair Test, including the Safety Net Test, where "cut-off levels" means the value at which a result of the Hair Test is reported as positive for the presence of illegal drugs and below which a result is reported as negative for the presence of illegal drugs. The time period for this request is January 1, 1994 to the present."), 32 ("All documents and communications concerning whether Psychemedics' Hair Testing is affected by a person's passive exposure to drugs of abuse, including cocaine."), 38 ("All documents and communications concerning any instance in which a Hair Test reported as positive for one or more illegal drugs was deemed to be erroneous or inconclusive as to the question whether the person had actually ingested any illegal drug, including cocaine."), 39 ("All documents and communications concerning whether contamination, passive exposure, bias of any kind, sample handling, record keeping, interpretation, or any other factors or phenomena do affect or might affect the results of Psychemedics' Hair Testing or the accurate, objective, neutral, and unbiased reporting Psychemedics' Hair Testing results, including all documents and communications concerning any presentation, discussion, analysis, assessment, or evaluation of potential or actual bias or disparate impact, based upon race or any other factor, related to Psychemedics' Hair Testing and all documents and communications concerning any discussion, analysis, assessment, or evaluation of alternative drug testing methods with less potential or actual bias or disparate impact that that associated with or related to Psychemedics' Hair Testing."), 40 ("All documents and

(Footnote Continued on Next Page.)

J. Allen Holland, Jr.
February 28, 2007
Page 5

Bingham McCutchen LLP
bingham.com

- "upon information and belief, the Society of Forensic Toxicologists considers the testing of hair samples for the presence of illegal drugs to be too unreliable to be used in making individual employment decisions." (Complaint at ¶ 3);

- "Each of the plaintiffs vehemently denies using illegal drugs...All but two of the plaintiffs obtained results negative for the presence of illegal drugs in independent hair drug tests performed soon after the allegedly positive result on the Hair Test used by the defendants.  Indeed, the independent hair drug tests of some of the plaintiffs were performed by the very same laboratory that performed the Hair Tests on which they had allegedly tested positive.  In the case of one plaintiff, the negative and allegedly positive results were obtained from tests performed by the very same laboratory on hair samples taken on the very same day." (Complaint at ¶ 5);

- "Under the procedures utilized by Psychemedics and the defendants, a hair sample provided to Psychemedics by the Health Department is initially tested by radioimmunoassay.  If this test yields a positive result for the presence of illegal drugs, Psychemedics then tests the sample using a combination of chromatography and mass spectrometry methodologies.  If there is again a positive result, this is reported to the [Boston Police Department's] Medical Review Officer, pursuant to the Substance Abuse Policy.  Although the Substance Abuse Policy does not specify cut-off levels for distinguishing between positive and negative results with respect to the presence of illegal drugs in hair samples, Psychemedics reports a finding of cocaine at a level of 5ng/10mg or more as a positive result and lower levels of cocaine as a negative result.  Pursuant to the Substance Abuse Policy, if the affected officer cannot provide an alternative medical explanation for the positive result, the Medical Review Office reports the Hair Test as positive for the presence of illegal drugs to the [Boston Police Department]." (Complaint at ¶ 32);

---

(Footnote continued from Previous Page.)

communications concerning the accuracy and reliability – or lack thereof – of all aspects of Psychemedics' Hair Testing, including the standards, methods, procedures, and criteria to be applied in the collection, transmission, storage, and testing of the samples; the analysis interpretations, confirmation, and reporting of the test results; and the retention of samples and records after Psychemedics' Hair Testing results are reported to the Defendants."), and 41 ("All documents and communications concerning complaints, grievances, petitions, or lawsuits concerning the Hair Test, hair drug testing in general, or Psychemedics' Hair Testing.").  Once again, Psychemedics objects to these requests on the grounds that they are "overly broad and unduly burdensome," and "contain trade secrets and confidential, proprietary information."  These abusive, conclusory objections are addressed below.

J. Allen Holland, Jr.
February 28, 2007
Page 6

Bingham McCutchen LLP
bingham.com

- "The Substance Abuse Policy provides that, in the event that a positive result is reported to the [Boston Police Department], the affected officer may request an additional "Safety Net" test within 72 hours of receipt of the initial test results. Under the procedures utilized by Psychemedics and the defendants for the "Safety Net" test, a second hair sample is to be taken from the same body site as the original hair sample. The same tests are performed on the new sample as on the original sample, but a lower cut-off level is used to distinguish between positive and negative results. Although the Substance Abuse Policy does not specify cut-off levels for distinguishing between positive and negative results with respect to the presence of drugs on the Safety Net test, Psychemedics currently reports a finding of cocaine at a level of 0.2ng/10mg or more as a positive result and lower levels of cocaine as a negative result on the Safety Net test. Psychemedics previously used a cut-off level of 2.0ng/10mg on the Safety Net test, which is an order of magnitude higher than the current cut-off level. Pursuant to the Substance Abuse Policy, the affected officer must pay for the Safety Net test and its review by the Medical Review Officer unless the result on the Safety Net test is negative." (Complaint at ¶ 33);

- "According to the defendants, each of the plaintiffs tested positive for cocaine on an initial Hair Test and on a follow-up Safety Net test performed by Psychemedics. Each of the eight sworn-officer plaintiffs had excellent service records during their employment with the BPD (ranging from 4 to 28 years), and none had previously been the subject of a past complaint for behavior indicative of illegal drug use. The same is true of the former police cadet. For several years prior to the Hair Test that precipitated their wrongful discharge, each of the eight sworn-officer plaintiffs had submitted to a mandatory annual drug test, including a Hair Test. The same is true of the former police cadet. All of these previous tests had been negative and each of the plaintiffs vehemently denies using illegal drugs." (Complaint at ¶ 35);

- "All but two of the plaintiffs obtained results negative for the presence of illegal drugs in independent hair drug tests performed soon after their allegedly positive Hair Test results were reported. Indeed, the independent hair drug tests of some of the plaintiffs were performed by the very same laboratory that performed the Hair Tests on which they had allegedly tested positive. That is, the very same laboratory returned both negative and allegedly positive results on hair samples taken from these plaintiffs. In the case of one plaintiff, the negative and allegedly positive results were obtained from tests performed by the very same laboratory on hair samples taken on the very same day. In the case of another plaintiff, the negative and allegedly positive results were obtained from tests performed on hair samples taken only one day apart." (Complaint at ¶ 36);

- "Forensic toxicologists have reported on the inability of repeated wash procedures to remove completely external cocaine contamination from the dark, coarse hair of African-Americans. Upon information and belief, the Society of Forensic Toxicologists considers the testing of hair samples for the presence of

J. Allen Holland, Jr.
February 28, 2007
Page 7

Bingham McCutchen LLP
bingham.com

illegal drugs to be too unreliable to be used in making individual employment decisions." (Complaint at ¶ 41);

- "The Hair Test is unreliable, imprecise, and arbitrary. Scientific studies have demonstrated flaws in the procedures used to test hair samples for the presence of illegal drugs as well as the hair drug test's inherent bias against people of color -- i.e., the propensity of the test to yield false positives on hair samples taken from persons of color. Moreover, upon information and belief, results obtained by laboratory analysis of the same hair sample can vary by more than 40 percent." (Complaint at ¶ 44);

Psychemedics does not have a right to deny plaintiffs an opportunity to pursue the discovery that is at the core of this case. I turn next to your repeated conclusory objection that the vast majority of the requested documents are immune from discovery because they are confidential, proprietary, trade secrets, etc.

### Psychemedics' "Confidentiality" Objection is a Red Herring -- Not Only Does Psychemedics' Offer no Basis Whatsoever For Why The Requested Documents Are Confidential, But a Confidentiality Objection Does Not Immunize The Requested Documents From Discovery

Of the 41 document requests, Psychemedics objects to 28 of the requests on the grounds that they contain trade secrets and confidential, proprietary information.[5] As a general matter, the party asserting an applicable privilege has the burden of establishing that it applies. *See, e.g., FDIC v. Ogden Corp.*, 202 F.3d 454, 460 (1st Cir. 2000). The privilege's applicability must be demonstrated by a fair preponderance of the evidence. *See, e.g., Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 190 F.R.D. 287, 289 (D. Mass. 2000). Here, Psychemedics has made no attempt whatsoever to establish that the

---

[5] The requests to which Psychemedics objects on grounds of trade secrets and/or confidentiality include all of the following: 2, 5-19, 21, 25-33, and 39-41. In addition, Psychemedics did not respond to Document Request Numbers 24, 34 or 25, which seek the same general type of information to which Psychemedics' asserted this conclusory objection. In addition, Psychemedics objected to several request on the grounds that they seek private information concerning third-parties. Depending on the nature of these documents, plaintiffs would be open to exploring whether the requested documents would be adequately protected by either the protections afforded in the confidentiality stipulation or through reasonable redactions of personal information. Alternatively, if Psychemedics can establish that there is still some legally protected interest that would not be protected by the confidentiality order and/or reasonable redactions of personal information, plaintiffs might agree to a narrower production of documents concerning the plaintiffs and any current or former employee of the defendants.

J. Allen Holland, Jr.
February 28, 2007
Page 8

requested documents contain trade secrets or other proprietary information. Even worse, Psychemedics asserts these conclusory objections in response to requests where there is no basis whatsoever for the objections:

Bingham McCutchen LLP
bingham.com

- Document Request Number 2: "All documents and communications between Psychemedics and any present or former agents, servants, employees, attorneys, consultants of the Department of Health and Human Services or the Substance Abuse and Mental Health Services Administration, including, but not limited to, all documents and communications between Psychemedics and Robert Stephenson."

- Document Request Number 15: "All documents and communications concerning Psychemedics' compliance with 21 CFR Part 809.40(c), which requires that a laboratory testing hair for drugs of abuse 'shall have, and shall be recognized as having, adequate capability to reliably perform the necessary screening and confirmatory tests, including adequate capability to perform integrity checks of the biological specimens for possible adulteration.'"

- Document Request Number 16: "All documents and communications concerning Psychemedics' certification in the area of toxicology by the Health Care Financing Administration, the College of American Pathologists, or any other organization with deemed status in the area of toxicology. "

- Document Request Number 17: "All documents and communications concerning Psychemedics' status as a licensed laboratory certified to perform hair testing. This request includes, but is not limited to, Psychemedics' Clinical Laboratory Improvement Amendments of 1998 (CLIA) Application for Certification.

- Document Request Number 18: "All documents and communications concerning correspondence between the Food and Drug Administration ("FDA") and Psychemedics relating to the litigation matter initiated in 1995 before the United States Court of Appeals for the First Circuit, styled Psychemedics Corporation v. Food and Drug Administration, Case No. 95-2357. This request includes, but is not limited to, all documents concerning the resolution of this litigation and the FDA's decision, on March 26, 1996, to withdraw its November 20, 1995 letter to Psychemedics, notifying Psychemedics that its PDT-909 Personal Drug Testing Service (K954493) device was not substantially equivalent to any legally marketed predicate device and that any commercial distribution of the device would be in violation of the Federal Food, Drug, and Cosmetic Act. The time period for this request is January 1, 1994 to the present."

- Document Request Number 19: "All documents and communications concerning the following statement in the September 11, 2002 Consent Motion for Voluntary Dismissal ("the Consent Motion") that resolved the litigation matter initiated in 2000 before the United States Court of Appeals for the District of Columbia Circuit, styled Psychemedics Corporation v. Donna E. Shalala, Jane E. Henney,

J. Allen Holland, Jr.
February 28, 2007
Page 9

Bingham McCutchen LLP
bingham.com

M.D., and Food and Drug Administration, Case No. 00-1199: "The parties have in fact continued their discussions, and the agency has taken actions with respect to Psychemedics' laboratory testing services. Based on those discussions and agency actions, Psychemedics – with Respondents' consent – respectfully requests that this case be voluntarily dismissed without prejudice, each party to bear its own costs." This request seeks documents concerning the "discussions and agency actions" described in the Consent Motion other than the FDA's decision to provide 510K clearance to Psychemedics to market all five of its assays for testing hair for drugs of abuse.

- Document Request Number 26: "All documents and communications concerning Psychemedics' status as a certified laboratory to perform hair testing as described in Rule 111, Appendix D of Defendants' Substance Abuse Policy."

It seems that Psychemedics believes any document that concerns its business is proprietary and therefore immune from discovery. This position would effectively terminate the right to discovery from any corporate entity. Furthermore, the Federal Rules of Civil Procedure provide for robust discovery practice, and Psychemedics' position is legally and practically untenable.

Next, to the extent Psychemedics has any genuine concerns regarding the confidentiality of the documents plaintiffs' requested, the Court has issued a Confidentiality Order to protect the interests of third parties producing documents, including Psychemedics. A copy of the Confidentiality Order is attached hereto as <u>Exhibit C</u>. Thus, Psychemedics' position that the requested documents cannot be produced because they are confidential is without merit as there are already adequate procedures in place to protect Psychemedics' alleged concerns.

Finally, Psychemedics' assertion that the requested documents are immune from discovery because they contain trade secrets or other confidential, proprietary information is misguided and legally unsound, especially in light of the facts that (1) plaintiffs are not business competitors of Psychemedics, and (2) all materials produced in this litigation—including those produced by non-parties such as Psychemedics—are subject to the Confidentiality Order.

Assuming that any of the requested documents contain trade secrets or other proprietary information, there exists no blanket privilege that protects proprietary information or trade secrets from discovery. As the Supreme Court and various courts in this District have held, "there is no absolute privilege for trade secrets and similar confidential information." *Federal Open Market Committee v. Merrill*, 443 U.S. 340, 362 (1979). *See, e.g., ITT Electro-Optical Prods. Div. of ITT Corp. v. Electronic Tech. Corp.*, 161 F.R.D. 228, 231 (D. Mass. 1995) ("trade secrets should be disclosed, unless they are privileged or the subpoenas are unreasonable, oppressive, annoying or embarrassing"); *Ares-Serono, Inc. v. Organon Int'l B.V.*, 151 F.R.D. 215, 219 (D. Mass. 1993); *Kleinerman v. United States Postal Service*, 100 F.R.D. 66, 69 (D. Mass. 1983) ("Although [one] may have a legitimate interest in protecting its trade secrets, that

J. Allen Holland, Jr.
February 28, 2007
Page 10

interest must yield to the right of the plaintiff to discover the full truth of the facts
involved in the issues of the case . . . . [where] the issues cannot be fairly adjudicated
unless this information is available.") (internal quotations and citations omitted).

Therefore, when a court is evaluating whether to grant a motion to compel or a motion to
quash a subpoena, where the party resisting discovery asserts that disclosure of
proprietary information will result in harm, the court will simply weigh the right of the
party seeking discovery "to examine relevant evidence against the right of [the party
resisting discovery] to protect its trade secrets and confidential data." *Ares-Serono*, 151
F.R.D. at 220 (citing *GTE Prods. Corp. v. Gee*, 112 F.R.D. 169, 172 (D. Mass. 1986)
(balancing risk of competitive injury against need for information)).   Admittedly,
"[w]here . . . parties are business competitors, there is a greater need for confidentiality
[because] [t]he risk of competitive injury is particularly high when the opposing party is a
business competitor." *Bailey v. Dart Container Corp. of Mich.*, 980 F. Supp. 560, 582-83
(D. Mass. 1997) (requiring production of confidential business information to competitor
under protective order limiting access of information to one in-house attorney and one in-
house expert who must sign affidavits agreeing to be bound by the terms of the protective
order). Because Fed. R. Civ. P. 26(c)(7) allows a court to offer protection in the form of
a protective order, "there is a particularly heavy burden upon [the party resisting
discovery]." *Horizons Titanium Corp. v. Norton Co.*, 290 F.2d 421, 425 (1st Cir. 1961)
(footnote and citations omitted).  Here, however, the plaintiffs and are in no way, shape
or form business competitors of Psychemedics.

Furthermore, even if plaintiffs were competitors with Psychemedics, a court would likely
grant a motion to compel production of the allegedly confidential information because of
the existence of the protective agreement in this case. Courts have been willing to order
the production of confidential or proprietary information while granting a protective
order limiting the disclosure of such information. *See, e.g., Bailey*, 980 F. Supp. at 583
("protective order with the provisions requiring in house counsel and experts to sign an
affidavit agreeing to be bound by the terms of the [protective] order sufficiently protects
[competitor's] interests while allowing [party] access to relevant information"); *Ares-
Serono*, 151 F.R.D. at 220 (restriction of confidential documents "to outside litigation
counsel, independent experts, paralegals and clerical employees" sufficient to protect
competitive interests); *GTE Prods. Corp. v. Gee*, 112 F.R.D. at 170-72 (trade secrets
must be produced to opposing party's attorney who is prohibited from disclosing to
client).

Finally, Psychemedics' blanket assertions of confidentiality are improper.   Like
generalized assertions of privilege, generalized claims of confidentiality fail to meet the
burden borne by a party resisting production of requested discovery materials. *See, e.g.
Kelling v. Bridgestone/Firestone, Inc.*, 157 F.R.D. 496 (D. Kan. 1994) (Plaintiff's blanket
claim that bank records sought were "confidential," in response to a defense motion for
an order to allow the use of these records in connection with motion to disqualify
counsel, was insufficient to support a claim of privilege or confidentiality); *Obiajulu v.
City of Rochester*, 166 F.R.D. 293 (W.D.N.Y. 1996) (A general claim of privilege, be it
work product or attorney client, is an inadequate response to a discovery request). I turn

Bingham McCutchen LLP
bingham.com

J. Allen Holland, Jr.
February 28, 2007
Page 11

next to Psychemedics other abusive tactic of objecting to nearly every request on the
grounds that it is either overly broad or unduly burdensome.

### Psychemedics' Objections That It Would Be Unduly Burdensome To Produce The Requested Documents Will Not Hold Up Because Psychemedics Has Not Demonstrated Any Burden And The Need For The Requested Documents Far Outweighs Any Undemonstrated Burden

Bingham McCutchen LLP
bingham.com

Psychemedics objects to plaintiffs' subpoena in general, and to certain of its requests in
particular, for the stated reason that the subpoena and many of its component requests are
overly broad or unduly burdensome.[6]   These objections are too generalized and
conclusory to overcome Psychemedics' duty to comply with plaintiffs' subpoena.  The
obligation of persuasion lies with Psychemedics, and broad, nonspecific statements of
burden do not suffice to meet that obligation.  *See, e.g., Miscellaneous Docket Matter No.
1 v. Miscellaneous Docket Matter No. 2*, C.A.8th, 1999, 197 F.3d 922•(the producing
party had the burden to demonstrate good cause for the issuance of an order quashing the
subpoena, and claims of harm have to be based on more than stereotypical and
conclusory statements); *see also Compagnie Francaise d'Assurance Pour le Commerce
Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16, 42 (S.D.N.Y. 1984) (American
corporation's conclusory allegations of undue burden were insufficient grounds to object
to request for production of personnel, payroll and compensation records of one of its
corporate employees).

The producing party must demonstrate specifically why compliance with the request
would be burdensome.  *See, e.g., In re American Motors Club, Inc.*, 129 Bankr. 981
(E.D.N.Y. 1991); *see also White v. Beloginis*, 53 F.R.D. 480, 481 (S.D.N.Y. 1971) (an
entity cannot escape its obligation to produce documents in response to a legally valid
discovery request by simply intoning the familiar refrain that the requests are
burdensome, oppressive or overly broad).   Moreover, nonparties and parties bear
effectively the same burden to overcome a document request or subpoena.  *Composition
Roofers Union v. Graveley Roofing Enterprises, Inc.*, 160 F.R.D. 70 (E.D. Pa. 1995)
(nonparty was not treated differently in evaluating discovery burden).

Provided only that the materials sought are relevant, nonparties generally bear a
significant burden to demonstrate what is unreasonable or oppressive about a subpoena
before it may be quashed.  *See Mariner Health Care, Inc. v. Indemnity Ins. Co. of No.
America, Inc.*, 2005 WL 44521 (E.D. Pa. Jan. 7, 2005) (noting that movant's burden is
heavy); *see also Kirschner v. Klemons*, 2005 WL 1214330 (S.D.N.Y. May 19, 2005)
(stating that inconvenience alone will not justify quashing subpoena that seeks potentially

---

[6] The specific requests to which Psychemedics makes these objections include all of the
following:  1-22, 25-26, 28-33, and 36-41.

J. Allen Holland, Jr.
February 28, 2007
Page 12

relevant testimony); *see also Massachusetts School of Law at Andover, Inc. v. American Bar Ass'n*, 914 F. Supp. 1172 (E.D. Pa. 1996) (holding that a party withholding subpoenaed information on the ground of privilege must describe the nature of what is not produced or disclosed in a manner enabling other parties to assess the applicability of the privilege or protection; a general objection is not sufficient).

Bingham McCutchen LLP
bingham.com

Here, Psychemedics has made no attempt to show that this legal standard is met; indeed, Psychemedics has not even made any particularized assertions of burden. Instead, Psychemedics merely offers blanket objections of undue burden to almost all of plaintiffs' requests, regardless of how narrowly tailored those requests are. As a preliminary matter, Psychemedics is hardly in the position of an innocent third-party requested to produce scores of documents in a case that it has no connection to. Not only did defendants' rely on Psychemedics' flawed, racially biased hair test, but Psychemedics has earned well over a million dollars by marketing and selling its test to the defendants. Furthermore, Psychemedics' objections to many of plaintiffs' narrowly tailored requests on the grounds of undue burden are incredulous:

- Document Request Number 5: "Psychemedics' Standard Operating Procedures in effect between January 1, 1994 and the present."

- Document Request Number 6: "All documents and communications concerning changes to Psychemedics' Standard Operating Procedures between January 1, 1994 and the present."

- Document Request Number 7: "All documents and communications concerning Psychemedics' Standard Operating Procedures between January 1, 1994 and the present."

- Document Request Number 8: "All documents and communications concerning the policies, procedures, methods, and standards used by Psychemedics in testing hair samples for the presence of illegal drugs, including cocaine, between January 1, 1994 and the present."

- Document Request Number 15: "All documents and communications concerning Psychemedics' compliance with 21 CFR Part 809.40(c), which requires that a laboratory testing hair for drugs of abuse "shall have, and shall be recognized as having, adequate capability to reliably perform the necessary screening and confirmatory tests, including adequate capability to perform integrity checks of the biological specimens for possible adulteration."

- Document Request Number 16: "All documents and communications concerning Psychemedics' certification in the area of toxicology by the Health Care Financing Administration, the College of American Pathologists, or any other organization with deemed status in the area of toxicology."

J. Allen Holland, Jr.
February 28, 2007
Page 13

Bingham McCutchen LLP

bingham.com

- Document Request Number 17: "All documents and communications concerning Psychemedics' status as a licensed laboratory certified to perform hair testing. This request includes, but is not limited to, Psychemedics' Clinical Laboratory Improvement Amendments of 1998 (CLIA) Application for Certification."

- Document Request Number 22: "All documents and communications concerning any contract, agreement, or other document concerning the terms of the relationships between Psychemedics and the Defendants, including but not limited to documents concerning the negotiation, drafting, or performance of such contracts, agreements, or other documents."

- Document Request Number 26: "All documents and communications concerning Psychemedics' status as a certified laboratory to perform hair testing as described in Rule 111, Appendix D of Defendants' Substance Abuse Policy."

- Document Request Number 33: "All documents concerning Psychemedics' procedures for determining the color of a hair sample, including, but not limited to, Psychemedics' procedures for determining the natural hair color of a hair sample."

- Document Request Number 36: "All documents and communications concerning the race, hair texture, hair color, and test result of Boston Police Department personnel who were tested for drugs, including cocaine, on the initial hair and/or safety-net hair test(s)."

- Document Request Number 38: "All documents and communications concerning any instance in which a Hair Test reported as positive for one or more illegal drugs was deemed to be erroneous or inconclusive as to the question whether the person had actually ingested any illegal drug, including cocaine."

Without knowing what documents are in Psychemedics' possession, custody or control, and without knowing whether it would be feasible to narrow the document requests to ease Psychemedics' alleged burden of production, plaintiffs are not in a position to offer a compromise position for their requests.[7]  Similarly, the plaintiffs ability to limit the

---

[7] For example, Document Request Numbers 36 and 37 seek all documents concerning the race, hair texture, hair color, and test result of persons, including Boston Police Department personnel, who Psychemedics has tested for drugs, including cocaine.  Any discussion on how to limit these requests would have to start with some explanation by Psychemedics of how accessible this data is (and if it is even accessible at all).

J. Allen Holland, Jr.
February 28, 2007
Page 14

scope of the subpoena is curtailed by Psychemedics' total refusal to produce any documents.[8]   However, I am sure Psychemedics could think of some reasonable compromises should it decide to approach the requests in good faith.

Very truly yours,

*[signature]*

Robert B. Baker

Bingham McCutchen LLP

bingham.com

Enclosure

cc:    Mary Jo Harris, Esq. (via U.S. Mail and Facsimile)
       Helen G. Litsas, Esq. (via U.S. Mail and Facsimile)

---

[8] For example, plaintiffs have requested "[a]ll documents and communications between Psychemedics and Defendants." (Document Request Number One)  Without having received any documents from Psychemedics responsive to this request (or any explanation of why it would be burdensome to comply with this request), plaintiffs are not in a position to determine whether, for example, it is possible to somehow limit their other requests, such as requests for Psychemedics' marketing materials (Document Request Number 3), the identify of facilities and persons involved in the Hair Tests performed on plaintiffs' hair samples (Document Request Number 24), or the training and supervision of persons involved in collecting and transmitting hair samples (Document Request Number 25).

Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RONNIE JONES, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | NO. 05-11832-GAO |
| | ) | |
| CITY OF BOSTON, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED AND SUPPLEMENTAL COMPLAINT AND JURY DEMAND

### Introduction

1.     This is a civil rights action to redress the deprivation of rights guaranteed by the Constitutions and laws of the United States and the Commonwealth of Massachusetts. Pursuant to the Boston Police Department's Substance Abuse Policy, the defendants have, since 1999, unlawfully based employment decisions upon the results of a flawed, imprecise, unreliable, arbitrary, and racially biased mandatory drug test performed on hair samples (the "Hair Test").

2.     The plaintiffs have no objection to the concept of the mandatory drug-testing of law enforcement officers and applicants for employment as law enforcement officers. The plaintiffs contend, however, that the defendants' use of the Hair Test is unlawful because, among other reasons, it (a) has a disparate, adverse, and discriminatory impact on Boston police officers and applicants of color; (b) is used despite the availability of alternative testing methods and procedures that would have less disparate, adverse, and discriminatory impact on Boston police officers and applicants of color; and (c) constitutes discrimination on the basis of a false and erroneous perception that the plaintiffs had a disability.

3.     Upon information and belief, there are currently no government-mandated guidelines for testing hair samples for the presence of illegal drugs. Nor are there such guidelines concerning collection procedures or cut-off levels for the Hair Test used by the

defendants.  In addition, scientific studies demonstrate that the procedures used by the defendants to test hair samples for the presence of illegal drugs are flawed, imprecise, arbitrary, unreliable, and inherently biased against people of color.  For example, upon information and belief, the procedures and methods used in performing the Hair Test cannot identify whether a result that is positive for the presence of illegal drugs is due to ingestion or to external contamination from environmental exposure.  In addition, the Hair Test has an inherent propensity to yield "false positives"[1] on hair samples taken from persons of color because of the composition of the hair itself and other factors.  Indeed, upon information and belief, the Society of Forensic Toxicologists considers the testing of hair samples for the presence of illegal drugs to be too unreliable to be used in making individual employment decisions.

4.      Seven of the plaintiffs are former Boston police officers -- "former," because they were wrongfully terminated on the basis of their allegedly positive results on the Hair Test.  One plaintiff is a police officer who is still with the Boston Police Department but who, on the basis of her allegedly positive Hair Test, was wrongfully forced to choose between termination and signing documents falsely stating that she had requested drug rehabilitation treatment and agreeing to, among other things, undergo such treatment at her own expense.  Another plaintiff is a police cadet who was wrongfully terminated on the basis of her allegedly positive result on the Hair Test.  Another plaintiff was denied employment altogether on the basis of her allegedly positive Hair Test.  The plaintiff officers who were terminated each served with distinction, including commendations and medals, for between 4 and 28 years; collectively, for nearly 100 years.  The plaintiff officer still with the Boston Police Department has served for approximately 18 years and the plaintiff cadet had served for approximately 4 years prior to her wrongful termination.

5.      Each of the plaintiffs vehemently denies using illegal drugs.  The plaintiffs'

---

[1]  Hair Test results described herein as "false positive" and "allegedly positive" are results reported as "positive" for an illegal drug, although the person identified as having tested positive did not ingest the illegal drug reported in the result.

allegedly positive results on the Hair Test is the *only* "evidence" of illegal drug use by the plaintiffs that was considered by the defendants in making their adverse employment decisions against them. All but two of the plaintiffs obtained results negative for the presence of illegal drugs in independent hair drug tests performed soon after the allegedly positive result on the Hair Test used by the defendants. Indeed, the independent hair drug tests of some of the plaintiffs were performed by the very same laboratory that performed the Hair Tests on which they had allegedly tested positive. In the case of one plaintiff, the negative and allegedly positive results were obtained from tests performed by the very same laboratory on hair samples taken on the very same day.

      6.   The defendants' use of the Hair Test in making employment decisions disproportionately and adversely impacts police officers and applicants of color and constitutes unlawful discrimination on the basis of race as well as on the basis of a false and erroneous perception of a disability. As a consequence of the defendants' policies, customs, practices, and conduct with respect to the implementation, execution, administration, supervision, related training, and use of the Hair Test in making employment decisions, the plaintiffs have been terminated from their employment with the Boston Police Department or have been forced to sign documents falsely stating that they have requested drug rehabilitation treatment and agreeing to undergo such treatment at their own expense. The result is the ruination of the lives, careers, and reputations of the plaintiffs.

      7.   Among the damages that the plaintiffs have suffered and continue to suffer as a consequence of the defendants' policies, customs, practices, and conduct are, without limitation, loss of compensation, benefits, seniority, and employment opportunities, lost careers, damaged reputations, loss of standing in the community, humiliation, mental pain, anguish, and severe emotional distress.

### Jurisdiction and Venue

      8.   The plaintiffs' civil rights claims are based upon Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e, *et. seq.*; Title I of the Americans with Disabilities Act of

1990, codified at 42 U.S.C. § 12101, *et seq.*; 42 U.S.C. § 1981; 42 U.S.C. § 1983; the Fourteenth Amendment to the United States Constitution; Mass. Gen. Laws ch. 151B; Mass. Gen. Laws ch. 93, § 103; Mass. Gen. Laws ch. 12, §§ 11H and 11I; Articles 1, 10, 11, and 12, and Article of Amendment 114 of the Massachusetts Declaration of Rights. This Court has subject matter jurisdiction over the plaintiffs' claims pursuant to Mass. Gen. Laws ch. 212, §§ 3, 4; Mass. Gen. Laws ch. 231A, § 1; Mass. Gen. Laws ch. 12, §§ 11H, 11I; 28 U.S.C. § 1343; and 42 U.S.C. § 12117.

9.    All plaintiffs have exhausted the necessary administrative prerequisites. Prior to filing this civil action, each plaintiff timely filed written Charges of Discrimination, asserting claims of discrimination, with the Massachusetts Commission Against Discrimination and the Equal Employment Opportunity Commission ("EEOC"). This civil action is filed within three years of the discriminatory acts alleged in this Complaint and within 90 days of Right to Sue letters from the EEOC.

10.    Venue is proper in Suffolk County pursuant to Mass. Gen. Laws ch. 223, § 1.

### Parties

11.    Defendant City of Boston ("City") is a municipality of the Commonwealth of Massachusetts and owns, operates, manages, controls, and is responsible for the actions of the Boston Police Department. The City is an "employer" within the meanings of 42 U.S.C. § 2000e, 42 U.S.C. § 12111(5), and Mass. Gen. Laws Chapter 151B, and is subject to suit under all of the claims alleged in this Complaint.

12.    Defendant Boston Police Department ("BPD") is a paramilitary law enforcement organization of the City. The BPD is an "employer" within the meanings of Title VII, 42 U.S.C. § 2000e, 42 U.S.C. § 12111(5), and Mass. Gen. Laws ch. 151B and is subject to suit under all of the claims alleged in this Complaint.

13.    Defendant Kathleen O'Toole is the current Commissioner of the BPD. As is relevant to this Complaint, Commissioner O'Toole is responsible for making, implementing, permitting, and overseeing the BPD's (a) policy decisions; (b) customs and practices; (c) training

4

and supervision of BPD employees; and (d) acts and omissions with respect to all allegations and claims set forth in this Complaint. Commissioner O'Toole is sued in her official capacity.

14.    Plaintiff Ronnie Jones is an African-American male who resided in Suffolk County, Massachusetts during all times relevant to this Complaint. He joined the BPD in 1983 and provided approximately nineteen years of service until he was wrongfully terminated on or about August 9, 2002. Officer Jones had an excellent service record that was free of warnings or disciplinary actions related to drug abuse. He had taken and passed a mandatory annual drug test every year that it was administered prior to the Hair Test upon which his termination was based.

15.    Plaintiff Richard Beckers is an African-American male who resided in Suffolk County, Massachusetts during all times relevant to this Complaint. He joined the BPD in 1989 and provided approximately thirteen years of service until he was wrongfully terminated on or about August 9, 2002. Officer Beckers had an excellent service record that was free of warnings or disciplinary actions related to drug abuse. He had taken and passed a mandatory annual drug test every year that it was administered prior to the Hair Test upon which his termination was based.

16.    Plaintiff Walter Washington is an African-American male who resided in Suffolk County, Massachusetts during all times relevant to this Complaint. He joined the BPD in 1989 and provided approximately fourteen years of service until he was wrongfully terminated on or about April 22, 2003. Officer Washington had an excellent service record that was free of warnings or disciplinary actions related to drug abuse. During his service, Officer Washington received the BPD Medal of Honor twice, as well as the Hanna Award for valor and numerous letters of commendation from the BPD. He had taken and passed a mandatory annual drug test every year that it was administered prior to the Hair Test upon which his termination was based.

17.    Plaintiff William Earl Bridgeforth is an African-American male who resided in Suffolk County, Massachusetts during all times relevant to this Complaint. During the time of the acts complained of herein, he was a resident of Suffolk County, Massachusetts. He joined the BPD in 1989 and provided approximately fourteen years of service before he was wrongfully

terminated on or about September 11, 2003. Officer Bridgeforth had an excellent service record that was free of warnings or disciplinary actions related to drug abuse. He had taken and passed a mandatory annual drug test every year that it was administered prior to a Hair Test upon which the defendants based their adverse employment decisions, including the decision to terminate his employment.

18.     Plaintiff Shawn N. Harris is an African-American male who resided in Suffolk County, Massachusetts during all times relevant to this Complaint. He joined the BPD in 1999 and provided approximately four years of service before he was wrongfully terminated on or about April 22, 2003. Officer Harris had an excellent service record that was free of warnings or disciplinary actions related to drug abuse. During his service, Officer Harris received the BPD Medal of Honor, as well as the Hanna Award for valor; a commendation from prior Boston Police Commissioner Paul Evans; and several letters of appreciation from community residents. He had taken and passed a mandatory annual drug test every year that it was administered prior to the Hair Test upon which his termination was based.

19.     Plaintiff Eugene Wade is an African-American male who resided in Suffolk County, Massachusetts during all times relevant to this Complaint. He joined the BPD in 1975. He was promoted to sergeant in 1985 and to sergeant-detective in 1992. He provided approximately 28 years of service before he was wrongfully terminated on or about February 6, 2003. Sergeant-Detective Wade had an excellent service record that was free of warnings or disciplinary actions related to drug abuse. He had taken and passed a mandatory annual drug test every year that it was administered prior to the Hair Test upon which his termination was based.

20.     Plaintiff George C. Downing, Jr. is an African-American male who resided in Suffolk County, Massachusetts during all times relevant to this Complaint. He joined the BPD in 1995 and provided approximately eight years of service before he was wrongfully terminated on or about January 6, 2004. Officer Downing had an excellent service record that was free of warnings or disciplinary actions related to drug abuse. He had taken and passed a mandatory annual drug test every year that it was administered prior to the Hair Test upon which his

termination was based.

21.    Plaintiff Clararise Bristow is an African-American female who resided in Suffolk County, Massachusetts during all times relevant to this Complaint. The BPD extended an offer of employment to Ms. Bristow in December 2002, but wrongfully refused to make her a permanent offer a short time later, based upon the same Hair Test administered to the other plaintiffs.

22.    Plaintiff Rachelle Couch is an African American female who resided in Suffolk County, Massachusetts during all times relevant to this Complaint. She joined the BPD in 1987 and has provided approximately 18 years of service. She had taken and passed a mandatory annual drug test every year that it was administered prior to the Hair Test upon which the defendants based their adverse employment decisions. Officer Couch continues to serve as a Boston Police officer, despite having allegedly tested positive on the Hair Test because, but only because, in order to keep her job, she signed documents falsely stating that she had requested drug rehabilitation treatment and agreeing to, among other things, undergo such treatment.

23.    Plaintiff Keri Hogan is an African American female who resided in Suffolk County, Massachusetts during all times relevant to this Complaint. She was commissioned as a police cadet by the BPD in 2001 and provided approximately 4 years of service before she was wrongfully terminated in 2005. Ms. Hogan had an excellent service record that was free of warnings or disciplinary actions related to drug abuse. She had taken and passed a mandatory annual drug test every year that it was administered prior to the Hair Test upon which her termination was based.

24.    The Massachusetts Association of Minority Law Enforcement Officers ("MAMLEO") represents the interests of all BPD law enforcement personnel and applicants of color, including the interests of the plaintiffs and others who have been, or may be, adversely affected by the Hair Test. MAMLEO has offices in Suffolk County, Massachusetts.

LITDOCS/636659.1

### Factual Allegations

### The BPD's Substance Abuse Policy and the Challenged Hair Test

25.     Beginning in 1999, the Hair Test has been administered annually to all sworn uniformed employees of the BPD, pursuant to the BPD's Substance Abuse Policy, as stated in BPD Rule 111, dated December 17, 1998 (the "Substance Abuse Policy").[2]  The BPD purportedly instituted the mandatory Hair Test in order to detect unlawful drug use that allegedly took place during the previous weeks or months.

26.     Although union representatives agreed to the Hair Test as part of collective bargaining agreements, this consent was secured on the basis of the defendants' misrepresentations that the Hair Test would be "conducted through a fair, reasonable, and objective hair analysis testing system," Substance Abuse Policy(V)(G), and without the union representatives' knowledge of the arbitrary, unreliable, unfair, and discriminatory nature and use of the Hair Test.

27.     The Substance Abuse Policy specifically states that the "[t]he [BPD] agrees that it will establish and adhere to written collection and testing procedures for hair samples"; that "[t]hese procedures shall be fair and reasonable so as to ensure the accuracy and integrity of the test and process"; and that [t]hese written procedures will be appended to this Rule and become incorporated thereto." Substance Abuse Policy(V)(G).

28.     The Hair Test is administered by the City's Occupational Health Department (the "Health Department").  Among other things, Health Department personnel are responsible for collecting hair samples and transmitting them to the laboratory for testing.

29.     With respect to officers already employed by the BPD, the Substance Abuse Policy requires that the Hair Test be administered annually during the thirty-day period before or after the police officer's birthday.  The BPD determines the date for the test and notifies the officer several days in advance.  The Hair Test also applies to all applicants for the position of

---

[2]Although the Hair Test on BPD patrol officers began in 1999, testing of the detectives, sergeant-detectives, and superior officers was implemented in succession, starting in the year 2000.

8

sworn police officer with the BPD.

30.    According to the Substance Abuse Policy, the BPD uses the Hair Test to determine "the presence of these five drugs, classes of drugs, or their metabolites: marijuana metabolites, cocaine metabolites, opiate metabolites, phencyclidine (PCP), and amphetamines." Substance Abuse Policy(V)(G). The Substance Abuse Policy provides that hair samples are to be collected by Health Department personnel and sent for testing by a licensed laboratory certified to test hair samples for the presence of illegal drugs.

31.    The BPD contracts exclusively with Psychemedics Corporation ("Psychemedics") to perform the Hair Test on samples collected by Health Department personnel and to report the results. Upon information and belief, Psychemedics is not certified to test hair for the presence of illegal drugs, as required by the Substance Abuse Policy.

32.    Under the procedures utilized by Psychemedics and the defendants, a hair sample provided to Psychemedics by the Health Department is initially tested by radioimmunoassay. If this test yields a positive result for the presence of illegal drugs, Psychemedics then tests the sample using a combination of chromatography and mass spectrometry methodologies. If there is again a positive result, this is reported to the BPD's Medical Review Officer, pursuant to the Substance Abuse Policy. Although the Substance Abuse Policy does not specify cut-off levels for distinguishing between positive and negative results with respect to the presence of illegal drugs in hair samples, Psychemedics reports a finding of cocaine at a level of 5ng/10mg or more as a positive result and lower levels of cocaine as a negative result.[3] Pursuant to the Substance Abuse Policy, if the affected officer cannot provide an alternative medical explanation for the positive result, the Medical Review Office reports the Hair Test as positive for the presence of illegal drugs to the BPD.

33.    The Substance Abuse Policy provides that, in the event that a positive result is reported to the BPD, the affected officer may request an additional "Safety Net" test within 72

---

[3]A nanogram ("ng") is one billionth of a gram; a milligram ("mg") is one thousandth of a gram.

hours of receipt of the initial test results. Under the procedures utilized by Psychemedics and the defendants for the "Safety Net" test, a second hair sample is to be taken from the same body site as the original hair sample. The same tests are performed on the new sample as on the original sample, but a lower cut-off level is used to distinguish between positive and negative results. Although the Substance Abuse Policy does not specify cut-off levels for distinguishing between positive and negative results with respect to the presence of drugs on the Safety Net test, Psychemedics currently reports a finding of cocaine at a level of 0.2ng/10mg or more as a positive result and lower levels of cocaine as a negative result on the Safety Net test. Psychemedics previously used a cut-off level of 2.0ng/10mg on the Safety Net test, which is an order of magnitude higher than the current cut-off level. Pursuant to the Substance Abuse Policy, the affected officer must pay for the Safety Net test and its review by the Medical Review Officer unless the result on the Safety Net test is negative.

34. A sworn officer or applicant whose Hair Test is reported to the BPD as positive is subject to termination or denial of employment, as the case may be. In the case of a sworn officer who tests positive on the Hair Test for the first time, the Substance Abuse Policy provides that the BPD may offer an alternative to termination: a 45-day suspension without pay and execution of a "Rehabilitation Agreement." This Agreement falsely states that the officer has requested drug rehabilitation treatment and agrees to undergo such treatment at his or her own expense, and requires placement in an administrative position; suspension of weapon-carrying privileges until a treatment provider certifies recovery; and submission to follow-up random drug testing for the next three years.

**Problems with the HairTest**

35. According to the defendants, each of the plaintiffs tested positive for cocaine on an initial Hair Test and on a follow-up Safety Net test performed by Psychemedics. Each of the eight sworn-officer plaintiffs had excellent service records during their employment with the BPD (ranging from 4 to 28 years), and none had previously been the subject of a past complaint for behavior indicative of illegal drug use. The same is true of the former police cadet. For

several years prior to the Hair Test that precipitated their wrongful discharge, each of the eight sworn-officer plaintiffs had submitted to a mandatory annual drug test, including a Hair Test. The same is true of the former police cadet. All of these previous tests had been negative and each of the plaintiffs vehemently denies using illegal drugs.

36.    All but two of the plaintiffs obtained results negative for the presence of illegal drugs in independent hair drug tests performed soon after their allegedly positive Hair Test results were reported. Indeed, the independent hair drug tests of some of the plaintiffs were performed by the very same laboratory that performed the Hair Tests on which they had allegedly tested positive. That is, the very same laboratory returned both negative and allegedly positive results on hair samples taken from these plaintiffs. In the case of one plaintiff, the negative and allegedly positive results were obtained from tests performed by the very same laboratory on hair samples taken on the very same day. In the case of another plaintiff, the negative and allegedly positive results were obtained from tests performed on hair samples taken only one day apart. The defendants have failed and refused to consider independent tests indicating that the plaintiffs were drug-free at the time of the Hair Test that falsely and erroneously indicated illegal drug use.

37.    Although each of the eight sworn-officer plaintiffs was offered an opportunity to avoid termination by signing the Rehabilitation Agreement, this Agreement requires an admission of illegal drug use; drug treatment; placement in an administrative position; suspension of weapon-carrying privileges until a treatment provider certifies recovery; and submission to follow-up random drug testing for the next three years. Six of the officers refused because they did not use illegal drugs. These officers were terminated. The two remaining officers accepted the Rehabilitation Agreement, notwithstanding that they did not use illegal drugs, in order to keep their jobs. Of these two officers, one was reinstated after losing 45 days of pay and accompanying benefits. The other officer who accepted the Rehabilitation Agreement was reinstated. However, this officer was terminated after he allegedly tested

LITDOCS/636659.1

positive on the Hair Test one year later, despite the fact that he had tested negative on ten or eleven random urine tests during that year.

38.    Upon information and belief, there are currently no government-mandated guidelines for testing hair samples for the presence of illegal drugs.    Nor are there such guidelines concerning collection procedures or cut-off levels for the Hair Test used by the defendants.[4]

39.    The defendants rely exclusively on the work of one laboratory, Psychemedics, to perform all Hair Tests for the BPD and have rejected all independent tests that refute the results of the Hair Test.

40.    Although the FDA has approved other methods of testing for the presence of illegal drugs (using blood and urine), upon information and belief, the FDA has not approved the procedures used by the defendants and Psychemedics to test hair samples for the presence of illegal drugs.

41.    Forensic toxicologists have reported on the inability of repeated wash procedures to remove completely external cocaine contamination from the dark, coarse hair of African-Americans.    Upon information and belief, the Society of Forensic Toxicologists considers the testing of hair samples for the presence of illegal drugs to be too unreliable to be used in making individual employment decisions.

42.    Upon information and belief, the defendants had knowledge, at least as early as 2002, that the reliability of the procedures they had chosen to use for the Hair Test was questionable in view of the fact that an increasing number of long-term officers of color were testing positive for cocaine on the Hair Test, even though they had excellent service records; no

---

[4]The Mandatory Guidelines for Federal Workplace Drug Testing Programs, initially published by the HHS in the Federal Register on April 11, 1988 (53 FR 11970-89) and extensively revised in the Federal Register on June 9, 1994 (59 FR 29908-31), establish scientific and technical guidelines for federal drug-testing programs, as well as standards for certification of laboratories engaged in urine drug-testing for federal agencies.    A second revision to the Mandatory Guidelines regarding opiate testing was published in the Federal Register on September 30, 1997 (62 FR 51118-19).    Upon information and belief, draft Guidelines are in the process of being finalized.

12

history of illegal drug use; and denied using illegal drugs. The defendants nevertheless continue to use the Hair Test; administered in the same way; performed and interpreted by the same laboratory; and with the same disparate, adverse, and discriminatory consequences for officers and applicants of color in the terms and conditions of their employment.

43.     The Hair Test is rife with flaws. For example, the defendants have failed to ensure that personnel responsible for collecting the hair samples and transmitting them to Psychemedics are sufficiently trained to follow the procedures necessary to ensure the integrity of the hair samples used in the Hair Test and that the hair samples provided to Psychemedics are of sufficient length and quantity to comply with the testing protocol.

44.     The Hair Test is unreliable, imprecise, and arbitrary. Scientific studies have demonstrated flaws in the procedures used to test hair samples for the presence of illegal drugs as well as the hair drug test's inherent bias against people of color -- i.e., the propensity of the test to yield false positives on hair samples taken from persons of color. Moreover, upon information and belief, results obtained by laboratory analysis of the same hair sample can vary by more than 40 percent.

45.     Upon information and belief, the defendants are aware of these studies but refuse to take remedial steps. Although officers who never ingested illegal drugs have tested positive on the Hair Test, and although a disproportionate number of officers and applicants of color are being adversely affected by the Hair Test in the terms and conditions of their employment, the defendants will not suspend or modify its use in making employment decisions.

46.     The BPD has denied "that race, specifically African-American, is a factor in drug testing results and can cause a positive drug test result [on the Hair Test]." The BPD also refuses to acknowledge that hair samples used in the Hair Test may be contaminated from external exposure, as might occur, for example, during the performance of job duties; as a result of unsanitary collection, transmission, preparation, or testing procedures; or because of errors in the chain of custody.

47.     The defendants afford no meaningful opportunity for an officer or applicant who

13

allegedly tests positive on the Hair Test to prove his or her innocence with respect to alleged illegal drug use. Despite scientific evidence demonstrating the unreliability of procedures used to test hair samples for the presence of illegal drugs and the hair drug test's inherent bias against people of color, the BPD refuses to consider independent test results that refute the Hair Test results and to give sufficient credence and weight to the affected officer's or applicant's record, even when the record strongly negates the possibility of illegal drug use.

48.    The Hair Test used by the defendants is discriminatory in its nature and its effect and has had, and continues to have, a disparate, adverse, and discriminatory impact on police officers and applicants of color. Because of this discrimination, a hostile work environment for people of color has been created by and within the BPD.

49.    Upon information and belief, alternative testing methods and procedures exist that would have less disparate, adverse, and discriminatory impact on officers and applicants of color in the terms and conditions of their employment, but the defendants have failed and refused to utilize them.

50.    As a consequence of the defendants' policies, customs, practices, and conduct with respect to the implementation, execution, administration, supervision, related training, and use of the Hair Test, the plaintiffs have been stripped of their livelihoods; suffered the loss of compensation, benefits, seniority, and opportunities for employment and promotion; seen their reputations and careers destroyed; and endured humiliation, loss of standing in the community, and extreme emotional distress.

### Count I

### Violation of 42 U.S.C. § 2000e, *et seq.* and Mass. Gen. Laws. ch. 151B
### (Discrimination on the Basis of Race)

51.    Plaintiffs repeat and re-allege the facts contained in the foregoing paragraphs.

52.    Plaintiffs are members of a class protected by 42 U.S.C. § 2000e and Mass. Gen. Laws. ch. 151B and are qualified for employment by the BPD.

53.    As alleged above, the plaintiffs have satisfied the necessary administrative

14

prerequisites to the filing of a civil action asserting claims arising under 42 U.S.C. § 2000e and Mass. Gen. Laws. ch. 151B.

54.    As alleged above, the defendants have failed and refused to (a) give any meaningful consideration to independent test results that show the affected officer or applicant to be drug-free at the time the Hair Test yielded a false positive result or to service records that show no indication of illegal drug use; and (b) utilize alternative methods and procedures with respect to drug testing and its use in making employment decisions that would have less disparate, adverse, and discriminatory impact on officers and applicants of color.

55.    As alleged above, the defendants' policies, customs, practices, and conduct (including intentional conduct) with respect to the implementation, execution, administration, supervision, related training, and use of the Hair Test in making employment decisions constitute unlawful discrimination on the basis of race against the plaintiffs, in violation of 42 U.S.C. § 2000e and Mass. Gen. Laws. ch. 151B and also constitute part of the defendants' pattern and practice of discrimination on the basis of race, including but not limited to the following: (a) the use of a mandatory drug test (the Hair Test) that discriminates against employees and applicants on the basis of race; (b) the creation of a hostile work environment for people of color; (c) the disparate, adverse, and discriminatory alteration of the terms and conditions of the plaintiffs' employment; (d) the harassment of the plaintiffs based on race; and (e) the failure and refusal to utilize alternative methods and procedures with respect to drug testing and its use in making employment decisions that would have less disparate, adverse, and discriminatory impact on officers and applicants of color in the terms and conditions of their employment.

56.    As alleged above, the plaintiffs have suffered and continue to suffer injuries and damages as a result of the defendants' policies, customs, practices and conduct, for which the defendants are liable under the provisions of 42 U.S.C. § 2000e and Mass. Gen. Laws. ch. 151B in an amount to be proven at trial, including compensatory and punitive damages, back pay with interest, front pay, sick leave, disability leave, vacation leave, reimbursement for all lost compensation, seniority, Social Security, pre-judgment interest, and all other entitlements and

15

emoluments provided by 42 U.S.C. § 2000e and Mass. Gen. Laws. ch. 151B.

## Count II

### Violation of 42 U.S.C. § 1981 and Mass. Gen. Laws ch. 93, § 103
### ((Discrimination on the Basis of Race)

57.    Plaintiffs repeat and re-allege the facts contained in the foregoing paragraphs.

58.    Plaintiffs are members of a class protected by 42 U.S.C. § 1981 and Mass. Gen. Laws ch. 93, § 103.

59.    At all relevant times, the defendants acted under color of state law with respect to their policies, customs, practices, and conduct (including intentional conduct) concerning the implementation, execution, administration, supervision, related training, and use of the Hair Test in making employment decisions.

60.    As alleged above, the defendants have a policy, custom, and practice of failing and refusing to (a) give any meaningful consideration to independent test results that show the affected officer or applicant to be drug-free at the time the Hair Test yielded a false positive result or to service records that show no indication of illegal drug use; and (b) utilize alternative methods and procedures with respect to drug testing and its use in making employment decisions that would have less disparate, adverse, and discriminatory impact on officers and applicants of color.

61.    As alleged above, the defendants' policies, customs, practices, and conduct (including intentional conduct) constitute unlawful discrimination on the basis of race against the plaintiffs with respect to (a) the making, performance, modification, and termination of contracts; (b) the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship; and (c) the enjoyment of the full and equal benefit of all laws as enjoyed by white citizens, as guaranteed by 42 U.S.C. § 1981 and Mass. Gen. Laws ch. 93, § 103.

62.    As alleged above, the defendants' policies, customs, practices, and conduct (including intentional conduct) has, among other things, damaged the good names, reputations, honor, and integrity of the plaintiffs; lowered the plaintiffs' standing in the community; deprived

16

the plaintiffs' of employment and related compensation and benefits; and foreclosed employment opportunities for the plaintiffs.

63.    As alleged above, the plaintiffs have suffered and continue to suffer injuries and damages as a result of the defendants' policies, customs, practices, and conduct, for which the defendants are liable under the provisions of 42 U.S.C. § 1981 and Mass. Gen. Laws ch. 93, § 103 in an amount to be proven at trial, including compensatory and punitive damages in the full amount permitted by law.

## Count III

### Violation of 42 U.S.C. § 1983 and the Fourteenth Amendment Equal Protection Clause (Discrimination on the Basis of Race)

64.    Plaintiffs repeat and re-allege the facts contained in the foregoing paragraphs.

65.    At all relevant times, the defendants acted under color of state law with respect to their policies, customs, and practices, and conduct (including intentional conduct) concerning the implementation, execution, administration, supervision, related training, and use of the Hair Test in making employment decisions.

66.    As alleged above, the defendants have a policy, custom, and practice of failing and refusing to (a) give any meaningful consideration to independent test results that show the affected officer or applicant to be drug-free at the time the Hair Test yielded a false positive result or to service records that show no indication of illegal drug use; and (b) utilize alternative methods and procedures with respect to drug testing and its use in making employment decisions that would have less disparate, adverse, and discriminatory impact on officers and applicants of color in the terms and conditions of their employment, as compared with other, similarly situated BPD employees and applicants.

67.    As alleged above, the defendants' policies, customs, practices, and conduct concerning the implementation, execution, administration, supervision, related training, and use of the Hair Test in making employment decisions constitutes intentional discrimination on the basis of race against the plaintiffs, in violation of 42 U.S.C. § 1983 and the Fourteenth

17

LITDOCS/636659.1

Amendment Equal Protection Clause.

68.    As alleged above, the defendants' policies, customs, practices, and conduct have, among other things, damaged the good names, reputations, honor, and integrity of the plaintiffs; lowered the plaintiffs' standing in the community; deprived the plaintiffs of employment and related compensation and benefits; and foreclosed employment opportunities for the plaintiffs.

69.    As alleged above, the plaintiffs have suffered and continue to suffer injuries and damages as a result of the defendants' policies, customs, practices, and conduct, for which the defendants are liable under the provisions of 42 U.S.C. § 1983 in an amount to be proven at trial.

<div align="center">

**Count IV**

**Violation of 42 U.S.C. § 1983 and the Fourteenth Amendment**
**(Due Process)**

</div>

70.    Plaintiffs repeat and re-allege the facts contained in the foregoing paragraphs.

71.    At all relevant times, the defendants acted under color of state law with respect to their policies, customs, and practices concerning the implementation, execution, administration, supervision, related training, and use of the Hair Test in making employment decisions.

72.    As alleged above, the Hair Test used by the defendants to screen BPD officers and applicants for illegal drug use is, flawed, unreliable, imprecise, arbitrary, and inherently biased against people of color -- i.e., the Hair Test has a propensity to yield false positives on hair samples taken from persons of color.

73.    As alleged above, the defendants have a policy, custom, and practice of failing and refusing to (a) give any meaningful consideration to independent test results that show the affected officer or applicant to be drug-free at the time the Hair Test yielded a false positive result or to service records that show no indication of illegal drug use; and (b) utilize alternative methods and procedures with respect to drug testing and its use in making employment decisions that would have less disparate, adverse, and discriminatory impact on officers and applicants of color in the terms and conditions of their employment.

74.    As alleged above, the defendants' policies, customs, practices, and conduct are

<div align="center">18</div>

arbitrary and capricious in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment Due Process Clause.

75.    As alleged above, the defendants' policies, customs, practices, and conduct have deprived the plaintiffs of a fair opportunity to have evidence considered that indicates that they were drug free at the time of the Hair Test that resulted in the defendants' adverse employment decisions against them, in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment Due Process Clause.

76.    As alleged above, the defendants' policies, customs, practices, and conduct have, among other things, damaged the good names, reputations, honor, and integrity of the plaintiffs; lowered the plaintiffs' standing in the community; deprived the plaintiffs' of employment and related compensation and benefits; and foreclosed employment opportunities for the plaintiffs.

77.    As alleged above, the plaintiffs have suffered and continue to suffer injuries and damages as a result of the defendants' policies, customs, practices, and conduct, for which the defendants are liable under the provisions of 42 U.S.C. § 1983 in an amount to be proven at trial.

### Count V

### Violation of 42 U.S.C. § 1983
### (Failure to Train and Supervise)

78.    Plaintiffs repeat and re-allege the facts contained in the foregoing paragraphs.

79.    At all relevant times, the defendants acted under color of state law with respect to their policies, customs, and practices concerning the implementation, execution, administration, supervision, related training, and use of the Hair Test in making employment decisions.

80.    At all relevant times, the defendants were and are responsible for, among other things, the training and supervision of personnel charged with administering and performing the procedures involved in the Hair Test and were and are obligated by law to ensure that the implementation, execution, administration, supervision, related training, and use of the Hair Test in making employment decisions (including the defendants' policies, customs, and practices concerning the foregoing) are consistent with the Constitution and laws of the United States.

19

81.    As alleged above, the defendants' policies, customs, practices, and conduct have deprived the plaintiffs of rights guaranteed by 42 U.S.C. § 1983, 42 U.S.C. § 1981, 42 U.S.C. § 2000e, U.S.C. § 12112, and the Fourteenth Amendment to the United States Constitution, and the defendants have acted with deliberate indifference to the defendants' deprivations of the plaintiffs' constitutional and statutory rights.

82.    As alleged above, the defendants' policies, customs, practices, and conduct have, among other things, damaged the good names, reputations, honor, and integrity of the plaintiffs; lowered the plaintiffs' standing in the community; deprived the plaintiffs' of employment and related compensation and benefits; and foreclosed employment opportunities for the plaintiffs.

83.    As alleged above, the plaintiffs have suffered and continue to suffer injuries and damages as a result of the defendants' policies, customs, practices, and conduct, for which the defendants are liable under the provisions of 42 U.S.C. § 1983 in an amount to be proven at trial.

## Count VI
### Violation of 42 U.S.C. § 12101, *et seq.*, Mass. Gen. Laws ch. 151B
### Mass. Gen. Laws ch. 93, § 103, and Article of Amendment 114
### to the Massachusetts Declaration of Rights
### (Disability Discrimination)

84.    Plaintiffs repeat and re-allege the facts contained in the foregoing paragraphs.

85.    Plaintiffs are members of a class protected by 42 U.S.C. §§ 12102(2), 12111(8), 12112, and 12114; Mass. Gen. Laws ch. 151B; Mass. Gen. Laws ch. 93, § 103, and Article of Amendment 114 to the Massachusetts Declaration of Rights, and able to perform the essential functions of their jobs without accommodation.

86.    As a consequence of the plaintiffs' allegedly positive Hair Test results, the defendants falsely and erroneously regarded the plaintiffs as having a disability that substantially limited a major life activity, even though the plaintiffs had no such disability and were able to perform the essential functions of their jobs without accommodation.

87.    As a consequence of the plaintiffs' allegedly positive Hair Test results, the defendants treated the plaintiffs in a disparate, adverse, and discriminatory manner — as

LITDOCS/636659.1

compared with other BPD employees and applicants for employment — on the basis of the defendants' false and erroneous perception that the plaintiffs had a disability that substantially limited a major life activity, even though the plaintiffs had no such disability.

88.     As a result of the Hair Test, the defendants terminated or denied employment to the plaintiffs on the basis of the defendants' false and erroneous perception of a disability, even though the plaintiffs had no such disability.

89.     As alleged above, the defendants' conduct has deprived the plaintiffs of their right to be free from discrimination on the basis of disability as guaranteed by 42 U.S.C. § 12112, Mass. Gen. Laws ch. 151B, Mass. Gen. Laws ch. 93, § 103, and Article of Amendment 114 to the Massachusetts Declaration of Rights.

90.     As alleged above, the defendants' conduct has, among other things, (a) interfered with the plaintiffs' contractual rights; (b) deprived the plaintiffs of their rights with respect to the enjoyment of the full and equal benefit of all laws as enjoyed by white citizens; (c) damaged the good names, reputations, honor, and integrity of the plaintiffs; (d) lowered the plaintiffs' standing in the community; (e) deprived the plaintiffs' of employment and related compensation and benefits; and (f) foreclosed employment opportunities for the plaintiffs.

91.     As alleged above, the plaintiffs have suffered and continue to suffer injuries and damages as a result of the defendants' conduct, for which the defendants are liable under the provisions of 42 U.S.C. § 12112, Mass. Gen. Laws ch. 151B, Mass. Gen. Laws ch. 93, § 103, and Article of Amendment 114 to the Massachusetts Declaration of Rights in an amount to be proven at trial, including compensatory and punitive damages to the full extent permitted by law.

### Count VII
#### Violation of Mass. Gen. Laws. ch. 12, §§ 11H, 11I and Rights Guaranteed by Massachusetts and Federal Law

91.     Plaintiffs repeat and re-allege the facts contained in the foregoing paragraphs.

92.     At all relevant times, the defendants acted under color of state law with respect to their policies, customs, and practices concerning the implementation, execution, administration,

21

LITDOCS/636659.1

supervision, related training, and use of the Hair Test in making employment decisions.

93.    As alleged above, the defendants' policies, customs, practices, and conduct have deprived the plaintiffs of rights guaranteed by Mass. Gen. Laws. ch. 12, §§ 11H, 11I, 42 U.S.C. § 2000e; 42 U.S.C. § 1981; 42 U.S.C. § 1983; 42 U.S.C. § 12112; the Fourteenth Amendment to the United States Constitution; Mass. Gen. Laws ch. 151B; Mass. Gen. Laws ch. 93, § 103; and Articles 1, 10, 11, and 12 of, and Article of Amendment 114 to, the Massachusetts Declaration of Rights.

94.    As alleged above, the defendants have used or attempted to use threats, intimidation, and coercion in interfering with, attempting to interfere with, and depriving the plaintiffs of rights guaranteed by Mass. Gen. Laws ch. 12, §§ 11H and 11I ; 42 U.S.C. § 2000e; 42 U.S.C. § 1981; 42 U.S.C. § 1983; 42 U.S.C. § 12112; the Fourteenth Amendment to the United States Constitution; Mass. Gen. Laws ch. 151B; Mass. Gen. Laws ch. 93, § 103; and Articles 1, 10, 11, and 12 of, and Article of Amendment 114 to, the Massachusetts Declaration of Rights.

95.    As alleged above, the defendants' policies, customs, practices, and conduct have, among other things, damaged the good names, reputations, honor, and integrity of the plaintiffs; lowered the plaintiffs' standing in the community; deprived the plaintiffs' of employment and related compensation and benefits; and foreclosed employment opportunities for the plaintiffs.

96.    As alleged above, the plaintiffs have suffered and continue to suffer injuries and damages as a result of the defendants' conduct in violation of Mass. Gen. Laws ch. 12, §§ 11H and 11I; 42 U.S.C. § 2000e; 42 U.S.C. § 1981; 42 U.S.C. § 1983; 42 U.S.C. § 12111; the Fourteenth Amendment to the United States Constitution; Mass. Gen. Laws ch. 151B; Mass. Gen. Laws ch. 93, § 103; and Articles 1, 10, 11, and 12 of, and Article of Amendment 114 to, the Massachusetts Declaration of Rights, for which the defendants are liable under the provisions of Mass. Gen. Laws. ch. 12, §§ 11H and 11I in an amount to be proven at trial.

LITDOCS/636659.1

### Count VIII

### Declaratory Judgment, Mass. Gen. Laws ch. 231A

97.    Plaintiffs repeat and re-allege the facts contained in the foregoing paragraphs.

98.    As alleged above, there is an actual controversy between the plaintiffs and the defendants concerning the lawfulness of the defendants' policies, customs, practices, and conduct with respect to the implementation, execution, administration, supervision, related training, and use of the Hair Test in making employment decisions.

99.    Pursuant to Mass. Gen. Laws ch. 231A, § 1, the plaintiffs are entitled to a declaratory judgment stating that the defendants have violated rights guaranteed them by 42 U.S.C. § 2000e; 42 U.S.C. § 1981; 42 U.S.C. § 1983; 42 U.S.C. § 12112; the Fourteenth Amendment to the United States Constitution; Mass. Gen. Laws ch. 151B; Mass. Gen. Laws ch. 93, § 103; Mass. Gen. Laws ch. 12, §§ 11H and 11I; Articles 1, 10, 11, and 12 of, and Article of Amendment 114 to, the Massachusetts Declaration of Rights.

100.    The plaintiffs also are entitled to further relief as may be warranted under Mass. Gen. Laws ch. 231A, § 5.

### Count IX

### Permanent Injunction

101.    Plaintiffs repeat and re-allege the facts contained in the foregoing paragraphs.

102.    The defendants' policies, customs, practices, and conduct with respect to the implementation, execution, administration, supervision, related training, and use of the Hair Test in making employment decisions is in violation of rights guaranteed to the plaintiffs by 42 U.S.C. § 2000e; 42 U.S.C. § 1981; 42 U.S.C. § 1983; 42 U.S.C. § 12112; the Fourteenth Amendment to the United States Constitution; Mass. Gen. Laws ch. 151B; Mass. Gen. Laws ch. 93, § 103; Mass. Gen. Laws ch. 12, §§ 11H and 11I; Articles 1, 10, 11, and 12 of, and Article of Amendment 114 to, the Massachusetts Declaration of Rights.

103.    Absent the granting of permanent injunctive relief, enjoining the defendants' unlawful policies, customs, practices, and conduct, the plaintiffs will continue to be irreparably

23

harmed by said unlawful policies, customs, practices, and conduct, for which there is no adequate remedy at law.

PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE

WHEREFORE, plaintiffs pray that this Court:

    (a)    enter judgment against the defendants and in favor of the plaintiffs on all counts of the Complaint;

    (b)    enter judgment against the defendants declaring that the policies, customs, practices, and conduct set forth in this Complaint are in violation of 42 U.S.C. § 2000e; 42 U.S.C. § 1981; 42 U.S.C. § 1983; 42 U.S.C. §§ 12112; the Fourteenth Amendment to the United States Constitution; Mass. Gen. Laws ch. 151B; Mass. Gen. Laws ch. 93, § 103; Mass. Gen. Laws ch. 12, §§ 11H and 11I; Articles 1, 10, 11, and 12 of, and Article of Amendment 114 to, the Massachusetts Declaration of Rights;

    (c)    issue a permanent injunction enjoining the defendants from further violating the plaintiffs' rights asserted in this Complaint;

    (d)    order the defendants to make the plaintiffs whole by providing appropriate back pay with interest, front pay, sick leave, disability leave, vacation leave and reimbursement for all lost compensation and benefits, Social Security, pre-judgment interest, seniority, and all other entitlements and emoluments in an amount to be proven at trial and to take other affirmative steps immediately to eliminate the effects of the discriminatory and otherwise unlawful policies, customs, practices, and conduct set forth in this Complaint;

    (e)    order the defendants immediately to (i) reinstate the plaintiffs, with seniority and with all required adequate protective measures in place, to the positions that they would now occupy but for the defendants' unconstitutional and otherwise unlawful policies, customs, practices, and conduct; and (ii) adjust the plaintiffs' wage rate, salary, bonuses, seniority, and benefits to the levels that they would enjoy but for said unconstitutional and otherwise unlawful policies, customs, practices, and conduct;

    (f)    award the plaintiffs compensatory and punitive damages to the full extent permitted by law;

    (g)    award the plaintiffs reasonable attorneys' fees, costs, and expenses incurred in pursuing this action to the full extent permitted by law;

    (h)    retain jurisdiction over this action until the defendants have fully complied with the orders of this Court and require the defendants to file such reports as is necessary to supervise such compliance; and

    (i)    grant such other, further relief that the Court deems just and proper.

LITDOCS/636659.1

Respectfully submitted,

**Ronnie Jones, Richard Beckers, Walter Washington, William Earl Bridgeforth, Shawn N. Harris, Eugene Wade George C. Downing, Jr., Clararise Bristow, Rachelle Couch, Keri Hogan, and the Massachusetts Association of Minority Law Enforcement Officers,**

By their attorneys,


Nadine Cohen, BBO # 090040
Lawyers' Committee for Civil Rights
  Under Law of the Boston Bar Association
294 Washington Street, Suite 443
Boston, Massachusetts 02108
(617) 482-1145

_____/s/ Rheba Rutkowski_____
Paul Robertson, BBO # 562421
Rheba Rutkowski, BBO # 632799
Rachael Splaine Rollins, BBO # 641972
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA 02110
(617) 951-8000


Maricia Woodham, BBO # 600886
SABEL & SABEL, P.C.
Hillwood Office Center
2800 Zelda Road; Ste. 100-5
Montgomery, AL 36106
(334) 271-2770


Dated:  April 7, 2006

LITDOCS/636659.1

Exhibit B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RONNIE JONES, RICHARD BECKERS, WALTER R. WASHINGTON, WILLIAM E. BRIDGEFORTH, SHAWN N. HARRIS, EUGENE WAGE, GEORGE C. DOWNING, JR., CLARARISE BRISTOW, and the MASSACHUSETTS ASSOCIATION OF MINORITY LAW ENFORCEMENT OFFICERS,<br><br>             Plaintiffs,<br><br>v.<br><br>CITY OF BOSTON, BOSTON POLICE DEPARTMENT, and KATHLEEN O'TOOLE, as she is Commissioner of the Boston Police Department,<br><br>             Defendants. | C.A. No. 05-11832-GAO |

## DEFENDANTS' ANSWER TO THE FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

### Introduction

1.    The allegations contained in this paragraph are introductory and summarize the allegations made throughout the complaint, and therefore no responsive pleading is required.  To the extent the allegations of this paragraph contain allegations to which a response is required, those allegations are denied.

2.    The defendants are without knowledge or information sufficient to form a belief as to the truth contained in the first sentence of this paragraph.  The remaining allegations in this paragraph are denied.

3.    Denied.

4.     Defendants admit that the plaintiffs are former Boston Police Officers, an active Boston

Police Officer who signed a Settlement and Rehabilitation Agreement with the Boston Police

Department, a former Boston Police Department cadet, and an applicant for employment as a

Boston Police Officer.  The remaining allegations are denied.

5.  ·     Defendants are without knowledge or information sufficient to form a belief as to the

truth contained in the first sentence of this paragraph.  Defendants admit that the positive drug

test was the evidence considered in making the employment decisions at issue.  The remaining

allegations in this paragraph are denied.

6.     Denied.

7.     Denied.

**Jurisdiction and Venue**

8.     The allegations contained in this paragraph are recitations of statutory jurisdiction, and no

responsive pleading is required.

9.     Defendants are without sufficient knowledge or information to form a belief as to the

truth of the allegations contained in this paragraph.

10.     The allegations contained in this paragraph are recitations of venue, and no responsive

pleading is required.

**Parties**

11.     Admitted.

12.     The Defendants admit that the Boston Police Department is a paramilitary law

enforcement organization of the City and is an "employer" within the meaning of Title VII, 42

U.S.C. § 2000(e), 42 U.S.C. 12111(5), and Mass. Gen. Laws ch. 151B.  The remaining

allegations of this paragraph are denied.

2

13.    Defendants admit that, as of the time the First Amended and Supplemental Complaint

was filed, Kathleen O'Toole was the Police Commissioner of the BPD and as such exercised the

authority vested in that position. The remaining allegations of this paragraph are denied.

14.    Defendants admit that plaintiff Jones is an African-American male who served in the

BPD from 1983 to 2002, and that he had taken and passed a mandatory annual drug test every

year that it was administered prior to the hair tests which led to his termination. The remaining

allegations of this paragraph are denied.

15.    Defendants admit that plaintiff Beckers is an African-American male who served in the

BPD from 1989 to 2002, and that he had taken and passed a mandatory annual hair drug test

every year that it was administered prior to the hair test that led to his termination. The

remaining allegations of this paragraph are denied.

16.    Defendants admits that plaintiff Washington is an African-American male who served in

the BPD from 1989 to 2002, that he received certain awards from the BPD, and that he had taken

and passed a mandatory annual hair test every year that it was administered prior to the hair tests

that led to his termination. The remaining allegations of this paragraph are denied.

17.    Defendants admit that plaintiff Bridgeforth is an African-American male who served in

the BPD from 1989 to 2003 and that he had taken and passed a mandatory annual hair drug test

every year that it was administered prior to the hair tests that led to his termination. The

remaining allegations of this paragraph are denied.

18.    Defendants admit that plaintiff Harris is an African-American male who served in the

BPD from 1999 to 2003, that he received certain awards from the BPD, and had taken and

passed a mandatory annual hair test every year that it was administered prior to the hair tests that

led to his termination. The remaining allegations of this paragraph are denied.

3

19.     Defendants admit that plaintiff Wade is an African-American male who served in the
BPD from 1975 to 2003, that he had taken and passed a mandatory annual hair test every year
that it was administered prior to the year in which he resigned, but deny that he was terminated.
The remaining allegations of this paragraph are denied.

20.     Defendants admit that plaintiff Downing is an African-American male who served in the
BPD from 1995 to 2004 and that he had taken and passed a mandatory annual hair test every
year that it was administered prior to the hair tests that led to his termination.  The remaining
allegations of this paragraph are denied.

21.     Defendants admit that plaintiff Bristow is an African-American female who was
extended a conditional offer of employment in 2002, subject to successfully passing a medical
examination and hair drug test.  The remaining allegations in this paragraph are denied.

22.     Defendants admit that plaintiff Couch is an African-American female who has served in
the BPD since 1987, and that she had taken and passed a mandatory hair test every year that it
was administered prior to the hair test that led to her suspension.  The remaining allegations of
this paragraph are denied.

23.     Defendants admit that Hogan is an African-American female who served in the BPD as a
cadet from 2001 to 2005, and admit that she failed to pass a mandatory hair drug test which led
to her termination.  The remaining allegations of this paragraph are denied.

24.     Defendants admit that plaintiff Massachusetts Association of Minority Law Enforcement
Officers ("MAMLEO") is an association with offices in Suffolk County.  The remaining
allegations of this paragraph are denied.

**Factual Allegations**

25.     Defendants admit that the mandatory hair drug test has been administered annually to all sworn personnel of the BPD as well as to certain civilian personnel, pursuant to BPD Rule 111, since 1999 – 2000.  The remaining allegations of this paragraph are denied.

26.     Denied.

27.     Defendants admit that the language quoted in this paragraph is excerpted from BPD Rule 111.

28.     Defendants admit the allegations contained in the first sentence of paragraph twenty eight.  The remaining allegations are denied.

29.     Admitted.

30.     Defendants admit that the quotation contained in paragraph thirty of the complaint is excerpted from BPD Rule 111 and that the remaining allegations generally summarize portions of the hair testing process.

31.     Defendants admit that the City contracts exclusively with Psychemedics to perform the hair drug tests.  The remaining allegations of this paragraph are denied.

32.     Defendants admit that Psychemedics conducts testing on hair samples provided by the BPD, and admits that if an employee is reported to have illegal drugs in his or her hair sample and cannot provide an explanation for the positive result, the Medical Review Officer reports the sample as positive for the presence of illegal drugs to the BPD.   Further answering, Defendants deny that they utilize any procedure for testing hair, and are without sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph.

33.     Defendants admit that BPD Rule 111 provides employees who test positive for illegal drugs to opt for a "Safety Net" test, at their expense.  Defendants admit that the "Safety Net" test

uses a lower cut off level for distinguishing between positive and negative results with respect to the presence of illegal drugs, and admits that the cut off level has been adjusted by Psychemedics to reflect the level of detection of illegal drugs. Defendants admit that if an employee's Safety Net test is negative, the BPD reimburses the employee for the cost of the test.

34.     Defendants admit that if an employee tests positive for illegal drugs, the employee is offered a Settlement and Rehabilitation Agreement, which provides for a 45 day suspension without pay and completion of a Rehabilitation Program, at the employee's expense. Defendants admit that if the employee refuses the Settlement and Rehabilitation Agreement, the employee is subject to termination. Defendants admit that employees who are reported positive are placed on restricted duty pending completion of the Rehabilitation Program, and are subject to random urine testing for a period of three years following the positive test result (as well as the annual hair test). Defendants admit that applicants for employment who test positive for illegal drugs are not offered employment. The remaining allegations of this paragraph are denied.

**Problems with the Hair Test**

35.     Defendants admit that each of the plaintiffs tested positive for illegal drugs in annual and/or pre-employment hair drug testing, and that each sworn officer employee had previously tested negative in previous annual hair drug testing.   The remaining allegations of this paragraph are denied.

36.     Defendants deny the allegations contained in the final sentence of paragraph thirty six. Defendants are without sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph.

37.     Defendants admit that the allegations in the first sentence of paragraph thirty seven generally describe the Settlement and Rehabilitation Agreements, but state that the Agreement

6

speaks for itself. Answering further, Defendants admit that sworn officers who test positive for

illegal drugs and who do not accept the Settlement and Rehabilitation Agreements are subject to

termination, that two plaintiffs accepted the Agreement, and one was subsequently terminated

after failing the annual hair drug test a second time. The remaining allegations of this paragraph

are denied.

38.    Denied.

39.    Defendants admit that they have a contract with one laboratory, Psychemedics, to

perform all hair drug tests. The remaining allegations of this paragraph are denied.

40.    Denied.

41.    Denied.

42.    Denied.

43.    Denied.

44.    Denied.

45.    Denied.

46.    Defendants admit that the BPD has denied that race is a factor in drug testing results.

The remaining allegations of this paragraph are denied.

47.    Denied.

48.    Denied.

49.    Denied.

50.    Denied.

## Count I

51.    Defendants incorporate their responses to paragraphs one through fifty of the complaint

herein.

7

52.    Defendants admit that plaintiffs are members of a protected class. The remaining allegations of this paragraph are denied.

53.    Defendants admit that plaintiffs have satisfied the administrative prerequisites to filing suit.

54.    Denied.

55.    Denied.

56.    Denied.

## Count II

57.    Defendants incorporate their responses to paragraphs one through fifty six of the complaint herein.

58.    Defendants admit that plaintiffs are members of a protected class.

59.    Defendants admit that administration of the hair drug test and policy is conduct taken under color of state law.

60.    Denied.

61.    Denied.

62.    Denied.

63.    Denied.

## Count III

64.    Defendants incorporate their responses to paragraphs one through sixty three of the complaint herein.

65.    Defendants admit that the administration of the hair drug test and policy is conduct taken under color of state law.

66.    Denied.

67.    Denied.

68.    Denied.

69.    Denied.

## Count IV

70.    Defendants incorporate their responses to paragraphs one through sixty nine of the complaint herein.

71.    Defendants admit that the administration of the hair drug test and policy is conduct taken under color of state law.

72.    Denied.

73.    Denied.

74.    Denied.

75.    Denied.

76.    Denied.

77.    Denied.

## Count V

78.    Defendants incorporate their responses to paragraphs one through seventy seven of the complaint herein.

79.    Defendants admit that the administration of the hair drug test and policy is conduct taken under color of state law.

80.    Defendants admit that they are responsible for the training and supervision of BPD employees.  The remaining allegations of this paragraph are denied.

81.    Denied.

82.    Denied.

83.    Denied.

## Count VI

84.    Defendants incorporate their responses to paragraphs one through eighty three of the complaint herein.

85.    Defendants admit that plaintiffs are members of a protected class.  The remaining allegations of this paragraph are denied.

86.    Denied.

87.    Denied.

88.    Denied.

89.    Denied.

90.    Denied.

91.    Denied.

## Count VII

92.    Defendants incorporate their responses to paragraphs one through ninety one of the complaint herein.

93.    Defendants admit that the administration of the hair drug test and policy is conduct taken under color of state law.

94.    Denied.

95.    Denied.

96.    Denied.

## Count VIII

97.    Defendants incorporate their responses to paragraphs one through ninety six of the complaint herein.

98.    Admitted.

99.    Denied.

100.    Denied.

### Count IX

101.    Defendants incorporate their responses to paragraphs one through one hundred of the

complaint herein.

102.    Denied.

103.    Denied.

### Prayer for Relief

Defendants deny that plaintiffs are entitled to judgment as set forth in the

"WHEREFORE" clause of their Amended Complaint and deny that plaintiffs are entitled to any

damages or equitable relief.

### Affirmative Defenses

### First Affirmative Defense

The Complaint fails to state a claim upon which relief may be granted.

### Second Affirmative Defense

There is no factual connection between any unconstitutional municipal custom, policy or

practice and any alleged violation of plaintiffs' constitutional rights.

### Third Affirmative Defense

At all relevant times, Defendants acted in good faith and in accord with the Constitutions

and laws of the United States and the Commonwealth of Massachusetts.

11

### Fourth Affirmative Defense

The plaintiffs have not been deprived of any rights secured by either the Constitutions or the laws of the United States or of the Commonwealth of Massachusetts.

### Fifth Affirmative Defense

Defendants state that the injury or damage alleged in plaintiffs' Amended Complaint was neither caused nor proximately caused by it.

### Sixth Affirmative Defense

Defendants state that punitive damages may not be assessed against the City of Boston or any subdivision thereof.

### Seventh Affirmative Defense

All actions taken by the Defendants were motivated by legitimate, non-discriminatory and non-pretextual reasons.

### Eighth Affirmative Defense

Plaintiffs, by their own acts, omissions, conduct and activities have waived and/or are estopped from asserting any claims against the City of Boston.

### Ninth Affirmative Defense

Defendants state that the exclusive method of establishing the City's drug testing program for sworn police personnel is by means of collective bargaining between the City and the unions representing such personnel, and that the City complied with all of its bargaining obligations under M.G.L. c. 150E.

### Tenth Affirmative Defense

Defendants state that they were obliged to administer the hair drug testing program pursuant to the terms of its collective bargaining agreements with the unions representing the City's sworn police personnel.

### Eleventh Affirmative Defense

Some or all of the plaintiffs' claims are barred by the statute of limitations.

### Twelfth Affirmative Defense

Without conceding that plaintiffs have suffered any damages as a result of any purportedly wrongful acts of the Defendants, Defendants state that the plaintiffs have failed to mitigate their damages.

### Thirteenth Affirmative Defense

Plaintiff MAMLEO has no standing to challenge the actions of the City, as alleged in the Amended Complaint.

### Fourteenth Affirmative Defense

To the extent plaintiffs' claims are based on allegedly disparate treatment, they fail to identify any similarly situated employees who were treated differently.

### Fifteenth Affirmative Defense

Plaintiffs' claims relating to alleged handicap or disability are not actionable because the current use of illegal drugs is not protected under state or federal disability laws or under the Massachusetts Declaration of Rights.

13

### Sixteenth Affirmative Defense

Plaintiffs' claims relating to alleged handicap or disability are not actionable because they are not qualified individuals with a handicap or disability within the meaning of state or federal disability laws or under the Massachusetts Declaration of Rights.

### Seventeenth Affirmative Defense

Plaintiffs' claims relating to alleged handicap or disability discrimination are not actionable because they failed to set forth a prima facie case of employment discrimination on the basis of handicap or disability.

### Eighteenth Affirmative Defense

Defendants have complied with all laws and regulations and otherwise satisfied their statutory obligations toward plaintiffs under M. G. L. c. 151B, 42 U.S.C. § 2000(e), and 42 U.S.C. § 12111.

### Nineteenth Affirmative Defense

Plaintiffs who are represented by any union representing sworn City of Boston police personnel are bound to adhere exclusively to the drug testing procedures negotiated on their behalf by their union and the City and no other procedures.

### Twentieth Affirmative Defense

Plaintiffs' claims are barred by the theory of res judicata and/or collateral estoppel.

### Twenty First Affirmative Defense

Plaintiffs have failed to exhaust their administrative remedies and/or have failed to meet jurisdictional prerequisites.

## RESERVATION OF RIGHTS CLAUSE

Defendants reserve their right to amend their answer and to assert any additional

affirmative defense as may become available or apparent during the course of discovery in this

case.

## JURY CLAIM

Defendants demand a trial by jury on all claims.

<div style="margin-left:40%">

Respectfully submitted,
Defendants City of Boston,
Boston Police Department, and
Kathleen O'Toole
By their attorneys,
WILLIAM F. SINNOTT
CORPORATION COUNSEL

By:


__/s/ Mary Jo Harris_____
Mary Jo Harris, BBO # 561484
Special Assistant Corporation Counsel
Morgan, Brown & Joy, LLP
200 State Street
Boston, MA 02109-2605
(617) 523-6666


_____
Helen Litsas, BBO #  644848
City of Boston Law Department
Room 615 City Hall
Boston, MA 02110
(617) 635-4023

_____
Margaret M. Buckley, BBO# 561101
Office of the Legal Advisor
Boston Police Department
One Schroeder Plaza
Boston, MA 02120
(617) 343-4550

</div>

Dated:  September 25, 2006

## CERTIFICATE OF SERVICE

I, Mary Jo Harris, hereby certify that this document was filed through the ECF system on September 25, 2006, and that a true paper copy of this document will be sent to those indicated as non registered participants on the Notice of Electronic Filing by first class mail on the same date.

<u>/s/  Mary Jo Harris</u>

DATED:  September 25, 2006

Exhibit C



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RONNIE JONES, ET AL.,          )
                               )
        Plaintiffs,            )          C.A. No. 05-11832-GAO
                               )
v.                             )
                               )
CITY OF BOSTON, ET AL.,        )
                               )
        Defendants.            )

[PROPOSED] ORDER GOVERNING THE PRODUCTION AND EXCHANGE
OF CONFIDENTIAL INFORMATION

        Pursuant to Rule 26 of the Federal Rules of Civil Procedure, the Parties to this

action, by and through their respective counsel, hereby stipulate to the following terms of

an agreed order for the protection of confidential information produced by the defendants

in the above-captioned case:

1.      For purposes of this Confidentiality Order, "Confidential Documents" or

        "Confidential Information," shall mean documents, materials and information that

        are entitled to confidential treatment pursuant to Rule 26(c) of the Federal Rules

        of Civil Procedure and which the Producing Party, as defined herein, designates

        as confidential, including, but not limited to, deposition transcripts, interrogatory

        responses, responses to requests for admission and documents produced during

        discovery.  A Producing Party may designate as confidential any document or any

        portion of a document, and any other thing, materials, testimony, or other

information that he, she or it reasonably and in good faith believes to contain or reflect any confidential commercial or financial information or material, or other personal, proprietary or sensitive information. Such designation shall be made in the manner set forth in Paragraphs 6, 7 and 8 of this Order, or by written agreement of the Parties at any time.

2.    For purposes of this Confidentiality Order, "Producing Party" means any person, whether or not a party to the Litigation, who produced Confidential Documents or Confidential Information in the course of the Litigation. All information and materials produced by the Producing Party shall be treated as Confidential and subject to this Order until expiration of the ten day period.

3.    For purposes of this Confidentiality Order, the "Litigation" means the above-captioned action entitled Ronnie Jones, Richard Beckers, Walter Washington, William Earl Bridgeforth, Shawn N. Harris, Eugene Wade, George C. Downing, Jr., Clarise Bristow, Rachelle Couch, Keri Hogan, and the Massachusetts Association of Minority Law Enforcement Officers v. City of Boston, Boston Police Department, and Kathleen O'Toole as she is Commissioner of the Boston Police Department, Civil Action No. 05-11832-GAO (Judge George O'Toole), United States District Court for the District of Massachusetts.

4.    For purposes of this Confidentiality Order, "Party" or "Parties" means the plaintiffs Ronnie Jones, Richard Beckers, Walter Washington, William Earl Bridgeforth, Shawn N. Harris, Eugene Wade, George C. Downing, Jr., Clarise Bristow, Rachelle Couch, Keri Hogan, and the Massachusetts Association of Minority Law Enforcement Officers and the defendants City of Boston, Boston

Police Department, and Kathleen O'Toole as she is Commissioner of the Boston

Police Department in the Litigation.

5.   For purposes of this Confidentiality Order, "Order" means this Stipulation and

Order Governing the Production and Exchange of Confidential Information.

6.   Documents.  A Producing Party shall designate any document, tangible thing,

interrogatory response or response to request for admission as Confidential

Information by stamping or otherwise marking such documents, tangible things,

interrogatory responses or responses to requests for admission "Confidential."

Except as provided for in Paragraph 16, below, the designation of any document,

tangible thing, interrogatory response or response to request for admission as

Confidential shall be made at the time the document or tangible thing is produced

or the interrogatory response or response to request for admission is given.

7.   Deposition Testimony.  A Party shall designate in good faith deposition testimony

or portions thereof, including exhibits, as Confidential Information by means of a

statement by counsel or the witness or other authorized counsel at the time of the

giving of testimony, or by written notice by said counsel to all Parties within

thirty (30) days of receipt of the transcript, designating which portion(s) of the

transcript and which exhibit(s) are being designated as Confidential Information.

If a party believes that Confidential Information may be disclosed during the

course of the deposition, the party disclosing the information shall cause the court

reporter to place the legend "Contains Confidential Information" on the front page

of the transcript.  However, within thirty (30) days of receipt of the transcript, the

party shall in good faith re-designate the transcript in order to indicate the specific

portion(s) and/or exhibit(s) of the transcript which are to be designated as confidential. If designation is made during the thirty-day period after receipt of the transcript, all Parties in possession of the transcript at the time of receiving the designation or thereafter shall place the "Contains Confidential Information" legend on the front cover of the transcript and each copy thereof, and the "Confidential" legend on each portion and/or exhibit so designated, and on each copy thereof.

8.    Court Filings.  Before filing any pleadings or other documents which contain Confidential Documents or Confidential Information, the parties shall confer and agree on redactions that would permit the filing of the pleadings or other documents in open court. If the parties are unable to agree on such redactions, the Producing Party(ies) shall move, pursuant to Federal Rule of Civil Procedure 26(c) and Local Rule 7.2, for a court order permitting such pleadings or other documents to be filed under seal. No pleadings or other documents which contain Confidential Documents or Confidential Information shall be filed prior to the Court's ruling on that motion. In its consideration of whether any pleadings or documents may be filed under seal the Court is not bound by the designation of any material as "Confidential" any and such designation shall not create any presumption that documents so designated are entitled to confidential treatment pursuant to Federal Rule of Civil Procedure 26(c). If the Court determines that the Confidential Documents or Confidential Information are not entitled to confidential treatment pursuant to Federal Rule of Civil Procedure 26(c), and/or does not permit the pleadings or other documents which contain such Confidential

Information to be filed under seal, the parties may then file those pleadings or other documents in open court.

9.   The Confidential Documents or Confidential Information or information derived therefrom may only be disclosed or made available by the counsel for the party receiving such information to "Qualified Persons," who are defined to consist of:

   (a)   Counsel for the Parties to the Litigation, including clerical, secretarial and paralegal staff, and outside services (including copy services, litigation consulting services, document management services, and graphics services) employed by such counsel;

   (b)   Any Party, or legally authorized Representatives of named Parties assisting in the prosecution or defense of the Litigation;

   (c)   The Court and its support personnel (in the manner provided by paragraph 8 hereof);

   (d)   Any special master appointed by the Court;

   (e)   Court reporters and persons operating video recording equipment at depositions;

   (f)   Experts, outside consultants and investigators, including the staff of such experts, consultants or investigators retained for the purpose of assisting counsel in the Litigation;

   (g)   Any persons who counsel in good faith believes will or may be requested or required to testify as a witness at deposition or trial ("Potential Witness") provided that such Potential Witness shall be shown only such Confidential Documents or Confidential Information as counsel shall

reasonably deem necessary to allow for full and fair exploration and presentation of information possessed by the Potential Witness;

(h)     Any third-party mediator, settlement judge, or arbitrator selected by the Parties or assigned by the Court; and

(i)     Any other person the Producing Party agrees to in writing.

10.     Prior to providing Confidential Information to any person described in Subparagraphs 9(f) and/or 9(g) above (including a non-party deponent's attorney): (i) counsel for the Party providing the Confidential Information shall inform the person of the terms of this Order and the obligation to comply with those terms; (ii) each such person who is given access to Confidential Information shall be given a copy of this Order; and (iii) each such person who is given access to Confidential Information shall sign a copy of the Consent to Terms of Confidential Order, the form of which is attached to this Order. The counsel of record who imparts such Confidential Information shall retain copies of the signed Consent to Terms of Confidentiality Order. Persons to whom disclosure of Confidential Information is made under this Order shall use such information exclusively for preparation and trial of the Litigation (including appeals and retrials) and shall not use it for any other purpose including, but not limited to, business, governmental, media, commercial, or administrative or judicial proceedings.

11.     The Confidential Documents or Confidential Information shall not be disclosed to persons other than Qualified Persons. However, nothing contained herein shall prevent any party from disclosing its own Confidential Documents or

Confidential Information it deems appropriate, and any disclosure by any party of its own Confidential Documents or Confidential Information shall not be a waiver of the provisions contained herein.

12.   Nothing herein shall impose any restrictions on the use or disclosure by a party or witness of documents or information obtained by such party or witness independently of the discovery proceedings in this Litigation.

13.   Nothing in this Order shall be construed to affect in any way the admissibility of any document, deposition testimony or other evidence at trial of this action. Nothing in this Order shall constitute a waiver of any claim or privilege or other protection from discovery.

14.   If information designated pursuant to this Confidentiality Order is disclosed to any person other than in the manner authorized by this Confidentiality Order, the Party responsible for this disclosure must immediately bring all pertinent facts relating to such disclosure to the attention of the designating Party, without prejudice to the other rights and remedies of the designating Party, and shall cooperate in the retrieval of such information and shall make every effort to prevent further improper disclosure.

15.   Nothing in this Order shall create any presumption that the Confidential Information does or does not constitute or contain confidential, proprietary or other sensitive information or material. Any Party may challenge the designation by another Party of any information or material as Confidential Information. The objecting Party shall object, in writing, to the specific designations with which it takes exception ("Challenged Designated Information") providing the basis for

the objection(s), and identifying the purpose for which it seeks to use the Challenged Designated Information and the individuals or entities to whom it seeks to disclose the Challenged Designated Information. The objecting Party shall continue to treat the Challenged Designated Information as Confidential Information for a period of 10 days from the date of the written objection. If the Parties are then unable to resolve the objection, the designating Party may file a motion with the Court requesting a ruling that the subject information or material should be treated as Confidential Information, and bear the burden of establishing that a protective order concerning such documents or information is appropriate. *See Anderson v. Cryovac*, 805 F.2d 1 (1st Cir. 1986). Upon filing of such motion, the Challenged Designated Information or material shall be treated as Confidential Information unless and until the Court enters an order to the contrary. If the designating Party fails to serve such a motion within 10 days after the date of the written objection, the Challenged Designated Information shall no longer be treated as Confidential Information beginning on the eleventh day after the date of the written objection.

16. A Producing Party that inadvertently fails to designate its material as Confidential may so designate it promptly after discovering the error. The Producing Party shall provide replacement copies bearing the "Confidential" designation or provide a list of Bates numbers of those documents, designated as "Confidential." In that event, from that time forward, the provisions of this Order shall apply to the newly designated material, and the receiving party shall make reasonable efforts to retrieve the material from any non-Qualified Person to whom it was

previously disseminated, but shall have no other responsibility or obligation with respect to any prior dissemination. Any party may thereafter challenge the appropriateness of the confidentiality designation in accordance with paragraph 15 hereof, but the inadvertent production without the confidentiality designation shall not constitute waiver of any claim of confidentiality.

17. Any Party may waive a previously made Confidential designation by informing all other Parties of the waiver in writing, and this Order shall no longer apply to such material.

18. If Confidential Documents or Confidential Information in the possession of a receiving party is subpoenaed by any court, administrative or legislative body, or any other person purporting to have authority to subpoena such information, the party to whom the subpoena is directed shall promptly give written notice of the subpoena (including the delivery of a copy thereof) to the attorneys for the Producing Party prior to the time when production of the information is requested by subpoena. Absent a court order to the contrary, the party to whom the subpoena is directed may comply therewith, however, if application for a protective order is made promptly before the return date, the party to whom the subpoena is directed shall not produce such Confidential Documents or Confidential Information prior to receiving a court order or the consent of the Producing Party.

19. Unless otherwise ordered, the provisions of this Order shall not terminate at the conclusion of this Litigation, whether by dismissal, final judgment, completion of appeal, or settlement, and shall continue in full force and effect thereafter. This

Court will retain jurisdiction after the termination of the Litigation to enforce the terms of the Order.

20.   After final conclusion of all aspects of this Litigation, documents and information designated as confidential, and all copies of same (other than exhibits of record), shall be returned to the Producing Party at the request and expense of the Producing Party, except that counsel of record may retain for their files copies of any of their own work product, correspondence, pleadings, briefs and exhibits, any other court filings, deposition transcripts and exhibits, or hearing or other official transcripts and exhibits, which contain Confidential Information. Such retained copies will remain subject to the restrictions herein.

21    Each party shall maintain Confidential Documents in secure and safe offices.

22.   This Order shall be applicable to any third-party witnesses who agree in writing to be subject to the terms of this Order.

23.   Nothing in the foregoing shall control or govern the use of evidence at trial.

24.   This Order may be modified only by a writing executed by the parties and approved by the Court. No term of this Order shall be waived except by means of a writing.

Respectfully submitted,

PLAINTIFFS RONNIE JONES et al.,
By their attorneys:

_Robert Belin_

Louis A. Rodriques, BBO # 424720
Rheba Rutkowski, BBO # 632799
Raquel J. Webster, BBO # 658796
Robert B. Baker, BBO # 654023
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110

DATED: 11/21/2006


DEFENDANTS CITY OF BOSTON et al.,
By their attorneys:

_Mary Jo Harris_

Mary Jo Harris, BBO# 561484
Special Assistant Corporation Counsel
Morgan, Brown & Joy, LLP
200 State Street
Boston, MA 02109

DATED: 12/15/06


SO ORDERED:

_George A. O'Toole_

Honorable George A. O'Toole
United States District Judge


DATED: 1/08/07


LITDOCS/658456.2/0999997-0000928537          -11-

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| RONNIE JONES, ET AL., ) | C.A. No. 05-11832-GAO |
| Plaintiffs, ) | |
| v. ) | |
| CITY OF BOSTON, ET AL., ) | |
| Defendants. ) | |

## CONSENT TO TERMS OF CONFIDENTIALITY ORDER

I, the undersigned, whose assistance is required in the preparation or trial of this action, have read the annexed Order, dated _____, 20__, and understand its contents and hereby agree to comply therewith. In addition, the undersigned agrees not to use such Confidential Documents or Confidential Information for any purpose other than preparing for or conducting this Litigation.

At the conclusion of the Litigation, all Confidential Documents or Confidential Information and all copies of same shall be promptly returned to the Producing Party or destroyed by the undersigned.

LITDOCS/658456.2/0999997-0000928537

I consent to the jurisdiction of the United States District Court for the District of Massachusetts (with venue in Boston, Massachusetts) for the purposes of enforcement of the Order.

Signature: _____

Printed Full Name: _____

Address: _____
_____
_____

Date: _____

- 2 -