# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| RONNIE JONES, ET AL., | ) |
| Plaintiffs, | ) |
|  | ) |
| v. | ) |
|  | ) |
| CITY OF BOSTON, ET AL., | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

CIVIL ACTION
NO.  05-11832-GAO

<u>**HEARING REQUESTED**</u>

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL DEFENDANTS TO PRODUCE POSITIVE HAIR TEST RESULTS AND E-MAILS RESPONSIVE TO PLAINTIFFS' DOCUMENT REQUESTS

Nadine Cohen, BBO # 090040
Lawyers' Committee for Civil Rights
  Under Law of the Boston Bar Association
294 Washington Street, Suite 443
Boston, Massachusetts 02108
(617) 482-1145

Maricia Woodham, BBO # 600886
SABEL & SABEL, P.C.
Hillwood Office Center
2800 Zelda Road; Ste. 100-5
Montgomery, AL 36106
(334) 271-2770

Louis A. Rodriques, BBO # 424720
Rheba Rutkowski, BBO # 632799
Raquel J. Webster, BBO # 658796
Robert B. Baker, BBO # 654023
Eric A. Heining, BBO # 664900
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA 02110
(617) 951-8000

Counsel for Plaintiffs

Dated:  June 11, 2007

i

TABLE OF CONTENTS
(continued)

Page

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ..................................................................................................................... 3

    A.    Plaintiffs' Efforts To Gather Data Concerning Positive Hair Test Results .......... 3

    B.    Plaintiffs' Efforts To Request Relevant E-Mail Communications ....................... 9

ARGUMENT .......................................................................................................................... 12

CONCLUSION ....................................................................................................................... 15

ACTIVE/72003172.4

<u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## FEDERAL CASES

*Ardrey v. United Parcel Service*, 798 F.2d 679 (4th Cir. 1986) ...............................................13, 14

*Avillan v. Digital Equipment Corp.*, No. 91 Civ. 8594, 1994 U.S. Dist. LEXIS 6454
(S.D.N.Y. May 17, 1994).....................................................................................................13

*Brazburg v. Hayes*, 408 U.S. 665 (1972) .......................................................................................12

*Diaz v. American Tel. & Tel.*, 752 F.2d 1356, 1362 (9th Cir. 1985) .............................................14

*Hickman v. Taylor*, 329 U.S. 495 (1947)........................................................................................13

*Hollander v. American Cyanamid Co.*, 895 F.2d 80 (2d Cir. 1990)...............................................14

*Horizons Titanium Corp. v. Norton Co.*, 290 F.2d 421 (1st Cir. 1961).........................................12

*Klonoski v. Mahlab*, 156 F.3d 255 (1st Cir. 1998) ........................................................................13

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978)............................................................13

*Ross v. Buckeye Cellulose Corp.*, 980 F.2d 648 (11th Cir. 1993) ..................................................13

*United States v. Nixon*, 418 U.S. 683 (1974).................................................................................12

*Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989)..............................................................13

## STATE CASES

*In the Matter of Roche*, 411 N.E.2d 466 (Mass. 1980)..................................................................12

## FEDERAL STATUTES

Fed. R. Civ. P. 26..................................................................................................................12, 15

ACTIVE/72003172.4

## PRELIMINARY STATEMENT

This is a civil rights action concerning the defendants'[1] flawed, imprecise, unreliable, arbitrary, and racially biased mandatory drug test performed on hair samples (the "Hair Test"). As plaintiffs have alleged, the Hair Test is unlawful because, among other reasons, it has a disparate, adverse, and discriminatory impact on Boston police officers and applicants of color because these officers and applicants are more likely than other officers and applicants to have a "false positive" on the Hair Test. To prove this and other aspects of their case, plaintiffs intend to call an expert witness to demonstrate that the Hair Test has a disparate, adverse, and discriminatory impact on Boston police officers and applicants of color.

Because plaintiffs intend to demonstrate a disparity in Hair Test results of officers and applicants of color when compared with other officers and applicants, their ability to gather complete statistical evidence pertaining to positive test results is critical for their expert analysis. After extensive negotiation between the parties (and in the middle of a deposition of the defendants' keeper of the records of Hair Test results), the defendants finally provided a spreadsheet setting forth the name, gender, and race of 80 officers who have tested positive on the Hair Test since the inception of the Hair Test (hereafter referred to as the "spreadsheet of positive test results").

While the spreadsheet of positive test results is important for a thorough disparate impact analysis, it is not enough. Among other shortcomings described below, the spreadsheet of positive test results does not show which officers on the spreadsheet of positive test results took both an initial test and a safety-net test[2], or how much of the drug was found on the initial test,

---

[1] The defendants are the City of Boston, the Boston Police Department ("BPD"), and Edward Davis ("Mr. Davis"), Commissioner of the Boston Police Department (collectively referred to herein as "defendants"). Plaintiffs initiated this action against the City of Boston, the Boston Police Department, and former Boston Police Department Commissioner Kathleen O'Toole ("Ms. O'Toole"). Plaintiffs sued Ms. O'Toole in her official capacity. Mr. Davis has replaced Ms. O'Toole as Commissioner of the Boston Police Department. Therefore, pursuant to Fed. R. Civ. P. 25(d), Mr. Davis "is automatically substituted as a party" for Ms. O'Toole.

[2] According to the BPD's "Procedures For Annual Hair Testing," "[i]f an Officer receives a positive, confirmed hair test result, the Officer may request a safety-net test. The safety-net

or, if applicable, a safety-net test.  Therefore, plaintiffs have requested that defendants produce the "back-up" records for the spreadsheet of positive test results, including all of the records showing the initial and safety-net test results for all of the officers who have tested positive on the Hair Test.  Because the defendants have already produced these records for the plaintiffs' test results, this request concerns Hair Test records for 72 officers.[3]

It is beyond dispute that defendants have ready access to the records of positive Hair Test results and yet have refused to produce significant information concerning these records[4], but defendants continue to object to plaintiffs' requests for production by vaguely commenting that the requests are overly broad.  The defendants' vague, reflexive objections remain unchanged despite the fact that plaintiffs have significantly reduced the scope of their requests to that which is easily accessible and have provided defendants with their rationale for needing such information.  Furthermore, whatever modest burden on defendants in producing readily

---

test must be performed under the same or more stringent procedures as recommended by the manufacturer."  A copy of the BPD's "Procedures For Annual Hair Testing" are attached hereto as Exhibit A.  Upon information and belief, defendants are in the process of negotiating with the BPD's officers' unions to make several amendments to the BPD's "Procedures for Annual Hair Testing," including changes concerning the procedures and drug cut-off levels for safety-net tests.  These changes do not alter the BPD's nearly universal reliance on the Hair Test in making employment decisions and are therefore no less unlawful than the current procedures attached as Exhibit A.

[3] Plaintiffs seek injunctive relief, so their requests are ongoing.  Therefore, if additional officers have tested positive on the Hair Test since the spreadsheet of positive test results was generated, plaintiffs also seek production of documents concerning their Hair Test results.  As with certain other third-party officers Hair Test results and the spreadsheet of positive test results that defendants have previously produced, these documents would be produced pursuant to the Order Governing The Production And Exchange of Confidential Information ("Confidentiality Order").

[4] In addition to the personnel and medical files that include all positive and negative Hair Test results for all the BPD's officers, the BPD's current keeper of the records of positive Hair Test results testified that she keeps a file of positive test results for all officers who have violated the BPD's drug testing policy.  The only other keeper of the records of positive Hair Test results also testified that he kept files of all positive test results for all officers who have violated the BPD's drug testing policy.  The former keeper of the records also testified that the only way to ascertain the amount of drug detected on a Hair Test and whether an officer took a safety-net test is to review the actual test results because this information is not reflected on the spreadsheet of positive test results.

accessible positive Hair Test results for 72 officers is insignificant when compared to the importance of the information to plaintiffs' case.

Finally, plaintiffs document requests call for the production of communications, including e-mails, relating to the plaintiffs' claims. Defendants agreed to undertake a search for some e-mails, but their search was woefully inadequate given the admittedly relevant witnesses and issues in this case. For these reasons, the Court should compel defendants to conduct a more thorough e-mail search (as described below) and produce all the responsive e-mails resulting from this search.

## BACKGROUND

**A.    Plaintiffs' Efforts To Gather Data Concerning Positive Hair Test Results.**

In Plaintiffs' First Set of Requests For Production ("Plaintiffs' Document Requests"), plaintiffs sought production of:

> All documents sufficient to show -- year by year -- the race, hair color, rank, years of service, department or deployment, Hair Test results (including for positive results, the illegal drug reported as present), and employment status of BPD personnel or candidates for employment during the relevant time period, including whether the employee signed a Rehabilitation Agreement, as described in Boston Police Department Rule 111.

Plaintiffs' Document Request 3. On October 2, 2006, defendants responded to Plaintiffs' Document Requests, specifically objecting to the above request, arguing it was "overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence." Nonetheless, defendants agreed to produce "all responsive information in their possession, custody or control." A copy of the Defendants' Responses to the Plaintiff's [sic] First Set of Request for Production, which includes Plaintiffs' Document Requests, is attached hereto as Exhibit B.

Plaintiffs had good reasons to believe that the defendants kept statistics concerning the racial disparity of positive and negative Hair Test results,[5] so Plaintiffs focused their initial follow-up discovery efforts by requesting all Hair Test results, positive or negative, since the defendants' inception of the Hair Test in January 1999.  However, in a November 17, 2006 letter from defendants' counsel to plaintiffs' counsel responding to plaintiffs' request for data on all officers' Hair Test results, defendants advised plaintiffs that "the City will continue to object to this request on the grounds that it is overly broad and unduly burdensome."  A copy of the defendants' counsel's November 17, 2006 letter is attached hereto as Exhibit D.  By defendants' description, production of all Hair Test results (positive or negative) would require hand searching of personnel and medical files of each officer employed since 1999.  Defendants estimated "that this would require review of some 5,000 files (personal and medical files are maintained separately) and that each review would take approximately 30 minutes."

In an effort to ease the burden on defendants in producing all Hair Test results, plaintiffs inquired whether defendants would provide information concerning positive test results, and, as to negative Hair Test results, stipulate that all officers took the Hair Test once per year and tested negative unless reflected in the data of positive test results to be provided.  In order for plaintiffs to assume the number of negative test results and the racial breakdown of those results, defendants would supply plaintiffs with monthly "strength reports" showing the racial breakdown of the BPD.  Defendants accepted this compromise.  In a December 18, 2006 e-mail from defendants' counsel to plaintiffs' counsel, defendants' counsel stated:

---

[5] For instance, the BPD has published a document on its internal website called "Hair Drug Testing: Fact vs. Fiction."  A copy of this document is attached hereto as Exhibit C.  The "Fact vs. Fiction" piece stated that "Since the introduction of hair drug testing in January of 1999, the Department has conducted over 6,804 hair tests on samples provided by police officers.  Only forty-five officers have tested positive in that time, out of the approximately 2,200 sworn officers who have been tested annually."  Several of the defendants' current and former employees have testified to the authenticity of the "Fact vs. Fiction" document, but the defendants have not produced a copy of the document from their own files and have not been able to provide information regarding when the document was generated or on what basis the defendants were able to state that 6,804 Hair Tests had been conducted as of whatever date the "Fact vs. Fiction" piece was created.

> I will stipulate regarding the statistics that we will not contest the assumption that every sworn employee listed in the strength reports were subjected to the hair drug test, and that one can assume that all officers who did not get reported as positive received negative drug test results. In making this stipulation, I would be doing so with the caveat that testing negative does not mean that one is not using drugs (as one may have tested positive below the cut off), but simply that the Department has not received any positive result from Psychemedics.

A copy of the defendants' counsel's December 18, 2006 e-mail to plaintiffs' counsel regarding the stipulation for the number of negative Hair Test results is attached hereto as Exhibit E.

On January 8, 2007, plaintiffs deposed Marisela Perez, the defendants' current keeper of the records of Hair Test results. During her deposition, Ms. Perez referred to documents that defendants had not previously produced, including the spreadsheet of positive test results described above. Although Ms. Perez stated that she had prepared with her attorneys for her deposition for a total of four hours, defendants waited until the middle of the deposition to produce, for the first time, the spreadsheet of positive test results. After the deposition, defendants produced several additional documents concerning Hair Test statistics and Ms. Perez's role as keeper of the records of the Hair Test. Because plaintiffs had questions pertaining to the belatedly produced documents, including questions concerning what positive Hair Test result statistics are retained by the defendants, plaintiffs asked to depose Ms. Perez a second time, causing plaintiffs to incur needless expense. By letter from plaintiffs' counsel to defendants' counsel dated January 22, 2007, plaintiffs requested that Ms. Perez appear for a second deposition. A copy of plaintiffs' counsel January 22, 2007 letter to defendants' counsel is attached hereto as Exhibit F. On March 8, 2007, Ms. Perez appeared for her second deposition concerning the defendants' positive Hair Test result statistics and the spreadsheet of positive test results.

In her depositions, Ms. Perez testified, among other things, that, for officers who fail the Hair Test, Hair Test results are "placed in the files contained in my office for officers who have violated Rule 111." Plaintiffs also exhausted Ms. Perez's knowledge on the shortcomings of the spreadsheet of positive test results. Specifically, Ms. Perez clarified that the spreadsheet of

positive test results does not show: 1) what officers on the spreadsheet of positive test results took both an initial test and a safety net test; 2) how much of the drug was found on the initial test, and, if applicable, a safety net test; 3) the date a hair sample was taken (either for an initial test or a safety-net test); 4) the result of a safety-net test, if any; and 5) whether an officer opted for a settlement agreement and rehabilitation.[6]  Ms. Perez also thought there were "one or two people who are listed" on the spreadsheet of positive test results who did not test negative on a safety-net test result and did not accept the settlement agreement.  Without the "back-up" records for the spreadsheet of positive test results, it is impossible to determine what happened to these officers and why.

On June 7, 2007, plaintiffs deposed Jay Devlin.  Mr. Devlin was the keeper of the records of Hair Test results from the inception of the Hair Test until Ms. Perez assumed Mr. Devlin's keeper of the records position when Mr. Devlin retired in 2004.  Mr. Devlin testified that he drafted procedures concerning retention of positive Hair Test results (exactly the records sought by this motion to compel) and started the spreadsheet of positive test results later edited by Ms. Perez.  Mr. Devlin's testimony concerning what information is not reflected on the spreadsheet of positive test results was consistent with Ms. Perez's testimony.   In addition, Mr. Devlin testified  that the BPD sometimes received both a negative and positive safety-net result for the same collection of hair.  Mr. Devlin further testified that, even though it is not reflected in the BPD's "Procedures For Annual Hair Testing," The BPD would consider this a positive test result and an officer would be disciplined accordingly.   Finally, Mr. Devlin testified that the spreadsheet of positive test results does not reflect whether an officer received both a positive and a negative safety-net test result, and this information can only be found in the files kept by the keeper of records for each officer who has tested positive on the Hair Test.

---

[6] For some of the officers on the spreadsheet of positive test results, it is possible to discern whether the officer opted for a settlement agreement and rehabilitation.  However, this information is not set forth for all of the officers on the spreadsheet, and it is completely unclear whether the officers who opted for settlement did so after a positive safety-net test result.

In order to decipher the data from the spreadsheet of positive test results and conduct a disparate impact analysis of the Hair Test data, on April 30, 2007, plaintiffs requested all positive Hair Test results for the officers, other than the individual plaintiffs, listed on the spreadsheet of positive test results.[7] Plaintiffs requested documents showing, "1) the date the sample was taken for the initial test, 2) the amount of drug found in the initial positive test result. . . , 3) the date the sample was taken for the safety-net test, and 4) the safety-net test result." Plaintiffs also requested clarification on which individuals opted for either a settlement agreement or rehabilitation in lieu of taking a safety-net test. Plaintiffs informed defendants that all documents and information produced in response to the request would be kept confidential pursuant to the Confidentiality Order. Because this request sought records for only 72 officers' positive Hair Test results, it was significantly reduced from plaintiffs original demand for all Hair Test results (positive or negative) for all officers since January 1999 (a request that, according to defendants, would have required a review of 5,000 personnel and medical files).

Defendants responded to plaintiffs' April 30, 2007 e-mail on May 7, 2007, stating that plaintiffs' request was overbroad and unreasonable. Defendants requested that plaintiffs' counsel advise them as to why this additional material was needed. In response, on May 8, 2007, plaintiffs provided defendants with great detail as to why the additional information was needed on the officers listed in the spreadsheet of positive test results. Plaintiffs advised defendants that their disparate impact analysis and scientific experts needed the additional information for consideration in their expert analyses. Plaintiffs further informed defendants that production of about 500 pages of documents needed by plaintiffs did not appear to be overly burdensome. Plaintiffs advised defendants that they would move to compel production and would move for costs should defendants continue to object to production of the documents. Defendants' counsel responded to plaintiffs' counsel's detailed account on the same day by simply stating, "I cannot

---

[7] Because the plaintiffs' counsel's April 30, 2007 e-mail to defendants' counsel requesting additional records for the data set forth in the spreadsheet of positive test results also contains information that was produced by the defendants pursuant to the Confidentiality Order, the April 30, 2007 letter it is not attached hereto.

agree to produce materials relating to every drug test that has resulted in positive test results from 1999 to the present." Defendants' counsel provided no further rationale for defendants' continued objections. A copy of the May 7 and 8, 2007 e-mail communications between counsel for the plaintiffs and defendants is attached hereto as Exhibit G.

Therefore, plaintiffs now seek an order compelling the defendants to produce all positive Hair Test results and related documents and information used to generate the spreadsheet of positive test results. Based on the Hair Test records defendants previously produced for each of the plaintiffs' Hair Test results, plaintiffs expect these records will include records from Psychemedics and the Medical Review Officer (i.e., Business Health Management, P.C.) showing: 1) whether each of the officers reflected on the spreadsheet of positive test results took both an initial Hair Test and a safety-net test; 2) whether the officers reflected on the spreadsheet of positive test results received both a positive and a negative safety-net test; 3) the date hair samples were collected for the initial Hair Test, and, if applicable, a safety-net test; 4) the date hair samples were tested for the initial Hair Test, and, if applicable, a safety-net test; 5) the amount of drug that Psychemedics detected in both the initial Hair Test, and, if applicable, a safety-net test; 6) whether head, nape, or body hair was used for the initial Hair Test, and, if applicable, the safety-net test; 7) whether Psychemedics reported that it received the hair sample with the chain of custody intact; 8) whether Psychemedics or the Medical Review Officer reported any caveats (e.g., variable dormancy period) based on the type of hair (head, nape, body, etc…) collected for the hair test; and 9) the confirmation cutoff  level used by Psychemedics in determining that the Hair Test was positive.

The above information is critical to plaintiffs' disparate impact and scientific expert analyses concerning the Hair Test. For example, the requested documents may show whether there is an issue concerning what type of hair (head, nape, body, etc…) the defendants collect for the Hair Test that could effect whether a hair sample is more likely to be externally contaminated with drugs, and, similarly, whether this issue has a disparate impact on African-American officers. In addition, only the requested documents will show the extent to which defendants

treated a positive and negative safety-net result for the same individual as a positive Hair Test result. For these and other reasons to be explored through plaintiffs' expert analyses, the Hair Test results for all of the officers who have tested positive on the Hair Test are critical to plaintiffs' allegations.

**B.    Plaintiffs' Efforts To Request Relevant E-Mail Communications.**

Several of plaintiffs' document requests sought e-mail communications concerning the allegations in the Amended Complaint and the Hair Test. *See, e.g.*, Document Requests 1, 4, 7, 9, 10, 11 , attached hereto as <u>Exhibit</u> <u>B</u>. On January 4, 2007, defendants produced the Affidavit of John E. Boyle ("Mr. Boyle's Affidavit") dated December 27, 2006 that concerns defendants' efforts to gather and produce these e-mail communications. A copy of Mr. Boyle's Affidavit is attached hereto as <u>Exhibit</u> <u>H</u>. According to the affidavit, Mr. Boyle was instructed to search the e-mail communications of nine current and former employees. The affidavit further states that Mr. Boyle conducted his inquiry by searching the subject field and message body of emails dating back three months using the following search terms: "hair testing, hair drug testing, MAMLEO (Massachusetts Association of Minority Law Enforcement Officers), Psychemedics, Psychemedics Corporation." Mr. Boyle attested that he had "exhausted all available sources within the Boston Police Department computer systems in retrieving these documents."

Despite Mr. Boyle's conclusory statement that he had "exhausted all available sources" to gather responsive e-mail communications, defendants have never produced any e-mail communications except for e-mail communications that appeared to come from hard copy document files. Therefore, by letter on January 22, 2007, attached hereto as <u>Exhibit</u> <u>F</u>, plaintiffs advised defendants of their concern, based on Mr. Boyle's affidavit and the document production reflecting no electronic communications, that defendants had not made sufficient efforts to gather and produce responsive e-mail communications. In particular, plaintiffs voiced the following concerns with the search process outlined in Mr. Boyle's Affidavit: 1) there was no indication that defendants had searched e-mail attachments for responsive documents, a

necessary component of an exhaustive search; 2) the search terms articulated in Mr. Boyle's Affidavit were far too narrow to even attempt to gather most responsive e-mail communications; and 3) given the list of defendants' employees whom defendants had already identified as having information relevant to this case, the defendants had searched far too few of their employees' e-mail files in order exhaust the possibilities of a good faith search. Therefore, plaintiffs demanded that defendants extend their search and provided defendants with the following additional search criteria:

> To the extent defendants are using search terms to assist in their review, the terms should include: the last names of all of the individual plaintiffs, MAMLEO, hair, urine, specimen, test, testing, drug, race, racial, bias, color, Psychemedics, the last name of all Psychemedics representatives who have communicated with anyone employed by defendants or defendants' Medical Review Officer, Psychemedics' email addresses, the current and former corporate names of Defendants' Medical Review Officer, the last names of all employees of defendants' Medical Review Officer, and the last names of anyone defendants' have ever consulted with concerning the hair test (e.g. Dr. Carl M. Selavka). Finally, to the extent defendants have communicated with any third-party concerning the hair test (e.g. the M.R.O., Psychemedics, Dr. Selavka, etc.), all emails to or from these individuals should be reviewed for responsiveness regardless of search terms.

Additionally, plaintiffs advised defendants that they should have reviewed "all emails for any of defendants' current or former employees identified in defendants' initial disclosures, any of defendants' current or former employees identified in defendants' responses to plaintiffs' first set of interrogatories, and any of defendants' current or former employees covered by plaintiffs' deposition notices."

Next, Mr. Boyle's affidavit stated this his e-mail retrieval efforts involved "a restore going back **three months** because that was our retention period." (emphasis added). Furthermore, according to Mr. Boyle's affidavit, he did not begin this restoration until at least October 2006. Therefore, given that the plaintiffs' complaint was filed in July 2005, plaintiffs notified defendants that Mr. Boyle's affidavit raised serious spoliation concerns, and plaintiffs requested that "defendants immediately confirm whether and when any litigation holds were put

on documents concerning the hair test, along with a complete description thereof." Plaintiffs also stated that "[b]ecause the defendants' hair test has been extensively litigated in prior disputes with defendants' current and former officers and their unions, this request covers any instruction to defendants' employees not to destroy documents concerning the hair test in connection with any dispute concerning the hair test."

Finally, plaintiffs requested that defendants furnish them with a pst. file of responsive email, a file which, according to Mr. Boyle's Affidavit, had already been created by defendants. This would be of no cost to defendant but would reduce plaintiffs' cost of cataloging the documents in an electronic database.

Defendants responded to plaintiffs' January 22, 2007 in a letter dated January 23, 2007. A copy of the defendants' counsel's January 23, 2007 letter is attached hereto as <u>Exhibit</u> <u>I</u>. Regarding the adequacy of defendants' email search and production, defendants stood by a conclusory assertion that "the Department's email and electronic data search is sufficient for the purposes of discovery in this case" and invited plaintiffs to file a motion to compel if they did not agree. While defendants did state that "the plaintiffs in this case are making every effort to ensure that the discovery of this case is burdensome to the City and disruptive to the Police Department," defendants did not elaborate on which requests were burdensome and disruptive or in what way the requests were burdensome and disruptive.

The defendants' communications relating to plaintiffs' claims are of the utmost importance to this case, yet the defendants have only made the most cursory and half-hearted attempt to comply with plaintiffs' request for this critical information. Using the alternative search criteria provided by plaintiffs to recover e-mail communications and attachments relevant to plaintiffs' claims would impose almost no burden on defendants and would likely be of great benefit to plaintiffs. Therefore, plaintiffs seek an order compelling the defendants to: 1) conduct the most exhaustive e-mail search possible (including going as far back in time as possible and searching both the text and attachments of e-mail communications for responsive documents) for e-mail files for any of defendants' current or former employees identified in defendants' initial

disclosures, any of defendants' current or former employees identified in defendants' responses to plaintiffs' first set of interrogatories, and any of defendants' current or former employees covered by plaintiffs' deposition notices; 2) conduct searches using all of the e-mail terms described in the plaintiffs' January 22, 2007 letter; 3) produce pst. files of responsive email; and 4) confirm whether and when defendants placed any litigation holds on documents concerning the Hair Test, along with a complete description thereof.

## **ARGUMENT**

Both state and federal courts recognize the fundamental principle that the public has the right to every man's evidence. *United States v. Nixon*, 418 U.S. 683, 709 (1974) ("The need to develop all relevant facts in the adversary system is both fundamental and comprehensive."); *Brazburg v. Hayes*, 408 U.S. 665, 688 (1972) (relying upon principle that the public has a right to every person's evidence); *In the Matter of Roche*, 411 N.E.2d 466, 473 (Mass. 1980) (invoking principle that the need to develop all relevant facts is fundamental to adversary system). "Exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." *Nixon*, 418 U.S. at 710. This general principle is embodied in Federal Rule of Civil Procedure 26(b)(1) ("Rule 26(b)(1)"), which provides:

> Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter.

Fed. R. Civ. P. 26(b)(1). This rule "apparently envisions generally unrestrictive access to sources of information, and the courts have so interpreted it." *Horizons Titanium Corp. v. Norton Co.*, 290 F.2d 421, 425 (1st Cir. 1961).

As the Supreme Court has held, the word 'relevant' as it pertains to Rule 26(b)(1) should be construed broadly, "to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (citing *Hickman v. Taylor*, 329 U.S. 495 (1947)); *see also*

*Klonoski v. Mahlab*, 156 F.3d 255, 267 (1st Cir. 1998) (acknowledging that discovery rules should be construed broadly). "Relevant" matter is not limited to issues raised by the pleadings, nor is it limited to the merits of the case. Rather, information is relevant as long as it is designed to "help define and clarify the issues." *Oppenheimer Fund, Inc.*, 437 U.S. at 351 (internal citation omitted).

Furthermore, "[t]he Supreme Court has instructed that plaintiffs in employment discrimination lawsuits may employ 'liberal civil discovery rules' to obtain 'broad access to employer's records' in order to generate a statistical analysis to show the disparate impact of an employer's personnel policies." *Avillan v. Digital Equipment Corp.*, No. 91 Civ. 8594, 1994 U.S. Dist. LEXIS 6454, at *3-4, 13-14 (S.D.N.Y. May 17, 1994) (granting plaintiff's motion to compel various employment records "pertaining to employees of defendant with plaintiff's job category" to "develop evidence of a pattern of employment discrimination against Hispanics , and to build a statistical case," and noting that "courts have not been receptive to broad or reflective claims of burden, particularly in Title VII litigation") (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 657 (1989) (superseded by statute on other grounds)); *see also Ross v. Buckeye Cellulose Corp.*, 980 F.2d 648, 661 n.19 (11th Cir. 1993) (Title VII appellants were "able to take advantage of 'liberal civil discovery rules [that] give plaintiffs broad access to employers' records in an effort to document their claims'") (quoting *Wards Cove Packing Co.*, 490 U.S. at 657)); *and Ardrey v. United Parcel Service*, 798 F.2d 679, 682-84 (4th Cir. 1986) (noting that "a district court may not, through discovery restrictions, prevent a plaintiff from pursuing a theory or entire cause of action" and "undue restrictions of discovery in Title VII cases are especially frowned upon" (internal citation omitted)).

In *Hollander v. American Cyanamid Co.,* the Second Circuit reversed the district court's denial of the plaintiff's motion to compel discovery in a discriminatory discharge claim brought under the Age Discrimination in Employment Act. 895 F.2d 80, 84-85 (2d Cir. 1990). During discovery, plaintiff requested that defendants "identify each management level employee who has terminated employment with [the company] since January 1, 1983 and who at the time of the

termination of his employment was over the age of 40, stating as to each the reason or reasons for the termination of employment." *Id.* at 84. The defendant objected on the grounds that the request was vague and overbroad, pointing to the fact that plaintiff sought discovery of information on managers throughout the entire company, not just those employed at plaintiff's facility. *Id.* A magistrate judge denied the motion, finding that additional discovery would be burdensome and irrelevant, and the district court upheld. *Id.* The Second Circuit reversed, finding that the district court abused it's discretion in denying the plaintiff's motion. *Id.* The Court found that even general statistical information pertaining to defendant's employment practices was relevant to plaintiff's case, based on the following reasoning:

> It is well-settled that an individual disparate treatment plaintiff may use statistical evidence regarding an employer's general practices at the pretext stage to help rebut the employer's purported nondiscriminatory explanation. Evidence relating to company-wide practices may reveal patterns of discrimination against a group of employees, increasing the likelihood that an employer's offered explanation for an employment decision regarding a particular individual masks a discriminatory motive. . . .

*Id.* (internal citations omitted); *see also Ardrey*, 798 F.2d at 684 (4th Cir. 1986) (finding that "statistical evidence is unquestionably relevant in a Title VII disparate treatment case" (quoting *Diaz v. American Tel. & Tel.*, 752 F.2d 1356, 1362 (9th Cir. 1985)).

As set forth above, the Hair Test results for all of the officers who have tested positive on the Hair Test is critical to plaintiffs' expert analyses and theories of liability. Similarly, e-mail communications concerning the Hair Test and plaintiffs' allegations are unquestionably relevant to this dispute. Production of additional e-mail communications and additional Hair Test result data is not cumulative or duplicative, nor is there is no more convenient source from which to obtain the requested documents. Only defendants have access to their own internal email collection. Also, only defendants have centralized access to all of the requested Hair Test data

and demographic information.  Therefore, defendants have no valid objection under Fed. R. Civ.

P. 26 for refusing to provide the requested documents.[8]

### CONCLUSION

For all of the foregoing reasons, the Court should grant the plaintiffs' motion and issue an

order compelling defendants to comply with their discovery obligations under the Federal Rules

of Civil Procedure by immediately producing the e-mail communications and additional Hair

Test results information as requested by the plaintiffs.  Further, defendants should be ordered to

pay the plaintiffs' costs, including attorneys' fees, incurred in bringing this Motion, in an amount

to be determined upon submission of an affidavit setting forth such costs.  A form of proposed

Order is submitted as Exhibit A to the plaintiffs' Motion.

Respectfully submitted,

**Ronnie Jones, Richard Beckers, Walter Washington, William Earl Bridgeforth, Shawn N. Harris, Eugene Wade George C. Downing, Jr., Clararise Bristow, and the Massachusetts Association of Minority Law Enforcement Officers,**

By their attorneys,

/s/ Robert B. Baker
Louis A. Rodriques, BBO # 424720
Rheba Rutkowski, BBO # 632799
Raquel J. Webster, BBO # 658796
Robert B. Baker, BBO # 654023
Eric A. Heining, BBO # 664900
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA  02110
(617) 951-8000

---

[8] Defendants have yet to demonstrate the supposed burden plaintiffs have imposed upon them.  While "[a] party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost," on a motion to compel discovery of said documents, that party must demonstrate that such burden or cost exists.  Fed. R. Civ. P. 26(b)(2)(B).  Still, the court can order discovery despite undue burden and cost if the requesting party shows good cause.  *Id.*

Nadine Cohen, BBO # 090040
Lawyers' Committee for Civil Rights
 Under Law of the Boston Bar Association
294 Washington Street, Suite 443
Boston, Massachusetts 02108
(617) 482-1145

Marcia Woodham, BBO # 600886
SABEL & SABEL, P.C.
Hillwood Office Center
2800 Zelda Road; Ste. 100-5
Montgomery, AL 36106
(334) 271-2770

Dated June 11, 2007

## CERTIFICATE OF SERVICE

    I hereby certify that, on June 11, 2007, a true copy of the above document was served upon the attorney of record for each other party electronically via the ECF/CM.

/s/ Robert B. Baker

# Exhibit A

Boston Police Department                              Rules and Procedures

RULE 111

Appendix D
## PROCEDURES FOR ANNUAL HAIR TESTING

A)  **Tracking System** – The Department shall develop and maintain a tracking system that ensures each Officer who is subject to Annual Testing will undergo a hair test as required by Rule 111, sec. V, para. G.

B)  **Notification to Submit** – The Department shall provide to Commanding Officers a listing of those Officers who shall be required to submit to an annual hair test. The Commanding Officer or his/her designee shall notify the Officer when he/she shall submit to the test at Occupational Health Services.

C)  **Collection Personnel** – Certified employees of the Occupational Health Services Unit shall perform all hair sample collections.

D)  **Identification of Officer's Identity** – The Officer's identity shall be verified by checking the driver's license or other photo identification. The Department, including personnel from the Occupational Health Services Unit, may do a visual identification of the Officer, however this must be noted on the Test Request Form.

E)  **Completing the Test Request Form** – The Test Request Forms (TRF) are pre-printed forms that are coded specifically to the Department. The collection personnel shall fill out the form in the presence of the Officer. The TRF includes information such as the collector's identity, the Test Subject Identification Number, and where the sample was collected (ex., crown of head, nape of the neck).

F)  **Completing the Sample Acquisition Card (SAC)** – The SAC is a card that will hold the hair sample during transportation. A foil used for collection is included with the card. These steps may occur prior to or after the collection of the hair sample and shall be completed in the presence of the Officer.

   1) The collection personnel shall sign and date the SAC. The collection personnel shall write the Test Subject Identification Number on the SAC. This number must match the number listed on the TRF.

   2) The collection personnel shall place the bar code from the TRF on the SAC to ensure the two documents are identified with one another.

G)  **Collecting the Hair Sample** – The collection personnel shall complete each of the following steps in the presence of the Officer.

   1) The collection personnel will grasp a small lock of hair approximately ½ inch wide by one strand deep when held flat and cut the sample close to the scalp. If the head hair is not available other body hair shall be collected.

COB 0005782

Page 26

Boston Police Department

Rules and Procedures

RULE 111

---

2) The sample is then placed in the foil with the root ends extending approximately ¼ inch. The foil is pressed together, trapping the sample inside. If the hair is long, the collection personnel will wrap the remaining hair around the foil.

3) The collection personnel shall place the sample inside the SAC, sign and date the integrity seal, and place the integrity seal over the designated spot on the SAC.

4) The Officer shall initial the SAC in the space provided.

5) The Officer shall complete the Donor Certification section of the TRF that includes the Officer's name and telephone number. In the comments section, the donor may provide additional information for the Medical Review Officer (MRO), (ex., use of prescription medicine or an additional phone number where the MRO can contact the Officer if the need arises).

6) The copy of the TRF that contains the Donor Certification section shall be separated from the TRF and placed in a sealed envelope addressed to the MRO. The Officer shall initial and date the sealed envelope. The sealed envelope shall be kept in a secured area until sent to the MRO, at the next regularly scheduled pick-up using an overnight carrier.

7) The collection personnel shall place the SAC and a copy of the TRF into the collection pouch and seal the pouch.

8) The Officer shall initial and date the collection pouch in the space provided.

H) **Storing and Shipping the Sample** – The sealed collection pouch shall be kept in a secured area until sent to the laboratory, at the next regularly scheduled pick-up using an overnight carrier.

I) **Licensed Laboratory** – The sample shall be tested at a licensed laboratory that is certified to perform hair testing.

J) **Review of Test Result by an authorized Medical Review Officer (MRO)** – All hair sample drug test results shall be reviewed by an authorized MRO prior to the transmission of the test results to the Commanding Officer, Bureau of Internal Investigations (BII)

1) The duties of the MRO with respect to positive test results are to review and interpret confirmed, positive test results obtained through the Department's annual hair testing program. In carrying out this responsibility, the MRO shall examine alternative medical explanations for any positive test result. This action may include conducting a medical interview and review of the Officer's medical history, or review of any other relevant biomedical factors. The MRO shall review all medical records made available by the tested Officer when a positive test could have resulted from legally prescribed medication. The

COB 0005783

Boston Police Department

Rules and Procedures

RULE 111

MRO shall not, however, consider the results for hair samples that are not obtained or processed in accordance with the procedures set forth herein.

2) Prior to making a final decision to verify a positive test result for an Officer, the MRO shall give the Officer an opportunity to discuss the test result with him. For example, there may be a legitimate positive test result for the use of legally prescribed or dispensed medication such as codeine for coughs, narcotic analgesics for pain, tetrahydrocannobinol for cancer, cocaine as a vasoconstrictive anesthetic, etc. It is important to note that it is highly unlikely that a medically acceptable explanation will be found for the presence of cocaine or marijuana.

3) The MRO shall contact the Officer directly, on a confidential basis, to determine whether the employee wishes to discuss the test result. A staff person under the MRO's supervision may make the initial contact, and a medically licensed or certified staff person may gather information from the employee. Except as provided in Paragraph J(5) of this Section, the MRO shall talk directly with the employee before verifying a test as positive.

4) If after making all reasonable efforts and documenting them, the MRO is unable to reach the Officer directly, the MRO shall contact BII who shall contact the Officer and direct him to contact the MRO as soon as possible. If it becomes necessary to reach the Officer through BII, the Bureau shall employ procedures that ensure, to the maximum extent practicable, that the requirement that the Officer contact with the MRO is held in confidence.

5) The MRO may verify a test result as positive without having communicated directly with the Officer in three circumstances.

   a) If the Officer expressly declines the opportunity to discuss the test result, the test shall be reported as positive.

   b) If BII has successfully made and documented a contact with the Officer and instructed the Officer to contact the MRO and more than five calendar days have passed since the date the Officer was successfully contacted by BII and the Officer has not contacted the MRO, the test shall be reported as positive.

   c) If after making all reasonable efforts and documenting them, BII has not been able to contact the Officer and fourteen calendar days have passed since BII's first documented attempt to contact the Officer, the test shall be reported as positive.

6) The MRO shall report to BII any samples that were not suitable for testing. When BII receives a test result that indicates the hair specimen was an inadequate specimen and/or was not testable for any other reason, BII shall contact the Officer and require him/her to provide another specimen for

COB 0005784

testing provided the collection occurs on or within thirty (30) calendar days of that Officer's birthday.

7) The MRO shall report whether the verified test result is positive or negative to BII. If the MRO, in his/her sole medical opinion, concludes there is a legitimate medial explanation for the positive test result, the MRO shall report the test result as negative to BII.

8) BII shall notify each Officer who receives a positive test result and the provisions of Rule 111 shall apply.

K)   Safety-Net Tests – If an Officer receives a positive, confirmed hair test result, the Officer may request a safety-net test. The safety-net test must be performed under the same or more stringent procedures as recommended by the manufacturer.

1) To request the safety-net test, the Officer must submit a written request to the Commanding Officer, BII within 72 hours of being notified by BII of the positive test result. BII shall notify Occupational Health that a safety-net test has been requested, and Occupational Health shall schedule the safety-net test forthwith. The Officer must pay for the costs of the safety-net test and the MRO review, payable by check made out to the City of Boston at the time of the sample collection.

2) For Officers who have requested a safety-net test, the Department shall immediately place the Officer on administrative duty pending the outcome of the safety-net test. While on administrative duty the Officer shall not carry a firearm and shall not be eligible for overtime or details.

3) If the result of the safety-net test result is negative, the Officer shall be reimbursed for the costs of the safety-net test and the MRO review and shall be made whole, e.g., paid for any overtime or details he/she would have been eligible to perform pursuant to the current collective bargaining agreement. Likewise, said hours shall be recorded and posted pursuant to the current collective bargaining agreement. In addition, the Officer's IAD file shall be expunged of the prior positive test result that led to the safety-net test.

L)   Access and Storing of Test Results - Any Officer who is the subject of a hair test conducted under this procedure shall, upon written request to the Commanding Officer, BII, have access to any and all record(s) relating to his/her hair test result that is/are in the possession of the Department. Such results and records are confidential medical information and shall not be disclosed without the Officer's consent except to the extent necessary to effectuate the purposes of the Department's Substance Abuse Policy. Positive hair test results shall be retained by the Department and processed in the same manner as any violations of Department Rules and Procedures.

COB 0005785

Boston Police Department                                    Rules and Procedures

                                                               RULE 111

_____

M)    Applicability of Rule 111- The hair testing procedures are effective pursuant to
      the collective bargaining agreement. Nothing contained herein alters the current
      Substance Abuse Policy as it relates to other drug/alcohol testing, procedures, or
      requirements, e.g., switching, adulterating or refusing to be tested are prohibited
      by Section IV of Rule 111.

COB 0005786

# Exhibit B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RONNIE JONES, RICHARD BECKERS, WALTER R. WASHINGTON, WILLIAM E. BRIDGEFORTH, SHAWN N. HARRIS, EUGENE WAGE, GEORGE C. DOWNING, JR., CLARARISE BRISTOW, and the MASSACHUSETTS ASSOCIATION OF MINORITY LAW ENFORCEMENT OFFICERS,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF BOSTON, BOSTON POLICE DEPARTMENT, and KATHLEEN O'TOOLE, as she is Commissioner of the Boston Police Department,<br><br>Defendants. | C.A. No. 05-11832-GAO |

**DEFENDANTS' RESPONSES TO PLAINTIFF'S
FIRST SET OF REQUESTS FOR PRODUCTION**

**GENERAL OBJECTIONS**

Defendants object to Plaintiff's first request for production of documents to the extent that it seeks material protected by the attorney-client privilege or work product doctrine. Defendants also object to Plaintiff's first request for production of documents to the extent that it demands that Defendants turn over material already in Plaintiff's possession. Defendants further state that this response is based on Defendants' present knowledge of the facts. Defendants have not completed their investigation into the facts alleged in the action. Therefore, Defendants reserve the right to supplement these responses as additional information and/or documents are uncovered and/or Defendants determine the relevance of information and/or documents already available. Defendants also reserve the right to produce and/or rely on such additional information and documents uncovered or determined to be relevant.

All responses herein are made on an express reservation of the General Objections set forth above and any specific objections set forth below.

## DOCUMENT REQUEST NO. 1:

All documents and communications evidencing, concerning, describing, or referring to the Hair Test, including but not limited to all documents and communications evidencing, concerning, describing, or referring to the following:

(a) the formulation, development, implementation, and administration of the requirement of Boston Police Department Rule 111 that a mandatory annual drug test be performed on hair samples;

(b) the standards, methods, procedures, and criteria to be applied in connection with all aspects of the Hair Test, including the collection, transmission, storage, and testing of the samples; the analysis, confirmation, and reporting of the test results,' and the treatment of and consequences to BPD employees and candidates for employment whose Hair Test results are reported as positive for the presence of illegal drugs;

(c) the standards, methods, procedures, and criteria to be applied in connection with selecting a facility to perform the Hair Test,

(d) discussions and negotiations with the BPD's unions and/or plaintiff MAMLEO concerning the Hair Test, including but not limited to all documents and communications distributed to or by Deputy Superintendent John Sullivan and the City's Labor Relations Department;

(e) the defendants' investigation, evaluation, assessment, and selection of a facility to perform the Hair Test, including the standards, methods, procedures, and criteria to be applied in the collection, transmission, storage, and testing of the samples and the analysis, confirmation, and reporting of the test results;

(f) the scientists, experts, facilities, or employers consulted by the defendants and/or Psychemedics concerning the Hair Test and the defendants' selection of a facility to perform the Hair Test on BPD employees and candidates for employment;

(g) the accuracy and reliability -- or lack thereof — of all aspects of the Hair Test, including the standards, methods, procedures, and criteria to be applied in the collection, transmission, storage, and testing of the samples, the analysis, interpretation, confirmation, and reporting of the test results, and the retention of samples and records after the Hair Test results are reported to the defendants;

2

(h) whether contamination, bias of any kind, sample handling, record keeping, interpretation, or any other factors or phenomena do affect or might affect the results of the Hair Test or the accurate, objective, neutral, and unbiased reporting of Hair Test results, including all documents and communications evidencing or concerning any presentation, discussion, analysis, assessment, or evaluation of potential or actual bias or disparate impact, based upon race or any other factor, related to the Hair Test and all documents and communications evidencing or concerning any discussion, analysis, assessment, or evaluation of alternative drug testing methods with less potential or actual bias or disparate impact than that associated with or related to the Hair Test;

(i) any of the plaintiffs' Hair Tests, Hair Specimens, and/or independent drug tests taken by any of the plaintiffs, including the original or certified true copy of the drug testing custody and control form signed by the individual responsible for the day-to-day management of the drug testing laboratory or the individual responsible for attesting to the accuracy or validity of reports issued in connection with the Hair Test;

(j) the policies, procedures, methods, and standards used by Psychemedics in testing hair samples for the presence of illegal drugs, including whether Psychemedics is licensed, certified, or otherwise authorized by any governmental entity to test hair samples for the presence of illegal drugs, and whether Psychemedics' policies, procedures, methods, and standards comply with the requirements of Boston Police Department Rule 111 and or any applicable government or industry guidelines, standards, rules, regulations, ordinances, or statutes;

(k) any instance in which a Hair Test reported as positive for one or more illegal drugs was deemed to be erroneous or inconclusive as to the question whether the individual had actually ingested any Illegal drug;

(l) the determination of and any changes made to the cut-off levels applicable to the Hair Test, including the Safety Net Test, where "cut-off levels" means the value at which a result on the Hair Test is reported as positive for the presence of illegal drugs and below which a result is reported as negative for the presence of illegal drugs;

(m) any contract, agreement, or other document evidencing, concerning, describing, or referring to the terms of the relationship between Psychemedacs and the defendants, including but not limited to documents concerning the negotiation, drafting, negotiation, or performance of such contracts, agreements, or other documents;

(n) the training and supervision of individuals involved in the collection and transmission of hair samples to Psychemedics; the performance and conduct of

3

the Hair Test and related data collection and record-keeping; and the analysis, interpretation, and reporting of Hair Test Results;

(o) all memoranda or communications concerning any of the foregoing, including but not limited to memoranda or communications to or from (i) Psychemedics, or (ii) any of the defendants, or (iii) any person acting for, on behalf of, at the request of, or in cooperation with Psychemedics or the defendants concerning hair testing, the Hair Test, or any of the plaintiffs.

**RESPONSE**

OBJECTION.        Defendants object to this request on the grounds that it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks materials which are in the possession of the plaintiffs.

Notwithstanding this objection, Defendants shall produce all responsive information in their possession, custody or control.

**DOCUMENT REQUEST NO. 2:**

All documents and communications concerning the Rehabilitation Agreement, as described in Boston Police Department Rule 111, including the policies and purposes served by the Rehabilitation Agreement.

**RESPONSE**

OBJECTION.        Defendants object to this request on the grounds that it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks materials which are in the possession of the plaintiffs.

Notwithstanding this objection, Defendants shall produce all responsive information in their possession, custody or control.

**DOCUMENT REQUEST NO. 3:**

All documents sufficient to show -- year by year -- the race, hair color, rank, years of service, department or deployment, Hair Test results (including for positive results, the illegal drug reported as present), and employment status of BPD personnel or candidates for employment during the relevant time period, including whether the employee signed a Rehabilitation Agreement, as described in Boston Police Department Rule 111.

**RESPONSE**

OBJECTION.        Defendants object to this request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

Notwithstanding this objection, Defendants shall produce all responsive information in their possession, custody or control.

## DOCUMENT REQUEST NO. 4:

All documents and communications evidencing, concerning, describing, or referring to the process and procedures used by the BPD in making employment decisions concerning BPD employees or candidates for employment who reportedly tested positive on the Hair Test, including all evidence and factors considered in making such decisions.

**RESPONSE**

OBJECTION.        Defendants object to this request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

Notwithstanding this objection, Defendants shall produce all responsive information in their possession, custody or control.

## DOCUMENT REQUEST NO. 5:

All documents sufficient to identify the particular facilities and persons involved in the Hair Tests performed on samples taken from the plaintiffs, including the location of sampling, storage, and testing facilities; the names, affiliations, employment status, and whereabouts of all persons who collected, handled, transmitted, tested, processed, prepared, or analyzed plaintiffs' Hair Specimens, and all persons who were involved in record keeping, data collection, analysis, interpretation or reporting of test results.

**RESPONSE**

OBJECTION.        Defendants object to this request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

Notwithstanding this objection, Defendants shall produce all responsive information in their possession, custody or control.

**DOCUMENT REQUEST NO. 6:**

> All documents and communications concerning the identity, qualifications, employment status, and employment history of the Medical Review Officer(s) who provided services to the defendants in connection with the Hair Test during the relevant time period.

**RESPONSE**

OBJECTION.          Defendants object to this request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

Notwithstanding this objection, Defendants shall produce all responsive information in their possession, custody or control.

**DOCUMENT REQUEST NO. 7:**

> All documents and communications evidencing, concerning, describing, or referring to complaints, grievances, petitions, or lawsuits concerning the Hair Test, hair drug testing in general, or drug testing performed by Psychemedics.

**RESPONSE**

OBJECTION.          Defendants object to this request on the grounds that it is overly broad,  unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

Notwithstanding this objection, Defendants shall produce all responsive information in their possession, custody or control.

**DOCUMENT REQUEST NO. 8:**

> All documents and communications evidencing, concerning, describing, or referring to Psychemedics' Standard Operating Procedures.

**RESPONSE**

OBJECTION.          Defendants object to this request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.  Defendants further object as the materials sought, to the extent the materials are in the Defendants' possession, are subject to a protective order in another proceeding and therefore Defendants are not at liberty to produce the requested materials.

**DOCUMENT REQUEST NO. 9:**

All documents and communications concerning the plaintiffs, including but not limited to the complete Personnel File for each plaintiff all documents and communications evidencing or concerning drug tests administered to the plaintiffs at any time, all documents and communications evidencing or concerning any investigation of any of the plaintiffs at any time; and all documents, communications, or memoranda to or from (i) Psychemedics, or (ii) any of the defendants, Or (iii) any person acting for, on behalf of, at the request of, or in cooperation with Psychemedics or the defendants concerning any of the plaintiffs.

**RESPONSE**

OBJECTION.        Defendants object to this request on the grounds that it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks materials which are in the possession of the plaintiffs.

Notwithstanding this objection, Defendants shall produce all responsive information in their possession, custody or control.

**DOCUMENT REQUEST NO. 10:**

All documents and communications evidencing, concerning, describing, or referring to any evidence, including witness statements, tending to support the allegations and claims asserted in plaintiffs' complaint, as amended.

**RESPONSE**

OBJECTION.        Defendants object to this request on the grounds that it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks materials which are in the possession of the plaintiffs.

Notwithstanding this objection, Defendants shall produce all responsive information in their possession, custody or control.

**DOCUMENT REQUEST NO. 11:**

All documents and communications evidencing, concerning, describing, or referring to any evidence, including witness statements, that defendants contend support their defenses to the allegations and claims asserted in plaintiffs' complaint, as amended.

7

**RESPONSE**

OBJECTION.    Defendants object to this request on the grounds that it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks materials which are in the possession of the plaintiffs.

Notwithstanding this objection, Defendants shall produce all responsive information in their possession, custody or control.

**DOCUMENT REQUEST NO. 12:**

Samples of the Hair Specimens taken from each of the plaintiffs sufficient in size to allow for both DNA and drug testing to be performed on the samples produced.

**RESPONSE**

There are no materials responsive to this request in the Defendants' possession.

**DOCUMENT REQUEST NO. 13:**

To the extent not otherwise requested above, all documents and communications identified in your responses to the Plaintiffs First Set of Interrogatories.

# Exhibit C

Hair Drug Testing: Fact vs. Fiction

Since the introduction of hair drug testing in January of 1999, the Department has conducted over 6,804 hair tests on samples provided by police officers. Only forty-five officers have tested positive in that time, out of the approximately 2,200 sworn officers who have been tested annually. That is less than 2% of all officers: a rate below the national average. However, since the Department continues to get questions about hair testing, you'll find a brief list of the most frequently asked questions about the Department's drug-testing procedures and policies listed for your reference below.

**Background:**
Together the unions and the Department share a joint desire to achieve and maintain a work force that is 100% drug-free. The sworn unions and the Department agreed to reach this goal through fair, reasonable, and objective testing procedures. During negotiations, the Department proposed an annual hair drug test in response to the Boston Police Patrolmen's Association's (B.P.P.A.) opposition to random urine testing. Hair testing can detect drug use for a longer time period, is harder to adulterate, and is less invasive than urine testing. Both the Department and the union had an opportunity to examine and discuss various issues, such as the scientific validity of the testing methods, time frames for drug detection and the concerns for bias or inaccurate test results. In July 1998, the Department reached agreement with the B.P.P.A and the annual hair test was added to the collective bargaining agreement. The other sworn unions negotiated the annual hair test, which ultimately became a part of their contracts through subsequent interest arbitration awards.

**1. Why does the Department use Psychemedics' laboratory to conduct hair tests?**
Psychemedics is the premier hair testing laboratory for hair tests of employees. It conducts more hair tests than any other laboratory in the world. The Psychemedics laboratory is the only lab in the United States to be approved by the FDA to conduct hair analysis drug testing for the five illicit drugs that we test for under Rule 111 (Cocaine, Methamphetamine, Opiates, PCP and Marijuana).

Psychemedics conducts hair testing for over 1,600 Fortune 500 companies and numerous major metropolitan police departments including: New York City, Chicago, Philadelphia, Minneapolis, San Francisco and Las Vegas.

Psychemedics has conducted well over two million hair drug tests. Because it conducts so many hair tests, Psychemedics' procedures and technology have been heavily challenged and have consistently been upheld in every court in which they have been challenged. Furthermore, every arbitration case the Department has defended has found the testing to be a fair, reasonable, and objective hair analysis test. For copies of the arbitration decisions regarding

drug testing, please contact Alicia McDonnell in the Legal Advisor's Office at 343-5037. For more information about Psychemedics' laboratory, visit www.psychemedics.com

**2. What is the process used for testing hair for drugs?**
Collection: The Department personnel that collect the hair samples are specially trained to follow a specific protocol to collect a sufficient quantity of hair to be tested at Psychemedics. The protocol has stringent chain-of-custody procedures, and the hair collectors have been well trained on how much hair is needed, and the specific areas from which the hair should be collected (head, nape of neck, face, etc.). The officer having his/her hair collected cannot dictate the amount of hair collected, or the collection location. (See Rule 111, Appendix D for collection, testing and reporting procedures.).

Note: The medical staff personnel who collect the hair samples do so professionally and diligently. They do not have the authority to deviate from the collection protocols. Further, they are not there to debate the hair collecting process or the testing methodology. Failure to submit to an annual hair test under the procedures dictated by the medical staff may be considered a refusal to be tested and will result in appropriate discipline. Officers who have questions or concerns about their collection should not address them to the medical staff but to their union or the Bureau of Internal Investigations.

**Testing:** Once Psychemedics receives the hair sample, the chain-of-custody is confirmed. Then, the sample is decontaminated through a multi-stage washing process. The hair sample is then divided into several smaller hair samples to allow for screening and confirmation testing. The first portion of the sample is digested into a liquid state. The digested sample is then subjected to a Radioimmunoassay (RIA) test, which is a screen test to detect the presence of the five drugs.

If the RIA test indicates the presence of one or more drugs, another portion of the hair sample is then digested and subjected to a more accurate test, Liquid Chromatography Mass Spectrometry Mass Spectrometry (LC/MS/MS) or GC/MS, which confirms the presence of the drug screened by the RIA.

If the LC/MS/MS or GC/MS test results indicate the presence of a drug above the cut-off level, the test is deemed positive and Psychemedics forwards the test results to the Medical Review Officer (MRO). (See Rule 111, Appendix D, Section J). To learn more about hair drug testing, visit: www.drugtestwithhair.com.

*Cutoff levels.* All drugs are screened at a specific cutoff level. The cutoff level is established by the laboratory and industry standards, and ensures that low levels of drugs from external or passive contamination will not result in a positive drug test. The cutoff levels are different for each drug and for each type

of scientific test, e.g., the RIA versus LC/MS/MS or GC/MS.

### 3. What/Who is a MRO?

The Medical Review Officer (MRO) is an independent doctor who reviews all positive drug test results. An MRO is a licensed physician who has knowledge of substance abuse disorders and medical training to interpret and evaluate a positive test result relative to the donor's medical history.

After the laboratory conducts a drug test that is positive, it sends the results directly to the MRO, not the Department. The MRO then reaches out to the donor and asks about any alternative medical explanation for the positive drug test result.

If the donor has a valid, medical reason for the presence of drugs in his/her system, e.g., a valid prescription drug, then the positive result is reported as a negative to the Department. If the donor does not have a legitimate alternative medical reason, the test is reported as positive (See Rule 111, Appendix D for more detailed information).

### 4. Can I test positive from external or environmental contamination or exposure to drugs?

No. There are two different ways that an individual could potentially have a positive drug test from external or environmental contamination:
1) from passive inhalation (inhaling marijuana or crack smoke that is smoked by someone else), or
2) by having the drug on the outside of your hair, (handling cocaine and then touching your hair).
The Psychemedics tests address both these potential problems.

For external contamination, (having drugs on your hair) Psychemedics has an elaborate "washing" process, which includes washing the hair sample multiple times and testing the wash water for the presence of drugs before any testing on the hair sample begins.

A recent study by the University of South Florida of police officers in the Narcotics Unit of the Miami/Dade County Police Department illustrates this process well. It found that although each narcotics officer's hair was *externally contaminated* with cocaine, as shown through the hair washing process, *none* of the officers had positive test result for cocaine or any other illegal narcotic. This holds true for our Department as well, as no police officer in either the Drug Control Division or the Youth Violence Strike Force has tested positive for drugs.

For passive inhalation concerns, the cutoff levels used by Psychemedics are set high enough to prevent problems with passive inhalation. To test above a

cutoff level, the donor must have engaged in repeated drug use prior to the hair collection date. One time exposure will not result in a positive drug test.

**5. Is there a race bias in hair testing?**
No. There is a misguided theory that race is a factor in drug testing results, and that it could possibly cause a positive drug test result. This theory is scientifically invalid, and has mis-characterized the original theory regarding hair color.

A few scientifically flawed, early studies proposed that dark hair (not specific to any particular race) has more melanin than lighter hair. This rate of melanin was thought to have resulted in longer detection times. Therefore, it was argued, individuals with dark hair would test positive more frequently than those with lighter hair because the drug stays in the hair longer.

This hair color theory never suggested that melanin *caused* positive drug tests. Rather, the theory suggested that drugs that had been *ingested* would remain in dark hair longer than those with lighter hair color.

Subsequently, this hair color theory has been repeatedly and categorically disproved by large-scale, scientifically valid studies. Hair color or the amounts of melanin present have both been shown to have no effect on the outcome of a drug test. Copies of these studies are available in the Office of the Legal Advisor at Headquarters by calling Alicia McDonnell at 343-5037.

**6. If I am taking prescription medications, will I test positive for illegal drugs?**
On the "test request form" that is used during the sample collection there is a section for a donor to provide information that goes only to the MRO. The donor is asked to put a telephone number where he/she can be reached. In this box, the donor can also list any medications he/she believes may affect the drug test. If you are taking a legally prescribed and dispensed medication that results in a positive test result, the MRO will report the test as a negative to the Department. However, there is virtually no valid medical explanation for a positive cocaine or marijuana test result. (See Rule 111, Appendix D).

**7. What is a Safety-Net test?**
The safety-net test is a test that an officer can request if he/she has a positive test result. It must be requested in writing within 72 hours of receiving notification of the positive test. This is not a complete re-test or another chance. Rather, it is a test to confirm that no mistake was made with the donor's hair sample. Another hair sample is taken, and the laboratory conducts a more stringent test, using lower cutoff levels. The officer pays for the test and the MRO review unless the test is negative, in which case the Department will pay for the test. Also, the Department will expunge the officer's IAD file of the

positive test result. (See Rule 111, Appendix D).

**8. What are the consequences of testing positive for illegal drugs?**
Drug testing is intended, in part, as a means of identifying those officers who need help. The Department's drug testing policy is intended to be humanitarian, combining both treatment and discipline for a first time offense. This Department is one of just a few police department in the country that offers an officer a second chance to keep his/her job after testing positive for illegal drugs, thereby minimizing the financial impact on the family and preserving a valued member of the Department.

Every officer that tests positive for the first time, if there are no other violations pending, is given the opportunity to accept the settlement/rehabilitation agreement, which includes a 45 working day suspension and participation in a treatment program. The officer is also subject to unannounced urine testing for three years to monitor the officer's recovery progress. If an officer refuses the settlement/rehabilitation agreement or tests positive a second time, termination is the only appropriate discipline. There is simply no room in the Department for an officer that continues to use illegal drugs.

@2005 Boston Police Department.All rights reserved.

# Exhibit D

**Baker, Robert B.**

| | |
|---|---|
| From: | Harris, Mary Jo [mharris@morganbrown.com] |
| Sent: | Friday, November 17, 2006 4:33 PM |
| To: | Baker, Robert B. |
| Subject: | Baker re disc conference |

Attachments:      Baker re disc conference.doc



Baker re disc
conference.doc (...
                Please see attached.


This communication is intended for the named recipient's attention only, and may be
communication covered by the attorney client privilege.  If you are not the named
recipient, you are advised that you may have received this message in error and are asked
to return it immediately to the sender at the address below.

Mary Jo Harris
Morgan, Brown & Joy, LLP
200 State Street
Boston, MA 02109-2605
(617) 788-5011

 <<Baker re disc conference.doc>>

November 17, 2006

**By Electronic Mail**
**And First Class Mail**

Robert Baker, Esq.
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110

      Re:    Ronnie Jones, et al v. City of Boston, et al
              <u>Civil Action No. 05-11832-GAO</u>

Dear Robert:

I write to follow up on our discovery conference of November 3, 2006.

With regard to your request for data on all officers' hair tests from the inception of the hair drug test policy (including, as I understand your request, results for positive as well as negative tests, along with date of test, age, race, and assignment of employee, and residential neighborhood of employee), please be advised that the City will continue to object to this request on the grounds that it is overly broad and unduly burdensome. I am informed that in order to produce information responsive to your request, the personnel and medical files of each officer employed since 1999 would have to be hand searched, and within each file, would need to be cross referenced to match assignment and residential neighborhood with the date of each test. I estimate that this would require review of some 5,000 files (personnel and medical files are maintained separately) and that each review would take approximately 30 minutes. Thus, my objection.

I have reviewed your proposed changes to the confidentiality agreement, and have no objection to the changes you propose. Please forward an executed copy and I will provide you with the internal affairs files relative to your clients.

With respect to documents related to initial positives followed by negative safety net tests, I am awaiting confirmation from the BPD as to whether those materials still exist. If they do exist, I will forward same to you as a supplemental production, subject to the confidentiality agreement.

With regard to Interrogatory 2(a) and (b), please be advised that I will supplement production with a memorandum authored by William Murphy of the Office of Labor Relations containing the information sought. Please be advised that this memorandum is being produced because it relates to policy development, and any legal

Robert Baker, Esq.
November 17, 2006

Page 2

advice will be redacted prior to production.  Defendants expressly do not waive any attorney client privilege by producing this document.

With regard to Interrogatory 2(i), please be advised that materials produced have been collected from the City Office of Labor Relations, the BPD Office of Labor Relations, Occupational Health, and the Legal Advisor's Office.

With regard to Interrogatory 13, I confirm that Drs. Benjamin Hoffman and Carl Selavka have been used in prior litigation by the City as expert witnesses.

Please be advised that signed, supplemental interrogatories will be forwarded to you, and that Bates numbers for expert transcripts will be provided.  I am coordinating with Helen Litsas, of the City Law Department, who has been on trial since last week, and will finalize this response as soon as possible.

Sincerely,


Mary Jo Harris


cc:    Helen Litsas, Esq.

# Exhibit E

## Baker, Robert B.

| | |
|---|---|
| **From:** | Harris, Mary Jo [mharris@morganbrown.com] |
| **Sent:** | Monday, December 18, 2006 6:29 PM |
| **To:** | Baker, Robert B.; Webster, Raquel J. |
| **Cc:** | Buckley, Margaret; Litsas, Helen |
| **Subject:** | update |

Hi Robert, Raquel –

I have Al Goslin available for deposition on Jan 8 (he is traveling for most of the month), so please advise if this date will work for you. I am waiting for confirmation from Roberta Mullan and believe that for Labor Relations issues, the most knowledgeable person would be Michael Reagan, the prior director of OLR. I have asked him for his availability, and will get that for you asap.

The documents I've referenced as strength reports (snapshots of positive/negative results) appear in the exhibits of some MCAD filings (for example, Bridgeforth's filings), and I believe that you have these (so did not produce again). I'd also direct you to bates numbers 7026 and following; I believe these documents reflect the dept's response to the union's requests for breakdown on the test results from its inception. Please let me know what else you are looking for.

I will stipulate regarding the statistics (that we will not contest the assumption that every sworn employee listed in the strength reports were subjected to the hair drug test, and that one can assume that all officers who did not get reported as positive received negative drug test results. In making this stipulation, I would be doing so with the caveat that testing negative does not mean that one is not using drugs (as one may have tested positive below the cut off), but simply that the Department has not received any positive result from Psychemedics.

As to the confidentiality agreement, I apologize if you are waiting for me – I assumed you would add my name (as an electronic signature) and file with the court. Please let me know if you'd like me to have an actual signature page messengered to you.

I am informed that the email search is complete; and I'm having the BPD produce an affidavit from the IT person outlining the retention policy, search items and users. I'll send to you when I receive it.

FYI, the dates that I'll be available for deposition (and that you've offered) in January are 5, 8, 11, 23. I hope we can fit the 3 dept witnesses into this space.

Thanks,

Mary Jo

**Mary Jo Harris**

Morgan, Brown & Joy, LLP
200 State Street
Boston, MA 02109

Phone: (617) 788-5011 (direct)
Phone: (617) 523-6666 (general)
Fax: (617) 367-3125
mharris@morganbrown.com

MORGAN, BROWN & JOY, LLP

www.morganbrown.com
Bio | vCard

This email and any attachments are confidential, subject to the attorney-client and work product privilege and are intended only for the named addressee(s). If you are not a person to whom this e-mail was intended to be addressed, please disregard it and delete it from your computer system. Any unauthorized dissemination, distribution or copying of this communication is strictly prohibited.

# Exhibit F

*BPD corresp*

BI..GHAM McCUTCHEN

Robert B. Baker
Direct Dial: (617) 951-8873
robert.baker@bingham.com

January 22, 2007

**VIA FACSIMILE AND FIRST-CLASS MAIL**

Bingham McCutchen LLP
150 Federal Street
Boston, MA
02110-1726

617.951.8000
617.951.8736 fax

bingham.com

Boston
Hartford
London
Los Angeles
New York
Orange County
San Francisco
Silicon Valley
Tokyo
Walnut Creek
Washington

Mary Jo Harris
Morgan Brown & Joy LLP
200 State Street
Boston, MA 02109-2605
Facsimile: (617) 367-3125

**Re:    Jones, et al. v. City of Boston, et al., Case Number 05-11832**

Dear Ms. Harris:

I write to follow-up on several issues concerning defendants' document production. Please treat this as a communication pursuant to Local Rule 7.1(a)(2).

**Marisela Perez's January 8, 2007 Deposition And Defendants' January 17, 2007 Document Production And**

As background, during the deposition of Marisela Perez, Ms. Perez referred to documents that the defendants had not previously produced. The defendants also waited until the middle of Ms. Perez's deposition to produce the document that was marked as Perez Exhibit 8. As noted on the record during Ms. Perez's deposition, plaintiffs reserved their right to recall Ms. Perez in the event that defendants uncovered additional documents that plaintiffs would need to ask Ms. Perez about.

Defendants hereby assert their previously reserved right to resume Ms. Perez's deposition. Some of the documents in defendants' January 17th document production (and perhaps all of the documents in this production) appear to be from Ms. Perez's files. The document production also includes several documents concerning positive hair test statistics that plaintiffs would have asked Ms. Perez about had we received them before her deposition.

Particularly given that Ms. Perez testified that she prepared for her deposition with her attorneys on two occasions for a total of four hours, we cannot understand why defendants waited until the middle of Ms. Perez's deposition to produce key documents concerning her testimony and then, after the deposition, produced documents highly relevant to her deposition.

We would like to resume the Perez deposition sometime in March or April, in accordance with our proposal regarding the scheduling of future depositions, discussed below. If the

Mary Jo Harris
January 22, 2007
Page 2

defendants object to resuming Ms. Perez's deposition, plaintiffs will move for an order to compel the deposition. Plaintiffs would also seek their attorneys' fees and costs incurred in connection with the motion, and as a result of being forced to depose a fact witness twice.

We hope that defendants will not continue the practice of producing documents relevant to a particular witness immediately before, during, or after that witness's deposition, as it forces the plaintiffs to incur needless expenses. If this happens again, plaintiffs will move for sanctions.

Bingham McCutchen LLP

bingham.com

### Other Issues Concerning Defendants' January 17th Document Production

Your cover letter for this production states that the defendants have identified several publications concerning the hair test in the defendants' possession, but that the defendants will not produce these documents because they are equally accessible to plaintiffs. When I called you to inquire as to whether the articles in defendants' possession contain handwriting and who they belonged to, you told me that the articles were from Ms. Perez's files. We were able to obtain all but one of the articles, which was identified as Mandatory Guidelines for Federal Workplace Drug Testing Program, 2001 WL 9378869. This Westlaw citation does not appear to exist. Please produce this document.

Next, defendants' January 17th document production heightens plaintiffs' concern that defendants have not produced all of the responsive electronic documents in their possession custody or control. Many of the documents appear to be from computer files accessible to Ms. Perez, including, but not limited to, several unsigned interoffice memoranda without Boston Police Department letterhead. For example, 0036152-54 appears to be a computerized printout of a signed interoffice memorandum on police department letterhead previously produced at 0006245-47. From the document productions to date, it is far from clear that defendants have made a diligent effort to gather and produce all responsive electronically stored documents in their possession.[1] Therefore, plaintiffs require some affirmation from defendants regarding defendants' efforts to gather and produce electronic documents, including, but not limited to, what electronic files are accessible, whose electronic files have been searched, what electronic files have been searched, and what the search for responsive electronic files has entailed (i.e., when a particular electronic file is searched, defendants should describe what they have done to ensure that all responsive electronic documents in the file are located).

---

[1] On a related topic, I note that plaintiffs are still awaiting defendants' production of any and all versions of the "Hair Drug Testing: Fact v. Fiction" document from defendants' internal website. Both former Commissioner Evans and Roberta Mullan alluded to such a document during their depositions. It strains credulity to believe that this document does not exist either in an electronic file of historical documents posted to the Police Department's internal webpage or in the electronic file(s) of the person(s) who created it.

Mary Jo Harris
January 22, 2007
Page 3

Finally, the document numbered 0036015-22 sets forth procedures for creating electronic files concerning the hair test. If such procedures were ever followed, there should be extensive electronic files in defendants' possession concerning hair test results. All of these documents should have already been produced. Please confirm that all of these documents have been produced and identify the bates numbers for this production. If these documents have not been produced, please produce them immediately.

### Defendants' Production of Emails

On January 4, 2007, you produced the "Affidavit of John E. Boyle" dated December 27, 2006 that concerns defendants' efforts to gather and produce responsive e-mail communications. Upon review of Mr. Boyle's affidavit, plaintiffs have several questions and/or concerns about defendants' efforts to gather and produce e-mail.

First, Mr. Boyle's affidavit states "I would first do a restore going back three months because that was our retention period." According to Mr. Boyle's affidavit, he did not begin this restoration until at least October 2006. Given that the plaintiffs' complaint was filed in July 2005, this raises serious spoliation concerns. Therefore, plaintiffs request that defendants immediately confirm whether and when any litigation holds were put on documents concerning the hair test, along with a complete description thereof. Because the defendants' hair test has been extensively litigated in prior disputes with defendants' current and former officers and their unions, this request covers any instruction to defendants' employees not to destroy documents concerning the hair test in connection with any dispute concerning the hair test.

Second, Mr. Boyle's affidavit states, "I then used the advanced find feature under tools and searched the subject field and message body for the following words: hair testing, hair drug testing, MAMLEO (Massachusetts Association of Minority Law Enforcement Officers), Psychemedics, Psychemedics Corporation." This raises three serious concerns. First, defendants have evidently done nothing to search email attachments for responsive documents. Please confirm that this is the case, and, if so, please produce all email attachments responsive to defendants' document requests as soon as possible. Second, these search terms do not constitute a diligent effort to gather responsive email communications. Defendants have never articulated why they chose to use search terms instead of reviewing all email for responsiveness. To the extent defendants are using search terms to assist in their review, the terms should include: the last names of all of the individual plaintiffs, MAMLEO, hair, urine, specimen, test, testing, drug, race, racial, bias, color, Psychemedics, the last names of all Psychemedics' representatives who have communicated with anyone employed by defendants or defendants' Medical Review Officer, Psychemedics' email addresses, the current and former corporate names of defendants' Medical Review Officer, the last names of all employees of defendants' Medical Review Officer, and the last names of anyone defendants' have ever consulted with concerning the hair test (e.g. Dr. Carl M. Selavka). Finally, to the extent defendants communicated with any third-party concerning the hair test (e.g., the M.R.O., Psychemedics, Dr. Selavka, etc.), all emails to or from these individuals should be reviewed for responsiveness regardless of search terms.

Bingham McCutchen LLP
bingham.com

Mary Jo Harris
January 22, 2007
Page 4

Next, Mr. Boyle's affidavit states that he only searched email files for nine of defendants' current or former employees. At a minimum, defendants should restore and review all emails for any of defendants' current or former employees identified in defendants' initial disclosures, any of defendants' current or former employees identified in defendants' responses to plaintiffs' first set of interrogatories, and any of defendants' current or former employees covered by plaintiffs' deposition notices.

Bingham McCutchen LLP
bingham.com

Finally, Mr. Boyle's affidavit states that he "pulled all the messages related to these topics... [and] then exported the messages to a .pst file. I then went to Margaret[] [Buckley's] desk and imported the files so that she could view and print them." Please confirm that all of these emails have been produced. Also, plaintiffs request that defendants produce the .pst file of responsive email. There is no added cost to defendants in producing documents in this format and it will lessen plaintiffs' costs of putting defendants' document productions into an electronic database.

### Other Miscellaneous Issues Concerning Defendants' Document Production

First, in your letter dated November 20, 2006, you stated you would be producing a memorandum authored by William Murphy. On December 28, 2006, I sent you an email inquiring when defendants would be producing this document. Please produce this document as soon as possible.

Second, in my December 28th email to you, I noted that there are several bates-range gaps in the defendants' document productions and in the indices to defendants' productions. I asked that you confirm that there are no responsive documents withheld in these gaps, or, if there were documents withheld, what those documents are and why they were withheld. I am concerned that some or all of these gaps may be documents that defendants think the plaintiffs already have in their possession from a prior dispute concerning the hair test. If this is the case, please produce an index of such documents so that plaintiffs can be certain they have all of the documents they are entitled to. In any event, please address this issue as soon as possible.

Third, as I noted in my December 28th email to you, we never received a copy of the document COB 000296, which is identified on defendants' document production indices. We also never received COB: 5173, 5384-5399, 5618-5735, 6516-6517, 7875-7876, 22680-22800, 23941-23981, 24040-24293, 25083, 26643-26652, 26872, 27331-27332, 27888, 29493, 29540-29545, 29568, 31304, 32411, 32455, 32684, 33084, and 33468-33469, which are identified on defendants' document production indices. Please produce these documents as soon as possible.

Fourth, defendants' response to interrogatory 2(c) refers plaintiffs "to documents produced at Bates stamp number 26643 *et seq.*" Defendants never produced a document numbered 26643, nor is such a document identified on the indices to defendants' document productions. Please produce the documents referred to at response to interrogatory 2(c) as soon as possible.

Mary Jo Harris
January 22, 2007
Page 5

Fifth, I requested in my December 28th email to you that the defendants remove all redactions from previously redacted document and/or produce a log explaining what information was redacted. We are still awaiting a response to this request. Moreover, in defendants' document productions after December 28th, defendants continue to redact information without any explanation for the redactions. Please address this concern from by December 28th letter immediately.

Finally, in my December 28th email to you, I requested that plaintiffs produce an updated privilege log. Please produce an updated privilege log as soon as possible.

Bingham McCutchen LLP

bingham.com

### Scheduling of Future Depositions in Light of Issues Concerning Defendants' Document Production

As I noted above, in light of the problems raised by defendants' belated production of documents concerning Ms. Perez, plaintiffs have serious concerns about taking future depositions of defendants' fact witnesses without the benefit of all responsive documents in defendants' possession that plaintiffs requested almost a year ago. Defendants are prepared to go forward with the currently scheduled depositions of Messrs. Dowd and Dunlap, but I would first like some assurance from you that defendants will not be producing additional documents concerning Messrs. Dowd and Dunlap immediately before, during, or after their depositions. For the depositions that the parties have noticed, plaintiffs would prefer not to go forward with these depositions until the discovery issues above have been addressed. I think it is reasonable for defendants to address all these issues by the end of February and then to begin scheduling depositions again for March and April. Please let me know if you disagree.

Very truly yours,

Robert B. Baker

cc:    Rheba Rutkowski, Esq.
       Raquel J. Webster, Esq.
       Nadine Cohen, Esq.
       Maricia Woodham, Esq.
       Renee Jenkins

# Exhibit G

## Baker, Robert B.

| | |
|---|---|
| **From:** | Harris, Mary Jo [mharris@morganbrown.com] |
| **Sent:** | Tuesday, May 08, 2007 11:20 AM |
| **To:** | Baker, Robert B. |
| **Cc:** | Murati Ferrer, Nicole; Rutkowski, Rheba; Webster, Raquel J.; Heining, Eric A. |
| **Subject:** | RE: Jones |

Robert,

I cannot agree to produce materials relating to every drug test that has resulted in positive test results from 1999 to the present. I understand from your message that you intend to move to compel, and consider your message to be a conference within the meaning of local rule 7.1.

Mary Jo

**Mary Jo Harris**

Morgan, Brown & Joy, LLP
200 State Street
Boston, MA 02109

Phone: (617) 788-5011 (direct)
Phone: (617) 523-6666 (general)
Fax: (617) 367-3125
mharris@morganbrown.com

MORGAN, BROWN
& JOY, LLP

www.morganbrown.com
Bio | vCard

This email and any attachments are confidential, subject to the attorney-client and work product privilege and are intended only for the named addressee(s). If you are not a person to whom this e-mail was intended to be addressed, please disregard it and delete it from your computer system. Any unauthorized dissemination, distribution or copying of this communication is strictly prohibited.

**From:** Baker, Robert B. [mailto:robert.baker@bingham.com]
**Sent:** Tuesday, May 08, 2007 10:32 AM
**To:** Harris, Mary Jo
**Cc:** Murati Ferrer, Nicole; Rutkowski, Rheba; Webster, Raquel J.; Heining, Eric A.
**Subject:** RE: Jones

Mary Jo,

If overbreadth is your objection, please advise of any alternatives for providing the information plaintiffs' experts need for their analysis. If defendants are unwilling to provide the requested information, plaintiffs will need to file a motion to compel. Given the basis for your objection thus far, plaintiffs will also seek their costs for such a motion.

To answer your question, the requested material is necessary because document 0035999-0036000 contains incomplete and unclear information. Neither the defendants' keeper of the records for the drug tests nor any other witness has been able to clarify this information. For example, it is unclear: 1) who on the list at 0035999-0036000 took both an initial test and a safety net test; 2) how much of the drug was found on the initial test and, if applicable, a safety net test; 3) the date a sample was taken (either for an initial test or a safety-net test); and 4) what the result of a safety-net test was. Our disparate impact and science experts will need to consider this data as part of their analysis of a variety of issues.

Given the importance of this case and the relevance of the requested information, I cannot imagine why the production of about 500 pages of paper that will merely clarify unclear information in a summary document previously produced would impose an undue burden on the defendants. Please advise whether defendants

continue to object to the production of these documents. If so, plaintiffs will move for an order compelling production and seek their costs for doing so.

Very truly yours,

Robert B. Baker
Bingham McCutchen
150 Federal Street
Boston, MA 02110
Tel: (617) 951-8873
Fax: (617) 951-8736
E-Mail: robert.baker@bingham.com

---

**From:** Harris, Mary Jo [mailto:mharris@morganbrown.com]
**Sent:** Monday, May 07, 2007 2:06 PM
**To:** Baker, Robert B.; Webster, Raquel J.
**Cc:** Murati Ferrer, Nicole
**Subject:** Jones

Hi Robert and Raquel.

I have your request for drug test information for all BPD officers, per your email to me of April 30, 2007. I believe this request is overbroad. We have provided you with the drug test information for your clients, as well as for the "safety net negative" officers. I do not think it is reasonable to request that the City provide you with data for another hundred or so drug tests. Please let me know if you disagree and if so, let me know why you believe this material is necessary.

I am checking with the Department as to the records for ▉▉▉ and ▉▉▉ I believe that all records with regard to these officers in the Department's possession have been produced but will confirm that with you.

Mary Jo

Mary Jo Harris

Morgan, Brown & Joy, LLP
200 State Street
Boston, MA 02109

Phone: (617) 788-5011 (direct)
Phone: (617) 523-6666 (general)
Fax: (617) 367-3125
mharris@morganbrown.com

MORGAN, BROWN
& JOY, LLP

www.morganbrown.com
Bio | vCard

This email and any attachments are confidential, subject to the attorney-client and work product privilege and are intended only for the named addressee(s). If you are not a person to whom this e-mail was intended to be addressed, please disregard it and delete it from your computer system. Any unauthorized dissemination, distribution or copying of this communication is strictly prohibited.

---

Bingham McCutchen LLP Circular 230 Notice: To ensure compliance with IRS requirements, we inform you that any U.S. federal tax advice contained in this communication is not intended or written to be used, and cannot be used by any taxpayer, for the purpose of avoiding any federal tax penalties. Any legal advice expressed in this message is being delivered to you solely for your use in connection with the matters addressed herein and may not be relied upon by any other person or entity or used for any other purpose without our prior written consent.

6/11/2007

# Exhibit H

AFFIDAVIT OF JOHN E. BOYLE

I, John Boyle, do hereby depose and state as follows:

1.      I have been employed by the Boston Police Department for over 5 years. I
am presently a Network Administrator assigned to the Information Systems
Group.

2.      My duties include maintaining the security of the network, maintaining back-
up of the servers, maintaining data integrity and conducting e-mail administration.

3.      In October, 2006, I was instructed by Margaret M. Buckley, Staff Attorney,
Office of the Legal Advisor, to conduct a search for any and all e-mail documents
in connection with: Psychemedics, MAMLEO, hair drug testing and drug testing
for the following present and former employees:

Former Police Commissioner Kathleen M. O'Toole

Former Police Commissioner Paul F. Evans

Acting Police Commissioner Albert Goslin

Deputy Superintendent Marie Donahue

Sergeant Marisella Perez

Retired Sergeant Joseph Devlin

Roberta Mullan

Former Labor Attorney Sandra DeBow

Edward Callahan and Christopher Fox [1]

4.      I conducted the search as follows:

I first received approval from Margaret Buckley to go into the user's mailbox.  I would first do a restore going back three months because that was our retention period. As long as the message was saved at least one night I was able to retrieve the message. Messages that were never deleted would already be there and I found them also.  I then went to the Exchange Server and logged on as the Administrator.  The Administrator account has rights to everyone's mailbox.  I then created a profile under Microsoft Outlook of the user that I wanted to search.  Once I created the profile, I opened up their mailbox.  I then used the advanced find feature under tools and searched the subject field and message body for the following words:  hair testing, hair drug testing, MAMLEO (Massachusetts Association of Minority Law Enforcement Officers), Psychemedics, Psychemedics Corporation.  This pulled up all the messages related to these topics.  I then exported the messages to a .pst file.  I then went to Margaret's desk and imported the files so that she could view and print them.

5.      I further state that I exhausted all available sources within the Boston Police Department computer systems in retrieving these documents.


SIGNED THIS _27th_ DAY OF _Dec._, 2006, UNDER THE PENALTIES OF PERJURY.

John E. Boyle

---

[1] On December 21, 2006 I was instructed to search Edward Callahan and Christopher Fox's files for any and all e-mails in connection with Psychemedics, MAMLEO, hair drug testing and drug testing.  I have attached all documents responsive to this search.

2

# Exhibit I

January 23, 2007

**By Electronic Mail**
**And First Class Mail**

Robert Baker, Esq.
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110

      Re:    Ronnie Jones, et al v. City of Boston, et al
              Civil Action No. 05-11832-GAO

Dear Robert:

I write in response to your five page missive of January 22, 2007.

I informed you during Sgt. Perez's deposition that I had no objection to you renoticing her deposition, in light of the documents identified during her deposition. I continue to hold that position. Please feel free to renotice her at your convenience. I am also informed that Michael Reagan is available in February, and would prefer not to be deposed on Tuesdays or Wednesdays. He is available on February 15; please advise if you would like to hold his deposition then or if you prefer to schedule his deposition later in March/April. John Dunlop has become unavailable on January 25 due to scheduling of contract negotiations, but is available on January 30; again, please advise as to whether that date works for you. If you prefer to hold off on these depositions until you have received the updated Index and privilege log listed in the paragraph following, please advise. I ask that you respond to myself and to Helen Litsas as I will be out of the office on trial this week into next.

With respect to the document production, it appears that several documents were not produced in our initial production despite their number listing on the Index because these documents constitute attorney-client communications and are therefore privileged. Some additional documents were not produced, despite their listing on the Index, because it appears that they constitute blank pages and the Defendants did not want to burden the Plaintiffs with unnecessary paper given the already voluminous discovery production. We are currently working to revise and update the document production Index to accurately reflect these corrections. We will provide you with a corrected version shortly. As for some other documents you have listed, it appears from our records that we did in fact produce these documents. However, for your convenience, we will

Robert Baker, Esq.
January 23, 2007
Page 2

provide you with another copy of these documents as well as an updated Index to reflect the above-mentioned corrections.

As for document COB 000296, we informed you in our January 4, 2007 letter of the following: "Please also note that the Index has been corrected to reflect that the first documents indexed should read COB 000288 –000295. COB 000296 is a privileged document and will not be produced."   Additionally, please note there was an inadvertent typographical error in the Westlaw citation for the document, <u>Mandatory Guidelines for Federal Workplace Drug Testing Program</u>; the correct citation is 2001 WL 937869.

You have also inquired into the Department's review and retention of electronic data.  The Department does not have a policy of retention of individual employees' electronic data, and it is frequently the case that as personnel are transferred, their electronic files are purged as they move between assignments.  So, for example, the electronic files of Thomas Dowd, maintained when he was the Superintendent of the Bureau of Internal Investigations, were purged in or around March 2004, when he was transferred to his current position.  Likewise, I am informed that the electronic files of James Hussey were purged when he left the Department for an extended leave of absence in the spring of 2004.  The same is true for all former employees.   All witnesses identified in the Department's answers to interrogatories have been asked to identify and produce all  documents in their possession that relate to hair testing or this litigation, including their electronic data.

As to your concerns regarding the Department's email search and production, I take the position that the Department's email and electronic data search is sufficient for the purposes of discovery in this case.  If you feel differently, you of course may raise this issue with Judge O'Toole at the status conference in February.

You had asked me whether defendants would agree to depose the plaintiffs by written deposition question.  We will not agree to do so, since the plaintiffs' claims of exposure to illicit drugs and/or theories of how drugs came to be present in their hair is obviously significant to the opinions of the experts in this case.

It is our position that the plaintiffs in this case are making every effort to ensure that the discovery of this case is burdensome to the City and disruptive to the Police Department.  Although I was not present for earlier conferences with the Court, I am informed by my predecessor that Judge O'Toole cautioned against unrestrained discovery in this case.  It is the City's intention to request the Court's assistance in this regard.

My motion for a protective order to prohibit the depositions of the hair test negative officers will follow by separate cover.  Please be advised that I will ask the Court to establish firm discovery limitations.  I do not object to scheduling further discovery events after review and resolution of our discovery disputes with the Court.

Robert Baker, Esq.
January 23, 2007
Page 2

Sincerely,

Mary Jo Harris

cc:    Helen Litsas, Esq.