UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

)
)
RONNIE JONES, RICHARD BECKERS,           )
WALTER R. WASHINGTON, WILLIAM            )
E. BRIDGEFORTH, SHAWN N. HARRIS,         )
EUGENE WADE, GEORGE C. DOWNING,          )
JR., CLARARISE BRISTOW, RACHELLE         )     C.A. No. 05-11832-GAO
COUCH, KERI HOGAN AND THE                )
MASSACHUSETTS ASSOCIATION OF             )
MINORITY LAW ENFORCEMENT                 )
OFFICERS,                                )
                                         )
               Plaintiffs,               )
                                         )
v.                                       )
                                         )
CITY OF BOSTON, BOSTON POLICE            )
DEPARTMENT, and KATHLEEN O'TOOLE,        )
as she is Commissioner of the Boston Police )
Department,                              )
                                         )
               Defendants.               )
_____)

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL AND CROSS MOTION FOR A PROTECTIVE ORDER

## INTRODUCTION

In this case, ten individuals who tested positive for cocaine in the Boston Police Department's annual hair drug test and/or in pre-employment hair drug test screening have brought suit, alleging that the hair drug test is "flawed, imprecise, unreliable, arbitrary, and racially biased" (Plaintiffs' Memorandum of Law in Support of their Motion to Compel, "Preliminary Statement"). They are joined by the Massachusetts Association of Minority Law Enforcement Officers ("MAMLEO").

The hair drug test was implemented at the BPD in January 1999, and was the product of negotiations with the Boston Police Patrolmen's Association, which accepted it as a condition of its contract with the BPD in June 1998.  Thereafter, the BPD engaged in binding arbitration with its superior officers and detectives unions at the Joint Labor Management Commission, which ultimately issued a ruling that, <u>inter alia</u>, included the hair drug test as a condition of employment.  (Exhibit A, Deposition of M. Reagan).

The hair drug test is administered annually, within sixty days of an officer's birthday.  The individual's hair is collected at the BPD Occupational Health Unit by individuals trained to collect hair, and the officer participates with the collector in preparing the hair for submission to the testing laboratory, Psychemedics.  The testing is performed by Psychemedics, which then reports the results of the test to a Medical Review Officer ("MRO").  The MRO is under contract with the BPD to review the results of the hair drug test, to inquire of officers whose hair test results reflect the presence of illegal drugs, and ultimately reports to the BPD whether a test is positive or negative.  (Exhibit B, Rule 111, Appendix D).

The Court has approved a pretrial scheduling order that generally divides the case into two stages; the first focusing on issues common to all plaintiffs' claims, and the second focused on the issues that affect the plaintiffs individually.  See Joint Statement, filed October 5, 2006.  With that in mind, the parties have engaged in discovery that has entailed the production by the BPD of over 12,000 documents, including:  all documents related to plaintiffs (their personnel files, medical files, internal affairs files;  all proceedings relating to the hair test results for each);  all documents related to the collective bargaining negotiations and litigation regarding hair drug testing;  all

documents regarding all arbitrations held with regard to the hair drug testing for each officer who challenged the test; summary documents reflecting interventions by the BPD Stress Unit prior to the implementation of the hair drug test; documents reflecting officers who tested positive for drugs (including a spreadsheet dated January 2006 listing all officers who had tested positive to that date, their race, drug detected, and employment consequence; and a spreadsheet dated January 10, 2007 listing all officers who had tested positive to that date, their race, drug detected, whether a safety net test was taken, and their employment status); documents reflecting training of hair collectors; survey of police departments using drug testing; scientific articles regarding hair drug testing; and documents regarding presentations made to MAMLEO and NAACP regarding hair drug testing.

Defendants have also produced test results of non-party officers who tested positive for drugs on the initial test, then received negative test results on a follow up "safety net" test. (See letter dated January 16, 2007, attached as Exhibit C, with cumulative index of materials produced).

In addition to these materials, plaintiffs have deposed or have noticed the depositions of the following 17 individuals (their rank at time of service noted): (1) **Paul F. Evans**, Police Commissioner from 1994 until November 2003; he learned of hair testing being performed for other police departments and instructed his managerial staff, including the Office of Labor Relations, to engage in negotiations with the BPD police unions to implement hair drug testing for Boston; (2) **Kathleen O'Toole**, Police Commissioner from 2004 – 2006; (3) **Albert Goslin,** Acting Police Commissioner following O'Toole's resignation and, prior to that, from 2004 – 2006, the Superintendent

in charge of the Bureau of Internal Investigations ("BII"), which oversaw disciplinary matters related to hair drug testing;  (4)  **James M. Hussey**, former Superintendent of BII, (5) **Thomas A. Dowd,** former Superintendent of BII and Deputy Superintendent of the Anti-Corruption Division; (6)  **Roberta Mullan**, director of Occupational Health and supervisor of employees who perform hair collection on officers' hair;  she also has had contact with Psychemedics both when it marketed materials to the BPD and during the implementation of hair drug testing;  (7)  **Edward Callahan,** director of Human Resources, who periodically produced "strength reports" (statistics showing the numbers of officers employed at the BPD and broken down by race, gender, rank);  (8) **William Good**, former Chief of the Bureau of Administrative Services and thus, ultimate supervisor of Human Resources and Occupational Health;  (9)  **Michael Reagan**, former Deputy Director and Director of the Office of Labor Relations, City Hall office, who participated in the labor negotiations and litigation with the BPD police unions on the issue of hair drug testing, along with Robert Holland, the City's lead negotiator, who is now deceased;  (10) **William Murphy**, former Deputy Director, Office of Labor Relations, City Hall office, who researched legal issues related to drug testing and hair drug testing prior to negotiation and implementation;  (11) **Virginia Tisei**, the former Director of Labor Relations, City Hall office, who was in office during the negotiations of the hair drug test with the police unions;   (12) **Robert Boyle**, labor counsel, Labor Relations, City Hall office, who prepared a "Q and A" sheet regarding hair drug testing; (13)  **Sandra Debow**, former Deputy Director Labor Relations, BPD office, who oversaw grievances and arbitrations related to hair drug test challenges;  (14) **John Ferguson**, former Deputy Superintendent, Labor Relations, BPD office, who participated in

discussions with the police unions regarding hair drug testing; (15) **John Dunlap**, current Director of Labor Relations, City Hall office; (16) **Joseph Devlin**, retired Sergeant Detective who maintained records of hair drug test results for BII; (17) **Marisela Perez**, Sergeant Detective who succeeded Devlin as record keeper for BII.

To say that the plaintiffs have had open access to each senior official likely to have information about the decision to utilize hair drug testing, negotiations with the unions, data retention within the BPD and the status of every challenge brought to date is no exaggeration. None of the 17 present and former BPD employees is a scientist, have any role in performing hair drug testing, have any specialized knowledge with regard to the hair drug test performed by Psychemedics, or can offer testimony germane to the thrust of the plaintiffs' allegations: that the hair test is "flawed, imprecise, unreliable, arbitrary, and racially biased."

In addition to the documents produced and the deposition practice engaged in, Plaintiffs had also indicated their intent to take the depositions of a number of non-party witnesses (other officers who had drug positive results from the hair drug test), but that request has been held in abeyance by the parties' agreement (see docket number 42 ).

Plaintiffs' Motion to Compel seeks to add to the information already provided by the Defendants, by requiring the production of all hair drug test documents that relate to these non-party officers (the remaining 70 officers who have tested positive). In general, the documents to which Plaintiffs refer – all positive hair test results for these officers – would amount to approximately 4,500 pages of material, as the indicated by review of the hair test supporting documentation produced by the laboratory in regard to one positive hair drug test for one of the individual plaintiff (64 pages, see Exhibit D, test support

documents, bates number "Jones 000031 – 000095." These materials are not included in the electronic filing, but are produced under a motion to seal as they relate to an identifiable individual).

Plaintiffs' motion is bereft of any explanation about why their experts need access to the records of other officers who have tested positive for drugs in the eight years since the test has been implemented other than to say that they "need" this information, and that information about the area of the body from which the hair was collected "may show whether there is an issue" with regard to the body hair tested. See Plaintiffs' Memorandum at p. 7, 8.

The Defendants object to this discovery request because the data sought – test results of some seventy non-party officers – is irrelevant to the plaintiffs' claims, is cumulative (to the extent that the Defendants have already disclosed the numbers and race of all officers who have tested positive since 1999), is invasive of the privacy of these non-parties, and does not appear related to any legitimate interest of the Plaintiffs.

Defendants also oppose Plaintiffs' motion to compel the Defendants to conduct further search of its electronic records, because again, these materials have been reviewed, and materials recovered produced, as Plaintiffs' brief acknowledges. Further search of the Department's electronic databases cannot reveal any information that would illuminate Plaintiffs' claims about the scientific methods used by Psychemedics which, Plaintiffs' brief suggests, is the heart of their complaint.

## ARGUMENT

A party from whom discovery is sought may seek a protective order to prevent or limit certain discovery to protect from "annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c). Such a protective order may require "that the disclosure or discovery not be had … that certain matters not be inquired into, or that the scope of the disclosure or discovery be limited to certain matters." Fed. R. Civ. P. 26(c)(1, 4).

Rule 26(b)(1) of the Federal Rule of Civil Procedure, as amended in 2000, provides in pertinent part:

> Parties may obtain discovery regarding any matter, not privileged, that is _relevant_ to the claim or defense of any party… For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. [emphasis added].

The 2000 amendments, "while not intended to alter dramatically the scope of discovery, were intended to make it 'narrower than it was, in some meaningful way.'" Collens v. City of New York, 222 F.R.D. 249, 252 (S.D.N.Y. 2004). "The Advisory Committee explained that the amendments were designed to 'focus [discovery] on the actual claims and defenses involved in the action,' and 'when judicial intervention is invoked, the actual scope of discovery should be determined according to the reasonable needs of the action.'" Id. "While Rule 26(b)(1) still provides for broad discovery, courts should not grant discovery requests based on pure speculation that amount to nothing more than a 'fishing expedition' into actions or past wrongdoing not related to the alleged claims or defenses." Id.; see Surles v. Air France, No. 00-5004, 2001 WL 815522, *4 (S.D.N.Y.

7

July 19, 2001) (stating that even under un-amended version of Rule 26(b)(1), courts

"would routinely decline to authorize fishing expeditions").

This Circuit has recognized that, while broad pretrial discovery is generally

favored, it is not limitless.  The "trial court has wide discretion in determining the scope

and effect of discovery,"  Amey, Inc. v. Gulf Abstract & Title, Inc.,  (citing Mack v.

Great Atl. & Pac. Tea Co., 871 F.2d 179, 187 (1st Cir. 1989) (holding that a party may not

"undertake wholly exploratory [discovery] operations in the vague hope that something

helpful will turn up")).

1.     **The Request For Hair Drug Test Results Of Non-Party Officers Is Overly Broad, Unduly Burdensome And Not Designed To Elicit Relevant Information Of Evidence That Will Be Admissible At Trial.**

Plaintiffs have failed to establish that they have a need for the production of the

hair drug test results of the non-party BPD officers who have tested positive since the

implementation of the hair drug test in 1999.   Although they claim "need" because the

hair test results for all officers who have tested positive are "critical to plaintiffs' expert

analyses and theories of liability,"  Plaintiffs' Brief at p. 14, they offer no expert affidavit

to address why the hair drug tests of third parties are necessary in order for them to prove

their claims that the test itself is flawed.  Plaintiffs' conclusory assertion that they need

the materials sought is no support for their motion.

It bears noting that Plaintiffs have subpoenaed materials from the testing

laboratory, Psychemedics (including standard operating procedures of the laboratory),

arguing to the Court that these materials are the "most critical documents" in this

litigation as those materials will shed light on Psychemedics' testing protocols, including

its ability to mitigate against external exposure to illicit drugs.  See Document 42,

Plaintiffs' Memorandum of Law in Support of Their Motion to Compel (Psychemedics). That motion is pending before the Court. Defendants respectfully suggest that the real focus of Plaintiffs' efforts ought to be directed toward the laboratory that they claim is conducting the "flawed" test, rather than seeking access to the files of individuals who have not chosen to challenge the hair drug test (or who have done so unsuccessfully)[1].

Since Plaintiffs' challenge to the BPD's decision to take adverse action against them on the basis of positive hair drug test results hinges on their claim that the test is unreliable, their argument is with Psychemedics, and their quest to scrutinize the files of all officers who received positive hair drug test results (none of whom have successfully proven that the results were inaccurate) is overreaching, overbroad, and not reasonably designed to lead to admissible evidence.

Defendants suggest that the arguments tendered by the Plaintiffs in their efforts to discover information related to non-party officers, (i.e., their claim of "need" for dates hair was taken, amount of drug found, date of safety net test and result thereof), see Plaintiffs' Memorandum at p. 7, are wholly speculative, and in no way support the invasion of privacy of the non-party officers nor the burdens to the BPD of producing the requested materials.

> For the most part, there are no barbed-wire fences marking the precise boundaries of pretrial discovery. Management of discovery is a largely empirical exercise, requiring judges to balance the inquirer's right to know against the responder's right to be free from unwarranted intrusions, and then to factor in systemic concerns. … [P]arties have a …obligation to tailor [discovery requests ] to the particular exigencies of the litigation. They ought not to be permitted to use

---

[1] Defendants suggest that there is no basis for Plaintiffs to believe that the hair drug tests of non-party officers are "false positives," and further suggest that the hair drug test results of officers who have used drugs are of little probative value to Plaintiffs' claims. Plaintiffs' access to positive hair drug test results of non-party officers will not illuminate their claims of false positives, nor point to patterns of external exposure issues, as Plaintiffs hint at page 8 of their Memorandum, since they will have no principled basis for claiming the hair test results are inaccurate.

broadswords where scalpels will suffice, nor to undertake wholly exploratory operations in the vague hope that something helpful will turn up.

Mack v. Great American & Pacific Co., 871 F.2d 179, 187 (1st Cir. 1989).

Plaintiffs' motion to compel, supported only by the conclusory claim that the documents sought are needed, is "a wholly exploratory operation[]" of the sort disfavored by the courts[2]. See Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 244 F.3d 189, 193 (1st Cir. 2001) (refusing to overturn district court ruling that requested depositions were "duplicative and cumulative, and otherwise unduly burdensome…" and noting that the amendments to the Federal Rules of Civil Procedure were designed "to deal with the problem of over-discovery"); Milazzo v. Sentry Ins., 856 F.2d 321, 322 (1st Cir. 1988) (discovery ought not be a "fishing expedition").

For these reasons, the Court should deny the Plaintiffs' Motion to Compel production of non-party officer hair drug test results.

**2.      The Plaintiffs' Motion Seeking To Compel Additional Search Of BPD Electronically Stored Data Should Be Denied.**

The Court should deny the Plaintiffs' request for an order compelling "the most exhaustive e-mail search possible" of the e-mails and communications of current and former BPD employees since this request is beyond the scope of discovery that is reasonable in this matter.

The Defendants produced an affidavit from its Network Administrator assigned to the Information Systems Group, as acknowledged by Plaintiffs' Memorandum (and

---

[2] Plaintiffs' claim that they need access to the positive test results to determine whether Defendants treated a "positive and negative safety-net result" as a positive result is inaccurate; at deposition, former Sergeant Detective Joseph Devlin explained that a sectional analysis of hair that showed both a positive and negative result would be treated as a confirmed positive. (Exhibit E, Devlin deposition). There is no dispute that any positive result on a safety net test was treated as a confirmed positive.

attached hereto as Exhibit F ).  That affidavit recited that Boyle had searched all e-mail correspondence of ten BPD officials (Paul Evans, Kathleen O'Toole, Albert Goslin, Marie Donahue, Marisella [sic] Perez, Joseph Devlin, Roberta Mullan, Sandra DeBow, Edward Callahan and Christopher Fox) and utilized search terms (Psychemedics, MAMLEO, hair drug testing, drug testing).  The officials whose files were searched included the three Police Commissioners serving from 1999 – 2006, the Deputy Superintendent of Internal Affairs, the record keepers for Internal Affairs, the Director of Occupational Health, Deputy Director of Labor Relations (BPD), Director of Human Resources and the current Chief of the Bureau of Administrative Services.

Defendant respectfully suggests that the search that was performed – especially when coupled with the review and production of materials from the offices within the Department that deal with the hair drug test (including the Office of the Police Commissioner, Labor Relations at both the City and BPD, Occupational Health) and the depositions of the individuals listed above – is appropriate and responsive to the Plaintiffs' requests, and more extensive electronic searching would likely be both futile and prohibitively costly.  (Exhibit F, Affidavits of Fitzpatrick, Cappellano)[3].

---

[3] Defendants respectfully suggest that, to the extent the Plaintiffs seek a confirmation as to whether there was a litigation hold placed upon commencement of this litigation, Plaintiffs seek a privileged communication to which they are not entitled under the Federal Rules of Civil Procedure.

## **CONCLUSION**

For the reasons stated herein, Defendants respectfully request that the Court deny the Plaintiffs' Motion to Compel Production of Positive Hair Test Results and E-Mails, and grant their Cross Motion for a Protective Order that the discovery not be had.

Respectfully submitted,
Defendants City of Boston,
Boston Police Department, and
Kathleen O'Toole
By their attorney,


__/s/ Mary Jo Harris_____
Mary Jo Harris, BBO # 561484
Morgan, Brown & Joy, LLP
200 State Street
Boston, MA 02109-2605
(617) 523-6666

Dated:  July 2, 2007


## CERTIFICATE OF SERVICE

I, Mary Jo Harris, hereby certify that this document was filed through the ECF system on July 2, 2007.

DATED:  July 2, 2007                    _/s/  Mary Jo Harris_____

# EXHIBIT A

Ronnie Jones, et al.  vs.
City of Boston, et al.

Michael Reagan
March 26, 2007

Page 52

1    first time, and a safety net was put in place and

2    you had a negative based on that level.  But that

3    doesn't mean you necessarily didn't do drugs.  It

4    means that under the test that is in place you are

5    not treated as a positive, and the levels are set by

6    the company.  But it's a scientific judgement based

7    on their process that we lived under.

8         So is it possible that some people who did

9    drugs got away with it so to speak, because the

10   safety net came back less?  Maybe, could have

11   happened.  We were willing to live with that to help

12   ensure that the overall process was fair and

13   reasonable, and help ensure we only caught those, so

14   to speak, that did drugs and eliminated, to the

15   degree we could, the chance of any false positives.

16        Q.   Was it your understanding that the hair

17   test was 100 percent accurate?

18        A.   Yes, as much as anything can be 100

19   percent.

20        Q.   So how is it possible to test negative in a

21   safety-net test if a hair test is 100 percent?

22        A.   You'd have to ask a scientist that.

23        Q.   Are you aware of any reasons at all?

24        A.   I would defer to the Dr. Cairnses of the

Ronnie Jones, et al.  vs.
City of Boston, et al.

Michael Reagan
March 26, 2007

Page 53

1    world.

2         Q.    Did you ever talk to Dr. Cairns about how

3    one could test negative on a safety-net test and

4    still have an accurate --

5         A.    That was one of the topics of arbitrations.

6    The Robert Polito arbitration that we dealt with,

7    that was one of the topics.  And Dr. Cairns or --

8    there's another doctor, Selavka, from the State

9    Police.  He testified about the process and how that

10   works.

11        And they testified convincingly there and

12   we talked about it as well in preparation of that

13   case and going back prior to this that it's a

14   process to help ensure that we're only punishing

15   those we are as sure as we can be that they did

16   drugs.

17        My answer would be, if someone came up

18   positive in a first test and negative on a safety

19   net, in every one of those cases I would bet there

20   was some number some in the safety net that they

21   came back with that was a little bit less than the

22   threshold, so they lucked out even though they did

23   drugs, is what I would say to you.  They did it, but

24   somehow through the process they got the benefit of

Ronnie Jones, et al.   vs.
City of Boston, et al.

Michael Reagan
March 26, 2007

Page 54

1     the stringent safeguards we had in place in terms of

2     the level of the safety net.

3         Q.    You mentioned Dr. Selavka.

4         A.    Yeah, State Police lab I think he works.

5         Q.    Do you know how to spell his name?

6         A.    I'd be guessing.  S-e-l-a-v-k-a, something

7     like that.

8         Q.    And he testified for the City or for the

9     police department?

10        A.    In one or more of those grievance

11    arbitrations.

12        Q.    Did he testify that the hair test was

13    scientifically accurate or valid, something to that

14    effect?

15        A.    Yes.

16        Q.    You said he's employed by or he was

17    employed by the State --

18        A.    State Police.

19        Q.    Is he still employed by the State Police?

20        A.    I don't know.

21        Q.    Did you play any role whatsoever in

22    determining whether to renew Psychemedics' contract

23    every year?

24        A.    No.

Ronnie Jones, et al. vs.
City of Boston, et al.

Michael Reagan
March 26, 2007

Page 55

1      Q.    Other than the -- you described the times

2    you met with Mr. Thistle and Mr. Cairns.  Do you

3    recall any separate conversations you had with them

4    that weren't in person that were just relayed?

5      A.    Not in person?  I'm sure I had some phone

6    conversations with Bill Thistle, I may have with Dr.

7    Cairns as well, in preparing for the JLMC

8    arbitration, that kind of thing.  Nothing specific

9    sticks out in my memory, but I'm sure I did; I'm

10   assuming I did.

11     Q.    Do you recall any topics that you discussed

12   in the phone conversation other than the topics we

13   just went through?

14     A.    No.

15     Q.    Have you ever had any conversations with

16   anybody at Psychemedics other than Mr. Thistle and

17   Mr. Cairns?

18     A.    I don't recall.

19     Q.    Did you discuss with Mr. Cairns or Mr.

20   Thistle whether the hair test had a color bias?

21     A.    There had been a couple articles out there

22   suggesting potential racial bias.  We were aware of

23   that and asked for their answer on them, and they

24   gave an -- I don't know the specifics of it, but in

Ronnie Jones, et al.  vs.
City of Boston, et al.

Michael Reagan
March 26, 2007

Page 56

1    talking to them, talking to Cairns, that eliminated

2    any serious consideration that there was a bias.

3         Q.    But you don't remember any of those

4    specific reasons?

5         A.    I don't recall sitting here today, no.

6         Q.    Did the City of Boston or the Boston Police

7    Department have any scientists on staff that you

8    talked about the hair test with?

9         A.    Did the City of Boston have scientists?

10   No.

11             MR. BAKER:  I'll introduce the second

12   document and call this Exhibit 2.

13                   (Document marked as Reagan

14                   Exhibit 2 for identification)

15        Q.    Just for the record, the document on the

16   first page says "Police Drug Testing Nationwide."

17   It's Bates COB 22470, 22746.  At the bottom of each

18   document it says, "Prepared by Boston Police

19   Department Office of Research and Evaluation," and

20   there's what appears to be a date of June 10, 1998.

21             Just let me know after you've had a chance

22   to look at this.

23        A.    Yes.  Okay.

24        Q.    Have you ever seen this document before?

Ronnie Jones, et al.  vs.
City of Boston, et al.

Michael Reagan
March 26, 2007

Page 57

1      A.   Not sure.  I may have.

2      Q.   Do you know what it is?

3      A.   Boston Police Department does research,

4  reaches out to other police departments around

5  various topics to see how they're doing, operations

6  or business, so to speak.  And this appears to be

7  something that they would have done as part of drug

8  testing.  Drug testing review in terms of what other

9  departments are doing.

10      Q.   Is the Boston Police Department or does the

11  Boston Police Department have an office for research

12  and evaluation?

13      A.   It rings a bell.

14      Q.   Do you know who would have worked in that

15  department in 1998?

16      A.   No, no.

17      Q.   Do you know whether or not the Boston

18  Police Department studied, by asking questions of

19  other police departments, drug testing?  Do you know

20  if they studied drug testing bias on other police

21  departments?

22      A.   Yes.

23      Q.   And how do you know that?

24      A.   Because I just recall that being talked

Ronnie Jones, et al.  vs.
City of Boston, et al.

Michael Reagan
March 26, 2007

Page 58

```
 1   about, Bill Good and the police department

 2   mentioning that in these meetings that that's

 3   something they had talked about.  It also became a

 4   topic in the negotiations of the Joint Labor

 5   Management Commission cases, try to convince the

 6   arbitrator there to award drug testing; that we

 7   weren't breaking new ground here.  This was

 8   happening in other places.

 9        Q.   Do you recognize the handwriting on the

10   bottom of these two first two pages?

11        A.   No, I don't.

12        Q.   Do you have any idea how -- looking at the

13   first page, the left column has several police

14   departments' names of I guess contacts and telephone

15   numbers.  Do you know how that data was gathered?

16        A.   No.

17        Q.   Do you know who drafted the questions in

18   the top row of this sheet?

19        A.   No.

20        Q.   For example, the first question is, "Does

21   your department have a formal drug testing policy?"

22        A.   I don't know who did this specifically.

23        Q.   You mentioned that Mr. Good spoke at one of

24   these meetings you had about the hair test that he
```

Ronnie Jones, et al.   vs.
City of Boston, et al.

Michael Reagan
March 26, 2007

Page 59

 1    had or somebody had gathered information from other

 2    police departments.

 3         A.    Yeah.   He was part of the -- may have had

 4    those conversations with Psychemedics about

 5    Psychemedics and hair testing in general.

 6         Q.    What did Mr. Good say in regards to other

 7    police departments doing drug testing?

 8         A.    Well, nothing specifically.   Just that drug

 9    testing was not new ground here.   Drug testing

10    happened across the country.

11         Q.    So was the conversation that Mr. Good had

12    with you and others, was it just in regards to drug

13    testing generally, or was it specifically focused on

14    hair testing?

15         A.    Both.

16         Q.    With regard to hair testing, what did

17    Mr. Good say about other police departments?

18         A.    Mr. Good, I don't recall anything

19    specifically from him.   I don't recall.

20         Q.    Do you recall anyone from the City of

21    Boston or the Boston Police Department saying that

22    other cities, other police departments were doing

23    hair testing specifically?

24         A.    Yes, I believe Commissioner Evans, after

Ronnie Jones, et al.    vs.
City of Boston, et al.

Michael Reagan
March 26, 2007

Page 60

1  that conference he came back from, there were other

2  police departments doing it.  For some reason

3  Chicago sticks out as a police department doing it.

4  New York may have been in the process of negotiating

5  it.  There were others as well, I believe, doing it.

6  Chicago sticks out to me as the big one, but there

7  may have been others.

8      Q.    Does this document reflect that Chicago was

9  doing hair testing in 1998?

10     A.    Yeah, it does.

11     Q.    Where do you see that?

12     A.    Chicago, Illinois; Officer Rhodes, fourth

13  over, indicates using both hair and urine and also

14  nail and blood.  They were doing random hair, if I'm

15  reading this right.

16     Q.    And you thought also New York; is that

17  correct?

18     A.    I thought New York was back then.  For some

19  reason Jacksonville, Florida -- is Jacksonville on

20  here?  Maybe not Jacksonville.  There were some

21  others, though, I thought as well.

22     Q.    Jacksonville is on the first page.

23     A.    Okay.  Looks like New York as well was

24  doing it.

Ronnie Jones, et al.  vs.
City of Boston, et al.

Michael Reagan
March 26, 2007

Page 61

1    Q.    So you have this general recollection that

2  Jacksonville, Chicago and --

3    A.    Jacksonville is sketchy.   Chicago sticks

4  out strongly.

5    Q.    New York?

6    A.    New York sticks out as well strongly.

7  Chicago sticks out.   New York less so, but it

8  appears from this they were.

9    Q.    Do you know who you learned that from?

10    A.    I don't recall.

11    Q.    I don't have any more questions about that

12  document.

13        MR. BAKER:   Exhibit 3, please.

14            (Document marked as Reagan

15            Exhibit 3 for identification)

16    Q.    We're talking about this, if you could just

17  take a moment to look at it.

18    A.    Okay.

19    Q.    Just for the record, this is a document

20  that's Bates numbered COB5756 through 5786 and is

21  Rule 111, which we've been talking about in today's

22  testimony.

23        Do you recognize this to be a copy of Rule

24  111?

Ronnie Jones, et al.  vs.
City of Boston, et al.

Michael Reagan
March 26, 2007

Page 69

 1    through 25753.  I believe it's a 103-page document.

 2          Can you just take a moment to, I guess,

 3    recognize what this is or become familiar with it.

 4        A.   Yes, I know what it is.

 5        Q.   Have you seen this document before?

 6        A.   Yes.

 7        Q.   If you look to 103 at the very end, are you

 8    the Michael Reagan, Esquire, designated as one of

 9    the attorneys for the City of Boston?

10        A.   Yes.

11        Q.   Just for the record, I described the page

12    numbers in this document.  The first page says "City

13    of Boston's Post-Hearing Brief, Case No.

14    JLMC-97-42P, Boston Police Superior Officers

15    Federation and the City of Boston."

16          It looks like the document was signed on

17    April 27, 2005, by Virginia Tisei.  And do you know

18    whose signature appears for Robert Holland's firm?

19        A.   That's Robert Holland.

20        Q.   Okay.  It says Scott C. Merrill is also

21    somebody who worked with Robert Holland.

22        A.   He was an associate there.

23        Q.   Was he an associate that frequently, to

24    your knowledge, worked with Mr. Holland on hair

Doris O. Wong Associates, Inc.
50 Franklin Street, Boston, MA 02110

Professional Court Reporters
Videoconference Center

(617)426-2432
www.doriswong.com

Ronnie Jones, et al.   vs.
City of Boston, et al.

Michael Reagan
March 26, 2007

Page 70

```
 1    testing cases or issues?

 2              MS. HARRIS:   I object.  Go ahead.

 3        A.    He worked on this case.

 4        Q.    This one?

 5        A.    And maybe others.

 6        Q.    You had mentioned earlier that there may

 7    have been an associate with Mr. Holland on some

 8    meetings.  Do you know if it was Scott Merrill or

 9    someone else, or you're not sure?

10        A.    It may have been Merrill, but I'm not sure.

11        Q.    Just for the record, what is this document?

12        A.    This is the City's closing brief in a Joint

13    Labor Management Committee arbitration with the

14    Boston Police Superior Officers Federation.

15              As part of the process you had a full

16    hearing and then you had a closing brief.  This is

17    that document.

18        Q.    And was one of the issues in this

19    arbitration drug testing?

20        A.    Yes.

21        Q.    If we look to Page 10 of the brief, it

22    looks like Part III, Drug Testing, section here.  Do

23    you see that?

24        A.    Yes.
```

Doris O. Wong Associates, Inc.
50 Franklin Street, Boston, MA 02110

Professional Court Reporters
Videoconference Center

(617)426-2432
www.doriswong.com

Ronnie Jones, et al.  vs.
City of Boston, et al.

Michael Reagan
March 26, 2007

Page 71

1      Q.    Then there's a section right under that, a

2   subsection called "Proposal."  Do you see that?

3      A.    Yes.

4      Q.    And what is the proposal set forth here?

5      A.    This sets forth our proposal to the Joint

6   Labor Management Commission of what we want for drug

7   testing as part of the contract.

8      Q.    Does it involve hair testing like we talked

9   about that today?  Is that the proposal?

10     A.    Yes.

11     Q.    So generally speaking, the proposal was to

12   have hair testing adopted as part of the drug

13   testing?

14     A.    We were looking to get the same thing

15   through the Federation, what we already achieved at

16   the bargaining table with the patrolmen.

17     Q.    Just for clarification's sake, because I

18   know we went through it before, what is the purpose

19   of that, or why would one go to an arbitration as

20   opposed to just negotiating?  Why does one come to

21   that stage?  Does it always happen?

22     A.    It's a statutory process where, if a police

23   union or fire union, by state statute, is unable to

24   reach an agreement at the table, they are able to

Doris O. Wong Associates, Inc.
50 Franklin Street, Boston, MA 02110

Professional Court Reporters
Videoconference Center

(617)426-2432
www.doriswong.com

Ronnie Jones, et al.  vs.
City of Boston, et al.

Michael Reagan
March 26, 2007

Page 72

1    get into the Joint Labor Management Committee, which

2    is a committee in place to close out contracts and

3    issue contract awards.

4            We entered into a contract with patrolmen

5    at the bargaining table.  They agreed to a contract

6    around May of '88.  The other three police unions in

7    Boston, the Detectives, the Detective Superiors and

8    the Superior Officers Federation, none of those

9    groups had agreed to a contract at the table.  They

10   went to the Joint Labor Management Commission, and

11   their contract was awarded through that process.

12           The process involves first mediation, then

13   all sorts of ways, but in this case it was a

14   hearing.  We had a full hearing for -- this is the

15   Federation case.  It was multiple days, testimony,

16   evidence, trying to convince the arbitrator to our

17   side.  And as part of that, one of our big issues

18   was hair testing.

19           So we put on a full case of why we should

20   be awarded hair testing, the same hair testing that

21   the patrolmen had agreed to at the table.  At this

22   point I believe that the detectives and also

23   detective superiors also had been awarded to us

24   through arbitration.  This was the last group.

Doris O. Wong Associates, Inc.
50 Franklin Street, Boston, MA 02110

Professional Court Reporters
Videoconference Center

(617)426-2432
www.doriswong.com

Ronnie Jones, et al.   vs.
City of Boston, et al.

Michael Reagan
March 26, 2007

Page 73

1          We had the full hearing.  I believe Selavka

2   testified in the case on the drug testing piece.

3   There may have been others.  I think of him for

4   sure.  There may have been one or more others, but I

5   know he did.  And this is the closing brief as part

6   of that.  We submit this; the union submits their

7   closing brief, and basically the award comes out,

8   which is the contract.  And in this case the

9   arbitrator awarded us the hair testing that the

10  patrolmen had agreed to.

11       Q.   Is it one arbitrator?

12       A.   It could be all sorts of forms or

13  approaches.  Can be committees, can be combinations.

14  In this case it was one arbitrator.  I believe it

15  was Richard Bolanger who was named to be arbitrator

16  by the commission, the committee.  And as part of

17  that they also name a panel.  Each side gets to pick

18  one person to be on the panel.  I was the City's

19  panel member, and the union I believe chose James

20  LaMonte.

21          Our role really was limited to after the

22  hearing is concluded, after the briefs are

23  submitted, there's a follow-up meeting with the

24  arbitrator where it was a little more additional

Ronnie Jones, et al.  vs.
City of Boston, et al.

Michael Reagan
March 26, 2007

Page 74

1    chance to advocate your position.

2            We had a meeting, myself, Jim LaMonte for

3    the union, and the arbitrator, one more chance to

4    advocate, do a follow-up brief kind of approach.  We

5    made our positions clear to the arbitrator.  He then

6    issued his ruling, which it becomes, in effect, the

7    contract.

8        Q.    Looking back to the brief we were just

9    looking at and the page we were looking at, Page 10,

10   the last sentence on the page states, "Further the

11   procedures that govern testing are fair and

12   reasonable to ensure the accuracy and integrity of

13   the test and the process."  Did I read that

14   correctly?

15       A.    Yes.

16       Q.    Is that referring to hair testing?

17       A.    Yes.

18       Q.    What procedures concerning hair testing at

19   the police department were developed to ensure that

20   the hair testing be fair, reasonable and accurate?

21       A.    Appendix D.

22       Q.    Anything else?

23       A.    Whatever the manufacturer offered, a chain

24   of custody and the like, but Appendix D is what we

Doris O. Wong Associates, Inc.
50 Franklin Street, Boston, MA 02110

Professional Court Reporters
Videoconference Center

(617)426-2432
www.doriswong.com

Ronnie Jones, et al.   vs.
City of Boston, et al.

Michael Reagan
March 26, 2007

Page 75

 1   developed.

 2       Q.    Is it everything in Appendix D goes to the

 3   fairness, reasonableness and accuracy, or are there

 4   particular things?

 5           MS. HARRIS:   Objection.

 6       A.    I don't understand the question.

 7       Q.    Appendix D we were just looking at has

 8   several pieces, two of which we went through,

 9   licensed laboratory and safety-net tests, also

10   storing and shipping of samples, access to and

11   storing test results.

12       A.    Right.

13       Q.    To your knowledge do all of the sections in

14   Appendix D, A through M, go to the issue of

15   fairness, reasonableness and accuracy of the hair

16   test?

17           MS. HARRIS:   Objection.   You can answer.

18       A.    Yes.

19       Q.    Are there any procedures in here that you

20   would hold out as more significant than other

21   procedures in terms of the fairness, reasonableness

22   and accuracy of the hair test?

23           MS. HARRIS:   Objection.

24       A.    No.   It's overall process we agreed to,

Ronnie Jones, et al.   vs.
City of Boston, et al.

Michael Reagan
March 26, 2007

Page 86

 1           This was drafted in 2000.  Back in the

 2    1999-2000 time frame when you were deputy director,

 3    the acting director and the director of the Boston

 4    Labor Relations Department, did you have a view as

 5    to whether random and reasonable suspicion

 6    urinalysis testing were an adequate alternative to

 7    hair testing?

 8       A.    It didn't matter.  In my personal opinion,

 9    I thought the hair testing was better in terms of

10    helping to ensure a drug-free police department.

11       Q.    Why?

12       A.    Because you can test back further in time

13    and get drug use over a period of time versus the

14    urinalysis, random urinalysis, which is more of a

15    pot luck, somebody taking drugs over the preceding

16    few weeks, whatever it may be.

17           So to me, the best would be random hair,

18    would be the best of all worlds probably, but

19    announced hair is a good program to help to

20    accomplish or get closer to accomplishing the goal

21    of having a drug-free police department.

22       Q.    We just went through a lot there.  I want

23    to break it down.  What type of drug testing has the

24    City of Boston Police Department had since 1999?

Ronnie Jones, et al.  vs.
City of Boston, et al.

Michael Reagan
March 26, 2007

Page 87

1        A.    That would be Rule 111, take out Appendix

2   D.

3        Q.    Okay.  And what type of testing is Appendix

4   D?

5        A.    I think primarily urinalysis.  Is there

6   blood in there as well?

7        Q.    Appendix D.

8        A.    Appendix D.  Sorry.  Hair.

9        Q.    What type of hair testing is it in Appendix

10  D?

11           MS. HARRIS:   Objection.

12       A.    It's announced hair testing.

13       Q.    As opposed to what?

14       A.    Random hair testing, probable cause hair

15  testing, reasonable suspicion hair testing.

16       Q.    So do you have a view as to whether or not

17  announced hair testing, which is what Appendix D

18  is --

19       A.    Appendix D is the process and procedure.

20  What we agreed to is the collective bargaining

21  agreement.  That's the hair testing, what Rule 111

22  covers when it's done.  It's done on an announced

23  basis, 30 days either side of your birthday I

24  believe.

Doris O. Wong Associates, Inc.
50 Franklin Street, Boston, MA 02110

Professional Court Reporters
Videoconference Center

(617)426-2432
www.doriswong.com

Ronnie Jones, et al.   vs.
City of Boston, et al.

Michael Reagan
March 26, 2007

Page 88

1      Q.    Do you have a view as to whether or not

2   that announced hair-testing process is better, worse

3   or the same as random urinalysis testing?

4      A.    My opinion, it's better.

5      Q.    Why is announced hair-testing better than

6   random urinalysis testing?

7      A.    You want to get people who -- you do your

8   best to find officers who have a drug problem, are

9   taking drugs while police officers.

10          Through the hair test, you get a period of

11   time, depending how long the hair is -- I think, for

12   example, I think it's like three months for an

13   inch-and-a-half of hair, ballpark approximation --

14   you're able to assess drug use during an extended

15   period of time.

16          To that extent it's better than the random

17   urinalysis, in that you are getting someone with a

18   shorter window in terms of when they may have taken

19   drugs or not.

20          So that's the improvement aspect of it.  If

21   you ask me in my opinion, best of all worlds, maybe

22   a random hair test when they don't know it's coming.

23   You also get a bigger window.  That would be the

24   best of all worlds, and if you're asking my personal

**EXHIBIT B**

Boston Police Department

Rules and Procedures

*RULE 111*

Appendix D
PROCEDURES FOR ANNUAL HAIR TESTING

A)      Tracking System – The Department shall develop and maintain a tracking system that ensures each Officer who is subject to Annual Testing will undergo a hair test as required by Rule 111, sec. V, para. G.

B)      Notification to Submit – The Department shall provide to Commanding Officers a listing of those Officers who shall be required to submit to an annual hair test. The Commanding Officer or his/her designee shall notify the Officer when he/she shall submit to the test at Occupational Health Services.

C)      Collection Personnel – Certified employees of the Occupational Health Services Unit shall perform all hair sample collections.

D)      Identification of Officer's Identity – The Officer's identity shall be verified by checking the driver's license or other photo identification. The Department, including personnel from the Occupational Health Services Unit, may do a visual identification of the Officer, however this must be noted on the Test Request Form.

E)      Completing the Test Request Form – The Test Request Forms (TRF) are pre-printed forms that are coded specifically to the Department. The collection personnel shall fill out the form in the presence of the Officer. The TRF includes information such as the collector's identity, the Test Subject Identification Number, and where the sample was collected (ex., crown of head, nape of the neck).

F)      Completing the Sample Acquisition Card (SAC) – The SAC is a card that will hold the hair sample during transportation. A foil used for collection is included with the card. These steps may occur prior to or after the collection of the hair sample and shall be completed in the presence of the Officer.

     1)    The collection personnel shall sign and date the SAC. The collection personnel shall write the Test Subject Identification Number on the SAC. This number must match the number listed on the TRF.

     2)    The collection personnel shall place the bar code from the TRF on the SAC to ensure the two documents are identified with one another.

G)      *Collecting the Hair Sample – The collection personnel shall complete each of the following steps in the presence of the Officer.*

     1)    The collection personnel will grasp a small lock of hair approximately ½ inch wide by one strand deep when held flat and cut the sample close to the scalp. If the head hair is not available other body hair shall be collected.

COB 0005782

Boston Police Department                                    Rules and Procedures

                                                            RULE 111

---

2) The sample is then placed in the foil with the root ends extending approximately ¼ inch. The foil is pressed together, trapping the sample inside. If the hair is long, the collection personnel will wrap the remaining hair around the foil.

3) The collection personnel shall place the sample inside the SAC, sign and date the integrity seal, and place the integrity seal over the designated spot on the SAC.

4) The Officer shall initial the SAC in the space provided.

5) The Officer shall complete the Donor Certification section of the TRF that includes the Officer's name and telephone number. In the comments section, the donor may provide additional information for the Medical Review Officer (MRO), (ex., use of prescription medicine or an additional phone number where the MRO can contact the Officer if the need arises).

6) The copy of the TRF that contains the Donor Certification section shall be separated from the TRF and placed in a sealed envelope addressed to the MRO. The Officer shall initial and date the sealed envelope. The sealed envelope shall be kept in a secured area until sent to the MRO, at the next regularly scheduled pick-up using an overnight carrier.

7) The collection personnel shall place the SAC and a copy of the TRF into the collection pouch and seal the pouch.

8) The Officer shall initial and date the collection pouch in the space provided.

H) **Storing and Shipping the Sample** – The sealed collection pouch shall be kept in a secured area until sent to the laboratory, at the next regularly scheduled pick-up using an overnight carrier.

I) **Licensed Laboratory** – The sample shall be tested at a licensed laboratory that is certified to perform hair testing.

J) **Review of Test Result by an authorized Medical Review Officer (MRO)** – All hair sample drug test results shall be reviewed by an authorized MRO prior to the transmission of the test results to the Commanding Officer, Bureau of Internal Investigations (BII)

1) The duties of the MRO with respect to positive test results are to review and interpret confirmed, positive test results obtained through the Department's annual hair testing program. In carrying out this responsibility, the MRO shall examine alternative medical explanations for any positive test result. This action may include conducting a medical interview and review of the Officer's medical history, or review of any other relevant biomedical factors. The MRO shall review all medical records made available by the tested Officer when a positive test could have resulted from legally prescribed medication. The

COB 0005783

Boston Police Department

Rules and Procedures

RULE 111

MRO shall not, however, consider the results for hair samples that are not obtained or processed in accordance with the procedures set forth herein.

2) Prior to making a final decision to verify a positive test result for an Officer, the MRO shall give the Officer an opportunity to discuss the test result with him. For example, there may be a legitimate positive test result for the use of legally prescribed or dispensed medication such as codeine for coughs, narcotic analgesics for pain, tetrahydrocannobinol for cancer, cocaine as a vasoconstrictive anesthetic, etc. It is important to note that it is highly unlikely that a medically acceptable explanation will be found for the presence of cocaine or marijuana.

3) The MRO shall contact the Officer directly, on a confidential basis, to determine whether the employee wishes to discuss the test result. A staff person under the MRO's supervision may make the initial contact, and a medically licensed or certified staff person may gather information from the employee. Except as provided in Paragraph J(5) of this Section, the MRO shall talk directly with the employee before verifying a test as positive.

4) If after making all reasonable efforts and documenting them, the MRO is unable to reach the Officer directly, the MRO shall contact BII who shall contact the Officer and direct him to contact the MRO as soon as possible. If it becomes necessary to reach the Officer through BII, the Bureau shall employ procedures that ensure, to the maximum extent practicable, that the requirement that the Officer contact with the MRO is held in confidence.

5) The MRO may verify a test result as positive without having communicated directly with the Officer in three circumstances.

   a) If the Officer expressly declines the opportunity to discuss the test result, the test shall be reported as positive.

   b) If BII has successfully made and documented a contact with the Officer and instructed the Officer to contact the MRO and more than five calendar days have passed since the date the Officer was successfully contacted by BII and the Officer has not contacted the MRO, the test shall be reported as positive.

   c) If after making all reasonable efforts and documenting them, BII has not been able to contact the Officer and fourteen calendar days have passed since BII's first documented attempt to contact the Officer, the test shall be reported as positive.

6) The MRO shall report to BII any samples that were not suitable for testing. When BII receives a test result that indicates the hair specimen was an inadequate specimen and/or was not testable for any other reason, BII shall contact the Officer and require him/her to provide another specimen for

COB 0005784

Boston Police Department                                     Rules and Procedures

RULE 111

testing provided the collection occurs on or within thirty (30) calendar days of that Officer's birthday.

7) The MRO shall report whether the verified test result is positive or negative to BII. If the MRO, in his/her sole medical opinion, concludes there is a legitimate medial explanation for the positive test result, the MRO shall report the test result as negative to BII.

8) BII shall notify each Officer who receives a positive test result and the provisions of Rule 111 shall apply.

K) **Safety-Net Tests** – If an Officer receives a positive, confirmed hair test result, the Officer may request a safety-net test. The safety-net test must be performed under the same or more stringent procedures as recommended by the manufacturer.

1) To request the safety-net test, the Officer must submit a written request to the Commanding Officer, BII within 72 hours of being notified by BII of the positive test result. BII shall notify Occupational Health that a safety-net test has been requested, and Occupational Health shall schedule the safety-net test forthwith. The Officer must pay for the costs of the safety-net test and the MRO review, payable by check made out to the City of Boston at the time of the sample collection.

2) For Officers who have requested a safety-net test, the Department shall immediately place the Officer on administrative duty pending the outcome of the safety-net test. While on administrative duty the Officer shall not carry a firearm and shall not be eligible for overtime or details.

3) If the result of the safety-net test result is negative, the Officer shall be reimbursed for the costs of the safety-net test and the MRO review and shall be made whole, e.g., paid for any overtime or details he/she would have been eligible to perform pursuant to the current collective bargaining agreement. Likewise, said hours shall be recorded and posted pursuant to the current collective bargaining agreement. In addition, the Officer's IAD file shall be expunged of the prior positive test result that led to the safety-net test.

L) Access and Storing of Test Results - Any Officer who is the subject of a hair test conducted under this procedure shall, upon written request to the Commanding Officer, BII, have access to any and all record(s) relating to his/her hair test result that is/are in the possession of the Department. Such results and records are confidential medical information and shall not be disclosed without the Officer's consent except to the extent necessary to effectuate the purposes of the Department's Substance Abuse Policy. Positive hair test results shall be retained by the Department and processed in the same manner as any violations of Department Rules and Procedures.

COB 0005785

Boston Police Department

Rules and Procedures

RULE 111

---

M)     *Applicability of Rule 111- The hair testing procedures are effective pursuant to the collective bargaining agreement. Nothing contained herein alters the current Substance Abuse Policy as it relates to other drug/alcohol testing, procedures, or requirements, e.g., switching, adulterating or refusing to be tested are prohibited by Section IV of Rule 111.*

COB 0005786

January 16, 2007

<u>**BY HAND DELIVERY**</u>
Rheba Rutkowski, Esq.
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110

Nadine Cohen, Esq.
Lawyers' Committee for Civil Rights
Under Law of the Boston Bar Association
294 Washington Street, Suite 443
Boston, MA 02108

Maricia Woodham, Esq.
Sabel & Sabel, P.C.
Hillwood Office Center
2800 Zelda Road, Suite 100-S
Montgomery, AL 36106

      Re:    Ronnie Jones, et al v. City of Boston, et al
             <u>Civil Action No. 05-11832-GAO</u>

Dear Attorneys Rutkowski, Cohen and Woodham:

      Enclosed please find Defendants' Seventh Set of Production of Documents. The documents themselves are produced to Bingham only. Additionally, we have enclosed an updated **Index** reflecting the addition of the Defendants' Seventh Set of Production of Documents. Please note that the strength reports have now been produced with a Bates number (they had been previously produced without such a number because of the time-sensitive nature of your request). The highlighted portion of the Index reflects the documents produced herein.

      Additionally, please note that we have also identified several additional articles in our possession that relate to drug testing and they include the following: "Hair Testing Bibliography", <u>The International Journal of Drug Testing</u>, Vol. 1, No. 1; "Evaluation of Analytical Methodologies for Non-Intrusive Drug Testing: Supercritical Fluid Extraction of Cocaine from Hair," <u>National Institute of Justice, Law Enforcement and Corrections Standards Testing Program</u>; "Sub-Committee Report On Employee Testing In the Workplace," <u>ABA State Labor and Employment Law Developments Winter Meeting 2000</u>; and <u>Mandatory Guidelines</u>

for Federal Workplace Drug Testing Program, 2001 WL 9378869.  Because these articles are equally accessible to you, we have not produced them herein.

Thank you for your attention to this matter.

Sincerely,


Helen G. Litsas

cc:    Mary Jo Harris, Esq.

## DEFENDANTS' INDEX OF PRODUCTION
### (*dated 1-16-07, Seventh Set of production enclosed herein)

## DEFENDANTS' FIRST SET OF PRODUCTION

| | |
|---|---|
| 288 – 295 | Shawn Harris – unemployment appeal |
| 319 – 334 | Kerri Hogan – MCAD materials, name clearing hearing |
| 415 – 501 | Collective bargaining agreement (cadets) |
| 2935 – 3043 | Rachelle Couch – MCAD materials |
| 3550 – 5835 | Personnel files – all plaintiffs |
| 5400 – 5617 | Psychemedics materials |
| 5736 – 5948 | Filings by City and labor unions regarding: unfair practice litigation;  substance abuse manuals for supervisory personnel; iterations of Rule 111. |
| 6141 – 6212 | Drug testing policies (MBTA, Dept. of Corrections) |
| 6243 – 6280 | Communications regarding hair testing (Internal Affairs) |
| 6283 – 6302 | Communications between BPPA counsel, Labor Relations;  Cairns letter |
| 6320 – 6322 | Grievance:  Full duty issue. |
| 6432 – 6511 | Psychemedics materials |
| 6512, 6514-20 | Urinalysis issues; Special Order issued by K O'Toole re: notice, procedure |
| 6521 – 6608 | Labor / Union communications |
| 6610 – 6614 | Labor / Union communications |
| 6630 – 6633 | Labor / Union communications |
| 6693 – 6698 | Drafts of Rule 111; materials re: safe |
| 6744 | Labor / Union communications |
| 6754 | Labor / Union communications |
| 6775 – 6788 | Statistics regarding test results |
| 6791 | Recruit drug test failure data **\* attorney/client communication redacted** |
| 6792 – 6793 | Anti-Corruption data regarding number of investigations re: illegal drug activity **\* attorney notes redacted** |
| 6795 – 6796 | Stress Unit report of interventions with officers re: illegal drug use **\* attorney notes redacted** |
| 6806 | Stress Unit re: same |
| 6814 – 6817 | Data from Stress Unit, Occupational Health, Internal Affairs re: drug use |
| 6819 | List of reasonable suspicion drug tests **\* non-plaintiff names redacted** |

| | |
|---|---|
| 6821 -6822 | |
| 6824 – 6826 | Stress Unit:  numbers of personnel re: drug intervention/hospitalization |
| 6886 – 6887 | Labor Relations documents re: BPPA Arbitration |
| 7005 | List of rehabilitation agreements entered into by date |
| | **\* attorney notes redacted** |
| 7022 | Chart re: positive test results as of 1/200 |
| | **\* non-plaintiff names, IDs redacted** |
| 7024 | Chart from Academy regarding: recruit positive drug test results |
| 7025 – 7042 | Labor / Union communications |
| 7050 – 7054 | Compilation of hair test data as of 6/2000 |
| 7076 | Chart of officers testing positive |
| | **\* non-plaintiff names, IDs redacted** |
| 7081 | Labor / Union communications |
| 7084 – 7087 | |
| 7091 – 7093 | |
| 7182 – 7184 | Psychemedics communications |
| 7224 – 7251 | Power point presented to MAMLEO, NAACP |
| 7252 -7253 | BPPA website re: investigating claims of discriminatory impact |
| 7409 – 7531 | Articles re: discriminatory impact of hair testing (pro / con) |
| 7532 – 7541 | Training schedule; reference guide |
| 7578 – 7579 | Article re: hair testing |
| 7580 | List of contacts at other police departments re: drug testing |
| 7590- 7594 | Article re: hair testing |
| 7599 – 7601 | Psychemedics communications |
| 7605 – 7609 | Survey of drug testing in large metropolitan police departments |
| 7617 – 7618 | Officer complaint (Michael O'Hara) |
| 7619 – 7621 | Labor Relations communication |
| 7622 | Special Order re: Drug Test Notification Procedures |
| 7674 – 7702 | Articles re: hair testing |
| 7706 – 7710 | |
| 7723 – 7876 | |
| 7901 – 8068 | Materials re: arbitration |
| 8183 – 8134 | BPPA information request |
| 22680 – 23793 | Exhibits (arbitration with Superior Officers' Federation re: hair drug test) |

| | |
|---|---|
| 23982 – 24039 | Materials re: negotiations with Boston Police Patrolmen's Ass'n |
| 24776 – 814 | City's brief re: drug testing |
| 25054 -25083 | JMLC: Award (BPSOF) |
| 25178- 241 | City's brief re: drug testing |
| 25648 – 758 | City's post hearing brief |
| 25759 – 811 | Arbitrator's award |
| 25812 – 932 | Transcript (BPPA arbitration) |
| 26343 – 639 | Psychemedics, Business Health Mgmt. contracts |
| 26643 – 708 | Collection manuals |
| 26712 – 872 | Collector certifications |

## DEFENDANTS' SECOND SET OF PRODUCTION

| | |
|---|---|
| 26953-27149 | Downing Medical File |
| 27150-27463 | Beckers Medical File |
| 27464-27611 | Couch Medical File |
| 27612-27763 | Harris Medical File |
| 27764-27886 | Bridgeforth Medical File |
| 27887-28141 | Washington Medical File |
| 28142-28334 | Jones Medical File |
| 28335-28347 | Hogan Medical File |
| 28348-28726 | Wade  Medical File |
| 28795-28940 28943-28949 | Downing District File |
| 28951-28977 28987-29022 | Beckers District File |
| 29023 29025-29069 29072-29085 29090-29157 29161-29170 290173 | Couch District File |

29175-29181
29184-29188

29189                              Harris District File
29196
29198-29204
29206-29207
29212-29227
29232-29236


29238-29268                        Washington District File
29275-29293
29304-29313
293332
29340-29348
29350-29359
29361-29385


29386-29387                        Bridgeforth District File
29389-29403
29408-29425
29430-29437


29439-29441                        Jones District File
29448-29488
29491-29492                        *CORI redacted
29493
29500-29502                        *CORI redacted
29505-29551
29560
29568-29576
29578-29581
29590-29595
29598-29681

29682-29691                        Kerri Hogan documents (Residency)
29692-29803                        *CORI redacted 290803
29806-29823
29830-29844
29853-29878
29886-29896
29903-29912
29920-29926

29948-29949
29956-29962
29970-29978
29985
29997-29999
30022-30068                          *CORI redacted 30047
30075-30100
30105-30119                          *CORI redacted 30114, 30115, 30117
30126-30165


30798 - 30801                        MAMLEO correspondence
30806 –30809
30814 – 30817
30848 – 30854
30866
30868

## DEFENDANTS' THIRD SET OF PRODUCTION

0026642                              BPD List of Hair Collectors
0031241-42                           BPD Spreadsheet of Current Drug Results
                                     *Redacted (non-plaintiffs' information)

0031243—46                           BPPA v. City of Boston Arbitration No. 16-1587
                                     Confidentiality Agreement re: Psychemedics
                                     Materials

0031247                              Videotape of Pscyhemedics Training Procedures

0031248                              Email  to Kathleen O'Toole


## DEFENDANTS' FOURTH SET OF PRODUCTION

0023929-24296,                       Articles regarding drug testing and hair analysis
0025421-29

002456073                           Correspondence regarding BPSOF contract
                                     negotiation between City and BPSOF

0025461-647                          BPSOF Post Hearing Memorandum

| | |
|---|---|
| 0031249-50 | BPD Correspondence regarding implementing hair testing |
| 0031251-64 | MRO article on hair testing |
| 0031270 | Correspondence from Pyschemedics to BPD, Roberta Mullan |
| 0031271-76 | BPD correspondence regarding implementing hair testing and procedures for collection |
| 0031277-81 | BPD correspondence regarding MRO contract |
| 0031282-6 | Downloaded website print-outs regarding drug testing |
| 0031287-9 0031292 | BPD correspondence relating to Pyschemedics contract |
| | *Redacted 031288 |
| 0031290-1 | Correspondence from Pyschemedics |
| 0031292 | Correspondence regarding Pyschemedics contract |
| 0031293-4 | BPD correspondence regarding MRO contract |
| 0031295 | Statistical information regarding drug testing |
| 0031297-301 | BPD Rule 111 Training Schedule |
| 0031303 | BPD correspondence relating to Pyschemedics contract |
| 0031304 | Roberta Mullan handwritten notes regarding hair testing |
| 0031306 | BPD correspondence regarding implementing hair testing and procedures for collection |
| 0031307-334 | Articles on hair testing and MRO certification |

| | |
|---|---|
| 0031335 | BPD correspondence regarding MRO contract |
| 0031336-42 | BPD correspondence regarding hair testing accuracy and process and articles |
| 0031445-53 | MRO article regarding hair testing |
| 0031454 | Roberta Mullan handwritten notes regarding hair testing and Pyschemedics |
| 0031455-61 | Articles regarding hair testing from Sandulli Grace and HR magazine |

## DEFENDANTS' FIFTH SET OF PRODUCTION

| | |
|---|---|
| 0025938-0025969 | City of Boston v. BPPA arbitration transcript, Vol. I (Cairns testimony) |
| 0030252-0030271 0030305, 0030308 | Correspondence and article regarding updated hair testing protocols |
| 0030934-0030941 0030954-0030957 0030993-0031016 0031067-0031081 0031083-0031096 | Various articles regarding hair testing |
| 0033971-0034073 | BPPA v. City of Boston arbitration transcript, Vol. IV (Selavka testimony) |
| 0033667-0033905 | BPPA v. City of Boston, arbitration transcript, Vol. III (Cairns testimony) |
| 0030565-0030660 | Boyd v. Anderson Chevrolet Deposition Transcript of David Kidwell |

*CONFIDENTIAL DOCUMENTS PRODUCED UNDER PROTECTIVE ORDER*

| | |
|---|---|
| 0035132-0035136 | Test results of non-plaintiffs who first tested |
| 0035168-0035169 | positive and then tested negative after safety-net test |
| 0035179-0035181 | |
| 0035184 | |
| 0035199-0035201 | |
| 0035207 | |
| 0035214 | |
| 0035216 | |
| 0035227-0035230 | |
| 0035241 | |
| 0035259-003260 | |
| 0035266-0035269 | |
| 0035288 | |
| 0035299 | |
| 0035300-0035301 | |
| 0035307 | |
| 0035312-003515 | |
| 0035333-0035334 | |
| 035339-035341 | *0035339 Attorney notes redacted |
| 035345-035346 | |
| 0035363 | |
| 0035371-035373 | |

| | |
|---|---|
| 0031544-0031546 | Walter Washington Internal Affairs files |
| 0031548-0031549 | *0031549 Redacted |
| 0031555-0031563 | |
| 0031565-0031566 | |
| 0031568-0031569 | *0031569 Redacted |
| 0031572-0031576 | *0031572;0031574 Redacted |
| 0031579-0031589 | *0031582-0031583; 0031585 Redacted |
| 0031591-0031594 | *0031591 Redacted |
| 0031596-0031605 | *0031596-0031598, 00315600; 00315602-0031604 Redacted |
| 0031608-0031618 | *0031608-0031613, 0031616-0031618 Redacted |
| 0031620 | |

0031622-0031625                          *0031623 Redacted
0031627-0031639                          *0031627-0031629, 0031631, 0031633; 0031638
                                         Redacted


0031648-0031658                          *0031648-0031656; 0031658 Redacted
0031660


0031661-0031662                          Rachelle Couch Internal Affairs File

0031667
0031669-0031675                          *0031670-0031675 Redacted

0031679                                  *0031679 Redacted
0031680-0031686                          *0031681-0031686 Redacted
0031688-0031693                          *0031688-0031693 Redacted

0031696-0031702                          *0031696-0031697 Redacted
                                         *0031699-0031702 Redacted

0031706-0031708                          *0031707-0031708 Redacted

0031711

0031717-0031720                          *0031717-0031720 Redacted

0031726                                  *0031726 Redacted
0031737                                  *0031737 Redacted

0031769-0031788                          *0031769-003188 Redacted

0031790
0031792-0031809                          *0031793, 0031795-0031796, 0031798-0031809
                                         Redacted
0031812
0031814-0031818                          *0031815; 0031818 Redacted

0031821-0031830                          *0031821-0031827 Redacted

0031833-0031835                          *0031834 Redacted

0031838-0031840                          *0031838-0031840, 0031842 Redacted
0031842

0031847-0031849                              *0031847-0031848 Redacted

0031851-0031853                              *0031851-0031853 Redacted

0031855-0031862                              *0031855; 0031856; 0031860-0031862 (CORI)
                                             Redacted

0031864-0031865
0031867-0031869                              *0031867; 003169 Redacted

0031877-0031886                              *0031877; 0031881 Redacted
0031888-0031889
0031891
0031894-0031911


0031912-0031913                              Shawn Harris Internal Affairs File
0031915-0031916                              *0031916 Redacted

0031919-0031940

00319443
00319445--0031957                            *0031943 Redacted


0031960-0031970                              *0031960-0031970 Redacted

0031972-0031976                              *0031972; 0031974 CORI Redacted

0031980-0031982                              *0031980 CORI Redacted

0031984-0031986                              *0031984; 0031986; 0032000-0032001 CORI and
0032000-0032001                              Attorney notes Redacted

0032016-0032017                              *0032016 Redacted

0032028-0032035                              *0032033-0032034 Redacted

0032037-0032044

0032046-0032052                              *0032051-0032052 Redacted

0032054

| | |
|---|---|
| 0032055-0032057 | Kerri Hogan Internal Affairs File |
| 0032060-0032068 | *0032060-0032061 Redacted |
| 0032070-0032074 | |
| 0032075-0032077 | William Bridgeforth Internal Affairs File |
| 0032079-0032080 | *0032075 Attorney notes redacted |
| | *0032080 Redacted |
| 0032082-0032101 | |
| 0032103 | |
| 0032105-0032106 | *0032106 Redacted |
| 0032109-0032119 | |
| 0032122-0032131 | |
| 0032133 | |
| 0032136-0032160 | *0032136-0032138; 0032143; 0032145; 0032147; 0032148; 0032154; 0032158; 0032160 Redacted |
| 0032164-0032187 | *0032164; 0032170-0032171; 0032187 Redacted |
| 0032189-0032190 | *0032189-0032190  Redacted |
| 0032192-0032209 | *0032192-0032195; 0032197-0032209 |
| 0032214-0032219 | *0032214-0032217 Redacted |
| 0032221-0032225 | *0032225 Redacted |
| 0032227-003229 | *0032227 CORI redacted |
| 0032231 | |
| 0032234-0032236 | George Downing Internal Affairs File |
| 0032238-0032239 | *0032239 Redacted |
| 0032241-0032259 | |
| 0032262 | |
| 0032265-0032269 | *0032265-0032269 Redacted |

0032271-0032286                              *0032271; 0032274; 0032277; 0032279
                                             Redacted

0032288-0032351                              *0032290; 0032293; 0032295-0032296;
                                             *0032303; 0032305-0032308 Redacted

0032354

0032360-0032361                              *032360-0032361 Redacted

0032362-0032365                              *0032362-0032365 Redacted

0032367-0032374                              *0032369; 0032370-0032374 Redacted

0032376-0032377

0032379-0032381                              Ronnie Jones Internal Affairs File
                                             *0032379 Attorney notes redacted
0032383-0032384
0032386-0032397

0032400
0032406-0032407                              *0032406 Redacted

0032409-0032413                              *0032409-0032410; 0032412  Redacted

0032415-0032429                              *0032415; 0032417-0032420; 0032422-
                                             *0032423; 0032428 Redacted

0032431-0032433                              *0032432 Redacted

0032435-0032439                              *0032435-0032438 Redacted
0032441-0032451                              *0032444-0032449 Redacted

0032453-0032457                              *0032453-0032454 Redacted
                                             *0032457 Redacted

0032460-0032464                              *0032462; 0032464 Redacted

0032466-0032473                              *00323466-00323468; 00323472 Redacted
0032475-0032477                              *00323475-00323476 Redacted

0032482-0032486                              *003234582-00323486 Redacted

| | |
|---|---|
| 0032489-0032527 | *00324590-0032493; 0032499; 0032502-0032505; 0032510-0032512; 0032514-0032516; 0032518-0032525; 0032527 Redacted |
| 0032531-0032533 | *0032531-0032533 Redacted |
| 0032535-0032537 | *0032535-0032537 Redacted |
| 0032540-0032542 | *0032540-0032541 Redacted |
| 0032544-0032551 | *0032542;0032544-0032551 Redacted |
| 0032553-003254 | *0032553 Redacted |
| 0032556-0003262 | *0032556 Redacted |
| 0032565-00032566 | *0032565 Redacted |
| 0032569-0032577 | Richard Beckers Internal Affairs File *0032572-0032574; 0032577 Redacted |
| 0032581-0032604 0032606-0032652 0032656 0032663-0032668 | *0032582 Redacted |
| 0032672-0032696 | |
| 0032700-0032703 0032705-0032707 0032709-0032736 0032738-0032855 | |
| 0032857-0032858 | *0032858 Redacted |
| 0032860-0032863 0032865-0032875 0032877 | |
| 0032879-0032887 | *0032879-0032882; 0032884; 0032887 Redacted |

15

| | |
|---|---|
| 0032890-0032938 | *00329892; 0032897-0032901; 0032913-0032915; 0032921; 0032924-0032925; 003297-0032929   Redacted |
| 0032940 | |
| 0032943-0032954 | *0032945-0032946; 0032948 Redacted |
| 0032957-0032961 | |
| 0032963-0032982 | |
| 0032984-0032987 | *0032985 Redacted |
| 0032991-0032994 | *0032991-0032994 Redacted |
| 0033003-0033005 | *0033003-0033005 Redacted |
| 0033007-0033046 | *0033007-0033009; 0033011; 0033013-003314; 0033016-0033017; 0033019-0033020; 0033026-0033036; 0033041; 0033045 Redacted |
| 0033049-0033053 | *0033050; 0033052 Redacted |
| 0033056-0033059 | *0033056-0033059 Redacted |
| 0033061-0033078 | |
| 0033080-0033091 | *0033061; 0033064; 0033066; 0033071; 0033073-0033075; 0033077-0033078; 0033080-033091 Redacted |
| 0033093-003394 | |
| 003397-0033102 | *0033093-0033094 Redacted 0033097-0033098 |
| 0033119-0033138 | *0033119-0033138 Redacted |
| 0033143-0033152 | *0033143-0033151 Redacted |
| 0033159-0033167 | *0033159-0033164; 0033166-0033167 Redacted |
| 0033176-0033178 | *0033176; 0033178 Redacted |
| 0033180-0033182 | *0033180-0033182 Redacted |
| 0033205-0033206 | *0033205 Redacted |
| 0033213-0033216 | |

0033223-0033227                          *0033223-0033224 Redacted
0033229
0033232-0033233                          *0033232 Redacted

0033235                                  *0033235 Redacted
0033238-0033246                          *0033238-0033246 Redacted
0033255-0033273                          *0033255-0033261; 0033263; 0033266-
                                         0033267; 0033272-0033273


0033275
0033278
0033285-0033300

0033302
0033304-0033309                          *0033305; 0033307-0033309 Redacted

0033311-0033321                          *0033312-0033317; 0033319-0033321
                                         Redacted

0033326-0033329
0033331
0033334-0033348                          *0033334; 0033337-0033348 Redacted

0033350-0033351                          *0033350-0033351 Redacted

0033354-0033367                          *0033354-0033260; 0033362-0033367
                                         Redacted


0033370-0033378                          *0033370; 0033372-0033378 Redacted

0033380-0033392                          *0033381; 0033383-0033388; 0033391-
                                         0033392 Redacted

0033396-0033399                          0033396-0033397; 0033399 Redacted


0033405-003413                           *0033405; 0033407-0033408; 0033410-
                                         0033411; 0033413 Redacted

0033416                                  *0033416 Redacted
0033425-0033437                          *0033425-0033437 Redacted

0033442-0033443                          *0033442-0033443 Redacted

0033445-0033446
0033455                                    *0033455 Redacted

0033458-0033469                            *0033458; 0033460; 0033462-0033465;
                                           0033468-0033469 Redacted


### DEFENDANTS' SIXTH SET OF PRODUCTION

0035403-0035545                            Transcript of departmental disciplinary
                                           hearing, Walter Washington and Shawn
                                           Harris v. Boston Police Department
                                           IAD Case No. 006-03

0035546-0035720                            Preston Thompson v. Boston Police
                                           Department Civil Service Commission
                                           hearing (Selavka testimony)


0035734                                    Notes from Roberta Mullen

**0035872-0035970**                        **Strength Reports (1/98-4/06)**


### DEFENDANTS' SEVENTH SET OF PRODUCTION


**0035872-0035970**                        **Strength Reports (1/98-4/06) (produced
                                           here again with Bates-stamped version)**


**0035999-0036012;**                       **Lists and charts of Rule 111 Violators**
**0036155-0036201**                        **(*non-plaintiff information redacted)**


**0036013**                                **Contacts sheet of other Police
                                           Departments for drug testing**

**0036014**                                **Chart of Rescheduled Drug Testing
                                           Appointments due to Insufficient Sample**

**0036015-0036022**                        **Drug Testing Notification Procedures**

**0036152-0036154**                        **Memorandum from Sgt. Devlin regarding
                                           AAMRO Symposium**

**EXHIBIT E**

# In The Matter Of:



*Ronnie Jones, et al. vs.*
*City of Boston, et al.*

---

*Joseph T. Devlin, Jr.*
*June 7, 2007*
*PORTIONS OF THIS TRANSCRIPT*
*MAY BE DESIGNATED CONFIDENTIAL*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*Videoconference Center*
*50 Franklin Street, Boston, MA 02110*
*Phone: (617) 426-2432*

Original File devlin.v1, Pages 1-105

**Word Index included with this Min-U-Script®**

Joseph T. Devlin, Jr.
June 7, 2007

Ronnie Jones, et al. vs.
City of Boston, et al.

Page 61

[1]     Q.   Just generally, I guess, what is this
[2]  document, this Drug Test Notification Procedures?
[3]     A.   I created this document so that when I was
[4]  away on vacation, whoever was covering for me while
[5]  I was gone would know what to do when various types
[6]  of results would come in and what files they should
[7]  keep.
[8]     Q.   Was there a particular individual that
[9]  would cover for you when you were on vacation or
[10]  many individuals?
[11]     A.   More than one person from time to time.
[12]  The vacation is over a five-year period.
[13]     Q.   With regard to the Keeper of the Records of
[14]  the hair test role that you had, was there more than
[15]  one person who would fill in for you when you were
[16]  on vacation over a five-year period?
[17]     A.   Yes.
[18]     Q.   When you left or when you retired from the
[19]  Boston Police Department, who succeeded you in the
[20]  role of Keeper of the Records of the hair test?
[21]     A.   Sergeant Detective Marisela Perez.
[22]     Q.   When you left the Boston Police Department,
[23]  did you provide this document, Devlin 4, to Ms.
[24]  Perez?

Page 62

[1]     A.   It would have been left behind in a
[2]  notebook, yes.
[3]     Q.   Did you have any discussion with Ms. Perez
[4]  about the Drug Test Notification Procedures when she
[5]  was succeeding you, I guess, as the Keeper of the
[6]  Records?
[7]     A.   Yes.
[8]     Q.   Was it your understanding she would
[9]  continue to follow the Drug Test Notification
[10]  Procedures set forth in Devlin 4?
[11]     A.   I have no idea. I would certainly hope so.
[12]     Q.   But you trained her on how to use these
[13]  procedures?
[14]     A.   I showed her, yes.
[15]     Q.   Would you turn to Page 4. Under "Positive
[16]  Safety-Net Result," it says, "Occasionally you will
[17]  receive" -- this is a quote. "Occasionally you will
[18]  receive more than one safety-net result." Did I
[19]  read that correctly?
[20]     A.   Yes.
[21]     Q.   What would the Department do if it got one
[22]  positive safety-net result and one negative result?
[23]     A.   That's considered a positive.
[24]     Q.   Why?

Page 63

[1]     A.   Because the hair is examined in sections if
[2]  it is long enough. The hair closest to the scalp is
[3]  the hair that is most recently grown out. The hair
[4]  that is furthest away would be an indicator of drug
[5]  usage from further back in time. So if the
[6]  safety-net test confirms that the person used drugs
[7]  further back in time, then that still confirms the
[8]  original result since the Department is checking
[9]  over what is on average a 90-day period.
[10]     Q.   What, as Keeper of the Records, would you
[11]  do in that situation with those results? In other
[12]  words, you have two safety-net results, one is
[13]  positive, one is negative. What happens to these
[14]  records?
[15]     A.   They go into the officer's file the same as
[16]  all the other records.
[17]     Q.   Both the positive result and the negative
[18]  result will go into the file?
[19]     A.   Correct.
[20]     Q.   How many times did that happen?
[21]     A.   I don't know.
[22]     Q.   More than once?
[23]     A.   I don't know. I would say more than once,
[24]  but I don't remember.

Page 64

[1]     Q.   Do you recall any of the individuals that
[2]  this happened with?
[3]     A.   No.
[4]     Q.   Is it reflected anywhere in the Rule 111,
[5]  Appendix D, that the result will still be positive
[6]  if there's two safety-net results, one being
[7]  positive, one being negative? Does the rule reflect
[8]  what will happen?
[9]     A.   No.
[10]     Q.   Who made the decision that it would still
[11]  be considered a positive if you received both a
[12]  positive and a negative safety-net result?
[13]     A.   I don't know.
[14]     Q.   Do you recall ever having discussions with
[15]  anyone at the Police Department about the issue of
[16]  having a positive and a negative safety-net result
[17]  for the same person?
[18]     A.   I'm sure I did, but I don't recall with
[19]  who.
[20]     Q.   Look to Page 6. Part D says -- this is a
[21]  quote -- "Have the negative safety-net memorandum
[22]  initialed by Superintendent Hussey." Did I read
[23]  that correctly?
[24]     A.   Yes.

**EXHIBIT F**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO.  05-CV-11832-GAO

| | |
|---|---|
| RONNIE JONES, RICHARD BECKERS, WALTER R. WASHINGTON, WILLIAM E. BRIDGEFORTH, SHAWN N. HARRIS, EUGENE WADE, GEORGE C. DOWNING, JR., CLARARISE BRISTOW, and the MASSACHUSETTS ASSOCIATION OF MINORITY LAW ENFORCEMENT OFFICERS,  )))))))))) | |
| Plaintiffs )<br>vs. )<br> )<br>CITY OF BOSTON, BOSTON POLICE DEPARTMENT, and KATHLEEN O'TOOLE,  as she is Police Commissioner for the Boston Police Department,  )))))))<br> )<br>Defendants ) | AFFIDAVIT |

I, Jim Fitzpatrick, do hereby affirm the following:

1) I am the IT Director of the Information Services Group ("ISG") at the Boston Police Department ("the Department").

2) I have worked in ISG for 13 years.

3) As part of my job, I oversee all information systems and technology for the Department.

4) The Department network performs automated routines every night that backup any electronic file that is on any office server or in any individual's inbox on the email server.

5) These backups are stored electronically on a hard drive that is between two and five terabytes.[1]

6) These backups store approximately ninety days worth of data from within the Department, however that length of time is constantly diminishing as more data is added to the network that is being "backed up" and thus the size of the backup increases while the amount of hard drive storage remains constant.

---

[1] 1 Terabyte = 1000 Gigabytes; 1 Gigabyte = 1000 Megabytes

7) To search through old, archived backups is a time consuming and difficult process. The process probably takes approximately ten minutes per term per user per day searched.

8) The Department requires that all files be stored on the server; no files are stored on the user's local drive.

9) Even if the Department received a letter or request asking us to retain documents for the next five years, the Department does not have the storage nor the resources to retain electronic data for more than ninety days.

10) When a Department employee leaves the Department, that individual's local machine is completely erased and re-imaged[2]; no data is retained unless a file had been posted to the server (and those are subject to deletion as indicated above.)

11) When a Department employee receives a new machine, the old computer is completely erased, re-imaged and transferred within the Department.

Signed, under the pains and penalties of perjury,

Jim Fitzpatrick, IT Director

7-2-07

Date

---

[2] Re-Imaging a drive involves restoring the drive to the original state from which it left the factory; in essence the original "image" of the drive as it was received at the Department is restored so that another user is given a clean machine.

2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 05-CV-11832-GAO

RONNIE JONES, RICHARD BECKERS,      )
WALTER R. WASHINGTON, WILLIAM       )
E. BRIDGEFORTH, SHAWN N. HARRIS,    )
EUGENE WADE, GEORGE                 )
C. DOWNING, JR., CLARARISE          )
BRISTOW, and the MASSACHUSETTS      )
ASSOCIATION OF MINORITY LAW         )
ENFORCEMENT OFFICERS,               )
                                    )
          Plaintiffs                )          AFFIDAVIT
vs.                                 )
                                    )
CITY OF BOSTON, BOSTON POLICE       )
DEPARTMENT, and KATHLEEN            )
O'TOOLE,  as she is Police Commissioner )
for the Boston Police Department,   )
                                    )
          Defendants                )
                                    )

I, Mike Cappellano, do hereby affirm the following:

1) I am a Network Administrator in the Information Services Group ("ISG") at the Boston Police Department ("the Department").

2) I have worked in ISG for 1 year, and have been a Network Administrator for 1 year.

3) As part of my job, I perform general network maintenance and network upgrades.

4) The Department network performs automated routines every night that backup any electronic file that is on any office server or in any individual's inbox on the email server.

5) These backups are stored electronically on a hard drive that is between two and five terabytes.[1]

6) These backups store approximately ninety days worth of data from within the Department, however that length of time is constantly diminishing as more data is added to the network that is being "backed up" and thus the size of the backup increases while the amount of hard drive storage remains constant.

---

[1] 1 Terabyte = 1000 Gigabytes; 1 Gigabyte = 1000 Megabytes

7) To search through old, archived backups is a time consuming and difficult process. The process probably takes approximately ten minutes per term per user per day searched.

8) The Department requires that all files be stored on the server; no files are stored on the user's local drive.

9) Even if the Department received a letter or request asking us to retain documents for the next five years, the Department does not have the storage nor the resources to retain electronic data for more than ninety days.


Signed, under the pains and penalties of perjury,

_(signature)_    7/2/07

Network Administrator Mike Cappellano    Date

2