# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **RONNIE JONES, ET AL.,** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | CIVIL ACTION |
| | ) | NO.  05-11832-GAO |
| **CITY OF BOSTON, ET AL.,** | ) | |
| | ) | **HEARING REQUESTED** |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
## MOTION TO COMPEL PRODUCTION OF NON-PRIVILEGED DEPOSITION
## TESTIMONY AND RULE 26 PRIVILEGE LOG

Nadine Cohen, BBO # 090040
Lawyers' Committee for Civil Rights
  Under Law of the Boston Bar Association
294 Washington Street, Suite 443
Boston, Massachusetts 02108
(617) 482-1145

Maricia Woodham, BBO # 600886
SABEL & SABEL, P.C.
Hillwood Office Center
2800 Zelda Road; Ste. 100-5
Montgomery, AL 36106
(334) 271-2770

Louis A. Rodriques, BBO # 424720
Rheba Rutkowski, BBO # 632799
Raquel J. Webster, BBO # 658796
Robert B. Baker, BBO # 654023
Eric A. Heining, BBO # 664900
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA 02110
(617) 951-8000


Counsel for Plaintiffs


Dated:  August 17, 2007

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................... 1

BACKGROUND ........................................................................................................................... 1

ARGUMENT ................................................................................................................................. 6

I.      DEFENDANTS FAILED ADEQUATELY TO ASSERT ATTORNEY-CLIENT
        PRIVILEGE........................................................................................................................ 6

II.     TO THE EXTENT DEFENDANTS COULD CLAIM ATTORNEY-CLIENT
        PRIVILEGE, THEY WAIVED THE PRIVILEGE BY ALLOWING
        DEPOSITION TESTIMONY ON SUBJECTS WHERE PRIVILEGE WAS
        CLAIMED ........................................................................................................................... 8

III.    DEFENDANTS WAIVED ANY ATTORNEY-CLIENT PRIVILEGE BY
        FAILING TO PROVIDE PLAINTIFFS WITH A PRIVILEGE LOG ............................. 9

CONCLUSION............................................................................................................................. 10

ACTIVE/72156634.1/0999997-0000928537

# <u>TABLE OF AUTHORITIES</u>

Page(s)

## FEDERAL CASES

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 190 F.R.D. 287 (D. Mass. 2000) ................6

*Avery Dennison Corp. v. Four Pillars*, 190 F.R.D. 1 (D.D.C. 1999) ................................9

*Borase v. M/A COM, Inc.*, 171 F.R.D. 10 (D. Mass. 1997)...........................................7, 8

*Brazburg v. Hayes*, 408 U.S. 665 (1972) ............................................................................6

*Cavallaro v. United States*, 284 F.3d 236 (1st Cir. 2002) ...................................................6

*Coastal Corp. v. Duncan*, 86 F.R.D. 514 (D. Del. 1980) ....................................................7

*Dorf & Stanton Commc'ns, Inc. v. Molson Breweries*, 100 F.3d 919 (Fed. Cir. 1996).......9

*FDIC v. Ogden Corp.*, 202 F.3d 454 (1st Cir. 2000)...........................................................6

*In re Grand Jury Subpoena*, 274 F.3d 563 (1st Cir. 2001)...............................................6, 9

*Greater Newburyport Clamshell Alliance v. Public Serv. Co. of N.H.*,
838 F.2d 13 (1st Cir. 1988)...................................................................................................8

*Mobil Oil Corp. v. Dept. of Energy*, 102 F.R.D. 1 (N.D.N.Y. 1983) .................................7

*Obiajulu v. City of Rochester*, 166 F.R.D. 293 (W.D.N.Y. 1996).......................................7

*Texaco Puerto Rico v. Dept. of Consumer Affairs*, 60 F.3d 867 (1st Cir. 1995) ................7

*United States v. Nixon*, 418 U.S. 683 (1974) ......................................................................6

*Vaughn v. Rosen*, 484 F.2d 820 (D.C. Ct. App. 1973) ........................................................9

*In re Xchange, Inc. Sec. Litig.*, No. 01-10322-RWZ, 2005 WL. 1532629
(D. Mass. June 29, 2005) ......................................................................................................9

*In re XYZ Corp.*, 348 F.3d 16 (1st Cir. 2003) .................................................................6, 8

## STATE CASES

*In the Matter of Roche*, 411 N.E.2d 466 (Mass. 1980)........................................................6

## FEDERAL STATUTES AND RULES

Fed. R. Civ. P. 26(b)(5)(A) ..................................................................................................1

## PRELIMINARY STATEMENT

Defendants' refusal to adequately respond to plaintiffs' discovery requests has continued at recent depositions, where defendants have repeatedly made improper and inconsistent assertions of attorney-client privilege and the work-product doctrine. In addition to depriving plaintiffs of discovery to which they are entitled, defendants' erratic and improper objections at depositions have had the effect of blurring any distinction that defendants have drawn between privileged and non-privileged materials, to the point that plaintiffs are unable to exercise their rights to challenge defendants' privilege designations in any meaningful way. Making matters worse, defendants have yet to deliver their long-promised and long overdue privilege log, despite the fact that plaintiffs have requested it repeatedly over the course of the last eight months. This Court should order defendants to cease their stonewalling and obstructionist discovery tactics in general, and specifically order defendants to (i) make Sandra DeBow available to provide the full and complete deposition testimony to which plaintiffs are entitled, and (ii) produce a detailed privilege disclosure log that is fully compliant with the requirements of Fed. R. Civ. P. 26(b)(5)(A).

## BACKGROUND

At her recent deposition, Sandra DeBow, former Deputy Director of Labor Relations for the Boston Police Department ("BPD"), stated that her responsibilities in that position included both legal and non-legal tasks. She described her job duties as follows:

> assist[ing] the director in advising the Commissioner in all matters of labor relations; to process grievances, particularly in the first two steps, on behalf of the City of Boston; to provide assistance and expertise in all the arbitrations; to help direct policy. I think that about covers it.

DeBow Transcript 13:15-23. Relevant portions of DeBow Transcript are attached hereto as **Exhibit A**. DeBow further clarified that "in all legal matters it was really straight line to the Commissioner." *Id.* at 13:24-14:7. DeBow stated that she had extensive discussions regarding hair testing with Commissioners Evans and Hussey, and one or two discussions with Commissioner O'Toole. *Id.* at 17:23-18:4. When plaintiffs attempted to examine DeBow

1

concerning the content of those discussions, defendants objected "to the extent that there is an attorney-client relationship. The conversations would be privileged." *Id.* at 18:8-10. defendants then asserted a blanket privilege as to "consultation between labor counsel, legal counsel, the police commissioner, [and] any other policy-makers who may be identified." *Id.* 18:4-9.

Defendants nevertheless permitted DeBow to testify "as to the reliance of the Department's policy-makers on the prehair drug testing efforts that were made by the Office of Labor Relations to review and consider the use of the hair drug test," effectively waiving any available privilege regarding those communications. *Id.* at 18:20-19:1. Defendants also agreed to allow "labor counsel to speak about their role in arbitration and in discussions with the Patrolmen's Union and any other unions." *Id.* at 18:1-4. Defendants further consented to "limited waiver with respect to Kathleen O'Toole's conversations with Ms. DeBow." *Id.* at 18:9-11. Accordingly, DeBow answered questions regarding her discussions with O'Toole, which focused on DeBow describing the hair-testing process for O'Toole. *Id.* at 20:18-22:7. Defense counsel later stated that "there is a waiver with respect to the communications between labor counsel and any decision-makers about that decision to go with the hair drug testing. It's not a blanket waiver of everything that was done." *Id.* at 19:12-20:16.

Defendants subsequently asserted attorney-client privilege when DeBow was asked about the nature of conversations with colleague Roberta Mullan with respect to hair testing. DeBow went so far as to state that the purpose of *every single* conversation with Mullan and other colleagues Ed Callahan (the former Director of Human Resources for the BPD) and Robin Hunt (the current Director of Human Resources for the BPD) was to provide legal advice regarding an arbitration or grievance.[1] *Id.* at 26:13-28:12. Defendants also asserted attorney-client privilege

---

[1] Regarding Mullan, DeBow testified:

| Question: | For example, did you ever have any meetings with Ms. Mullan and someone from Psychemedics? |
|---|---|
| Answer: | I don't think so. We may have had a conference call, but it would have been discussing a grievance or arbitration. |

when asked whether there was any concern within the BPD that minority officers were testing positive more frequently than white officers. *Id.* at 71:1-72:23, 73:14-76:7.  Finally, after DeBow reviewed Exhibit 12, a memo concerning drug testing statistics sent to Virginia Tisei and Bob Holland (outside counsel) and referencing Hussey, Evans, and Mary Jo Harris (legal advisor and lead counsel for the defendants in this litigation), plaintiffs questioned DeBow about her discussions with Commissioner Evans and Mr. Hussey and defendants again objected and asserted the attorney-client privilege.  *Id.* at 122:1-19.

Defendants' inconsistent approach to allegedly privileged communications appeared again at the deposition of Attorney Robert Boyle, Labor Counsel in the City of Boston Office of Labor Relations, who was examined extensively about each of the following topics:

- his job responsibilities with respect to the hair test; and a letter Boyle wrote to Attorney Susan Horwitz concerning follow-up to a meeting regarding sample collection procedures.  Boyle Transcript, 21:14-26:1  Relevant portions of Boyle Transcript are attached hereto as ***Exhibit B***;

- Boyle's conversations with Thistle at Psychemedics [*Id.* at 30:13-33:2];

- what BPD Attorney Holland told the Union during meetings about Rule 111 [*Id.* at 67:2-19];

| Question: | So is it fair to say you don't remember ever having any conversation, conference call, meeting with Ms. Mullan or anyone from Psychemedics outside the context of an arbitration? |
|---|---|
| Answer: | No.  There would be no reason. |

*Id.* at 27:11-20.  DeBow's testimony that she never spoke to Mullan about the hair test outside the context of an arbitration is dubious in light of a document defendants produced *after* Debow's deposition (and approximately one hour before Attorney Robert Boyle's deposition).  A copy of this document, a July 8, 1999 memorandum from Boyle describing a meeting with Psychemedics and its General Counsel Bill Thistle at BPD headquarters to discuss the hair test and its potential problems, is attached hereto as ***Exhibit M***.  The memorandum reflects that DeBow and Mullan attended the meeting and that the meeting in no way concerned pending arbitrations.  Defendants did not produce the Boyle memorandum until *six months after Mullan's deposition*.  In response to questions concerning information about Mullan's communications and meetings with Psychemedics, Mullan did not mention the meeting.  She also testified that she first met Thistle within two years of her January 2007 deposition.  Mullan Transcript, 38:16-17.  Relevant portions of the Mullan Transcript are attached hereto as ***Exhibit L***.

- whether the City ever investigated why African Americans are more likely to test positive on a hair test than other officers, even when Boyle testified as to the research and BPD Attorney Holland's brief. *Id.* at 82:11-84:1;

- a January 29, 1999 "question and answer" memorandum regarding information learned through discussions with Attorney Thistle at Psychemedics and documents and other attorneys in the Labor Relations Office. *Id.* at 91:9-93:21;

- a July 8, 1999 memorandum (attached hereto as ***Exhibit M***) that Boyle drafted regarding a meeting at BPD headquarters with Psychemedics, even when Boyle mentions discussions with BPD Attorney Holland. *Id.* at 117:13-125:12; and

- memorandum Boyle drafted Nov. 6, 1998 regarding "Called William Thistle Re: Hair testing protocol", memo to self or file while engaged in negotiations with BP Patrolmen's Association leading up to implementation of hair testing [*Id.* at 139:10-145:16].

Attorney Boyle was also questioned extensively regarding several memoranda that labor counsel generated for senior BPD policy-makers that conclude hair testing is accurate, reliable, and legally permissible.    These memoranda include a "Question and Answer" style memorandum drafted by Attorney Boyle in November 1998 (attached hereto as ***Exhibit C***) and two memoranda drafted by City of Boston Labor Relations Counsel Bill Murphy in November 1997 (attached hereto as ***Exhibit D***) and February 1998 (attached hereto as ***Exhibit E***), respectively.  In their continuing effort to provide only privileged information that they think is helpful for their position (while seeking to block everything else by asserting privilege), defendants did not object on privilege grounds to any of plaintiffs' questions to Attorney Boyle regarding these materials.

The relatively relaxed approach to privilege issues taken by the defendants at the Boyle deposition is similar to the tactics they employed at the deposition of former BPD Commissioner Kathleen O'Toole.  When O'Toole was questioned about what she did to determine whether hair testing was racially biased, defendants stated that they had no objection to O'Toole testifying to what she did as a consequence of conversations with lawyers and individuals from Labor Relations and Human Resources, including Sandra DeBow.  O'Toole Transcript, 21:2-24:3. Relevant portions of the O'Toole Transcript are attached hereto as ***Exhibit F***.    Defendants

similarly made no objection when O'Toole was asked to describe conversations with Human Resources, even when her response was that she remembered only collective discussions that were similar to those she had with the legal department about how the policy evolved and how confident people felt in the hair testing. *Id.* at 28:16-29:5.   Still, there was no objection when O'Toole was questioned regarding two letters concerning race and positive drug tests, dated January 17, 2006 and signed by Sandra DeBow (whom O'Toole testified was an attorney). *Id.* at 81:23-86:15.   Defendants did object, however, and claimed attorney-client privilege, when O'Toole was asked whether any of the individuals with whom she met voiced any concerns about hair testing *Id.* at 30:7-12.

Finally, despite plaintiffs' repeated requests, to date defendants still have not produced a privilege log, or made any disclosure sufficient to enable plaintiffs to assess defendants' numerous assertions of privilege and protection.   In response to plaintiffs' December 2006 request for a privilege log, defense counsel Harris responded that she needed to speak with her co-counsel and would get back to plaintiffs.   Plaintiffs' request is attached hereto as ***Exhibit G***; defendants' response is attached hereto as ***Exhibit H***.   As defense counsel has not responded to plaintiffs' counsel concerning the privilege log, plaintiffs reiterated their request for a privilege log in a letter dated January 22, 2007, attached hereto as ***Exhibit I***.   In response, attached hereto as ***Exhibit J***, defense counsel indicated that a privilege log would be forthcoming.   No privilege log was provided.   On July 12, 2007, after defendants produced -- only one hour before Attorney Boyle's deposition -- a critical document that concerns several previous depositions (attached hereto as ***Exhibit M***), plaintiffs demanded that defendants produce a privilege log immediately as part of a compromise to avoid sanctions for their belated production.   On July 13, 2007, defendants agreed to produce a privilege log.   Copies of electronic mail concerning this issue are attached hereto as ***Exhibit K***.   To date, no such privilege log has been produced.

## ARGUMENT

**I.    Defendants Failed Adequately to Assert Attorney-Client Privilege.**

Federal Rule of Civil Procedure 26(b)(1) provides that "[p]arties may obtain discovery regarding any matter, *not privileged*, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter." (Emphasis added). Both the state and federal courts have recognized the fundamental principle that the public has the right to every man's evidence. *Brazburg v. Hayes*, 408 U.S. 665, 688 (1972); *see United States v. Nixon*, 418 U.S. 683, 709 (1974) ("The need to develop all relevant facts in the adversary system is both fundamental and comprehensive."); *In re Roche*, 411 N.E.2d 466, 473 (Mass. 1980). Accordingly, it is well established that the attorney-client privilege "must be narrowly construed because it comes with substantial costs and stands as an obstacle of sorts to the search for truth." *In re XYZ Corp.*, 348 F.3d 16, 22 (1st Cir. 2003). *See Nixon*, 418 U.S. at 710 (stating that "exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth"); *Cavallaro v. United States,* 284 F.3d 236, 245-46 (1st Cir. 2002). In short, the attorney-client privilege "protects only those communications that are confidential and are made for the purpose of seeking or receiving legal advice." *In re XYZ Corp.*, 348 F.3d at 22; *see In re Grand Jury Subpoena,* 274 F.3d 563, 571 (1st Cir. 2001) ("[T]he privilege applies only to the extent necessary to achieve its underlying goal of ensuring effective representation through open communication between lawyer and client.").

The party asserting a privilege has the burden of establishing by a fair preponderance of the evidence that it applies and has not been waived. *See, e.g., FDIC v. Ogden Corp.*, 202 F.3d 454, 460 (1st Cir. 2000); *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 190 F.R.D. 287, 289 (D. Mass. 2000). Defendants have not even attempted to meet this burden and their blanket assertions of privilege -- *e.g.*, defendants' assertion of a blanket privilege as to "consultation between labor counsel, legal counsel, the police commissioner, [and] any other policy-makers

who may be identified" [DeBow Transcript 18:4-9 (attached hereto as ***Exhibit A***)] -- are wholly insufficient as a matter of law. *Borase v. M/A COM, Inc.*, 171 F.R.D. 10, 14 (D. Mass. 1997) (stating that conclusory statements will not suffice, rather, "the proponent must show by affidavit that precise facts exist to support the claim of privilege"); *Obiajulu v. City of Rochester*, 166 F.R.D. 293, 295 (W.D.N.Y. 1996) (holding that a general claim of privilege, be it work product or attorney client, is an inadequate response to a discovery request).

It is also well established that attorney-client privilege attaches only when the "in-house" counsel asserting the privilege is acting in a legal capacity. *Texaco Puerto Rico v. Dept. of Consumer Affairs*, 60 F.3d 867, 884 (1st Cir. 1995). The privilege does not apply when counsel is engaged in non-legal work, such as policy-making. *Id.* (citing *Mobil Oil Corp. v. Dept. of Energy*, 102 F.R.D. 1, 9-10 (N.D.N.Y. 1983) (rejecting claim of attorney-client privilege where proponent failed to show that lawyers were acting in their capacities as attorney advisors rather than as regulatory decisionmakers); *Coastal Corp. v. Duncan*, 86 F.R.D. 514, 521 (D. Del. 1980) (holding that proponents must show that lawyers were acting in their capacities as attorney advisors and noting that such a showing is particularly important where "attorneys function primarily as policy-makers rather than as lawyers"). Thus, an attorney who holds a non-legal position must prove that she was acting in her capacity as an attorney for all communications as to which the attorney client privilege is asserted. *See Borase*, 171 F.R.D. at 14 ("Such an attorney would have to be prepared to segregate [her] legal duties in a *clearly demonstrable fashion*.") (internal quotations and citations omitted) (emphasis added).

DeBow testified that her position as the Deputy Director of Labor Relations included both legal and non-legal tasks. ***Exhibit A*** (DeBow Transcript 13:15-23). She was not an attorney for the BPD, nor has she demonstrated that she was acting in a legal capacity during the conversations where she claims the attorney-client privilege. Indeed, defendants have offered no proof to establish that DeBow clearly separated her duties as Deputy Director and her duties as an attorney when discussing hair drug testing policies. *See Borase*, 171 F.R.D. at 14. Defendants cannot claim attorney-client privilege for communications with DeBow concerning

hair drug testing where they have failed to offer any proof that she was acting in her capacity as an attorney for the purpose of those communications.[2]  *Id.*

## II.    To the Extent Defendants Could Claim Attorney-Client Privilege, They Waived the Privilege By Allowing Deposition Testimony on Subjects Where Privilege Was Claimed.

The attorney-client privilege, like any privilege, can be waived.  *Greater Newburyport Clamshell Alliance v. Public Serv. Co. of N.H.*, 838 F.2d 13, 17 (1st Cir. 1988).  This is particularly true in civil proceedings where the "liberal federal policy favoring discovery is of substantially greater relative weight" because the privilege lacks a constitutional dimension.  *Id.* at 19.  *See In re XYZ Corp.*, 348 F.3d at 22 (explaining that the "idea that the attorney-client privilege may be waived is a direct outgrowth of [the] well-established construction" that the privilege protects only those confidential communications made for the purpose of seeking or receiving legal advice).  Thus, "[w]hen otherwise privileged communications are disclosed to a third party, the disclosure destroys the confidentiality upon which the privilege is premised."  *Id.*

It is axiomatic that a party cannot use "the attorney-client privilege as both a sword and a shield," *In re Keeper of Records*, 348 F.3d 16, 24 (1st Cir. 2003), yet that is exactly what defendants are attempting to do.  As outlined above, defendants asserted the attorney-client privilege in an inconsistent manner by allowing some individuals to testify about their

---

[2] During her deposition, DeBow testified that her colleague, Alicia McDonnell, was responsible for statements regarding the certification status of Psychemedics in a five-page document entitled "Hair Drug Testing: Fact vs. Fiction."  *See* ***Exhibit A*** (DeBow Transcript 94:18-95:1). McDonnell is another attorney in the defendants' Labor Relations Department, who, according to DeBow, investigated certain issues with respect to defendants' hair-testing policy.  On July 2, 2007, right after the conclusion of DeBow's deposition, plaintiffs noticed McDonnell's deposition for July 11, 2007.  Defendants have indicated several times that they plan to file a protective order concerning McDonnell's deposition, but they have not yet done so.  McDonnell, like DeBow, is an attorney employed by defendants who participated in investigating issues concerning the hair test and advising policy-makers concerning the defendants' hair testing policy.  As demonstrated herein, these topics are not privileged, and defendants have waived their right to assert privilege by producing documents and offering testimony concerning the same topics from other attorneys employed by the defendants.  Accordingly, plaintiffs request that this Court apply the same logic to McDonnell's deposition and order defendants to make McDonnell available to provide the full and complete deposition testimony to which plaintiffs are entitled.

communications regarding hair drug testing while prohibiting others from doing the same. Here, it is readily apparent that defendants are improperly asserting the privilege when the expected testimony will be damaging to their case but are waiving the privilege when the expected testimony will be helpful. For instance, defendants agreed to provide documents and testimony concerning their attorneys' work concerning the decision to adopt the hair test (where these attorneys concluded that the hair test is accurate, reliable, and legally permissive), but asserted the attorney-client privilege and refused to provide testimony or documents from their attorneys that were generated in deciding to keep the policy in place (including testimony regarding whether there was any concern within the BPD that minority officers were testing positive more frequently than white officers). As noted above, defendants produced and testified about several memoranda prepared by labor counsel that comment favorably on the alleged accuracy, reliability and legal permissibility of hair testing generally. *See **Exhibits C**, **D**, and **E***. Defense counsel did not object on privilege grounds to any of plaintiffs' questions to Attorney Boyle regarding these materials.

### III. Defendants Waived Any Attorney-Client Privilege By Failing to Provide Plaintiffs with a Privilege Log.

"A party that fails to submit a privilege log is deemed to waive the underlying privilege claim." *In re Grand Jury Subpoena*, 274 F.3d 563,576 (1st Cir. 2001) (citing *Dorf & Stanton Commc'ns, Inc. v. Molson Breweries*, 100 F.3d 919, 923 (Fed. Cir. 1996) (holding that failing "to provide a complete privilege log demonstrating sufficient ground for taking the privilege" waives the privilege)). *See also In re Xchange, Inc. Sec. Litig.*, No. 01-10322-RWZ, 2005 WL 1532629, *1 (D. Mass. June 29, 2005) (granting motion to compel production of documents where defendants failed to provide any privilege log to support their blanket assertions of attorney-client privilege); *Avery Dennison Corp. v. Four Pillars,* 190 F.R.D. 1, 1 (D.D.C. 1999) (describing privilege logs as "the universally accepted means" of asserting privilege claims in the federal courts); *cf. Vaughn v. Rosen,* 484 F.2d 820 (D.C. Ct. App. 1973) (articulating the justifications for requiring privilege logs in the context of the FOIA).

As outlined above, plaintiffs, over the last eight months, have repeatedly requested that defendants produce a privilege log. To date, no such privilege log has been provided. Because defendants have failed to comply with their discovery obligations, defendants have waived their right to assert any privilege and must produce all documents responsive to plaintiffs' requests.

## CONCLUSION

For the foregoing reasons, this Court should grant the plaintiffs' Motion and enter an Order compelling defendants to (i) make Sandra DeBow available for further deposition and (ii) produce a privilege log within ten (10) days of this Order. If a privilege log is not produced, defendants shall immediately produce all documents responsive to defendants' requests. Further, defendants should be ordered to pay the plaintiffs' costs, including attorneys' fees, incurred in bringing this Motion, in an amount to be determined upon submission of an affidavit setting forth such costs.

Respectfully submitted,

**Ronnie Jones, Richard Beckers, Walter Washington, William Earl Bridgeforth, Shawn N. Harris, Eugene Wade George C. Downing, Jr., Clararise Bristow, and the Massachusetts Association of Minority Law Enforcement Officers,**

By their attorneys,

/s/ Eric A. Heining
Louis A. Rodriques, BBO # 424720
Rheba Rutkowski, BBO # 632799
Raquel J. Webster, BBO # 658796
Robert B. Baker, BBO # 654023
Eric A. Heining, BBO # 664900
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA  02110
(617) 951-8000

Nadine Cohen, BBO # 090040
Lawyers' Committee for Civil Rights
Under Law of the Boston Bar Association
294 Washington Street, Suite 443
Boston, Massachusetts 02108
(617) 482-1145

Maricia Woodham, BBO # 600886
SABEL & SABEL, P.C.
Hillwood Office Center
2800 Zelda Road; Ste. 100-5
Montgomery, AL 36106
Dated August 17, 2007          (334) 271-2770

## CERTIFICATE OF SERVICE

    I hereby certify that, on August 17, 2007, a true copy of the above document was served upon the attorney of record for each other party electronically via the ECF/CM.

/s/ Eric A. Heining

# Exhibit A

13

1   certain categories or individuals or drugs?

2       A.  They are all tested.

3       Q.  Is it a urine test or a hair test or a

4   blood test?

5       A.  Urine.

6       Q.  Going back to the Deputy Director of Labor

7   Relations, was that a position within the Boston

8   Police Department or within the City of Boston?

9       A.  It was physically located at the Boston

10  Police Department, and I reported to the

11  Commissioner.  But I think on an organizational

12  chart it would have been under the City's Office of

13  Labor Relations.  It was so busy it was in essence a

14  satellite office.

15      Q.  What were your responsibilities as the

16  Deputy Director of Labor Relations?

17      A.  To advise the Commissioner on all matters

18  of labor -- to assist the director in advising the

19  Commissioner in all matters of labor relations; to

20  process grievances, particularly in the first two

21  steps, on behalf of the City of Boston; to provide

22  assistance and expertise in all the arbitrations; to

23  help direct policy.  I think that about covers it.

24      Q.  Did you report, then, to the assistant

14

1   director or to the Commissioner?

2       A.  I reported through the director, the

3   Director of Labor Relations.  I was the Deputy

4   Director.  That's his assistant.  So I reported to

5   the director to the Commissioner.  But in all legal

6   matters it was really a straight line to the

7   Commissioner.

8       Q.  When you were hired was the Commissioner

9   Mr. Evans.

10      A.  Yes.

11      Q.  Paul Evans?

12      A.  Yes.

13      Q.  Who was the director of labor relations

14  when you were hired?

15      A.  When I was hired it was Deputy

16  Superintendent John Ferguson.

17      Q.  Let's talk about the drug test and the

18  police department's drug test.  What role did you

19  have as the Deputy Director of Labor Relations -- or

20  roles did you have as the Deputy Director of Labor

21  Relations with respect to the police department's

22  drug test?

23      A.  Are we talking about the whole Rule 111?

24      Q.  Starting with that question, what is Rule

17

1    Q.  And what was Mr. Ferguson's role with
2  respect to drug testing or hair testing?
3    A.  He was the Director of Labor Relations.  So
4  his responsibility would be to take the
5  interpretations of the contract, to refer to legal
6  counsel when appropriate, and also to ensure that
7  the grievance process up to arbitration went as it
8  was required.
9    Q.  Who reported to you when you were the
10  Deputy Director of Labor Relations?
11    A.  We had an administrative assistant and then
12  later we had -- legal assistant was her title.
13    Q.  What was the legal assistant's name?
14    A.  Kathy Michaud.
15    Q.  Can you just spell Kathy's last name?
16    A.  M-i-c-h-a-u-d.
17    Q.  Who is the police commissioner that
18  succeeded Paul Evans during your tenure as deputy
19  director?
20    A.  The acting commissioner for some time was
21  James Hussey and then Kathleen O'Toole, and I left
22  before Ed Davis came.
23    Q.  Would it be accurate to say that you had
24  discussions with Mr. Evans, Mr. Hussey and

18

1  Ms. O'Toole about the hair test during your tenure
2  as Deputy Director?
3    A.  Extensively with the first two.  Only once
4  or twice maybe with Commissioner O'Toole.
5    Q.  Let's start with first Mr. Evans.  What
6  sorts of issues with respect to the drug test did
7  you discuss with him?
8    MS. HARRIS:  I'll object to the extent that
9  there is an attorney-client relationship.  These
10  conversations would be privileged.  If you want to
11  go off and see if we can narrow it, I'm happy to do
12  that.
13    MR. BAKER:  We can go off the record for
14  the time being.
15    (Discussion off the record.)
16    MR. BAKER:  We can go back on the record.
17  Can you, Ms. Harris, tell the court reporter what
18  the waiver is in respect to.
19    MS. HARRIS:  All right.  I'll just put on
20  the record for the Defendants that the Department
21  has agreed to waive its privilege as to the reliance
22  of the Department's policy-makers on the prehair
23  drug testing efforts that were made by the Office of
24  Labor Relations to review and consider the use of

19

1  the hair drug test.  We are also allowing labor
2  counsel to speak about their role in arbitrations
3  and in discussions with the Patrolmen's Union and
4  any other unions as that might come up.  We are
5  asserting the privilege as it relates to
6  consultation between labor counsel, legal counsel,
7  the police commissioner, any other policy-makers who
8  may be identified by the City or by the purse of
9  discovery in this case.  And we will agree to a
10  limited waiver with respect to Kathleen O'Toole's
11  conversations with Ms. DeBow.
12    MR. BAKER:  With respect to the memo that
13  you mentioned, the Reagan and Murphy memo, I guess a
14  question for you is, and the way that this was
15  reflected in the record, are you saying that there
16  is a waiver as to any analysis or any legal thought
17  process that went into the decision to use the hair
18  test initially?
19    MS. HARRIS:  No.  I'm saying that there is
20  a waiver with respect to the communications between
21  labor counsel and any decision-makers about that
22  decision to go with the hair drug testing.  It's not
23  a blanket waiver of everything that was done.
24    MR. BAKER:  I'm not understanding.  You are

20

1  saying that to the extent you produced a document
2  let's say that dealt with the decision to adopt hair
3  testing and the legal analysis of it and there was a
4  conversation with labor counsel and the commissioner
5  about that memo, I can ask about it?  You are
6  waiving as to that issue or not?
7    MS. HARRIS:  Well, the Murphy deposition
8  has already taken place.  So without having it
9  before me, I don't want to go over a
10  question-by-question analysis of it.  But I believe
11  that in that deposition we discussed the extent of
12  the waiver, and to that Murphy testified about the
13  cases he reviewed and about the departments that he
14  was aware of that used hair drug testing and
15  testified about the memos that he created that was
16  sent to Virginia Tisei who was his supervisor.
17    BY MR. BAKER:
18    Q.  Let's focus on your conversations with
19  Commissioner O'Toole.  With respect to drug testing,
20  what did you discuss with Commissioner O'Toole?
21    A.  I can remember, and I don't have a very
22  specific memory of it, she was not that involved,
23  and I can only assume it was because the program had
24  been up and running for so many years.  When she

21

1    first came there was either a case or litigation

2    that was going forward that got some media play, and

3    she just didn't know that much about hair testing

4    and needed to be brought up to speed and understand

5    the process and what it meant and the lingo and

6    that.  So I think it was when -- it may have even

7    been when she just started because I think Jimmy

8    Hussey was in that meeting as well.  So it was

9    bringing her up to speed.  I can't recall having any

10   other conversations with her.

11       Q.  When you say "bringing her up to speed,"

12   what sorts of issues were addressed?

13       A.  As to what hair testing was, what the

14   process was, the difference between a regular test

15   and a positive and a safety net and how they related

16   to each other, all that.

17       Q.  Other than those procedural issues, were

18   there ever any discussions with Ms. O'Toole about

19   the accuracy of the hair test?

20       A.  Well, I think in describing the process we

21   were assuring her of all the mechanisms that were in

22   place to ensure that it was an accurate test.

23       Q.  How about with respect to whether or not

24   there was, for example, a racial disparity with

22

1    respect to hair testing; did you ever discuss that

2    issue with Commissioner O'Toole?

3        A.  I really don't remember.  It's possible.

4    Again, I can't remember the context of the meeting

5    occurring so I don't remember specifically what it

6    was.  I mean, it could have been this lawsuit being

7    filed.  I just don't remember.

8        Q.  With respect to Commissioner Evans, did you

9    ever have a meeting with him where Psychemedics was

10   present, anyone from Psychemedics?

11       A.  Ever?

12       Q.  Ever.

13       A.  Most likely, yes.

14       Q.  Do you recall any of those conversations or

15   meetings?

16       A.  The one that comes to mind I think was with

17   MAMLEO, and I believe we brought Bill Thistle in.

18       Q.  And Bill Thistle is the general counsel of

19   Psychemedics?

20       A.  Vice-president.

21       Q.  He is also their general counsel?

22       A.  Yes.

23       Q.  What was discussed at that meeting?

24       A.  The same thing, process

26

1    police department?

2       A.  Right.  That's true.

3       Q.  Was Roberta Mullan the Director of

4    Occupational Health throughout --

5       A.  She was.

6       Q.  Throughout your tenure?

7       A.  Yes.

8       Q.  And who were the Directors of Human

9    Resources?

10      A.  Primarily Ed Callahan.  In the end Robin

11   Hunt, but I don't think I ever discussed drug

12   testing with them.

13      Q.  What was the nature of the conversations

14   that you had with Roberta Mullan with respect to the

15   hair test?

16      MS. HARRIS:  Objection.  I'm asserting the

17   attorney-client privilege for those conversations

18      Q.  When you had conversation with Roberta

19   Mullan with respect to the hair test, were you

20   providing legal advice to her?

21      A.  Yes, I was.

22      Q.  In every instance?

23      A.  Yes.

24      Q.  How about Ed Callahan and Robin Hunt; were

27

1    you providing legal advice in every conversation you

2    ever had with them about the hair test?

3       A.  I would have been briefing them on what I

4    had discussed with Bobbie Mullan.

5       Q.  Did you ever have any conversations with

6    Roberta Mullan or Ed Callahan or Robert Klein to

7    where someone other than an employee of the police

8    department was present at the meeting?

9       A.  Someone other than the police department,

10   no.

11      Q.  For example, did you ever have any meetings

12   with Ms. Mullan and someone from Psychemedics?

13      A.  I don't think so.  We may have had a

14   conference call, but it would have been discussing a

15   grievance or arbitration.

16      Q.  So is it fair to say you don't remember

17   ever having any conversation, conference call,

18   meeting with Ms. Mullan or anyone from Psychemedics

19   outside the context of an arbitration?

20      A.  No.  There would be no reason.

21      Q.  How about -- do you know what Business

22   Health Management is?

23      A.  Yes.  They provide MRO services.

24      Q.  Did you ever have any conversations with

28

1    Ms. Mullan and anyone from Business Health

2    Management about the hair test?

3       A.  It would have been the same.  Yes, with

4    regard to legal counsel -- I mean, providing legal

5    advice regarding a grievance or arbitration.

6       Q.  I guess those are -- let me just break it

7    down.  Was every single time that you had a

8    conversation with Ms. Mullan and somebody from

9    Business Health Management, whether it be by

10   telephone or person, did that concern an arbitration

11   or litigation?

12      A.  Yes.

13      Q.  Do you believe the hair test is accurate?

14      A.  I do.

15      Q.  Why?

16      A.  It's highly reliable.  There are so many

17   safeguards in place that it's virtually 100 percent

18   accurate.  Psychemedics is -- provides these

19   services internationally to Fortune 500, Fortune 100

20   companies, many major police departments, and they

21   have -- you know, I don't know what else to say

22   other than that.

23      Q.  Are there any other reasons other than what

24   you have mentioned, and I can go through them

71

```
1    Q.  Was there any concern that you were aware
2   of in the police department about the fact that four
3   times as many minority officers were testing
4   positive on the hair test than white officers?
5        MS. HARRIS:  You mean concern about the
6   validity of the test?
7        MR. BAKER:  No.
8    Q.  Was there any concern within the Boston
9   Police Department about these figures reflected on
10  Page 13?
11       MS. HARRIS:  I'll object to the extent that
12  would call for attorney-client communications.
13   Q.  To the extent -- other than to the extent
14  that it would reflect an attorney-client privileged
15  communication, can you answer the question?
16       MS. HARRIS:  In other words, can you answer
17  that question without disclosing an attorney-client
18  communication?
19       THE WITNESS:  Right.  And I am trying to
20  think if I can.
21   A.  The purpose of this --
22       MS. HARRIS:  Sandra, that's not the
23  question.
24   A.  Ask the question again.
```

73

```
1   to MAMLEO -- did you deliver this presentation to
2   MAMLEO?
3    A.  Alicia McDonnell did but I was present.
4    Q.  Other than just reciting the facts on Page
5   13, do you recall what else was discussed during the
6   presentation?
7    A.  This presentation and the slide
8   presentation was delivered by Alicia.  I do not
9   believe there was any discourse through it, and
10  there may have been questions at the end that we
11  answered.  Can you ask the question again.  I'm
12  sorry.
13   Q.  Well, I'll be more direct in getting at it.
14  You say you can't recall anything other than
15  attorney-client privileged communication where --
16  perhaps an attorney-client privileged communication
17  where you discussed the concerns that the police
18  department had with respect to the statistics in
19  terms of who was testing positive on a racial basis?
20   A.  Right.
21   Q.  Is that subject something that came up at
22  MAMLEO?
23   A.  Whether they had a concern or whether the
24  department had a concern.
```

72

```
1    Q.  The question I asked was, in a very simple
2   way, was there any concern within the police
3   department that you were aware of about the
4   statistics reflected on Page 13?
5        MS. HARRIS:  With the caveat it's not
6   attorney-client communication.
7    A.  I don't think I can answer that.
8    Q.  Just so we are on the same basis as to
9   attorney-client communication, it could be in the
10  presence of a third-party, for example.  It has to
11  be confidential, and it would have to be for the
12  purpose of soliciting or providing legal advice?
13   A.  Right.
14   Q.  Other than within that context do you
15  recall any concern within the police department
16  about the statistics on Page 13?
17   A.  So I'm shaking my head because I can't
18  answer, not because the answer is no.
19   Q.  You just don't recall?
20   A.  No, I don't believe I can answer that
21  question.
22   Q.  Okay.  Because of the privilege issue?
23   A.  Right.
24   Q.  When you were delivering this presentation
```

74

```
1    Q.  Whether the department had a concern and
2   whether the department, for example, was looking
3   into the issue, is this something that you ever
4   conveyed to MAMLEO or Ms. McDonnell conveyed to
5   MAMLEO?
6    A.  The purpose of this presentation was to
7   convey to MAMLEO that we did not have concerns --
8   that was the purpose of this -- and the reasons why
9   we didn't have concerns.  And I believe at that time
10  based on the discussion back and forth, that we
11  achieved that at that time in the meeting because
12  there was not extensive discussion.
13   Q.  Did you convey why the City didn't have
14  concerns about the racial statistic issue with
15  respect to the hair test to MAMLEO?
16   A.  Did we convey?  Through the presentation.
17  You know, I haven't looked at this presentation in a
18  long time, but I think that we go through the
19  mechanisms that are in place to protect police
20  officers from false positives.
21   Q.  Well, did MAMLEO express a concern to you
22  that there was a, for lack of a better term,
23  disparate statistic in terms of who was testing
24  positive on the hair test?  Was that something
```

75

1    MAMLEO conveyed to you at any point?

2        A.   To us?

3            MS. HARRIS:  To you.

4        A.   To me?

5        Q.   To you.

6        A.   No, I don't believe I spoke to MAMLEO

7    specifically.

8        Q.   Was that something that you became aware of

9    that MAMLEO was conveying to someone at the police

10   department?

11           MS. HARRIS:  Again, I'll object to

12   attorney-client communications, to the extent that

13   it does.

14           MR. BAKER:  I don't know how that could

15   possibly be privileged.

16       Q.   But if you can answer the question.

17           MS. HARRIS:  Well, considering MAMLEO is a

18   party to this suit, I would think that if there was

19   a challenge made by MAMLEO based on the disparate

20   impact, it would go directly to MCAD litigation.

21       Q.   How about in the context of this

22   presentation, is this something that you were aware

23   of when you went into the presentation or not, that

24   MAMLEO was concerned about disparate statistics with


76

1    regard to the hair test?

2        A.   That was the purpose of the meeting, I

3    believe.

4        Q.   So were you just assuming that MAMLEO had a

5    concern about it or had MAMLEO expressed it to the

6    police department?

7            MS. HARRIS:  Same objection.

8        A.   I don't know how the meeting came about

9    specifically.

10       Q.   If you could turn to Page 16, and this

11   slide is called "Facts and Figures, Officers Testing

12   Positive By Race/Gender."  Why was this slide

13   included in this presentation?

14       A.   I don't recall specifically except that,

15   again, we were trying to be transparent and give

16   them as much information as possible.  I don't

17   remember why it was race and gender other than it

18   was another fact for them.

19       Q.   Well, the statistic would indicate, I

20   think, that 57.8 of positive test results were

21   attributed to African Americans as of the time of

22   this presentation; is that correct?

23       A.   Say that again.

24       Q.   From this chart we can see that the total

94

1    This was a new fact that had come to light.  But

2    Alicia would have been more involved in that than

3    me, and that's why I think that she wrote it.

4        Q.  Are you saying that the -- what we just

5    looked at there, "Psychemedics was approved by the

6    FDA to conduct hair analysis drug testing for the

7    five illicit drugs," that that's a fact that came to

8    your awareness through litigation?

9        MS. HARRIS:  I object.  He is not looking

10    for you to guess.  Do you know where it came from?

11        A.  Yes.  Alicia had this information.  It

12    wasn't my litigation.  It was her litigation.

13        Q.  So other than the fact that Ms. McDonnell

14    put this statement together that determined that it

15    was a fact, you don't know what the basis for this

16    statement is; is that correct?

17        A.  Say that again.

18        Q.  Other than the fact that -- are you saying

19    that Ms. McDonnell wrote this sentence, that

20    "Psychemedics Laboratory is the only lab in the

21    United States to be approved by the FDA to conduct

22    hair analysis drug testing for the five illicit

23    drugs that we test for under Rule 111," Are you

24    saying that she drafted that sentence?

95

1        A.  Yes.

2        Q.  So you didn't know whether or not that was

3    a fact or not other than what Ms. McDonnell told

4    you?

5        A.  All the vast majority of our conversations

6    with regard to drug tests had to do with litigation

7    because that's what we did, and I had seen it on the

8    FDA Web site.  I was aware that they had approved

9    it, but I was not working with this material.  So

10    yes, I got that information through Alicia.

11        Q.  But you also saw it in the FDA Web site, is

12    that what you are saying, that Psychemedics had

13    been, quote, "Approved by the FDA to conduct hair

14    analysis drug testing for the five illicit drugs"?

15    You saw that on the FDA Web site?

16        A.  At some point.  I don't have any direct

17    knowledge, I guess.  I don't have any clear

18    recollection.

19        Q.  You don't know if you ever saw this on

20    the -- this fact reflected on the FDA's Web site?

21        A.  This fact as it is written in this document

22    I do not have any knowledge as to whether I saw that

23    on the FDA Web site.

24        Q.  With regard to Psychemedics and the FDA Web

122

1    Q.  I am going to go back to some questions I

2    asked you earlier, then.  What discussions did you

3    have with Commissioner Evans about the validity of

4    the hair test?

5        MS. HARRIS:  I'll object and instruct her

6    not to answer, and understand you can move to

7    compel.

8    Q.  How about Mr. Hussey; what conversations

9    did you have with Mr. Hussey with respect to the

10   validity of the hair test?

11       MS. HARRIS:  The same objection.  Same

12   instruction.

13       MR. BAKER:  So you are instructing the

14   witness not to answer?

15       MS. HARRIS:  That's correct.

16       MR. BAKER:  We will reserve our rights to

17   file a motion to compel.  If we prevail, we reserve

18   our rights to have Ms. DeBow come back and answer

19   the questions.

20       MS. HARRIS:  Whatever you want to do.

21          (Document marked as DeBow

22          Exhibit 13 for identification)

23   Q.  This is a document numbered 36002 to 36004

24   consecutive.  And it doesn't have the COB Bates

# Exhibit B

21

1  period of time.

2      Q.  Could you elaborate on that, please.  In

3  what way did you rely upon Mr. Holland?

4      A.  Well, we'd report to him.  We'd call him up

5  and ask him questions, and you know, send him

6  e-mails.  He was outside counsel -- he was a

7  resource for us.

8      Q.  Were you his client?

9      A.  True.  Yes.

10      Q.  And do you recall where Mr. Holland worked

11  during that period?

12      A.  Deutsch Williams -- Deutsch, Williams,

13  Holland & Truckman.

14      Q.  During the time that you were labor counsel

15  which includes the present time, as I understand it,

16  what were your job responsibilities with respect to

17  the hair test?

18      A.  For the entire period of time?  All right.

19  Well, I think I need to break it down.  Virginia

20  Tisei had me involved in the -- I think it was June

21  8th of -- 1998 in June, Boston Police Patrolmen's

22  Police Association signed the Collective Bargaining

23  Agreement that included the hair testing provisions.

24  And I came in in October, and we were -- the office

22

1  was at that time looking towards bargaining

2  procedures for sample collection.  The Collective

3  Bargaining Agreement said the parties would get

4  together and bargain about how the samples are going

5  to be collected and so forth.

6          And I was involved as a new labor attorney,

7  as, you know, most junior labor attorney with Robert

8  Holland, Virginia, Mike Reagan and Bill Murphy and

9  Sandra DeBow, in collective bargaining strategy as

10  to the meetings that we had with the patrolmen.  I

11  attended some of those meetings.  I would be in the

12  prep sessions for some of those.  And I wrote some

13  correspondence.  But I wasn't assigned to it other

14  than to help out.  It was not a team approach, I

15  guess.

16      Q.  In your position as labor counsel are there

17  people in the office who report directly to you?

18      A.  No.

19      Q.  You mentioned several names just a moment

20  ago when you were describing your job

21  responsibilities.  I believe these included Bill

22  Murphy, Mr. Reagan, Mr. Holland, Ms. Tisei and

23  Ms. DeBow.  I believe you have already testified

24  that you reported to Ms. Tisei and that Mr. Holland

23

1  was outside counsel to your office.  Can you tell me

2  a little bit about your working relationship with

3  Mr. Murphy and Ms. DeBow and Mr. Reagan?

4      A.  Okay.  Virginia was the Director of Labor

5  Relations.

6      Q.  Yes.

7      A.  Michael Reagan was her Deputy Director at

8  the time.  So he was my immediate supervisor.

9  William Murphy was a more senior labor attorney in

10  the office, and he was kind of a mentor to me at the

11  time because I was transitioning from doing civil

12  litigation in the law department to coming over to

13  Labor Relations.

14      Q.  And Ms. DeBow?

15      A.  She was the Deputy Director of Labor

16  Relations at the Boston Police Department.  She

17  worked with John Ferguson.  John Ferguson was the

18  director -- he was the superintendent of the Boston

19  Police Department.  He was a sworn member of the

20  department, and he was the Director of Labor

21  Relations at the time.  So I would also interact

22  with him.  He would be in those meetings, those

23  discussions.

24      Q.  Mr. Ferguson would be?

24

1      A.  Yes.

2      Q.  So it sounds as if you sat in on a number

3  of meetings that concerned the hair test and also

4  wrote some correspondence concerning the hair test;

5  is that fair?

6          MS. FERRER:  Objection.

7      A.  I recall one letter that I wrote to Susan

8  Horwitz of the Boston Police Patrolmen's --

9  actually, she is an attorney.  She is at Sandulli

10  Grace, and it concerned follow-up to one of the

11  meetings that we had regarding sample collection

12  procedures.

13      Q.  Do you recall anything else about that

14  correspondence?

15      A.  Yes.  I recall the correspondence.  I

16  almost have a mental picture of it.

17      Q.  Do you remember approximately when it was

18  sent?

19      A.  It was sent -- I'm just going to guess.  It

20  was sent in 1999.  I can't remember when it was

21  sent.  I can't recall.

22      Q.  But it concerned bargaining over collection

23  procedures?

24      A.  Yes, it did.  The Appendix D to Rule 111

25

1  providing those provisions, those procedures.

2    Q.  Why did you have to write to her about

3  that?

4    A.  We had a meeting.  And I was coming into

5  this bargaining -- it had already begun before I

6  came there in October.  The contract closed June of

7  1998, and the Department wanted to implement the

8  hair testing.  Before they did that they had to

9  negotiate with the Union over what the sample

10  collection procedures and so forth would be.  So

11  they had started that.  I don't know when they

12  started that, but it was ongoing when I got there.

13    So I started to sit in on a couple of those

14  meetings.  Negotiations were actually winding down.

15  A lot of things were already resolved.  There were a

16  few things that were unresolved.  I recall a meeting

17  that Bob Holland led for the City.  Susan Horwitz

18  led for the Boston Police Patrolmen's Association.

19  And basically the meeting was where Bob Holland was

20  asking her to, you know, what the remaining

21  issues, and she gave a handful.  I simply wrote her

22  a letter and said, "Would you please respond to us

23  in writing regarding what the handful of issues are

24  remaining that you see."  It was an effort to try to

26

1  get some closure on her to move the process along.

2    Q.  Do you recall any other correspondence that

3  you either sent to or received regarding the hair

4  test during the time that you worked as labor

5  counsel?

6    A.  I don't recall any others for that time

7  period that we're talking about.  Do you see what I

8  am saying?

9    Q.  I do.

10    A.  You asked me about '92 to '98.

11    Q.  What about other time periods; do you

12  recall sending or receiving other correspondence

13  regarding the hair test at any other time?

14    A.  Not regarding the hair test itself but

15  regarding arbitrations, sure, I corresponded with

16  the union, I called them on the phone; but that was

17  the grievance arbitration.

18    Q.  So is it fair to say, then, that outside of

19  the time that you spent in your current position as

20  labor counsel you have not ever had any job

21  responsibilities with respect to the hair test?

22    A.  That's true.

23    Q.  The only job responsibilities you ever had

24  with respect to the hair test were in your current

30

1   Q.  Have you looked?

2   A.  Yes.

3   Q.  Where?

4   A.  Well, I don't know if you have the

5   arbitration materials from the hair testing case

6   that I was putting on with Joseph Ambash, but I have

7   looked at the issue off and on for the past, I don't

8   know how many years, nine years.

9   Q.  But always and only in your capacity as

10  labor counsel?

11  A.  True, and defending arbitrations and so

12  forth.

13  Q.  Have you ever met with, spoken to or

14  corresponded with anyone from Psychemedics?

15  A.  Yes.

16  Q.  Who was that?

17  A.  William Thistle and more recently there was

18  someone who came on board at Psychemedics who is

19  the -- he became the contact for the hair testing

20  arbitration that we were doing, and the person's

21  name slips my mind.  He was a Psychemedics employee.

22  Q.  Is there anything that you can think of

23  that would refresh your recollection as to the name

24  of that employee?

31

1   A.  I don't know if he appeared at any hearing

2   dates, if there was a transcript, but there is "Also

3   Present" on it that would refresh my memory.  If I

4   think of it, I'll tell you.  I'm having a mental

5   block right now.  I'm sorry.

6   Q.  It happens to all of us.  How many times

7   did you speak with Mr. Thistle from Psychemedics?

8   A.  Numerous times.

9   Q.  More than ten?

10  A.  Yes.

11  Q.  During what years did these communications

12  take place?

13  A.  Well, I know from -- not from memory, but I

14  know from one of the documents that you have, I

15  think the first time I spoke to him was November 1st

16  of 1998.

17  Q.  How did you come to speak to him on

18  November 1st, 1998?

19  A.  I don't know.

20  Q.  Were you speaking in person or was it over

21  the telephone?

22  A.  Over the phone.

23  Q.  Over the phone.  Did you call you?

24  A.  I called him.

32

1   Q.  Why did you call him?

2   A.  It had something to do with work that was

3   going on in the Office of Labor Relations, and I

4   presume that it had to do with the -- I don't know

5   exactly what the circumstances are, but I believe

6   that it was basically for my own information of

7   trying to study the materials that we had,

8   understand the hair test, and basically, you know,

9   prepare myself to be part of the team to be meeting

10  with the Boston Police Patrolmen and talk about the

11  hair test.  I was trying to school myself as to the

12  issue that we would be discussing once I sat across

13  the table from the Union to talk about the sample

14  collection procedures.

15  Q.  Did any of your supervisors instruct you to

16  call Mr. Thistle for that purpose?

17  A.  I don't think so.

18  Q.  Okay.  So as I understand it, you phoned

19  Mr. Thistle because you wanted to educate yourself

20  on the hair test generally?

21  A.  Well, part of it.  I had read the

22  materials, and I also wanted to talk to someone at

23  the corporation.  So in other words, my memory is I

24  had an understanding of, you know, what the

33

1   materials were and -- I had an idea.  I also wanted

2   to talk to someone from the company, I guess.

3   Q.  Just to be clear, when you say "I had read

4   the materials," which materials are you referring

5   to?

6   A.  Well, there was some studies that had come

7   out and was shared with the Union during the

8   contract negotiations, I was told.  I can't

9   remember.  There was a whole package of information

10  that Bob Holland put together.

11  Q.  Was there actually a Redweld or a box

12  filled with these materials?

13  A.  I don't know if they were three-ring

14  binders or what it was.  I can't really describe it

15  to you.

16  Q.  But as you recall, they had been collected

17  in some fashion by Mr. Holland?

18  A.  I can tell you by 2000 when -- in 1998 the

19  patrolmen settled volunteer only.  In 2000 the

20  Federation was engaged in interest arbitration to

21  settle their contract.  So a lot of these things

22  were put together by Bob Holland and Mike Reagan and

23  Bill Murphy for that Federation interest

24  arbitration.  So a lot of the material I see in

1    what the sentence means.

2        Q.  So what would have been a better way to

3    express what the rule says, then?  If this is badly

4    worded, what would be a better way to express it?

5        MS. FERRER:  Objection.

6        A.  I think Robert Holland told the Union

7    during these meetings that we'll give you

8    the -- it's actually -- the conversation is actually

9    encapsulated in the transcript.  I think Susan

10   Horwitz testified to it during the Robert Pullido

11   arbitration what that conversation was.  And the

12   conversation was, does Psychemedics have a procedure

13   similar to the retesting they have for uranalysis.

14   Yes, it does.  They call it a safety net.  The

15   safety net is performed pursuant to Psychemedics'

16   procedures.  Well, we want to have that.  Okay.

17   Fine.  You can have it.  That, in a paraphrase, was

18   the conversation, all right.  It results in this

19   sentence.  I didn't write the sentence.

20       Q.  Thank you.

21       A.  Okay.  Is one of the purposes of the

22   safety-net test to help ensure that the first test

23   was not a false positive?

24       MS. FERRER:  Objection.

82

1    the fact that both with urinalysis and with hair
2    testing you might get an incidence of positive among
3    some artificial classification or of human beings.
4    I'm aware of that research, all right.  But taking
5    any one particular person and saying this person is
6    more likely to test positive or have a false
7    positive than any other particular person, I
8    disagree with that.  So when you say to me has the
9    City ever investigated why African Americans more
10   likely tested positive, I disagree with that.
11       Q.  If I were to change the question to say has
12   the City ever investigated why African Americans in
13   class are more likely to test positive on a hair
14   test than other officers, what would you say to
15   that?
16       MS. FERRER:  Objection.
17       A.  Well, I know what issue you are talking
18   about, and it was researched.  You know, it was
19   looked at.
20       Q.  By whom?
21       A.  By the police department, by the Office of
22   Labor Relations, by the Boston Police Patrolmen's
23   Association.  And this was negotiations and
24   discussions that were ongoing when I arrived at the

83

1    office, and it's something that we have been dealing
2    with in terms of repeated arbitrations, you know,
3    over time.
4        Q.  Did any of these bodies that you just
5    mentioned reach any conclusions as to why African
6    Americans as a class are more likely to test
7    positive on the hair test?
8        MS. FERRER:  Objection.
9        A.  What I'm saying is that the issue was, you
10   know -- part of the -- the research showing that
11   there is not a race bias in hair testing was
12   provided to the Boston Police Patrolmen's
13   Association during contract negotiations.  They
14   agreed to the hair testing, and you know, the
15   interest arbitrator awarded to the City.  Subsequent
16   arbitrations where people have challenged hair
17   tests, too, the City did not lose those
18   arbitrations.  The City prevailed in those
19   arbitrations.  So it's come up on numerous
20   occasions, and on each case, you know, the idea that
21   there is a race bias in hair testing hasn't held
22   water basically.  You know, if you look at Bob
23   Holland's brief from June of 2000 he talks about in
24   there it's been something he's looked at,

84

1    researched, and so forth over time.
2        Q.  Thank you.  But you used some words that
3    were different from the ones I used.  You spoke of a
4    race bias in hair testing.  What do you mean by a
5    "race bias in hair testing"?
6        A.  The allegation that you are referring to,
7    okay.  See, I get to use my own words, right?
8        Q.  Of course.
9        A.  So you are saying, you know, has anyone
10   investigated why African Americans are more likely
11   to test positive, all right.  And I have told you a
12   couple of times I disagree with that phrasing, that
13   statement, all right.  What I believe -- what I take
14   you, in order to answer your question since you are
15   referring to this race bias allegation, that is
16   reported in the literature that I talked about,
17   okay.  And, you know, it's something that we have
18   been aware of that is out there as an allegation,
19   and we have looked at it thoroughly.  And we are
20   completely convinced that it holds no water.
21       Q.  I think we are talking about two different
22   things.
23       A.  I don't know.  I don't know what we're
24   talking about.

91

1    MR. HEINING:  Would you please mark this as

2    an exhibit.

3        (Document marked as Boyle

4        Exhibit 3 for identification)

5    Q.  Mr. Boyle, take a moment to review this

6    document and let me know when you are ready to

7    proceed.

8    A.  (Witness reviews document)  Yes, sir.

9    Q.  Have you seen this before?

10   A.  Yes, sir.

11   Q.  What is it?

12   A.  It's the Q and A that I talked about when

13   we first started here this afternoon.

14   Q.  Who wrote it?

15   A.  I did.

16   Q.  When did you write it?

17   A.  January 29 of 1999.

18   Q.  Why did you write it?

19   A.  We talked about this in the beginning.  I

20   couldn't understand how it was that I prepared this.

21   I believe Virginia Tisei assigned it to me.  I was

22   trying to remember -- when I was told I was

23   potentially going to be deposed about this document

24   I was trying to remember why I wrote it.  I couldn't

93

1    that you wrote this approximately three months after

2    you started?

3    A.  Right.  I don't remember exactly in October

4    when I started.  So yes, three months after coming

5    into the office, right.

6    Q.  And all of the information that's reflected

7    in this Q and A document was learned or gathered by

8    you during that three-month period?

9    A.  True.

10   Q.  You didn't know any of this before you

11   started in your current position?

12   A.  Not a shred.

13   Q.  And you learned some of it from Bill

14   Thistle and you learned other parts of the

15   information from documents that have been gathered

16   and collected and accumulated over time by your

17   colleagues in the Office of Labor Relations?

18   A.  Documents and other attorneys, you know,

19   conversations with other attorneys.  "What's hair

20   testing?"  So they would tell me what hair testing

21   is.

22   Q.  Did you write all of this?

23   A.  Yes.  I don't know about -- someone has got

24   a scratch in the -- I don't know if that's my

92

1    really recall.  I know she asked me to do it.  I

2    couldn't recall why she would do that.  So based on

3    the November 1, 1998, document I'm assuming -- I'm

4    asking Bill Thistle these questions over the phone.

5    He is giving me the answers.  I'm typing them down.

6    I'm assuming she saw them or somebody in the office

7    saw them and said, "Why don't we write this up

8    into..."  I'm just guessing, but that's my

9    understanding of it.

10   Q.  So did the information that's in this

11   document come from Bill Thistle?

12   A.  Yes and no.  Some of it did but some of it

13   did not.  I think this document was my effort to get

14   up to speed on the hair testing for the negotiations

15   that we were going to do about the Appendix D and

16   where I was going regarding Appendix D.  I was

17   trying to get up to speed on that.  So I relied on

18   -- for example, Bill Thistle didn't tell me how to

19   spell "radioimmunoassay."  So I'm reading things

20   that I'm taking from the research material that was

21   available at the office.  You know, I didn't come

22   into the office three months earlier knowing any of

23   this, about three months.

24   Q.  Sorry.  Just to be clear, are you saying

117

1    A.  That's how I signed up for the e-mails.

2    Q.  I take it that was on the World Wide Web?

3  That was a www site?

4    A.  Right, right, right.

5    Q.  My understanding from your counsel is that

6  Psychemedics has an intranet or internal Web site

7  that's accessible only to presumably employees and

8  so on.  Do you have access to that site?

9    A.  I wasn't aware of it.  I don't know if I

10  have access to it, but I wasn't aware of it.

11    Q.  All right.  We can put that aside for a

12  moment.

13        (Document marked as Boyle

14         Exhibit 5 for identification)

15    Q.  The same drill, Mr. Boyle.  Please take a

16  moment to review the document, and let me know when

17  you are ready to proceed.

18    A.  (Witness reviews document)  Okay.

19    Q.  Have you seen this before?

20    A.  Yes.

21    Q.  What is it?

22    A.  It's a memo that I found yesterday

23  afternoon on my computer.

24    Q.  Was that the first time you had ever seen

118

1  it?

2    A.  The first time I saw it was July 8, 1999,

3  when I wrote it.

4    Q.  Why did you write this memo?

5    A.  I attended a meeting -- all I know about

6  it -- this is past recollection recorded.  I have to

7  tell you I have no memory of being in this meeting.

8  I can't deny I was there, but I don't remember being

9  in the meeting.

10    Q.  You are referring now to the meeting that's

11  described in the memo?

12    A.  Yes.

13    Q.  This is the meeting at BPD headquarters?

14    A.  Yes.

15    Q.  You mentioned, I believe, that you just

16  found this yesterday, and prior to yesterday you

17  hadn't seen the document in years, is that right?

18    A.  Yes.  I don't know how many years, yes.

19    Q.  What prompted you to find this document

20  yesterday?

21    A.  The deposition.

22    Q.  I thought you testified earlier today that

23  you had previously gathered documents in response to

24  document requests that the Plaintiffs served on

119

1  Defendants in this case; is that right?

2    A.  Yes.

3    Q.  But you didn't find this at that time?

4    A.  True, as far as I know.  I could be lodged

5  in a Bankers Box somewhere, but I don't recall

6  seeing it.  I didn't know if it had been produced;

7  provided it in case it hadn't.  But I was involved

8  in that discovery process, all right.  I went

9  through the bargaining files, Xeroxed pages of

10  bargaining notes.  I tried to be as comprehensive as

11  possible.

12    Q.  But this document, this is stored on the

13  hard drive on the computer?

14    A.  Yes.

15    Q.  That's your computer at City Hall; is that

16  right?

17    A.  True.

18    Q.  Did you search the files on that computer

19  when you were previously gathering documents

20  responsive to Plaintiffs' document request?

21    A.  No.

22    Q.  So you didn't look on that computer for

23  documents to produce in this litigation until

24  yesterday?

120

1    A.  I was under the assumption that everything

2  was on file in hard copy.  So when I was responding

3  to the discovery I got the hard copies together, and

4  in terms of, you know, Q and A -- looking for the Q

5  and A, I came across this (indicating exhibit).

6    Q.  So you found this yesterday.  And what did

7  you do with it when you found it?

8    A.  I provided it to counsel for the purpose

9  of, you know, any necessity to supplement discovery.

10    Q.  When was that?  What time of day?

11    A.  Well, let's see.  We had fire negotiations

12  all day yesterday.  I got back to my office around

13  4:00.  I had to get home.  I had my two kids

14  downtown, as we talked about during the break.  So

15  sometime between 4:00 and 5:30.

16    Q.  So sometime between 4:00 and 5:30 yesterday

17  you provided this to your counsel?

18    A.  Yes.

19    Q.  How did you do that?  By e-mail?

20    A.  Yes.

21    Q.  Did somebody ask you to write this memo?

22    A.  No.

23    Q.  What did you do with it after you wrote it?

24    A.  Apparently I left it on my computer.

121

1    Q.  Who is Patrick Kelley from Psychemedics?
2    A.  I don't know.
3    Q.  Have you ever met Patrick Kelley?
4    A.  Apparently once, but I don't recall meeting
5    him.  He is not the person whose name I'm trying to
6    remember.
7    Q.  Who is Bobbie Mullan?
8    A.  Roberta Mullan is the director of the
9    Occupational Health Service at the Boston Police
10   Department.
11   Q.  And Bernie Kelly, who is Bernie Kelly?
12   A.  I should know but I don't.
13   Q.  If you know?
14   A.  I don't know.  Go ahead.
15   Q.  You write in the second paragraph, "Patrick
16   Kelley showed a Psychemedics videotape on sample
17   collection procedures."  I believe, if I'm not
18   mistaken, earlier today you referenced a
19   Psychemedics videotape?
20   A.  Right.
21   Q.  Is this the same videotape?
22   A.  I don't know.  And the reason is I didn't
23   see the original.  Deputy Ferguson had the tape.  I
24   said, "What's on it?"  I had never sat down and

122

1    watched it.  I just wanted to make sure he had seen
2    it before he gave it to the Union.
3    Q.  In the third paragraph you write, "Patrick
4    Kelley discussed the possibility of prescription
5    drugs contributing to a positive test result."  Is
6    it your understanding that the use of legal
7    prescription medication can result in a positive
8    result on the hair test?
9    MS. FERRER:  Objection.
10   A.  You know, this was an issue that was
11   discussed as part of the negotiations.  I remember
12   when, you know, I think in talking to Bob Holland,
13   you know, at the time people were saying that people
14   had concerns about eating poppy seeds and testing
15   positive.  So one of the things we were saying is
16   no, you can't test positive because you ate poppy
17   seeds.  And you know, so along that line this person
18   apparently had a concern about Tylenol with codeine
19   which I don't know if that's a prescription drug or
20   not.  Okay.  It says -- so in other words, I guess
21   the concern here was Tylenol with codeine, a
22   prescription drug, is going to influence the test.
23   I'm just reading from the third paragraph.
24   Q.  Right.  What I'm interested in is your

123

1    understanding as you sit here today, can Tylenol
2    with codeine or other prescription drugs influence
3    the results of a hair drug testing?
4    MS. FERRER:  Objection.
5    A.  I haven't thought about it in a long time.
6    I haven't had reason to think about it in a long
7    time.  I haven't really read this.  You know, I just
8    saw it and said, you know... I haven't gone through
9    this in detail at all.
10   Q.  If you look at the last paragraph that
11   starts on this first page, the one that begins, "BK
12   then asked BT if external contamination was a
13   concern."  Do you see that paragraph?
14   A.  Yes.
15   Q.  The next sentence says, "BT said that
16   external exposure to drugs can lead to drugs getting
17   into the bloodstream"?
18   A.  Right.
19   Q.  Is it your understanding as you sit here
20   today that external exposure to drugs can lead to
21   drugs getting into the bloodstream?
22   MS. FERRER:  Objection.  Just for the
23   record it reads in part only that.  You may answer.
24   A.  I think -- I don't understand what he is

124

1    saying.  I'm not an expert, but as I sit it here
2    today I would tend to disagree with it.
3    Q.  I'm not sure I understand what you mean
4    when you say "tend to disagree with it"?
5    A.  I disagree with it, although I'm not
6    qualified to disagree with it.  It's just my
7    opinion.  I don't think that's true.  And I don't
8    know -- you know, for example, I'm typing what I
9    heard at a meeting in my office.  So don't get the
10   impression this is word for word.  I was sent to a
11   meeting, took some notes, didn't provide it to
12   anyone, and apparently never printed a hard copy
13   because it didn't go with the other hard copied
14   documents that were produced in discovery.  It
15   stayed on my computer for nine years.
16   I think that from the arbitration that we
17   did the information that I heard was different, and
18   it made more sense the way it was explained in the
19   arbitration.  So I don't think, as I sit here today,
20   it gets into the bloodstream.
21   Q.  Do you doubt the accuracy of anything you
22   have written here in this report?
23   A.  Honestly, I haven't read the whole thing.
24   It's three pages long.  I was told before I went on

125

1    vacation I was going to be deposed or could be

2    deposed. I wasn't told I was going to be deposed.

3    There was a possibility of being deposed. I was

4    going to be deposed about a Q and A that I had

5    written nine years ago. My only -- I wasn't looking

6    this up for today's deposition. I was looking this

7    up because -- well, there was the automatic

8    discovery in Federal Court in that drug testing

9    case. We spent time putting the hard documents

10   together. "Here's another document." So I, you

11   know, haven't read through it. I didn't see a need

12   to read through it. I don't know what it says

13        Q.  I would like to draw your attention back to

14   that same sentence, the one that begins, "BT said

15   that external exposure to drugs can lead to drugs

16   getting into the bloodstream, but in such small

17   amounts that the appropriate cutoff level would

18   render it a negative."

19        A.  Uh-huh.

20        Q.  As you sit here today is it your opinion

21   that it's false that external exposure to drugs can

22   lead to drugs getting into the bloodstream and

23   therefore the cutoff level is irrelevant --

24        MS. FERRER:  Objection.

139

1  a person who takes drugs is breaking the law, as you
2  pointed out.  We have also got the compassionate
3  policy where we give the first-time offender the
4  45-day suspension as opposed to immediate
5  termination.  So it is what we are saying, it's a
6  compassion policy.  And the idea of cutoffs was
7  something that's an industry standard as opposed to
8  something that the Boston Police Department came up
9  with.
10      Q.  Let's look at another exhibit.
11          (Document marked as Boyle
12          Exhibit 6 for identification)
13      Q.  Mr. Boyle, I want to ask the same question
14  as before.  Please take a moment and review this and
15  let me know when you are ready to proceed.
16      A.  (Witness reviews document)  Yes, I'm ready.
17      Q.  Have you seen this before?
18      A.  Yes.
19      Q.  What is it?
20      A.  It is a memo to file dated November 6th,
21  1998.
22      Q.  Who wrote it?
23      A.  I did.
24      Q.  Why?

140

1      A.  "Called William Thistle Re: Hair testing
2  protocol."
3      Q.  Why did you call him?
4      A.  We were engaged with the Boston Police
5  Patrolmen's Association in negotiations that led up
6  to the implementation of a hair testing protocol.
7  So this is a memo about hair testing protocol to
8  myself or to my file.
9      Q.  So you didn't provide this memo to anyone
10  else?
11      A.  I don't know.  As we said earlier, you
12  know, I think this has something to do with the
13  other exhibit, but I can't swear to that.  It might
14  have led to Exhibit 6 -- no.  I'm sorry.  The
15  other -- the 1999 document, Exhibit 3.
16      Q.  Thank you.  Was this one of the documents
17  on your computer at City Hall yesterday?
18      A.  True.
19      Q.  Prior to yesterday when was the last time
20  you saw it?
21      A.  November 6th, 1998.  I'm just going by the
22  date.  I don't recall seeing it on November 6th,
23  1998.
24      Q.  You did not find this document when you

141

1  previously searched for documents responsive to the
2  Plaintiffs' discovery requests in this litigation?
3      A.  True.
4      Q.  Why not?
5      A.  The same reason, when I gathered documents
6  for the case I was under the assumption that if I
7  had a document that it would be printed out, and I
8  would have the opportunity to, you know, go through
9  the hard copy, produce the hard copy documents.  So
10  you know, it was just something on my computer.  I
11  didn't go through my computer.
12      Q.  When you were searching for documents
13  responsive to the Plaintiffs' discovery request did
14  you search any electronic media?
15          MS. FERRER:  Objection.
16      A.  No.
17      Q.  Were you asked to search any electronic
18  media?
19      A.  As I said --
20          MS. FERRER:  Objection.
21      A.  -- I don't recall being asked.  I recall --
22  I had the hair testing arbitration at the same time
23  that I heard that this lawsuit was being filed, and
24  I knew that people were going to need my assistance

142

1  in putting together a Bankers Box full of documents.
2  So when that period of time came, I worked for a
3  couple of days putting together a Bankers Box full
4  of documents, as I described, Xeroxing bargaining
5  notes and so forth, with the assistance of the law
6  department.
7      Q.  What did you do with this particular
8  document after you found it yesterday?
9      A.  I sent it to counsel.
10      Q.  Did you send this to counsel yesterday at
11  approximately the same time that you sent the other
12  memo that you found yesterday?
13      A.  True, about the same time.
14      Q.  Via e-mail?
15      A.  Yes, the same e-mail.
16          MR. HEINING:  While we are on the record,
17  we are going to reserve our rights not only to
18  reopening this deposition but also the depositions
19  of other witnesses who are mentioned or otherwise
20  implicated by these documents, given that we only
21  received them at 12:15 today.  We have made an
22  effort to review them in a very short amount of time
23  that we had, but it was obviously not sufficient.
24  So we are going to reserve those rights.

143

1    Q.  Mr. Boyle, do you recall ever talking with

2    anyone about this memo?

3    A.  No, I don't.

4    Q.  How did you come up with the list of

5    questions that we see here?

6    A.  I was having a conversation with Bill

7    Thistle.  And I was asking questions, and he was

8    giving answers.  You know, so I think what I'm doing

9    is -- I'm guessing.  I have no memory of this.  But

10   I think what I'm doing is I'm saying here's the

11   question I have.  Here's the answer.

12   Q.  Is it fair to say that the answers that are

13   provided to the questions in this document were

14   given to you by Mr. Thistle?

15   A.  Well, I would just give the caveat, you

16   know, as we talked about with the other document,

17   Exhibit 5, I think it's a note to myself, you know,

18   for my purposes which are, you know, just to have

19   myself some notes from a phone call.  I wasn't

20   trying to take them down word for word, you know,

21   paraphrasing, you know.  I can't say that he said

22   these words, any one of them.

23   Q.  I understand.  The question is not whether

24   you are quoting Mr. Thistle verbatim in this

144

1    document.

2    A.  Sure.

3    Q.  The question is simply whether it was

4    Mr. Thistle and no one else who provided you with

5    the answers to the questions that you wrote here?

6    A.  I think that this is as a result of the

7    phone call as opposed to any other source.

8    Q.  And on that phone call was anyone present

9    aside from you and Mr. Thistle?

10   A.  No.

11   Q.  Is it your testimony that you believe that

12   this document was later developed into the Q and A

13   memo that we reviewed earlier today?

14   A.  Well, what I want to say is I was trying to

15   come to an understanding as to how the Q and A was

16   developed.  Why I was assigned to it, how I was

17   assigned to it, I don't recall.  I knew you were

18   going to ask me about it.  I didn't want to say "I

19   don't know."  So looking at this I still have to say

20   I don't know.  I believe they are related.  I

21   believe this is like a draft, and someone worked

22   this up into something more.  But I believe they are

23   related, but I don't know.

24   Q.  So in other words, if I may paraphrase what

145

1    you just said -- and please correct me if I'm

2    wrong -- this document dated November 6th, 1998,

3    which is your notes on a call with Mr. Thistle, was

4    used as a draft version of the Q and A memo that you

5    produced later?

6    MS. FERRER:  Objection.

7    A.  You know, I'm going to equivocate.  I

8    haven't really thought about this in a long time.  I

9    don't have a memory.  The other Q and A doesn't talk

10   about -- and I haven't read through this entirely

11   even as I sit here today.  I don't know about --

12   just taking the first question and answer, the

13   question and answer is different, the information is

14   different, so I don't know -- as opposed to the

15   Exhibit 3.  So I don't know if they have a

16   relationship at all whatsoever.

17   Q.  Thank you.  I would like to direct your

18   attention to the third question on the first page of

19   this document.  It says, "Can an officer have a

20   false positive outside contamination?"  Do you see

21   that question?

22   A.  I see it.

23   Q.  The answer begins, "There are two

24   independent ways the company prevents false

# Exhibit C

**MEMO**
TO FILE
FROM BOB BOYLE
RE: HAIR TESTING
DATE: NOVEMBER 6, 1998

Called William Thistle (Tel. 868-7455) re the hair testing protocol.

### What if subject is bald?

Company uses body hair from under arm, etc. or resorts to urinalysis.
Self-induced baldness means that the subject has to be rescheduled for testing.

### What happens to the remains of the sample?

The process involves digesting the hair with enzymes. The liquid is tested. The liquid is thrown out. The test sample includes about 50 mg of hair and only 10 mg are needed to perform the test. The remainder of the sample is kept on file. Can be retested. Negative hair kept for one month. Positive hair kept for one year.

### Can an officer have a "false positive" from outside contamination?

There are two independent ways the company prevents false positives. First, the test measures metabolites of the drugs, i..e., the products of digestion of the drug. For example, "Carbonic THC" is different from THC found externally on hair from ambient smoke.
Second, the hair sample is aggresively cleaned with chemical agents prior to testing. Not only do they study the hair, but they also study the wash. If there's nothing on the outside but there's something on the inside, that's from use. (The methodology consists of comparing the ratio of ng on the outside versus ng on the inside of the hair. A positive means that the ratio has been exceeded beyond what could possibly be from mere environmental exposure)

### Are the cut off levels standardized?

Psychemedics is the largest tester, performing 90 % of the tests across the country, such that whatever other companies do is the minority practice. Other companies do not have less rigorour standards. One in PA uses .4 ng as cut off whereas psychemedics uses .5 ng.

(International Society for Hair Testing, Strasbourg, France working on standards. Florida has come up with some standards. Bill Thistle of Psychemedics has wrote an article in Security Management magazine talking about what you want in a hair testing company).

### Is there a preliminary test followed by a confirmatory test—or a second chance?

There is a preliminary screen at the lab. For-sure negatives are screened away. Suspicious samples receive further scrutiny through various tests. To be positive, you are screened positive then confirmed positive. All positive results are confirmed using GC/MS or the more sophisticated GC/MS/MS tests.

The company also recommends that retesting or second-chances be given to people who complain of a positive result, saying that there must have been a lab error. The lab retains 40 mg. of the original sample. Negative results are available at the lab within 24 hrs of receipt of sample and positive results are available in 2 to 3 days. In no case would the subject be without notification from the lab more than ten days assuming the sample was mailed the day it was taken. If so, then a sample taken 10 days later for a second, retest would lead to the same positive result. Also, the original sample is available to compare to the second sample.

"Safety net testing"

New sample can be analyzed if first result is challenged. This is not possible with urinalysis. This is because a second sample can be tested for the same approximate time window as the original test. The company actually has what it calls its "Safety Net Program".

Hair testing is better than urinalysis because of this feature: you can retest the same time period by collecting two different samples.

**What is the turn around time for notification?**     See above  The lab is open 24 hours a day.

**Is there a video of the process?**    Yes.

**What info does the Department get from the lab?**

The department gets a certified report stating the cut off level and the level reported in the test.

**Are the samples tamper proof?**

The company has a protocol for rejecting unsealed samples, samples with first names missing, etc. Some samples would be rejected as "externally contaminated" if they arrived in rough shape. Notice of rejection of sample is sent to department.

**Can the medical review officer determine the ID of the tested officer?**  Yes.


**Other information not responsive to any particular question.**

Suppose that a document request went to the lab for all documents related to the batch of samples that contained the subject / grievant's sample. What paperwork would there be from the lab?

The lab saves paperwork received with the sample. It saves left over hair. There are computer reports documenting the lab results. These are certified by staff person. There is also paperwork relating to the receipt of batches of samples. Some clients have electronic transfer of test results. Company reports back negatives and positives.

There's an ACLU web site that raises the issue of whether light hair tests differently from dark hair—raising the specter of a racially discriminatory drug screen process. Thistle says that there have been huge clinical studies of large departments, such as Chicago, where the results of the hair testing was similar to results for urinalysis for all sorts of groupings: blacks, women, etc. The material reports that Psychemedics process takes "melanin" out of the hair, so that the hair is actually colorless when tested.

# Exhibit D



**Office of Labor Relations**

Virginia M. Tisei, Esq., Director

Boston City Hall, Room 624
Boston, Massachusetts 02201

(617) 635-4525
FAX: 635-3690

# MEMORANDUM

## CONFIDENTIAL – NOT A PUBLIC DOCUMENT

TO:         Virginia Tisei, Director, OLR

FROM:    Bill Murphy, Labor Relations Counsel $\mathcal{BM}$

DATE:     November 17, 1997

RE:         Random Drug Testing in the Boston Police Department

You have requested that I conduct research on the issue of random drug testing in preparation for the ongoing negotiations with the BPPA, and the likely interest arbitration before the JLMC. Specifically, you asked me to research the case law in Massachusetts, as well as the Supreme Court's, the federal courts', and other state's decisions on the issue. As part of this research, I also reviewed decisions regarding a union's authority to waive an individual's constitutional rights, including the right to be free from unreasonable searches and seizures. Cases and articles regarding hair analysis for indications of prior drug use, and the right to privacy in one's hair is also part of the materials.

Pursuant to my research, I also contacted several police departments across the nation that currently have a random drug testing policy. Copies of the policies from New York City, Ft. Worth, Texas, Jacksonville, Florida, and Kansas City, Missouri are

COB 0031179

Thomas M. Menino, Mayor

Virginia Tisei, Director, OLR
November 17, 1997
-page 2-

supplied in the materials. Finally, I have attached copies of several states' Bill or

Declaration of Rights, including Massachusetts' Declaration of Rights, and have included

past memos from our office on the issue of random drug testing.

I.    THE MASSACHUSETTS SJC HAS DEEMED RANDOM URINALYSIS
      DRUG TESTING OF POLICE OFFICERS TO BE AN UNREASONABLE
      SEARCH AND SEIZURE IN VIOLATION OF ARTICLE 14 OF THE
      MASSAUCHUSETTS DECLARATION OF RIGHTS.

      A.    **Guiney and O'Connor – The Need to Make a Strong Factual Showing
            that a Drug Problem Exists and the Issue of Officer Consent.**

      Massachusetts does not have a statute which specifically addresses the topic of

drug testing. As such, there is no statutory prohibition against random drug testing of

employees. Pursuant to Article Fourteen of the Massachusetts Declaration of Rights,

however, all individuals are to be protected from unreasonable searches and seizures. In

pertinent part, the Massachusetts Declaration of Rights directs that: "Every subject has a

right to be secure from all unreasonable searches and seizures, of his person, his houses,

his papers, and all his possessions." Art. XIV. The Fourth Amendment to the United

States Constitution is virtually identical to the foregoing provision. Despite this fact, the

state may afford its citizens greater constitutional protections against unreasonable

COB 0031180

Virginia Tisei, Director, OLR
November 17, 1997
-page 3-

searches and seizures than may be required by the United States Supreme Court's

interpretation of the Fourth Amendment. See Commonwealth v. Blood, 400 Mass. 61,

67-75 (1987). Accordingly, despite Supreme Court decisions finding random urinalysis

testing of police officers to be constitutional for Fourth Amendment purposes, and despite

the United State Court of Appeals for the First Circuit's decision that such a random

testing policy in Boston was constitutional for Fourth Amendment purposes, the SJC, in

Guiney v. Police Commissioner of Boston, 411 Mass. 328 (1991), declared that random

urinalysis testing of police officers is an unreasonable search and seizure, violative of

Article 14 of the Massachusetts Declaration of Rights.

The Guiney case involved Boston Police Department Rule 111, which was issued

by then-Boston Police Commissioner Mickey Roache. Specifically, Rule 111 called for

the random urinalysis testing of police officers in order to preserve the "integrity of the

Department and its personnel; to guard against the harmful consequences of the public

good occasioned by the unauthorized use" of drugs by law enforcement personnel; and to

"maintain a high degree of public confidence in all those charged with upholding public

order and public safety.". See Guiney v. Roache, 654 F.Supp. 1287, 1289-94 (D.Mass.

1987), vacated 873 F.2d 1157 (1ˢᵗ Cir. 1987), cert. denied 493 U.S. 963 (1989). While

Commissioner Roache conceded that urinalysis involves a search and seizure for Article

Fourteen purposes, the SJC still had to decide whether the random urinalysis testing

COB 0031181

Virginia Tisei, Director, OLR
November 17, 1997
-page 4-

procedure that Rule 111 imposed was an <u>unreasonable</u> search and seizure under Article

Fourteen.

In determining that random urinalysis testing violated Article Fourteen, the SJC

found that the Commissioner failed to make a strong factual showing that a drug problem

existed in the Boston Police Department. <u>Guiney</u> at 333. Further, the SJC rejected the

U.S. Supreme Court's decision in <u>National Treasury Employees Union v. Von Raab</u>, 489

U.S. 656 (1989), wherein the Supreme Court held that proof of a problem is not required

because "it is sufficient that the Government have a compelling interest in preventing an

otherwise pervasive societal problem from spreading to the particular context". <u>Id.</u>

quoting <u>Von Raab</u> at 675, n.3. Finally, the SJC distinguished the <u>Guiney</u> decision from

its decision in <u>O'Connor v. Police Commissioner of Boston</u>, 408 Mass. 324 (1990),

where the Court found random urinalysis of police cadets to be reasonable where such

cadets consented in advance to the testing.

In <u>O'Connor</u>, the SJC balanced the governmental need for the random search

against the search's intrusiveness into a person's reasonably expected privacy right.

While the SJC in <u>O'Connor</u> considered the cadets' consent as a factor, noting that the

intrusiveness of the mandatory urinalysis was diminished by the cadets' agreement to be

tested before accepting employment, the Court was also clear that the cadets' consent was

not the sole reason for allowing random urinalysis, since "the plaintiff would not be

COB 0031182

Virginia Tisei, Director, OLR
November 17, 1997
-page 5-

barred from relief if his consent to be the subject of a search and seizure were

unreasonably required as a condition of employment". Id. at 329. In fact, it is a well-

established legal principle that public employment may not be conditioned upon the

surrender of constitutional rights which could not be abridged by direct government

action. Id. at 341 (O'Connor, J., Dissenting) citing Broderick v. Police Commissioner of

Boston, 368 Mass. 33, 37 (1975). Rather, the O'Connor Court followed the Supreme

Court's decisions in Von Raab and Skinner v. Railway Labor Executive Assn., 489 U.S.

602 (1989), and ruled that the City's rule was a reasonable search and seizure since its

"compelling interest in determining whether cadets were using drugs and in deterring

such use outweighed the plaintiff's privacy interest under art. 14. Id. at 330.

   Therefore, the Guiney Court's reliance on "consent" as a distinguishing factor, in

my opinion, is tenuous at best. That being said, however, Guiney has essentially made

the issue of consent an overriding factor when determining whether a random drug test is

reasonable under Article Fourteen. Accordingly, pursuant to the state of the law in this

area after Guiney, the Department could possibly prevail on a challenge to a random

urinalysis policy only if it:

1.  Shows, with concrete examples, that a drug problem currently exists in the
    workforce; or

2.  Proposes a policy that would require all new hires to consent to random
    drug testing.

COB 0031183

Virginia Tisei, Director, OLR
November, 17, 1997
-page 6-

    B.    **PURSUANT TO MASSACHUSETTS DECISIONS, THE PROCESS
OF URINALYIS, AND NOT DRUG TESTING ITSELF, IS AN
UNREASONABLE SEARCH AND SEIZURE IN VIOLATION OF
ARTICLE FOURTEEN – THE POSSIBILITY OF HAIR
ANALYSIS.**

Under both Guiney and O'Connor, the SJC analyzed whether random urinalysis of police officers is a reasonable search and seizure under Article Fourteen. In fact, in Horsemen's Benevolent & Protective Association, Inc. v. State Racing Commission, 403 Mass. 692 (1989), the first SJC decision to address the issue of random urinalysis testing, the SJC explicitly cited the process of monitored urinalysis, and the individual's great expectation of privacy in this bodily function, as a significant factor when finding such a form of drug testing violative of Article Fourteen. See Horsemen's at 699-700 (noting urination is one of the most private of all activities). As the Court noted, Article Fourteen analysis must focus on an individual's reasonable expectations of privacy. Id. at 703.

Reasonableness of drug testing by other methods has never been considered by Massachusetts Courts. Therefore, it remains to be seen whether a drug testing policy which calls for random hair analysis will pass the Article Fourteen balancing test. Certainly, the sampling of hair is a far less invasive procedure than mandatory urinalysis or blood testing. Moreover, in the criminal context, courts have generally held that the taking of hair from a person who does not consent to such a taking is so minor an

COB 0031184

Virginia Tisei, Director, OLR
November 17, 1997
-page 7-

intrusion as to not implicate Fourth Amendment rights. <u>See</u> <u>United States v. Weir</u>, 657

F.2d 1005 (8th Cir. 1981); <u>United States v. D'Amico</u>, 408 F.2d 331 (2nd Cir. 1966).

     The New York City Police Department currently utilizes this type of analysis in

conjunction with urinalysis.  Further, several court decisions have recognized

radioimmunoassay analysis of human hair to determine drug use as generally accepted in

the scientific community. <u>See</u> <u>Bass v. Florida Dept. of Law Enforcement</u>, 627 So.2d

1321, 1322 (Fla. App. 3 Dist. 1993) (citing numerous state and federal decisions.).

Currently, the reliability of hair analysis in still being debated.  The several advantages

and disadvantages to such testing are noted in the article supplied in the materials.  I

believe more research needs to be done on this topic in order to determine the possible

constitutional implications of such a policy, and also to determine if hair analysis can be

conducted in an accurate fashion.  In my opinion, when and if the Department determines

that hair analysis is an acceptable form of drug testing (and New York City's use of it

seems to indicate that it may be), the Article Fourteen issue of reasonableness will be

open to further SJC review.

COB 0031185

Virginia Tisei, Director, OLR
November 17, 1997
-page 8-

       **C.**    **THE OVERWHELMING SUPPORT OF RANDOM
           URINALYSIS OF POLICE OFFICERS IN THE FEDERAL
           AND STATE COURTS MAY PERSUADE THE SJC TO
           OVERTURN GUINEY.**

      The majority of federal courts that have applied the Fourth Amendment balancing

test set forth in <u>Skinner</u> and <u>Von Raab</u>, have concluded that random urinalysis drug

testing is constitutional. Deputy Director, Mike Reagan set forth several such decisions

in footnote 2 of his memorandum to you dated July 18, 1997. I, likewise, have included

in the attached materials several more federal decisions that find random urinalysis drug

testing to be constitutional under Fourth Amendment analysis.

      Whether such cases will persuade the SJC to overturn <u>Guiney</u> is unclear.

Certainly, while it seems such cases should be persuasive, these cases, including <u>Skinner</u>

and <u>Von Raab,</u> existed at the time the SJC issued the <u>Guiney</u> decision. Moreover, the

SJC, in both <u>Guiney</u> and the <u>Horsemen's Benevolent & Protective Ass'n</u> case has made it

clear that it intends to afford Massachusetts citizens more protection under Article

Fourteen than that required under the Supreme Court's decisions analyzing the Fourth

Amendment.

      One state court case of note comes from New Jersey. Until 1996, only

Massachusetts, California and New Jersey had found random urinalysis unconstitutional

on state constitutional grounds. Pursuant to <u>New Jersey PBA Local 304 v. New Jersey</u>

<u>Transit Corp.,</u> 675 A.2d 1180 (N.J. Super.A.D. 1996), however, the Superior Court of

COB 0031186

Virginia Tisei, Director, OLR
November 17, 1997
-page 9-

New Jersey overturned previous state decisions to find random urinalysis of police

officers constitutional.  The New Jersey PBA Court, in finding police officers to be

members of a "highly-regulated industry" subject to such testing, cited societal conditions

and federal decisions such as Skinner and Von Raab as warranting a change in New

Jersey law. It is worth noting that New Jersey PBA overturned decisions made prior to

Skinner and Von Raab.  Conversely, Guiney was decided in the face of the Skinner and

Von Raab decisions, lending further weight to the premise that the SJC will not be

inclined to overturn the Guiney decision.

COB 0031187

# Exhibit E



**Office of Labor Relations**

Virginia M. Tisei, Esq., Director

Boston City Hall, Room 624
Boston, Massachusetts 02201

(617) 635-4525
FAX: 635-3690

## M E M O R A N D U M

TO:     Virginia Tisei, Director, OLR

FROM:   Bill Murphy, Labor Relations Counsel  ℬℳ

DATE:   February 3, 1998

RE:     Hair Analysis Drug Testing

In a memorandum dated November 17, 1997, I addressed the issue of random drug testing at the Boston Police Department. In one portion of the memo, I specifically analyzed the possibility of random drug testing by hair analysis. As you are aware, I also discussed the possibilities of the Boston Police Department using such a testing procedure with BPD Deputy Director of OLR, Chris Groll, Deputy Director Mike Reagan, and Attorney Bob Holland. After further research on the matter, I recommend the use of drug testing by hair analysis at the Boston Police Department.

The Massachusetts Supreme Judicial Court, in both the *Guiney* and *O'Connor* decisions, has previously analyzed whether random urinalysis testing of police officers is a reasonable search and seizure under Article Fourteen of the Massachusetts Declaration of Rights. In both decisions, the Court balanced the City's interest in preventing drug use among the police force against the reasonableness of the search. Particular focus was placed on the method, or level of intrusiveness, of the testing method. With urinalysis, the Court has noted that the level of intrusiveness of such a method outweighs the government's interest in preventing drug use. In order to tip the scales in our favor, the Court held that the City must show concrete examples of drug use in the force.

Radioimmunoassay analysis of human hair to determine drug use is a fairly new method of drug testing, and provides the City with an alternative to urinalysis. Presently, New York City uses the hair analysis method for reasonable suspicion testing. Throughout the nation, hair analysis is generally accepted in the scientific community as reliable. *Bass v. Florida Dept. of Law Enforcement*, 627 So. 2d 1321, 1322 (Fla. App. 3 Dist. 1993).

COB 0031177

Thomas M. Menino, Mayor

Virginia Tisei, Director, OLR
February 2, 1998
- page 2 -

Because hair analysis is a relatively new method of drug testing, the Massachusetts SJC has yet to analyze it under the Article Fourteen balancing test. It is arguable that the Court may view such a method as being less intrusive than urinalysis, thereby, possibly tipping the scales in the City's favor. In the criminal context, courts have generally held that the taking of hair from a person who does not consent to such a taking is so minor an intrusion as to not even implicate Fourth Amendment rights (Federal rights analogous to Article Fourteen state rights). *United States v. Weir*, 657 F.2d 1005 (8th Cir. 1981); *United States v. D'Amico*, 408 F.2d 331 (2nd Cir. 1966).[1] But see *Bouse v. Bussey*, 573 F.2d 548 (9th Cir. 1997) (holding where officer allegedly unzipped inmate's jail uniform and forcibly pulled a sample of pubic hair from inmate's person, search and seizure violated Fourth Amendment rights).

Based on articles on the matter, there exist several pros and cons with regard to such testing. Some of the advantages of hair analysis over urine testing include: 1) offers a less embarrassing or intrusive procedure; 2) is less susceptible to evasive maneuvers; 3) provides long-term drug use information, sometimes going back as far as six months to one year; 4) retests – obtaining a second hair sample – is useful for corroborating an initial test. A urine retest, on the other hand, is not generally useful because, if the donor takes no drugs during the several days between collections, the second test will probably be negative.

Some of the disadvantages include: 1) hair can be contaminated by contact with, or airborne exposure to, drugs in the environment (although washing the sample is believed to be a reliable method of overcoming this problem. If hair has been contaminated by contact with drugs, such exposure should be revealed in the wash.); 2) some debate exists as to whether differences in melanin content in the hair based on racial or ethnic background, unfairly creates a "racial bias" in the testing; 3) there are currently less labs that conduct such analysis, and they are less regulated than labs that conduct urinalysis testing.

---

[1] Of course, it should be noted that the Massachusetts Court of Appeals for the First Circuit in *Guiney v. Roache*, 873 F.2d 1557, cert. denied 110 S.Ct. 404 (1st Cir. 1989), also held that the random urinalysis testing procedure called for in Rule 11 did not violate the Fourth Amendment insofar as it was applied to officers carrying firearms or participating in drug interdiction.

COB 0031178



**Office of Labor Relations**

Virginia M. Tisei, Esq., Director

Boston City Hall, Room 624
Boston, Massachusetts 02201

(617) 635-4525
FAX: 635-3690

<u>M E M O R A N D U M</u>

<u>CONFIDENTIAL – NOT A PUBLIC DOCUMENT</u>

TO:      Virginia Tisei, Director, OLR

FROM:    Bill Murphy, Labor Relations Counsel ℬℳ

DATE:    November 17, 1997

RE:      Random Drug Testing in the Boston Police Department

      You have requested that I conduct research on the issue of random drug testing in preparation for the ongoing negotiations with the BPPA, and the likely interest arbitration before the JLMC. Specifically, you asked me to research the case law in Massachusetts, as well as the Supreme Court's, the federal courts', and other state's decisions on the issue. As part of this research, I also reviewed decisions regarding a union's authority to waive an individual's constitutional rights, including the right to be free from unreasonable searches and seizures. Cases and articles regarding hair analysis for indications of prior drug use, and the right to privacy in one's hair is also part of the materials.

      Pursuant to my research, I also contacted several police departments across the nation that currently have a random drug testing policy. Copies of the policies from New York City, Ft. Worth, Texas, Jacksonville, Florida, and Kansas City, Missouri are

COB 0031179

Thomas M. Menino, Mayor

Virginia Tisei, Director, OLR
November 17, 1997
-page 2-

supplied in the materials.  Finally, I have attached copies of several states' Bill or

Declaration of Rights, including Massachusetts' Declaration of Rights, and have included

past memos from our office on the issue of random drug testing.

I.      THE MASSACHUSETTS SJC HAS DEEMED RANDOM URINALYSIS
        DRUG TESTING OF POLICE OFFICERS TO BE AN UNREASONABLE
        SEARCH AND SEIZURE IN VIOLATION OF ARTICLE 14 OF THE
        MASSAUCHUSETTS DECLARATION OF RIGHTS.

        A.      <u>Guiney and O'Connor – The Need to Make a Strong Factual Showing
                that a Drug Problem Exists and the Issue of Officer Consent.</u>

        Massachusetts does not have a statute which specifically addresses the topic of

drug testing.  As such, there is no <u>statutory</u> prohibition against random drug testing of

employees.  Pursuant to Article Fourteen of the Massachusetts Declaration of Rights,

however, all individuals are to be protected from unreasonable searches and seizures.  In

pertinent part, the Massachusetts Declaration of Rights directs that:  "Every subject has a

right to be secure from all unreasonable searches and seizures, of his person, his houses,

his papers, and all his possessions." Art. <u>XIV</u>.  The Fourth Amendment to the United

States Constitution is virtually identical to the foregoing provision.  Despite this fact, the

state may afford its citizens greater constitutional protections against unreasonable

COB 0031180

Virginia Tisei, Director, OLR
November 17, 1997
-page 3-

searches and seizures than may be required by the United States Supreme Court's

interpretation of the Fourth Amendment. See Commonwealth v. Blood, 400 Mass. 61,

67-75 (1987). Accordingly, despite Supreme Court decisions finding random urinalysis

testing of police officers to be constitutional for Fourth Amendment purposes, and despite

the United State Court of Appeals for the First Circuit's decision that such a random

testing policy in Boston was constitutional for Fourth Amendment purposes, the SJC, in

Guiney v. Police Commissioner of Boston, 411 Mass. 328 (1991), declared that random

urinalysis testing of police officers is an unreasonable search and seizure, violative of

Article 14 of the Massachusetts Declaration of Rights.

The Guiney case involved Boston Police Department Rule 111, which was issued

by then-Boston Police Commissioner Mickey Roache. Specifically, Rule 111 called for

the random urinalysis testing of police officers in order to preserve the "integrity of the

Department and its personnel; to guard against the harmful consequences of the public

good occasioned by the unauthorized use" of drugs by law enforcement personnel; and to

"maintain a high degree of public confidence in all those charged with upholding public

order and public safety.". See Guiney v. Roache, 654 F.Supp. 1287, 1289-94 (D.Mass.

1987), vacated 873 F.2d 1157 (1st Cir. 1987), cert. denied 493 U.S. 963 (1989). While

Commissioner Roache conceded that urinalysis involves a search and seizure for Article

Fourteen purposes, the SJC still had to decide whether the random urinalysis testing

COB 0031181

Virginia Tisei, Director, OLR
November 17, 1997
-page 4-

procedure that Rule 111 imposed was an <u>unreasonable</u> search and seizure under Article

Fourteen.

   In determining that random urinalysis testing violated Article Fourteen, the SJC

found that the Commissioner failed to make a strong factual showing that a drug problem

existed in the Boston Police Department. <u>Guiney</u> at 333. Further, the SJC rejected the

U.S. Supreme Court's decision in <u>National Treasury Employees Union v. Von Raab</u>, 489

U.S. 656 (1989), wherein the Supreme Court held that proof of a problem is not required

because "it is sufficient that the Government have a compelling interest in preventing an

otherwise pervasive societal problem from spreading to the particular context". <u>Id.</u>

quoting <u>Von Raab</u> at 675, n.3. Finally, the SJC distinguished the <u>Guiney</u> decision from

its decision in <u>O'Connor v. Police Commissioner of Boston</u>, 408 Mass. 324 (1990),

where the Court found random urinalysis of police cadets to be reasonable where such

cadets consented in advance to the testing.

   In <u>O'Connor</u>, the SJC balanced the governmental need for the random search

against the search's intrusiveness into a person's reasonably expected privacy right.

While the SJC in <u>O'Connor</u> considered the cadets' consent as a factor, noting that the

intrusiveness of the mandatory urinalysis was diminished by the cadets' agreement to be

tested before accepting employment, the Court was also clear that the cadets' consent was

not the sole reason for allowing random urinalysis, since "the plaintiff would not be

COB 0031182

Virginia Tisei, Director, OLR
November 17, 1997
-page 5-

barred from relief if his consent to be the subject of a search and seizure were

unreasonably required as a condition of employment". Id. at 329. In fact, it is a well-

established legal principle that public employment may not be conditioned upon the

surrender of constitutional rights which could not be abridged by direct government

action. Id. at 341 (O'Connor, J., Dissenting) citing Broderick v. Police Commissioner of

Boston, 368 Mass. 33, 37 (1975). Rather, the O'Connor Court followed the Supreme

Court's decisions in Von Raab and Skinner v. Railway Labor Executive Assn., 489 U.S.

602 (1989), and ruled that the City's rule was a reasonable search and seizure since its

"compelling interest in determining whether cadets were using drugs and in deterring

such use outweighed the plaintiff's privacy interest under art. 14. Id. at 330.

　　　　Therefore, the Guiney Court's reliance on "consent" as a distinguishing factor, in

my opinion, is tenuous at best. That being said, however, Guiney has essentially made

the issue of consent an overriding factor when determining whether a random drug test is

reasonable under Article Fourteen. Accordingly, pursuant to the state of the law in this

area after Guiney, the Department could possibly prevail on a challenge to a random

urinalysis policy only if it:

　　　　1.　　Shows, with concrete examples, that a drug problem currently exists in the
　　　　　　　workforce; or

　　　　2.　　Proposes a policy that would require all new hires to consent to random
　　　　　　　drug testing.

COB 0031183

Virginia Tisei, Director, OLR
November, 17, 1997
-page 6-

B.    PURSUANT TO MASSACHUSETTS DECISIONS, THE PROCESS
OF URINALYIS, AND NOT DRUG TESTING ITSELF, IS AN
UNREASONABLE SEARCH AND SEIZURE IN VIOLATION OF
ARTICLE FOURTEEN – THE POSSIBILITY OF HAIR
ANALYSIS.

Under both Guiney and O'Connor, the SJC analyzed whether random urinalysis

of police officers is a reasonable search and seizure under Article Fourteen.  In fact, in

Horsemen's Benevolent & Protective Association, Inc. v. State Racing Commission, 403

Mass. 692 (1989), the first SJC decision to address the issue of random urinalysis testing,

the SJC explicitly cited the process of monitored urinalysis, and the individual's great

expectation of privacy in this bodily function, as a significant factor when finding such a

form of drug testing violative of Article Fourteen. See Horsemen's at 699-700 (noting

urination is one of the most private of all activities).  As the Court noted, Article Fourteen

analysis must focus on an individual's reasonable expectations of privacy. Id. at 703.

Reasonableness of drug testing by other methods has never been considered by

Massachusetts Courts.  Therefore, it remains to be seen whether a drug testing policy

which calls for random hair analysis will pass the Article Fourteen balancing test.

Certainly, the sampling of hair is a far less invasive procedure than mandatory urinalysis

or blood testing.  Moreover, in the criminal context, courts have generally held that the

taking of hair from a person who does not consent to such a taking is so minor an

COB 0031184

Virginia Tisei, Director, OLR
November 17, 1997
-page 7-

intrusion as to not implicate Fourth Amendment rights. See United States v. Weir, 657

F.2d 1005 (8th Cir. 1981); United States v. D'Amico, 408 F.2d 331 (2nd Cir. 1966).

    The New York City Police Department currently utilizes this type of analysis in

conjunction with urinalysis.  Further, several court decisions have recognized

radioimmunoassay analysis of human hair to determine drug use as generally accepted in

the scientific community. See Bass v. Florida Dept. of Law Enforcement, 627 So.2d

1321, 1322 (Fla. App. 3 Dist. 1993) (citing numerous state and federal decisions.).

Currently, the reliability of hair analysis in still being debated.  The several advantages

and disadvantages to such testing are noted in the article supplied in the materials.  I

believe more research needs to be done on this topic in order to determine the possible

constitutional implications of such a policy, and also to determine if hair analysis can be

conducted in an accurate fashion.  In my opinion, when and if the Department determines

that hair analysis is an acceptable form of drug testing (and New York City's use of it

seems to indicate that it may be), the Article Fourteen issue of reasonableness will be

open to further SJC review.

COB 0031185

Virginia Tisei, Director, OLR
November 17, 1997
-page 8-

C.    **THE OVERWHELMING SUPPORT OF RANDOM
        URINALYSIS OF POLICE OFFICERS IN THE FEDERAL
        AND STATE COURTS MAY PERSUADE THE SJC TO
        OVERTURN GUINEY.**

The majority of federal courts that have applied the Fourth Amendment balancing test set forth in Skinner and Von Raab, have concluded that random urinalysis drug testing is constitutional. Deputy Director, Mike Reagan set forth several such decisions in footnote 2 of his memorandum to you dated July 18, 1997. I, likewise, have included in the attached materials several more federal decisions that find random urinalysis drug testing to be constitutional under Fourth Amendment analysis.

Whether such cases will persuade the SJC to overturn Guiney is unclear. Certainly, while it seems such cases should be persuasive, these cases, including Skinner and Von Raab, existed at the time the SJC issued the Guiney decision. Moreover, the SJC, in both Guiney and the Horsemen's Benevolent & Protective Ass'n case has made it clear that it intends to afford Massachusetts citizens more protection under Article Fourteen than that required under the Supreme Court's decisions analyzing the Fourth Amendment.

One state court case of note comes from New Jersey. Until 1996, only Massachusetts, California and New Jersey had found random urinalysis unconstitutional on state constitutional grounds. Pursuant to New Jersey PBA Local 304 v. New Jersey Transit Corp., 675 A.2d 1180 (N.J. Super.A.D. 1996), however, the Superior Court of

COB 0031186

Virginia Tisei, Director, OLR
November 17, 1997
-page 9-

New Jersey overturned previous state decisions to find random urinalysis of police

officers constitutional.  The <u>New Jersey PBA</u> Court, in finding police officers to be

members of a "highly-regulated industry" subject to such testing, cited societal conditions

and federal decisions such as <u>Skinner</u> and <u>Von Raab</u> as warranting a change in New

Jersey law. It is worth noting that <u>New Jersey PBA</u> overturned decisions made prior to

<u>Skinner</u> and <u>Von Raab</u>.  Conversely, <u>Guiney</u> was decided in the face of the <u>Skinner</u> and

<u>Von Raab</u> decisions, lending further weight to the premise that the SJC will not be

inclined to overturn the <u>Guiney</u> decision.

COB 0031187

# RANDOM DRUG TESTING

## MASSACHUSETTS CASES

### Police & Police Cadets

1. <u>Guiney v. Police Commissioner of Boston</u>, 411 Mass. 328 (1991) (Random urinalysis testing of police officers an unreasonable search and seizure violative of art. 14 of the Massachusetts Declaration of Rights where no consent to the searches was contemplated by the rule, and where the commissioner failed to show at least a concrete, substantial government interest that would be well served by imposing urinalysis on police officers. "Justification for body searches, if there ever can be one, cannot rest on some generalized sense that there is a drug problem . . ." No indication of drug problem on the force also considered by Court.).

2. <u>O'Connor v. Police Commissioner of Boston</u>, 408 Mass. 324 (1990) (Unannounced, warrantless, and suspicionless (ie. Random) testing of the urine of cadets assigned to a police training academy is not an unreasonable search and seizure in violation of art. 14 of the Massachusetts Constitution where the public interest in discovering and deterring drug use by police cadets who had agreed in advance to urine testing outweighed the intrusiveness into their reasonably expected privacy).

### State Licensees

1. <u>Horsemen's Benevolent & Protective Association, Inc. v. State Racing Commission</u>, 403 Mass. 692 (1989) (Regulation adopted by State Racing Commission requiring monitored random urinalysis of all licensees in the horse racing industry violative of art. 14 of the Massachusetts Declaration of Rights where Commission fails to provide sufficiently compelling reason to justify the testing program as "reasonable").

### Private University – Student Athletes

1. <u>Bally v. Northeastern University</u>, 403 Mass. 713 (1989) (Requirement that student athletes consent to random urinalysis as a condition of participating in intercollegiate sports not violative of Massachusetts Civil Rights Act (G.L. c.12, §§11H and 11I) or Mass Privacy Statute (G.L. c.214, §1B).  Unlike <u>Guiney</u> because no "state action" ,and thus, no art. 14 protection).

### Search and Seizure – Random Roadblocks or "Sobriety Checkpoints"

1. <u>Commonwealth v. Shields</u>, 402 Mass. 162 (1988) (Random stops of motor vehicles, while seizures, are not unreasonable seizures under art. 14.  Upheld in the absence of individualized suspicion and without a showing of no equally effective yet less

COB 0031188

intrusive alternative); see also Commonwealth v. Trumble, 396 Mass. 81 (1985);
Commonwealth v. McGeoghegan, 389 Mass. 137 (1983).

## Privacy Rights in Medical Information

1. Bratt v. International Machines Corp., 392 Mass. 508 (1984) (In determining whether
   a physician's disclosure of medical information about an employee to his employer
   constitutes an actionable invasion of privacy under G.L. c.214, §1B (Privacy Statute),
   it is necessary to balance the degree of intrusion on the employee's privacy and the
   public interest in preserving the confidentiality of a physician-patient relationship
   against the employer's need for the information. No art. 14 implications because no
   state action); see also Cort v. Bristol-Myers Co., 385 Mass. 300 (1982) (holding
   reasonableness of requiring employee to disclose personal facts must be weighed
   against employer's valid business interests).

## SUPREME COURT CASES

1. Skinner v. Railway Labor Executives Assn., 489 U.S. 602 (1989) (Federal Railroad
   Administration mandated drug and alcohol tests are reasonable under the Fourth
   Amendment even though there is no requirement of a warrant or a reasonable
   suspicion that any particular employee may be impaired since, the compelling
   government interests served by the regulations outweigh employee's privacy
   concerns. Notes that a substance-impaired railroad employee in a safety-sensitive job
   can cause great human loss before any signs of the impairment become noticeable.
   Also noted government interest was strong enough to constitute a "special need"
   beyond normal law enforcement).

2. Treasury Employees v. Von Raab, 489 U.S. 656 (1989) (United States Customs
   Service's random urinalysis program for employees seeking transfer or promotion to
   positions having a direct involvement in drug interdiction or requiring the incumbent
   to carry firearms or to handle "classified material" meets the Fourth Amendment
   reasonableness standard. Governmental interests in ensuring that front-line
   interdiction personnel are physically fit and have unimpeachable integrity and
   judgment, as well as compelling interest in preventing the risk to the life of the
   citizenry posed by the potential use of deadly force by persons suffering from
   impaired perception and judgment outweigh the privacy interests of those seeking
   promotion to such positions).

## FEDERAL CASES

### First Circuit and District of Massachusetts

1. Keaveny v. Town of Brookline, 937 F.Supp. 975 (D.Mass. 1996) (Town's random
   drug and alcohol policy regarding drivers of its commercial vehicles, required by and

COB 0031189

in compliance with Federal Omnibus Transportation Employee Testing Act, not violative of art. 14 since Mass Constitution preempted by the Fed. Act).

2. Jackson v. Liquid Carbonic Corp., 863 F.2d 111 (1ˢᵗ Cir. 1988) (Pre-Guiney and O'Connor; states no right to be free from drug testing under either the Federal or State Constitutions).

3. Guiney v. Roache, 873 F.2d 1557 (1ˢᵗ Cir.), cert. denied 493 U.S. 963 (1989) (ruling Rule 111 constitutional under Article 4 of the U.S. Constitution).

## Other Circuits and Districts

1. National Treasury Employees Union v. Von Raab, 816 F.2d 170 (5ᵗʰ Cir. 1987) (held that random urinalysis of Customs Service agents constitutes search within meaning of fourth amendment, but, because of the strong governmental interest in drug enforcement, reasonable, and thus, constitutional).

2. Intern. Broth. Of Teamsters v. Dept. of Transp., 932 F.2d 1292 (9ᵗʰ Cir. 1991) (holding Federal Highway Administration articulated compelling government interest in support of regulation calling for random drug testing of truck drivers, even though there was alleged lack of evidence of a serious drug problem among drivers – serious safety concerns involved support testing).

3. Transportation Institute v. U.S. Coast Guard, 727 F.Supp. 648 (D.D.C. 1989) (ruling that a showing of a documented drug problem exists in the workplace is not necessary prior to requiring that employees undergo drug testing – balancing government's interest in safety against individuals' privacy interest is appropriate analysis).

4. National Treasury Emp. Union v. Dept. of Treasury, 25 F.3d 237 (5ᵗʰ Cir. 1994) (Dept. of Treasury's requirement that public trust IRS employees respond to a questionnaire disclosing information about their past illegal drug use not violative of the 4ᵗʰ Amendment. Given importance the government attached to a drug-free society, its employees had a diminished expectation of privacy in their past drug and alcohol abuse being kept secret).

## New York State Courts

1. Matter of Seelig v. Koehler, 76 N.Y.2d 87, 556 N.E.2d 125 (1990) (upholding random drug testing program of the New York City Correction Department – cites consent to urinalysis prior to achieving tenure, and diminished expectation of privacy outweighed by governmental safety interests).

2. Delaraba v. Nassau County Police Dept., 83 N.Y.2d 367, 632 N.E.2d 1251 (1994), citing Matter of Caruso v. Ward, 72 N.Y.2d 432, (sets out 3 prong standard for permitting random drug testing only where: 1.the individual's privacy interests are

COB 0031190

minimal, 2.the government's interests are substantial, and 3.safeguards are in place to ensure that the individual's expectations of privacy are not subject to unregulated discretion – upheld random drug testing of police officers as necessary to deter officers from taking drugs which might result in impaired judgment and which could endanger fellow officers.)

## California State Courts

1. Luck v. Southern Pacific Transp. Co., 267 Cal Rptr. 618 (Cal. App. 1 Dist. 1990), citing Wilkinson v. Times Mirror Corp., 215 Cal.App.3d 1034, 1048 (1989) (applying balancing of compelling government interest and individual privacy interest to reasonableness of mandatory urinalysis).

2. Local 1616 v. Thornburgh, 798 F.Supp. 597 (N.D. Cal. 1991) (Immigration and Naturalization Service (INS) random drug testing program enjoined since not compelling interest which furthers public safety).

3. American Fed. Of Govt. Employees v. Derwinski, 777 F.Supp. 1493 (N.D. Cal. 1991) (ruling safety sensitive position such as police officer subject to random testing).

## New Jersey State Courts

1. New Jersey PBA Local 304 v. New Jersey Transit Corp., 675 A.2d 1180 (N.J. Super.A.D. 1996) (upholding random drug testing of New Jersey transit police after conducting lengthy analysis of both state and federal constitutions as well as relevant case law. Overturns previous state decisions prohibiting random, unannounced drug testing without reasonable individualized suspicion of drug use. Court found that police officers constitute members of a "highly-regulated industry" and that societal conditions coupled with federal decisions warranted a change in New Jersey law. Specifically applied standards used in Skinner and Von Raab.

## Illinois State Courts

1. Washington v. Police Bd. Of City of Chicago, 629 N.E.2d 715 (Ill.App.1ˢᵗ Dist. 1994)

## Union Waiver of Constitutional Rights --Massachusetts

1. Rooney v. Yarmouth, 410 Mass. 492 (1984) (holding employees need not arbitrate substantive, personal, nonwaivable statutory guarantees).

2. School Committee of Brockton v. Massachusetts Commission Against Discrimination, 377 Mass. 392, 399 (1979) (union may not waive individual rights)

## Union's Ability to Consent to Drug-Testing on Behalf of Members (Federal Cases)

COB 0031191

1. <u>Bolden v. Southeastern Pennsylvania</u>, 953 F.2d 807, 828 (3rd Cir. 1991) (holding a public employee union acting as exclusive bargaining representative may consent to drug testing on behalf of the employees it represents).

2. <u>Utility Workers v. Southern California Edison Co.</u>, 852 F.2d 1083 (9th Cir. 1988) (union may bargain away individual rights with regard to drug testing).

## Hair Analysis –Expectation of Privacy

1. <u>Bass v. Florida Department of Law Enforcement</u>, 627 So.2d 1321 (Fla. App.3d Dist. 1993) (noting that the analysis of human hair for evidence of drug use generally accepted in the scientific community. Specifically noted that hair analysis can provide a more accurate history of drug use than conventional urinalysis).

2. <u>United States v. Weir</u>, 657 F.2d 1005 (8th Cir. 1981) (holding that an intrusion on defendant's person by agent who took samples of hair from defendant's head, beard and mustache by combing and plucking, was so minor, even if defendant did not consent to search and seizure, that 4th Amendment rights were not implicated. – hair not taken in drug testing context.).

3. <u>United States v. D'Amico</u>, 408 F.2d 331, 333 (2nd Cir. 1966) (holding "clipping by the officer of the few strands of hair from appellant's head was so minor an imposition that appellant suffered no true humiliation or affront to his dignity . . . a search warrant was not required to justify the officer's act." – not in drug testing context).

4. <u>Bouse v. Bussey</u>, 573 F.2d 548 (9th Cir. 1977) (holding that when two officers unzipped defendant's uniform and forcibly pulled out hair, evidence excluded because defendant "subjected to a painful and humiliating invasion upon the most intimate parts of his anatomy.").

COB 0031192

# Exhibit F

21

1    using other types of testing if the Union agreed?
2        A:  When it was first brought to my attention M.A.M.L.E.O.
3    said generally that, people from M.A.M.L.E.O. said generally
4    that they thought the test was biased and they asked me to look
5    into it to determine if I would consider other options.  You
6    know, if I would research it to determine if in fact the test
7    was biased.  I think my first response was I know this was the
8    subject of collective bargaining.  I know that collective
9    bargaining took place long before my appointment as Police
10   Commissioner.  I felt strongly that drug testing, a drug testing
11   policy had to be in place in any police organization and that
12   I'd explore their concerns about the hair drug testing policy.
13   Again, I didn't know much about, or I didn't know anything about
14   the science but I said I would go back to police headquarters
15   and talk to the lawyers, talk to the people in labor relations,
16   talk to the people in HR to determine how this policy evolved
17   and whether or not it was the appropriate policy for our agency.
18       Q:  Part of what you just said is that you would explore?
19       A:  Absolutely.  I was open-minded.  I thought it was
20   really important.  That's why I had the meetings with
21   M.A.M.L.E.O. to listen to their issues, not just the hair drug
22   testing policy but many other issues that were of concern to
23   them or of mutual concern to us and keep the lines of
24   communication open.  I was always very open-minded.

22

1        Q:  Please describe how you explored whether the test was
2    biased?
3        A:  I went back in to talk to, I generally had staff
4    meetings every day.  I remember having discussions with people
5    from the legal department, with Sandra Debow who is a lawyer for
6    Labor Relations.  I don't remember exactly who I spoke to but I
7    remember talking to Sandra.  I remember talking to people in our
8    legal department   I remember talking to Ed Callahan in our HR
9    Department because they all collectively would have the history
10   on this.  So I learned that, yes it was negotiated as part of
11   the collective bargaining process in the late 90s.  The Union at
12   that point was opposed to urine testing.  That somehow hair was
13   agreed on and that in return for the drug testing the hair drug
14   testing policy, the Union got the Quinn bill.  I also asked
15   about the science and I was told that the attorneys felt that it
16   would --
17       MS. HARRIS:  I'm going to object and instruct the
18   witness that any attorney-client communications are
19   confidential.
20       A:  I guess I would just finish by saying that I asked
21   questions about the science as well, in addition to how the
22   policy evolved and why it was hair.  I also asked about the
23   science because M.A.M.L.E.O. was questioning the reliability of
24   the test and asking why we didn't have a urine test versus a

23

1    hair test.
2        Q:  So I'll back up a little.  You said that you met with
3    lawyers, people from Labor Relations, people from Human
4    Resources.  Even though you can't discuss the substance of the
5    conversations with your lawyers, will you please describe what
6    those conversations were about, what the topics were?
7        MS. LITSAS:  Objection.
8        MS. HARRIS:  I object.  If it might make it easier,
9    I have no problem with her testifying about what she did as a
10   consequence of, well what she did as a consequence of those
11   discussions.
12       MS. COHEN:  Let me just also say that since the
13   science is so much at issue in this case, I think having her
14   talk about her understanding of the science, I don't think that's
15   confidential.
16       MS. HARRIS:  I have no problem with that.  I just
17   don't want to have her say I was told by thus and such, by this
18   attorney this, or by that attorney that.  What I'm saying is if
19   she can testify about what her conclusions were as a result of
20   the information that she gathered, that would be fine.
21       MS. COHEN:  I guess what I'm saying is the
22   information that she was given on the science I'm not sure that
23   that itself is attorney-client communication.
24       MS. HARRIS:  I would argue that it is, but I think

24

1    that we can get to where you need to go from --
2        Q:  So what did you learn about the science as a result of
3    your meetings with the lawyers?
4        MS. HARRIS:  Objection.  Go ahead.
5        A:  Again, I just learned that it was likely that this
6    case at the end of the day would come down to the science, but
7    that the Police Department prior to my arrival and then
8    subsequent to my arrival felt strongly that their case based on
9    science was a strong one.  I also recall hearing that several
10   other major Police Departments, including the NYPD used the hair
11   test and that it had never been overturned in a legal challenge.
12   So I was very open-minded when hearing the concerns from
13   M.A.M.L.E.O. but when I went back to staff, both legal and
14   otherwise, and discussed it came to the conclusion that it was a
15   case that would ultimately come down to science and be sorted
16   out based on scientific evidence.
17       Q:  What is your opinion regarding why it was concluded
18   that the case would come down to science?
19       MS. HARRIS:  Objection.
20       MS. LITSAS:  Objection.  You can answer.
21       MS. COHEN:  Can I just say something?  Probably one
22   person should object.
23       A:  Would you repeat that, please?  Thank you.
24       Q:  What was your opinion regarding the conclusion that

28

1  I usually relied on quick telephone calls, or people coming in
2  face-to-face and doing briefings.  Usually every afternoon at
3  three o'clock, at least during the last year that I was on the
4  job, I gathered my immediate command staff when I was in the
5  office and said just give me a sense for what's going on in each
6  bureau.  So a lot of it was done verbally.
7  Q:  Was any of it done in written memos or even email?
8  A:  Well, from time to time but I don't recall any
9  lengthy, I don't recall any emails other than what I saw today
10  that related to hair testing.  The discussions I had were pretty
11  cut and dry:  look, this was negotiated back in the late 90s
12  with the Union.  It's been an ongoing issue.  We feel
13  comfortable that we have, that the science is sound and at the
14  end of the day the scientists will prepare for any litigation
15  that evolves.
16  MS. WEBSTER:  I'd like to go back to the meetings
17  you described with lawyers, Labor Relations and Human Resources
18  regarding the hair tests and M.A.M.L.E.O.'s concerns.
19  Q:  Could you describe what the conversations were about
20  with Ed Callahan from Human Resources?
21  A:  Well, I don't remember exactly what I said to Ed
22  Callahan or anybody else.  I can remember collectively the
23  discussions that I had with people, or the impressions that I
24  developed as a result of discussions I had with people.  I'm

29

1  sure that whatever discussions I had with Ed Callahan would have
2  been very similar to the ones I had with Sandra Debow or people
3  from the legal department just asking how the policy evolved,
4  why we opted for hair testing, and how confident people felt
5  with that process versus other processes that may be available.
6  Q:  Besides Ed Callahan and I think you said Sandra DeBow,
7  was a legal relations lawyer.  Correct?
8  A:  Labor Relations.
9  Q:  Labor Relations lawyer.  Were there any other
10  non-lawyers present during those meetings?
11  A:  Deputy Superintendent Rachel Hutchinson would have
12  been involved in the discussions.  She attended some of to
13  M.A.M.L.E.O. meetings I believe that were held at headquarters
14  early on.  Bobbie Johnson would have participated in or been
15  present when we had some of the discussions about hair testing.
16  Perhaps Kevin Foley who was a Deputy Superintendent in charge of
17  Labor Relations or worked closely with Sandra DeBow.  I don't
18  remember anybody else being present.
19  Q:  So after these meetings how confident were you about
20  the hair testing process?
21  A:  Well, when I heard that several other major city
22  police departments used this process and that it had never been
23  overturned in a challenge, I felt confident that it was probably
24  the best method out there at this point.  As I said before, I

30

1  felt very strongly that a drug testing policy needed to be in
2  place and that the Union and management negotiated this prior to
3  my arrival and at the end of the day let the scientists sort it
4  out.  I think that was the conclusion that I came to and again
5  we reached a point where we couldn't discuss it anymore because
6  it was in litigation.
7  Q:  Did any of the individuals with whom you spoke about
8  hair testing voice any concerns about the hair tests?
9  MS. HARRIS:  I would object and again just instruct
10  you that any attorney-client communications are privileged.  So
11  to the extent that you can answer without revealing those
12  communications, you can answer.
13  A:  I'll just say I was very open-minded about it because
14  I didn't know anything about it.  So when the issue was first
15  raised by M.A.M.L.E.O. I went back and talked to different
16  staff.  I was surprised at the level of confidence they had in
17  the methodology.  They obviously had spent a lot of time in
18  briefings over the years prior to and since the implementation
19  of the policy.  I was surprised at their level of confidence in
20  the process.
21  Q:  Why were you surprised?
22  A:  Well, they were very emphatic about, the people I
23  spoke to obviously had a great deal of confidence in the vendor
24  and in the process and were quick to tell me that this was what

81

1  a negative result for caucasians who ingested the same small
2  amount of cocaine and that were proven to you, would you have
3  discontinued the use of the hair test?
4      MS. HARRIS:  Objection.
5      A:  If that were proven to me, yes.
6      Q:  Do you have any idea as to what the parameters of a
7  study would be that would be scientifically reliable?
8      A:  No.
9      Q:  Do you think the City and the Police Department should
10  have the burden of proving that the hair test is scientifically
11  valid?
12      MS. HARRIS:  I'll object to the legal conclusion
13  you're asking her to draw.  You are the plaintiffs.  Right?
14      A:  Could you please ask the question again?
15      Q:  Do you think the City should have the burden of
16  proving that the hair test is scientifically valid?
17      A:  The policy has been in place for eight or nine years
18  now so I assume it's the plaintiffs who have to prove that it's
19  invalid.
20      Q:  Do you know how many officers in the Department had
21  positive hair drug tests?
22      A:  No, I don't.
23      MR. BAKER:  I'd like to mark exhibit 17.  What we
24  have here are two letters with some documents attached to each

82

1  of the letters.  The first letter is a letter signed by Sandra
2  DeBow, Deputy Director Office of Labor Relations to Attorney
3  Patrick Bryant, dated January 17, 2006.  The second letter is
4  also a letter from Ms. DeBow to Mr. Bryant and it's also dated
5  January 17, 2006.
6      (Exhibit No. 17 Marked)
7      Q:  I think you testified to this already but who is
8  Sandra DeBow?
9      A:  Sandra DeBow is an attorney in the office of Labor
10  Relations at the Boston Police Department.
11      MR. BAKER:  Her letter says, "As a follow-up to our
12  January 17, 2006," her first letter in the packet that I
13  provided, "As a follow-up to our January 17, 2006 correspondence
14  we are including a redacted list of officers who received
15  positive drug test results.  You will note we have already
16  provided this chart, organized by race and offense
17  (first/second), to the union under cover letter to you from
18  Attorney Bob Boyle, and dated October 28, 2005.  In this copy,
19  the rank of the individuals is revealed, per the union's
20  otherwise 20, 2006 request."  And it goes on.
21      Q:  Were you the Commissioner when this letter was sent to
22  Mr. Bryant?
23      A:  Yes, I was.
24      Q:  Do you know who gathered the statistics that are

83

1  attached to this letter?
2      A:  No, I was unaware of the letter.
3      Q:  Were you aware of whether statistics were gathered?
4      A:  No, I wasn't.
5      Q:  Do you know if the Police Department keeps statistics
6  concerning the hair tests such as those that are attached to
7  this?
8      A:  I don't know.
9      Q:  If you look at the statistics attached to the letter
10  the first two pages contains no names and the third page says,
11  "SECOND OFFENSE".  Would I be correct that the first two pages
12  concern first offense statistics?
13      A:  I have no idea.  I haven't seen this before.
14      Q:  I'll represent to you that on the first two pages of
15  the document under the column, "Race" do you see a "B" under
16  that and for cocaine there were 34 persons who tested positive
17  according to this document with a "B" next to it.  And for folks
18  with the "W" who start on the second page there were 21
19  officers.  If it were correct that there were 34
20  African-American officers that tested positive for cocaine and
21  21 caucasian officers that tested positive for cocaine during
22  the history of the hair test at the Police Department, would you
23  have any concerns about that?
24      MS. HARRIS:  Objection.

84

1      A:  I would only have concerns if I had proof the test was
2  unreliable.
3      Q:  So if it were a fact that the number of
4  African-Americans was 1.6 times higher than the number of
5  caucasians, that wouldn't give you any concerns independent of
6  the invalidity of the hair test?
7      MS. HARRIS:  Objection.
8      A:  (No verbal response).
9      Q:  You'd have no concerns about the hair test unless you
10  also found out that it was scientifically invalid.  Is that
11  correct?
12      A:  I think when the issue has been raised to me and when
13  people have expressed concerns about it --
14      MS. HARRIS:  It's a yes or not question,
15  Commissioner.  He's asking if you have concerns.
16      A:  No, I wouldn't have concerns.
17      Q:  If we can look at the next letter from Ms. DeBow to
18  Mr. Bryant with a "Re:" line, "January 27, 2006 Info. Request
19  (Rank, Race, Gender)".  The date of this letter I'll represent
20  to you is probably incorrect given that it relates to events
21  that occurred afterwards.  But if we turn to the next page do
22  you see here where it has statistics?
23      A:  Yes.
24      Q:  Have you ever seen these statistics before?

85

1    A: I don't know if I've seen this particular page, the

2    one dated 1/30/2006 but I've certainly seen similar reports.

3    Q: If you look at the top under "TOTALS" it says, "W/M

4    W/F", what does that stand for?

5    A: White male, white female, black male, black female,

6    Hispanic male, Hispanic female, Asian male, Asian female.

7    Q: By my count the police force was 26.4%

8    African-American and 64.1% caucasian as of the date of these

9    statistics. Does it give you any concern about the validity of

10   the drug test that 1.6 times as many African-Americans as

11   caucasians tested positive for cocaine when caucasians outnumber

12   African-Americans in the police force by 2.5 to 1 margin?

13   A: No.

14   Q: Does the City keep statistics like this concerning the

15   racial breakdown in the Department going back to 1998, do you

16   know?

17   A: I don't know.

18   Q: Does the fact that African-Americans on the police

19   force, does the fact that there are at least four times likely

20   to test positive for cocaine than a caucasian based on these

21   statistics that we looked at, does that lead you to think that

22   there's a bias to the hair test?

23   A: Not in and of itself.

24   Q: Do you think that African-Americans are more likely to

86

1    be drug users than caucasians?

2        MS. HARRIS: Objection. That's an improper

3    question. You can answer it. Go ahead.

4    A: No.

5    Q: Had the Police Department undertaken to compare

6    whether African-Americans and the general population are more

7    likely to test positive for cocaine than caucasians?

8    A: No, not that I'm aware of.

9    Q: Are you aware that there are federal guidelines for a

10   federal workplace drug testing?

11   A: I'm aware they exist. I don't know what they are.

12   Q: Do you know if there are any laboratories that do hair

13   testing or are certified to do so under the federal mandatory

14   guidelines?

15   A: I don't know.

16       MR. BAKER: I'm going to offer exhibit 19 and I will

17   be skipping over 18.

18       (Exhibit No. 19 Marked)

19   Q: If you could just take a moment to review that

20   document which is Bates number "COB0031231" through "31232"?

21   A: Yes.

22   Q: I'll represent to you that this is another document

23   that we receive from Helen Litsas of the City of Boston Law

24   Department on October 4, 2006. The cover letter that the

# Exhibit G

# Fisher, Nikki Jean

| | |
|---|---|
| **From:** | Baker, Robert B. |
| **Sent:** | Thursday, December 28, 2006 4:06 PM |
| **To:** | 'Harris, Mary Jo' |
| **Cc:** | 'Buckley, Margaret'; 'Litsas, Helen'; Webster, Raquel J.; Rutkowski, Rheba |
| **Subject:** | Jones et al. v. City of Boston et al. |
| **Attachments:** | RE: Baker re disc conference |

Mary Jo,

Following up on my voicemail:

Depositions: We're still waiting to hear if Mr. Reagan is available on either 1/11 or 1/23. In addition, Raquel and I now have availability January 16-19. We also plan to depose John Dunlap at some point. If Mr. Reagan isn't available, please advise as to Mr. Dunlap's availability on any of these dates. Next, we will be deposing Marisela Perez, but I expect her deposition will be rather brief. We could schedule it for the afternoon of January 8th after Mr. Goslin's deposition or on one of the other dates above. Please advise. Finally, I spoke to J. Allen Holland this morning regarding the deposition of a Psychemedics' representative. We will be rescheduling that deposition until after the outstanding disputes concerning Psychemedics' document production are resolved.

Outstanding Document Discovery: We reviewed the MCAD filings we have as well as the documents produced by the defendants and have not located any strength reports other than the reports I've mentioned previously from early to mid 2006 (see COB 0007033 for a "strength report" dated 1/30/2006 and COB0005799 for a "strength report" dated 5/4/2006). Please produce documents showing the number of police officers and the race of police officers employed by the police department each year back to 1998. We will be using the data as part of the defendants' stipulation below, so the data should reflect a summary of those individuals required to take the hair test each year under Rule 111. Next, in your November 20, 2006 letter to me, you stated that you were awaiting confirmation from the Police Department as to whether materials related to initial positive test results followed by safety net negative test results are still available. The same letter states that you would be producing a memorandum authored by William Murphy. Please produce the memorandum. Finally, you state below that the defendants' email search is now complete and that you will have the police department produce an affidavit from an IT person outlining the retention policy, search terms and users. We only received a couple of emails right before PC O'Toole's deposition. If your search has resulted in addition emails, please produce them as soon as possible.

Confidentiality Agreement: Please sign and return the attached proposed confidentiality order. I'm waiting for your signature to get this filed.

Defendants' Document Production: Based on the defendant's index circulated with the document production, there were several bates range gaps. Please confirm that there were no responsive documents withheld in these gaps, or, if there were documents withheld, what those documents are and why they were withheld. Next, based on the same index and the documents that were produced, we never received a copy of COB 000296. We are still comparing the documents we did receive to the index and will let you know if there are any other documents on the defendants' index that we have not received. Finally, since parties have agreed to a confidentiality stipulation, please either remove redactions on any documents that previously had redactions or produce a log explaining what information was redacted and the basis for the redactions. I understand that it may take some time to either update the production and/or produce a log, but you had previously stated that you would produce COB 0007037-39 without redactions after we agreed to a confidentiality stipulation. We need an unredacted version of this document for next week's deposition, so please produce it as soon as possible. Similarly, please produce an updated privilege log.

Very truly yours,

Robert

Robert B. Baker
Bingham McCutchen
150 Federal Street
Boston, MA 02110
Tel: (617) 951-8873
Fax: (617) 951-8736
E-Mail:  robert.baker@bingham.com

---

**From:** Baker, Robert B.
**Sent:** Monday, December 18, 2006 6:49 PM
**To:** 'Harris, Mary Jo'; Webster, Raquel J.
**Cc:** Buckley, Margaret; Litsas, Helen
**Subject:** RE: update

Thanks Mary Jo.

I will get a deposition notice out for Al Goslin's deposition on 1/8.  Please let me know when you have dates for Mullan and Reagan and I will get notices out for them as well.

We'll check what we have from the MCAD filings and the bates range referenced to see if we have what we need at this point for adverse impact statistics.  What I thought we were referring to as strength reports were snapshots of the racial breakdown of the police department from 1998 to present.  As part of defendants' stipulation, we would need to use those numbers to estimate the number of tests that were done each year (1 test per employee).  We would then assume that every test was negative except for the list of positive results (please see my message from last Wednesday requesting that you produce this list in unredacted form pursuant to the confidentiality stipulation).

Please see the attached email regarding the confidentiality order.  If you could sign a copy and fax to me that would be ideal.  I will then file the proposed stip. with your consent.

Thanks,

Robert


Robert B. Baker
Bingham McCutchen
150 Federal Street
Boston, MA 02110
Tel: (617) 951-8873
Fax: (617) 951-8736
E-Mail:  robert.baker@bingham.com

*The information in this transmittal is privileged and confidential and is intended only for the recipient(s) listed above.  If you are neither the intended recipient(s) nor a person responsible for the delivery of this transmittal to the intended recipient(s), you are hereby notified that any unauthorized distribution or copying of this transmittal is prohibited.  If you have received this transmittal in error, please notify me immediately at (617) 951-8873.*

8/14/2007

*Attachment: The attachment in this e-mail message is privileged and confidential and is intended only for the recipient(s) listed above. If you are neither the intended recipient(s) nor a person responsible for the delivery of this attachment to the intended recipient(s), you are hereby notified that any unauthorized distribution or copying of this attachment is prohibited. If you receive this attachment in error, please notify me immediately at (617) 951-8873.*

*Circular 230 Disclosure: Internal Revenue Service regulations provide that, for the purpose of avoiding certain penalties under the Internal Revenue Code, taxpayers may rely only on opinions of counsel that meet specific requirements set forth in the regulations, including a requirement that such opinions contain extensive factual and legal discussion and analysis. Any tax advice that may be contained in this message does not constitute an opinion that meets the requirements of the regulations. Any such tax advice therefore cannot be used, and was not intended or written to be used, for the purpose of avoiding any federal tax penalties that the Internal Revenue Service may attempt to impose. The legal advice expressed in this message is being delivered to you solely for your use in connection with the matters addressed herein and may not be made available to or relied upon by any other person or entity or used for any other purpose without our prior written consent.*

---

**From:** Harris, Mary Jo [mailto:mharris@morganbrown.com]
**Sent:** Monday, December 18, 2006 6:29 PM
**To:** Baker, Robert B.; Webster, Raquel J.
**Cc:** Buckley, Margaret; Litsas, Helen
**Subject:** update

Hi Robert, Raquel –

I have Al Goslin available for deposition on Jan 8 (he is traveling for most of the month), so please advise if this date will work for you. I am waiting for confirmation from Roberta Mullan and believe that for Labor Relations issues, the most knowledgeable person would be Michael Reagan, the prior director of OLR. I have asked him for his availability, and will get that for you asap.

The documents I've referenced as strength reports (snapshots of positive/negative results) appear in the exhibits of some MCAD filings (for example, Bridgeforth's filings), and I believe that you have these (so did not produce again). I'd also direct you to bates numbers 7026 and following; I believe these documents reflect the dept's response to the union's requests for breakdown on the test results from its inception. Please let me know what else you are looking for.

I will stipulate regarding the statistics (that we will not contest the assumption that every sworn employee listed in the strength reports were subjected to the hair drug test, and that one can assume that all officers who did not get reported as positive received negative drug test results. In making this stipulation, I would be doing so with the caveat that testing negative does not mean that one is not using drugs (as one may have tested positive below the cut off), but simply that the Department has not received any positive result from Psychemedics.

As to the confidentiality agreement, I apologize if you are waiting for me – I assumed you would add my name (as an electronic signature) and file with the court. Please let me know if you'd like me to have an actual signature page messengered to you.

I am informed that the email search is complete; and I'm having the BPD produce an affidavit from the IT person outlining the retention policy, search items and users. I'll send to you when I receive it.

FYI, the dates that I'll be available for deposition (and that you've offered) in January are 5, 8, 11, 23. I hope we can fit the 3 dept witnesses into this space.

Thanks,

Mary Jo

**Mary Jo Harris**

Morgan, Brown & Joy, LLP

8/14/2007

200 State Street
Boston, MA 02109

Phone: (617) 788-5011 (direct)
Phone: (617) 523-6666 (general)
Fax: (617) 367-3125
mharris@morganbrown.com



**MORGAN, BROWN
& JOY, LLP**

www.morganbrown.com
Bio | vCard

This email and any attachments are confidential, subject to the attorney-client and work product privilege and are intended only for the named addressee(s). If you are not a person to whom this e-mail was intended to be addressed, please disregard it and delete it from your computer system. Any unauthorized dissemination, distribution or copying of this communication is strictly prohibited.

8/14/2007

# Exhibit H

## Fisher, Nikki Jean

| | |
|---|---|
| **From:** | Harris, Mary Jo [mharris@morganbrown.com] |
| **Sent:** | Tuesday, January 02, 2007 6:14 PM |
| **To:** | Baker, Robert B.; Webster, Raquel J.; Rutkowski, Rheba |
| **Cc:** | Litsas, Helen; Buckley, Margaret |
| **Subject:** | Jones |

Hello all.

Robert, I attach a scanned signature page re the confidentiality agreement. I thought this had been faxed to you previously, and apologize that it was not.

Mike Reagan is available on Jan. 19, so please advise if that date will still work for you. I'd like to have his deposition start later in the day if possible, as he's traveling from Connecticut. Is 1:00 p.m. acceptable?

Marisela Perez is available on Jan. 8 in the afternoon, so again, please advise if you would like to hold her deposition then and at what time.

I am having strength reports pulled from 1998 to present, and hope to have those made available to you this week. I also expect to have the executed affidavit on the email search this week.

I believe that the documents reflecting positive initial tests followed by negative safety net results were produced to you in our Dec. 8 production. Please see docs at 35132 and following.

I need to speak with Helen Litsas on the redacted docs and logs, and will get to you on those issues after I have done so.

Mary Jo

**Mary Jo Harris**

Morgan, Brown & Joy, LLP
200 State Street
Boston, MA 02109

Phone: (617) 788-5011 (direct)
Phone: (617) 523-6666 (general)
Fax: (617) 367-3125
mharris@morganbrown.com



**MORGAN, BROWN**
**& JOY, LLP**

www.morganbrown.com
Bio | vCard

This email and any attachments are confidential, subject to the attorney-client and work product privilege and are intended only for the named addressee(s). If you are not a person to whom this e-mail was intended to be addressed, please disregard it and delete it from your computer system. Any unauthorized dissemination, distribution or copying of this communication is strictly prohibited.

8/14/2007

# Exhibit I

BINGHAM McCUTCHEN

Robert B. Baker
Direct Dial: (617) 951-8873
robert.baker@bingham.com

January 22, 2007

**VIA FACSIMILE AND FIRST-CLASS MAIL**

Bingham McCutchen LLP
150 Federal Street
Boston, MA
02110-1726

617 951 8000
617 951 8736 fax

bingham.com

Boston
Hartford
London
Los Angeles
New York
Orange County
San Francisco
Silicon Valley
Tokyo
Walnut Creek
Washington

Mary Jo Harris
Morgan Brown & Joy LLP
200 State Street
Boston, MA 02109-2605
Facsimile: (617) 367-3125

**Re:    Jones, et al. v. City of Boston, et al., Case Number 05-11832**

Dear Ms. Harris:

I write to follow-up on several issues concerning defendants' document production. Please treat this as a communication pursuant to Local Rule 7.1(a)(2).

**Marisela Perez's January 8, 2007 Deposition And Defendants' January 17, 2007 Document Production And**

As background, during the deposition of Marisela Perez, Ms. Perez referred to documents that the defendants had not previously produced. The defendants also waited until the middle of Ms. Perez's deposition to produce the document that was marked as Perez Exhibit 8. As noted on the record during Ms. Perez's deposition, plaintiffs reserved their right to recall Ms. Perez in the event that defendants uncovered additional documents that plaintiffs would need to ask Ms. Perez about.

Defendants hereby assert their previously reserved right to resume Ms. Perez's deposition. Some of the documents in defendants' January 17th document production (and perhaps all of the documents in this production) appear to be from Ms. Perez's files. The document production also includes several documents concerning positive hair test statistics that plaintiffs would have asked Ms. Perez about had we received them before her deposition.

Particularly given that Ms. Perez testified that she prepared for her deposition with her attorneys on two occasions for a total of four hours, we cannot understand why defendants waited until the middle of Ms. Perez's deposition to produce key documents concerning her testimony and then, after the deposition, produced documents highly relevant to her deposition.

We would like to resume the Perez deposition sometime in March or April, in accordance with our proposal regarding the scheduling of future depositions, discussed below. If the

Mary Jo Harris
January 22, 2007
Page 2

defendants object to resuming Ms. Perez's deposition, plaintiffs will move for an order to compel the deposition. Plaintiffs would also seek their attorneys' fees and costs incurred in connection with the motion, and as a result of being forced to depose a fact witness twice.

We hope that defendants will not continue the practice of producing documents relevant to a particular witness immediately before, during, or after that witness's deposition, as it forces the plaintiffs to incur needless expenses. If this happens again, plaintiffs will move for sanctions.

Bingham McCutchen LLP
bingham.com

### Other Issues Concerning Defendants' January 17th Document Production

Your cover letter for this production states that the defendants have identified several publications concerning the hair test in the defendants' possession, but that the defendants will not produce these documents because they are equally accessible to plaintiffs. When I called you to inquire as to whether the articles in defendants' possession contain handwriting and who they belonged to, you told me that the articles were from Ms. Perez's files. We were able to obtain all but one of the articles, which was identified as Mandatory Guidelines for Federal Workplace Drug Testing Program, 2001 WL 9378869. This Westlaw citation does not appear to exist. Please produce this document.

Next, defendants' January 17th document production heightens plaintiffs' concern that defendants have not produced all of the responsive electronic documents in their possession custody or control. Many of the documents appear to be from computer files accessible to Ms. Perez, including, but not limited to, several unsigned interoffice memoranda without Boston Police Department letterhead. For example, 0036152-54 appears to be a computerized printout of a signed interoffice memorandum on police department letterhead previously produced at 0006245-47. From the document productions to date, it is far from clear that defendants have made a diligent effort to gather and produce all responsive electronically stored documents in their possession.[1] Therefore, plaintiffs require some affirmation from defendants regarding defendants' efforts to gather and produce electronic documents, including, but not limited to, what electronic files are accessible, whose electronic files have been searched, what electronic files have been searched, and what the search for responsive electronic files has entailed (i.e., when a particular electronic file is searched, defendants should describe what they have done to ensure that all responsive electronic documents in the file are located).

---

[1] On a related topic, I note that plaintiffs are still awaiting defendants' production of any and all versions of the "Hair Drug Testing: Fact v. Fiction" document from defendants' internal website. Both former Commissioner Evans and Roberta Mullan alluded to such a document during their depositions. It strains credulity to believe that this document does not exist either in an electronic file of historical documents posted to the Police Department's internal webpage or in the electronic file(s) of the person(s) who created it.

Mary Jo Harris
January 22, 2007
Page 3

Finally, the document numbered 0036015-22 sets forth procedures for creating electronic files concerning the hair test. If such procedures were ever followed, there should be extensive electronic files in defendants' possession concerning hair test results. All of these documents should have already been produced. Please confirm that all of these documents have been produced and identify the bates numbers for this production. If these documents have not been produced, please produce them immediately.

Bingham McCutchen LLP
bingham.com

### Defendants' Production of Emails

On January 4, 2007, you produced the "Affidavit of John E. Boyle" dated December 27, 2006 that concerns defendants' efforts to gather and produce responsive e-mail communications. Upon review of Mr. Boyle's affidavit, plaintiffs have several questions and/or concerns about defendants' efforts to gather and produce e-mail.

First, Mr. Boyle's affidavit states "I would first do a restore going back three months because that was our retention period." According to Mr. Boyle's affidavit, he did not begin this restoration until at least October 2006. Given that the plaintiffs' complaint was filed in July 2005, this raises serious spoliation concerns. Therefore, plaintiffs request that defendants immediately confirm whether and when any litigation holds were put on documents concerning the hair test, along with a complete description thereof. Because the defendants' hair test has been extensively litigated in prior disputes with defendants' current and former officers and their unions, this request covers any instruction to defendants' employees not to destroy documents concerning the hair test in connection with any dispute concerning the hair test.

Second, Mr. Boyle's affidavit states, "I then used the advanced find feature under tools and searched the subject field and message body for the following words: hair testing, hair drug testing, MAMLEO (Massachusetts Association of Minority Law Enforcement Officers), Psychemedics, Psychemedics Corporation." This raises three serious concerns. First, defendants have evidently done nothing to search email attachments for responsive documents. Please confirm that this is the case, and, if so, please produce all email attachments responsive to defendants' document requests as soon as possible. Second, these search terms do not constitute a diligent effort to gather responsive email communications. Defendants have never articulated why they chose to use search terms instead of reviewing all email for responsiveness. To the extent defendants are using search terms to assist in their review, the terms should include: the last names of all of the individual plaintiffs, MAMLEO, hair, urine, specimen, test, testing, drug, race, racial, bias, color, Psychemedics, the last names of all Psychemedics' representatives who have communicated with anyone employed by defendants or defendants' Medical Review Officer, Psychemedics' email addresses, the current and former corporate names of defendants' Medical Review Officer, the last names of all employees of defendants' Medical Review Officer, and the last names of anyone defendants' have ever consulted with concerning the hair test (e.g. Dr. Carl M. Selavka). Finally, to the extent defendants communicated with any third-party concerning the hair test (e.g. the M.R.O., Psychemedics, Dr. Selavka, etc.), all emails to or from these individuals should be reviewed for responsiveness regardless of search terms.

Mary Jo Harris
January 22, 2007
Page 4

Next, Mr. Boyle's affidavit states that he only searched email files for nine of defendants' current or former employees. At a minimum, defendants should restore and review all emails for any of defendants' current or former employees identified in defendants' initial disclosures, any of defendants' current or former employees identified in defendants' responses to plaintiffs' first set of interrogatories, and any of defendants' current or former employees covered by plaintiffs' deposition notices.

Bingham McCutchen LLP
bingham.com

Finally, Mr. Boyle's affidavit states that he "pulled all the messages related to these topics... [and] then exported the messages to a .pst file. I then went to Margaret[] [Buckley's] desk and imported the files so that she could view and print them." Please confirm that all of these emails have been produced. Also, plaintiffs request that defendants produce the .pst file of responsive email. There is no added cost to defendants in producing documents in this format and it will lessen plaintiffs' costs of putting defendants' document productions into an electronic database.

### Other Miscellaneous Issues Concerning Defendants' Document Production

First, in your letter dated November 20, 2006, you stated you would be producing a memorandum authored by William Murphy. On December 28, 2006, I sent you an email inquiring when defendants would be producing this document. Please produce this document as soon as possible.

Second, in my December 28th email to you, I noted that there are several bates-range gaps in the defendants' document productions and in the indices to defendants' productions. I asked that you confirm that there are no responsive documents withheld in these gaps, or, if there were documents withheld, what those documents are and why they were withheld. I am concerned that some or all of these gaps may be documents that defendants think the plaintiffs already have in their possession from a prior dispute concerning the hair test. If this is the case, please produce an index of such documents so that plaintiffs can be certain they have all of the documents they are entitled to. In any event, please address this issue as soon as possible.

Third, as I noted in my December 28th email to you, we never received a copy of the document COB 000296, which is identified on defendants' document production indices. We also never received COB: 5173, 5384-5399, 5618-5735, 6516-6517, 7875-7876, 22680-22800, 23941-23981, 24040-24293, 25083, 26643-26652, 26872, 27331-27332, 27888, 29493, 29540-29545, 29568, 31304, 32411, 32455, 32684, 33084, and 33468-33469, which are identified on defendants' document production indices. Please produce these documents as soon as possible.

Fourth, defendants' response to interrogatory 2(c) refers plaintiffs "to documents produced at Bates stamp number 26643 *et seq.*" Defendants never produced a document numbered 26643, nor is such a document identified on the indices to defendants' document productions. Please produce the documents referred to at response to interrogatory 2(c) as soon as possible.

Mary Jo Harris
January 22, 2007
Page 5

Bingham McCutchen LLP
bingham.com

Fifth, I requested in my December 28th email to you that the defendants remove all redactions from previously redacted document and/or produce a log explaining what information was redacted. We are still awaiting a response to this request. Moreover, in defendants' document productions after December 28th, defendants continue to redact information without any explanation for the redactions. Please address this concern from by December 28th letter immediately.

Finally, in my December 28th email to you, I requested that plaintiffs produce an updated privilege log. Please produce an updated privilege log as soon as possible.

## Scheduling of Future Depositions in Light of Issues Concerning Defendants' Document Production

As I noted above, in light of the problems raised by defendants' belated production of documents concerning Ms. Perez, plaintiffs have serious concerns about taking future depositions of defendants' fact witnesses without the benefit of all responsive documents in defendants' possession that plaintiffs requested almost a year ago. Defendants are prepared to go forward with the currently scheduled depositions of Messrs. Dowd and Dunlap, but I would first like some assurance from you that defendants will not be producing additional documents concerning Messrs. Dowd and Dunlap immediately before, during, or after their depositions. For the depositions that the parties have noticed, plaintiffs would prefer not to go forward with these depositions until the discovery issues above have been addressed. I think it is reasonable for defendants to address all these issues by the end of February and then to begin scheduling depositions again for March and April. Please let me know if you disagree.

Very truly yours,

Robert B. Baker

cc:    Rheba Rutkowski, Esq.
       Raquel J. Webster, Esq.
       Nadine Cohen, Esq.
       Maricia Woodham, Esq.
       Renee Jenkins

# Exhibit J

January 23, 2007

**By Electronic Mail**
**And First Class Mail**

Robert Baker, Esq.
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110

      Re:    Ronnie Jones, et al v. City of Boston, et al
             <u>Civil Action No. 05-11832-GAO</u>

Dear Robert:

      I write in response to your five page missive of January 22, 2007.

      I informed you during Sgt. Perez's deposition that I had no objection to you renoticing her deposition, in light of the documents identified during her deposition. I continue to hold that position. Please feel free to renotice her at your convenience. I am also informed that Michael Reagan is available in February, and would prefer not to be deposed on Tuesdays or Wednesdays. He is available on February 15; please advise if you would like to hold his deposition then or if you prefer to schedule his deposition later in March/April. John Dunlop has become unavailable on January 25 due to scheduling of contract negotiations, but is available on January 30; again, please advise as to whether that date works for you. If you prefer to hold off on these depositions until you have received the updated Index and privilege log listed in the paragraph following, please advise. I ask that you respond to myself and to Helen Litsas as I will be out of the office on trial this week into next.

      With respect to the document production, it appears that several documents were not produced in our initial production despite their number listing on the Index because these documents constitute attorney-client communications and are therefore privileged. Some additional documents were not produced, despite their listing on the Index, because it appears that they constitute blank pages and the Defendants did not want to burden the Plaintiffs with unnecessary paper given the already voluminous discovery production. We are currently working to revise and update the document production Index to accurately reflect these corrections. We will provide you with a corrected version shortly. As for some other documents you have listed, it appears from our records that we did in fact produce these documents. However, for your convenience, we will

Robert Baker, Esq.
January 23, 2007
Page 2

provide you with another copy of these documents as well as an updated Index to reflect the above-mentioned corrections.

As for document COB 000296, we informed you in our January 4, 2007 letter of the following: "Please also note that the Index has been corrected to reflect that the first documents indexed should read COB 000288 –000295. COB 000296 is a privileged document and will not be produced." Additionally, please note there was an inadvertent typographical error in the Westlaw citation for the document, Mandatory Guidelines for Federal Workplace Drug Testing Program; the correct citation is 2001 WL 937869.

You have also inquired into the Department's review and retention of electronic data. The Department does not have a policy of retention of individual employees' electronic data, and it is frequently the case that as personnel are transferred, their electronic files are purged as they move between assignments. So, for example, the electronic files of Thomas Dowd, maintained when he was the Superintendent of the Bureau of Internal Investigations, were purged in or around March 2004, when he was transferred to his current position. Likewise, I am informed that the electronic files of James Hussey were purged when he left the Department for an extended leave of absence in the spring of 2004. The same is true for all former employees. All witnesses identified in the Department's answers to interrogatories have been asked to identify and produce all documents in their possession that relate to hair testing or this litigation, including their electronic data.

As to your concerns regarding the Department's email search and production, I take the position that the Department's email and electronic data search is sufficient for the purposes of discovery in this case. If you feel differently, you of course may raise this issue with Judge O'Toole at the status conference in February.

You had asked me whether defendants would agree to depose the plaintiffs by written deposition question. We will not agree to do so, since the plaintiffs' claims of exposure to illicit drugs and/or theories of how drugs came to be present in their hair is obviously significant to the opinions of the experts in this case.

It is our position that the plaintiffs in this case are making every effort to ensure that the discovery of this case is burdensome to the City and disruptive to the Police Department. Although I was not present for earlier conferences with the Court, I am informed by my predecessor that Judge O'Toole cautioned against unrestrained discovery in this case. It is the City's intention to request the Court's assistance in this regard.

My motion for a protective order to prohibit the depositions of the hair test negative officers will follow by separate cover. Please be advised that I will ask the Court to establish firm discovery limitations. I do not object to scheduling further discovery events after review and resolution of our discovery disputes with the Court.

Robert Baker, Esq.
January 23,  2007
Page 2


                                    Sincerely,


                                    Mary Jo Harris



cc:     Helen Litsas, Esq.

# Exhibit K

**Fisher, Nikki Jean**

| | |
|---|---|
| **From:** | Harris, Mary Jo [mharris@morganbrown.com] |
| **Sent:** | Friday, July 13, 2007 2:48 PM |
| **To:** | Baker, Robert B.; Murati Ferrer, Nicole |
| **Cc:** | Webster, Raquel J.; Heining, Eric A.; Rutkowski, Rheba |
| **Subject:** | RE: Jones v BPD - Second Revised Joint Statement of Proposed Discovery Schedule (Draft 7-11-07) |

Robert,

I appreciate your frustration, and I assure you that our first awareness of the memos - as well as the presence of officers Kelly and  Sullivan at a meeting with Psychemedics - was yesterday as well.

I understand your interest in examining DeBow, Devlin, Hussey and Mullan about the meeting described in Bob Boyle's notes, and appreciate your courtesies in offering to do these examinations by written questions.  I also agree that if additional discovery is indicated as a result of those responses, I will not raise the discovery deadline as an issue.

I believe that both Bernie Kelly and Michael Sullivan were assigned as peer counselors to the BPD Stress Unit, an EAP, and that communications they had with officers seeking their assistance are privileged.  I do not have any objection to your deposing them with regard to the meeting reflected in Boyle's notes, or regarding any communications they had with personnel internally that would not fall within the Stress Unit's therapeutic function.  I do not know whether these individuals are still
with the Department, and am checking on their status now.

You will be provided with a completed privilege log and the affirmations you request.

I have made every effort to identify or produce all materials in the City's possession that touch on the issue of hair drug testing.
Attorneys in the City's law department, labor relations and legal advisor's offices have interviewed the directors of human resources, occupational health, internal affairs, info technology, the contracts division and the office of the police commissioner, in addition to identifying all materials within their own offices, in order to respond to the plaintiffs' discovery requests.  You are aware that the scope of this litigation spans a decade, involves four administrations within the police department, two offices of labor relations, and innumerable changes in personnel and staffing.  In light of this, I suggest that the inadvertent oversight of three documents is not outrageous, although certainly regrettable.  I also regret that the tenor of our communications has become so unpleasant, since we will be working together on this case for quite some time to come.

Mary Jo


Mary Jo Harris

Morgan, Brown & Joy, LLP
200 State Street
Boston, MA 02109

Phone: (617) 788-5011 (direct)
Phone: (617) 523-6666 (general)
Fax: (617) 367-3125
mharris@morganbrown.com

www.morganbrown.com
Bio | vCard


This email and any attachments are confidential, subject to the attorney-client and

1

work product privilege and are intended only for the named addressee(s). If you are not a person to whom this e-mail was intended to be addressed, please disregard it and delete it from your computer system. Any unauthorized dissemination, distribution or copying of this communication is strictly prohibited.


-----Original Message-----
From: Baker, Robert B. [mailto:robert.baker@bingham.com]
Sent: Thursday, July 12, 2007 1:21 PM
To: Murati Ferrer, Nicole; Harris, Mary Jo
Cc: Webster, Raquel J.; Heining, Eric A.; Rutkowski, Rheba
Subject: RE: Jones v BPD - Second Revised Joint Statement of Proposed Discovery Schedule (Draft 7-11-07)

Nicole and Mary Jo,

This is completely unacceptable.  This is not the first time defendants have produced documents critical to a witness's deposition after the witness was already deposed. Setting aside the fact that we would have asked almost every witness who has testified so far whether they had ever seen these documents, the 1999 memorandum would have been critical in the depositions of Ms. DeBow, Mr. Hussey, Mr. Devlin, and Ms. Mullan.
We have also had no disclosure in response to our interrogatories and document requests or in defendants' initial disclosures that Bernie Kelly and Michael Sullivan are employees of defendants' with information concerning the Hair Test and Psychemedics.  To say that this prejudices the plaintiffs is an understatement.

We reserve our rights with respect to whether to recall Mr. Boyle and do not consider his deposition closed after today.  Also, unless you agree to following we will seek relief, including sanctions, from the court:

1) Provide a thorough description of the efforts defendants have made to comply with plaintiffs' discovery requests, including what documents defendants looked for, where they looked, who they asked to search for documents, and what they were asked to search for.

2) An affirmation that defendants have conducted a thorough review for documents responsive to plaintiffs' document requests and have produced all non-privileged documents that they previously agreed to produce.

3) A privilege log of all documents withheld to date, including a thorough description of the subject matter of the document, the sender and recipients, the date, the document type (e.g., interoffice memorandum), and the basis for withholding the document.

4) An agreement (a) to have Ms. DeBow, Mr. Devlin, Mr. Hussey and Ms. Mullan examined about the contents of the attached document through deposition by written question, and (b) if their answers require additional discovery, that the discovery cut-off will not apply.

5) Produce Bernie Kelly and Michael Sullivan for deposition.

All of the above is more than reasonable given defendants' conduct with respect to discovery to date.  If defendants do not agree to this compromise, we will seek, at a minimum: 1) an order compelling plaintiffs to provide Ms. DeBow, Mr. Hussey, Mr. Devlin, and Ms. Mullan for deposition again and to pay court reporter costs and plaintiffs' attorneys fees for resuming these depositions; 2) sanctions for the prejudice to plaintiffs due to defendants' failure to produce these documents until now; 3) attorneys' fees and costs for the need to resume Ms. Perez's deposition because of similar conduct in discovery; 4) the affirmation, description of efforts to gather documents, and privilege log described above; and 5) attorneys' fees incurred in filing the motion for sanctions.

Robert B. Baker
Associate
T 617.951.8873
F 617.951.8736
robert.baker@bingham.com

B I N G H A M
Bingham McCutchen LLP

150 Federal Street
Boston, MA 02110-1726


-----Original Message-----
From: Murati Ferrer, Nicole
[mailto:Nicole.MuratiFerrer@cityofboston.gov]
Sent: Thursday, July 12, 2007 12:15 PM
To: Heining, Eric A.; Baker, Robert B.; Webster, Raquel J.; Rutkowski, Rheba
Cc: Harris, Mary Jo
Subject: RE: Jones v BPD - Second Revised Joint Statement of Proposed Discovery Schedule (Draft 7-11-07)

Counselors,

Attached are a couple of documents which were provided to us by Bob Boyle this morning.  I will bring copies with me to today's deposition.


Thank you.

Nicole Murati Ferrer
Assistant Corporation Counsel
City Of Boston -- Law Department
1 City Hall Plaza, Rm. 615
Boston, MA 02201
617 635-4045
617 635-3199 (fax)

CONFIDENTIALITY NOTICE: The information contained in this electronic mail transmission is intended by the City of Boston Law Department for the use of the named individual or entity to which it is directed and may contain information that is privileged or otherwise confidential.
If you have received this electronic mail transmission in error, please delete it from your system without copying or forwarding it, and notify the sender of the error by reply e-mail so that the sender's address records can be corrected.


-----Original Message-----
From: Heining, Eric A. [mailto:eric.heining@bingham.com]
Sent: Wednesday, July 11, 2007 3:42 PM
To: Murati Ferrer, Nicole; Baker, Robert B.; Harris, Mary Jo; Webster, Raquel J.; Rutkowski, Rheba
Subject: RE: Jones v BPD - Second Revised Joint Statement of Proposed Discovery Schedule (Draft 7-11-07)


Nicole,

Yes, the deposition will be at 1:30 pm tomorrow.

Thanks,

Eric
-----Original Message-----
From: Murati Ferrer, Nicole
[mailto:Nicole.MuratiFerrer@cityofboston.gov]
Sent: Wednesday, July 11, 2007 3:38 PM
To: Baker, Robert B.; Harris, Mary Jo; Heining, Eric A.; Webster, Raquel J.; Rutkowski, Rheba
Subject: RE: Jones v BPD - Second Revised Joint Statement of Proposed Discovery Schedule (Draft 7-11-07)


Just to confirm, Boyle's deposition will be tomorrow @ 1:30, correct?

-----Original Message-----

3

From: Baker, Robert B. [mailto:robert.baker@bingham.com]
Sent: Wednesday, July 11, 2007 3:29 PM
To: Harris, Mary Jo; Heining, Eric A.; Webster, Raquel J.; Rutkowski, Rheba; Murati
Ferrer, Nicole
Subject: RE: Jones v BPD - Second Revised Joint Statement of Proposed Discovery Schedule
(Draft 7-11-07)


Mary Jo,

We will plan on proceeding with Ms. Tisei's deposition on either July 25 or 26.  We can be
available the afternoon of the 25th or anytime on the 26th.  Please confirm a date and
time.  I have revised the proposed joint motion (attached) to include: 1) the track change
you sent along earlier, 2) the revision regarding the scheduling of Ms. Tisei's deposition
on July 25 or 26, and 3) a 8/3 discovery cut-off and 8/17 motions cut-off.  Given the
likely need to file motions, I would prefer two weeks for motions from whatever the date
of the discovery cut-off is.  Please let me know if this is acceptable.  Thank you

-----Original Message-----
From: Harris, Mary Jo [mailto:mharris@morganbrown.com]
Sent: Wednesday, July 11, 2007 12:29 PM
To: Baker, Robert B.; Heining, Eric A.; Webster, Raquel J.; Rutkowski, Rheba; Murati
Ferrer, Nicole
Subject: Jones v BPD - Second Revised Joint Statement of Proposed Discovery Schedule
(Draft 7-11-07)

Hi Robert - thank you for your email.  I am happy to speak with you tomorrow morning on
the issues you raise.  I have an appointment this afternoon that will go all day so will
try to reach you in the morning.


I added in a note that Ferguson's deposiiton is moved because of his living out of state
as well, as I don't know all the details of his health and would have fewer concerns about
producing him if he lived locally.  Let me know if you have any objection to this.

I can't do Virginia Tisei's deposition next week, as I'm starting a trial on Thursday; I
don't expect it to last more than a couple days, but to be safe I'd suggest we extend the
discovery deadline to Aug 3 and the motion deadline to August 10.  I'd refer to set a date
for Virginia after July 25 in case my trial gets bumped a day or so (she is available
the 25th and 26th).   I didn't put these dates in the motion that's
attached.

I will also still make space in Court Street available tomorrow if you decide you'd rather
get this done now.  Please let me know how you'd like to handle.  If you or one of the
others decide to proceed tomorrow, please call and leave a  message on my cell phone -
617-894-7311 - letting me know that.

Thank you, and tallk to you soon.

This communication is intended for the named recipient's attention only, and may be
communication covered by the attorney client privilege.  If you are not the named
recipient, you are advised that you may have received this message in error and are asked
to return it immediately to the sender at the address below.

Mary Jo Harris
Morgan, Brown & Joy, LLP
200 State Street
Boston, MA 02109-2605
(617) 788-5011


  <<Jones v  BPD - Second Revised Joint Statement of Proposed Discovery Schedule (Draft
7-11-07).DOC>>

```
===================================================================
====
Bingham McCutchen LLP Circular 230 Notice:   To ensure compliance with
IRS requirements, we inform you that any U.S. federal tax advice contained in this
communication is not intended or written to be used, and cannot be used by any taxpayer,
for the purpose of avoiding any federal tax penalties.  Any legal advice expressed in this
message is being delivered to you solely for your use in connection with the matters
addressed herein and may not be relied upon by any other person or entity or used for any
other purpose without our prior written consent.
===================================================================
====


-------------------------------------------
The substance of this message, including any attachments, may be confidential, legally
privileged and/or exempt from disclosure pursuant to Massachusetts law. It is intended
solely for the addressee. If you received this in error, please contact the sender and
delete the material from any computer.
```

# Exhibit L

38

1       A:  Not a suggestion.  He said that, I believe he said

2   that that was unusual.

3       Q:  When you say that it was unusual do you mean the

4   random nature of it or the non-random nature of it?

5       A:  The non-random nature of it.

6       Q:  Did you discuss anything else in this phone call?

7       A:  Not that I can recall.

8       Q:  Do you recall having any other conversations with Mr.

9   Cairns about any other subjects?

10      A:  I don't recall.

11      Q:  Have you ever met anyone else from Psychemedics other

12  than Mr. Cairns?

13      A:  I met William Thistle.

14      Q:  William Thistle is the General Counsel?

15      A:  I think so.

16      Q:  When did you meet him?

17      A:  Sometime within the past two years.

18      Q:  You met him on one occasion?

19      A:  That I can recall, yes.

20      Q:  What did you discuss with Mr. Thistle?

21      A:  I met him at an arbitration.

22      Q:  What was the name of the arbitration?

23      A:  I believe it was the Maritza Correia case,

24  C-o-r-r-e-a.  M-a-r-i-t-z-a.

# Exhibit M

**MEMORANDUM**

To:    File
From:  Robert Boyle
Date:  July 8, 1999

---

Sandra DeBow arranged a meeting at BPD HQ.  Patrick Kelley from Psychemedics in Atlanta made a presentation.  Bill Thistle (hereinafter "BT") from Psychemedics in Cambridge attended and answered questions.  Several BPD members were present: Bobby Mullan, Bernie Kelly (hereinafter "BK") and Michael Sullivan from BPD's EAP, Sup. James Hussey and Joseph Devlin.

Patrick Kelley showed a Psychemedics videotape on sample collection procedures.  It was the same videotape that the City provided the BPPA during negotiations over implementation of hair testing in Rule 111.  After the videotape, Kelley explained how drugs get into hair.  Kelley started to talk about fingernails and pubic hair when BT explained that BPD does not use either.

Patrick Kelley discussed the possibility of prescription drugs contributing to a positive test result.  He said that while there is Tylenol with Codeine, no doctor would prescribe the amount of medication necessary to score positive.  A positive test would only result from uncontrolled levels of Codeine.  Kelley said that cancer patients taking some THC-based prescription medications may return positive for Marijuana.  A Morphine positive may also be based upon a prescription, such as if there was a recent physical injury.  Kelley said that the MRO would be able to sort through all of these.  He said that there is no prescription for Cocaine or Heroin.

The two BPD officers from EAP asked questions about the hair testing process.

BT said that the plastic pouch for hair samples is opened at the bottom.  If a subject claims tampering with the seal, Psychemedics can provide a Xerox copy of the intact sealed bag.

BT recommended a mirror at the collection site.  (Outside the meeting, Bobbie Mullan said that BPD does not provide a mirror.  She is waiting for direction from Labor Relations)

BK asked why the sample collectors do not wear gloves.  BT said that Psychemedics provides gloves to sample collectors, but the gloves are for the convenience of the sample collector, not because of any concern that bare hands could contaminate a hair sample.

BK then asked BT if external contamination was a concern.  BT said that external exposure to drugs can lead to drugs getting into the bloodstream, but in such small amounts that the appropriate cut-off level would render it a negative.  BT said that the

cut-off levels are high enough to eliminate passive ingestion and even low level use of drugs.

BK asked if marriage to a drug-user puts an officer at risk for a positive result. This led to a discussion of a challenge to a positive hair tests based upon the subject's claim that sexual relations (i.e., oral sex) with a drug user caused the positive result. BT said the evidence in that case was that the drug levels in semen are very low.

Sandra DeBow asked BT to discuss a study on hair testing of narcotics officers. BT explained that the study of narcotics officers showed that external contamination was not an issue.

BK asked if Psychemedics has had any court challenges. BT went back to talk about the sexual transmission challenge. He said the subject claimed that her positive test was due to sexual transmission, use of Fen-Fen, and external contamination from removing a Methamphetamine lab from her mother-in-law's house.

BK then asked if about prescription medications: do any antidepressants have the ability to make a test come back positive? BT said that there are drugs that screen the same as some antidepressants (RIAH screen) but the second test (GCMS) gives a molecular fingerprint of each drug, and they can be distinguished.

BK asked if there is anything to the racial bias claim. BT gave the explanation that the studies raising the concern use only a handful of subjects. The best studies, he said, involve thousands of subjects. Those studies all show the absence of a hair bias. In these studies, the results of hair testing, urinalysis and self-reporting are compared for different racial groupings. He said the differences across racial lines are proportionate.

BT explained that while Cocaine binds with Melanin, it also binds with other proteins in hair. He said Melanin makes up only a small percentage of the total weight of a strand of hair.

BT went on to say that a preference among blacks for Cocaine also explains the higher rate of positives for that group. He said that cocaine is the "drug of choice" for blacks whereas Methamphetamine is the "drug of choice" for whites. He said that Methamphetamine is a "Caucasoid", meaning, it is a drug that Caucasians use.

BT said that the race bias claim was baseless but that the media likes controversy so it continues to stir the pot.

BT said that Psychemedics's clients keep records of the rate of positives and also the demographics among those who test positive.

BK asked about other firms that are available to do hair testing. BK said that people he sees at EAP want independent tests. BT said that there are other labs, some whose work

is better than others. He said that any hair testing lab needs the right equipment. BT said that in court employers challenge the other lab's chain of custody.

BK asked about Safety Net Tests. He said that on occasion Psychemedics has responded that there was insufficient hair in the sample. The lab tested for everything but Cocaine first when the first test was only positive for Cocaine. BT said he would inquire to see "what went . . . . with that test" (i.e., what went wrong, but he didn't say "wrong"). BK said that the Department has had negative Safety Net Tests. What bothers him is a Safety Net Test that comes back as a bad sample (i.e., no answer).

BK said that people at EAP are screaming and crying. They are extremely upset that they tested positive. Sup. Hussey asked how far back do fingernail samples test. BT said 6 to 8 months ago (i.e., the tip of your fingernail is 6 to 8 months old). The newest part of a fingernail is at the base. Scrapings of fingernails can test for drug use in the past 3 months. Sup. Hussey said that he wants to be able to tell officers reporting to EAP what they can do to try to prove their innocence. BT said that people do use negative re-tests as a defense, but that the negative retest only shows that the person is not a habitual user. It does not show that the person "never used drugs" and it doesn't refute the original test.

Michael Sullivan asked how many false positives Psychemedics has had. BT said there has never been a reported false positive in Psychemedics ten years of testing. He said that no one who has ever claimed to have received a false positive was ever proven to be right. Sullivan asked if Psychemedics could provide a chart showing the cut-off levels that the lab uses to define positive results for the different drugs tested. Sullivan also asked if officers ordered to EAP could obtain access to Psychemedics test results data (i.e., regarding other subjects).

After the meeting, Bobbie Mullan told BT that the Department has had two negative Safety Net Tests.

After the meeting, Patrick Kelley provided hair sample collection training to four BFD personnel in Bobbie Mullan's office. They did not review the videotape but watched as Kelley demonstrated hair collection technique.