UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO.  05-CV-11832-GAO

_____

| | |
|---|---|
| RONNIE JONES, RICHARD BECKERS, | ) |
| WALTER R. WASHINGTON, WILLIAM | ) |
| E. BRIDGEFORTH, SHAWN N. HARRIS, | ) |
| EUGENE WADE, GEORGE | ) |
| C. DOWNING, JR., CLARARISE | ) |
| BRISTOW, and the MASSACHUSETTS | ) |
| ASSOCIATION OF MINORITY LAW | ) |
| ENFORCEMENT OFFICERS, | ) |
| | ) |
|     Plaintiffs | ) |
| | ) |
| vs. | ) |
| | ) |
| CITY OF BOSTON, BOSTON POLICE | ) |
| DEPARTMENT, and KATHLEEN | ) |
| O'TOOLE,  as she is Police Commissioner | ) |
| for the Boston Police Department, | ) |
| | ) |
|     Defendants | ) |

_____)

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR A PROTECTIVE ORDER SEEKING RELIEF FROM PLAINTIFFS' REQUEST TO DEPOSE ADDITIONAL WITNESSES

I.    <u>INTRODUCTION</u>

The Defendant City of Boston (hereafter "City")  seeks protection from the proposed deposition of two current and former Boston Police  personnel:  Alicia McDonnell, a former staff attorney assigned to the Boston Police Department's Legal Advisor's Office, and Michael O'Sullivan, an incumbent police officer who is currently on injured leave pending the resolution of a disability retirement request. The City submits that the depositions of these individuals is cumulative of other evidence, is burdensome, and since the information in the possession of these individuals does not pertain to the main issue to be addressed in the first phase of

this litigation – namely, whether the hair drug test is accurate and reliable – the burdensomeness of the proposed discovery greatly outweighs its probative value.

The City also objects to the deposition of Alicia McDonnell, a former attorney for the Boston Police, on the additional grounds that the deposition of in-house counsel is unnecessarily disruptive to the attorney-client relationship and almost certainly would entail additional pretrial delays to resolve disputes over work-product and privilege objections.

The City refers to its Opposition to Plaintiffs' Motion to Compel and Cross Motion for Protective Order, Docket Number 51, for a summary of the pretrial events that have taken place to date.  In sum, the Plaintiffs have deposed seventeen individuals, including three prior Police Commissioners, five in-house Labor Relations attorneys, the current Director of Labor Relations for the City, the former Deputy of Labor Relations for the Police Department (by written question), two former Commanders of Internal Investigations, two Keeper of Records for Internal Affairs, and three Human Resources and Administration personnel.  These individuals are all fact witnesses with respect to the City's determination to utilize hair drug testing, the collective bargaining process and implementation of hair drug testing, and conversations with Psychemedics, the lab that actually performs the test.  None of these individuals is qualified to testify about the accuracy or scientific validity of hair drug testing with any degree of expertise.

Defendants assume that the Plaintiffs seek the deposition of McDonnell because at the deposition of former Labor Relations counsel Sandra DeBow, McDonnell was identified as having been a presenter at a meeting held at Boston Police headquarters with members of MAMLEO, and a co-author of a document concerning hair drug testing that was posted on the Department's internal web

page[1].  Plaintiffs questioned DeBow – and other Labor Relations attorneys – about the names and holdings of cases in which hair drug testing was at issue, about whether hair drug testing was subject to regulation by the federal government, and about whether Psychemedics had obtained FDA approval for its hair drug testing. Plaintiffs have asked each City attorney these questions.  See, e.g., Exhibit A, Boyle deposition at p. 60, l. 6 – 19;  p. 161 -2, l. 9 – 19;  Exhibit B, DeBow deposition at p. 50 – 53, 92 – 97;  Exhibit C, Murphy deposition  at p. 27 – 28.

Defendants assume that Plaintiffs wish to question McDonnell about the same issues.  There is no reasonable need to depose a sixth City attorney to find out how cases involving hair testing were resolved, or whether federal regulations or approvals exist.  These facts can be readily determined by review of public records, and McDonnell's recollection about these matters is, at most, redundant of the information already developed by Plaintiffs in discovery.  The only conceivable reason to depose McDonnell is to delve into communications she may have had with City officials, or to inquire into the work product developed by McDonnell in her handling of arbitrations on hair drug test grievances.  These communications are privileged, and her work product is protected from disclosure.

Likewise, the request to depose Officer Michael O'Sullivan is overly burdensome.  Defendants assume that Plaintiffs wish to depose him because he was an attendee at a meeting with Psychemedics and other Department personnel. Labor Counsel Robert Boyle took notes of that meeting, which were produced during his deposition. (Exhibit E).   O'Sullivan is on injured leave from his employment with the City.  (Exhibit F, personnel order).

The City has agreed to make the second officer in attendance at this meeting, Bernard Kelly, available for deposition, and the Plaintiffs have already deposed

---

[1]     That document, titled "Hair Drug Test: Fact v. Fiction" is attached hereto as Exhibit F.

Attorney Boyle.   Plaintiffs have been given notes of that meeting.  Defendants submit that the Plaintiffs' insistence that an injured officer be brought in for deposition, where all they can hope to inquire of is already spoken to by two other City employees, where the meeting itself was documented, and where the subject matter of the meeting has no bearing on the accuracy or validity of the hair drug test itself, is tantamount to harassment.

By agreement, the Court and the parties have divided the discovery events of the case into roughly two stages, the first dealing with issues impacting the claims common to all plaintiffs, and the issues peculiar to each plaintiff during the second. In so doing, the Court directed that the litigation was primarily concerned with the accuracy and validity of the hair drug test.  See Electronic Clerk's Notes for proceedings held before Judge George A. O'Toole Jr., entered on the docket on February 9, 2006:

> The court sets a status conference to take the temperature of the case as counsel proceed along with the idea being primarily to the science but to the extent that that requires knowing what happened to single people, aspects of reliability and so on.

At this point in the litigation, further depositions of additional City fact witnesses are duplicative,  burdensome, and not reasonably related to the discovery of relevant or admissible evidence.  The court should grant the City's motion for a protective order.

## II.  <u>ARGUMENT</u>

Despite the general rule that the discovery rules provide for broad discovery, discovery is not unlimited.  The Court has discretion to curtail discovery when it goes beyond what is required by the reasonable needs of the case.  <u>Mack v. Great Atl. & Pac. Tea Co.</u>, 871 F.2d 179, 187 (1st Cir.1989).

Both the Massachusetts and Federal courts recognize that the testimony of an attorney in a civil case can raise issues of privilege and attorney-work product and can be disruptive to the attorney-client relationship when an adverse party seeks the testimony of another party's counsel.  Serody v. Serody, 19 Mass. App. Ct. 411, 414 (1985) (noting potential for abuse by opposing counsel who calls an adversary's current attorney as a witness for the purposes of trying to maneuver his or her withdrawal).  As the Eight Circuit observed in a leading case on deposing an attorney,

> Taking the deposition of opposing counsel not only disrupts the adversarial system and lowers the standards of the profession, but it also adds to the already burdensome time and costs of litigation.  It is not hard to imagine additional pretrial delays to resolve work-product and attorney-client objections, as well as delays to resolve collateral issues raised by the attorney's testimony.  Finally, the practice of deposing opposing counsel detracts from the quality of client representation.  Counsel should be free to devote his or her time and efforts to preparing for the client's case without fear of being interrogated by his or her opponent. Moreover, the "chilling effect" that such practice will have on the truthful communications from the client to the attorney is obvious.

Shelton v. Am. Motors Corp, 805 F.2d 1323, 1327 (8th Cir. 1986) (analyzing request to depose in-house counsel) (cited in Saldana-Sanchez v Lopez-Gerena, 256 F.3d 1, 4, n. 9 (1st Cir. 2001)).  "Deposing an opponent's attorney is a drastic measure. It not only creates a side-show and diverts attention from the merits of the case, its use also has a strong potential for abuse.  Thus, a motion to depose an opponent's attorney is viewed with a jaundiced eye and is infrequently proper."  M&R Amusements Corp. v. Blair, 142 F.R.D. 304, 308 (N.D. Ill. 1992) (citation omitted).  See also, Dunkin' Donuts, Inc. v. Mandorico, Inc., 181 F.R.D. 208, 209-210 (D. P.R. 1998) (noting that the taking of an attorney's deposition "not only disrupts the adversarial system and lowers the standards of the profession, but it also adds to the already burdensome time and costs of

litigation.") (citation omitted).

Recognizing the strong potential for abuse, Courts limit the circumstances under which an attorney can be compelled to testify in civil cases to those where the party seeking the attorney's testimony can show the following:  (1) that the information sought from the attorney is crucial to the party's case; (2) that the information sought is not privileged; and (3) that no other means exist to obtain the information than to depose opposing counsel.  Shelton, 805 F.2d at 1327.  But see In re Subpoena Issued to Dennis Friedman, 350 F.3d 65, 71-72 (2d Cir.2003) (rejecting Shelton in favor of a "totality of the circumstances" test).   "The burden is on the party seeking the attorney's deposition to establish that each of these three criteria are met."  Epling v. UCB Films, Inc., 204 F.R.D. 691, 693 (D. Kan. 2001) (citing Shelton, supra at 1326).  Regardless of which test is applied, Attorney McDonnell should not be deposed.[2]

### A.    The Information Sought Is Not Crucial To Plaintiffs' Case

McDonnell does not have any information that is crucial to plaintiffs' case that has not already been the subject of extensive questioning of the other attorneys examined (assuming, only for purposes of this Motion, that the subjects upon which these attorneys were questioned are crucial at all).   Defendants do not contest that, to the extent in-house counsel is an "actor or viewer" to the events in dispute, no privilege exists.  Indeed, the City has made available five Labor Relations counsel to testify about non-litigation conversations with Psychemedics, the negotiations with the police unions, and the implementation of the substance abuse policy.

---

[2]    Attorney McDonnell, as an in-house attorney, is entitled to be treated the same as any outside attorney for the purpose of applying Shelton.  Epling v. UCB Films, Inc., 204 F.R.D. 693-694.  See also, Boughton v. Cotter Corp, 65 F.3d 823, 828-829 (10th Cir. 1995) (treating in-house counsel as opposing counsel for the purposes of whether his deposition should be taken and relying, in part, on the finding that the in-house attorney was operating as an attorney and made no underlying decisions).  Further, according to the recent decision of the Supreme Judicial Court, the communications of an in-house government attorney is entitled to the same privileges as apply to private attorney client communications.  Suffolk Construction Co., Inc. v. Division of Capital Asset  Management, SJC No. 09733 (July 13, 2007).

If the Plaintiffs seek to inquire into facts observed by Attorney McDonnell as an actor or viewer, her testimony is cumulative of that already offered by the five attorneys already deposed. Attorney McDonnell's recollection about these matters is, at most, redundant of the information already developed by Plaintiffs in discovery. If the Plaintiffs seek to ask Attorney McDonnell why she characterized the hair drug test as having "withstood vigorous legal challenge," or why she believed Psychemedics to have obtained FDA "approval," those topics are not relevant or central to the dispute in this case. Psychemedics' success or defeat in other litigation speaks for itself, and McDonnell's opinions of those results has no bearing on the accuracy of the hair drug test. Likewise, any action taken by the FDA with regard to Psychemedics' test is a matter of public record, and Attorney McDonnell's interpretation of those actions is not relevant to the issues in this case.

While deposition of an attorney acting in a non-advisory role may be appropriate, it is not appropriate where the attorney "was not a party to any of the underlying transactions giving rise to the action" or whose role in a transaction was "speculative and not central to the dispute." Rainbow Investors Group, Inc. v. Fuju Trucolor Missouri, Inc., 168 F.R.D. 34, 36 (W.D.La. 1996). The dispute in this case is whether the hair drug test is scientifically accurate and reliable. Attorney McDonnell's testimony not only is not central to this dispute, it is wholly irrelevant to it.

### B.    The Information Sought Is Privileged

If Plaintiffs seek information other than that described above, the Court should consider what, if anything, Attorney McDonnell could testify to that would not be protected by the attorney-client privilege and/or work product rule. Attorney McDonnell's non-advisory work was her participation in the meeting with MAMLEO, and her co-authoring the "Fact vs. Fiction" document. All other

involvement by Attorney McDonnell in hair drug testing was done in her role as in-house counsel, representing the Department in employee disciplinary hearings, appeals and arbitrations.

The work-product doctrine protects from discovery all materials obtained or prepared in anticipation of litigation, as well as Attorney McDonnell's mental impressions, thought processes, opinions, conclusions, and legal theories. Hickman v. Taylor, 329 U.S. 495 (1947). "Not even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of an attorney." Hickman, 329 U.S. at 510. What Attorney McDonnell may have thought, considered, or done in connection with her efforts in anticipation of litigation are not subjects about which she can be compelled to testify. Shelton, 805 F.2d at 1328. The only conceivable reason to depose McDonnell is to delve into communications she may have had with City officials, or to inquire into the work product developed by McDonnell in her handling of arbitrations on hair drug test grievances. These communications are privileged, and her work product is protected from disclosure.

### C. The Information Sought Can Be Obtained By Other Means

Defendants are proceeding on the assumption that the information sought by Plaintiffs is that outlined above (facts and results of cases involving challenges to Psychemedics, FDA/federal standards and approval). Plaintiffs can obviously obtain this information by reference to the public record (if they have not already done so). If these topics are not those upon which Plaintiffs seek to inquire, Defendants suggest that an offer of proof be made in order to demonstrate that the Plaintiffs do not intend questioning that would invade privilege or work-product protections.

### D.    Practical Issues With Attorney McDonnell's Deposition

Any deposition of Attorney McDonnell that goes beyond the facts already explored with the five other Labor Relations counsel would be filled with objections and discussions concerning privilege and work product issues.  Courts have discouraged the use of such depositions because they produce little more than a collection of objections. Cox v. Admin. U.S. Steel & Carnegie, 17 F.3d 1386, 1423 (11th Cir. 1994).

### E.    Alternatively, Defendants Suggest A Deposition On Written Questions

Courts have discourage the use of oral depositions of counsel, but in some circumstances have allowed the deposition to proceed on written questions (and in fact, the parties have used this method to obtain the deposition of an out of state witness).  See, e.g., Foley v. Juron Assoc., 1986 WL 3754, at *3 (E.D. Pa. Mar. 26, 1986) (noting that the Court granted a protective order limiting examination of plaintiffs' counsel to a deposition by written questions pursuant to Fed. R. Civ. P. 31).  After receiving Attorney McDonnell's answers, Plaintiffs could then decide if deposition is necessary.  If Plaintiffs do decide that further, oral examination of Attorney McDonnell is necessary, the Court would be in a better position to assess whether to allow the examination to go forward if her written questions were available for review.

## III.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court issue a Protective Order, that the depositions of Attorney McDonnell and Michael O'Sullivan not be had.

Respectfully submitted,
Defendants City of Boston,
Boston Police Department, and
Kathleen O'Toole
By their attorney,


__/s/ Mary Jo Harris_____
Mary Jo Harris, BBO # 561484
Morgan, Brown & Joy, LLP
200 State Street
Boston, MA 02109-2605
(617) 523-6666

Dated:  August 17, 2007


## CERTIFICATE OF SERVICE


I, Mary Jo Harris, hereby certify that this document was filed through the ECF system on August 17, 2007, and that a true paper copy of this document will be sent to those indicated as non registered participants on the Notice of Electronic Filing by first class mail on the same date.


DATED:  August 17, 2007          _/s/  Mary Jo Harris_____

# EXHIBIT A

00001                                boyle

                                          Volume I
                                          Pages 1 to 167
                                          Exhibits 1 to 6
                        UNITED STATES DISTRICT COURT
                          DISTRICT OF MASSACHUSETTS
          - - - - - - - - - - - - - - - - - -x
                                              :
          RONNIE JONES, et al.,                :
                          Plaintiffs,          :
                                              :
                  vs.                          :      Civil Action
                                              :      No. 05-11832-GAO
          CITY OF BOSTON, et al.,              :
                          Defendants.          :
                                              :
          - - - - - - - - - - - - - - - - - -x

                    DEPOSITION OF ROBERT BOYLE, a witness
          called on behalf of the Plaintiffs, taken pursuant
          to the Federal Rules of Civil Procedure, before
          Linda A. Walsh, Registered Professional Reporter and
          Notary Public in and for the Commonwealth of
          Massachusetts, at the Offices of Bingham McCutchen
          LLP, 150 Federal Street, Boston, Massachusetts, on
          Thursday, July 12, 2007, commencing at 1:42 p.m.
          PRESENT:
                  Bingham McCutchen LLP
                      (By Eric Heining, Esq.)
                      150 Federal Street, Boston, MA 02110, for
                      the Plaintiffs.
                  City of Boston Law Department
                      (By Nicole Murati Ferrer, Esq.)
                      City Hall, Room 615, Boston, MA 02201,
                      for the Defendants.
          ALSO PRESENT:  Kate Bartlett, Summer Associate
                              * * * * *

00002

          WITNESS               I N D E X
          ROBERT BOYLE     DIRECT  CROSS   REDIRECT  RECROSS
           BY MR. HEINING             3
                              * * * *
                         E X H I B I T S
          NO.              DESCRIPTION
           1    Document entitled "Appendix D,                  PAGE
                Procedures for Annual Hair Testing"              45
           2    Document entitled "Rule 111
                Substance Abuse Policy," Bates Nos.              75
                COB0007224-7251
           3    Memorandum dated January 29, 1999,
                to Virginia Tisei from Robert Boyle,             91
                Bates Nos. COB0031173-31175
           4    Document entitled "Hair Drug
                Testing:  Fact vs. Fiction"                     116
           5    Memorandum dated July 8, 1999, to              117
                File from Robert Boyle
           6    Memo dated November 6, 1998, to File           139
                from Bob Boyle regarding Hair
                Testing
                              * * * *

00003
             1
             2            P R O C E E D I N G S
                    MR. HEINING:  The usual stipulations:  All
                              Page 1

00060

1 certified when this went into effect?

2     MS. FERRER: If you know.

3   A.   Someone at Psychemedics would know.

4   Q.   Who else?

5   A.   I don't know what other people know.

6   Q.   Was it the job of anyone in your office to

7 know whether or not Psychemedics was certified to

8 perform hair testing as defined by Part D of Rule

9 111?

10     MS. FERRER: Objection. Part "I," you

11 mean, right?

12   Q.   That's exactly right. I'm sorry. Appendix

13 D, Part I of Rule 111.

14   A.   What I recall is that there was an FDA

15 approval for the RAI -- RIAH process which I think

16 is -- I'm just guessing at this point, but I'm

17 trying to work from memory. It was an FDA approval

18 of the RIAH process which is, you know, part of

19 that, I guess.

20   Q.   What does "RIAH" stand for?

21   A.   Radio, radioimmunoassay, I think. Don't

22 ask me how to spell it, please.

23   Q.   I won't. What does that mean?

24   A.   I used to know.

**Boyle 071207**

00061

1    Q.  If you don't know as you sit here today,

2  that's fine.

3    A.  They liquify the sample, and they subject

4  it to I believe some kind of a light or some kind of

5  a ray.  I'm not sure.  I don't know how they look at

6  the results of that.  I don't know what the results

7  look like.

8    Q.  I would like to direct your attention to a

9  different portion of this document.  On Page 29,

10  Part K which is headed "Safety-Net Tests," do you

11  see that?

12    A.  Yes, I am there.

13    Q.  You are there?

14    A.  Go ahead.

15    Q.  Are you familiar with the term "false

16  positive test result"?

17    A.  Yes.

18    Q.  What does it mean?

19    A.  False positive -- I'm familiar with the

20  term "false positive" from, you know, going back to

21  1992 when we had a medical malpractice case.  People

22  are talking about, you know, performing medical

23  exams on patients, and you know, the alarm goes off

24  because some test was reported positive but it was a

**Boyle 071207**

00161

1    I believe you again have refused to answer

2  a question that was put before you.  It's totally

3  unresponsive.

4    MS. FERRER:  I think he just said "I don't

5  remember."

6    A.  I'm not being nonresponsive.  I'm trying to

7  be cooperative.  I think that I'm a fact witness and

8  ask a question.

9    Q.  Is Psychemedics certified to conduct hair

10  testing?

11    A.  I don't know.

12    MS. FERRER:  Objection.

13    A.  I don't know.

14    Q.  So earlier when you said that it was

15  contrary to fact to say that Psychemedics is not

16  certified to conduct hair testing, you were basing

17  that on no knowledge whatsoever?

18    A.  No.

19    MS. FERRER:  Objection.

20    A.  I was basing it on a memory that I have

21  that there are documents showing that Psychemedics

22  has some certifications.  I referenced the fact that

23  the radioimmunoassay -- some portion of it has an

24  FDA approval.  I remember that.  I think that some

**Boyle 071207**

00162

1  of the states have drug testing and some states have

2  given Psychemedics certifications.  I don't know,

3  you know.  It's hard for me to recall all of this,

4  you know.

5      I was told before I went on vacation -- I

6  have been on vacation for three weeks -- you might

7  be deposed regarding this question and answer

8  document you wrote nine years ago.  I have come

9  back.  I haven't spoken to anybody.  I haven't

10  reviewed any documents, and I don't

11  think -- honestly, I just don't think you are being

12  fair.

13    Q.  Do you have a specific recollection of any

14  certification that Psychemedics has received to

15  conduct hair testing?

16      MS. FERRER:  Objection.

17    A.  I am trying to picture it in my mind's eye,

18  but I just can't see it.  So I don't have a specific

19  recollection.

20    Q.  Thank you.

21      MR. HEINING:  I would like to ask for a

22  very short two-minute recess.  I think I'm finished.

23  I just want to take a glance at my notes, take a few

24  minutes and come back.

**Boyle 071207**

**Page 162**

# EXHIBIT B

00001

debow

Volume I
Pages 1 to 126
Exhibits 1 to 13

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x

RONNIE JONES, et al.,
            Plaintiffs,

        vs.                              Civil Action
                                         No. 05-11832-GAO
CITY OF BOSTON, et al.,
            Defendants.

- - - - - - - - - - - - - - - - -x

DEPOSITION OF SANDRA DeBOW, a witness called on behalf of the Plaintiffs, taken pursuant to the Federal Rules of Civil Procedure, before Linda A. Walsh, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Bingham McCutchen LLP, 150 Federal Street, Boston, Massachusetts, on Friday, July 2, 2007, commencing at 10:36 a.m.
PRESENT:

    Bingham McCutchen LLP
        (By Robert B. Baker, Esq.)
        150 Federal Street, Boston, MA 02110, for
        the Plaintiffs.
    Morgan Brown & Joy, LLP
        (By Mary Jo Harris, Esq.)
        200 State Street, Boston, MA 02109-2605,
        for the Defendants.
ALSO PRESENT:  Meghan Bailey, Summer Intern
                    * * * * *

 00002

                        I N D E X
WITNESS              DIRECT  CROSS    REDIRECT   RECROSS
SANDRA DeBOW
  BY MR. BAKER
                          4
                    * * * *
NO.               E X H I B I T S
                    DESCRIPTION
1     Amended notice of deposition                    PAGE
2     Document entitled "Rules and                      6
      Procedures, Rule 111," Bates Nos.                 45
      COB0005782-5786
3     PowerPoint presentation entitled
      "Rule 111, Substance Abuse Policy,"              63
      Bates Nos. COB0007224-7251
4     Document entitled "Hair Drug
      Testing:  Fact vs. Fiction"                      84
5     Letter dated October 19, 1999, to
      Susan Horwitz from Robert Holland,              104
      Bates No. COB0006536
6     Phone call slip for Sandra DeBow
      from Deb Sullivan, Bates No.                    107
      COB0006521
7     Letter dated January 4, 1999, to
      Benjamin Hoffman from Roberta                   108
      Mullan, Bates No. COB0031335
 00003

                        Page 1

00050

1    "certified to do hair testing"?

2    A.  I do not.  This is an area of law that I'm

3    not familiar.

4    Q.  Do you know if anyone in the police

5    department other than you looked at the issue of

6    whether or not it would be lawful for Psychemedics

7    to say that it was, quote, "certified to do hair

8    testing"?

9    A.  I don't, no.

10    Q.  Did you or anyone in the police department

11    ever look at the legal basis under which

12    Psychemedics was able to offer its hair test to the

13    public?

14        MS. HARRIS:  Objection.

15    A.  I don't know what that question means.

16    Q.  You were involved in urine testing, for

17    example, when you were at Robert Stutman &

18    Associates?

19    A.  Uh-huh.

20    Q.  Just audibly is that a yes?

21    A.  Yes.  Sorry.

22    Q.  And a urine testing company would be

23    federally approved by the FDA, right?

24        MS. HARRIS:  Objection.

00051

1   Q.  Or would they be approved -- how would a

2  urine testing company be approved to do urine

3  testing?

4     MS. HARRIS: Objection.

5   A.  You mean collections? I don't know what

6  you are -- I don't know what you are talking about,

7  a testing company.

8   Q.  Well, let me back up. When you were with

9  Robert Stutman, would you -- as part of the process

10  would Robert Stutman recommend a particular company

11  to do the urine testing for one of its clients?

12   A.  You mean the collections?

13   Q.  Not the collections, the actual testing.

14   A.  The laboratories? You are talking about

15  the laboratories?

16   Q.  Yes.

17   A.  They were certified under -- I mean, there

18  was a whole scheme of -- urine testing is an entire

19  industry so it's very easy to follow. Yes, I mean,

20  they were certified and recommended the certified

21  lab. Again, even under that terminology I never

22  looked into what specifically they were certified

23  for. I would have to go back to the regulations. I

24  would have to look at specific language of SAMHSA.

**Debow 070207**

**Page 51**

00052

1  Other than the fact they were certified, this is the

2  list, you know -- you know that there is certain

3  criteria that they met that they were sanctioned by

4  these regulations.

5    Q.  I'm just going to -- let's start with the

6  generality, I guess, to get there.  Do you know

7  whether or not if a company wanted to be

8  incorporated today and offer hair testing whether or

9  not it would have to go through any legal process

10  with which to do that?

11    MS. HARRIS:  Objection.

12    A.  A laboratory?

13    Q.  A laboratory.

14    A.  Okay.  So a laboratory wants to start doing

15  hair testing?

16    Q.  Could it just offer its hair test to the

17  public today without going through any legal process

18  for doing so?

19    MS. HARRIS:  Objection.

20    A.  I can't imagine it would have clients.  I

21  believe it probably could.  I think that there

22  are -- I know that there are labs that aren't on the

23  certified list.  So I don't know -- I guess my

24  answer is I don't know whether that would be legal

**Debow 070207**

**Page 52**

00053

1  or not.  I just can't imagine why anybody would

2  invest money and do that.

3      MS. HARRIS:  Again, he is not looking for

4  you to guess.  Please answer on your knowledge.

5      Q.  You don't know the answer?

6      A.  I do not know.

7      Q.  You don't know, for example, whether or not

8  you have to get some sort of a clearance from the

9  Government in order to offer a hair test?

10      MS. HARRIS:  Objection.

11      A.  I don't know.  We'll make it simple.

12      Q.  If you could look to Part K of DeBow 2.  I

13  think you might have already answered the question I

14  had on this, but Part K is called "Safety-Net

15  Tests."

16      A.  Uh-huh.

17      Q.  Who drafted this section of Appendix D?

18      A.  I did.

19      Q.  And when you chose to use the words

20  "safety-net test," why did you choose to use that

21  word?

22      A.  Because that is specifically the term that

23  we were using with the union, and it was

24  specifically Psychemedics' product.

**Debow 070207**

**Page 53**

00092

1    A.  Uh-huh.

2    Q.  Is that a yes?

3    A.  Yes.

4    Q.  So did you look at whether other hair

5    testing companies had been heavily litigated in

6    terms of their hair testing process?

7    A.  No.

8    Q.  Did you look at the procedures used by

9    Psychemedics as compared to other hair testing

10   laboratories?

11   A.  No.

12   Q.  The third sentence of what we are looking

13   at here in response to Question 1, it says, "The

14   Psychemedics' laboratory is the only lab in the

15   United States to be approved by the FDA to conduct

16   hair analysis drug testing for the five illicit

17   drugs that we test for under Rule 111," and it lists

18   the five drugs.  Who made -- who conducted the

19   investigation in order to make this statement that I

20   just read?

21   MS. HARRIS:  Objection.  Can you answer who

22   conducted the investigation to make a decision to

23   include that statement.

24   A.  I don't remember if it was myself or

**Debow 070207**

**Page 92**

00093

1 Alicia. I am thinking it was probably Alicia

2 because it's something that Psychemedics was very

3 proud of at the time, and we thought it just added

4 another level of assurance to the officers.

5    Q.   So Psychemedics was telling either you or

6 Ms. McDonnell that it has been, quote, "officially

7 approved by the FDA" --

8       MS. HARRIS:  Objection.

9    Q.  -- "to do hair testing"?

10    A.   No.  I think this -- I don't remember how

11 it was drafted, but I know that we were not looking

12 for -- I just don't remember.  I remember that we

13 put it in just to add another level of assurance to

14 the officers, but I don't remember if we researched

15 it.

16    Q.   Is it accurate?  Is the statement I just

17 read accurate, Psychemedics was, quote, "approved by

18 the FDA to conduct hair analysis"?  Is that an

19 accurate fact as of the day this was written?

20    A.   For five illicit drugs.  I believe it was

21 accurate.

22    Q.   On what basis do you believe it was

23 accurate?

24    A.   Because there was litigation going on.

**Debow 070207**

**Page 93**

00094

1 This was a new fact that had come to light. But

2 Alicia would have been more involved in that than

3 me, and that's why I think that she wrote it.

4    Q.   Are you saying that the -- what we just

5 looked at there, "Psychemedics was approved by the

6 FDA to conduct hair analysis drug testing for the

7 five illicit drugs," that that's a fact that came to

8 your awareness through litigation?

9        MS. HARRIS:  I object.  He is not looking

10 for you to guess.  Do you know where it came from?

11    A.   Yes.  Alicia had this information.  It

12 wasn't my litigation.  It was her litigation.

13    Q.   So other than the fact that Ms. McDonnell

14 put this statement together that determined that it

15 was a fact, you don't know what the basis for this

16 statement is; is that correct?

17    A.   Say that again.

18    Q.   Other than the fact that -- are you saying

19 that Ms. McDonnell wrote this sentence, that

20 "Psychemedics Laboratory is the only lab in the

21 United States to be approved by the FDA to conduct

22 hair analysis drug testing for the five illicit

23 drugs that we test for under Rule 111,"  Are you

24 saying that she drafted that sentence?

**Debow 070207**

**Page 94**

00095

1    A.  Yes.

2    Q.  So you didn't know whether or not that was

3  a fact or not other than what Ms. McDonnell told

4  you?

5    A.  All the vast majority of our conversations

6  with regard to drug tests had to do with litigation

7  because that's what we did, and I had seen it on the

8  FDA Web site.  I was aware that they had approved

9  it, but I was not working with this material.  So

10  yes, I got that information through Alicia.

11    Q.  But you also saw it in the FDA Web site, is

12  that what you are saying, that Psychemedics had

13  been, quote, "Approved by the FDA to conduct hair

14  analysis drug testing for the five illicit drugs"?

15  You saw that on the FDA Web site?

16    A.  At some point.  I don't have any direct

17  knowledge, I guess.  I don't have any clear

18  recollection.

19    Q.  You don't know if you ever saw this on

20  the -- this fact reflected on the FDA's Web site?

21    A.  This fact as it is written in this document

22  I do not have any knowledge as to whether I saw that

23  on the FDA Web site.

24    Q.  With regard to Psychemedics and the FDA Web

**Debow 070207**

**Page 95**

00096

1  site, what did you see?

2    A.  I remember seeing that there were -- all

3  the approval papers or the documentation.  It was

4  not a matter I was looking into.

5    Q.  When you looked on the FDA's Web site were

6  you familiar with the process --

7    A.  No.

8    Q.  Just to finish the question -- familiar

9  with the process for which Psychemedics was, quote,

10  "approved for" --

11    A.  No.

12    Q.  The last paragraph on Page 1 makes

13  reference to "Because" -- and it's in quotes --

14  "Because it conducts so many hair tests,

15  Psychemedics' procedures and technology have been

16  heavily challenged and have consistently been upheld

17  in every court in which they have been challenged,"

18  end quote.  On what basis did you make this

19  statement?

20    A.  Discussions with Psychemedics.

21    Q.  Are those the same discussions we talked

22  about earlier?

23    A.  Yes.

24    Q.  So you are not aware of the specifics as to

**Debow 070207**

**Page 96**

00097

1   what those cases were about or what the holdings

2   were?

3     A.  That's right.

4     Q.  And you weren't aware of that when you

5   wrote this statement?

6     A.  That's correct.

7     Q.  When you wrote this statement that I have

8   just read from the bottom of Page 1 of DeBow 4, did

9   you know how many times a judge or a jury in the

10  United States upheld Psychemedics' procedures as

11  scientifically valid?

12    A.  No.

13    Q.  Other than conversations with

14  Psychemedics -- we have discussed at length so far

15  about the litigation that they have gone through --

16  did you do any independent verification?

17    A.  No.

18    Q.  If you go to Page 2, there is a section

19  here called "Testing," and it's in response to -- I

20  believe it's in response to the second frequently

21  asked question which is "What is the process used

22  for testing hair for drugs?"  Is that testing

23  section in response to that question?

24    A.  Yes.

# EXHIBIT C

00001

murphy_w

Volume I
Pages 1 to 44
Exhibits 1 - 3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x

RONNIE JONES, et al.,
   Plaintiffs,

  vs.

CITY OF BOSTON, et al.,
   Defendants.

- - - - - - - - - - - - - - - -x

    :
    :
    :
    : Civil Action
    : No. 05-11832-GAO
    :
    :
    :

DEPOSITION OF WILLIAM J. MURPHY, a witness
called on behalf of the Plaintiffs, taken pursuant
to the Federal Rules of Civil Procedure, before
Daniel P. Wolfe, Registered Professional Reporter
and Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Bingham McCutchen
LLP, 150 Federal Street, Boston, Massachusetts, on
Friday, June 8, 2007, commencing at 2:10 p.m.
PRESENT:
  Bingham McCutchen LLP
   (By Eric A. Heining, Esq.)
   150 Federal Street, Boston, MA  02110,
   for the Plaintiffs.
  Morgan Brown & Joy, LLP
   (By Mary Jo Harris, Esq.)
   200 State Street, Boston, MA  02109-2605,
   for the Defendants and the Deponent.
Also present: XinYue Angela Lin
    Amelia C. Joiner, Summer Associates
    Colin Boyle
    * * * * *

00002

I N D E X

WITNESS
WILLIAM J. MURPHY      DIRECT  CROSS
BY MR. HEINING        3

     * * * *
E X H I B I T S
NO.    DESCRIPTION      PAGE
1  Boston Police Department Rule 111,  18
  Substance Abuse Policy
2  Boston Police Department document  25
  regarding hair testing, five pages
3  Memorandum from William Murphy to  29
  Virginia Tisei dated 2/3/98, Bates
  Nos. COB 0031177 through 0031192
      * * * *

00003

1
2    P R O C E E D I N G S
3   MR. HEINING:  All objections, except as to
4 the form of the question, and motions to strike will
5 be reserved until the time of trial.  The deponent
6 will receive the transcript and, within 30 days of
7 submission, read and sign it under the pains and
8 penalties of perjury as opposed to in front of a
 notary.  The parties have waived sealing and filing.
      Page 1

00027

1    Q.  Do you recall whether the City or the

2  Boston Police Department ever had a page on the Web,

3  Worldwide Web, that contained a document with that

4  title?

5      MS. HARRIS:  Objection.  I think it was on

6  the Boston police Intranet, which is not a Web.

7    A.  I have never seen a Web that had these

8  questions.

9    Q.  Intra or Worldwide Web or otherwise?

10    A.  Right, that's correct.

11    Q.  Thank you.  Mr. Murphy, are you aware

12  whether Psychemedics was ever officially approved by

13  the FDA to conduct hair testing?

14      MS. HARRIS:  Objection.  Go ahead.

15    A.  I am not aware.

16    Q.  You are not aware either way?

17    A.  I don't know.

18    Q.  Mr. Murphy, are you aware of the

19  approximate number of times that a judge or jury in

20  the United States has upheld Psychemedics'

21  procedures as scientifically valid?

22    A.  No.

23    Q.  Have you ever researched the number of

24  times that a judge or jury in the United States has

**Murphy 060807**

**Page 27**

00028

1  upheld Psychemedics' procedures as scientifically

2  valid?

3    A.  No.

4    Q.  Have you ever undertaken research into the

5  question whether other hair testing procedures are

6  scientifically valid?

7      MS. HARRIS:  Objection.

8    A.  I don't recall scientific validity

9  research, no.

10    Q.  What about legal research regarding cases

11  in which courts consider the scientific validity of

12  hair testing; have you ever done such research?

13    A.  Not the scientific validity, again, no.

14    Q.  Are you aware whether anyone at the City

15  has inquired into the scientific validity of the

16  hair test?

17    A.  I am not.

18    Q.  Thank you.  We can put that document aside

19  for now.  I am going to now have the reporter mark

20  an additional document which actually contains two

21  different documents.  I think you will be familiar

22  with these, so I don't believe the fact they were

23  clipped together is misleading.

24      MR. HEINING:  Could you please mark that as

# EXHIBIT D

Depo Boyle
Ex. 5

MEMORANDUM

To:    File
From:  Robert Boyle
Date:  July 8, 1999

---

Sandra DeBow arranged a meeting at BPD HQ. Patrick Kelley from Psychemedics in Atlanta made a presentation. Bill Thistle (hereinafter "BT") from Psychemedics in Cambridge attended and answered questions. Several BPD members were present: Bobby Mullan, Bernie Kelly (hereinafter "BK") and Michael Sullivan from BPD's EAP, Sup. James Hussey and Joseph Devlin.

Patrick Kelley showed a Psychemedics videotape on sample collection procedures. It was the same videotape that the City provided the BPPA during negotiations over implementation of hair testing in Rule 111. After the videotape, Kelley explained how drugs get into hair. Kelley started to talk about fingernails and pubic hair when BT explained that BPD does not use either.

Patrick Kelley discussed the possibility of prescription drugs contributing to a positive test result. He said that while there is Tylenol with Codeine, no doctor would prescribe the amount of medication necessary to score positive. A positive test would only result from uncontrolled levels of Codeine. Kelley said that cancer patients taking some THC-based prescription medications may return positive for Marijuana. A Morphine positive may also be based upon a prescription, such as if there was a recent physical injury. Kelley said that the MRO would be able to sort through all of these. He said that there is no prescription for Cocaine or Heroin.

The two BPD officers from EAP asked questions about the hair testing process.

BT said that the plastic pouch for hair samples is opened at the bottom. If a subject claims tampering with the seal, Psychemedics can provide a Xerox copy of the intact sealed bag.

BT recommended a mirror at the collection site. (Outside the meeting, Bobbie Mullan said that BPD does not provide a mirror. She is waiting for direction from Labor Relations)

BK asked why the sample collectors do not wear gloves. BT said that Psychemedics provides gloves to sample collectors, but the gloves are for the convenience of the sample collector, not because of any concern that bare hands could contaminate a hair sample.

BK then asked BT if external contamination was a concern. BT said that external exposure to drugs can lead to drugs getting into the bloodstream, but in such small amounts that the appropriate cut-off level would render it a negative. BT said that the

cut-off levels are high enough to eliminate passive ingestion and even low level use of drugs.

BK asked if marriage to a drug-user puts an officer at risk for a positive result. This led to a discussion of a challenge to a positive hair tests based upon the subject's claim that sexual relations (i.e., oral sex) with a drug user caused the positive result. BT said the evidence in that case was that the drug levels in semen are very low.

Sandra DeBow asked BT to discuss a study on hair testing of narcotics officers. BT explained that the study of narcotics officers showed that external contamination was not an issue.

BK asked if Psychemedics has had any court challenges. BT went back to talk about the sexual transmission challenge. He said the subject claimed that her positive test was due to sexual transmission, use of Fen-Fen, and external contamination from removing a Methamphetamine lab from her mother-in-law's house.

BK then asked if about prescription medications: do any antidepressants have the ability to make a test come back positive? BT said that there are drugs that screen the same as some antidepressants (RIAH screen) but the second test (GCMS) gives a molecular fingerprint of each drug, and they can be distinguished.

BK asked if there is anything to the racial bias claim. BT gave the explanation that the studies raising the concern use only a handful of subjects. The best studies, he said, involve thousands of subjects. Those studies all show the absence of a hair bias. In these studies, the results of hair testing, urinalysis and self-reporting are compared for different racial groupings. He said the differences across racial lines are proportionate.

BT explained that while Cocaine binds with Melanin, it also binds with other proteins in hair. He said Melanin makes up only a small percentage of the total weight of a strand of hair.

BT went on to say that a preference among blacks for Cocaine also explains the higher rate of positives for that group. He said that cocaine is the "drug of choice" for blacks whereas Methamphetamine is the "drug of choice" for whites. He said that Methamphetamine is a "Caucasoid", meaning, it is a drug that Caucasians use.

BT said that the race bias claim was baseless but that the media likes controversy so it continues to stir the pot.

BT said that Psychemedics's clients keep records of the rate of positives and also the demographics among those who test positive.

BK asked about other firms that are available to do hair testing. BK said that people he sees at EAP want independent tests. BT said that there are other labs, some whose work

is better than others. He said that any hair testing lab needs the right equipment. BT said that in court employers challenge the other lab's chain of custody.

BK asked about Safety Net Tests. He said that on occasion Psychemedics has responded that there was insufficient hair in the sample. The lab tested for everything but Cocaine first when the first test was only positive for Cocaine. BT said he would inquire to see "what went . . . . with that test" (i.e., what went wrong, but he didn't say "wrong"). BK said that the Department has had negative Safety Net Tests. What bothers him is a Safety Net Test that comes back as a bad sample (i.e., no answer).

BK said that people at EAP are screaming and crying. They are extremely upset that they tested positive. Sup. Hussey asked how far back do fingernail samples test. BT said 6 to 8 months ago (i.e., the tip of your fingernail is 6 to 8 months old). The newest part of a fingernail is at the base. Scrapings of fingernails can test for drug use in the past 3 months. Sup. Hussey said that he wants to be able to tell officers reporting to EAP what they can do to try to prove their innocence. BT said that people do use negative re-tests as a defense, but that the negative retest only shows that the person is not a habitual user. It does not show that the person "never used drugs" and it doesn't refute the original test.

Michael Sullivan asked how many false positives Psychemedics has had. BT said there has never been a reported false positive in Psychemedics ten years of testing. He said that no one who has ever claimed to have received a false positive was ever proven to be right. Sullivan asked if Psychemedics could provide a chart showing the cut-off levels that the lab uses to define positive results for the different drugs tested. Sullivan also asked if officers ordered to EAP could obtain access to Psychemedics test results data (i.e., regarding other subjects).

After the meeting, Bobbie Mullan told BT that the Department has had two negative Safety Net Tests.

After the meeting, Patrick Kelley provided hair sample collection training to four BFD personnel in Bobbie Mullan's office. They did not review the videotape but watched as Kelley demonstrated hair collection technique.

# EXHIBIT E



Police Commissioner's Personnel Order

Number:   PO  06- 179

Date:   May 15, 2006

Post/Mention:

The following named persons are hereby reassigned on the dates listed below:

| LIEUTENANT DETECTIVE | I.D.# | FROM | TO | DATE |
|---|---|---|---|---|
| William McCarthy | 06869 | Human Res./M.I.S. Org. # 36131 | B.F.S./District D-4 Org. # 44040 | 05.11.06 |

| POLICE OFFICERS | I.D.# | FROM | TO | DATE |
|---|---|---|---|---|
| Brian Kilduff | 10718 | Human Res./M.I.S Org. # 36131 | B.F.S./District E-18 Org. # 45180 | 05.15.06 |
| Carol Holmes | 11946 | Human Res./M.I.S. Org. # 36131 | B.F.S./District C-6 Org. # 43060 | 05.17.06 |
| Robert Connelly | 05679 | Human Res./M.I.S. Org. # 36131 | B.F.S./District C-11 Org. # 43110 | 05.11.06 |
| Michael O'Sullivan | 11121 | B.F.S./Canine Unit Org. # 47120 | Human Res./M.I.S. Org. # 36131 | 05.09.06 |
| Michael Doogan | 09727 | B.F.S./District E-5 Org. # 45050 | Human Res./M.I.S. Org. # 36132 | 05.09.06 |
| Molwyn Shaw | 11459 | B.F.S./District E-5 Org. # 45050 | Human Res./M.I.S Org. # 36132 | 05.09.06 |
| Tracey McHale | 11213 | B.F.S./District C-11 Org. # 43110 | Human Res./M.I.S. Org. # 36131 | 05.10.06 |
| Richard Davis | 12112 | Human Res./M.I.S. Org. # 36131 | Human Res./M.I.S. Org. # 36132 | 05.15.06 |
| Hector Alicea | 09270 | B.F.S./District E-18 Org. # 45180 | Human Res./M.I.S. Org. # 36132 | 05.12.06 |
| Joseph Lynch | 86180 | B.F.S./District E-18 Org. # 45180 | Human Res./M.I.S. Org. # 36131 | 05.12.06 |

Page 2

Amending Personnel Order 06-91 to read as follows:

| SERGEANT | I.D.# | FROM | TO | DATE |
|----------|-------|------|-----|------|
| Michael Connolly | 11594 | B.F.S./District A-1 Org. # 41010 | Human Res./M.I.S. Org. # 36131 | 03.09.06 |

Albert E. Goslin
Superintendent-In-Chief

# EXHIBIT F

Since the introduction of hair drug testing in January of 1999, the Department has conducted over 6,804 hair tests on samples provided by police officers. Only forty-five officers have tested positive in that time, out of the approximately 2,200 sworn officers who have been tested annually. That is less than 2% of all officers: a rate below the national average. However, since the Department continues to get questions about hair testing, you'll find a brief list of the most frequently asked questions about the Department's drug-testing procedures and policies listed for your reference below.

**Background:**
Together the unions and the Department share a joint desire to achieve and maintain a work force that is 100% drug-free. The sworn unions and the Department agreed to reach this goal through fair, reasonable, and objective testing procedures. During negotiations, the Department proposed an annual hair drug test in response to the Boston Police Patrolmen's Association's (B.P.P.A.) opposition to random urine testing. Hair testing can detect drug use for a longer time period, is harder to adulterate, and is less invasive than urine testing. Both the Department and the union had an opportunity to examine and discuss various issues, such as the scientific validity of the testing methods, time frames for drug detection and the concerns for bias or inaccurate test results. In July 1998, the Department reached agreement with the B.P.P.A and the annual hair test was added to the collective bargaining agreement. The other sworn unions negotiated the annual hair test, which ultimately became a part of their contracts through subsequent interest arbitration awards.

**1. Why does the Department use Psychemedics' laboratory to conduct hair tests?**
Psychemedics is the premier hair testing laboratory for hair tests of employees. It conducts more hair tests than any other laboratory in the world. The Psychemedics laboratory is the only lab in the United States to be approved by the FDA to conduct hair analysis drug testing for the five illicit drugs that we test for under Rule 111 (Cocaine, Methamphetamine, Opiates, PCP and Marijuana).

Psychemedics conducts hair testing for over 1,600 Fortune 500 companies and numerous major metropolitan police departments including: New York City, Chicago, Philadelphia, Minneapolis, San Francisco and Las Vegas.

Psychemedics has conducted well over two million hair drug tests. Because it conducts so many hair tests, Psychemedics' procedures and technology have been heavily challenged and have consistently been upheld in every court in which they have been challenged. Furthermore, every arbitration case the Department has defended has found the testing to be a fair, reasonable, and objective hair analysis test. For copies of the arbitration decisions regarding

drug testing, please contact Alicia McDonnell in the Legal Advisor's Office at 343-5037. For more information about Psychemedics' laboratory, visit www.psychemedics.com

**2. What is the process used for testing hair for drugs?**

Collection: The Department personnel that collect the hair samples are specially trained to follow a specific protocol to collect a sufficient quantity of hair to be tested at Psychemedics. The protocol has stringent chain-of-custody procedures, and the hair collectors have been well trained on how much hair is needed, and the specific areas from which the hair should be collected (head, nape of neck, face, etc.). The officer having his/her hair collected cannot dictate the amount of hair collected, or the collection location. (See Rule 111, Appendix D for collection, testing and reporting procedures.).

Note: The medical staff personnel who collect the hair samples do so professionally and diligently. They do not have the authority to deviate from the collection protocols. Further, they are not there to debate the hair collecting process or the testing methodology. Failure to submit to an annual hair test under the procedures dictated by the medical staff may be considered a refusal to be tested and will result in appropriate discipline. Officers who have questions or concerns about their collection should not address them to the medical staff but to their union or the Bureau of Internal Investigations.

**Testing:** Once Psychemedics receives the hair sample, the chain-of-custody is confirmed. Then, the sample is decontaminated through a multi-stage washing process. The hair sample is then divided into several smaller hair samples to allow for screening and confirmation testing. The first portion of the sample is digested into a liquid state. The digested sample is then subjected to a Radioimmunoassay (RIA) test, which is a screen test to detect the presence of the five drugs.

If the RIA test indicates the presence of one or more drugs, another portion of the hair sample is then digested and subjected to a more accurate test, Liquid Chromatography Mass Spectrometry Mass Spectrometry (LC/MS/MS) or GC/MS, which confirms the presence of the drug screened by the RIA.

If the LC/MS/MS or GC/MS test results indicate the presence of a drug above the cut-off level, the test is deemed positive and Psychemedics forwards the test results to the Medical Review Officer (MRO). (See Rule 111, Appendix D, Section J). To learn more about hair drug testing, visit: www.drugtestwithhair.com.

*Cutoff levels.* All drugs are screened at a specific cutoff level. The cutoff level is established by the laboratory and industry standards, and ensures that low levels of drugs from external or passive contamination will not result in a positive drug test. The cutoff levels are different for each drug and for each type

of scientific test, e.g., the RIA versus LC/MS/MS or GC/MS.

### 3. What/Who is a MRO?

The Medical Review Officer (MRO) is an independent doctor who reviews all positive drug test results. An MRO is a licensed physician who has knowledge of substance abuse disorders and medical training to interpret and evaluate a positive test result relative to the donor's medical history.

After the laboratory conducts a drug test that is positive, it sends the results directly to the MRO, not the Department. The MRO then reaches out to the donor and asks about any alternative medical explanation for the positive drug test result.

If the donor has a valid, medical reason for the presence of drugs in his/her system, e.g., a valid prescription drug, then the positive result is reported as a negative to the Department. If the donor does not have a legitimate alternative medical reason, the test is reported as positive (See Rule 111, Appendix D for more detailed information).

### 4. Can I test positive from external or environmental contamination or exposure to drugs?

No. There are two different ways that an individual could potentially have a positive drug test from external or environmental contamination:
1) from passive inhalation (inhaling marijuana or crack smoke that is smoked by someone else), or
2) by having the drug on the outside of your hair, (handling cocaine and then touching your hair).
The Psychemedics tests address both these potential problems.

For external contamination, (having drugs on your hair) Psychemedics has an elaborate "washing" process, which includes washing the hair sample multiple times and testing the wash water for the presence of drugs before any testing on the hair sample begins.

A recent study by the University of South Florida of police officers in the Narcotics Unit of the Miami/Dade County Police Department illustrates this process well. It found that although each narcotics officer's hair was *externally contaminated* with cocaine, as shown through the hair washing process, *none* of the officers had positive test result for cocaine or any other illegal narcotic. This holds true for our Department as well, as no police officer in either the Drug Control Division or the Youth Violence Strike Force has tested positive for drugs.

For passive inhalation concerns, the cutoff levels used by Psychemedics are set high enough to prevent problems with passive inhalation. To test above a

cutoff level, the donor must have engaged in repeated drug use prior to the hair collection date. One time exposure will not result in a positive drug test.

**5. Is there a race bias in hair testing?**
No. There is a misguided theory that race is a factor in drug testing results, and that it could possibly cause a positive drug test result. This theory is scientifically invalid, and has mis-characterized the original theory regarding hair color.

A few scientifically flawed, early studies proposed that dark hair (not specific to any particular race) has more melanin than lighter hair. This rate of melanin was thought to have resulted in longer detection times. Therefore, it was argued, individuals with dark hair would test positive more frequently than those with lighter hair because the drug stays in the hair longer.

This hair color theory never suggested that melanin *caused* positive drug tests. Rather, the theory suggested that drugs that had been *ingested* would remain in dark hair longer than those with lighter hair color.

Subsequently, this hair color theory has been repeatedly and categorically disproved by large-scale, scientifically valid studies. Hair color or the amounts of melanin present have both been shown to have no effect on the outcome of a drug test. Copies of these studies are available in the Office of the Legal Advisor at Headquarters by calling Alicia McDonnell at 343-5037.

**6. If I am taking prescription medications, will I test positive for illegal drugs?**
On the "test request form" that is used during the sample collection there is a section for a donor to provide information that goes only to the MRO. The donor is asked to put a telephone number where he/she can be reached. In this box, the donor can also list any medications he/she believes may affect the drug test. If you are taking a legally prescribed and dispensed medication that results in a positive test result, the MRO will report the test as a negative to the Department. However, there is virtually no valid medical explanation for a positive cocaine or marijuana test result. (See Rule 111, Appendix D).

**7. What is a Safety-Net test?**
The safety-net test is a test that an officer can request if he/she has a positive test result. It must be requested in writing within 72 hours of receiving notification of the positive test. This is not a complete re-test or another chance. Rather, it is a test to confirm that no mistake was made with the donor's hair sample. Another hair sample is taken, and the laboratory conducts a more stringent test, using lower cutoff levels. The officer pays for the test and the MRO review unless the test is negative, in which case the Department will pay for the test. Also, the Department will expunge the officer's IAD file of the

positive test result. (See Rule 111, Appendix D).

**8. What are the consequences of testing positive for illegal drugs?**
Drug testing is intended, in part, as a means of identifying those officers who need help. The Department's drug testing policy is intended to be humanitarian, combining both treatment and discipline for a first time offense. This Department is one of just a few police department in the country that offers an officer a second chance to keep his/her job after testing positive for illegal drugs, thereby minimizing the financial impact on the family and preserving a valued member of the Department.

Every officer that tests positive for the first time, if there are no other violations pending, is given the opportunity to accept the settlement/rehabilitation agreement, which includes a 45 working day suspension and participation in a treatment program. The officer is also subject to unannounced urine testing for three years to monitor the officer's recovery progress. If an officer refuses the settlement/rehabilitation agreement or tests positive a second time, termination is the only appropriate discipline. There is simply no room in the Department for an officer that continues to use illegal drugs.

@2005 Boston Police Department.All rights reserved.