UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO.  05-CV-11832-GAO

_____
RONNIE JONES, RICHARD BECKERS,    )
WALTER R. WASHINGTON, WILLIAM    )
E. BRIDGEFORTH, SHAWN N. HARRIS,  )
EUGENE WADE, GEORGE                        )
C. DOWNING, JR., CLARARISE              )
BRISTOW, and the MASSACHUSETTS    )
ASSOCIATION OF MINORITY LAW       )
ENFORCEMENT OFFICERS,                    )
                                                                      )
         Plaintiffs                                            )
vs.                                                                  )
                                                                      )
CITY OF BOSTON, BOSTON POLICE    )
DEPARTMENT, and KATHLEEN            )
O'TOOLE,  as she is Police Commissioner )
for the Boston Police Department,            )
                                                                      )
         Defendants                                          )
_____)

<u>DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR OPPOSITION
TO PLAINTIFFS' MOTION TO COMPEL</u>

I.    <u>INTRODUCTION</u>

The Defendant City of Boston (hereafter "City")  opposes the Plaintiffs' Motion

to Compel further deposition of Sandra DeBow, former Deputy Director to the Office of

Labor Relations at the Boston Police Department ("BPD") because the areas of inquiry

Plaintiffs seek to explore are areas that are protected by attorney-client privilege and/or

the work product exemption from discovery, and no waiver has been made as to those

areas of inquiry.

By agreement, the Court and the parties have divided the discovery events of the

case into roughly two stages, the first dealing with issues impacting the claims common

to all plaintiffs, and the issues peculiar to each plaintiff during the second.  In so doing,

the Court directed that the litigation was primarily concerned with the accuracy and

validity of the hair drug test.  <u>See</u> Electronic Clerk's Notes for proceedings held before

Judge George A. O'Toole Jr., entered on the docket on February 9, 2006:

> The court sets a status conference to take the temperature of the case as
> counsel proceed along with the idea being primarily to the science but to
> the extent that that requires knowing what happened to single people,
> aspects of reliability and so on.

At this point in the litigation, further deposition of Sandra DeBow is duplicative,

burdensome, and not reasonably related to the discovery of relevant or admissible

evidence, in that the areas that Plaintiffs wish to discover is material protected by the

attorney – client privilege or work – product exception.  The Court should decline to

order further deposition of Sandra DeBow.

The City further opposes Plaintiffs' Motion to Compel production of a privilege

log, as the log has been produced (rendering the issue moot), and further opposes the

Plaintiffs' motion for fees and costs, as all but 2 paragraphs of their ten page

Memorandum address their arguments with regard to compelling testimony from DeBow

– arguments which the City submits are meritless, as described below.

II.    <u>BACKGROUND</u>

A.    <u>Discovery Efforts To Date</u>

The City refers to its Opposition to Plaintiffs' Motion to Compel and Cross

Motion for Protective Order, Docket Number 51, for a summary of the pretrial events that

have taken place to date.  In sum, the Plaintiffs have deposed seventeen individuals,

including three prior Police Commissioners, five in-house Labor Relations attorneys, the

current Director of Labor Relations for the City, the former Deputy of Labor Relations

for the Police Department (by written question), two former Commanders of Internal

Investigations, two Keeper of Records for Internal Affairs, and three Human Resources

and Administration personnel. These individuals are all fact witnesses with respect to the City's determination to utilize hair drug testing, the collective bargaining process and implementation of hair drug testing, and conversations with Psychemedics, the lab that actually performs the test. None of these individuals are qualified to testify about the accuracy or scientific validity of hair drug testing with any degree of expertise.

Relevant to this Motion, five City attorneys have been deposed – Reagan, Murphy, Boyle, DeBow, and Tisei. All five attorneys have served as counsel in the City's Offices of Labor Relations (both at City Hall and at the satellite Labor Relations office within BPD Headquarters) at one point or another in the eight years since hair drug testing was first considered by the Department.

B.    Specific Areas Of Inquiry To Which The City Did Not Object

The City has not objected to Plaintiffs' examination of Labor counsel with regard to those communications that dealt with the formulation of the hair drug testing policy, the negotiations with police unions over implementation of that policy, the drafting of the rule setting forth the protocol for hair drug testing within the Department, and conversations involving third parties. See Exhibit A (Murphy Deposition) at pps. 13, 15 – 16, 29 – 36 (research prior to negotiations with unions on drug testing in general and hair drug testing in particular); Exhibit B (Tisei Deposition) at pps. 21- 28, 30 – 42, 57 – 59, 61 – 69 (request by Police Commissioner to review and advise as to feasibility of pursuing hair drug testing policy); Exhibit C (Reagan Deposition) at pps. 7 – 13, 20 – 23, 27 – 32, 36, 37 – 40, 56 – 57 (assessment regarding feasibility of hair drug testing policy and negotiations with police unions); Exhibit D (DeBow Deposition) at pps. 41 – 44, 53, 64 – 68, 109 - 110  (drafting hair drug testing protocols, including provision of 'safety net test', presentation of information to labor groups,  discussions with scientist, outside of context of  litigation); Exhibit E (Boyle Deposition) at pps. 24 – 27, 32 – 36,

3

40 – 41, 47 – 50, 120 – 147 (negotiations with police unions, conversations with Psychemedics outside of context of litigation, policy reasons for adopting hair drug testing, and meetings attended by BPD personnel, union representatives, and Psychemedics personnel).

In allowing testimony by Labor Relations counsel as indicated above, the City has fairly distinguished between the dual roles of counsel as legal advisors, and as employees directing or assisting in policy development.   Allowing the City attorneys to testify as to the latter does not operate as a waiver to protections of the former;  in fact, the City is required to distinguish between the confidential and non-confidential aspects of in-house counsel's work.  The City objects to the Plaintiffs' efforts to invade confidential communications, as the City has provided access to its counsel with regard to all non-privileged communications and work product.

III.    ARGUMENT

A.    Standard Of Review

Despite the general rule that the discovery rules provide for broad discovery, discovery is not unlimited.  The Court has discretion to curtail discovery when it goes beyond what is required by the reasonable needs of the case.  Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 187 (1st Cir.1989).

The City agrees with the legal principles cited by the Plaintiffs in their Memorandum, to the extent that they acknowledge the attorney-client privilege exists to protect communications that are "confidential and made for the purposes of seeking or receiving legal advice," In re XYZ Corp., 348 F.3d, 16, 22 (1st Cir. 2003), and that in-house counsel are protected by the privilege when they are working in a legal capacity but not when they are not, Texaco Puerto Rico v. Dept. of Consumer Affairs, 60 F.3d 867, 884 (1st Cir. 1995).  The City agrees that the privilege does not exist when in-house

counsel is engaged in non-legal work, such as policy making.  Id..

The City does not agree with the Plaintiffs' application of these principles to the testimony at issue in their Motion to Compel.  As the testimony of DeBow (and indeed, of all Labor counsel, as well as former Commissioner O'Toole) reveal, the privilege has been asserted only with regard to inquiry that seeks communications held for the purpose of providing legal advice.  Given the City's willingness to allow the depositions of several counsel to be deposed (without first seeking oversight or protection from the Court), it is clear that the City has made every effort to produce non-privileged testimony.  By pressing for examination of Labor counsel – and according to the Memorandum filed by Plaintiffs, for examination only with regard to communications that go to the Plaintiffs' theory of the case – Plaintiffs are engaging in discovery tactics that have been disapproved by the courts.

Both the Massachusetts and Federal courts recognize that the testimony of an attorney in a civil case can raise issues of privilege and attorney-work product and can be disruptive to the attorney-client relationship when an adverse party seeks the testimony of another party's counsel.  Serody v. Serody, 19 Mass. App. Ct. 411, 414 (1985) (noting potential for abuse by opposing counsel who calls an adversary's current attorney as a witness for the purposes of trying to maneuver his or her withdrawal).  As the Eight Circuit observed in a leading case on deposing an attorney,

> Taking the deposition of opposing counsel not only disrupts the adversarial system and lowers the standards of the profession, but it also adds to the already burdensome time and costs of litigation.  It is not hard to imagine additional pretrial delays to resolve work-product and attorney-client objections, as well as delays to resolve collateral issues raised by the attorney's testimony.  Finally, the practice of deposing opposing counsel detracts from the quality of client representation.  Counsel should be free to devote his or her time and efforts to preparing for the client's case without fear of being interrogated by his or her opponent.

> Moreover, the "chilling effect" that such practice will have
> on the truthful communications from the client to the
> attorney is obvious.

Shelton v. Am. Motors Corp, 805 F.2d 1323, 1327 (8th Cir. 1986) (analyzing request to

depose in-house counsel) (cited in Saldana-Sanchez v Lopez-Gerena, 256 F.3d 1, 4, n. 9

(1st Cir. 2001)).  "Deposing an opponent's attorney is a drastic measure. It not only

creates a side-show and diverts attention from the merits of the case, its use also has a

strong potential for abuse.  Thus, a motion to depose an opponent's attorney is viewed

with a jaundiced eye and is infrequently proper."  M&R Amusements Corp. v. Blair, 142

F.R.D. 304, 308 (N.D. Ill. 1992) (citation omitted).  See also, Dunkin' Donuts, Inc. v.

Mandorico, Inc., 181 F.R.D. 208, 209-210 (D. P.R. 1998) (noting that the taking of an

attorney's deposition "not only disrupts the adversarial system and lowers the standards

of the profession, but it also adds to the already burdensome time and costs of

litigation.") (citation omitted).

 Recognizing the strong potential for abuse, Courts limit the circumstances under

which an attorney can be compelled to testify in civil cases to those where the party

seeking the attorney's testimony can show the following:  (1) that the information sought

from the attorney is crucial to the party's case; (2) that the information sought is not

privileged; and (3) that no other means exist to obtain the information than to depose

opposing counsel.  Shelton, 805 F.2d at 1327.  But see In re Subpoena Issued to Dennis

Friedman, 350 F.3d 65, 71-72 (2d Cir.2003) (rejecting Shelton in favor of a "totality of

the circumstances" test).    "The burden is on the party seeking the attorney's deposition

to establish that each of these three criteria are met."  Epling v. UCB Films, Inc., 204

F.R.D. 691, 693 (D. Kan. 2001) (citing Shelton, supra at 1326).  Regardless of which test

is applied, Attorney DeBow should not be compelled to give further testimony[1].

A.      The Information Sought Is Not Crucial To Plaintiffs' Case

DeBow does not have any information that is crucial to plaintiffs' case that has not already been the subject of extensive questioning of the other attorneys (and witnesses) examined (assuming, only for purposes of this Motion, that the subjects upon which these individuals were questioned are crucial at all). Defendants do not contest that, to the extent in-house counsel is an "actor or viewer" to the events in dispute, no privilege exists. Indeed, the City has made available five Labor Relations counsel (including DeBow) to testify about non-litigation conversations with Psychemedics, the negotiations with the police unions, and the implementation of the substance abuse policy.

Plaintiffs appear to press for further deposition of DeBow on the following topics:

- Communications with the Human Resources and Occupational Health Directors, which DeBow testified were limited to discussions occurring in the context of defending grievances or arbitrations (Plaintiffs' Memorandum at p. 2);
- Discussions DeBow had within the BPD with regard to whether there was a concern that minority officers were testing positive more frequently than white officers, which discussions DeBow testified were attorney – client conversations (Plaintiffs' Memorandum at p. 3);
- Discussions DeBow had with the Police Commissioner, Superintendent in Chief, and Legal Advisor with regard to statistics generated for use in an arbitration (Plaintiffs' Memorandum at p. 3).

None of these topics are "crucial" to the Plaintiffs' case, in that none of these topics illuminate the scientific validity of hair drug testing. The only reason Plaintiffs

---

[1]        Attorney DeBow, as an in-house attorney, is entitled to be treated the same as any outside attorney for the purpose of applying Shelton. Epling v. UCB Films, Inc., 204 F.R.D. 693-694. See also, Boughton v. Cotter Corp, 65 F.3d 823, 828-829 (10th Cir. 1995) (treating in-house counsel as opposing counsel for the purposes of whether his deposition should be taken and relying, in part, on the finding that the in-house attorney was operating as an attorney and made no underlying decisions). Further, according to the recent decision of the Supreme Judicial Court, the communications of an in-house government attorney is entitled to the same privileges as apply to private attorney client communications. Suffolk Construction Co., Inc. v. Division of Capital Asset  Management, SJC No. 09733 (July 13, 2007).

appear to wish to question DeBow would be to see what, if anything, was said with regard to defense strategies at grievance and arbitration, and the test results that form the basis of Plaintiffs' claims in this litigation.  In short, Plaintiffs seek information that DeBow would have had only by virtue of her work as a lawyer in the Labor Relations office, in her role as assisting in the defense of pending  litigation.

While deposition of an attorney acting in a non-advisory role may be appropriate (and again, it is clear from the depositions already taken that these topics have been explored without demur by the City), it is not appropriate where the attorney "was not a party to any of the underlying transactions giving rise to the action" or whose role in a transaction was "speculative and not central to the dispute."  <u>Rainbow Investors Group, Inc. v. Fuju Trucolor Missouri, Inc.</u>, 168 F.R.D. 34, 36 (W.D.La. 1996).  The dispute in this case is whether the hair drug test is scientifically accurate and reliable.  Attorney DeBow's testimony not only is not central to this dispute, it is wholly irrelevant to it[2].

B.    <u>The Information Sought Is Privileged, And No Waiver Applies</u>

The City has not prevented the Plaintiffs from inquiring of Labor counsel with regard to information in their possession that does not fall within the protection of the attorney – client privilege or work product exception.  As Plaintiffs acknowledge, DeBow testified with regard to the conversations that occurred in the presence of third parties; spoke with regard to providing general information about hair drug testing to then-Police Commissioner O'Toole;  about her conversations with the unions during negotiations over hair testing protocols;  about her work drafting the hair test appendix to the BPD's substance abuse policy;  and about conversations that she had with third party witnesses, when those conversations were not in furtherance of litigation.

---

[2] To the extent that Plaintiffs wish to press the deposition of DeBow in hopes that her discussions with the policy makers and counsel involved concerns about the defensibility of this litigation, the inquiry would go to the heart of the attorney-client privilege.

Similarly, as Plaintiffs acknowledge, Labor counsel Robert Boyle testified to conversations with the Union and its counsel, research undertaken to develop and guide policy decisions pre-implementation (November 1998), factual assertions made in the City's submissions at interest arbitration, and memorandum documenting meetings with Union representatives and Psychemedics personnel. In none of these instances were attorney – client or work product interests implicated[3].

Further, although the Plaintiffs reference the deposition of former Commissioner O'Toole in advance of their argument that the privilege was waived, see Memorandum at p. 4 – 5, an examination of her testimony shows the opposite. Plaintiffs note that no objection was made with regard to O'Toole's communications with Human Resources personnel. No privilege would protect such communications (even if the same or similar topics were discussed with counsel). O'Toole testified about communications between Labor Relations counsel and Union counsel (specifically, that she had never seen the documents before). No substantive attorney client communications were divulged.

Finally, Plaintiffs assert that O'Toole was instructed not to testify as to whether "any of the individuals [presumably, non-legal personnel] with whom she met voiced any concerns about hair testing." See Memorandum at p. 5. This assertion is wholly untrue. O'Toole was instructed that she could testify as to any conversations, except those with counsel. She did so, as the following exchange reveals:

---

[3]     Plaintiffs argue, at p. 4 of their Memorandum, that Boyle was questioned with regard to a "question and answer" memorandum drafted on January 29, 1999 from information gleaned from Psychemedics counsel and Labor Relations counsel, and thereby effected a waiver of privilege. This memorandum was created at the request of Boyle's then supervisor, Virginia Tisei, see Ex. E, pg. 36. Boyle did not know why this request was made. Id. Tisei testified that she requested the memorandum for the Police Commissioner in anticipation of press inquiry; January 1999 was the roll-out date for hair drug testing. See Ex. B, pps. 69 – 70. Defendants submit that it was appropriate to disclose the memorandum, as it was not prepared in anticipation of or defense of litigation, but rather was apparently prepared in order to provide responses to press inquiry.

Q:        … Were there any non-lawyers present during those meetings?

A:        Deputy Superintendent Rachel Hutchinson would have been involved in
those discussions.  She attended some of to [sic] MAMLEO meetings I believe
that were held at headquarters early on.  Bobbie Johnson would have participated
in or been present when we had some of the discussions about hair testing.
Perhaps Kevin Foley who was a Deputy Superintendent in charge of labor
relations or worked closely with Sandra DeBow.  I don't remember anyone else
being present.
…

Q:        Did any of the individuals with whom you spoke about hair testing voice
any concerns about the hair test?

Ms. Harris:      I would object and again just instruct you that any attorney – client
communications are privileged.  So to the extent that you can answer without
revealing those communications, you can answer.

A:        I'll just say that I was very open minded about it because I didn't know
anything about it … when the issue was first raised by MAMLEO I went back
and talked to different staff.  I was surprised at the level of confidence they had in
the methodology.  They obviously had spent a lot of time in briefings over the
years prior to and since the implementation of the policy.  I was surprised at their
level of confidence in the process.

Q:        Why were you surprised?

A:        Well, they were very emphatic about, the people I spoke to obviously had
a great deal of confidence in the vendor and in the process and were quick to tell
me that this was what was negotiated with the Union … So initially I was very
open minded about it, you know, why not explore other options but then learned
that the other options had been explored …
…

Q:        What other options were explored?

A:        Well, apparently, and again I wasn't part of the process.

Ms. Harris:      Then I'll object.  We don't want you to guess.  So if you're
reporting what other people have informed you, again leaving aside attorney-
client communications, that's fine. …


A:        I was just told that the urine option had been explored …

Exhibit F (O'Toole Deposition), pps. 29 – 31.

In short, the City has asserted its privileges when doing so was appropriate, and has made no attempt to assert privilege in circumstances where it would not, in good faith, lie, whether the witness was counsel or client. It is meritless to assert that, by allowing counsel or client to testify when no privilege could be asserted, that the City has thereby waived its rights to object when the privilege applies.

C.    Since Plaintiffs Are Not Entitled To The Information Sought, The Court Need Not Consider Whether It Can Be Obtained By Other Means

Defendants submit that the information sought – DeBow's communications with the City in furtherance of its defense of litigation, as outlined above – is information to which the Plaintiffs are not entitled. Thus, Defendants submit that whether the Plaintiffs can obtain the information from other sources is immaterial to the Court's analysis of their Motion to Compel.

**III.    CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court deny the Plaintiffs' Motion to Compel the further deposition of Sandra DeBow.

Respectfully submitted,

Defendants City of Boston,
Boston Police Department, and
Kathleen O'Toole
By their attorney,


\_\_/s/ Mary Jo Harris_____
Mary Jo Harris, BBO # 561484
Morgan, Brown & Joy, LLP
200 State Street
Boston, MA 02109-2605
(617) 523-6666

Dated:  August 28, 2007

11

<u>CERTIFICATE OF SERVICE</u>

     I, Mary Jo Harris, hereby certify that this document was filed through the ECF system on August 28, 2007, and that a true paper copy of this document will be sent to those indicated as non registered participants on the Notice of Electronic Filing by first class mail on the same date.


DATED:  August 28, 2007      _/s/  Mary Jo Harris_____

# EXHIBIT A

# In The Matter Of:

*Ronnie Jones, et al. vs.*
*City of Boston, et al.*

---

*William J. Murphy*
*June 8, 2007*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*Videoconference Center*
*50 Franklin Street, Boston, MA 02110*
*Phone: (617) 426-2432*

Original File murphy_w.v1, Pages 1-44

**Word Index included with this Min-U-Script®**

William J. Murphy
June 8, 2007

Case 1:05-cv-11832-GAO    Document 67-2    Filed 08/28/2007    Page 3 of 17

Ronnie Jones, et al. vs.
City of Boston, et al.

Page 13

[1] director at that time was Michael Reagan.

[2] Q. R-e-a-g-a-n?

[3] A. R-e-a-g-a-n.

[4] Q. Did you replace Mr. Reagan in 2000?

[5] A. Yes. Reagan was promoted to director. I

[6] was promoted to deputy director.

[7] Q. When you were staff attorney in the Office

[8] of Labor Relations, what involvement, if any, did

[9] you have with the hair test?

[10] A. Some of the early research that I have

[11] referred to in those memos. As a staff attorney, I

[12] also -- after Rule 111 was amended with hair

[13] testing, I did a number of the arbitration cases

[14] involving drug testing and hair testing

[15] specifically.

[16] Q. Could you approximate the number of

[17] arbitration cases that you handled --

[18] A. Approximately eight or nine, I believe.

[19] Q. Just so that the record remains clear, I'd

[20] ask that you wait until I finish my questions before

[21] you answer, and I will try to wait till you conclude

[22] your answers before I ask another question. Okay?

[23] A. Sounds fair.

[24] Q. Once you became deputy director in that

Page 14

[1] same office in 2000, what involvement, if any, did

[2] you have with respect to hair testing?

[3] A. Once I became deputy director, I continued

[4] to do arbitration cases.

[5] Q. Was there any other involvement that you

[6] had with the hair test as deputy director?

[7] A. That was it.

[8] Q. Have you ever taken the hair test before?

[9] A. No.

[10] Q. Never?

[11] A. Right. Never.

[12] Q. Have you ever undertaken any sort of

[13] analysis regarding the accuracy of the hair test?

[14] A. No.

[15] Q. Do you believe that the hair test is

[16] accurate?

[17] A. No reason not to.

[18] Q. Have you ever met, spoken to or

[19] corresponded with anybody from Psychemedics?

[20] A. Yes.

[21] Q. Who was that?

[22] A. Bill Thistle.

[23] Q. Could you spell his last name, please.

[24] A. T-h-i-s-t-l-e, I believe is how he spells

Page 15

[1] his last name.

[2] Q. When did you first meet Mr. Thistle?

[3] A. It would have been when I was doing cases

[4] for the City, so it would have been after the

[5] adoption of the rule changes. And I'd have to

[6] approximate on that.

[7] Q. Please approximate the year.

[8] A. 2000, I would guess. It could have been

[9] '99.

[10] Q. How did it come about that you met Mr.

[11] Thistle?

[12] MS. HARRIS: I will object. I am going to

[13] assert the attorney-client privilege inasmuch as it

[14] applies to the work that Bill did as counsel for the

[15] City, representing the City during the arbitrations.

[16] And I believe that when we discussed releasing the

[17] memos that Bill did, the City's position is you can

[18] examine him about the work he did leading up to the

[19] decision to adopt the hair test and those pieces

[20] that dealt with the work prior, but the work that he

[21] did as counsel in the arbitrations I'd object to.

[22] So to the extent that he met with Thistle

[23] as part of his preparation for and defense of the

[24] City in the arbitrations, we would raise the

Page 16

[1] attorney-client privilege.

[2] MR. HEINING: Sorry. Just to be clear, are

[3] you asserting that the communications between Mr.

[4] Murphy and Thistle are attorney-client privileged?

[5] MS. HARRIS: That they would be work

[6] product inasmuch as they dealt with the City's

[7] defense during those arbitrations.

[8] MR. HEINING: Understood.

[9] Q. I believe that I am still entitled to know

[10] how many times you met with Mr. Thistle.

[11] A. I would say a few. I'd approximate three

[12] or four, probably.

[13] Q. All during roughly that same time period,

[14] 2000?

[15] A. Probably over about a year period of time,

[16] early on, in the earlier cases, earlier challenges

[17] to the testing.

[18] Q. Could you tell me generally what you

[19] discussed with Mr. Thistle; in other words, what the

[20] subject matter of the conversations were, or

[21] correspondence?

[22] MS. HARRIS: I would object to that as

[23] being work product, and instruct the witness not to

[24] answer.

William J. Murphy
June 8, 2007

Ronnie Jones, et al. vs.
City of Boston, et al.

---

Page 29

[1]    Murphy 3.

[2]    Q.    Once the reporter has an opportunity to

[3]    mark these, I would again ask you to familiarize

[4]    yourself with the document and let me know when you

[5]    are ready to move forward.

[6]            (Document marked as Murphy

[7]            Exhibit 3 for identification)

[8]    A.    (Reviewing document)  Okay.

[9]    Q.    Are you ready to proceed?

[10]   A.    Yes.

[11]   Q.    Are you familiar with these documents?

[12]   A.    I am.

[13]   Q.    Have you seen them before?

[14]   A.    Yes.

[15]   Q.    Are these in fact two of the memos to which

[16]   you were referring earlier when you spoke about

[17]   memos that you drafted while you were a staff

[18]   attorney?

[19]   A.    They are.

[20]   Q.    I would ask you to first look at the one

[21]   that is on top.  It is dated February 3, 1998.  Did

[22]   you draft this memorandum?

[23]   A.    Yes.

[24]   Q.    What did you do with it after you completed

---

Page 30

[1]    it?

[2]    A.    I gave it to Director Tisei.

[3]    Q.    How did you transmit it to her?

[4]    A.    I believe I just walked it over to her

[5]    office.

[6]    Q.    Did you give it to anyone else?

[7]    A.    Not that I recall.

[8]    Q.    Why did you draft this memo?

[9]    A.    It was an assignment from my director.

[10]   Q.    From Ms. Tisei?

[11]   A.    Yes.

[12]   Q.    Did you speak to anybody about this memo

[13]   while you were in the process of researching the

[14]   drafting?

[15]   A.    I may have.  I don't recall specifically.

[16]   Q.    Do you recall what exactly the assignment

[17]   was?  In other words, what did Ms. Tisei ask you?

[18]   A.    As I recall it, it was a follow-up to an

[19]   earlier memo which touched on hair testing as a

[20]   method of drug testing.

[21]   Q.    Would that earlier memo be a document that

[22]   begins a couple of pages hence?  It is Bates-labeled

[23]   COB 0031179, dated November 17, 1997.

[24]   A.    Yes.

---

Page 31

[1]    Q.    That's the earlier memo.  Let's talk about

[2]    that earlier memo for just a moment.  Who asked you

[3]    to create that memo, if anyone?

[4]    A.    Again, that would have been -- Director

[5]    Tisei would have assigned -- she would have assigned

[6]    me this research.

[7]    Q.    Would you tell me, please, what exactly

[8]    that assignment was.

[9]    A.    More generally -- as it says on the memo

[10]   itself, the issue was more generally about random

[11]   drug testing.  We were in negotiations with the

[12]   Police Patrolmen's Association at that time.

[13]   Q.    When you completed the November 17, 1997,

[14]   memo, what did you do with it?

[15]   A.    I gave it to my director, Virginia Tisei.

[16]   Q.    Anyone else?

[17]   A.    Again, possibly.  I don't recall.  I know I

[18]   gave it to her.  That would have been the standard

[19]   procedure.

[20]   Q.    Do you know what she did with it?

[21]   A.    Read it.

[22]   Q.    Anything else?

[23]   A.    Probably shared it with others on the

[24]   negotiating team.  I don't know for sure.

---

Page 32

[1]    Q.    Who else was on the negotiating team?

[2]    A.    At that time, Attorney Bob Holland was the

[3]    lead negotiator.  Deputy Director Mike Reagan was on

[4]    the team.  At that point in time, I don't recall who

[5]    from the Police Department would have been on the

[6]    negotiating team.  That would have been the

[7]    representatives.  I don't recall.

[8]    Q.    Did you ever speak to any member of the

[9]    negotiating team about the November 17, 1997, memo?

[10]   A.    Yes.

[11]   Q.    Who was that?

[12]   A.    I would have spoken with -- I think I refer

[13]   in the '98 memo -- to Bob Holland, to Mike Reagan.

[14]   And it says here Chris Groll, so he must have at

[15]   that time -- he must have been at the Boston Police

[16]   Department at that time of these negotiations.

[17]   Q.    Could you repeat that name for me.

[18]   A.    Chris Groll, G-r-o-l-l.

[19]   Q.    Was there anyone else that you spoke to

[20]   about the memo?

[21]   A.    Not that I recall.

[22]   Q.    In both these memos you repeatedly

[23]   reference a case, a Massachusetts case.  I believe

[24]   it's pronounced "Guiney."

---

Page 33

[1]   **A.**   Yes. "Guy-nee," I think it is.

[2]   **Q.**   In that case -- specifically in these memos

[3] you make a number of statements about that case, as

[4] I understand it, one of which is that Guiney stands

[5] for the proposition that there's a need to make a

[6] strong factual showing that a drug problem exists in

[7] order to justify a random urinalysis for drugs. Is

[8] that accurate?

[9]   **MS. HARRIS:**   Objection. Just for

[10] clarification, is it accurate that that's what it

[11] says or that's what the case stands for?

[12]   **Q.**   Start with whether that's accurate, an

[13] accurate reflection of what he said.

[14]   **A.**   I think that's what I wrote in the '97

[15] memo.

[16]   **Q.**   Is it today your understanding that's what

[17] the case stands for?

[18]   **A.**   I have not looked at the case probably

[19] since I worked at the City, so I don't recall.

[20]   **Q.**   At the time that you wrote the November 17,

[21] 1997, memo, was it your understanding the City or

[22] the Boston Police Department was capable of making a

[23] strong factual showing that a drug problem existed

[24] within the department?

Page 34

[1]   **MS. HARRIS:**   Objection. You can answer.

[2]   **A.**   I didn't have any knowledge one way or the

[3] other.

[4]   **Q.**   As you sit here today, do you have any

[5] knowledge whether the City or the Boston Police

[6] Department are in a position to make a strong

[7] factual showing that a drug problem exists?

[8]   **MS. HARRIS:**   Objection.

[9]   **A.**   I know they had some positive tests in drug

[10] testing, so there is some evidence of drug usage on

[11] the force.

[12]   **Q.**   How do you know about those tests?

[13]   **A.**   I know of some of the tests because they

[14] were grieved. The results of some of the positives

[15] were grieved while I was with the City.

[16]   **Q.**   I would like to turn our attention back to

[17] the later memo, the Feb 3, 1998, memo. I note that

[18] towards the end of the second paragraph, first page

[19] of that memo, you appear to have written, "In order

[20] to tip the scales in our favor, the Court held that

[21] the City must show concrete examples of drug use in

[22] the force."

[23]   **A.**   Mm-hmm.

[24]   **Q.**   Just a moment ago you testified that you

Page 35

[1] believe that there were some positive -- there have

[2] recently been some positive drug tests in the Boston

[3] Police Department. Is that accurate?

[4]   **A.**   I didn't say "recently." I said when I

[5] worked at the City, I was aware of positives that

[6] were grieved, right.

[7]   **Q.**   Let me ask a different question, then,

[8] because I intended to refer to a more recent time

[9] period. As you sit here today, are you aware

[10] whether the City or the Boston Police Department is

[11] in a position to make a strong factual showing that

[12] there is a drug problem in the Boston Police

[13] Department?

[14]   **A.**   Today, no, I am not in a position.

[15]   **Q.**   Just to be clear, just a moment ago you

[16] clarified some earlier testimony regarding positive

[17] drug tests of which you are aware. Approximately

[18] when did those drug tests occur?

[19]   **A.**   It would have been approximately between

[20] the time that the rule was amended, the ones I was

[21] aware of. So it would have been late '98, early

[22] '99, until the time I left the City, which was the

[23] fall of 2002.

[24]   **Q.**   So these positive drug tests to which you

Page 36

[1] referred, is it safe to say they all occurred after

[2] you wrote these memos?

[3]   **A.**   Yes.

[4]   **Q.**   Would you consider those positive drug

[5] tests to be concrete examples of drug use in the

[6] force?

[7]   **MS. HARRIS:**   Objection. You can answer.

[8]   **A.**   What does "concrete" mean? They are

[9] evidence of drug use. That's their intention.

[10]   **Q.**   I am actually picking up on the language

[11] that you used in the February 3, 1998, memo. Again

[12] drawing your attention to the second paragraph, last

[13] sentence, "In order to tip the scales in our favor,

[14] the Court held that the City must show concrete

[15] examples of drug use in the force." I am asking now

[16] whether the drug tests to which you referred which

[17] occurred after you wrote these memos might

[18] constitute, in your opinion, concrete examples of

[19] drug use in the force as you used that phrase in

[20] this memo.

[21]   **A.**   I think that's reasonable, yes.

[22]   **MR. HEINING:**   I would like to ask that we

[23] take a very short break, five minutes. And we may

[24] have a few minutes to go, but I am close to the end.

# EXHIBIT B

# In The Matter Of:

*Ronnie Jones, et al. vs.*
*City of Boston, et al.*

---

*Virginia Tisei*
*July 25, 2007*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*Videoconference Center*
*50 Franklin Street, Boston, MA 02110*
*Phone: (617) 426-2432*

Original File tisei.v1, Pages 1-79

**Word Index included with this Min-U-Script®**

Virginia Tisei
July 25, 2007

Case 1:05-cv-11832-GAO    Document 67-2    Filed 08/28/2007    Page 8 of 17

Ronnie Jones, et al. vs.
City of Boston, et al.

Page 21

[1] responsibilities, if any, did you have with respect
[2] to the hair test?
[3]     A.    The commissioner, police commissioner -- we
[4] handled the negotiations, including police
[5] negotiations.  The police commissioner had requested
[6] that he wanted to do -- initiate a more reliable
[7] drug testing system than urine analysis, and the
[8] urine analysis testing had been severely limited by
[9] the Guiney decision.
[10]    Q.    Which commissioner are you referring to
[11] now?
[12]    A.    Evans.
[13]    Q.    Did he communicate that to you directly?
[14]    A.    Yes, he did.
[15]    Q.    To the best of your recollection, when did
[16] that happen?
[17]    A.    I don't recall.
[18]    Q.    Could you give me your best estimate of
[19] which year that was?
[20]    A.    I don't recall.
[21]    Q.    Did you have an in-person conversation
[22] about his desire for a more reliable alternative to
[23] urine analysis?
[24]    A.    It was a telephone conversation.

Page 22

[1]    Q.    Did he call you?
[2]    A.    Yes.
[3]    Q.    And what did he say?
[4]    A.    He said that the, the urine analysis -- he
[5] was very frustrated by the, the fact that they
[6] were -- that he suspected that there was a drug
[7] problem in the Police Department that was not being
[8] detected and that he felt that people were unable to
[9] tell when there was probable cause to test someone,
[10] and -- with the current system and that he had
[11] discussed this with some other police heads, and he
[12] wanted to initiate a hair testing system for police
[13] officers for the City of Boston, and he wanted to
[14] negotiate it with them.
[15]    Q.    When you say "them," do you mean with the
[16] union?
[17]    A.    With the union.
[18]    Q.    And what did you say?
[19]    A.    I asked him what, what the hair testing
[20] was, to describe it to me, and he did.
[21]    Q.    Prior to that conversation, did you have
[22] any familiarity or understanding of the hair test?
[23]    A.    No.
[24]    Q.    Had you ever heard of it?

Page 23

[1]    A.    No.
[2]    Q.    Before that did you ever know it was even
[3] possible to test for drugs through hair?
[4]    A.    No.
[5]    Q.    And how did he describe the hair test to
[6] you?
[7]    A.    He said that a snip -- he didn't go into
[8] great detail, just that a snip of hair was tested,
[9] and that it was more reliable, and he gave me the
[10] name of the company that was doing the drug testing,
[11] and that was a reliable company.
[12]    Q.    What company was that?
[13]    A.    I can't remember the name.
[14]    Q.    Was it Psychemedics?
[15]    A.    Yes.
[16]    Q.    Did Commissioner Evans state the basis for
[17] his opinion that the hair test was more reliable
[18] than urine analysis?
[19]    A.    He said that it stayed in the system
[20] longer, the drug.  When a person was tested for
[21] drugs through hair testing, it stayed in the system
[22] longer than it did for urine analysis.
[23]    Q.    Did he explain to you where he was getting
[24] his information?

Page 24

[1]    A.    No.
[2]    Q.    Did you ask him where he was getting his
[3] information?
[4]    A.    I can't recall.
[5]    Q.    Did he explain to you why he had chosen to
[6] call you about this?
[7]    A.    Because I was the person that was
[8] responsible for negotiating contracts, and an issue
[9] like that needs to be negotiated with the union.
[10]    Q.    On that call did he say anything else that
[11] you can remember regarding the reliability of the
[12] hair test?
[13]    A.    No.
[14]    Q.    Did he say anything else about
[15] Psychemedics?
[16]    A.    Not that I can recall.
[17]    Q.    Did he mention any employees of
[18] Psychemedics?
[19]    A.    Yes.  He mentioned the contact person.
[20]    Q.    Do you recall who that was?
[21]    A.    I'm not sure, but I think it was Bill
[22] Thistle.  I'm not positive.  That name comes to
[23] mind.
[24]    Q.    Did Commissioner Evans explain how he had

Page 25

[1] come into contact with Mr. Thistle?
[2]     A.    No.
[3]     Q.    Did he explain how he had learned about
[4] Psychemedics?
[5]     A.    No.
[6]     Q.    Had you ever heard of Psychemedics prior to
[7] that conversation?
[8]     A.    No.
[9]     Q.    Had you ever heard of Mr. Thistle prior to
[10] that conversation?
[11]    A.    No.
[12]    Q.    And did Commissioner Evans then ask you to
[13] do something?
[14]    A.    Well, he asked me to contact the company
[15] and to look into it further.
[16]    *Q.   Was it your understanding at the time that
[17] a decision had been made by the commissioner to
[18] institute hair testing if it could be negotiated
[19] with the union?
[20]        MS. FERRER:  Objection.
[21]    A.    He -- could you repeat the question,
[22] please?
[23]    Q.    Certainly.
[24]        MR. HEINING:  Could you, please, read back

Page 26

[1] the question.
[2]        *(Question read)
[3]        MS. FERRER:  Objection.
[4]    A.    I don't know.
[5]    Q.    I believe you testified a moment ago that
[6] he asked you to look into it further; is that
[7] accurate?
[8]    A.    Yes.
[9]    Q.    What did you take that to mean?
[10]    A.    To contact the company, to speak to them,
[11] to look into the validity of it, and to do some
[12] research.
[13]    Q.    You said he asked you to look into the
[14] validity of the test, or at least you understood his
[15] request --
[16]    A.    He said to look into it.
[17]    Q.    He specifically said that you should look
[18] into it?
[19]    A.    (Nods head)  Because he wanted -- he would
[20] like to do it.  You know, he would like to do it.
[21]    Q.    And did you call Psychemedics?
[22]    A.    I did.
[23]        (Cellular phone interruption)
[24]        MR. HEINING:  Let's go off the record,

Page 27

[1] please.
[2]        (The witness leaves the room and returns)
[3]        MR. HEINING:  Back on the record, please.
[4] BY MR. HEINING:
[5]    Q.    I believe the last question I asked was,
[6] then you did contact Psychemedics?
[7]    A.    I did.
[8]    Q.    Did you contact Mr. Thistle?
[9]    A.    I did.
[10]    Q.    Anyone else in Psychemedics?
[11]    A.    I can't recall.
[12]    Q.    How did you contact Mr. Thistle?
[13]    A.    By phone.
[14]    Q.    And do you recall approximately when that
[15] phone call took place?
[16]    A.    No.
[17]    Q.    What did you talk about?
[18]    A.    I asked him to describe the -- I wanted him
[19] to come out and meet with me and with a couple of my
[20] people, and I also spoke to him -- asked him to
[21] describe the testing to me, and that was the
[22] substance of the conversation.
[23]    Q.    Approximately how long did that phone call
[24] last?

Page 28

[1]    A.    I don't recall.
[2]    Q.    At that time did you make plans for him to
[3] come out and meet with you?
[4]    A.    I did.
[5]    Q.    In Boston?
[6]    A.    In my office.
[7]    Q.    Okay.  In Boston?
[8]    A.    Yes.
[9]    Q.    And approximately when did that meeting
[10] take place?
[11]    A.    I don't know.
[12]    Q.    Approximately how much time passed between
[13] the phone call and the meeting?
[14]    A.    I don't know.
[15]    Q.    Before that meeting occurred, were there
[16] other phone conversations between you and Mr.
[17] Thistle?
[18]    A.    No.
[19]    Q.    Did you exchange letters?
[20]    A.    Not that I can recall.
[21]    Q.    Did you exchange e-mails?
[22]    A.    Not that I can recall.
[23]    Q.    Did he send you any documentation?
[24]    A.    I believe he did.

Virginia Tisei
July 25, 2007

Case 1:05-cv-11832-GAO    Document 67-2    Filed 08/28/2007    Page 10 of 17

Ronnie Jones, et al. vs.
City of Boston, et al.

Page 29

[1]  Q.  Do you recall what documentation he sent to
[2]  you?
[3]  A.  No.
[4]  Q.  Do you recall whether you still have that
[5]  documentation in your possession today?
[6]  A.  I don't have any documentation.
[7]  Q.  Do you know what happened to it?
[8]  A.  I left it in the Office of Labor Relations
[9]  when I left.
[10]  Q.  And when you met with Mr. Thistle in person
[11]  for the first time at your office in Boston, who
[12]  else was present?
[13]  A.  I don't recall.  I know there was another
[14]  attorney present.  I cannot recall whether or not
[15]  there was someone from the Police Department there.
[16]  Q.  The other attorney that you recall being
[17]  there, was that an attorney for the city?
[18]  A.  It was an attorney from my office.  It was
[19]  from the city.  It was one of two people.  It was
[20]  either Mike Reagan or Bill Murphy.  I believe it was
[21]  Mike Reagan, but I'm not sure.
[22]  Q.  And was anyone else from Psychemedics
[23]  present other than Mr. Thistle?
[24]  A.  No.

Page 30

[1]  Q.  And what happened at the meeting?
[2]  A.  He explained the process, and he explained
[3]  how the hair sample was split and that the -- how it
[4]  was more reliable, that there was a 90-day period on
[5]  which drugs stayed in the system -- some drugs, and
[6]  that some drugs stayed in the system longer than
[7]  others, and I can't recall which ones; but that it
[8]  was a much more reliable system.
[9]  And I asked him about the chain of custody,
[10]  because I was concerned about that, and he described
[11]  the lab -- but I can't recall the name of the lab
[12]  that they used -- and went through the process of
[13]  how they took the sample, divided the sample, did an
[14]  initial testing; and then if that was positive, did
[15]  a follow-up testing to see if that was -- that
[16]  confirmed the -- if it was positive the first time,
[17]  then they would do the confirmatory test, which is a
[18]  more specific test.  And then if that test was
[19]  positive, there was something about a safety net
[20]  thing, but I can't recall that, what that was.
[21]  And then if someone was on medication --
[22]  because I asked him about that -- he indicated that
[23]  they would be -- that they could speak to the
[24]  medical officer and review that with them so that

Page 31

[1]  there would be no false positives.  So that's
[2]  essentially what he described to me.
[3]  Q.  Okay.  So just a moment ago I believe you
[4]  testified that Mr. Thistle explained to you during
[5]  that meeting that it would be important for persons
[6]  who were taking prescription medication to notify
[7]  the medical review officer taking the sample of that
[8]  fact so as to avoid a false positive test result; is
[9]  that accurate?
[10]  A.  Well, what I said was -- that's not exactly
[11]  what I said, but what I said was that if someone
[12]  was taking medicine, that they had an opportunity to
[13]  contact the medical officer and to discuss the test
[14]  results with them.
[15]  Q.  Prior to meeting with Mr. Thistle on that
[16]  day, did you do research into the hair test?
[17]  A.  I did, but I don't know if it was prior to
[18]  or after the meeting.
[19]  Q.  Okay.  So you're not sure whether prior to
[20]  that meeting you had looked into the hair test at
[21]  all?
[22]  A.  I may have.  I may not have.  I know at
[23]  some point I did some research.  I also asked the
[24]  company if they had had any challenges to their

Page 32

[1]  testing.
[2]  Q.  You said a moment ago that you were
[3]  concerned about chain-of-custody issues; is that
[4]  correct?
[5]  A.  Yes.
[6]  Q.  Why were you concerned about
[7]  chain-of-custody issues?
[8]  A.  It's always an issue with drug tests, and I
[9]  was unfamiliar with this process.  So I wanted to
[10]  know so I could explain it to the union.  In
[11]  negotiations you need to be able to explain your
[12]  proposal.
[13]  Q.  Did you have any reason to believe that
[14]  there may be chain-of-custody issues that would be
[15]  unique to hair testing as compared to, say, urine
[16]  analysis?
[17]  A.  It's a completely different system.
[18]  Q.  So you did think that there might be some
[19]  unique issues?
[20]  A.  I don't know.  I'm not that familiar with
[21]  the chain-of-custody issues with urine analysis.  I
[22]  just wanted to be able to know what the
[23]  chain-of-custody issues were with this because it
[24]  was new to me.

Ronnie Jones, et al. 1:05-cv-11832-GAO    Document 67-2    Filed 08/28/2007    Page 11 of 17
City of Boston, et al.

Virginia Tisei
July 25, 2007

Page 33

[1]   **Q.**   And do you recall what Mr. Thistle said
[2]   about chain of custody with the hair test?
[3]   **A.**   I think I just explained it, but -- I just
[4]   explained it.   He showed how they divided the
[5]   sample, and they kept one sample, and they used the
[6]   other sample.   I can't recall what they -- the
[7]   sample that they saved, what they did with that,
[8]   whether or not they used that for challenges.   It
[9]   may have been.   I'm not sure.   But I know the one
[10]  sample that they tested, and then they retested it
[11]  using a different methodology if it was positive.
[12]  **Q.**   Is this the so-called confirmatory test --
[13]  **A.**   Yes.
[14]  **Q.**   -- you referred to?   Was it your
[15]  understanding that Psychemedics routinely performed
[16]  confirmatory tests on positive samples?
[17]  **MS. FERRER:**   Objection.
[18]  **A.**   I don't know if they did or whether or not
[19]  they had someone else do it.
[20]  **Q.**   What's a confirmatory test exactly?
[21]  **A.**   I'm not sure.   I can't -- I can't recall.
[22]  It's ten years ago.   No.   Seven years ago.   I'm
[23]  sorry.   Whatever.   Seven, nine.
[24]  **Q.**   You also, I believe, said that the

Page 34

[1]   confirmatory test was a more specific test?
[2]   **A.**   Yes.
[3]   **Q.**   What does that mean, "more specific"?
[4]   **A.**   I can't recall the methodology, so I can't
[5]   explain it to you.
[6]   **Q.**   But you recall being told by Mr. Thistle
[7]   that the confirmatory test was more specific --
[8]   **A.**   And he explained it to me.   He explained --
[9]   he explained them, the methodology to me.
[10]  **Q.**   Did he say that the confirmatory test was
[11]  more specific?
[12]  **A.**   That's my memory.
[13]  **Q.**   Did he have a PowerPoint presentation that
[14]  he showed on that day?
[15]  **A.**   No.   At some point, and I don't recall
[16]  when, whether or not it was in my office or whether
[17]  or not it was in the Police Department, I did see, I
[18]  believe -- I believe I saw a video presentation on
[19]  it.
[20]  **Q.**   Was that video presentation created by
[21]  Psychemedics?
[22]  **A.**   Yes.
[23]  **Q.**   You also spoke of a safety-net test.   Is
[24]  that different from a confirmatory test?

Page 35

[1]   **A.**   I can't recall.
[2]   **Q.**   What's a false positive result?
[3]   **A.**   It's when a test comes back positive, but
[4]   it's really not accurate.   It's, it's -- it's a
[5]   positive test that when you confirm it, you find out
[6]   that -- by doing a confirmatory test, you can
[7]   determine that the first test is false positive.
[8]   It's only by doing the confirmatory test.
[9]   You have a first test which if it turns up
[10]  positive, then you have a confirmatory test.   If the
[11]  confirmatory test shows that there is not any drugs
[12]  in the hair sample, then that's called -- the first
[13]  test is called a false positive.
[14]  **Q.**   Thank you.   Is it your understanding today
[15]  that false positives sometimes occur with the hair
[16]  test?
[17]  **MS. FERRER:**   Objection.
[18]  **A.**   Yes.
[19]  *Q.   And one purpose of a confirmatory test
[20]  would be to try to identify those false positive
[21]  results?
[22]  **MS. FERRER:**   Objection.
[23]  **A.**   Could you repeat the question?
[24]  **Q.**   Certainly.

Page 36

[1]   **MR. HEINING:**   Could you please read the
[2]   question back.
[3]   *(Question read)
[4]   **Q.**   I believe you also testified a few moments
[5]   ago that you asked Mr. Thistle if there had been
[6]   challenges to the Psychemedics process; is that
[7]   accurate?
[8]   **A.**   Yes.
[9]   **Q.**   And what did he say?
[10]  **A.**   He said there had been some litigation, not
[11]  a lot, and he did provide me with some cases --
[12]  **Q.**   Did he --
[13]  **A.**   -- upon my request.
[14]  **Q.**   I'm sorry.   I didn't mean to interrupt you.
[15]  So you asked him for some case cites or opinions?
[16]  **A.**   Yes.
[17]  **Q.**   Did he actually give you opinions?
[18]  **A.**   Yes.
[19]  **Q.**   He had them with him at the time?
[20]  **A.**   No.
[21]  **Q.**   He sent them to you later?
[22]  **A.**   Yes.
[23]  **Q.**   You testified a moment ago that one reason
[24]  for a confirmatory test is to catch or identify

Virginia Tisei
July 25, 2007

Case 1:05-cv-11832-GAO    Document 67-2    Filed 08/28/2007    Page 12 of 17

Ronnie Jones, et al. vs.
City of Boston, et al.

Page 37

[1] false positive results.  As far as you're aware, is
[2] there any other reason for the confirmatory test?
[3]     A.    Not that I can recall.
[4]     Q.    Now, after this meeting with Mr. Thistle
[5] concluded, did you undertake other research into the
[6] validity of the hair test?
[7]     A.    Yes.
[8]     Q.    What was that research?
[9]     A.    I went online and I looked up "hair
[10] testing" and downloaded a number of articles.  I
[11] also asked at least one of my attorneys, but -- I
[12] know at least one.  There might have been more than
[13] one -- to do research in terms of case law on drug
[14] testing in general and whether or not hair testing
[15] would be -- what the status of hair testing was.
[16]     Q.    From a legal point of view?
[17]     A.    From a legal point of view.
[18]     Q.    And which attorney was that?
[19]     A.    I believe it was Bill Murphy, and it might
[20] have been Mike Reagan as well, and I don't know if
[21] there was anyone else.  I can't recall.
[22]     Q.    Did you do anything else to research the
[23] validity of the hair test?
[24]     A.    I spoke to Bob Holland.

Page 38

[1]     Q.    Who is Bob Holland?
[2]     A.    He was -- he was an outside litigator,
[3] partner in the firm of Deutsch Williams, and he
[4] was -- he was working with me as outside counsel on
[5] labor negotiations and on litigation, complicated
[6] litigation, and I wanted him to help me with this
[7] issue of the hair testing.
[8]     Q.    And did he?
[9]     A.    He did.
[10]     Q.    What did he do?
[11]     A.    He did some independent research.
[12]     Q.    Was this primarily research into the
[13] legality of hair testing?
[14]     A.    Well, it was to look at the legality, the
[15] status of drug testing in terms of what we could do
[16] in the State of Massachusetts and also to see if
[17] hair testing would be constitutional in the
[18] Commonwealth of Massachusetts.  That was my inquiry.
[19]     Q.    Did you ask Mr. Holland to perform any
[20] review of the scientific literature concerning the
[21] hair test?
[22]     A.    I was -- I asked him to do a legal review
[23] because that's where his expertise was.
[24]     Q.    Did you ask anyone to do a scientific

Page 39

[1] review?
[2]     A.    No.
[3]     Q.    Did you perform a scientific review --
[4]     A.    No.
[5]     Q.    -- of the hair test?  Did anyone in your
[6] office, to your knowledge, perform a scientific
[7] review --
[8]     A.    No.
[9]     Q.    -- of the hair test?
[10]     A.    Not that I can recall.
[11]     Q.    You mentioned a moment ago, I believe, that
[12] you asked Bill Murphy and possibly Mike Reagan to
[13] conduct some research on the hair test for you; is
[14] that accurate?
[15]     A.    Yes.
[16]     Q.    And did they at some later date present the
[17] results of their research to you --
[18]     A.    I believe they did.
[19]     Q.    -- if you remember?
[20]     A.    I know there was one memo that Bill Murphy
[21] did, but there may have been more.  I don't recall.
[22]     Q.    Okay.  So other than the research that you
[23] just spoke about, did you undertake any other
[24] research into the validity of the hair test?

Page 40

[1]     A.    Well, as I said, I looked at it.  Bob
[2] Holland looked at it.  My office looked at it, and I
[3] asked Psychemedics for cases as well and had
[4] follow-up discussions with Bill Thistle about it on
[5] the phone.
[6]     Q.    Approximately how many such conversations
[7] did you have with Mr. Thistle?
[8]     A.    Approximately two, but I'm not quite sure
[9] because I can't -- it's been so long.
[10]     Q.    Do you recall speaking to anybody else at
[11] Psychemedics about the hair test other than Mr.
[12] Thistle?
[13]     A.    No.
[14]     Q.    Have you ever met anybody else who works
[15] for Psychemedics?
[16]     A.    I can't recall.  My memory is just him, but
[17] I can't recall.
[18]     Q.    Do you know the names of any other -- as
[19] you sit here today, do you know the names of any
[20] other --
[21]     A.    There was a medical director.
[22]     Q.    -- of Psychemedics?
[23]     A.    I think his name was Hoffman, medical
[24] review officer or something like that.

Page 41

[1] Q. Do you recall having any interactions or
[2] communications with --
[3] A. I can't recall if I did or I didn't.
[4] Q. Do you recall how you came to know his
[5] name?
[6] A. Through Bill Thistle.
[7] Q. Other than Commissioner Evans, did you ever
[8] speak to any other acting commissioner about the
[9] hair test?
[10] A. Just -- what do you mean "acting
[11] commissioner"?
[12] Q. I'm sorry. Was there any time -- I'm not
[13] just focusing on the time that you were employed by
[14] the city. Was there any time where you had a
[15] conversation about hair testing with any other
[16] acting commissioner of the B.P.D. other than --
[17] A. No.
[18] Q. -- Mr. Evans? Now, you testified earlier
[19] today about a telephone conversation that you had
[20] with Mr. Evans where he phoned you and asked you to
[21] look into the hair test --
[22] A. Uh-huh.
[23] Q. -- is that accurate? Did you later, then,
[24] call him back and report the results of your

Page 42

[1] research to him?
[2] A. I did, but I can't recall when.
[3] Q. What's your best estimate of the amount of
[4] time that passed between that first phone call when
[5] he asked you to do the research and when you
[6] reported back to him?
[7] A. I don't recall.
[8] Q. Was it more than a year?
[9] A. I don't recall.
[10] Q. And what did you tell him when you reported
[11] back to him about your research?
[12] A. That I had talked to -- I talked to Bill
[13] Thistle, and that I had done some research and
[14] that -- that it appeared that it was a new, fairly
[15] new method, which he already knew, and whether or
[16] not we could -- we were looking at what -- whether
[17] or not we could do it, how we could do it; in other
[18] words, whether or not you would do random testing
[19] or, which is what he wanted -- he wanted random
[20] testing -- and whether or not that would be
[21] permissible under state law, and I said it looked as
[22] if we could, it would be permissible under certain
[23] circumstances; and we talked about that if we set up
[24] some parameters of a time period for doing it,

Page 43

[1] that that might not be totally random. So we talked
[2] about that, and then I told him about that we had
[3] done research, and, then, I don't recall the exact
[4] conversations I had with him about the research, but
[5] I did report to him about some of the research
[6] verbally.
[7] Q. Is it accurate to say that when you were
[8] reporting the results of your research to him
[9] verbally, your primary focus was on the question
[10] whether it was permissible under state law to do
[11] random hair drug testing?
[12] A. That was the primary focus, but we also
[13] wanted to make sure it was a reliable system and
[14] that it was a fair system.
[15] Q. When you say "we also wanted to make sure
[16] it was a reliable system," what do you mean
[17] "reliable"?
[18] A. Meaning that it was -- that the chain of
[19] custody was, the chain of custody was airtight and
[20] that the testing itself was reliable.
[21] Q. I believe you also said you wanted to make
[22] sure it was a fair system; is that accurate?
[23] A. Yes.
[24] Q. And what do you mean by "fair"?

Page 44

[1] A. That it -- it treated all employees equally
[2] in terms of, like, whether or not they had
[3] medications, they're on medications, or, you know,
[4] the length of the hair sample; for instance, if
[5] someone didn't have hair in a certain place, was it
[6] going to be reliable if they took hair out of
[7] another place, issues like that. And we talked
[8] about hair color, like dyed hair.
[9] Q. Do you believe that the hair test is
[10] scientifically accurate?
[11] MS. FERRER: Objection.
[12] A. I don't know.
[13] Q. So is it accurate to say that you don't
[14] have an opinion as to the scientific accuracy of the
[15] hair test?
[16] A. My response is that I, I -- at the time the
[17] hair testing was initiated, that I felt -- and I
[18] believed the commissioner felt, but I can't speak
[19] for him -- that this was a reliable system and a
[20] fair system, because we wouldn't have undertaken it
[21] if we didn't think so. I certainly didn't want any
[22] challenges to it.
[23] Q. Has your opinion of the hair test changed
[24] since then?

Ronnie Jones et al. vs.
City of Boston, et al.

Case 1:05-cv-11832-GAO    Document 67-2    Filed 08/28/2007    Page 14 of 17

Virginia Tisei
July 25, 2007

Page 57

[1] with it. It's refreshing my recollection on this.
[2]    Q.   So you've seen this document before?
[3]    A.   Yes.
[4]    Q.   What is it?
[5]    A.   It's a memo that Attorney Bill Murphy sent
[6] to me at my request in terms of doing a legal
[7] analysis of the hair testing in terms of its
[8] legality throughout -- in Massachusetts and
[9] nationally.
[10]    Q.   So you asked him specifically to do a legal
[11] analysis of the hair test in Massachusetts --
[12]    A.   Yes.
[13]    Q.   -- and nationally? And this is the work
[14] product that he sent you in response?
[15]    A.   This is one more product. I don't recall
[16] if there were other memos.
[17]    Q.   How did -- do you recall how he delivered
[18] this to you? Did he hand it to you in person or did
[19] he --
[20]    A.   I don't recall.
[21]    Q.   Did you ever have any conversations with
[22] him about this memo?
[23]    A.   Yes.
[24]    Q.   How many conversations?

Page 58

[1]    A.   I can't recall.
[2]    Q.   Do you recall who was present during those
[3] conversations?
[4]    A.   Aside from the both of us, I don't recall.
[5]    Q.   And what did you talk about with respect to
[6] this memo?
[7]    A.   The contents of the memo.
[8]    Q.   Did you ask him questions about the memo?
[9]    A.   Yes.
[10]    Q.   Do you recall what questions you asked him?
[11]    A.   No.
[12]    Q.   Do you recall what he said about it?
[13]    A.   No.
[14]    Q.   Do you recall what you did with it after
[15] you received it from him?
[16]    A.   No.
[17]    Q.   Did you send it to anybody else?
[18]    A.   I can't recall. I may have. I may not
[19] have. Usually I wouldn't send something like this
[20] out to anyone.
[21]    Q.   What would you typically do with something
[22] like this?
[23]    A.   I would discuss it with the attorney and,
[24] if necessary, I would have discussed it with --

Page 59

[1] probably discussed it with Bob Holland and may have
[2] discussed it with the police commissioner, but I
[3] can't recall. But I, I don't -- I can't recall.
[4]    Q.   I'd like to direct your attention to the
[5] second paragraph on the first page there.
[6]    A.   (Reviewing document)
[7]    Q.   I'm sorry. The second paragraph on the
[8] first page, specifically the last sentence in that
[9] paragraph. I believe it says: "In order to tip the
[10] scales in our favor, the Court held that the City
[11] must show concrete examples of drug use in the
[12] force." Do you see that sentence?
[13]    A.   Yes.
[14]    Q.   Now, since this memo was written -- it
[15] appears it was written in 1998; is that accurate?
[16]    A.   That's what it states.
[17]    Q.   Since then do you know whether there had
[18] been concrete instances of drug use in the force?
[19]    MS. FERRER:   Objection.
[20]    A.   I know that there were -- before I left,
[21] that there were -- hair testing was implemented, and
[22] there were some positive results of some police
[23] officers. I don't remember their names. I know
[24] that the commissioner called me and did tell me that

Page 60

[1] some officers that he had suspected of drug use did
[2] come up positive.
[3]    Q.   Now, as you understand this sentence, is it
[4] your opinion that those would constitute concrete
[5] examples of drug use in the force?
[6]    MS. FERRER:   Objection.
[7]    A.   I don't know what you mean by that.
[8]    Q.   Well, what do you understand that to mean,
[9] "concrete examples of drug use in the force"?
[10]    A.   That we would have to show -- if there was
[11] drug use in the department, that we would have to be
[12] able to have a reliable test to be able to show that
[13] there was drug use.
[14]    Q.   And has -- is there such a test that the
[15] city uses now?
[16]    MS. FERRER:   Objection.
[17]    A.   I don't know what the city is now using.
[18]    Q.   I'd like to direct your attention to the
[19] next page, specifically the last paragraph, third
[20] paragraph, begins: "Some of the disadvantages
[21] include," and then the first item listed says, "hair
[22] can be contaminated by contact with, or airborne
[23] exposure to drugs in the environment." Then in
[24] parenthesis, "although washing the sample is

Virginia Tisei
July 25, 2007

Ronnie Jones, et al. vs.
City of Boston, et al.

Page 61

[1] believed to be a reliable method of overcoming this
[2] problem.  If hair has been contaminated by contact
[3] with drugs, such exposure should be revealed in the
[4] wash."  Is that what it says?
[5]     A.    That's correct.
[6]     Q.    Now, did you talk with Mr. Murphy about
[7] this particular part of this memo?
[8]     A.    Yes.
[9]     Q.    Did he tell you what the basis for those
[10] statements was?
[11]    A.    I can't recall.  I know he had done
[12] research, but I can't recall a conversation.
[13]    Q.    And is it your understanding that these
[14] statements concerning external contamination or
[15] airborne exposure to drugs are accurate?
[16]        MS. FERRER:  Objection.
[17]    A.    I don't know.  I don't have the -- he did
[18] the research.  He did a lot of research.
[19]    Q.    Well, you personally didn't research the
[20] external exposure issue?
[21]    A.    I read a lot of articles, and I -- and read
[22] material given to me by Psychemedics, so I did read
[23] the material about that issue, specific issue, on my
[24] own.

Page 62

[1]     Q.    And what conclusion did you reach about
[2] external exposure?
[3]     A.    That Psychemedics could overcome the -- any
[4] airborne exposure such as exposure to marijuana,
[5] like if you were in a room, for instance, and some
[6] people were smoking marijuana, you know, would you
[7] be -- would you come up positive or...  That was a
[8] specific issue that kept coming up, and I know I did
[9] look into that, and in terms of any medication that
[10] people were taking, I did look into that.
[11]    *Q.    And your conclusion was that Psychemedics'
[12] wash procedures could effectively remove all traces
[13] of or enough traces of the drug from the hair that a
[14] person who had sort of passive exposure would --
[15]        MS. FERRER:  Objection.
[16]    A.    I'm not sure.  Would you repeat it.  It was
[17] a long...
[18]    Q.    It was long.
[19]        MR. HEINING:  Let's try reading it back.
[20]        *(Question read)
[21]        MR. HEINING:  I'll withdraw the question.
[22] Let's try it again.
[23]    Q.    Was it your understanding that
[24] Psychemedics' wash procedures could effectively

Page 63

[1] remove all traces of drug from hair?
[2]        MS. FERRER:  Objection.
[3]     A.    Yes.
[4]     Q.    All traces?
[5]        MS. FERRER:  Objection.
[6]     A.    Traces, traces that would be, that would
[7] affect the result.  If I'm -- and when I say
[8] "Psychemedics," I'm including their laboratory
[9] because they would send the material to the
[10] laboratory to deal with.
[11]    Q.    Now, if that were not, in fact, the case,
[12] if it turned out that Psychemedics' wash procedures
[13] couldn't get all traces of the drug out of the hair,
[14] all traces of drugs that had externally contaminated
[15] the hair out of the hair, do you think it's possible
[16] that external contamination of hair could then
[17] result in a positive result --
[18]        MS. FERRER:  Objection.
[19]    Q.    -- on the hair test?
[20]    A.    I don't know the answer to that.  I'm not
[21] that familiar with the scientific, the -- and it's a
[22] memory issue because it's so long ago -- with the
[23] two procedures, but I do know that the procedures
[24] did screen out contaminants.  I do know that,

Page 64

[1] because I asked that question, too.
[2]        MR. HEINING:  Could you please mark that as
[3] our next exhibit.
[4]     Q.    And the same with respect to this one,
[5] after she has a chance to mark it, I ask you to take
[6] a look at it and familiarize yourself with it.
[7]        (Document marked as Tisei
[8]        Exhibit 5 for identification)
[9]     A.    (Reviewing document)
[10]    Q.    Ready to go ahead?
[11]    A.    Uh-huh.
[12]    Q.    Have you seen this document before?
[13]    A.    I can't recall it, but my name is on it; so
[14] I must have received it.
[15]    Q.    What is it?
[16]    A.    It's a memo from Bill Murphy to me.
[17]    Q.    Do you recall whether you requested Bill
[18] Murphy to produce this memo for you?
[19]    A.    Yes, I did.
[20]    Q.    Do you recall what specifically you asked
[21] him to write a memo on?
[22]    A.    Well, we were getting ready for
[23] negotiations, and I asked him to look into the
[24] legality of -- to give me a current status of the

Page 65

[1] law on hair testing and to look into whether or not
[2] hair testing -- look into the legality of drug
[3] testing, the current state of the law on it and to
[4] analyze recent decisions into, into putting that
[5] analysis, whether or not -- what the state of drug
[6] test -- hair testing was, whether or not there had
[7] been any decisions on it, and whether or not it
[8] would be appropriate to use.
[9]     Q.    Do you recall what you did with this memo
[10] after receiving it?
[11]     A.    I discussed it with Bill Murphy, and I know
[12] I -- every -- any of these documents, any of these
[13] -- anything to do with this drug testing, I
[14] frequently, but I can't recall specifically whether
[15] or not I called Bob Holland on this particular memo.
[16] I may have, but I can't recall. I believe we did
[17] more research on this.
[18]     So I know I discussed it with Bill, and we
[19] went back and forth on it, and we -- and he had
[20] cases that we looked at, and that goes with the
[21] other memo as well. And we discussed it, but the
[22] content of those discussions I can't recall, other
[23] than to tell you it was on the subject matter.
[24]     Q.    Okay. Thank you. When you said that

Page 66

[1] "other memo" just a moment ago, which memo are you
[2] referring to?
[3]     A.    The one that's -- the February 3rd, 1998,
[4] memo.
[5]     Q.    And just so I understand, earlier today
[6] when we were just starting out, you talked about a
[7] document that you reviewed in preparation for your
[8] deposition today.
[9]     A.    Yes.
[10]     Q.    Was that one of these memos that you have
[11] before you now?
[12]     A.    I can't recall if it was this one or this
[13] one.
[14]     Q.    But it was one of those two?
[15]     A.    One of them. I just looked at it briefly.
[16]     Q.    Do you recall whether you talked with
[17] anyone other than Bill Murphy about this memo, the
[18] November 17th, 1997, memo?
[19]     A.    I don't recall specifically. I know I had
[20] discussions with Bob Holland on this, and I know I
[21] had some discussions with the police commissioner;
[22] but I don't know if it was -- when those took place,
[23] and I don't know if they were directly after these
[24] memos or as a result of these memos and research. I

Page 67

[1] just don't remember. It's so long ago.
[2]     Q.    You testified earlier today that
[3] Commissioner Evans contacted you some years ago and
[4] asked you to research the hair test; is that
[5] correct?
[6]     A.    That's right.
[7]     Q.    Do you know whether he also asked other
[8] employees of the city or of the Boston Police
[9] Department to perform similar research?
[10]     A.    I don't know. I know that -- I do know
[11] that there were people in the Police Department that
[12] knew about the hair testing proposal, because Bobbie
[13] Mullins was one of them. I believe the deputy
[14] director of the Police Department was -- knew about
[15] it. I know he knew about it.
[16]     Q.    Who was that?
[17]     A.    That was Chris Croll at the time -- Groll.
[18] And there was the director that was above him, and I
[19] think that was Flo. I can't recall her last name,
[20] but she was in charge of the Labor Department at the
[21] Police Department, and she's since passed on.
[22]     Q.    Just a moment ago you referred to that
[23] hair test proposal -- I think you said there were
[24] other people who were aware of the hair test

Page 68

[1] proposal?
[2]     A.    Well, it was part of our negotiations, so
[3] they were aware of it.
[4]     Q.    They were aware of it once the negotiations
[5] began?
[6]     A.    Well, I think independently. I know Bobbie
[7] Mullins knew about it because -- I knew Bobbie
[8] Mullins knew about it because I was at a meeting
[9] where she talked about it, and I knew that these
[10] other people knew about it because we were getting
[11] ready for negotiations or we were in the process of
[12] the negotiations, I think. I forget which.
[13]     MR. HEINING:  I'd like to mark this as the
[14] next exhibit, please.
[15]         (Document marked as Tisei
[16]         Exhibit 6 for identification)
[17]     Q.    Thank you.
[18]     A.    I don't know if the director of the Police
[19] Department, Labor Relations, was Flo Creed at the
[20] time or Mr. Ferguson, Deputy Superintendent
[21] Ferguson. I can't recall. It was one of the two.
[22]     Q.    Thank you. Please take a moment and look
[23] at this document, and let me know when you're ready
[24] to answer some questions about it.

Virginia Tisei
July 25, 2007

Ronnie Jones, et al. vs.
City of Boston, et al.

Page 69

[1]    A.    (Reviewing document)

[2]    Q.    Ready to go on?

[3]    A.    Uh-huh.

[4]    Q.    Have you seen this document before?

[5]    A.    Yes.

[6]    Q.    What is it?

[7]    A.    The -- it's a memo to me from Bob Boyle,

[8] who was an attorney in my office and still works for

[9] Labor Relations.

[10]    Q.    Did you specifically request that Robert

[11] Boyle draft this memo?

[12]    A.    Upon the request -- yes.  The answer is,

[13] yes, upon the request of the commissioner.

[14]    Q.    Did the commissioner specifically ask for a

[15] Q and A style memo?

[16]    A.    He did.

[17]    Q.    Do you know why?

[18]    A.    He anticipated that there was going to be

[19] some public questions about it.

[20]    Q.    So do you know for what use he intended

[21] this memo?

[22]    A.    I can't recall.  There was a specific

[23] reason.

[24]    Q.    And did the commissioner's request get

Page 70

[1] transmitted through you to Mr. Boyle?

[2]    A.    Yes.

[3]    Q.    And what did you do with this Q and A memo

[4] after Mr. Boyle --

[5]    A.    I reviewed it and I sent it to Commissioner

[6] Evans.

[7]    Q.    Did you send it to anyone else?

[8]    A.    I can't recall.

[9]    Q.    Do you know what Commissioner Evans did

[10] with it after you sent it to him?

[11]    A.    No.

[12]    Q.    Did you speak to Mr. Boyle about it after

[13] he gave it to you?

[14]    A.    I can't recall.

[15]    Q.    Did you speak to Mr. Evans about it after

[16] you gave it to him?

[17]    A.    I had a brief conversation that I had sent

[18] it to him; if he had any questions, he could give me

[19] a call.

[20]    Q.    Do you know what the basis for the answers

[21] here was?

[22]    A.    It was --

[23]    MS. FERRER:  Objection.

[24]    A.    I don't have the research, so I can't -- it

Page 71

[1] was too long ago.  All I can tell you is that there

[2] were lots of research.  There were a couple of very

[3] filled Redwelds full of research on this issue that

[4] was done by my office, and I don't know if they were

[5] retained or not.

[6]    Q.    I'd like to direct your attention to the

[7] second page of this document, the third question

[8] from the top, it says:  "Are there standardized

[9] cut-off levels for distinguishing negative tests

[10] from positive ones?"  What is a cut-off level?

[11]    A.    To the best of my memory, a cut-off level

[12] was the level at which you would determine whether

[13] or not somebody was positive or not, and I don't

[14] remember what those cut-off levels were, but there

[15] were -- they were specific at the time.

[16]    Q.    Okay.  When you say you don't remember what

[17] they were, in other words, you don't remember what

[18] the number was --

[19]    A.    That's right.

[20]    Q.    -- what the cut-off point was?  The idea

[21] was that after a sample had been analyzed, if the

[22] amount of drugs in the hair was below a certain

[23] point, it would be a negative test.  If it was above

[24] a certain point, it would be a positive test?

Page 72

[1]    A.    Correct.

[2]    Q.    Is that generally the idea?

[3]    A.    Correct.

[4]    Q.    Do you know whether the U.S. Government has

[5] ever published approved cut-off levels for hair

[6] testing?

[7]    MS. FERRER:  Objection.

[8]    A.    I don't recall.

[9]    Q.    Do you know who determines what the cut-off

[10] levels are for the test that's used by the city and

[11] the B.P.D.?

[12]    A.    No, I don't.  I know they worked with

[13] Psychemedics on it and utilized Psychemedics'

[14] technology.

[15]    Q.    The last question on that same page says,

[16] "Can use of some prescription medications result in

[17] a positive hair test in a subject that does not use

[18] drugs?"

[19]    A.    Uh-huh.

[20]    Q.    As you sit here today, what is your

[21] understanding of the answer to that question?  Would

[22] it be "yes," or would it be "no"?

[23]    A.    (Reviewing document)  Yes.  My

[24] understanding -- my understanding of this is it

**EXHIBIT C**

# In The Matter Of:

*Ronnie Jones, et al. v.*
*City of Boston, et al.*

---

*Michael Reagan*
*March 26, 2007*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*Videoconference Center*
*50 Franklin Street, Boston, MA 02110*
*Phone: (617) 426-2432*

Original File reagan.v1, Pages 1-109

**Word Index included with this Min-U-Script®**

Michael Reagan
March 26, 2007

Ronnie Jones, et al. v.
City of Boston, et al.

---

Page 5

[1]  A.  No.
[2]  MR. BAKER:  The first document I'd like to
[3] mark as Exhibit 1 is a Federal Rules of Civil
[4] Procedure Rule 45 Deposition Subpoena and a Notice
[5] of Deposition.
[6]  (Document marked as Reagan
[7]  Exhibit 1 for identification.)
[8]  Q.  And Mr. Reagan, do you understand that
[9] you're here today in response to a deposition
[10] subpoena?
[11]  A.  Yes.
[12]  Q.  And have you seen this document before
[13] that's been marked as Exhibit 1?
[14]  A.  I don't recall.
[15]  Q.  Okay.  I'm just going to go through a few
[16] background questions.  Can you please state your
[17] date of birth.
[18]  A.  December 6, 1965.
[19]  Q.  Are you represented by counsel here today?
[20]  A.  No.
[21]  Q.  What did you do to prepare for your
[22] testimony?
[23]  A.  I reviewed a packet sent to me by the one
[24] of the attorneys in the City of Boston law office,

Page 6

[1] and I just tried to read through the packet,
[2] refreshed my memory on the time and the stuff that
[3] took place in this.  That was really it.
[4]  Q.  And did you meet with anyone in advance of
[5] your testimony today?
[6]  A.  With Mary Jo Harris.
[7]  Q.  And how many times did you meet with Ms.
[8] Harris?
[9]  A.  Just this morning.
[10]  Q.  And for how long?
[11]  A.  45 minutes.
[12]  Q.  You mentioned a packet of materials that
[13] the City of Boston Law Department sent you?
[14]  A.  Yes.
[15]  Q.  What documents were in the packet?
[16]  A.  Series of documents.  A lot related to the
[17] collective bargaining negotiations, proposals back
[18] and forth.  There were some internal articles
[19] related to drug testing.  There was a series of
[20] arbitration awards around drug testing.  There was a
[21] memo from a Bill Murphy who was an attorney in the
[22] City of Boston relative to this issue.
[23]  Q.  When you say "this issue" --
[24]  A.  Hair drug testing and drug testing in

Page 7

[1] general.
[2]  Q.  Do you remember who the memo was to?
[3]  A.  It was either to me or to Virginia Tisei.
[4] I think it was to Virginia Tisei, T-i-s-e-i.
[5]  Q.  And what were the specifics of the memo,
[6] other than the fact that it was about hair testing?
[7]  A.  He had been assigned and had done research
[8] on the issue, on drug testing in general and the
[9] hair testing specifically, during the collective
[10] bargaining process, which led to us proposing hair
[11] drug testing with the police unions.
[12]  Q.  When you say "research," was it scientific
[13] research, legal research?
[14]  A.  Both.
[15]  MR. BAKER:  Just a question for you.  Is
[16] that a document that you produced in the case?
[17]  MS. HARRIS:  No.  This is a document that
[18] we had initially claimed privilege on, and in
[19] reviewing reliance issues, I've agreed we will
[20] produce it to you, and we're not objecting to Mike
[21] testifying about that.
[22]  MR. BAKER:  Do you have a copy today?
[23]  MS. HARRIS:  I don't have a copy today.
[24]  MR. BAKER:  So you're not objecting to him

Page 8

[1] testifying about the memo.  I don't know what it
[2] says.
[3]  MS. HARRIS:  He's not the author or the
[4] main recipient to it, so I think he can testify what
[5] his review of it was, but we will produce it to you
[6] in advance of the deposition of Bill Murphy.
[7]  MR. BAKER:  Okay.
[8]  Q.  I'll just get the questions out of the way,
[9] and then we'll come back to some other background
[10] questions.
[11]  Did you ask Mr. Murphy to prepare this
[12] memo?
[13]  A.  It was either myself or Virginia Tisei, or
[14] a combination of the two, asked Bill to do some
[15] research, do research on this topic.
[16]  Q.  And again, when you say "asked to do
[17] research," what research specifically did either you
[18] or Ms. Tisei ask Mr. Murphy to do?
[19]  A.  I think on the overall topic of drug
[20] testing and then more specifically hair drug testing
[21] and whether or not it made sense to make that a
[22] proposal at the collective bargaining table.
[23]  Q.  And again, just to be a little more
[24] specific than that, legal issues, scientific issues

---

Min-U-Script®

Doris O. Wong Associates, Inc.

Page 9

[1] in terms of the hair test, both?
[2]    A.  I would say both, but probably bent towards
[3] legal issues and concerns around Guiney -- that was
[4] part of it -- and then positive aspects and
[5] potential issues around hair testing.
[6]    Q.  Was there any effort to look at the whether
[7] there was a race bias or hair color bias to hair
[8] testing that you asked Mr. Murphy to do or that he
[9] did in response?
[10]    A.  Specifically as a request?  I don't recall
[11] that, but I believe part of the memo dealt with,
[12] there had been some articles out there, one or two
[13] articles or a few, that had raised bias as something
[14] that had been claimed as a defense to hair testing.
[15] There had been many more articles and case law, in
[16] Nevada and I think there was a case in Florida, in
[17] which hair testing had been found to be reliable and
[18] had withstood judicial scrutiny.
[19]    And there were also articles I think by
[20] Mieczkowski of a couple studies done or a study done
[21] around the topic.  I think there's Hoffman, Benjamin
[22] Hoffman had done a study.  So it was a combination
[23] of summarizing that.  I think they're all attached
[24] to the articles and some of the snippets of the

Page 10

[1] decisions as part of the memo.
[2]    Q.  Okay.  And if you know, did Mr. Murphy
[3] simply ask a scientist to summarize the scientific
[4] information about the hair test, or did he go out
[5] and evaluate it himself?  If that question is
[6] unclear --
[7]    A.  I don't understand the question.
[8]    Q.  Let me just back up.  You mentioned that
[9] this memo mentioned Mr. Mieczkowski.  Do you know if
[10] he's a professor at the University of South Florida?
[11]    A.  I don't know.
[12]    Q.  Do you know who he is?
[13]    A.  I know he did a couple studies on hair
[14] testing.  I remember the name.
[15]    Q.  And Ben Hoffman, do you know who he is?
[16]    A.  I believe he's a doctor.  He's our medical
[17] review officer I believe.
[18]    Q.  Okay.  Do you know if Mr. Murphy went
[19] directly to a research source published by
[20] Mr. Mieczkowski or Mr. Hoffman, or if he just went
[21] to someone else and asked that person for
[22] information?
[23]    A.  I don't know.
[24]    Q.  Okay.  And the cases that you mentioned,

Page 11

[1] one from Nevada and one from Florida?
[2]    A.  That rings a bell, yeah.
[3]    Q.  Do you know the procedural summary or
[4] factual summary of those cases?
[5]    A.  Unemployment case, I think that's the
[6] Nevada case, in which hair testing had been the
[7] topic, and a decision had been found that hair
[8] testing was upheld.
[9]    And there was a case in Florida where I
[10] believe it was whether or not at the time it was
[11] scientifically reliable or not, and I think the
[12] court found that it was.
[13]    There are others as well.  Those two stick
[14] out as the most prevalent in my mind.
[15]    Q.  Do you know if the Nevada or Florida cases
[16] involved somebody who was terminated as a result of
[17] a positive hair test?
[18]    A.  Not sure.  I think the unemployment case in
[19] Nevada, I assume it's in relation to that, but I'm
[20] not sure.
[21]    Q.  Okay.  And do you recall reading this memo
[22] from Mr. Murphy -- what is the approximate date of
[23] that memo?
[24]    A.  Fall of '97.

Page 12

[1]    Q.  Do you recall reading the memo after you
[2] received it in the fall of '97?
[3]    A.  Yes.
[4]    Q.  And what did you do with the information at
[5] that time, the information in the memo?
[6]    A.  I don't understand the question.
[7]    Q.  What was the purpose of requesting
[8] Mr. Murphy -- just to back up, what was the purpose
[9] of requesting Mr. Murphy to prepare the memo?
[10]    A.  We had been in collective bargaining
[11] negotiations with the police union since the summer
[12] of '96.  At the time our proposal for drug testing
[13] the police department was random drug testing.
[14]    At some point in '97, I believe,
[15] Commissioner Evans had attended a convention or some
[16] kind of conference and had come back with this idea
[17] of hair testing.  He knew it was in place in some
[18] other police departments, major police departments,
[19] maybe Chicago, maybe New York, and Psychemedics was
[20] a company who was well known in the field and had
[21] several major clients.  And he thought it made some
[22] sense to look, reevaluate our drug proposal, maybe
[23] look at going from random urine testing to hair
[24] testing.

Michael Reagan
March 26, 2007

Ronnie Jones, et al. v.
City of Boston, et al.

---

Page 13

[1] So Commissioner Evans let me, myself, know
[2] that, let Virginia Tisei know that, let basically
[3] City Hall know that, as we were negotiators of the
[4] contract.
[5] We looked into it, and as part of the
[6] looking into it, we asked Bill to do research around
[7] the topic, and that's what kind of led to the memo.
[8] **Q.** Okay. And after you read the memo, did you
[9] make the decision that hair testing was something
[10] the City should push for?
[11] **A.** It wouldn't be that simple. It was a
[12] combination. I do my own research. We looked into
[13] the topic, made our own phone calls, met with
[14] Psychemedics on many occasions. There were several
[15] internal meetings. We ultimately came to the
[16] decision that it was a good idea.
[17] **Q.** Did you ask Mr. Murphy or anyone else to do
[18] any follow-up about the issues raised in the memo
[19] after you read it?
[20] **A.** I don't recall.
[21] **Q.** Going back to some more background
[22] questions -- we'll get to the memo later in the
[23] context of some other questions. In your background
[24] have you testified before?

---

Page 14

[1] **A.** Yes.
[2] **Q.** And have you ever testified in a civil case
[3] before?
[4] **A.** Civil case, no.
[5] **Q.** Have you ever been deposed in a civil case
[6] before?
[7] **A.** No.
[8] **Q.** When I say "civil," I mean in contrast to
[9] criminal. Do you understand it the same way?
[10] **A.** I've testified several times in
[11] arbitrations, union matters, grievance arbitrations,
[12] union matters, those type of settings.
[13] **Q.** Have you ever testified in a matter
[14] concerning hair testing?
[15] **A.** Yes.
[16] **Q.** How many times?
[17] **A.** I testified in the Robert Polito
[18] arbitration, and I believe that's it.
[19] **Q.** Okay. And generally what was the subject
[20] matter of your testimony in that case?
[21] **A.** The issue in front of the arbitrator had to
[22] do with the safety-net test and the level of the
[23] safety-net test. That was the issue before the
[24] arbitrator, whether or not it was a violation of the

---

Page 15

[1] contract in our implementation and application of
[2] that test towards Polito.
[3] My testimony had to do with the negotiation
[4] and creation of the rules and procedures around hair
[5] testing, Rule 111, which covers hair testing in the
[6] department. And we negotiated with the police
[7] department in the fall of '98, and I was kind of
[8] lead negotiator of that. The actual process itself
[9] of how hair is to be snipped and tested, et cetera,
[10] my testimony was around primarily around that. I
[11] think it was Appendix D of Rule 111.
[12] And I testified as to the process, the
[13] negotiation process and the back and forth of the
[14] union that led to the implementation of the Appendix
[15] D and the implementation of hair drug testing in
[16] January of '99.
[17] **Q.** Approximately when was your testimony in
[18] the Polito case?
[19] **A.** I don't remember.
[20] **Q.** Have you ever been a party to a lawsuit
[21] before?
[22] **A.** No.
[23] **Q.** Have you been arrested or convicted of a
[24] crime?

---

Page 16

[1] **A.** No.
[2] **Q.** Can you describe your educational
[3] background, I guess starting with high school, where
[4] you went to high school and then from there.
[5] **A.** I went to East Lyme High School in
[6] Connecticut. I graduated in 1984. I graduated
[7] Hartwick College in 1988. I worked for a couple
[8] years and then went to law school. I graduated from
[9] Suffolk University Law School in May of 1994.
[10] **Q.** What was your major or majors at Hartwick?
[11] **A.** History.
[12] **Q.** And you worked for a couple of years after
[13] Hartwick. Where did you work?
[14] **A.** General Dynamics Boat Division in Groton,
[15] Connecticut.
[16] **Q.** What sort of work did you do there?
[17] **A.** A buyer for submarine parts.
[18] **Q.** Then you went to Suffolk after that?
[19] **A.** That's right.
[20] **Q.** Were you full time at Suffolk?
[21] **A.** Yes.
[22] **Q.** I take it you're a member of a Bar
[23] somewhere; is that correct?
[24] **A.** Massachusetts and Connecticut.

---

Min-U-Script®     Doris O. Wong Associates, Inc.

Page 17

[1]   Q.   And you're an active member in both
[2] jurisdictions today?
[3]   A.   I think I may have -- what's the phrase for
[4] it in Mass.?  I pay half my dues, whatever it leads
[5] to.  I think I do that.  I'm active in Connecticut.
[6] I'm inactive, I think, in Mass.
[7]   Q.   Okay.  Were you working at all while you
[8] were at Suffolk University?
[9]   A.   Yes.  I started my second year.  I got a
[10] job at Murphy, Lamere & Murphy.  It's a firm in
[11] Braintree, Mass., that focuses on the management
[12] side of labor employment law, municipal law.
[13]   Q.   What was your title or position there?
[14]   A.   I was a law clerk.  Then after I graduated
[15] law school I stayed on as -- I didn't pass the Bar
[16] yet, so I never had a title, but basically the legal
[17] clerk.  I stayed there through '94, and then I got a
[18] job with the City of Boston in January '95 as a
[19] staff attorney in the labor relations office.
[20]   Q.   Did you state the month in '95?
[21]   A.   January '95.
[22]   Q.   January '95.  If you could just approximate
[23] for me the best you can the different positions that
[24] you held with the City of Boston and the approximate

Page 18

[1] years or time periods that you held those positions.
[2]   A.   January of 1995 until around May of 1997 I
[3] was a staff attorney in the labor relations office.
[4] From May of 1997 until late 1999 I was deputy
[5] director in the labor relations office.  From late
[6] 1999 into early 2000, mid-2000, I was acting
[7] director.  And then I was appointed director of the
[8] office, I believe it was in 2000, and I remained in
[9] that position until I left the City in July of 2002.
[10]   Q.   Where did you go in July 2002?
[11]   A.   CIGNA Corporation.
[12]   Q.   Can you spell that?
[13]   A.   All capitals, C-I-G-N-A.
[14]   Q.   What was your position there?
[15]   A.   Assistant vice president of employee
[16] relations.
[17]   Q.   And where was your office located?
[18]   A.   Bloomfield, Connecticut.
[19]   Q.   How long did you hold that AVP position?
[20]   A.   I'm still in it.
[21]   Q.   Let's go back to the City of Boston,
[22] starting in May '97.  You said you were deputy
[23] director from that period until late '99?
[24]   A.   I'm trying to think back to the dates.  I

Page 19

[1] think that's right.
[2]   Q.   An approximation is fine.
[3]   A.   Yeah, that's right.
[4]   Q.   What were your responsibilities in that
[5] deputy director position?
[6]   A.   Well, the labor relations office is an
[7] office of attorneys and support staff who represent
[8] the mayor in all of his or the City's collective
[9] bargaining matters.  By that I mean representing the
[10] mayor in all collective bargaining negotiations and
[11] representing the City in all labor-related
[12] litigation, mainly arbitration, labor cases and
[13] court cases; beyond that, the day-to-day giving
[14] counseling, guidance, to department heads, HR and
[15] conducting training.
[16]       As deputy director, it's the same work.
[17] You just also oversee the work of the staff
[18] attorneys, so you have more of a supervisory role.
[19] Same as director.
[20]   Q.   Were there any other changes between being
[21] the deputy director or acting director or director?
[22]   A.   Not when I was there.  Basically the same
[23] thing.
[24]   Q.   Who succeeded you in July of '02 as the

Page 20

[1] director or acting director, if you know?
[2]   A.   I think Bill Murphy succeeded me for a
[3] couple of months, then he left and went to Harvard.
[4] He's at Harvard labor relations now.  Then at some
[5] point Dave Connelly took over as director of the
[6] office.
[7]   Q.   What was Mr. Bill Murphy's position in 1997
[8] when he wrote the memo?
[9]   A.   '97, he would have been a staff attorney.
[10] When I became director I made him my deputy
[11] director.
[12]   Q.   Okay.  With respect to the hair drug test,
[13] do you understand what I mean when I say "hair drug
[14] test"?
[15]   A.   Yes.
[16]   Q.   With respect to the hair drug test, what
[17] were your responsibilities when you were either the
[18] deputy director, acting director or director of the
[19] labor relations department for the City of Boston?
[20]   A.   One of my primary assignments during this
[21] time frame, I was one of the lead negotiators with
[22] all the collective bargaining talks with all the
[23] police unions.  I wasn't the only negotiator, but I
[24] was one of the leads; Bob Holland being the other.

Michael Reagan
March 26, 2007

Ronnie Jones, et al. v.
City of Boston, et al.

Page 21

[1] So we were negotiating at the table with all the
[2] police unions, among 25 other unions in the city.
[3] All contracts were open. We were negotiating with
[4] everybody.
[5]       As I said earlier, one of the focuses of
[6] the department was a fair, reasonable, good drug
[7] testing program we would negotiate with the unions.
[8]       Our first proposal was some kind of random
[9] process, random program, and that ultimately changed
[10] in the collective bargaining process to become a
[11] proposal for hair testing in or around late '97.
[12]       And I was at the table through all the
[13] negotiations with the Patrolmen's Union. What they
[14] ultimately agreed to, that, as part of a package in
[15] I think May of 1998 -- there were other unions in
[16] the police department: The Federation, Superior
[17] Officer's Federation, represents uniformed officers,
[18] sergeants, lieutenants and captains; the Detectives
[19] union, which represents detectives; and Detective
[20] Superiors represents detective sergeant, detective
[21] lieutenant, detective captain. So I also was
[22] involved in negotiations with those unions as well.
[23] It was all separate negotiations.
[24]       After Patrolmen's was settled in May of

Page 22

[1] '98, they never agreed at the table to a contract.
[2] We ended up getting those contracts through the
[3] process of the Joint Labor Management Commission,
[4] JLMC. And I was involved there as preparing the
[5] case and as being part of the City's JLMC team, so
[6] to speak.
[7]    Q.  Did you retain outside counsel for the JLMC
[8] team?
[9]    A.  Bob Holland, he was our outside counsel,
[10] and he was involved with negotiations and the JLMC.
[11]    Q.  I'll get into some more detail on that lead
[12] negotiator role, but what other roles did you have,
[13] if any, while you were deputy director, acting
[14] director or director for labor relations other than
[15] the lead negotiator role with regard to the hair
[16] test?
[17]    A.  In general?
[18]    Q.  Yes, in general, if anything.
[19]    A.  Yeah, what I said earlier. I negotiated
[20] with unions, representing the City in cases,
[21] arbitrations, labor relations cases, conducted
[22] training, provided guidance to city managers on
[23] labor issues.
[24]    Q.  Again, with respect to the hair test, you

Page 23

[1] said "conducted training." Was that with respect to
[2] the hair testing or --
[3]    A.  No. I'm talking about in general, it was
[4] my role.
[5]    Q.  You had some role with respect to the hair
[6] test in representing the City in cases though; is
[7] that correct, arbitration cases?
[8]    A.  I testified in the Polito case, grievance
[9] arbitration. Bill Murphy was the lead counsel, I
[10] believe, in all the other grievance arbitrations
[11] around hair testing. It wasn't me.
[12]    Q.  Okay. Can you think of any other role or I
[13] guess role you played with respect to the hair test?
[14]    A.  Other than acting as the lead negotiator
[15] and other than testifying or playing a role in
[16] arbitration cases with respect to the hair test, can
[17] you think of any other roles you played with respect
[18] to the hair test?
[19]    A.  Roles I played? I don't think so.
[20]    Q.  Let me just follow up, then, with the lead
[21] negotiator role.
[22]    A.  I would say co-lead. It was Bob Holland
[23] and myself.
[24]    Q.  Okay. Do you know what Mr. Holland is

Page 24

[1] doing today?
[2]    A.  He passed away.
[3]    Q.  I think I may have just misinterpreted what
[4] you said. Correct me if I'm wrong. But you said in
[5] May 1998 some of the unions had agreed to do random
[6] urine testing; is that right?
[7]    A.  No.
[8]    Q.  What happened in May 1998?
[9]    A.  Patrolmen's union, which represents 1500 or
[10] so officers, agreed to a contract which included
[11] hair testing.
[12]    Q.  Hair testing?
[13]    A.  Right.
[14]    Q.  Prior to negotiating with the unions about
[15] the hair test, were you negotiating with the unions
[16] about a urine test?
[17]    A.  Right.
[18]    Q.  And you said random urine testing?
[19]    A.  Random, right.
[20]    Q.  How close were you, if you know, to
[21] agreeing to something with the unions about a random
[22] urine testing process?
[23]    MS. HARRIS:  Objection. You can answer.
[24]    MR. BAKER:  I can strike the question and

Page 25

[1] just back up.

[2]  Q.  You said earlier -- I think it was in

[3] regards to the memo that Mr. Murphy prepared --

[4] there was a decision at some point in time in

[5] response to Mr. Evans attending a conference to push

[6] for hair testing instead of random urine testing.

[7]      Did I summarize your testimony accurately

[8] on that?

[9]  A.  That's right.

[10]  Q.  Prior to Mr. Evans attending that

[11] conference and making the decision that I just

[12] described, the City and labor unions were in active

[13] negotiations over random urine testing; is that

[14] correct?

[15]  A.  Yes.

[16]  Q.  Okay.  And do you know if that would have

[17] been a proposal that was accepted had Mr. Evans not

[18] changed gears and not pursued the hair test?

[19]  A.  I don't know.

[20]  Q.  Were the unions contesting random urine

[21] testing at the time?

[22]  A.  Yes.

[23]  Q.  When I say "contesting," were they outright

[24] contesting it in any form, or were they just asking

Page 26

[1] for certain things in response to it, if you know?

[2]  A.  Both.

[3]  Q.  But at one point in time the City was in

[4] favor of doing random urine testing?

[5]  A.  Our original proposal was random.

[6]  Q.  And what was the drug testing procedure in

[7] place before there was hair testing?

[8]  A.  There was Rule 111, which is basically as

[9] it is today I think, back then, 2002, when I left.

[10] It just didn't have the hair component of it.

[11]  Q.  And generally what did that involve?  We

[12] talked a little bit about random urine testing.

[13]  A.  I recall reasonable suspicion was part of

[14] it.  Reasonable suspicion testing was part of the

[15] original Rule 111.  It still is today.  And I

[16] believe there was some kind of test when you got

[17] promoted, maybe moving to different units.

[18]      Other than that, I'd just refer to Rule

[19] 111, whatever that says.

[20]  Q.  And again we've been talking about random

[21] urine testing.  What was, if you remember, the

[22] city's initial proposal on random urine testing;

[23] like, how often would it be; who would it apply to,

[24] that sort of thing?

Page 27

[1]  A.  We never got to that point.  We proposed

[2] random drug testing.  We never got to the specifics

[3] of how it would work, like how many a month and all

[4] of the details of a true random policy.  We never

[5] got to that point.

[6]      They fought us off the bat just on the

[7] concept of random testing, so we never got to the

[8] details of what it would look like.

[9]  Q.  Were there details that the City had in

[10] mind that it wanted to propose?

[11]  A.  I can't remember.

[12]  Q.  Did you ever talk to Mr. Evans about his

[13] attendance at the conference; was it the conference

[14] that led him to choose hair testing as something the

[15] City should pursue as opposed to urine testing?

[16]  A.  Yes.

[17]  Q.  What did the two of you discuss?

[18]  A.  It was more than the two of us.  It was a

[19] combination of people.  I'm trying to think who that

[20] was.  Dennis Demarzio, Virginia Tisei, Bill Murphy,

[21] the team, Bob Holland; and the Commissioner went to

[22] this conference and came away from it with the idea

[23] that hair testing sounded like a very good idea.  It

[24] was working in other departments.  I want to say New

Page 28

[1] York, Chicago, maybe some smaller departments, it

[2] was working.

[3]      And Psychemedics was the leading company in

[4] terms of doing this testing.  They had several other

[5] impressive client lists.  They did work for some of

[6] the Vegas casinos I believe, some of the large car

[7] manufacturers in Detroit, among others.  And that

[8] was kind of the gist of the conversation.

[9]      Beyond that, according to Commissioner

[10] Evans and then our further looking into it, it was a

[11] good science and it was something that was growing

[12] across the country, and also the idea that it may be

[13] preferred, if you want a truly drug-free police

[14] department, hair testing will get a bigger window of

[15] time in drug use versus urine, which is more of a

[16] luck kind of approach, which was random; had you

[17] done drugs in a period of time prior to the urine

[18] test.  So it had some other benefits as well.

[19]  A combination of that and also just from

[20] looking into it further, research, et cetera, led us

[21] to believe that it would be something worth pursuing

[22] at the collective bargaining table because we felt

[23] that hair testing would take away some of the

[24] concerns we had in terms of whether or not it would

Page 29

[1] withstand legal scrutiny from Guiney, which dealt
[2] with random.
[3]     We felt like hair testing, which is
[4] announced, you know when it's going to happen, the
[5] science is solid, and it isn't random; it isn't as
[6] invasive. That combination of factors led us to
[7] believe that hair testing was a good idea and
[8] something we would pursue at the collective
[9] bargaining table.
[10]     Q.  You mentioned a case called Guiney; is that
[11] right?
[12]     A.  Yes.
[13]     Q.  Can you spell that.
[14]     A.  G-u-i-n-e-y. Late '80s, Mass. S.J.C.,
[15] which declared random drug testing in the police
[16] department to be unconstitutional under the state
[17] constitution.
[18]     Q.  Do you know if that's still good law, that
[19] decision?
[20]     A.  I don't know.
[21]     Q.  You mentioned that several folks were
[22] involved in this conversation you had with
[23] Mr. Evans. Dennis Demarzio was one?
[24]     A.  He wasn't a part of that conversation. He

Page 30

[1] was somebody with the City that I report in to. It
[2] would be Bill Murphy, Bob Holland, Virginia Tisei,
[3] maybe an associate in Holland's office, Commissioner
[4] Evans, I'm thinking Bill Good, who was an
[5] administration of finance person with the police
[6] department. They would have been part of the
[7] conversation.
[8]     Q.  And you might have spelled it before, but
[9] Virginia Tisei's last name is spelled how?
[10]     A.  T-i-s-e-i.
[11]     Q.  What was her role at this time?
[12]     A.  She was a director of the office.
[13]     Q.  Of labor relations?
[14]     A.  Right.
[15]     Q.  Do you know if this was one -- was this an
[16] in-person conversation you had with Mr. Evans and
[17] the other individuals that we just went through?
[18]     A.  We had in-person conversations --
[19] conversation or conversations -- I remember talking
[20] to him on the phone as well.
[21]     Q.  Do you remember how many conversations
[22] there were about the subject of hair testing with
[23] Mr. Evans?
[24]     A.  When he raised this originally we had

Page 31

[1] several conversations internally amongst ourselves
[2] to try to make a decision whether or not it was a
[3] good idea.
[4]     Q.  Do you remember approximately when the
[5] first conversation was?
[6]     A.  I'm going to guess and say fall of '97,
[7] summer of '97.
[8]     Q.  And for how long did the conversations
[9] continue at that point with Mr. Evans?
[10]     A.  Well, that was it with him. "Here's my
[11] idea. What do you think," kind of thing. At that
[12] point we took it and ran with it. Bill Good, I
[13] believe, from the police department, and there may
[14] have been others, Sandra DeBow, she was labor
[15] relations office for the police department, looked
[16] into the issue. We in our office, myself, Bill
[17] Murphy, Bob Holland and some associates in his
[18] office, looked into the issue of hair testing, one,
[19] in general; two, Psychemedics; and then the overall
[20] idea from the collective bargaining standpoint: Is
[21] this something we can achieve.
[22]     We came to the conclusion that it was a
[23] good idea. So we decided to change our position at
[24] the bargaining table from random testing to

Page 32

[1] announced hair testing.
[2]     Q.  Before when you were describing the
[3] conversations you had with Mr. Evans, you mentioned
[4] Psychemedics was a leading company, had an
[5] impressive client list?
[6]     A.  Yes.
[7]     Q.  How did you first learn that bit of
[8] information?
[9]     A.  I don't remember.
[10]     Q.  Was it from Mr. Evans?
[11]     A.  It may have been; I don't remember for sure
[12] though.
[13]     Q.  Do you know if anyone at the police
[14] department went to this conference with Mr. Evans
[15] where the idea of hair testing came up?
[16]     A.  I don't know.
[17]     Q.  Then you mentioned three things sort of in
[18] discussion, hair testing generally, Psychemedics and
[19] whether or not the process for hair testing was
[20] workable at the negotiating table.
[21]     A.  Combination of all of those. It's always
[22] something you're looking at. You're looking at a
[23] combination of those factors as part of collective
[24] bargaining. Then the overall topic of drug testing

Ronnie Jones et al. v.
City of Boston, et al.
05-cv-11832-GAO    Document 67-3    Filed 08/28/2007    Page 10 of 21
Michael Reagan
March 26, 2007

**Page 33**

[1] in general, the Guiney issue, and how that plays
[2] into this, in terms of something we can pursue at
[3] the table. And if we achieve it at the table, will
[4] it be upheld.
[5]     Q. Before, you mentioned that in these
[6] conversations there was talk that Psychemedics had
[7] an impressive client list and was a leading company
[8] on hair testing.
[9]     A. Yes.
[10]     Q. What else, if anything, was discussed about
[11] Psychemedics at this point in time when the City was
[12] thinking about using Psychemedics and hair testing?
[13]     A. I don't recall.
[14]     Q. Do you recall if there was any discussion
[15] about whether Psychemedics was certified to do hair
[16] testing?
[17]     A. I don't recall.
[18]     Q. Do you recall if there was ever a
[19] conversation that you were part of whether
[20] Psychemedics was certified to do hair testing?
[21]     A. Ever?
[22]     Q. Yes.
[23]     A. When you say "certified," I don't believe
[24] there were ever federal standards for hair testing.

**Page 34**

[1] There are states who have certified them through
[2] their state processes, and they have been certified
[3] that way. Their hair testing had been upheld in
[4] courts and, like I said earlier, the unemployment
[5] hearing in Nevada, and their process had withstood
[6] scrutiny prior to us going down this path.
[7]     Q. Okay. And specifically on the issue of
[8] certification, you mentioned there was no federal
[9] standards on certifying hair-testing companies; is
[10] that right?
[11]     A. As I recall that was in the process at the
[12] federal level. I don't believe there was any
[13] decisions made there, any final outcomes of that
[14] when we negotiated this with Psychemedics. I
[15] believe this goes beyond -- Psychemedics goes beyond
[16] hair testing in general in terms of standards.
[17]     Q. How about after the hair testing process
[18] was in place and throughout the time that you were
[19] either the deputy director, acting director or
[20] director; was Psychemedics federally certified to do
[21] hair testing at that time?
[22]     A. Again, I don't believe -- I don't even know
[23] today if there's a federal standard or if there's
[24] even a process in place for hair testing. I don't

**Page 35**

[1] know. I do know they were certified by states,
[2] specific states they did work within who had that
[3] kind of process to do hair testing.
[4]     Q. Okay. Psychemedics has a facility in
[5] Massachusetts; is that correct?
[6]     A. I'm not sure.
[7]     Q. Okay. Does Psychemedics have certification
[8] from the State of Massachusetts to do hair testing?
[9]     MS. HARRIS: Objection. Go ahead.
[10]     A. I don't know.
[11]     Q. Did Psychemedics have certification from
[12] the State of Massachusetts to do hair testing when
[13] you were either the acting director, deputy director
[14] or director in the City of Boston Labor Relations
[15] Department?
[16]     MS. HARRIS: Objection.
[17]     A. I don't know.
[18]     Q. Do you know if anyone ever looked at that
[19] issue?
[20]     A. Massachusetts certification?
[21]     Q. Yes.
[22]     A. I don't recall.
[23]     Q. Do you recall if that was a topic of
[24] discussion, whether or not Psychemedics was properly

**Page 36**

[1] certified to do hair testing?
[2]     MS. HARRIS: Objection.
[3]     Q. Strike the question. I'll ask it
[4] differently just for the record.
[5]     Do you know if there was a conversation
[6] internally within the City of Boston or the Boston
[7] Police Department whether or not Psychemedics was
[8] properly certified to do hair testing while you
[9] were --
[10]     A. The commissioner wanted -- everyone wanted
[11] a drug testing program that would work; that we'd
[12] have reliance on; that would be fair and reasonable
[13] and objective to the degree it can be. And we were
[14] all comfortable through our due diligence that
[15] Psychemedics offered that.
[16]     Q. Okay. With respect specifically to the
[17] issue of certification, were you all comfortable
[18] that Psychemedics was properly certified to do hair
[19] testing?
[20]     MS. HARRIS: Objection. You can answer.
[21]     A. Certification was not a focus. The focus
[22] was a process and a program offered by a company
[23] that is a sound one. I don't believe -- I don't
[24] think certification was ever the focus of our

Page 37

[1] internal discussion.

[2]   Q.   Okay.  You were never an employee of the
[3] City of Boston Police Department, correct?

[4]   A.   That's right.

[5]   Q.   So you never took the hair test yourself?

[6]   A.   Correct.

[7]   Q.   Other than, I guess, the research that
[8] you've had put together for you by Mr. Murphy and
[9] anyone else, have you individually done any research
[10] about whether or not the hair test is accurate?

[11]   A.   Yes.  Back at the same time frame I did
[12] primarily on-line kind of my own research.  I looked
[13] at the topic, found articles, found studies, found
[14] cases, mainly the same ones that Bill Murphy found
[15] in his memo, and read those and became very
[16] confident in the process.

[17]       In addition, I believe Psychemedics
[18] provided extensive materials which provided the
[19] further support.  But independent of Psychemedics
[20] doing that, I, again, with Holland as well with his
[21] office, looked into it and became confident that it
[22] was a good test and it would be a fair process.

[23]   Q.   We talked about this name earlier, Benjamin
[24] Hoffman.  Do you recall that?

Page 38

[1]   A.   Yes.

[2]   Q.   He was an MRO I think you said?

[3]   A.   I believe he's the department's MRO for
[4] hair tests.

[5]   Q.   So they used him for hair testing.  They
[6] had a contract with his firm for hair testing?

[7]   A.   I don't know.  I know he's our MRO, was our
[8] department's MRO at some point.  I don't know if it
[9] was just the hair testing or whether there was a
[10] contract entered into, but at some point he became
[11] the MRO for the hair test and maybe random urine as
[12] well.  I'm not sure.

[13]   Q.   Sorry.  For at least the hair test?

[14]   A.   I think so.

[15]   Q.   Other than Mr. Hoffman -- and I think you
[16] mentioned before that you looked at some research
[17] that he prepared, right?

[18]   A.   He had written an article.

[19]   Q.   Other than articles or research or
[20] information prepared by Psychemedics or Mr. Hoffman,
[21] can you remember reading any articles or scientific
[22] studies about the hair test?

[23]   A.   The Mieczkowski study or studies, some
[24] court cases found on-line on the topic.

Page 39

[1]   Q.   Specifically those science articles and --

[2]   A.   Mieczkowski rings a bell.  Hoffman article
[3] rings a bell.  There may have been others.  I was
[4] on-line.  You find stuff.  You look at it, read it
[5] and move on, but those two ring a bell.  Mieczkowski
[6] is one definitely one of them.  Hoffman is the
[7] other.

[8]       I'm sure there are others, but I can't tell
[9] you who now, sitting here today.

[10]   Q.   Did you know whether Mr. Mieczkowski had
[11] any relationship with Psychemedics?

[12]   A.   No, I don't know.

[13]   Q.   You don't know now or you didn't know then?

[14]   A.   I don't know either.

[15]   Q.   If Mr. Mieczkowski's work had been funded
[16] by Psychemedics, would you still have relied on it
[17] as accurate and reliable?

[18]   A.   I didn't rely on any one thing.  It was a
[19] combination of things to lead us to believe it was a
[20] legitimate process.  Readings we did, research we
[21] did, the fact that the courts upheld it, the case in
[22] Nevada, unemployment case, there was a combination
[23] of factors that led to the conclusion that this was
[24] a good program, including the fact that other police

Page 40

[1] departments were using it and seemed to be having
[2] success with it, and the client list of
[3] Psychemedics, again, the fact that they had
[4] implemented it in casinos in Vegas, car
[5] manufacturers.  They were a legitimate, reputable
[6] company as far as we were concerned with a good test
[7] that showed whether or not you did drugs.

[8]   Q.   Okay.  Did you rely on Mr. Mieczkowski's
[9] study and information as part of this overall
[10] decision of --

[11]   A.   He was one of the articles I read or
[12] studies I read.

[13]   Q.   Going back, he was the only person that you
[14] can remember reading who was a scientist other than
[15] Mr. Hoffman or information prepared by Psychemedics?

[16]   A.   I recall reading more than that, but the
[17] names that stick out are Mieczkowski for some
[18] reason, because I think he had done a specific study
[19] on the test.  His name is kind of unique.  Maybe
[20] that's why I remember him.  Hoffman as well.  But
[21] there were other things I read.  The ones that stick
[22] out are Hoffman and Mieczkowski.

[23]   Q.   Would Mr. Murphy's memo reflect all of the
[24] other scientific pieces that you read other than Mr.

Michael Reagan
March 26, 2007

Ronnie Jones, et al. v.
City of Boston, et al.

---

Page 53

[1] world.

[2] **Q.** Did you ever talk to Dr. Cairns about how
[3] one could test negative on a safety-net test and
[4] still have an accurate --

[5] **A.** That was one of the topics of arbitrations.
[6] The Robert Polito arbitration that we dealt with,
[7] that was one of the topics. And Dr. Cairns or --
[8] there's another doctor, Selavka, from the State
[9] Police. He testified about the process and how that
[10] works.

[11] And they testified convincingly there and
[12] we talked about it as well in preparation of that
[13] case and going back prior to this that it's a
[14] process to help ensure that we're only punishing
[15] those we are as sure as we can be that they did
[16] drugs.

[17] My answer would be, if someone came up
[18] positive in a first test and negative on a safety
[19] net, in every one of those cases I would bet there
[20] was some number some in the safety net that they
[21] came back with that was a little bit less than the
[22] threshold, so they lucked out even though they did
[23] drugs, is what I would say to you. They did it, but
[24] somehow through the process they got the benefit of

---

Page 54

[1] the stringent safeguards we had in place in terms of
[2] the level of the safety net.

[3] **Q.** You mentioned Dr. Selavka.

[4] **A.** Yeah, State Police lab I think he works.

[5] **Q.** Do you know how to spell his name?

[6] **A.** I'd be guessing. S-e-l-a-v-k-a, something
[7] like that.

[8] **Q.** And he testified for the City or for the
[9] police department?

[10] **A.** In one or more of those grievance
[11] arbitrations.

[12] **Q.** Did he testify that the hair test was
[13] scientifically accurate or valid, something to that
[14] effect?

[15] **A.** Yes.

[16] **Q.** You said he's employed by or he was
[17] employed by the State --

[18] **A.** State Police.

[19] **Q.** Is he still employed by the State Police?

[20] **A.** I don't know.

[21] **Q.** Did you play any role whatsoever in
[22] determining whether to renew Psychemedics' contract
[23] every year?

[24] **A.** No.

---

Page 55

[1] **Q.** Other than the -- you described the times
[2] you met with Mr. Thistle and Mr. Cairns. Do you
[3] recall any separate conversations you had with them
[4] that weren't in person that were just relayed?

[5] **A.** Not in person? I'm sure I had some phone
[6] conversations with Bill Thistle, I may have with Dr.
[7] Cairns as well, in preparing for the JLMC
[8] arbitration, that kind of thing. Nothing specific
[9] sticks out in my memory, but I'm sure I did; I'm
[10] assuming I did.

[11] **Q.** Do you recall any topics that you discussed
[12] in the phone conversation other than the topics we
[13] just went through?

[14] **A.** No.

[15] **Q.** Have you ever had any conversations with
[16] anybody at Psychemedics other than Mr. Thistle and
[17] Mr. Cairns?

[18] **A.** I don't recall.

[19] **Q.** Did you discuss with Mr. Cairns or Mr.
[20] Thistle whether the hair test had a color bias?

[21] **A.** There had been a couple articles out there
[22] suggesting potential racial bias. We were aware of
[23] that and asked for their answer on them, and they
[24] gave an -- I don't know the specifics of it, but in

---

Page 56

[1] talking to them, talking to Cairns, that eliminated
[2] any serious consideration that there was a bias.

[3] **Q.** But you don't remember any of those
[4] specific reasons?

[5] **A.** I don't recall sitting here today, no.

[6] **Q.** Did the City of Boston or the Boston Police
[7] Department have any scientists on staff that you
[8] talked about the hair test with?

[9] **A.** Did the City of Boston have scientists?
[10] No.

[11] **MR. BAKER:** I'll introduce the second
[12] document and call this Exhibit 2.

[13] (Document marked as Reagan
[14] Exhibit 2 for identification)

[15] **Q.** Just for the record, the document on the
[16] first page says "Police Drug Testing Nationwide."
[17] It's Bates COB 22470, 22746. At the bottom of each
[18] document it says, "Prepared by Boston Police
[19] Department Office of Research and Evaluation," and
[20] there's what appears to be a date of June 10, 1998.
[21] Just let me know after you've had a chance
[22] to look at this.

[23] **A.** Yes. Okay.

[24] **Q.** Have you ever seen this document before?

---

Page 57

[1] **A.** Not sure. I may have.

[2] **Q.** Do you know what it is?

[3] **A.** Boston Police Department does research,
[4] reaches out to other police departments around
[5] various topics to see how they're doing, operations
[6] or business, so to speak. And this appears to be
[7] something that they would have done as part of drug
[8] testing. Drug testing review in terms of what other
[9] departments are doing.

[10] **Q.** Is the Boston Police Department or does the
[11] Boston Police Department have an office for research
[12] and evaluation?

[13] **A.** It rings a bell.

[14] **Q.** Do you know who would have worked in that
[15] department in 1998?

[16] **A.** No, no.

[17] **Q.** Do you know whether or not the Boston
[18] Police Department studied, by asking questions of
[19] other police departments, drug testing? Do you know
[20] if they studied drug testing bias on other police
[21] departments?

[22] **A.** Yes.

[23] **Q.** And how do you know that?

[24] **A.** Because I just recall that being talked

Page 58

[1] about, Bill Good and the police department
[2] mentioning that in these meetings that that's
[3] something they had talked about. It also became a
[4] topic in the negotiations of the Joint Labor
[5] Management Commission cases, try to convince the
[6] arbitrator there to award drug testing; that we
[7] weren't breaking new ground here. This was
[8] happening in other places.

[9] **Q.** Do you recognize the handwriting on the
[10] bottom of these two first two pages?

[11] **A.** No, I don't.

[12] **Q.** Do you have any idea how -- looking at the
[13] first page, the left column has several police
[14] departments' names of I guess contacts and telephone
[15] numbers. Do you know how that data was gathered?

[16] **A.** No.

[17] **Q.** Do you know who drafted the questions in
[18] the top row of this sheet?

[19] **A.** No.

[20] **Q.** For example, the first question is, "Does
[21] your department have a formal drug testing policy?"

[22] **A.** I don't know who did this specifically.

[23] **Q.** You mentioned that Mr. Good spoke at one of
[24] these meetings you had about the hair test that he

Page 59

[1] had or somebody had gathered information from other
[2] police departments.

[3] **A.** Yeah. He was part of the -- may have had
[4] those conversations with Psychemedics about
[5] Psychemedics and hair testing in general.

[6] **Q.** What did Mr. Good say in regards to other
[7] police departments doing drug testing?

[8] **A.** Well, nothing specifically. Just that drug
[9] testing was not new ground here. Drug testing
[10] happened across the country.

[11] **Q.** So was the conversation that Mr. Good had
[12] with you and others, was it just in regards to drug
[13] testing generally, or was it specifically focused on
[14] hair testing?

[15] **A.** Both.

[16] **Q.** With regard to hair testing, what did
[17] Mr. Good say about other police departments?

[18] **A.** Mr. Good, I don't recall anything
[19] specifically from him. I don't recall.

[20] **Q.** Do you recall anyone from the City of
[21] Boston or the Boston Police Department saying that
[22] other cities, other police departments were doing
[23] hair testing specifically?

[24] **A.** Yes, I believe Commissioner Evans, after

Page 60

[1] that conference he came back from, there were other
[2] police departments doing it. For some reason
[3] Chicago sticks out as a police department doing it.
[4] New York may have been in the process of negotiating
[5] it. There were others as well, I believe, doing it.
[6] Chicago sticks out to me as the big one, but there
[7] may have been others.

[8] **Q.** Does this document reflect that Chicago was
[9] doing hair testing in 1998?

[10] **A.** Yeah, it does.

[11] **Q.** Where do you see that?

[12] **A.** Chicago, Illinois; Officer Rhodes, fourth
[13] over, indicates using both hair and urine and also
[14] nail and blood. They were doing random hair, if I'm
[15] reading this right.

[16] **Q.** And you thought also New York; is that
[17] correct?

[18] **A.** I thought New York was back then. For some
[19] reason Jacksonville, Florida -- is Jacksonville on
[20] here? Maybe not Jacksonville. There were some
[21] others, though, I thought as well.

[22] **Q.** Jacksonville is on the first page.

[23] **A.** Okay. Looks like New York as well was
[24] doing it.

**EXHIBIT D**

Ronnie Case, et al., v. cv-11832-GAO    Document 67-3    Filed 08/28/2007    Page 15 of 21
City of Boston, et al.

Sandra DeBow
July 2, 2007

Page 41

[1] That's what I was doing. I think that in that first
[2] interview they mentioned they had just started doing
[3] hair testing, and I remember talking to them about
[4] their policy which Bob Stutman had designed. And so
[5] there was some -- you know, it was definitely
[6] discussed. I'm not sure they were focusing on me or
[7] I knew they were focusing on me because of that.
[8]    Q.    You said that Bob Stutman -- you said this
[9] before and just now again -- that he designed Rule
[10] 111?
[11]    A.    They hired him to draft the policy and
[12] present it and negotiate it with the unions.
[13]    Q.    Is that the original Rule 111 that was
[14] adopted in, I think you said, about 1995?
[15]    A.    Yes. I think that's when it became
[16] effective, I think.
[17]    Q.    Did Mr. Stutman also help design Appendix D
[18] to Rule 111 which is the hair testing procedures?
[19]    A.    I'm sorry. Say that again.
[20]    Q.    Did Mr. Stutman's firm also help design
[21] Appendix D to Rule 111?
[22]    A.    No. I did that.
[23]    Q.    When you were hired had Appendix D been
[24] written?

Page 42

[1]    A.    No.
[2]    Q.    There wasn't even a first draft?
[3]    A.    No.
[4]    Q.    You drafted the first draft?
[5]    A.    Yes.
[6]    Q.    Who did you do that in consultation with?
[7]    A.    Myself. I mean, I would have drafted it
[8] and, you know, reviewed it with the City's Office of
[9] Labor Relations, would have explained it to the
[10] Commissioner, but I had more knowledge than anybody
[11] else.
[12]    Q.    Had you ever drafted hair testing
[13] procedures before?
[14]    A.    No.
[15]    Q.    Were there any important things that you
[16] had to differentiate from prior procedures that you
[17] drafted when you were drafting the hair testing
[18] procedures?
[19]    MS. HARRIS: Objection.
[20]    Q.    The question was a little unclear, but I'll
[21] just rephrase it. At Mr. Stutman's firm you had
[22] designed drug testing procedures, correct?
[23]    A.    Yes.
[24]    Q.    And those were all with respect to urine

Page 43

[1] testing?
[2]    A.    That's correct.
[3]    Q.    And Rule 111, Appendix D, is a hair testing
[4] procedure?
[5]    A.    Uh-huh.
[6]    Q.    Audible.
[7]    MS. HARRIS: You have to give a verbal.
[8]    A.    Yes. Sorry.
[9]    Q.    What were the important differences, if
[10] any, in drafting a hair testing procedure versus
[11] drafting a urine testing procedure?
[12]    MS. HARRIS: Objection. You can answer it,
[13] if you can answer it.
[14]    THE WITNESS: Okay.
[15]    A.    For the most part they are very much the
[16] same because you are going to have the screening
[17] process and a confirmation process, and then with
[18] Rule 111 there was a very specific safety-net
[19] process which was different than the urine testing.
[20] The collection is different. Also, I didn't like
[21] the urine testing procedures that were in place, and
[22] it's one of the things -- one of the first things I
[23] changed when I went to Bob Stutman & Associates. So
[24] in -- well, that doesn't go to the differences. It

Page 44

[1] was mostly the collection. I mean, we had to
[2] provide the individual with enough understanding as
[3] to what they would be going through, and that was
[4] different than obviously urine collection.
[5]    Q.    One of the things you mentioned, and we'll
[6] be going into it in more detail later, but the
[7] safety-net test, that was something that you
[8] developed as part of Appendix D of Rule 111 that you
[9] had never developed before as part of the urine
[10] testing procedure; is that correct?
[11]    A.    The safety-net test is something that's
[12] specific to Psychemedics. I am trying to remember
[13] Rule 111 urine procedures.
[14]    Q.    We'll go through that later.
[15]    A.    Yes. I mean, it was -- again, it was the
[16] same sort of review mechanism, but the safety net
[17] was something that was specific to Psychemedics.
[18]    Q.    The term "safety net," is that -- that's a
[19] Psychemedics' term of art?
[20]    A.    It is. It's a product.
[21]    Q.    How did you come to learn that Psychemedics
[22] offered a product called the safety-net test?
[23]    A.    They described it to the union once in a
[24] session that we had.

Sandra DeBow
July 2, 2007

Ronnie Jones, et al. vs.
City of Boston, et al.

Page 53

[1] or not. I just can't imagine why anybody would
[2] invest money and do that.
[3]     MS. HARRIS: Again, he is not looking for
[4] you to guess. Please answer on your knowledge.
[5]     Q. You don't know the answer?
[6]     A. I do not know.
[7]     Q. You don't know, for example, whether or not
[8] you have to get some sort of a clearance from the
[9] Government in order to offer a hair test?
[10]     MS. HARRIS: Objection.
[11]     A. I don't know. We'll make it simple.
[12]     Q. If you could look to Part K of DeBow 2. I
[13] think you might have already answered the question I
[14] had on this, but Part K is called "Safety-Net
[15] Tests."
[16]     A. Uh-huh.
[17]     Q. Who drafted this section of Appendix D?
[18]     A. I did.
[19]     Q. And when you chose to use the words
[20] "safety-net test," why did you choose to use that
[21] word?
[22]     A. Because that is specifically the term that
[23] we were using with the union, and it was
[24] specifically Psychemedics' product.

Page 54

[1]     Q. What is the purpose of the safety-net test
[2] as described in Rule 111, Appendix D, Part K?
[3]     MS. HARRIS: Objection. You can answer.
[4]     A. To ensure that there is no donor mixup.
[5]     Q. Is there any other purpose?
[6]     A. No. It's something that is purely for the
[7] employee as a mechanism to assure them -- yes. I
[8] guess that would be the other purpose -- to assure
[9] them that we take this testing seriously, and it's
[10] another safeguard that we put in place to
[11] double-check.
[12]     Q. To double-check for what?
[13]     A. That there is no donor mixup.
[14]     Q. When you say "donor mixup," what do you
[15] mean?
[16]     A. If a donor submits a sample and it's
[17] positive, one of the first things they say is, "It
[18] wasn't mine. I have never done drugs before in my
[19] whole life." So this assures that if you
[20] resubmit -- in this case -- this is one of the
[21] reasons -- one of the ways that hair testing is
[22] different than urine. There was a separate
[23] collection within a discrete time frame, and the
[24] presence of the drug confirms that there was no

Page 55

[1] mixup of the samples.
[2]     Q. So just so I understand it, you are saying
[3] a donor mixup means that you verify that a positive
[4] test result was for the person who you think is
[5] being tested? Am I understanding it correctly?
[6]     A. It's to get rid of the donor's claim that
[7] there was a mixup with their sample and that
[8] somebody else's result got attributed to them.
[9]     Q. Now, when you were the Deputy Director of
[10] the Boston Police Department, did anyone ever test
[11] negative on a safety-net test after they tested
[12] positive on the initial test?
[13]     A. Yes.
[14]     Q. About how many times?
[15]     A. Three, probably three or four.
[16]     Q. And was it determined in each of those
[17] instances that it was a donor mixup that caused the
[18] negative test result for the safety net?
[19]     A. No. In each one of those cases the drug
[20] was there, but it was at a level below the cutoff.
[21] And so we abided by our policy and called it a
[22] negative.
[23]     Q. Did the cutoff level -- and I think you
[24] just mentioned the word "cutoff level" with respect

Page 56

[1] to the safety-net test. Did the cutoff level for
[2] the safety-net test change while you were the Deputy
[3] Director?
[4]     A. Yes.
[5]     Q. What was the change?
[6]     A. I would have to double-check, but I think
[7] it went from ".2" to ".02" is my recollection.
[8]     Q. Why did that change occur?
[9]     A. Their instruments must have become more
[10] sensitive.
[11]     Q. When you say "their instruments," is that
[12] Psychemedics?
[13]     A. Psychemedics, yes.
[14]     Q. So how did that work? Did Psychemedics
[15] just notify the police department that there would
[16] be a change --
[17]     MS. HARRIS: Objection.
[18]     A. No.
[19]     Q. -- to the cutoff level?
[20]     MS. HARRIS: Objection. Let me just see if
[21] I understand it. Are you asking how Psychemedics
[22] changed its cutoff or how Psychemedics informed the
[23] police department that it changed?
[24]     Q. I'm just wondering -- you said that

Sandra DeBow
July 2, 2007

Ronnie Jones, et al. vs.
City of Boston, et al.

Page 61

[1]      Q.   Are you saying that he did a study about
[2] this subject matter?
[3]      A.   Yes.
[4]      Q.   Other than Ben Hoffman's study on this
[5] subject of officers who handled drugs, was there any
[6] other reason why you thought that Psychemedics'
[7] cutoff levels and wash procedures were sufficient to
[8] rule out external contamination as a positive --
[9]      MS. HARRIS:  Objection.
[10]      Q.   -- as the cause of a positive test result?
[11]      MS. HARRIS:  Objection.  Other than the
[12] three items that she just described do you mean?
[13]      MR. BAKER:  I guess that's what I am trying
[14] to understand.
[15]      Q.   Did you understand the question?
[16]      A.   Which one?
[17]      Q.   I'll just start at the beginning.  You
[18] mentioned Ben Hoffman in a study that he did about
[19] other police departments?
[20]      A.   Yes.
[21]      Q.   And that was one reason, Ben Hoffman study,
[22] why you thought that the cutoff levels used by
[23] Psychemedics and the wash procedures used by
[24] Psychemedics were sufficient to rule out external

Page 62

[1] examination as the cause of a positive test result,
[2] correct?
[3]      A.   Yes.
[4]      Q.   Other than the Ben Hoffman study as it
[5] pertained to the police departments, what other
[6] sources or what other reasons, what other bases did
[7] you have for your view that the cutoff levels and
[8] wash procedures used by Psychemedics were adequate
[9] to rule out external contamination as the source of
[10] a positive result?
[11]      A.   So my own experience and also -- which
[12] replicated his studies, but also the fact that
[13] Psychemedics represents thousands of clients, and
[14] you know, heavily litigated and they continue to
[15] withstand through time.  Psychemedics also is, you
[16] know, heavily -- they are the leader in the field.
[17] They are also heavily involved in the Drug Testing
[18] Advisory Board that was drafting all the
[19] regulations, the draft regulations for the DOT/FHWA
[20] testing.  All those things assure us.
[21]      Q.   Did the Federal Government ever adopt those
[22] proposed regulations?
[23]      A.   I believe they are still in the comment
[24] stage, and it's not just hair testing.  I believe

Page 63

[1] it's saliva and some other form of testing.
[2]      Q.   So no, the Federal Government hasn't --
[3]      A.   No.
[4]      Q.   Have there ever been any
[5] Government-approved cutoff levels for hair testing?
[6]      MS. HARRIS:  Objection.
[7]      A.   Federal Government?
[8]      Q.   Any government.
[9]      MS. HARRIS:  I'm sorry?
[10]      MR. BAKER:  Any United States Government.
[11]      MS. HARRIS:  Any Federal Government?
[12]      MR. BAKER:  Any government.
[13]      Q.   Have there ever been any
[14] Government-approved cutoff levels for --
[15]      A.   Federal Government, not that I'm aware of.
[16]      Q.   How about Massachusetts State Government?
[17]      A.   No.  They don't have any regulations.
[18]           (Document marked as DeBow
[19]           Exhibit 3 for identification)
[20]      Q.   We have just marked DeBow 3.  If you could
[21] take a moment to review this document.
[22]      A.   (Witness reviews document)
[23]      MR. BAKER:  For the record DeBow 3 is a
[24] Document Bates No. COB7224 through COB7251.  On the

Page 64

[1] first page it says, "Boston Police Department, Rule
[2] 111, Substance Abuse Policy."
[3]      Q.   Have you had a chance to review DeBow 3?
[4]      A.   I have.
[5]      Q.   And have you ever seen this document
[6] before?
[7]      A.   Yes, I have.
[8]      Q.   Who created it?
[9]      A.   Alicia McDonnell and myself.
[10]      Q.   When?
[11]      A.   I don't remember the year, but I believe we
[12] put this together for a meeting that we had with
[13] MAMLEO.
[14]      Q.   Why was the document created?
[15]      A.   There had been some concern -- I don't know
[16] if it was because of a newspaper article or it was
[17] just MAMLEO hearing of the testing experience at the
[18] beginning of -- when this first got rolled out, and
[19] so Commissioner Evans thought it was prudent to just
[20] bring them in and sit down and explain the process
[21] to them and to address any questions that they had
[22] directly.
[23]      Q.   I'm going to flip back.  Let's turn to Page
[24] 12.  Now, this document says, "Since hair testing

Min-U-Script®

Doris O. Wong Associates, Inc.

**Page 65**

[1] began January 1999." Is that the month that the
[2] police department began using the hair test?
[3]   A.   It is, yes.
[4]   Q.   And then it says that there is 6,804 tests
[5] that have been conducted. Does that mean that 6,804
[6] hair tests have been conducted since January 1999
[7] until the date that this was created?
[8]   A.   Yes.
[9]   Q.   Does that give you a better idea as to when
[10] this was created in looking at the rest of the
[11] information on Page 12, approximately when it was
[12] created.
[13]   A.   Well, I'm assuming it probably would have
[14] been -- I'm assuming it would have been like 2001,
[15] 2002, somewhere in that area.
[16]   Q.   Is that because it looks like you would
[17] have been through approximately three cycles of the
[18] hair test based on the fact that every officer gets
[19] the test once per year?
[20]   A.   No. It's based more on the 45 officers who
[21] tested positive, and it's just my recollection of
[22] when it occurred. I think, you know, the first
[23] year, which would have been '99, you know, just
[24] people were testing positive, and in the second year

**Page 66**

[1] we were dealing with grievances and arbitrations.
[2] And so that's probably about when MAMLEO -- so a
[3] combination of the numbers and just my recollection.
[4]   Q.   Okay. These 6,804 tests that have been
[5] conducted between January 1999 and the date that
[6] this was -- the document was created, how did you
[7] come about getting that number?
[8]   A.   I don't remember getting the number. I'm
[9] assuming Alicia got it, and we probably would have
[10] got it through the Occupational Health Director
[11] and/or Psychemedics.
[12]   Q.   Is that a number, being the total number of
[13] tests that had been conducted since the inception of
[14] the hair test, was that a number that you could
[15] readily get from either Occupational Health or
[16] Psychemedics?
[17]   A.   I don't know. I don't specifically know.
[18] I didn't get the number.
[19]   Q.   Other than with regard to this
[20] presentation, do you remember ever getting the total
[21] number of tests that had been conducted at any other
[22] time during your tenure?
[23]   A.   Did I specifically?
[24]   Q.   Did you specifically?

**Page 67**

[1]   A.   No.
[2]   Q.   Did you cause anyone to get the number, do
[3] you recall, other than referring to this?
[4]   A.   I don't recall.
[5]   Q.   Do you know if anyone ever got the number
[6] of total hair tests --
[7]       MS. HARRIS:  Objection.
[8]   A.   -- other than with respect to this document
[9] during your tenure as Deputy Director?
[10]       MS. HARRIS:  Objection. You can answer, if
[11] you know.
[12]   A.   I don't remember.
[13]   Q.   If you look back to Page 8, and I think
[14] this is something you mentioned earlier, but the
[15] last bullet point on Page 8, the slide is called
[16] "Hair Test-Psychemedics Corp." And then there is
[17] four bullet points, and the last one is, quote,
[18] "Technology has withstood vigorous legal
[19] challenges"?
[20]   A.   Uh-huh.
[21]   Q.   Do you remember the names of the cases
[22] where Psychemedics' technology withstood vigorous
[23] legal challenge?
[24]   A.   No. There was one in Nevada early on, but

**Page 68**

[1] I don't remember the name of it. And it actually
[2] predated my time with the Boston Police Department
[3] when I was still working with Stutman & Associates.
[4] But it was just my knowledge in talking with Bill
[5] Thistle and Ben Hoffman that it was extensively
[6] litigated.
[7]   Q.   Do you know from -- well, was there any
[8] other basis for the bullet "Technology has withstood
[9] vigorous legal challenges" other than your
[10] conversations with Mr. Thistle and Mr. Hoffman that
[11] you can recall?
[12]   A.   Not that I can recall.
[13]   Q.   In those conversations you had with
[14] Mr. Thistle and Mr. Hoffman about Psychemedics'
[15] technology withstanding vigorous legal challenges,
[16] did they ever tell you that in those cases where
[17] Psychemedics' procedures had been tested that the
[18] cases concerned whether or not the wash procedures
[19] or the cutoff levels could return -- could rule out
[20] external contamination as the source of a false
[21] positive or a positive test result?
[22]   A.   Say that again. I'm sorry.
[23]   Q.   Sorry. That was too much. In the
[24] conversation you had with Mr. Thistle and

Sandra DeBow
July 2, 2007

Ronnie Jones, et al. vs.
City of Boston, et al.

Page 77

[1] number of tests was 45 positive test results. Since
[2] the inception of the test it was 45, correct?
[3]   A.   Right.
[4]   Q.   And then it also shows that of those 26 of
[5] the 45 positive results were for African Americans,
[6] correct?
[7]   A.   That's correct.
[8]   Q.   So that's 57.8 percent of positive test
[9] results of African Americans, correct?
[10]   A.   Your math is better than mine.
[11]   Q.   Do you know what the percentage of African
[12] Americans on the police force was as of the date of
[13] this presentation?
[14]   A.   Can I refer back to the earlier --
[15]   Q.   Absolutely.
[16]   A.   25 percent.
[17]   Q.   Okay.  So you said you were trying to be
[18] transparent in terms of the statistics conveyed, and
[19] the statistics we just looked at were 25 percent of
[20] the police force being African American and 57.8
[21] percent of the positive test results attributed to
[22] African Americans; is that correct?
[23]   MS. HARRIS:  We'll accept your math.
[24]   A.   Right.

Page 78

[1]   Q.   So other than being transparent, did you or
[2] Ms. McDonnell in presenting this PowerPoint try to
[3] explain those statistics that were transparent from
[4] this presentation?
[5]   MS. HARRIS:  Objection.  Do you understand
[6] the question?
[7]   THE WITNESS:  I do.
[8]   A.   But -- what do you mean by "explain"?
[9]   Q.   Other than the fact that there is
[10] statistics conveyed in here, was there any
[11] discussion with MAMLEO at this meeting about the
[12] statistics?
[13]   A.   This information was presented.  I don't
[14] remember if there was discussion.
[15]   MS. HARRIS:  Somebody is trying to knock on
[16] the door.  Can we take a break for just a second.
[17]   MR. BAKER:  Yes.
[18]   (Recess taken from 12:26 to 12:28 p.m.)
[19]   BY MR. BAKER:
[20]   Q.   We were going through these statistics, and
[21] again, just to leave off where we left off, was that
[22] 57.8 percent of the statistics shown in this
[23] PowerPoint marked as DeBow 4, I believe -- 3, showed
[24] that 57.8 percent of positive test results were

Page 79

[1] attributed to African Americans and 25 percent of
[2] the police force is African American.  Other than
[3] conveying these statistics -- being transparent
[4] about these statistics in this presentation to
[5] MAMLEO, was there any explanation of why those
[6] statistics were possible, I guess?
[7]   MS. HARRIS:  Objection.  You can answer, if
[8] you can.
[9]   Q.   Let me back up.  There was also an
[10] explanation that we just went through in another
[11] slide that the City essentially believes the hair
[12] test was accurate, correct?
[13]   A.   Uh-huh.  That's correct.  Sorry.
[14]   Q.   Was there any explanation to MAMLEO about
[15] how the City could hold the belief that the hair
[16] test was, A, accurate, and B, simultaneously
[17] believes that the results showing that 57.8 percent
[18] of positive test results were attributed to African
[19] Americans when they only made up 25 percent of the
[20] police force?
[21]   MS. HARRIS:  Objection.
[22]   A.   The numbers speak for themselves.  That's
[23] what our -- we were presenting this information for
[24] them and explaining why we believed it was accurate.

Page 80

[1] We did not feel that there was any disconnect
[2] between those two, and that's what we were
[3] presenting.
[4]   Q.   How did you present that?
[5]   A.   I mean, I don't know how to say it other
[6] than we presented the information as to the
[7] statistics and the process and the reasons we
[8] believed it was accurate.
[9]   Q.   Were there any takeaways from this meeting?
[10] In other words, were there any investigations,
[11] studies, anything like that that the police
[12] department undertook as a result of this meeting?
[13]   A.   Not that I'm aware of.
[14]   Q.   If you could turn to Slide 20, and this
[15] says, "Excerpts Arbitration Decision," and then
[16] there is a quote, "The hair drug testing techniques
[17] and methodologies employed here are both reliable
[18] and accurate," Arbitrator Tammy Brynie, Esquire, and
[19] it cites an arbitration.  Are you familiar with this
[20] arbitration that's referred to here?
[21]   A.   She ruled on us several.  I can't
[22] specifically remember which one that was.
[23]   Q.   And the arbitrations where she ruled, Tammy
[24] Brynie, did the City offer an expert to testify

Ronnie Jones, et al. 05-cv-11832-GAO    Document 67-3    Filed 08/28/2007    Page 20 of 21
City of Boston, et al.

Sandra DeBow
July 2, 2007

Page 81

[1]  about the accuracy of the hair test?
[2]     A.  This one here?  This specific one?
[3]     Q.  Yes.
[4]     A.  I don't remember which one it was.
[5]     Q.  Did the City in every instance where Tammy
[6]  Brynie issued a decision such as this where she
[7]  withheld -- she held that the drug testing
[8]  techniques and methodologies employed are reliable
[9]  and accurate, did the City have an expert testifying
[10]  about the accuracy on the hair test?
[11]     A.  I can't remember specifically which ones we
[12]  had off the top of my head and which ones we didn't.
[13]     Q.  Is it correct that in some instances there
[14]  was an expert hired by the City to testify about the
[15]  accuracy and reliability of the hair test?
[16]     A.  Yes.
[17]     Q.  And who were the experts that testified
[18]  about the accuracy and reliability of the hair test
[19]  in the arbitration proceeding?
[20]     A.  I can't remember.  There were a lot of
[21]  arbitrations, civil service and even trial board
[22]  hearings, and I just don't remember when we used the
[23]  experts and when we didn't.
[24]     Q.  I'm not wondering that.  I'm wondering who

Page 82

[1]  the experts were that testified about the
[2]  reliability and accuracy?
[3]     A.  Or even the experts.
[4]     Q.  Okay.
[5]     A.  I know the pool.
[6]     Q.  Who was in the pool?
[7]     A.  Well, Psychemedics would have been,
[8]  Dr. Cairns.
[9]     Q.  Is Dr. Cairns with Psychemedics?
[10]     A.  Yes.
[11]     Q.  That's C-a-i-r-n-s.  Who else was in the
[12]  pool of experts who testified for the City, the
[13]  police department, about the reliability and
[14]  accuracy of the hair test?
[15]     A.  Carl Selavka.  I can never say his name.
[16]     Q.  Is that spelled -- I can represent that
[17]  it's spelled S-e-l-a-v-k-a.  He was in the pool of
[18]  experts; is that correct?
[19]     A.  That's correct.
[20]     Q.  Anyone else other than Dr. Cairns and
[21]  Dr. Selavka -- I can't pronounce it either -- that
[22]  you recall being in the pool that testified about
[23]  the reliability and accuracy of the hair test?
[24]     A.  I can't recall.

Page 83

[1]     Q.  Do you know about how many times
[2]  Dr. Selavka testified about the accuracy or
[3]  reliability of the hair test in arbitrations for the
[4]  police department, arbitrations or other proceedings
[5]  on behalf of the police department?
[6]     A.  They were multi-day over the course of many
[7]  years.  I just don't remember the number.
[8]     Q.  Was it more than one?
[9]     A.  Yes.
[10]     Q.  Do you think it was more than ten?
[11]     A.  Cases or days of testimony?
[12]     Q.  Cases.
[13]     A.  No, it wouldn't have been more than ten.
[14]     Q.  More than five?
[15]     A.  I can't recall.  I really can't.
[16]     Q.  He would testify about the reliability and
[17]  accuracy of the hair test on behalf of the City?
[18]     A.  Right.
[19]     Q.  Who was he employed by at the time?
[20]     A.  The Massachusetts State Lab.
[21]     Q.  Is he still employed by them?
[22]     A.  I don't know.
[23]     MR. BAKER:  This is DeBow 4.
[24]

Page 84

[1]         (Document marked as DeBow
[2]         Exhibit 4 for identification)
[3]     Q.  If you could take a moment to review what's
[4]  been marked as DeBow 4.
[5]     A.  (Witness reviews document)
[6]     Q.  This is a five-page document that starts,
[7]  "Hair Drug Testing:  Fact vs. Fiction."  Have you
[8]  had an opportunity to review DeBow 4?
[9]     A.  Yes.
[10]     Q.  And have you seen this document before?
[11]     A.  I have.
[12]     Q.  Who drafted this document?
[13]     A.  Alicia McDonnell and myself.
[14]     Q.  Was this drafted around the same time as
[15]  the PowerPoint presentation we looked at?
[16]     A.  It was.
[17]     Q.  Why was this document drafted or created?
[18]     A.  To dispel a lot of rumors that were going
[19]  on and misinformation, more misinformation, that was
[20]  floating around the police department regarding
[21]  terminology that was used and the understanding of
[22]  what the drug -- hair drug testing did or didn't do.
[23]  So we decided to put this on the department's
[24]  intranet that people could use as a resource.

Sandra DeBow
July 2, 2007

Ronnie Jones, et al. vs.
City of Boston, et al.

Page 109

[1] Mullan to Dr. Hoffman about processes -- processing
[2] MRO results.
[3]    Q.    It starts, "Thank you for meeting with
[4] Sandra DeBow and I today regarding medical review
[5] officer's services for hair sample drug testing."
[6] Do you recall that meeting?
[7]    A.    I do not.
[8]    Q.    Do you recall any conversations with
[9] Mr. Hoffman about the validity of hair testing?
[10]    A.    I do, but I believe it was in a --
[11]    Q.    You believe -- sorry?
[12]    A.    I believe it's my role as an attorney.
[13]    Q.    Now, Mr. Hoffman, you weren't offering him
[14] legal advice, were you?
[15]    A.    No.
[16]    Q.    So what were the conversations that you had
[17] with Mr. Hoffman when you were an attorney?
[18]    A.    It was probably seeking information for my
[19] employer.
[20]    THE WITNESS:  Am I allowed to say?
[21]    MS. HARRIS:  Was it in the context of
[22] litigation?  You can speak about conversations that
[23] you had with him that were nonwork product related.
[24] If you are not speaking to him in his role as an

Page 110

[1] expert witness offering testimony on behalf of the
[2] department in a civil service hearing or an
[3] arbitration, if it was a general conversation, you
[4] can speak about it.
[5]    THE WITNESS:  Okay.
[6]    A.    So I had spoken with him when I first
[7] started working for the Boston Police Department
[8] about hair testing generally and Psychemedics
[9] specifically because the industry was at a turning
[10] point at that point, which I discussed earlier, that
[11] more people were looking at hair testing within the
[12] federal framework, and the Drug Testing Advisory
[13] Board had been formed.  And I was just asking his
[14] opinion as to the validity and accuracy of hair
[15] testing and how he felt about it because I knew that
[16] he was a disinterested objective person who was very
[17] familiar with the processes.
[18]    Q.    Did you ever discuss race bias issues with
[19] Mr. Hoffman with respect to hair testing?
[20]    A.    I may have.  I don't recall any -- I mean,
[21] I think I've probably -- in those conversations
[22] probably talked about all the issues surrounding
[23] hair testing.
[24]

Page 111

[1]    (Document marked as DeBow
[2]    Exhibit 8 for identification)
[3]    Q.    We have just marked a two-page document as
[4] DeBow 8 with Bates Nos. COB31231 through 31232.
[5] Take a moment to review the document and let me know
[6] when you have had a chance to do so.
[7]    A.    (Witness reviews document)
[8]    Q.    Have you had a chance to look at it?  Have
[9] you ever seen this document before?
[10]    A.    I have not.
[11]    Q.    Do you see on Page 2 about halfway down --
[12] well, the top of Page 2, it says, "Please see
[13] attached info from Margaret Buckley in legal and
[14] Sandra DeBow advises below," and there is a
[15] description there.  And you have had a chance to
[16] look at what's described there.  Do you recall
[17] attending a meeting where you discussed this
[18] information as set forth here?
[19]    A.    Specific to this document?
[20]    Q.    Yes.
[21]    A.    No.
[22]    Q.    It says about halfway down, "If she's
[23] hearing anything it's probably all about the race
[24] bias."  Do you know if that's referring to you or

Page 112

[1] not?
[2]    A.    No, that wouldn't be me.
[3]    (Document marked as DeBow
[4]    Exhibit 9 for identification)
[5]    Q.    Take a moment to review DeBow 9 which is a
[6] Document Bates Nos. COB6522 through 6534
[7] consecutive.
[8]    A.    (Witness reviews document)
[9]    Q.    You have had a chance to look at this?
[10]    A.    Yes.
[11]    Q.    I guess, to describe this a little bit for
[12] the record, is this your handwriting on Page 1?
[13]    A.    Yes.
[14]    Q.    And is the date 7/15/04?
[15]    A.    Yes.
[16]    Q.    And it says, "Pages: 13."  So would that
[17] indicate that the entire DeBow 9 was sent in a fax
[18] by you on July 15th, 2004?
[19]    A.    Yes.
[20]    Q.    Who is Jack Parlon?
[21]    A.    He was the vice-president of the detectives
[22] union.
[23]    Q.    What is the fax that's set forth in DeBow
[24] 9?

**EXHIBIT E**

# In The Matter Of:

*Ronnie Jones, et al. vs.*
*City of Boston, et al.*

---

*Robert Boyle*
*July 12, 2007*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*Videoconference Center*
*50 Franklin Street, Boston, MA 02110*
*Phone: (617) 426-2432*

Original File boyle.v1, Pages 1-167

**Word Index included with this Min-U-Script®**

Robert Boyle
July 12, 2007

Ronnie Jones, et al. vs.
City of Boston, et al.

Page 21

[1] period of time.

[2]     Q.    Could you elaborate on that, please.  In

[3] what way did you rely upon Mr. Holland?

[4]     A.    Well, we'd report to him.  We'd call him up

[5] and ask him questions, and you know, send him

[6] e-mails.  He was outside counsel -- he was a

[7] resource for us.

[8]     Q.    Were you his client?

[9]     A.    True.  Yes.

[10]     Q.    And do you recall where Mr. Holland worked

[11] during that period?

[12]     A.    Deutsch Williams -- Deutsch, Williams,

[13] Holland & Truckman.

[14]     Q.    During the time that you were labor counsel

[15] which includes the present time, as I understand it,

[16] what were your job responsibilities with respect to

[17] the hair test?

[18]     A.    For the entire period of time?  All right.

[19] Well, I think I need to break it down.  Virginia

[20] Tisei had me involved in the -- I think it was June

[21] 8th of -- 1998 in June, Boston Police Patrolmen's

[22] Police Association signed the Collective Bargaining

[23] Agreement that included the hair testing provisions.

[24] And I came in in October, and we were -- the office

Page 22

[1] was at that time looking towards bargaining

[2] procedures for sample collection.  The Collective

[3] Bargaining Agreement said the parties would get

[4] together and bargain about how the samples going

[5] to be collected and so forth.

[6]         And I was involved as a new labor attorney,

[7] as, you know, most junior labor attorney with Robert

[8] Holland, Virginia, Mike Reagan and Bill Murphy and

[9] Sandra DeBow, in collective bargaining strategy as

[10] to the meetings that we had with the patrolmen.  I

[11] attended some of those meetings.  I would be in the

[12] prep sessions for some of those.  And I wrote some

[13] correspondence.  But I wasn't assigned to it other

[14] than to help out.  It was not a team approach, I

[15] guess.

[16]     Q.    In your position as labor counsel are there

[17] people in the office who report directly to you?

[18]     A.    No.

[19]     Q.    You mentioned several names just a moment

[20] ago when you were describing your job

[21] responsibilities.  I believe these included Bill

[22] Murphy, Mr. Reagan, Mr. Holland, Ms. Tisei and

[23] Ms. DeBow.  I believe you have already testified

[24] that you reported to Ms. Tisei and that Mr. Holland

Page 23

[1] was outside counsel to your office.  Can you tell me

[2] a little bit about your working relationship with

[3] Mr. Murphy and Ms. DeBow and Mr. Reagan?

[4]     A.    Okay.  Virginia was the Director of Labor

[5] Relations.

[6]     Q.    Yes.

[7]     A.    Michael Reagan was her Deputy Director at

[8] the time.  So he was my immediate supervisor.

[9] William Murphy was a more senior labor attorney in

[10] the office, and he was kind of a mentor to me at the

[11] time because I was transitioning from doing civil

[12] litigation in the law department to coming over to

[13] Labor Relations.

[14]     Q.    And Ms. DeBow?

[15]     A.    She was the Deputy Director of Labor

[16] Relations at the Boston Police Department.  She

[17] worked with John Ferguson.  John Ferguson was the

[18] director -- he was the superintendent of the Boston

[19] Police Department.  He was a sworn member of the

[20] department, and he was the Director of Labor

[21] Relations at the time.  So I would also interact

[22] with him.  He would be in those meetings, those

[23] discussions.

[24]     Q.    Mr. Ferguson would be?

Page 24

[1]     A.    Yes.

[2]     Q.    So it sounds as if you sat in on a number

[3] of meetings that concerned the hair test and also

[4] wrote some correspondence concerning the hair test;

[5] is that fair?

[6]     MS. FERRER:  Objection.

[7]     A.    I recall one letter that I wrote to Susan

[8] Horwitz of the Boston Police Patrolmen's --

[9] actually, she is an attorney.  She is at Sandulli

[10] Grace, and it concerned follow-up to one of the

[11] meetings that we had regarding sample collection

[12] procedures.

[13]     Q.    Do you recall anything else about that

[14] correspondence?

[15]     A.    Yes.  I recall the correspondence.  I

[16] almost have a mental picture of it.

[17]     Q.    Do you remember approximately when it was

[18] sent?

[19]     A.    It was sent -- I'm just going to guess.  It

[20] was sent in 1999.  I can't remember when it was

[21] sent.  I can't recall.

[22]     Q.    But it concerned bargaining over collection

[23] procedures?

[24]     A.    Yes, it did.  The Appendix D to Rule 111

Ronnie Jones, et al. vs.
City of Boston, et al.

Case 1:05-cv-11832-GAO    Document 67-4    Filed 08/28/2007    Page 4 of 16

Robert Boyle
July 12, 2007

Page 25

[1] providing those provisions, those procedures.

[2]   Q.   Why did you have to write to her about
[3] that?

[4]   A.   We had a meeting. And I was coming into
[5] this bargaining -- it had already begun before I
[6] came there in October. The contract closed June of
[7] 1998, and the Department wanted to implement the
[8] hair testing. Before they did that they had to
[9] negotiate with the Union over what the sample
[10] collection procedures and so forth would be. So
[11] they had started that. I don't know when they
[12] started that, but it was ongoing when I got there.

[13]       So I started to sit in on a couple of those
[14] meetings. Negotiations were actually winding down.
[15] A lot of things were already resolved. There were a
[16] few things that were unresolved. I recall a meeting
[17] that Bob Holland led for the City. Susan Horwitz
[18] led for the Boston Police Patrolmen's Association.
[19] And basically the meeting was where Bob Holland was
[20] asking her to, you know, what are the remaining
[21] issues, and she gave a handful. I simply wrote her
[22] a letter and said, "Would you please respond to us
[23] in writing regarding what the handful of issues are
[24] remaining that you see." It was an effort to try to

Page 26

[1] get some closure on her to move the process along.

[2]   Q.   Do you recall any other correspondence that
[3] you either sent to or received regarding the hair
[4] test during the time that you worked as labor
[5] counsel?

[6]   A.   I don't recall any others for that time
[7] period that we're talking about. Do you see what I
[8] am saying?

[9]   Q.   I do.

[10]   A.   You asked me about '92 to '98.

[11]   Q.   What about other time periods; do you
[12] recall sending or receiving other correspondence
[13] regarding the hair test at any other time?

[14]   A.   Not regarding the hair test itself but
[15] regarding arbitrations, sure, I corresponded with
[16] the union, I called them on the phone; but that was
[17] the grievance arbitration.

[18]   Q.   So is it fair to say, then, that outside of
[19] the time that you spent in your current position as
[20] labor counsel you have not ever had any job
[21] responsibilities with respect to the hair test?

[22]   A.   That's true.

[23]   Q.   The only job responsibilities you ever had
[24] with respect to the hair test were in your current

Page 27

[1] position which you have held since October of '98?

[2]   A.   That's true.

[3]   Q.   Thank you. Have you ever undertaken any
[4] sort of an examination or analysis of the accuracy
[5] of the hair test?

[6]   MS. FERRER:   Objection.

[7]   A.   Of the accuracy of the hair test... Well,
[8] going back to what you said at the outset, I think
[9] don't understand what you mean by "the accuracy of
[10] the hair test." Any particular hair test or the
[11] hair test in general, in theory?

[12]   Q.   The hair test that's currently being used
[13] by Boston Police Department and which is
[14] administered by Psychemedics?

[15]   A.   Well, regarding that I would say -- when I
[16] started at the Office of Labor Relations the
[17] materials that the parties had developed in
[18] bargaining were available, and I studied those.
[19] And -- so Robert Holland was the lead attorney in
[20] those negotiations. He had investigated,
[21] researched, created materials that were a resource,
[22] and I simply read those.

[23]   Q.   Was anyone else other than Mr. Holland
[24] involved with the preparation of or gathering of

Page 28

[1] those materials?

[2]   A.   Well, I don't know from personal knowledge.
[3] You know, I have to guess about something that
[4] happened several years ago, but I do know that
[5] Michael Reagan was involved in those negotiations
[6] with -- and Virginia Tisei, too, but Michael Reagan
[7] and Bob Holland worked closely during those
[8] negotiations. Aside from that I just, you know,
[9] would not be speaking from personal knowledge.

[10]   Q.   Do you have any science degrees?

[11]   A.   No, I do not.

[12]   Q.   Have you ever undertaken any independent
[13] analysis of the accuracy or reliability of the hair
[14] test beyond your review of these materials that you
[15] referred to just a moment ago?

[16]   MS. FERRER:   Objection.

[17]   A.   The only time I have ever looked at hair
[18] test is in the course of my job with the Office of
[19] Labor Relations.

[20]   Q.   Have you ever had a discussion with former
[21] Commissioner Kathleen O'Toole about the hair testing
[22] policy?

[23]   MS. FERRER:   Objection.

[24]   A.   I never did.

Robert Boyle
July 12, 2007

Ronnie Jones, et al. vs.
City of Boston, et al.

Page 29

[1]    Q.   Have you ever had a discussion with any
[2] commissioner of the Boston Police Department
[3] regarding the hair test policy?
[4]        MS. FERRER:  Objection.
[5]    A.   No.
[6]    Q.   Have you ever had a discussion with
[7] Ms. O'Toole or any other commissioner of the Boston
[8] Police Department regarding the accuracy of the hair
[9] test?
[10]       MS. FERRER:  Objection.
[11]   A.   I can tell you that the only police
[12] commissioner that I have ever spoken -- oh.  The
[13] only police commissioners I ever spoke to would be
[14] Francis Roache and Paul Evans, and none of those
[15] conversations had anything to do with the hair test.
[16]   Q.   Do you believe that the hair test is
[17] accurate?
[18]   A.   Yes.
[19]       MS. FERRER:  Objection.
[20]   Q.   Why?
[21]   A.   Why?  It would take a treatise to answer
[22] that question.  I believe it's accurate.  I haven't
[23] seen any reputable, credible information to the
[24] contrary.

Page 30

[1]    Q.   Have you looked?
[2]    A.   Yes.
[3]    Q.   Where?
[4]    A.   Well, I don't know if you have the
[5] arbitration materials from the hair testing case
[6] that I was putting on with Joseph Ambash, but I have
[7] looked at the issue off and on for the past, I don't
[8] know how many years, nine years.
[9]    Q.   But always and only in your capacity as
[10] labor counsel?
[11]   A.   True, and defending arbitrations and so
[12] forth.
[13]   Q.   Have you ever met with, spoken to or
[14] corresponded with anyone from Psychemedics?
[15]   A.   Yes.
[16]   Q.   Who was that?
[17]   A.   William Thistle and more recently there was
[18] someone who came on board at Psychemedics who is
[19] the -- he became the contact for the hair testing
[20] arbitration that we were doing, and the person's
[21] name slips my mind.  He was a Psychemedics employee.
[22]   Q.   Is there anything that you can think of
[23] that would refresh your recollection as to the name
[24] of that employee?

Page 31

[1]    A.   I don't know if he appeared at any hearing
[2] dates, if there was a transcript, but there is "Also
[3] Present" on it that would refresh my memory.  If I
[4] think of it, I'll tell you.  I'm having a mental
[5] block right now.  I'm sorry.
[6]    Q.   It happens to all of us.  How many times
[7] did you speak with Mr. Thistle from Psychemedics?
[8]    A.   Numerous times.
[9]    Q.   More than ten?
[10]   A.   Yes.
[11]   Q.   During what years did these communications
[12] take place?
[13]   A.   Well, I know from -- not from memory, but I
[14] know from one of the documents that you have, I
[15] think the first time I spoke to him was November 1st
[16] of 1998.
[17]   Q.   How did you come to speak to him on
[18] November 1st, 1998?
[19]   A.   I don't know.
[20]   Q.   Were you speaking in person or was it over
[21] the telephone?
[22]   A.   Over the phone.
[23]   Q.   Over the phone.  Did you he call you?
[24]   A.   I called him.

Page 32

[1]    Q.   Why did you call him?
[2]    A.   It had something to do with work that was
[3] going on in the Office of Labor Relations, and I
[4] presume that it had to do with the -- I don't know
[5] exactly what the circumstances are, but I believe
[6] that it was basically for my own information of
[7] trying to study the materials that we had,
[8] understand the hair test, and basically, you know,
[9] prepare myself to be part of the team to be meeting
[10] with the Boston Police Patrolmen and talk about the
[11] hair test.  I was trying to school myself as to the
[12] issue that we would be discussing once I sat across
[13] the table from the Union to talk about the sample
[14] collection procedures.
[15]   Q.   Did any of your supervisors instruct you to
[16] call Mr. Thistle for that purpose?
[17]   A.   I don't think so.
[18]   Q.   Okay.  So as I understand it, you phoned
[19] Mr. Thistle because you wanted to educate yourself
[20] on the hair test generally?
[21]   A.   Well, part of it.  I had read the
[22] materials, and I also wanted to talk to someone at
[23] the corporation.  So in other words, my memory is I
[24] had an understanding of, you know, what the

Case 1:05-cv-11832-GAO   Document 67-4   Filed 08/28/2007   Page 6 of 16

Ronnie Jones, et al. vs.
City of Boston, et al.

Robert Boyle
July 12, 2007

Page 33

[1] materials were and -- I had an idea. I also wanted
[2] to talk to someone from the company, I guess.
[3]    Q.   Just to be clear, when you say "I had read
[4] the materials," which materials are you referring
[5] to?
[6]    A.   Well, there was some studies that had come
[7] out and was shared with the Union during the
[8] contract negotiations, I was told. I can't
[9] remember. There was a whole package of information
[10] that Bob Holland put together.
[11]    Q.   Was there actually a Redweld or a box
[12] filled with these materials?
[13]    A.   I don't know if they were three-ring
[14] binders or what it was. I can't really describe it
[15] to you.
[16]    Q.   But as you recall, they had been collected
[17] in some fashion by Mr. Holland?
[18]    A.   I can tell you by 2000 when -- in 1998 the
[19] patrolmen settled volunteer only. In 2000 the
[20] Federation was engaged in interest arbitration to
[21] settle their contract. So a lot of these things
[22] were put together by Bob Holland and Mike Reagan and
[23] Bill Murphy for that Federation interest
[24] arbitration. So a lot of the material I see in

Page 34

[1] those binders were available in a less organized
[2] fashion around the office.
[3]    Q.   Other than that set of materials, the
[4] materials that had been collected by Mr. Reagan,
[5] Mr. Holland and Mr. Murphy, were there any other
[6] studies or other materials that you reviewed with
[7] respect to the hair test?
[8]    A.   In 1999, no.
[9]    Q.   Prior to that conversation with
[10] Mr. Thistle?
[11]    A.   No. That was the setup information.
[12]    Q.   And do you remember how long that call with
[13] Mr. Thistle lasted?
[14]    A.   I don't recall the conversation. I didn't
[15] recall writing the memo. I was kind of surprised to
[16] find it. So I can't really say how long the
[17] conversation took, but I presume it was a while.
[18]    Q.   Why do you presume that it was a while?
[19]    A.   Well, just from the fact that there's -- I
[20] don't know. Maybe I shouldn't presume. I have no
[21] idea how long the conversation was.
[22]    Q.   Did you make notes during that
[23] conversation?
[24]    A.   No, no. The memo itself constitutes the

Page 35

[1] notes that I typed as opposed to writing things
[2] down.
[3]    Q.   So after you spoke to Mr. Thistle you typed
[4] a memo regarding your conversation with Mr. Thistle?
[5]    A.   I don't know if I typed it after or during.
[6] You know, it might have been I was kind of typing at
[7] the same time. I don't know. I can't recall.
[8] Sometimes I do that.
[9]    Q.   Is it your recollection that that memo was
[10] dated November 1st, 1998?
[11]    A.   That's my memory from this morning or
[12] yesterday. I forget. Yesterday afternoon.
[13]    Q.   What did you do with that memo?
[14]    A.   I sent it to counsel. I understand that
[15] it's been sent to you.
[16]    Q.   You testified just a moment ago that you
[17] sent it to counsel. Did you mean that today, when
[18] you found it you sent it to Ms. Ferrer?
[19]    A.   Yes, yes.
[20]    Q.   What I was trying to ask was what did you
[21] do with the memo immediately after you finished
[22] writing it on or around November 1st, 1998?
[23]    A.   I don't believe I gave it to -- I don't
[24] recall what I did. I don't recall what I did with

Page 36

[1] it.
[2]    Q.   When you had phone conversations with
[3] witnesses or experts or other people, would you
[4] routinely in your work draft a memo to file, type it
[5] up, and put it in the desk drawer or save it on the
[6] computer and not show it to anybody? I am just
[7] trying to get a sense of your general practice.
[8]    A.   Well, I don't have a general practice
[9] regarding, you know -- my sense is, the reason I was
[10] looking at this -- I don't have a distinct memory,
[11] but I believe that the November 1st, 1998, document
[12] is the predecessor of the Q and A that we talked
[13] about earlier. I was asked to do the Q and A, and I
[14] think the reason I was asked to do the Q and A is
[15] that someone saw the earlier memo and thought geez,
[16] wouldn't it be helpful to have these questions and
[17] answers developed into a piece of paper. So I'm
[18] just piecing this together. I don't have a distinct
[19] memory, but I think that the November 1st is kind of
[20] a draft of the 1999, January 1999.
[21]    Q.   You said just a moment ago that it's
[22] possible that someone else saw the November 1st,
[23] 1998, memo and thought it would be a good idea to
[24] put that into -- turn that into a more formal

Robert Boyle
July 12, 2007

Ronnie Jones, et al. vs.
City of Boston, et al.

Page 37

[1] document; is that accurate?

[2]    A.   I'm kind of guessing, but that's what I
[3] believe happened, yes.

[4]    Q.   Who might that have been?

[5]    A.   Well, it would have been Virginia Tisei.
[6] So I remember or seem to remember Virginia Tisei
[7] assigning me to write a Q and A for the office.

[8]    Q.   Are you familiar with someone named Thomas
[9] Cairns?

[10]    A.   Yes.

[11]    Q.   Who is Thomas Cairns?

[12]    A.   He is the chief -- or some period of time
[13] during this time frame, I don't know if he still
[14] is -- I assume he still is -- but he is the chief
[15] scientist at Psychemedics laboratory.

[16]    Q.   Earlier when I was asking you about your
[17] contacts at Psychemedics you said that there was
[18] Mr. Thistle and then there was another person who
[19] later became the BPD's or the City's contact at
[20] Psychemedics but you couldn't remember that person's
[21] name.  Was that Mr. Cairns?

[22]    A.   No, no, no.  All right.  You mentioned Tom
[23] Cairns, and he was a witness in the arbitration that
[24] we did.

Page 38

[1]    Q.   When was that?

[2]    A.   Geez, that started in November 2004, and it
[3] hasn't been completed.  He was a witness.  So he's
[4] another person that I was contacting by the City,
[5] and I am sure I spoke to him at some point in time
[6] myself.  But I still don't remember the other
[7] person's name.

[8]    Q.   Do you recall whether the other person was
[9] a scientist?

[10]    A.   No.  He was someone who was an assistant to
[11] Bill Thistle.  He was basically helping Bill Thistle
[12] at his job, working in Bill Thistle's office here in
[13] Massachusetts somewhere.

[14]    Q.   Other than Mr. Thistle, this unnamed
[15] assistant, and Mr. Cairns, have you ever spoken to
[16] or otherwise communicated with anybody else at
[17] Psychemedics?

[18]    A.   Not that I recall, no.

[19]    Q.   Is there anything that you could think of
[20] that would refresh your recollection?

[21]    A.   I don't know if I had any other
[22] conversations with anyone from Psychemedics.  There
[23] is Tom Cairns, the chief scientist; Bill Thistle;
[24] and -- I can get you the name.  I am just not

Page 39

[1] having -- this other person I'm just having
[2] difficulty remembering.  I believe that's all.

[3]    Q.   Now, when I ask about communications with
[4] Psychemedics personnel, I don't mean to refer just
[5] to spoken communications.  I mean to include written
[6] communications as well.

[7]    A.   Well, if that's the case, I did sign up for
[8] the Psychemedics Web site, and you know, I get
[9] e-mails from Psychemedics.  They have a Psychemedics
[10] newsletter.

[11]    Q.   Mass mailings?

[12]    A.   Mass mailings, true.

[13]    Q.   How frequently would you receive those?

[14]    A.   I think it was a quarterly thing.  I signed
[15] up for it for a few years and discontinued it a few
[16] years ago.

[17]    Q.   Do you know if there was a particular
[18] person at Psychemedics who was responsible for
[19] sending those out?

[20]    A.   I don't know.

[21]    Q.   Would they have someone's name at the
[22] bottom, like a signature?

[23]    A.   I'd be guessing.

[24]    Q.   Mr. Boyle, did you have any role in

Page 40

[1] determining whether to contract with Psychemedics
[2] for the hair test?

[3]    A.   None.

[4]    Q.   Do you know who did?

[5]    A.   I don't know.  Personal knowledge, no.

[6]    Q.   Do you know what factors the City weighed
[7] when deciding whether or not to contract with
[8] Psychemedics for the hair test?

[9]    MS. FERRER:   Objection.

[10]    A.   What factors the City weighed when they
[11] contracted with Psychemedics for the hair test.  I
[12] know that the Boston Police Department has had a
[13] desire to have drug testing for the police officers
[14] for several years.  They have been looking for a way
[15] to do that for several years going back before
[16] Commissioner Evans.

[17]    Q.   Were there any other factors that played a
[18] role in the decision?

[19]    A.   Well, they were all the reasons that we
[20] expressed to the Union at the bargaining table.
[21] They were all the reasons that the Union accepted
[22] when they signed the contract agreeing to the hair
[23] testing.  They were all the reasons when the
[24] arbitrators agreed -- for example, when Arbitrator

Ronnie Jones, et al. vs.
City of Boston, et al.

Robert Boyle
July 12, 2007

---

Page 41

[1] Boulanger awarded the drug testing procedure to the
[2] Federation, that was basically our first arbitration
[3] award in favor of drug testing. It was a contested
[4] matter, and the Union and the City argued to the
[5] interest arbitrator about whether or not there
[6] should be hair testing for Boston Police. And all
[7] of the factors in favor of the City's argument are
[8] contained in Robert Holland's brief to Richard
[9] Boulanger, and then Richard Boulanger came back and
[10] said this is an objectively reasonable scientific
[11] approach to hair testing.
[12]     Q.    I meant to actually ask a slightly
[13] different question. Perhaps I wasn't precise
[14] enough. I didn't mean to ask why did the City
[15] decide to use hair testing at all. What I meant to
[16] ask was why did the City decide to contract with
[17] Psychemedics other than some other hair testing
[18] laboratory?
[19]     MS. FERRER: Objection.
[20]     A.    What we've -- I wasn't involved in the
[21] process at the time, all right. I know that
[22] Psychemedics holds itself out to be a leader in the
[23] industry. The experts that I have talked to, and
[24] who have testified, agree that it's a leader in the

---

Page 42

[1] industry. And David Kidwell who testified as the
[2] plaintiff's expert in the hair testing arbitration
[3] that I was involved in agreed that Psychemedics hair
[4] tested better than other labs. So I think the
[5] information is all in one direction, as far as I'm
[6] concerned.
[7]     Q.    Okay. If I understand the answer that you
[8] just gave correctly, you said Psychemedics holds
[9] itself out to be a leader in hair testing, the other
[10] experts and scientists that you consulted with said
[11] that Psychemedics was the leader in the field; is
[12] that accurate?
[13]     A.    True.
[14]     Q.    Who are these other scientists and experts?
[15]     A.    Dr. Selavka.
[16]     Q.    Could you spell his last name for me, if
[17] you know?
[18]     A.    I should know. So I'll try.
[19] S-e-l-a-v-k-a.
[20]     Q.    Anyone else?
[21]     A.    There was -- no. I think that's it. I
[22] can't recall. I did speak to a retired FBI person
[23] at one point in time, but I don't know that I spoke
[24] to them about Psychemedics in particular.

---

Page 43

[1]     Q.    Did you have any role -- or do you have any
[2] role in determining whether to renew Psychemedics'
[3] contract each year?
[4]     A.    No role.
[5]     Q.    Do you know who does?
[6]     A.    I don't know, but I presume it would be the
[7] police commissioner. The contract would have to be
[8] signed, whoever offered it, when it's renewed, the
[9] signatories of the contract.
[10]     Q.    So as far as you know, the people that you
[11] worked with in the Office of Labor Relations have a
[12] role in determining whether or not to renew
[13] Psychemedics' contract each year?
[14]     A.    Well, I think there is many layers to that
[15] question. It's written into the Collective
[16] Bargaining Agreement that we are going to have the
[17] hair testing, all right. So there would have to be
[18] some lab, and Psychemedics itself, I don't think
[19] you'll find it referenced in the contract. I'm
[20] sorry. I'm forgetting the question. I'm not being
[21] responsive. I'm sorry. What was the question
[22] again?
[23]     Q.    I'm just trying to find out who determines
[24] each year whether or not to renew the contract with

---

Page 44

[1] Psychemedics. Not who decides --
[2]     A.    I don't know if there is any renegotiation
[3] process, what's the fee, you know, all that. I
[4] don't know. I'm not involved.
[5]     Q.    But you are presuming the commissioner
[6] would be involved?
[7]     A.    I would think it would happen down at the
[8] police department. I don't know if the commissioner
[9] is involved. When I say the "commissioner" I mean
[10] the Commissioner's office. They have administrative
[11] planning. They have got bureau of administrative --
[12] I don't know who that would be administratively.
[13]     Q.    Is there anyone else that you would presume
[14] to be involved in that process?
[15]     MS. FERRER: Don't guess.
[16]     A.    I do not want to guess. I don't think we
[17] want me guessing about things. Guesses aren't
[18] relevant.
[19]     Q.    So has anyone ever complained to you that
[20] the hair test is inaccurate?
[21]     MS. FERRER: Objection.
[22]     A.    To me, no. The Union has filed grievances,
[23] but I don't take that as being someone complaining
[24] to me personally. It's part of the collective

---

Robert Boyle
July 12, 2007

Ronnie Jones, et al. vs.<br>City of Boston, et al.

---

Page 45

[1] bargaining process.
[2]     **MR. HEINING:**  Could the reporter please
[3] mark this as an exhibit.
[4]         (Document marked as Boyle
[5]         Exhibit 1 for identification)
[6]     **Q.**   Mr. Boyle, I ask that you take a moment and
[7] familiarize yourself with this document, and let me
[8] know when you are ready to proceed and answer
[9] questions about it.
[10]     **A.**   (Witness reviews document)  Thank you.  I
[11] have looked at the document.
[12]     **Q.**   Have you ever seen this document before
[13] today?
[14]     **A.**   I take this to be an Appendix D of Rule 111
[15] which I have seen, yes.
[16]     **Q.**   Very generally what is Rule 111?
[17]     **A.**   Rule 111 is the Boston Police Department's
[18] rule regarding substance abuse.
[19]     **Q.**   Does it incorporate BPD regulations
[20] concerning the hair test?
[21]     **A.**   Yes.
[22]     **Q.**   Did you have any role in drafting Appendix
[23] D to Rule 111?
[24]     **A.**   No.  I did not write any of this.

---

Page 46

[1]     **Q.**   Have you ever commented on, edited or
[2] revised Appendix D, Rule 111?
[3]     **A.**   Yes.
[4]     **Q.**   When?
[5]     **A.**   Well, during the process of meeting with
[6] the Union regarding the sample collection procedures
[7] and so forth there were meetings.  I spoke.
[8]     **Q.**   Did you ever suggest changes to the wording
[9] of Appendix D that are now reflected in this version
[10] of the document?
[11]     **A.**   Yes.
[12]     **Q.**   You did?
[13]     **A.**   Yes.
[14]     **Q.**   Can you recall which revisions those were?
[15]     **A.**   The safety-net test.
[16]     **Q.**   Who did you suggest those revisions to?
[17]     **A.**   Deputy Ferguson.
[18]     **Q.**   Did you actually draft portions of Appendix
[19] D related to the safety-net testing?
[20]     **A.**   No, no.
[21]     **Q.**   Who did?
[22]     **A.**   It's my belief that Sandra DeBow wrote
[23] Appendix D.
[24]     **Q.**   So is it fair to say that before Appendix D

---

Page 47

[1] was finalized you provided your commentary on the
[2] safety-net testing provisions to Mr. Ferguson, and
[3] they were incorporated by Ms. DeBow or whoever
[4] drafted the final version of this document?
[5]     **A.**   It's limited.  I think, if you look at the
[6] transcript from that hair testing arbitration, at
[7] which I keep referring to because it assists my
[8] memory, there was a working document that people
[9] were looking at.  It did not have a safety-net test
[10] in it.  Sandra -- Susan Horwitz had asked for
[11] whatever procedure there was.  You know, she talked
[12] about urinalysis, and with urinalysis you have the
[13] retest option.  "Is there something like that for
[14] hair testing?"  And then Bob Holland said, "Yes,
[15] there is."  They asked whether it should be
[16] included, and I threw in my two cents that yes, it
[17] should be included.
[18]     **Q.**   So when you were asked for your opinion on
[19] the safety-net provisions you gave that opinion,
[20] which was "we should include some provision for
[21] safety-net testing in Rule 111"?
[22]     **MS. FERRER:**  Objection.
[23]     **A.**   Yes.
[24]     **Q.**   What's the basis for that opinion?

---

Page 48

[1]     **A.**   What's the basis for the opinion?  My
[2] opinion at the time was that we were bargaining with
[3] the Union regarding hair sample collection
[4] procedures and how those samples would be tested and
[5] how the results would be reported, what the role of
[6] the MRO would be, and what information would the MRO
[7] provide to the department and so forth, concerns
[8] that the Union had at that time.
[9]         And there was a videotape that John
[10] Ferguson had from Psychemedics that the Union -- the
[11] Union had asked for information from Psychemedics
[12] regarding drug testing sample collection procedures
[13] and so forth, and there was a video.  And the video
[14] continued to study the hair testing, the safety-net
[15] part, so that if Psychemedics is providing
[16] information saying the safety net is available, then
[17] the Union is asking for -- the Union should get it,
[18] basically.  The Union asked for it.  That was the
[19] basis for giving it to them.  Other than that I
[20] didn't have a basis.
[21]     **Q.**   Other than the Union's request and the
[22] videotape from Psychemedics there was no other basis
[23] for your opinion that that safety-net provision
[24] should be included?

---

Min-U-Script®          Doris O. Wong Associates, Inc.

Case 1:05-cv-11832-GAO    Document 67-4    Filed 08/28/2007    Page 10 of 16

Ronnie Jones, et al. vs.
City of Boston, et al.
Robert Boyle
July 12, 2007

Page 49

[1]   A.   Right, right.  In other words, there was no
[2]   reason not to give it to them.  There was no reason
[3]   not to give the safety net to the Union as part of
[4]   this.
[5]   Q.   What's the purpose of the safety-net test?
[6]   A.   My understanding is it parallels the
[7]   process with urinalysis.  When you have a urine
[8]   sample, the lab will divide the sample in half and
[9]   freeze half of it and keep it on file somewhere.
[10]  Test a half, report that original test.  Now, people
[11]  deny drug use even in the face of the positive test.
[12]  They might say that there was an issue with the
[13]  chain of custody.  These are the issues that we see
[14]  in drug testing litigation.  So the lab will have
[15]  the frozen half of the sample on hand to then
[16]  reassure the litigants, the fact finder, it's a
[17]  forensic setting, that there wasn't any problem with
[18]  the chain of custody, and the second half of the
[19]  sample is also positive; therefore, it's 100 percent
[20]  certain that this is a sample that's consistent with
[21]  drug use.
[22]       So the safety net, because it has the I
[23]  think the three-month window of time that
[24]  measures -- - enables the lab to -- rather than

Page 50

[1]   split the original hair sample, using the analogy of
[2]   the urine sample with the frozen half, they don't
[3]   retest -- Psychemedics does not retest the second
[4]   half of that sample on request.  Instead they have
[5]   their own procedure which they call the safety-net
[6]   procedure, which is rather than testing the second
[7]   half of that sample they call for a second original
[8]   sample within a certain limited period of time, but
[9]   it's the same purpose.  It's, you know, basically to
[10]  confirm the chain of custody, confirm a positive
[11]  result.
[12]  Q.   So tell me this:  With the safety-net
[13]  testing in the urinalysis context, the safety-net
[14]  test is typically performed on part of the same
[15]  sample that was initially tested; is that correct?
[16]  A.   I'm sorry.  I am going to have to disagree
[17]  with you.  I don't mean to be disagreeable, but I am
[18]  just going to say I think the "safety net" is kind
[19]  of like a trademark Psychemedics kind of a term.
[20]  The retest in urinalysis is not what I would call a
[21]  safety net.  The safety net is a Psychemedics'
[22]  alternative to the retest.
[23]  Q.   Can we agree to call it a retest in the
[24]  urinalysis context?

Page 51

[1]   A.   Yes.
[2]   Q.   So in the urinalysis context when a retest
[3]   is performed, the retest is performed on part of the
[4]   same sample that was initially taken for the first
[5]   test?
[6]   A.   Right.
[7]   Q.   So with urinalysis you have one test --
[8]   excuse me.  You have one sample and you split it
[9]   into two, one part is tested and the other part is
[10]  saved for later in the event of a retest?
[11]  A.   With urinalysis?
[12]  Q.   Yes.
[13]  A.   Yes, with urinalysis that's my
[14]  understanding.
[15]  Q.   Okay.  With the hair test, would I take you
[16]  to be saying it's a little bit different.  With the
[17]  hair test an initial sample is taken, the hair test
[18]  is performed.  In the event that a safety-net test
[19]  is requested, a second new hair sample will be
[20]  taken?
[21]  A.   From the subject, true.
[22]  Q.   From the subject for the safety-net test?
[23]  A.   True.
[24]  Q.   What is the -- in the urinalysis context,

Page 52

[1]   what is the retest supposed to show exactly?
[2]       MS. FERRER:  Objection.
[3]   A.   My opinion is that it has -- what is it
[4]   supposed to show?  It confirms the original test.
[5]   It verifies the chain of custody and documentation.
[6]   I think that's the extent of it.  But I think that's
[7]   the standard procedure.  You know, I'd have to defer
[8]   to the people who originally came up with the
[9]   procedures for a urinalysis testing.
[10]  Q.   Right.  I understand.  I'm just asking for
[11]  your understanding of why retests and safety-net
[12]  tests are performed.
[13]       So you stated just a moment ago that the
[14]  retest is designed in some way to confirm the
[15]  initial result?
[16]  A.   True.
[17]  Q.   Is confirmation necessary or desirable
[18]  because an initial test can sometimes be mistaken?
[19]       MS. FERRER:  Objection.
[20]  A.   No.
[21]  Q.   So it's your understanding that urinalysis
[22]  is never mistaken?
[23]       MS. FERRER:  Objection.
[24]  A.   That's not what I said.  I think that you

Robert Boyle
July 12, 2007

Ronnie Jones, et al. vs.
City of Boston, et al.

Page 117

[1]  A.    That's how I signed up for the e-mails.
[2]  Q.    I take it that was on the World Wide Web?
[3]  That was a www site?
[4]  A.    Right, right, right.
[5]  Q.    My understanding from your counsel is that
[6]  Psychemedics has an intranet or internal Web site
[7]  that's accessible only to presumably employees and
[8]  so on. Do you have access to that site?
[9]  A.    I wasn't aware of it. I don't know if I
[10] have access to it, but I wasn't aware of it.
[11] Q.    All right. We can put that aside for a
[12] moment.
[13]          (Document marked as Boyle
[14]          Exhibit 5 for identification)
[15] Q.    The same drill, Mr. Boyle. Please take a
[16] moment to review the document, and let me know when
[17] you are ready to proceed.
[18] A.    (Witness reviews document) Okay.
[19] Q.    Have you seen this before?
[20] A.    Yes.
[21] Q.    What is it?
[22] A.    It's a memo that I found yesterday
[23] afternoon on my computer.
[24] Q.    Was that the first time you had ever seen

Page 118

[1]  it?
[2]  A.    The first time I saw it was July 8, 1999,
[3]  when I wrote it.
[4]  Q.    Why did you write this memo?
[5]  A.    I attended a meeting -- all I know about
[6]  it -- this is past recollection recorded. I have to
[7]  tell you I have no memory of being in this meeting.
[8]  I can't deny I was there, but I don't remember being
[9]  in the meeting.
[10] Q.    You are referring now to the meeting that's
[11] described in the memo?
[12] A.    Yes.
[13] Q.    This is the meeting at BPD headquarters?
[14] A.    Yes.
[15] Q.    You mentioned, I believe, that you just
[16] found this yesterday, and prior to yesterday you
[17] hadn't seen the document in years; is that right?
[18] A.    Yes. I don't know how many years, yes.
[19] Q.    What prompted you to find this document
[20] yesterday?
[21] A.    The deposition.
[22] Q.    I thought you testified earlier today that
[23] you had previously gathered documents in response to
[24] document requests that the Plaintiffs served on

Page 119

[1]  Defendants in this case; is that right?
[2]  A.    Yes.
[3]  Q.    But you didn't find this at that time?
[4]  A.    True, as far as I know. I could be lodged
[5]  in a Bankers Box somewhere, but I don't recall
[6]  seeing it. I didn't know if it had been produced;
[7]  provided it in case it hadn't. But I was involved
[8]  in that discovery process, all right. I went
[9]  through the bargaining files, Xeroxed pages of
[10] bargaining notes. I tried to be as comprehensive as
[11] possible.
[12] Q.    But this document, is this stored on the
[13] hard drive on the computer?
[14] A.    Yes.
[15] Q.    That's your computer at City Hall; is that
[16] right?
[17] A.    True.
[18] Q.    Did you search the files on that computer
[19] when you were previously gathering documents
[20] responsive to Plaintiffs' document request?
[21] A.    No.
[22] Q.    So you didn't look on that computer for
[23] documents to produce in this litigation until
[24] yesterday?

Page 120

[1]  A.    I was under the assumption that everything
[2]  was on file in hard copy. So when I was responding
[3]  to the discovery I got the hard copies together, and
[4]  in terms of, you know, Q and A -- looking for the Q
[5]  and A, I came across this (indicating exhibit).
[6]  Q.    So you found this yesterday. And what did
[7]  you do with it when you found it?
[8]  A.    I provided it to counsel for the purpose
[9]  of, you know, any necessity to supplement discovery.
[10] Q.    When was that? What time of day?
[11] A.    Well, let's see. We had fire negotiations
[12] all day yesterday. I got back to my office around
[13] 4:00. I had to get home. I had my two kids
[14] downtown, as we talked about during the break. So
[15] sometime between 4:00 and 5:30.
[16] Q.    So sometime between 4:00 and 5:30 yesterday
[17] you provided this to your counsel?
[18] A.    Yes.
[19] Q.    How did you do that? By e-mail?
[20] A.    Yes.
[21] Q.    Did somebody ask you to write this memo?
[22] A.    No.
[23] Q.    What did you do with it after you wrote it?
[24] A.    Apparently I left it on my computer.

Ronnie Jones, et al. vs.
City of Boston, et al.

Robert Boyle
July 12, 2007

---

Page 121

[1] **Q.** Who is Patrick Kelley from Psychemedics?

[2] **A.** I don't know.

[3] **Q.** Have you ever met Patrick Kelley?

[4] **A.** Apparently once, but I don't recall meeting

[5] him. He is not the person whose name I'm trying to

[6] remember.

[7] **Q.** Who is Bobbie Mullan?

[8] **A.** Roberta Mullan is the director of the

[9] Occupational Health Service at the Boston Police

[10] Department.

[11] **Q.** And Bernie Kelly, who is Bernie Kelly?

[12] **A.** I should know but I don't.

[13] **Q.** If you know?

[14] **A.** I don't know. Go ahead.

[15] **Q.** You write in the second paragraph, "Patrick

[16] Kelley showed a Psychemedics videotape on sample

[17] collection procedures." I believe, if I'm not

[18] mistaken, earlier today you referenced a

[19] Psychemedics videotape?

[20] **A.** Right.

[21] **Q.** Is this the same videotape?

[22] **A.** I don't know. And the reason is I didn't

[23] see the original. Deputy Ferguson had the tape. I

[24] said, "What's on it?" I had never sat down and

---

Page 122

[1] watched it. I just wanted to make sure he had seen

[2] it before he gave it to the Union.

[3] **Q.** In the third paragraph you write, "Patrick

[4] Kelley discussed the possibility of prescription

[5] drugs contributing to a positive test result." Is

[6] it your understanding that the use of legal

[7] prescription medication can result in a positive

[8] result on the hair test?

[9] **MS. FERRER:** Objection.

[10] **A.** You know, this was an issue that was

[11] discussed as part of the negotiations. I remember

[12] when, you know, I think in talking to Bob Holland,

[13] you know, at the time people were saying that people

[14] had concerns about eating poppy seeds and testing

[15] positive. So one of the things we were saying is

[16] no, you can't test positive because you ate poppy

[17] seeds. And you know, so along that line this person

[18] apparently had a concern about Tylenol with codeine

[19] which I don't know if that's a prescription drug or

[20] not. Okay. It says -- so in other words, I guess

[21] the concern here was Tylenol with codeine, a

[22] prescription drug, is going to influence the test.

[23] I'm just reading from the third paragraph.

[24] **Q.** Right. What I'm interested in is your

---

Page 123

[1] understanding as you sit here today, can Tylenol

[2] with codeine or other prescription drugs influence

[3] the results of a hair drug testing?

[4] **MS. FERRER:** Objection.

[5] **A.** I haven't thought about it in a long time.

[6] I haven't had reason to think about it in a long

[7] time. I haven't really read this. You know, I just

[8] saw it and said, you know... I haven't gone through

[9] this in detail at all.

[10] **Q.** If you look at the last paragraph that

[11] starts on this first page, the one that begins, "BK

[12] then asked BT if external contamination was a

[13] concern." Do you see that paragraph?

[14] **A.** Yes.

[15] **Q.** The next sentence says, "BT said that

[16] external exposure to drugs can lead to drugs getting

[17] into the bloodstream"?

[18] **A.** Right.

[19] **Q.** Is it your understanding as you sit here

[20] today that external exposure to drugs can lead to

[21] drugs getting into the bloodstream?

[22] **MS. FERRER:** Objection. Just for the

[23] record it reads in part only that. You may answer.

[24] **A.** I think -- I don't understand what he is

---

Page 124

[1] saying. I'm not an expert, but as I sit it here

[2] today I would tend to disagree with it.

[3] **Q.** I'm not sure I understand what you mean

[4] when you say "tend to disagree with it"?

[5] **A.** I disagree with it, although I'm not

[6] qualified to disagree with it. It's just my

[7] opinion. I don't think that's true. And I don't

[8] know -- you know, for example, I'm typing what I

[9] heard at a meeting in my office. So don't get the

[10] impression this is word for word. I was sent to a

[11] meeting, took some notes, didn't provide it to

[12] anyone, and apparently never printed a hard copy

[13] because it didn't go with the other hard copied

[14] documents that were produced in discovery. It

[15] stayed on my computer for nine years.

[16] I think that from the arbitration that we

[17] did the information that I heard was different, and

[18] it made more sense the way it was explained in the

[19] arbitration. So I don't think, as I sit here today,

[20] it gets into the bloodstream.

[21] **Q.** Do you doubt the accuracy of anything you

[22] have written here in this report?

[23] **A.** Honestly, I haven't read the whole thing.

[24] It's three pages long. I was told before I went on

---

Doris O. Wong Associates, Inc.

Min-U-Script®

(31) Page 121 - Page 124

**EXHIBIT F**

Case 1:05-cv-11832-GAO    Document 67-4    Filed 08/28/2007    Page 14 of 16

10/12/06 DEPOSITION OF KATHLEEN O'TOOLE    RE:    RONNIE JONES, ET AL. V. CITY OF BOSTON, ET AL.

Page 1

VOLUME:  1

PAGES:  1-111

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

RONNIE JONES, ET AL.          ) CIVIL ACTION

        PLAINTIFFS,           ) NO.:  05-11832-GAO

V.                            )

CITY OF BOSTON, ET AL.,       )

        DEFENDANTS.           )

_____)

DEPOSITION OF KATHLEEN O'TOOLE

DATE:    OCTOBER 12, 2006

TIME:    10:06 A.M.

PLACE:   BINGHAM MCCUTCHEN, LLP

         150 FEDERAL STREET

         BOSTON, MA  02110

MEDEIROS STENO & VIDEO GROUP        EAST COAST:  617.590.9767        WEST COAST:  415.652.9340
E-MAIL:  DEPO@GOMEDEIROS.COM                                         WWW.GOMEDEIROS.COM

83b91a62-42c8-45af-bf05-24a1c000a756

10/12/06 DEPOSITION OF KATHLEEN O'TOOLE    RE:    RONNIE JONES, ET AL. V. CITY OF BOSTON, ET AL.

8  (Pages 26 to 29)



Page 26

1    MS. HARRIS:  Same objection as to the communications
2    with counsel.
3        A:  I don't recall anything else.
4        Q:  Are there any notes memorializing any of these
5    meetings?
6        A:  The meetings with M.A.M.L.E.O.?
7        MS. WEBSTER:  I'll separate that into two questions.
8        Q:  Are there any notes memorializing the meetings with
9    M.A.M.L.E.O. concerning the hair test?
10       A:  The only notes I remember is once in a while there was
11   an agenda I might scribble some notes on an agenda, or scribble
12   some things on an agenda during a meeting.  There were kind of
13   informal notes that I have.  I actually saw a page today that
14   was probably, well were definitely my notes during one of the
15   meetings.
16       Q:  Do you know if anyone else who attended these meetings
17   on behalf of the department took notes?
18       A:  I'm sure sometimes either Bobbie Johnson or Rachel
19   Hutchinson kept notes too.  I'm not sure whether they kept they
20   formally or whether they were just jotting things down similar
21   to my style.  We obviously jotted down a few notes here and
22   there because we wanted to get back to M.A.M.L.E.O. with answers
23   on some of the concerns from time to time.  So I might make a
24   quick note of something and either call it in to be followed up

Page 27

1    or when I'd get back to the office I'd mention to staff that I
2    wanted follow-up on a particular issue.  I wanted them to look
3    into something for me.
4        Q:  Who in staff would you follow-up with?
5        A:  It could be anybody.  Sometimes I'd go to Kathy
6    Kearney who was there.  Other times I'd go to Rachel Keefe who
7    was a Deputy Superintendent.  She was Chief of Staff in the
8    office.  Sometimes I'd call Ed Callahan who was responsible for
9    oversight of HR and other administrative functions.  It really
10   depended on the issue but it was usually my style to pick up the
11   phone to ask Kathy Kearney or Rachel Hutchinson to pick up the
12   phone to get answers on particular issues either after a
13   M.A.M.L.E.O. meeting or prior to the next M.A.M.L.E.O. meeting.
14       Q:  How would they get those answers?
15       A:  Sometimes they would just get a briefing.  For
16   instance, we often talked about the issue of civil service and
17   hiring practices and how we could diversify the department to a
18   greater extent.  I very often called Ed Callahan and would ask
19   Ed to quickly give me an answer, or to come up to my office and
20   brief me so I'd have a better sense for the civil service system
21   so I could understand how we could work within the system to get
22   a more diverse candidate pool.  So I definitely didn't spend a
23   lot of time writing reports back and forth to each other.  I
24   just didn't have time for that.  My day was absolutely crazy so

Page 28

1    I usually relied on quick telephone calls, or people coming in
2    face-to-face and doing briefings.  Usually every afternoon at
3    three o'clock, at least during the last year that I was on the
4    job, I gathered my immediate command staff when I was in the
5    office and said just give me a sense for what's going on in each
6    bureau.  So a lot of it was done verbally.
7        Q:  Was any of it done in written memos or even email?
8        A:  Well, from time to time but I don't recall any
9    lengthy, I don't recall any emails other than what I saw today
10   that related to hair testing.  The discussions that were pretty
11   cut and dry:  look, this was negotiated back in the late 90s
12   with the Union.  It's been an ongoing issue.  We feel
13   comfortable that we have, that the science is sound and at the
14   end of the day the scientists will prepare for any litigation
15   that evolves.
16       MS. WEBSTER:  I'd like to go back to the meetings
17   you described with lawyers, Labor Relations and Human Resources
18   regarding the hair tests and M.A.M.L.E.O.'s concerns.
19       Q:  Could you describe what the conversations were about
20   with Ed Callahan from Human Resources?
21       A:  Well, I don't remember exactly what I said to Ed
22   Callahan or anybody else.  I can remember collectively the
23   discussions that I had with people, or the impressions that I
24   developed as a result of discussions I had with people.  I'm

Page 29

1    sure that whatever discussions I had with Ed Callahan would have
2    been very similar to the ones I had with Sandra Debow or people
3    from the legal department just asking how the policy evolved,
4    why we opted for hair testing, and how confident people felt
5    with that process versus other processes that may be available.
6        Q:  Besides Ed Callahan and I think you said Sandra DeBow,
7    was a legal relations lawyer.  Correct?
8        A:  Labor Relations.
9        Q:  Labor Relations lawyer.  Were there any other
10   non-lawyers present during those meetings?
11       A:  Deputy Superintendent Rachel Hutchinson would have
12   been involved in the discussions.  She attended some of to
13   M.A.M.L.E.O. meetings I believe that were held at headquarters
14   early on.  Bobbie Johnson would have participated in or been
15   present when we had some of the discussions about hair testing.
16   Perhaps Kevin Foley who was a Deputy Superintendent in charge of
17   Labor Relations or worked closely with Sandra DeBow.  I don't
18   remember anybody else being present.
19       Q:  So after these meetings how confident were you about
20   the hair testing process?
21       A:  Well, when I heard that several other major city
22   police departments used this process and that it had never been
23   overturned in a challenge, I felt confident that it was probably
24   the best method out there at this point.  As I said before, I




MEDEIROS STENO & VIDEO GROUP
E-MAIL: DEPO@GOMEDEIROS.COM

EAST COAST: 617.590.9767

WEST COAST:  415.652.9340
WWW.GOMEDEIROS.COM

8e2155a1-c8ee-4c91-9d41-1d5afa421177

10/12/06 DEPOSITION OF KATHLEEN O'TOOLE        RE:    RONNIE JONES, ET AL. V. CITY OF BOSTON, ET AL.

9 (Pages 30 to 33)

Page 30

1  felt very strongly that a drug testing policy needed to be in
2  place and that the Union and management negotiated this prior to
3  my arrival and at the end of the day let the scientists sort it
4  out. I think that was the conclusion that I came to and again
5  we reached a point where we couldn't discuss it anymore because
6  it was in litigation.
7      Q: Did any of the individuals with whom you spoke about
8  hair testing voice any concerns about the hair tests?
9      MS. HARRIS: I would object and again just instruct
10 you that any attorney-client communications are privileged. So
11 to the extent that you can answer without revealing those
12 communications, you can answer.
13     A: I'll just say I was very open-minded about it because
14 I didn't know anything about it. So when the issue was first
15 raised by M.A.M.L.E.O. I went back and talked to different
16 staff. I was surprised at the level of confidence they had in
17 the methodology. They obviously had spent a lot of time in
18 briefings over the years prior to and since the implementation
19 of the policy. I was surprised at their level of confidence in
20 the process.
21     Q: Why were you surprised?
22     A: Well, they were very emphatic about, the people I
23 spoke to obviously had a great deal of confidence in the vendor
24 and in the process and were quick to tell me that this was what

Page 31

1  was negotiated with the Union; that the Union opted for this as
2  opposed to urine testing; that they were adamantly opposed to
3  urine testing during the negotiations process; and that since
4  then the science had been challenged on several occasions but
5  never successfully. They felt confident that this was the best
6  method. So initially I was very open-minded about it, you know,
7  why not explore other options but then learned that other
8  options had been explored and that the conclusion was reached
9  that this was the best method at the time the test was
10 implemented and following that.
11     Q: What other options were explored?
12     A: Well, apparently, and again I wasn't part of the
13 process.
14     MS. HARRIS: Then I'll object. We don't want you to
15 guess. So if you're reporting what people have informed you,
16 again leaving aside attorney-client communications, that's fine.
17 We're looking just for your personal knowledge.
18     THE WITNESS: I was just told that the urine option
19 was explored and that the Union was adamantly opposed to it back
20 in the late 90s and that's why the department explored the hair
21 testing option.
22     Q: Earlier you referred to a vendor. Who was that
23 vendor?
24     A: I wouldn't know how to spell this or I'm not even sure

Page 32

1  I know how to pronounce it correctly, but I think it's
2  Psychemedics. Is that correct?
3      Q: Psychemedics.
4      A: Psychemedics.
5      Q: When you were hired as the Police Commissioner were
6  you required to take a hair drug test?
7      A: I did take one. I'm not sure whether it was required
8  as part of my pre-employment physical but I, like Commissioner
9  Evans, took the test every year even though it wasn't required.
10     Q: When did you take the hair drug test?
11     A: I took it twice. I remember taking it twice and I
12 don't remember exactly when that was. I took it at least twice
13 but it was within a month prior to or after my birthday. The
14 Police Commissioner is a civilian and by law I wasn't required
15 to take it. I wasn't officially a sworn member of the
16 organization but Commissioner Evans set a precedent by taking it
17 because he thought I guess it was important to lead by example
18 and so I thought I'd do the same.
19     Q: What were the results of your hair drug test?
20     A: Well, I assume they were negative. I never saw them.
21     Q: So you never received any written reports?
22     A: No.
23     Q: Did you take a hair drug test when you first joined
24 the Boston Police force?

Page 33

1      A: No. Back in 1979 I'm not sure what the science was
2  but we went through an entire physical, including urine testing.
3  I'm not sure whether a drug test was conducted or not.
4      Q: Did you take a urine test when you first joined the
5  police force?
6      A: It was a complete physical and it did involve urine
7  testing. I don't know whether they tested for drugs back in
8  those days or not.
9      Q: When you were a police officer was drug use among
10 fellow officers a major problem?
11     A: That would be hard for me to say. Substance abuse has
12 always been a concern in the business. I think alcohol abuse
13 during my early days on the job was more prevalent but I'm sure
14 there were people then who were abusing other substances as
15 well.
16     Q: If we could go back to the hair drug test and the
17 negotiations. Were any negotiations concerning the hair drug
18 test still ongoing when you took the position of Police
19 Commissioner?
20     A: No.
21     Q: Did you play any role in the department's decision to
22 continue using the hair drug test?
23     MS. HARRIS: Objection. You can answer.
24     A: It was part of the ongoing collective bargaining

MEDEIROS STENO & VIDEO GROUP    EAST COAST: 617.590.9767    WEST COAST: 415.652.9340
E-MAIL: DEPO@GOMEDEIROS.COM                                  WWW.GOMEDEIROS.COM

8e2155a1-c8ee-4c91-9d41-1d5afa421177