**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

———————————————————————

RONNIE JONES, ET AL.,

        Plaintiffs,

v.

CITY OF BOSTON, ET AL.,

        Defendants.

———————————————————————

CIVIL ACTION
No. 1:05-cv-11832-DPW

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR ENTRY OF JUDGMENT PURSUANT TO FED. R. CIV. P. 52(c)

Respectfully submitted,

**RONNIE JONES, ET AL.,**

By their attorneys,

*/s/ Alexandra R. Reynolds*
Lisa J. Pirozzolo (BBO #561922)
Eric D. Wolkoff (BBO #679566)
Alexandra R. Reynolds (BBO #690501)
Jeffrey S. Olshan (BBO #693337)
Arjun K. Jaikumar (BBO #691311)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000
lisa.pirozzolo@wilmerhale.com
eric.wolkoff@wilmerhale.com
lexie.reynolds@wilmerhale.com
jeff.olshan@wilmerhale.com
arjun.jaikumar@wilmerhale.com

Oren M. Sellstrom (BBO #569045)
Laura Maslow-Armand (BBO #563003)
LAWYERS' COMMITTEE FOR CIVIL
   RIGHTS AND ECONOMIC JUSTICE
61 Batterymarch Street, Fifth Floor
Boston, MA  02110
(617) 988-0613
osellstrom@lawyerscom.org
laurama@lawyerscom.org

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ........................................................................................................... 1

II.  ARGUMENT ................................................................................................................... 1

    A.  The Officers Presented Substantial Evidence That Defendants Failed to Adopt A Less Discriminatory Alternative to the Hair Test ...................................................... 1

        1.  Evidence Established That Hair Testing Plus Random Urinalysis Would Have Been as Effective as the Hair Test Alone at Detecting and Deterring Drug Use ....................................................................................................... 3

        2.  The Officers Presented Evidence That the Proposed Alternative Would Have Had a Less Disparate Impact ............................................................... 4

        3.  The Evidence Established the Alternative Was Available to the Department .................................................................................................. 10

    B.  The Department's Other Attacks on The Officers' Claims Fail ............................. 15

        1.  The Officers Meet the Requirements of Article III Standing ................... 15

        2.  Officers Bridgeforth and Downing Remain Viable Plaintiffs .................. 15

        3.  Officer Couch Did Not Waive Her Claim ................................................. 17

    C.  Officer Bridgeforth and Ms. Hogan Suffered Compensable Injuries .................... 18

        1.  Officer Bridgeforth Proved a Compensable Injury ................................... 18

        2.  Cadet Keri Hogan Proved a Compensable Injury ..................................... 19

III.  CONCLUSION ............................................................................................................. 20

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Adams v. City of Chicago*, 469 F.3d 609 (7th Cir. 2006) .........................................................12, 14

*Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975)......................................................................5

*Allen v. McCurry*, 449 U.S. 90 (1980)...........................................................................................18

*Bradley v. City of Lynn*, 443 F. Supp. 2d 145 (D. Mass. 2006)............................................2, 12, 13

*Bridgeport Guardians, Inc. v. City of Bridgeport*, 735 F. Supp. 1126 (D. Conn. 1990) .......................................................................................................................................12

*Bridgeport Guardians, Inc. v. City of Bridgeport*, 933 F.2d 1140 (2d Cir. 1991).........2, 10, 12, 13

*Connecticut v. Teal*, 457 U.S. 440 (1982).......................................................................................5

*Denton v. Boilermakers Local 29*, 673 F. Supp. 37 (D. Mass. 1987)...........................................20

*Dothard v. Rawlinson*, 433 U.S. 321 (1977)...................................................................................5

*E.E.O.C. v. Convergys Customer Mgmt. Grp., Inc.*, 491 F.3d 790 (8th Cir. 2007)......................13

*E.E.O.C. v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018 (11th Cir. 2016) .........................................5

*Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280 (2005)..................................18

*Garcia v. Gloor*, 618 F.2d 264 (5th Cir. 1980)...............................................................................5

*Griggs v. Duke Power Co.*, 401 U.S. 424 (1971) ............................................................................5

*In re: Boston Police Dep't Drug Testing Appeals ("D" Cases)*, Case No. D-03-362, 125 (Mass. Civ. Serv. Comm'n 2013) .........................................................................19

*Jones v. City of Boston*, 752 F.3d 38 (1st Cir. 2014).........................................................5, 10, 15

*Jones v. City of Boston*, 845 F.3d 28 (1st Cir. 2016) ............................................................ *passim*

*Lewis v. City of Chicago, Ill.*, No. 98 C 5596, 2005 WL 693618 (N.D. Ill. Mar. 22, 2005) ..................................................................................................................13

*McDonald v. Menino*, No. CIV. A. 96-10825-RGS, 1997 WL 106955 (D. Mass. Jan. 3, 1997)...................................................................................................................13

*Melanson v. Browning-Ferris Indus., Inc*., 281 F.3d 272 (1st Cir. 2002) .....................................17

*NAACP v. North Hudson Regional Fire & Rescue*, 742 F. Supp. 2d 501 (D.N.J. 2010) .................................................................................................................13

*Porio v. Dep't of Revenue*, 80 Mass. App. Ct. 57 (2011) ............................................18

*Robinson v. Lorillard Corp.*, 444 F.2d 791 (4th Cir. 1971)...........................................11

*Thompson v. No. American Stainless, LP*, 562 U.S. 170 (2011) ...................................15

*United States v. City of Warren, Mich.*, 138 F.3d 1083 (6th Cir. 1998)..........................5

*United States v. N. L. Indus., Inc.*, 479 F.2d 354 (8th Cir. 1973) ..................................11

*Unum Life Ins. Co. of Am. v. Cappello*, 278 F. Supp. 2d 228 (D.R.I. 2003) ................17

*Wolf v. Reliance Standards Life Ins. Co.*, 71 F.3d 444 (1st Cir. 1995) .........................17

# I.     INTRODUCTION

Defendants' Motion for Entry of Judgment Pursuant to Fed. R. Civ. P. 52(c) (Dkt. 386-387) should be denied on the grounds that Plaintiffs presented substantial evidence that the Defendants' use of a discriminatory hair drug test violated Title VII of the Civil Rights Act of 1964.   Having already found that the hair drug test used by the Boston Police Department (the "Department") from 1999-2006 had a disparate impact on Black police officers, the First Circuit remanded this case for a determination of whether the Department failed to adopt a less discriminatory alternative: hair testing plus random, frequent urinalysis.  *Jones v. City of Boston*, 845 F.3d 28, 38 (1st Cir. 2016) (*Jones II*).  On remand, Plaintiffs offered substantial evidence that the proposed alternative would have been just as effective at detecting and deterring drug use as the hair test alone, but would have had a less disparate impact on Black officers.

Plaintiffs further demonstrated that the Department knew of but failed to adopt the less discriminatory alternative.  Each of the four individual plaintiffs in this case—George Downing, an 8-year veteran of the Department; Rachelle Couch, a 30-year veteran of the Department; William Bridgeforth, a 14-year veteran of the Department; and Keri Hogan, a successful cadet who dreamed of becoming a police officer—denied drug use and informed the Department of independent drug tests with negative results.  The Department nevertheless proceeded to take adverse action against them despite the availability of a superior and less discriminatory alternative.

The Department violated Title VII and the Officers are entitled to judgment in their favor.

# II.    ARGUMENT

## A.    The Officers Presented Substantial Evidence That Defendants Failed to Adopt A Less Discriminatory Alternative to the Hair Test

The Officers presented extensive evidence that the hair testing plus urinalysis alternative

proposed by Dr. David Kidwell in June 2003: 1) would have been as effective as the hair test

alone at meeting the Department's legitimate needs to detect and deter drug use; 2) would have

had a less disparate impact on Black officers than use of the hair test alone; and 3) was available

but the Department refused to adopt it.  *Jones II*, 845 F.3d at 34.  Indeed, the Officers' evidence

demonstrated that the alternative "retained the main benefit of the challenged drug testing

program: using a relatively unintrusive, easy-to-supervise hair test to generate the negative

results that confirm that almost all officers, regardless of race, do not use illegal drugs," while

adding the safeguard of urinalysis for those officers who test positive on the hair test.  *Id*. at 35.

Faced with evidence of an effective and less discriminatory alternative that would have

required only slight modification to its existing practices, the Department throws up a host of

factually and legally flawed arguments.[1]  Among other things, the Department repeatedly

criticizes Dr. Kidwell's proposal for what it does ***not*** specify, such as when and whether an

officer's weapons must be confiscated or the precise frequency of the random urinalysis.  These

attacks on the proposed alternative are misplaced.  Title VII does not demand that the Officers

proffer a blueprint for the less discriminatory alternative, particularly under circumstances where

the alternative was an obvious or logical variation of procedures already used by the Department.

*Bradley v. City of Lynn*, 443 F. Supp. 2d 145, 174-75 (D. Mass. 2006) (no obligation to provide

"exact floor plan").  Nor was there any requirement that the Department take the proposed

alternative "as is" without adjustment.  *Bridgeport Guardians, Inc. v. City of Bridgeport*, 933

F.2d 1140, 1145, 1149 (2d Cir. 1991) (Defendants could have adopted revised version of

alternative).  And finally, there is no basis to revise the proposed alternative to require features

---

[1] Contrary to the requirements of Rule 56(c), Defendants' motion improperly relies on their own proposed Findings of Fact that Plaintiffs disputed.  *See, e.g.*, Memorandum in Support of Defendants' Rule 52(c) Motion ("Defs Mot.") 4 (citing DFOF 150—52), 6 (citing DFOF 153), 7 (citing DFOF 156, 160-1, 163-4, 170, 172), 8 (citing DFOF 174, 176-77), 9 (citing DFOF 206), 10 (citing DFOF 209, 191, 197), 11 (citing DFOF 21-22), 13 (citing DFOF 131-2, 29-39), and 14 (citing DFOF 61-7, 69,73, 75, 78-9, 83-4, 86-90).

that were not suggested and, in any event, were within the discretion of the Department to disregard (such as removing weapons until random urinalysis indicated an absence of drug use). Defendants' reliance on these arguments should be rejected.

      1.    <u>Evidence Established That Hair Testing Plus Random Urinalysis Would Have Been as Effective as the Hair Test Alone at Detecting and Deterring Drug Use</u>

The Officers' evidence clearly established that the proposed alternative would have been as effective at deterring drug use as the hair test alone.  Kidwell Aff. ¶¶28-30, 75-78, 81-84. Indeed, the Officers presented evidence that the proposed alternative would have been ***more*** effective than hair testing alone in identifying actual drug users, allowing the Department to retain all the benefits of the hair test while minimizing the disparate impact with the additional safeguard of random, frequent urinalysis.

The Officers presented evidence that random urinalysis is not only highly effective, but the most widely accepted employment drug test, including by the Federal government.  Walsh Aff. ¶17; 36-45; Trial Tr. 1-32:12-13; *see also* Kidwell Aff. ¶17.  Random urinalysis can detect both occasional and frequent drug use, and thus provides a high level of deterrence since even occasional drug users cannot know when to abstain from drug use.  Kidwell Aff. ¶30, 75, 82. Indeed, it is undisputed that from 1999-2006 the Department was already using urinalysis in scenarios where officers received a positive hair test and admitted drug use or were reasonably suspected of using drugs.  *See* undisputed facts PFF ¶¶12, 143.  As noted by the First Circuit, the Department's use of urinalysis for officers reasonably suspected of using drugs "naturally suggests that the Department viewed random urinalysis as an acceptably reliable method for detecting drug use on a targeted (rather than mass) basis."  *Jones II*, 845 F.3d at 35.

Defendants' argument that the alternative would have posed a public safety risk because it would not detect drug use quickly enough, Defs Mot. 7, also misses the mark given evidence

that urinalysis following a positive hair test would readily (and more accurately) identify actual active drug users.  Under Dr. Kidwell's proposal, the Department could use random urinalysis as frequently as it deemed necessary to ensure that officers who tested positive on the hair test, but denied drug use, were not actively using drugs.  Kidwell Aff. ¶86.  Such random, frequent urinalysis, given as frequently as twice per week, would catch actual drug users within a short period of time.  Kidwell Aff. ¶¶75-76; EX-520 (2003 Crosby, et al. study) at 94.  Nor does anything in Dr. Kidwell's proposal suggest that officers who tested positive on the hair test must retain their firearms.  PL's F ¶35; Kidwell Aff. ¶¶72-73.  To the contrary, Dr. Kidwell testified that removing an officer's weapon would remain a policy choice for the Department, and that his proposal that "no adverse action" be taken on the hair test alone simply means an officer would not be suspended without pay or terminated based solely on a hair test.  Trial Tr. 1-92:20-94:8.  Indeed, the Department already removes an officer's weapon after a positive hair test and Dr. Kidwell did not propose changing that policy.  Trial Tr. 1-92:16-93:2.

Defendants' argument that the alternative would not have met the Department's goal of rehabilitation is similarly unavailing.  There is no need to rehabilitate officers who are not drug users.  Indeed, the Plaintiff Officers who entered rehabilitation despite not being drug users testified as to the inappropriateness of the rehabilitation program for them.  Bridgeforth Aff. ¶29 (group counseling session "felt strange" because "I was not a drug user"); Couch Aff. ¶41 ("I had nothing to share [in rehabilitation sessions] because I had not used drugs").  Forcing a non-drug-using officer into a false act of contrition by agreeing to attend rehabilitation is precisely one of the flaws that the proposed alternative would remediate.

    2.    <u>The Officers Presented Evidence That the Proposed Alternative Would Have Had a Less Disparate Impact</u>

Defendants' contention that the Officers have failed to show that the hair test as used by

the Department had a disparate impact on Black officers (and that the alternative would have had a lesser disparate impact) fails for the following reasons.

a)   The Officers Presented Substantial Evidence That the Hair Test Generated False Positives for Black Officers

Defendants' argument that the Officers' claim is one of "cultural bias" that will not support a Title VII claim, Defs Mot. 1-5, is directly contrary to the First Circuit's ruling that the hair drug test used by the Department from 1999-2006 had a disparate impact on Black officers. *Jones v. City of Boston*, 752 F.3d 38, 60 (1st Cir. 2014) ("*Jones I*") ("The plaintiffs have proven beyond reasonable dispute a prima facie case of disparate impact under Title VII.").  Moreover, as with Defendants' failed motion *in limine* predicated on the same theory, the cases Defendants cite in support of their position either were not disparate-impact cases, or run counter to Defendants' position.  *See, e.g.*, *E.E.O.C. v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1024 (11th Cir. 2016) (intentional discrimination case); *Garcia v. Gloor*, 618 F.2d 264, 269 & n.6 (5th Cir. 1980) (disparate impact can be based on "some mutable conditions, such as where an employee lives").

It is well-settled law that a Title VII claim can arise when a facially race-neutral employment practice based on a "mutable" characteristic—such as place of residence, weight, test scores, or education—has a racially disparate impact.  *See, e.g.*, *Connecticut v. Teal*, 457 U.S. 440 (1982) (written examinations); *Dothard v. Rawlinson*, 433 U.S. 321 (1977) (weight); *Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975) (written aptitude tests); *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971) (education); *United States v. City of Warren, Mich.*, 138 F.3d 1083 (6th Cir. 1998) (residency requirements).  The key is that the impact of the practice must fall disproportionately on members of a protected class.  The Officers presented ample evidence to support a finding that the hair drug test used by the Department from 1999-2006 resulted in

false positives for Black officers.

As the evidence demonstrated, hair testing cannot reliably distinguish between drug ingestion and external contamination.  It has not been accepted for use by the Federal government, and has been the subject of controversy in the scientific and law enforcement communities for nearly two decades, with many questioning its reliability to distinguish between exposure to drugs and drug use.  *See, e.g.*, PL's XXXX (1996 Joseph, et al.) at 1913 (further evaluation of ethnicity and hair color bias needed "before the adoption of hair testing as a reliable drug-testing technology"); PL's CCCC (2001 Romano) at 127 (positive hair test result "should always be confirmed with a urine test"); PL's VVVV (2007 Kidwell & Smith) at 66 ("[C]ocaine is readily incorporated into hair from environmental exposure and not removed by common decontamination techniques."); PL's UUUU (2009 Ropero-Miller & Stout) at 60 (even after decontamination, hair test cannot "adequately discriminate contamination from drug use").

Indeed, in 2009, the FBI terminated the use of hair drug testing out of concern that "cocaine may be absorbed into hair via external contamination to a higher extent than had previously been considered."  PL's WWWW (2009 LeBeau & Montgomery) at 1806; Walsh Aff. ¶33.  Numerous scientific studies have found that hair testing is an unreliable indicator of drug use and can be racially biased.  *See* PL's VVVV (2007 Kidwell and Smith) at 56 ("[H]air of Caucasian males or females incorporates much less drugs than the hair of many African-Americans"); PL's AAAAA (1998 Henderson, et al.) at 161 (discussing racial bias "in the incorporation of cocaine into human hair"); PL's XXXX (1996 Joseph, et al.) at 1913 (Africoid hair may test positive "by hair analysis at a higher rate in comparison with other groups").  This is consistent with the evidence that a disproportionate number of Black police officers, including the Plaintiff Officers who had no prior record or indication of drug use and provided independent

testing results contrary to the hair test, nevertheless tested positive.  *See, e.g.*, Downing Aff.

¶¶17, 25, 28, 29, 32; Bridgeforth Aff. ¶¶17, 38, 41; Couch Aff. ¶¶9, 23, 24, 31, 42, 54, 55;

Hogan Aff. ¶¶18, 25, 29, 32.

Defendants do not dispute that cocaine and cocaine metabolites are present in the general

environment and can end up in human hair as a result of either ingestion or external exposure.

*See* undisputed facts PFF ¶¶92-93.  They also do not contest that if a person comes in contact

with the sweat of a drug user or contaminated surfaces, their hair can itself become

contaminated.  *See* undisputed facts PFF ¶95.  And there is no dispute that, as a consequence, the

presence of cocaine and cocaine metabolites in hair does not prove that an individual has

ingested cocaine.  *See* undisputed facts PFF ¶ 96.  Although proponents of hair testing have

attempted to distinguish between ingestion and external exposure via "washing," "cutoffs," and

"ratios," Plaintiffs presented evidence that many in the scientific community rejected those

attempts as ineffective.  Kidwell Aff. ¶63-70; Walsh Aff. ¶30; PL's UUUU at 60.

The serious shortcomings of hair testing are readily apparent from evidence that

Psychemedics—the company that performed the disputed hair test—changed its testing criteria

numerous times during the time period at issue.  Walsh Aff. ¶¶49-55.  Psychemedics changed its

standard operating procedures thirteen times between 1999 and 2005, and such changes suggest

that there were problems with Psychemedics' hair testing procedures.  Walsh Aff. ¶49.  Among

other things, Psychemedics changed its standards for what levels of cocaine and metabolites

indicated a positive result for cocaine ingestion ***eight times*** over the six-year period at issue.

Walsh Aff. ¶53.  Some of the additional evidence that the Psychemedics hair test was unreliable

included:

- To prove drug use, Psychemedics relied on the presence of three metabolites—
  benzoylecgonine ("BE"), cocaethylene ("CE"), and norcocaine ("NC")—that are not

unique markers of cocaine ingestion.  The presence of those metabolites in a sample proves nothing of drug use.  Trial Tr. 1-118:13-124:24; EX-518 (2014 FBI study) at 5; Kidwell Aff. ¶66-70; Walsh Aff. ¶30; PL'S UUUU at p. 60.

- BE is created outside the body through the breakdown of cocaine itself.  Trial Tr. 1-121:11-122:7; EX-518 (2014 FBI Study) at 2, 5-6; Kidwell Aff. ¶67; Walsh Aff. ¶30.

- CE and NC are present in street cocaine.  Trial Tr. 1-23:10-22; EX-518 (2014 FBI study) at 2, 7, 8; Kidwell Aff. ¶69; Walsh Aff. ¶30; PL'S UUUU at p. 60.

Plaintiffs presented evidence that the hair test's high rate of positives for cocaine use among Black officers is at odds with detection of other types of drug use, including marijuana. Walsh Aff. ¶28 (findings of relatively high cocaine use and low marijuana use within the Department "seemed odd to me as marijuana use in the United States has always been significantly greater than cocaine use.").

The Officers also presented evidence that Black individuals are more likely to test positive as a result of external contamination because of several factors: (a) hair of Black individuals is generally very dark and contains more melanin than other hair types, allowing more cocaine to bind and be absorbed into the granules of the hair's inner cortex; (b) hair of Black individuals is more likely to have structural defects such as knotted or broken hair shafts than other hair types, increasing the effects of external contamination by allowing cocaine to more easily penetrate the hair's cuticle; (c) cosmetic treatments and moistening hair products, which are commonly used by Black individuals who have dry, brittle hair, especially those containing oil and glycerol, make hair more porous, permeable, and sensitive to external contamination by enhancing drug transfer from the environment into the hair; and (d) Black individuals may not wash their hair as frequently due to potential for cosmetic damage and lower levels of sebum, which allows for greater exposure time for externally introduced chemicals. Kidwell Aff. ¶¶48-54; Trial Tr. 1-130:15-134:22; Walsh Aff. ¶¶23-25.  As a result, false positives on the hair test due to external contamination can and do occur—and Black individuals'

hair is more susceptible to false positive results.

Unable to sustain their burden, Defendants resort to mischaracterizations.  Drs. Kidwell and Walsh did not testify that hair grooming practices are the ***only*** reason for false positives on the hair test.  On the contrary, they identified multiple factors, tied to genetic hair qualities such as an elevated concentration of melanin and the associated proteins that bind easily with cocaine, which contribute to the heightened false-positive risks that Black officers faced.  Kidwell Aff. ¶50-54; Walsh Aff. ¶23-25; Trial Tr. 1-130:15-21.

> b) <u>The Proposed Alternative Is Clearly Less Discriminatory Because Urinalysis is Race Neutral and Not Susceptible to External Contamination</u>

In contrast to hair testing, urinalysis is widely accepted to be biologically race neutral. *See* Kidwell Aff. ¶81.  It is the recognized "gold standard in identifying drug use," and does not suffer from external contamination risks.  *See* PL's SSSSS (2003 Kidwell, et al. study) at 63, 76 (referring to urinalysis as "gold standard" and stating, "Where external contamination is an issue, urinalysis will provide more reliable proof of drug use"); EX-520 (2003 Crosby, et al. study) at 90 (urinalysis considered "gold standard"); Kidwell Aff. ¶79.  It is therefore "self-evident" that, if the hair test produced false positives for Black officers due to its inability to differentiate external contamination from drug use, hair testing plus urinalysis would have "generated less of a disparate impact."  *Jones II*, 845 F.3d at 36.  Indeed, Dr. Kidwell unambiguously testified that combining urinalysis with hair testing would necessarily reduce or eliminate the disparate impact of the hair test alone.  Kidwell Aff. ¶¶82; *see also* PL's CCCCC (2001 Romano study) at 127 (in recognizing risk of external contamination in hair testing, stating that "the [positive] result from the hair test should always be confirmed with a urine test").

> c) <u>The Officers Were Not Required to Produce Statistical Evidence or Extensive Data to Prove That the Kidwell Alternative Would Have a Less Disparate Impact</u>

Defendants' argument that the Officers did not provide "extensive data" or "statistical

evidence" to show the proposed alternative would be less discriminatory, Defs Mot. 8-11,

ignores the First Circuit's decision in *Jones II*, which explicitly rejected this argument.  The

Department now quotes *Jones I* for the proposition that statistical analysis can be required to

show an alternative would have a less disparate impact.  Defs Mot. 9 (citing *Jones I*, 752 F.3d at

53).  This is an accurate recitation of the *Jones I* decision, but ignores the *Jones II* Court's

holding that "[t]he Department reads this statement as always requiring a new, large-sample

statistical analysis that specifies the precise impact of an alternative practice.  ***We reject this***

***overly narrow reading of the manner by which statistical evidence can be marshalled***."  *Jones*

*II*, 845 F.3d at 36 (emphasis added).  Instead, the First Circuit held that "if the jury were to

believe the Officers and their experts rather than the Department and its experts, it would be *self-*

*evident* that the 'hair testing plus urinalysis' alternative would have generated less of a disparate

impact. . ."  *Jones II*, 845 F.3d at 36 (emphasis added).  Because the Officers "can use the

statistically determined impact of the challenged process as a baseline, and demonstrate that the

alternative practice must necessarily be less," and because it is widely accepted that urinalysis is

race neutral, the proposed alternative of hair testing plus urinalysis would have necessarily

reduced the disparate impact of the hair test alone.  *Id.* at 36 & n.5; Kidwell Aff. ¶¶81-82.  Thus,

by showing that the alternative would have resulted in fewer terminations of minority officers,

the Plaintiff Officers have shown that the alternative met the Title VII requirement of having less

of a disparate impact.  *Bridgeport Guardians, Inc.*, 933 F.2d at 1149 (promotion process that

considered several factors including race was a less discriminatory alternative where it would

have increased the possibility that some minority candidates would receive promotions even

though it would not aid all minority candidates who applied for promotion).

   3. <u>The Evidence Established the Alternative Was Available to the Department</u>

    a) <u>The Department Already Used Random Urinalysis</u>

The Officers also presented evidence that the proposed alternative was readily available to the Department, and would have required only minor adjustments to the Department's existing practice.  The Department already utilized random urinalysis testing for individuals who received a positive hair test result, *admitted drug use*, signed a settlement agreement, and entered into a rehabilitation program.  PFF ¶¶10-11 (undisputed).  Those officers were only terminated if they subsequently failed a urinalysis test.  Kidwell Aff. ¶72-73; Trial Tr. 1-92:20-94:8; *see* undisputed facts PFF ¶¶7-14.  The only modification needed for the Department to adopt the alternative would have been to similarly provide random urinalysis to the 17 officers who denied drug use during the period of 1999-2006, and to refrain from taking any adverse employment action against such individuals unless they subsequently failed a urinalysis test.  Kidwell Aff. ¶¶72-74, Add. A (depicting same); *see* undisputed facts PFF ¶¶7-14; Trial Tr. 1-103:11-19.  Nor was there any credible evidence that cost was a barrier—Defendants agree that urine tests are no more than $50 per test.  PFF ¶164 (undisputed).  As such, the replacement cost of a falsely accused police officer exceeds the cost of the Kidwell alternative.  Trial Tr. 1-109:9-12.

Finally, Defendants cannot hide behind the Boston Police Patrolman's Association to argue that the alternative was not available due to a collective bargaining agreement in place at the time. Title VII rights "are not rights which can be bargained away – either by a union, by an employer, or by both acting in concert." *United States v. N. L. Indus., Inc.*, 479 F.2d 354, 379 (8th Cir. 1973) (quoting *Robinson v. Lorillard Corp.*, 444 F.2d 791, 799 (4th Cir. 1971)).

b)   Dr. Kidwell's Proposal Was Sufficiently Specific But Was Not Adopted

The Department also incorrectly assumes a requirement under Title VII for the Officers to have provided the Department with a blueprint for the proposed alternative, addressing everything from the exact statistical impact and cost-budget analysis to each administrative procedure.  Such details are not required.  *See Bradley*, 443 F. Supp. 2d at 174-75 (holding that

multi-pronged testing, which "operate[s] to reduce the disparate impact of the written cognitive examination" was a valid available alternative and that plaintiffs "have no obligation to provide the exact floor plan" to Defendants); *Bridgeport Guardians, Inc.*, 933 F.2d at 1145, 1149 (affirming finding of Title VII violation where fundamental aspects of proposed alternative would have achieved Defendants' goals with less adverse impact on minority candidates).  The law merely requires a showing that the Department had <u>notice</u> of an available less discriminatory alternative.  *Id.; see also Adams v. City of Chicago*, 469 F.3d 609, 613 (7th Cir. 2006) ("The statutory scheme requires plaintiffs to demonstrate a viable alternative and give the employer an opportunity to adopt it.") (citation omitted).

The key elements of the proposal, as the First Circuit recognized, are hair testing followed by random urinalysis, with adverse action taken only against those who subsequently fail a urinalysis test.  *Jones II*, 845 F.3d at 34.  Beyond that, there is no requirement that limits the Department and the Court from adopting only such a program that includes certain additional details or requirements.  Where there are pieces of the proposal that are ancillary to that core, the Department and Court are allowed to consider logical variations of that core proposal that would obviously and logically flow from the core of the proposal.  For example, in *Bridgeport Guardians, Inc.*, the Second Circuit affirmed the district court's finding that a promotion process that considered several factors including race was a less discriminatory alternative to the strict rank-ordering of candidates Defendants used, even though plaintiffs did not provide exact details of the procedure and the district court had disagreed with plaintiffs' expert's specifically suggested procedure. 933 F.2d at 1145, 1148-1149; *see also Bridgeport Guardians, Inc. v. City of Bridgeport*, 735 F. Supp. 1126, 1136–37 (D. Conn. 1990).  Indeed, in fashioning a remedy the court "adopted a middle approach" of alternatives offered.  *Bridgeport Guardians*, 933 F.2d at

1145.  Thus, for example, if Defendants were concerned that using safety-net levels in the initial

hair test—suggested in footnote 74 of Kidwell's 2003 affidavit, PL's F—is problematic, they

could have simply chosen to retain the current testing cutoffs while re-ordering the program to

include random urinalysis for officers who tested positive on the hair test but denied drug use.

Similarly, if an officer tested positive but denied drug use, the Department, to the extent it

thought appropriate, could have taken the officer's weapon and/or placed him or her on

administrative duty.  Indeed, it was <u>already</u> doing this during the time in which these officers

were involved in disciplinary proceedings.  *See, e.g.,* Downing Aff. ¶20; Bridgeforth Aff. ¶21.[2]

The Officers provided a sufficiently specific alternative that was both viable and less

discriminatory.  *See Bradley*, 443 F. Supp. 2d at 175 ("no obligation to provide the exact floor

plan" to defendants).  This was particularly appropriate where the alternative was an obvious or

logical variation of procedures already used by the Department.  *See, e.g.*, *Lewis v. City of*

*Chicago, Ill.*, No. 98 C 5596, 2005 WL 693618, at *1-2, 14-15 (N.D. Ill. Mar. 22, 2005), *rev'd*

*on other grounds*, 528 F.3d 488 (7th Cir. 2008), *rev'd sub nom.*, 560 U.S. 205 (2010) (randomly

selecting applicants who obtained a passing score on an examination was an available alternative

to selecting higher-scoring candidates); *NAACP v. North Hudson Regional Fire & Rescue*, 742

F. Supp. 2d 501, 525 (D.N.J. 2010) (finding City, which employed a residency requirement in

order to hire bilingual individuals, had less discriminatory alternative available because it already

---

[2] As the Court suggested, the Americans with Disabilities Act's ("ADA") model of an "interactive process" is instructive here.  *See* 29 C.F.R. § 1630.2(o)(3).  Because an employer may be better suited to understand its needs in implementing a reasonable accommodation, it is generally recognized that an employer and employee share responsibility to resolve accommodation requests.  *See, e.g.*, *McDonald v. Menino*, No. CIV. A. 96-10825-RGS, 1997 WL 106955, at *3 (D. Mass. Jan. 3, 1997) (employer and employee have a shared responsibility to determine accommodation); *E.E.O.C. v. Convergys Customer Mgmt. Grp., Inc.*, 491 F.3d 790, 795 (8th Cir. 2007) (same).  It is not the case that the employee must present the employer with a blueprint.  *See id.*

included a designation for bilingual ability on the application).[3]

Evidence presented by Plaintiffs at trial established that Dr. Kidwell's suggestion of combining hair testing with urinalysis, a testing methodology that the Department was already using, was both sufficiently specific and available.  Kidwell Aff. ¶¶24, 25, 45, 71-84; Pl's F ¶35. The Department not only did not adopt this alternative, it did nothing to explore or consider it in any way.  The Department made no inquiry into the viability of the proposed alternative involving a combination of hair testing and urinalysis, an especially problematic stance given that it was a slight variation of the current program.  *See Adams*, 469 F.3d at 613 & n.2 ("We agree . . . that [a] reasonable alternative is not unavailable simply because the defendant has not completed its own inquiry into the viability of the alternative.").

In sum, Dr. Kidwell's proposal that the Department could use hair testing as a screening tool and random urinalysis as a confirmation method, gave the Department ample notice of a less discriminatory alternative, exactly as the First Circuit recognized.  *Jones II*, 845 F.3d at 35 ("the Department already used a series of negative urinalysis tests as a basis to reinstate suspended officers who tested positive on the hair test . . . [t]he only difference between the challenged practice and the proposed 'hair testing plus urinalysis' alternative is that firing (or suspension and drug rehabilitation) preceded the urinalysis testing in the actual regime, whereas no change in employment status would have occurred until after urinalysis confirmation in the alternative scheme.").  Indeed, the First Circuit also recognized that the proposed "alternative would have retained the main benefit of the challenged drug testing program: using a relatively unintrusive,

---

[3] Defendants' reliance on *Adams*, Defs Mot. at 12, is misplaced.  In *Adams*, plaintiffs advocated for merit-based promotions but the court found that, "no process existed for evaluating the merits of officers for promotion to sergeant." 469 F.3d 609.  In sharp contrast, here the Department already used urinalysis for individuals who tested positive on the hair test.  At least by the time of the Kidwell affidavit in June 2003, the Department was put on notice that there were alternatives to the current practice that met its legitimate needs and reduced the disparate impact on Black officers.

easy-to-supervise hair test to generate the negative results that confirm that almost all officers, regardless of race, do not use illegal drugs." *Id.* Despite the availability of this alternative, the Department took adverse action against the Plaintiff Officers solely on the basis of the hair test. *See* Bridgeforth Aff. ¶41-42; Downing Aff. ¶32-33; Couch Aff. ¶¶32-40; Hogan Aff. ¶¶26-31.

**B.    The Department's Other Attacks on The Officers' Claims Fail**

1.    The Officers Meet the Requirements of Article III Standing

The Department's contention that the Officers lack standing because they are not within the "zone of interests" sought to be protected by Title VII is astonishing in light of prior proceedings in this case.  As Black individuals who were terminated solely on the basis of a hair test that the First Circuit found disparately impacted Black officers, *Jones I*, 752 F.3d at 41, 53, 60, the Officers are clearly within the ambit of "aggrieved" persons.  *Thompson v. No. American Stainless, LP*, 562 U.S. 170, 178 (2011).  It surely cannot be said that the Officers interests are "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit [their] suit." *Id.* Defendants' citation to case law meant to preclude *third parties* from suing employers based on Title VII violations *to other people*—such as shareholders suing a corporation under Title VII due to discrimination against its employees—is completely baseless.  Defs Mot. 5-6.

2.    Officers Bridgeforth and Downing Remain Viable Plaintiffs

The Department continues to assert that Officers Bridgeforth and Downing are not viable plaintiffs because their hair test results were issued before the service of Dr. Kidwell's affidavit on June 3, 2003.  Defs Mot. 14-16.  This argument ignores the process under which Officers Bridgeforth and Downing were terminated, and that the Department had ample opportunity to institute Dr. Kidwell's proposal before either officer was terminated.

Upon receipt of their positive hair test results, Officers Bridgeforth and Downing were

not suspended, but instead placed on administrative duty or administrative leave.  Downing Aff.

¶24; Bridgeforth Aff. ¶35.  The Department's attempt to characterize administrative statuses as

suspension has no basis in fact.  The Department's own personnel records show that

administrative leave and suspension are different and officers who are suspended are not paid.

PAFF ¶5 (undisputed).  In contrast, Officers Bridgeforth and Downing were paid until their

terminations, consistent with the status of being on administrative duty or administrative leave.

PL's XXX (Downing payroll records); PL's QQQ (Bridgeforth payroll records).

Indeed, as tenured police officers, Officers Bridgeforth and Downing *could not* be

terminated or suspended for more than five days without a Disciplinary Hearing.  Mass. Gen.

Laws ch. 31, § 41.  Officers Bridgeforth and Downing were provided Disciplinary Hearing

notices on June 21 and July 17, 2003, respectively.  PFF ¶¶28, 50 (undisputed); Bridgeforth Aff.

¶39 (citing PL's AA); Downing Aff. ¶31.  Those notices stated that the Commissioner was

"*contemplating* disciplinary action against [them], including discharge or suspension."  PFF

¶¶28, 50 (undisputed) (emphasis added).  Disciplinary hearings for Officers Bridgeforth and

Downing were held on July 18, 2003 and September 29, 2003, respectively.  *See* undisputed

facts PFF ¶¶29, 51.  Officers Bridgeforth and Downing remained employed with the Department

thereafter until they each received a Notice of Termination on September 9, 2003, and January 6,

2004, respectively.  *See* undisputed facts PFF ¶¶13, 30, 52.  Commissioner Evans signed the

notices, and it is undisputed that he retained discretion over whether to sustain the disciplinary

charges against Officers Bridgeforth and Downing and whether and when to terminate them as a

result.  *Id.*; *see* undisputed facts PFF ¶14, PAFF ¶¶7, 61-62.

The Officers also presented ample evidence that the Department terminated Officers

Bridgeforth and Downing notwithstanding the availability of a less discriminatory alternative.

Despite knowing that Black individuals were testing positive on the hair test at higher rates than individuals of other races, the Department took no steps to adopt hair testing plus urinalysis and terminated Officers Bridgeforth and Downing on the basis of the hair test alone.  *See* undisputed facts PFF ¶¶130-131, 228; Bridgeforth Aff. ¶42; Downing Aff. ¶33.  Commissioner Evans had, but refused to exercise, discretion to keep Officers Bridgeforth and Downing on administrative status as the Department considered and implemented the alternative.  PAFF ¶7 (undisputed).

### 3.   Officer Couch Did Not Waive Her Claim

The Department's argument that Officer Couch waived her Title VII claim when she signed a settlement agreement after receiving a positive hair test in 2005 is both untimely and without merit.  The Department never asserted that the 2005 settlement agreement barred Officer Couch's claim in either its original answer or its amended answer, filed just last year.  Dkt. 28 (Sept. 25, 2006 Answer); Dkt. 284 (March 7, 2017 Amended Answer).  It has thus waived this argument.  *See Wolf v. Reliance Standards Life Ins. Co.*, 71 F.3d 444, 449-450 (1st Cir. 1995).

In any event, the Department cannot meet its burden to show that any perceived waiver of Ms. Couch's Title VII rights was knowing and voluntary.  *See Melanson v. Browning-Ferris Indus., Inc.*, 281 F.3d 272, 276 (1st Cir. 2002) (employer "bears the burden" and must "establish that the release was knowing and voluntary.").  The Department did not cross-examine Officer Couch or present evidence to refute her testimony that: (1) she attempted to note that she was signing the agreement under duress; (2) she was not offered an opportunity to speak with a lawyer who was representing her about the agreement; and (3) she did not fully understand that the agreement stated that she waived her right to any and all appeals.  Couch Aff. ¶¶35-40; *see also Unum Life Ins. Co. of Am. v. Cappello*, 278 F. Supp. 2d 228, 236 (D.R.I. 2003) (plaintiff did not knowingly and voluntarily waive rights "despite the fact that she was represented by counsel and had ample time and opportunity to read the Agreement" because "neither party gave any

thought to [those benefits] when they negotiated and signed the Agreement.").

**C.    Officer Bridgeforth and Ms. Hogan Suffered Compensable Injuries**

Defendants' claim that Officer Bridgeforth and Ms. Hogan did not suffer compensable

injuries is without merit.

   1.    Officer Bridgeforth Proved a Compensable Injury

The Department's argument that Officer Bridgeforth is not entitled to relief based on the

Civil Service Commission ("CSC") decision (Defts. Mot. at 13) is meritless, and should be

denied.  Significantly, the Defendants' position has been rejected by the Massachusetts Appeals

Court itself, which has conclusively held that an adverse CSC decision affirmed by the Appeals

Court does *not* bar a plaintiff's recovery on a disparate-impact claim raised in separate

proceedings.  *See Porio v. Dep't of Revenue*, 80 Mass. App. Ct. 57, 63 (2011) ("[E]ven had the

civil service appeal conclusively established that [the agency] based its decision entirely on

legitimate considerations, this alone would not have barred [the plaintiff's] disparate impact

count.").  Under Massachusetts law, therefore, the CSC decision has no preclusive effect on a

disparate-impact claim arising out of the same termination.

Nor do Defendants cite any legal doctrine to support their assertion that the CSC decision

bars relief to Office Bridgeforth or his disparate impact claim.  Officer Bridgeforth's recovery is

not barred by *res judicata*, as Officer Bridgeforth raised no Title VII or analogous state claim in

state proceedings.  The *Rooker-Feldman* doctrine is also inapplicable, as Officer Bridgeforth

brought his Title VII claim in this Court well before entry of judgment in the state proceeding.

*See Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 280, 292 (2005).  Nor

would collateral estoppel apply to this case, as the issue of racial discrimination based on a

disparate impact was not raised, or litigated in the state proceedings.  *Allen v. McCurry*, 449 U.S.

90, 101 (1980) (collateral estoppel does not apply where the party "did not have a full and fair

opportunity to litigate the claim or issue decided by the first court.").  Instead, the issue was timely raised in parallel federal proceedings.  As the First Circuit observed, the issue before the CSC was distinct from those presented in this litigation: "The issue before the []CSC was whether a positive test result by itself was just cause for terminating a tenured public employee. That is simply not an issue in this case."  *Jones II*, 845 F.3d at 33.

Moreover, the hair test plus urinalysis alternative was not a matter before the CSC, *see* undisputed facts PAFF ¶71, and the proper inquiry for this Court is whether the regime under which Officer Bridgeforth was terminated violates Title VII.  The basis for Officer Bridgeforth's economic loss in this case is thus separate and distinct from the CSC's finding that the Department had shown by a "preponderance of evidence" that it had "just cause for his termination."  *See In re: Boston Police Dep't Drug Testing Appeals ("D" Cases)*, Case No. D-03-362, 125 (Mass. Civ. Serv. Comm'n 2013) (as corrected).  The CSC's finding occurred in the absence of any ruling that the Department's hair test was invalid under federal law.  Under this litigation, however, Officer Bridgeforth's economic loss arises because that hair test was an unlawful employment practice under Title VII.

Furthermore, Officer Bridgeforth provided substantial evidence that he suffered economic loss because his termination would have been avoided had the Department adopted the alternative.  Despite never testing positive for illicit drugs until 2002, repeatedly denying drug use, offering independent negative tests, and undergoing seven months of random urinalysis under the Department's program, the Department terminated Officer Bridgeforth on the basis of the hair test alone.  *See* Bridgeforth Aff. ¶17, 19-20, 25, 29, 31 34, 37-38

> 2.    Cadet Keri Hogan Proved a Compensable Injury

The Department's contention that Ms. Hogan is not entitled to reinstatement or monetary relief because it is unlikely she would have successfully graduated from the Academy is wholly

unsupported.  Defs Mot. 17.  Ms. Hogan presented substantial evidence that she possessed the

mental and physical skills necessary to successfully complete the Academy and become a Boston

police officer.  Hogan Aff. ¶¶19-21.  Indeed, subsequent to the Department's adverse actions

against her, she completed an intensive training program to become a corrections officer in

Massachusetts and passed required demanding physical tests in every year in which she took

them.  Hogan Aff. ¶¶36-41; undisputed facts PAFF ¶¶13-18; Trial Tr. 1-175:23-176:21.

Defendants' assertion that "Hogan conceded that she did not satisfy all these [Academy]

requirements," Defs Mot. 14, is disingenuous, at best.  The only thing Ms. Hogan "conceded"

was that she was not given the opportunity to complete some of the Academy prerequisites

because the Department wrongfully denied her admission.  Hogan Aff. ¶19.  Ms. Hogan

unambiguously testified that she was confident she would have had no trouble completing the

Academy's requirements.  Hogan Aff. ¶21; Trial Tr. 1-175:23-176:21. The Court should reject

the Department's reliance on speculation as a defense to evade responsibility for its Title VII

violations.  *Denton v. Boilermakers Local 29*, 673 F. Supp. 37, 41 (D. Mass. 1987) (regarding

damages, "the wrongdoer does not become the beneficiary of his own wrongful conduct").

## III.    CONCLUSION

In light of the Officers' evidence presented at the close of their case in chief, Defendants'

Motion for Entry of Judgment Pursuant to Fed. R. Civ. P. 52(c) should be denied.

Respectfully submitted,

**RONNIE JONES, ET AL.,**

By their attorneys,

<u>/s/ Alexandra R. Reynolds</u>
Lisa J. Pirozzolo (BBO #561922)
Eric D. Wolkoff (BBO #679566)
Alexandra R. Reynolds (BBO #690501)
Jeffrey S. Olshan (BBO #693337)
Arjun K. Jaikumar (BBO #691311)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000
lisa.pirozzolo@wilmerhale.com
eric.wolkoff@wilmerhale.com
lexie.reynolds@wilmerhale.com
jeff.olshan@wilmerhale.com
arjun.jaikumar@wilmerhale.com

Oren M. Sellstrom (BBO #569045)
Laura Maslow-Armand (BBO #563003)
LAWYERS' COMMITTEE FOR CIVIL
    RIGHTS AND ECONOMIC JUSTICE
61 Batterymarch Street, Fifth Floor
Boston, MA  02110
(617) 988-0613
osellstrom@lawyerscom.org
laurama@lawyerscom.org

Dated:  March 23, 2018

## <u>CERTIFICATE OF SERVICE</u>

I, Alexandra R. Reynolds, hereby certify that a true copy of this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on this March 23, 2018.

*/s/ Alexandra R. Reynolds*
Alexandra R. Reynolds
