**EXHIBIT A**

11

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION NO. 17-2494-BLS1

PSYCHEMEDICS CORPORATION,

*Plaintiff/Defendant-In Counterclaim,*

v.

CITY OF BOSTON,

*Defendant/Plaintiff-In-Counterclaim.*

**THE CITY OF BOSTON'S ANSWER
TO FIRST AMENDED
COMPLAINT AND
COUNTERCLAIM OF THE CITY
OF BOSTON**

## ANSWER

1.      Paragraph 1 of the Complaint is an introduction to which no response is required.

To the extent a response is required, the City of Boston ("City"), admits the allegations of the

first and third sentences and deny the allegations of the second, fourth and fifth sentences of

paragraph 1 of the First Amended Complaint (the "Complaint").

2.      Admitted.

3.      Admitted.

4.      Admitted.

5.      Admitted.

6.      Admitted.

7.      Admitted.

8.      The City lacks sufficient information to form a belief as to truth or falsity of the

allegation that the Psychemedics Corporation ("Psychemedics") hair test is used by law

enforcement agencies worldwide, but admit the remaining allegations of the first sentence of

paragraph 8 of the Complaint. The City lacks sufficient information to form a belief as to the truth or falsity of the second sentence of paragraph 8 of the Complaint.

9.      The City admits the allegations of the first sentence of paragraph 9 of the Complaint. The City denies the allegations of the second sentence of paragraph 9 of the Complaint. In further answer to paragraph 9 of the Complaint, the City states that on average the annual payments to Psychemedics have exceeded $133,000 per year.

10.     Denied as stated. In further answer to paragraph 10 of the Complaint, the City states that with respect to the officers of the Boston Police Department ("BPD") relevant to this matter, the Psychemedics hair testing results was the sole factor in the decision whether a BPD officer should face termination or other consequences for illicit drug use.

11.     Admitted.

12.     Admitted.

13.     Admitted.

14.     Admitted.

15.     Denied as stated. In further answer to paragraph 5 of the Complaint, the City states that with respect to the BPD officers relevant to this matter, the Psychemedics hair testing results were reported by Psychemedics to the MRO as positive for cocaine and that Psychemedics has repeatedly and consistently represented to the City and the BPD that such a result indicates ingestion of cocaine and that there is no alternative explanation for a positive cocaine test result by a BPD officer.

16.     The City admits the City and the BPD and one other defendant were sued for civil rights violations by several African–American officers as well as two other plaintiffs, that the African–American officers had been fired for testing positive for cocaine on the Psychemedics

2

hair test, and that the case was removed to the United States District Court for the District of Massachusetts under Case Number 1:05–cv–11832 (the "*Jones Case*").

17.     The City admits that summary judgment has twice entered in their favor in the *Jones Case* and that the action remains on remand from the United States Court of Appeals for the First Circuit, but denies that the remand is on "the narrow issue of whether an alternative test – combining the Psychemedics hair test with follow-up urine testing – could have been adopted by BPD as early as 2003." In further answer to paragraph 17 of the Complaint, the City states that among the other issues on remand is whether the Psychemedics hair test causes a disparate impact on the basis of race within the meaning of 42 U.S.C. § 2000e-2k.

18.     Admitted.

19.     The City responds that the Statement Of Undisputed Material Facts In Support Of Defendants' Motion for Summary Judgement is a document which speaks for itself.

20.     The City responds that the Statement Of Undisputed Material Facts In Support Of Defendants' Motion for Summary Judgement is a document which speaks for itself.

21.     The City responds that Defendants' Statement Of Undisputed Material Facts In Support Of Defendants' Motion for Summary Judgment is a document which speaks for itself.

22.     Admitted.

23.     The City admits that a true and accurate copy of the Decision of the Civil Service Commission ("Commission") and the Opinion of Commissioners Bowman, Ittleman and Marquis is available at http://www.mass.gov/anf/docs/csc/decisions/discipline/boston-police-drug-testing-appeals-022813.pdf and deny the remaining allegations of paragraph 23 of the Complaint.

3

24.     The City admits that the Commission upheld four of the terminations of BPD officers, but allowed in part six of the appeals to the Commission. The City denies that the remaining allegations of paragraph 24 of the Complaint accurately state what the Commission did and denies that the allegations accurately characterize the Opinion of Commissioners Bowman, Ittleman and Marquis.

25.     The City responds that the Decision of the Commission is a document which speaks for itself.

26.     The City responds that the Decision of the Commission is a document which speaks for itself.

27.     The City responds that the Decision of the Commission is a document which speaks for itself.

28.     Admitted.

29.     The City admits that they began settlement negotiations with the plaintiffs in the Jones Case but deny that those settlement negotiations are ongoing. The City denies the remaining allegations of paragraph 29 of the Complaint.

30.     The City admits that each year from 1998 to 2013 and in 2016, the City entered into contracts with Psychemedics and that a true and accurate copy of one such contract is attached as Exhibit A to the Complaint. The City responds further that each such contract speaks for itself. The City denies the remaining allegations of paragraph 30 of the Complaint.

31.     The City responds that Article 8.1 of the contracts between the City and Psychemedics speaks for itself.

4

32.     Admitted. In further answer to paragraph 32 of the Complaint, the City states that Psychemedics has never requested, offered or demanded to assume the defense of the Jones Case or the appeals to the Commission.

33.     The City admits that a true and accurate copy of the City's then Corporation Counsel's letter of June 9, 2006 is attached as Exhibit B to the Complaint and state that that letter speaks for itself. In further answer to paragraph 33, the City states that Psychemedics' collaboration with, and assistance of, the City's legal staff and representatives was: (1) required under Psychemedics contracts with the City and (2) provided by Psychemedics, at least in part, in furtherance of its own goals and objectives, which included avoiding an adjudication that its hair testing had a racial bias or that its methodology was unsound and unreliable.

34.     As to the first and second sentences of paragraph 34 of the Complaint, the City responds that the June 19, 2006 letter from William Thistle, Senior Vice President and General Counsel for Psychemedics, is a document which speaks for itself. The City admits the allegations of the third sentence and deny the allegations of the fourth sentence of paragraph 34 of the Complaint.

35.     The City admits that in October of 2007, the City filed a motion in the federal lawsuit for leave to file a third-party complaint for indemnification and contribution against Psychemedics in the event that the City was eventually found liable. The City further responds that the City's proposed third-party complaint and Memorandum Of Law In Support Of Its Motion For Leave To File Third Party Complaint Against Psychemedics Corporation are documents which speak for themselves. In further answer to paragraph 35 of the Complaint, the City states that Psychemedics filed a revised Memorandum In Opposition To Defendant City Of Boston's Motion For Leave To File Third Party Complaint Against Psychemedics Corporation in

5

the federal lawsuit in which it argued that "These types of indemnification actions are routinely brought if and only if a defendant is found liable."

36.     The City denies that the City's motion for leave to file a third-party complaint constituted a "request for financial contribution." The City admits the remaining allegations of paragraph 36 of the Complaint.

37.     The City admits that at times the City requested and that at times Psychemedics provided advice, research and expertise of Psychemedics' scientists and attorneys and that the City has never indicated any desire to relinquish control of the defense of the Jones Case or the appeal to the Commission. The City lacks information sufficient to form a belief as to whether that advice, research and expertise was "at a cost approximately $1.5 million" to Psychemedics. In further answer to paragraph 37, the City states that Psychemedics' collaboration with, and assistance of, the City's legal staff and representatives was: (1) required under Psychemedics contracts with the City and (2) provided by Psychemedics, at least in part, in furtherance of its own goals and objectives, which included avoiding an adjudication that its hair testing had a racial bias or that its methodology was unsound and unreliable.

38.     The City denies that an "original cooperation agreement" was asserted by Psychemedics as a basis for its refusal to indemnify the City and the BPD and deny that any such "original cooperation agreement" could plausibly support a refusal by Psychemedics to indemnify the City and the BPD. The City admits the remaining allegations of paragraph 38 of the Complaint.

39.     Admitted. In further answer to paragraph 39 of the Complaint, the City states that Psychemedics has never requested, offered or demanded to assume the defense of the Jones Case or the appeals to the Commission.

6

40.     Denied.

## COUNT ONE

41.     The City incorporates by reference and restates its responses to paragraph 1 through 40 of the Complaint.

42.     Denied.

43.     Denied.

44.     Admitted.

45.     Admitted.

46.     Denied.

47.     Denied.

## COUNT TWO

48.     The City incorporates by reference and restates its responses to paragraph 1 through 47 of the Complaint.

49.     Admitted. The City responds that Article 9.1 of the contracts between the City and Psychemedics speaks for itself.

50.     Denied. In further answer, the City states that its prior Amended Answer is a document that speaks for itself, that by filing its new Complaint, Psychemedics has rendered the City's prior Amended Answer inoperative, and that the City's prior Amended Answer is superseded by this Answer.

51.     The City responds that its prior Amended Answer is a document that speaks for itself, that by filing its new Complaint, Psychemedics has rendered the City's prior Amended Answer inoperative, and that the City's prior Amended Answer is superseded by this Answer.

850649.1

52.   The City responds that its Amended Answer is a document that speaks for itself, that by filing its new Complaint, Psychemedics have rendered the City's prior Amended Answer inoperative, and that the City's Amended Answer is superseded by this Answer.

53.   The City admits that a true and correct copy of Psychemedics' letter of October 6, 2017 is attached as Exhibit E to the Complaint and denies the remaining allegations of paragraph 53 of the Complaint.

54.   Admitted.

55.   Denied.

56.   Denied.

## COUNT THREE

57.   The City incorporates by reference and restates its responses to paragraph 1 through 56 of the Complaint.

58.   Admitted.

59.   Denied.

60.   The City admits at times Psychemedics provided advice, research and expertise of Psychemedics' scientists and attorneys. In further answer to paragraph 60, the City states that Psychemedics' collaboration with, and assistance of, the City's legal staff and representatives was: (1) required under Psychemedics contracts with the City and (2) provided by Psychemedics, at least in part, in furtherance of its own goals and objectives, which included avoiding an adjudication that its hair testing had a racial bias or that its methodology was unsound and unreliable.

61.   Denied.

8

850649.1

## COUNT FOUR

62.   The City incorporates by reference and restates its responses to paragraph 1 through 61 of the Complaint.

63.   Denied.

64.   Denied.

65.   Denied.

66.   Denied. In further answer, the City states that its prior Amended Answer is a document that speaks for itself, that by filing its new Complaint, Psychemedics have rendered the City's prior Amended Answer inoperative, and that the City's Amended Answer is superseded by this Answer.

## COUNT FIVE

67.   The City incorporates by reference and restates its responses to paragraph 1 through 66 of the Complaint.

68.   Denied.

69.   Denied as stated. The City admits that at times the City requested and that at times Psychemedics provided advice, research and expertise of Psychemedics' scientists and attorneys. In further answer to paragraph 69, the City states that Psychemedics' collaboration with, and assistance of, the City's legal staff and representatives was: (1) required under Psychemedics contracts with the City and (2) provided by Psychemedics, at least in part, in furtherance of its own goals and objectives, which included avoiding an adjudication that its hair testing had a racial bias or that its methodology was unsound and unreliable.

70.   Denied. In further answer, the City states that its prior Amended Answer is a document that speaks for itself, that by filing its new Complaint, Psychemedics have rendered

9

the City's prior Amended Answer inoperative, and that the City's prior Amended Answer is superseded by this Answer.

71.     Denied.

## COUNT SIX

72.     The City incorporates by reference and restates its responses to paragraph 1 through 71 of the Complaint.

73.     Denied.

74.     Denied.

75.     Denied.

## COUNT SEVEN

76.     The City incorporates by reference and restates its responses to paragraph 1 through 75 of the Complaint.

77.     Denied.

78.     Denied.

## AFFIRMATIVE DEFENSES

*First*, the Complaint fails to state a claim that entitles Psychemedics to any relief against the City.

*Second*, Psychemedics' claims and theories of relief are barred by the defense of waiver.

*Third*, Psychemedics' claims and theories of relief are barred by the defense of estoppel.

*Fourth*, Psychemedics' claims and theories of relief are barred by the defense of unclean hands.

*Fifth*, Psychemedics' claims and theories of relief are barred by the defense of failure of consideration.

10

850649.1

*Sixth*, Psychemedics' claims and theories of relief are barred by Article 2.1 of the parties' contracts, which provides:

> The Contractor shall conform to all determinations and directions, in accordance with provisions of this Contract, of the Official [which means the awarding authority/officer acting on behalf of the City] concerning all questions which may arise relating to the performance of services under this Contract.

*Seventh*, Psychemedics' claims and theories of relief are barred by Article 6.3 of the parties' contracts, which provides:

> All alterations or additions, material or otherwise, to the terms and conditions of this Contract must be in writing and signed by the Official and Contractor and filed with the City Auditor.

*Eighth*, Psychemedics' claims and theories of relief are barred by Article 6.4 of the parties' contracts, which provides:

> Any waiver, expressed or implied, by the City or the Official of any rights, terms or conditions of this Contract shall not operate to waive such rights, terms or conditions or any other rights, terms or conditions, beyond the specific instance of waiver.

*Ninth*, Psychemedics claims and theories of relief are barred by Article 8.2 of the parties' contracts, which provides:

> If the damages sustained by the City <u>resulting from the Contractor's wrongful or negligent acts or omissions</u> exceeds sums due or to become due [to the Contractor], the Contractor shall pay the difference [between the damages sustained by the City and the sums due or to become due to the Contractor,] to the City. (Emphasis in original).

*Tenth*, Psychemedics' claims and theories of relief under Article 9.1 of the parties' contracts are barred by the facts that its October 6, 2017 letter does not provide "a detailed written statement of" the claimed damages; and (2) was not delivered "within thirty (30) days after the [alleged] act or material omission by the City."

850649.1

*Eleventh*, Counts Four through Seven of the Complaint are barred by the parties' contracts.

*Twelfth*, Psychemedics' claims and theories of relief are barred by the defense of the statute of limitations.

*Thirteenth*, claims and theories of relief are barred by the defense of laches.

## COUNTERCLAIM

## PARTIES

1.      Plaintiff-in-Counterclaim the City of Boston ("City") is a municipality of the Commonwealth of Massachusetts.

2.      Defendant-in-Counterclaim Psychemedics Corporation ("Psychemedics") is a Delaware corporation with a principal office in Acton, Massachusetts.

## JURISDICTION

3.      The Court has jurisdiction over this matter pursuant to M.G.L. c. 231A.

## FACTS

### *The City's Adoption Of Psychemedics Hair Drug Testing*

4.      The Boston Police Department ("BPD") is the principal law enforcement department of the City. The BPD first codified a substance abuse policy in 1986, as Rule 111, which espoused a "zero-tolerance" policy for drug use among its personnel and a 100% drug-free workforce. As originally promulgated, Rule 111 prohibited both on-duty and off-duty use of illegal drugs and illegally-used prescription drugs, and provided for urinalysis testing of BPD personnel for "reasonable suspicion" of such drug use and on a random basis.

5.      The BPD was forced to abandon random drug testing after the Supreme Judicial Court held, in *Guiney v. Police Commissioner of Boston*, 411 Mass. 328 (1991), that random urinalysis

testing of BPD officers imposed an unreasonable search and seizure under Article 14 the Massachusetts Declaration of Rights. As a result, the BPD could no longer lawfully use random urinalysis testing to test an officer and could only use urinalysis testing on "reasonable suspicion" of drug use. As a practical matter, detecting drug use by a fellow officer is difficult and few instances of "reasonable suspicion" are reported. As a consequence, the City and the BPD were forced to consider hair drug testing as a method to enforce the BPD's zero-tolerance policy for drug use by its personnel.

6.     Neither the City nor the Boston Police Patrolmen's Association, Inc. ("BPPA") had more than a superficial knowledge of the science behind hair testing for drugs at that point. Before adopting and proposing "announced" hair drug testing, the City and the BPD made an effort to research the subject. Among other things, the City and the BPD wanted to make sure that if they disciplined an officer testing positive, that the officer truly had used illegal drugs.

7.     The City and the BPPA believed and understood that Psychemedics was "the only game in town" in the field hair drug testing. The City and the BPPA had several meetings with Psychemedic's legal counsel, William Thistle, and its senior scientist, Dr. Thomas Cairns. Psychemedics' representatives repeatedly and emphatically assured the City and the BPPA that its testing was "state of the art," that it could, with respect to any particular drug, distinguish between voluntary ingestion and environmental exposure, that it did not produce false positives and did not have a racial bias. The City believed and relied heavily on those representations and assurances.

8.     In 1998, the City and the BPPA agreed to incorporate Psychemedics hair drug testing into their collective bargaining agreement ("CBA"). Rule 111 as amended, of the CBA provided for annual hair drug testing as part of the BPD's substance abuse policy. Under Rule 111, an officer

would be subject to termination for a positive test result unless it was the officer's first violation, in which circumstance, the BPD would offer the officer a forty-five (45) day suspension and voluntary submission to a rehabilitation program, in lieu of termination.

### *The Contracts Between The City And Psychemedics*

9.      Also in 1998, the City and Psychemedics began to enter into annual contracts under which, "Psychemedics shall conduct substance abuse testing on the certain of the City's applicants and employees utilizing Psychemedics' proprietary drug testing services employing radioimmunoassay technology in the analysis of hair ("RIAH") and post-positive GCMS confirmation testing" (the "Contracts").[1] Those Contracts between the City and Psychemedics contain the following pertinent provisions:

> Article 2.1:
>
>> The Contractor [Psychemedics] shall conform to all determinations and directions, in accordance with provisions of this Contract, of the Official [which means the awarding authority/officer acting on behalf of the City] concerning all questions which may arise relating to the performance of services under this Contract.
>
> Article 6.3:
>
>> All alterations or additions, material or otherwise, to the terms and conditions of this Contract must be in writing and signed by the Official and Contractor and filed with the City Auditor.
>
> Article 6.4:
>
>> Any waiver, expressed or implied, by the City or the Official of any rights, terms or conditions of this Contract shall not operate to waive such rights, terms or conditions or any other rights, terms or conditions, beyond the specific instance of waiver.

_____

[1]Typically, the Contracts were annual contracts. The 2013 and 2016 Contracts, however, were three year contracts.

Article 7.3:

> The Contractor shall assume the defense of and hold the City, its officers, agents or employees, harmless from all suits and claims against them or any of them arising from any <u>wrongful or negligent</u> act or omission of the Contractor, its agents or employees, in any way connected with performance under this Contract.

Article 8.2:

> If the damages sustained by the City <u>resulting from the Contractor's wrongful or negligent acts or omissions</u> exceeds sums due or to become due [to the Contractor], the Contractor shall pay the difference [, between the damages sustained by the City and the sum due or to become due to the Contractor,] to the City.

### *Psychemedics Hair Testing Protocols*

10.     Psychemedics hair drug testing for the BPD followed protocols for the analysis and certification of its test results. These protocols were contained in proprietary documents known as "Standard Operating Procedures" ("SOPs"), that Psychemedics revised from time to time.

11.     Psychemedics mass spectrometry results of the officer's hair samples were analyzed under decision criteria established by Psychemedics and set forth in its SOPs. The decision that a mass spectrometry test result meets the criteria for reporting a sample positive for cocaine ("COC") was made by a member of the Psychemedics staff of medical technicians. In the first step of the Psychemedics hair drug test, the concentration of cocaine (COC) in a liquefied hair sample found by mass spectrometry testing must equal or exceed the 5ng/10mg COC cutoff, after applying a so-called "Wash Criterion" or "wash kinetics rule." If that initial cocaine (COC) cutoff was met, the mass spectrometry testing must then confirm the presence of cocaine metabolites in concentrations as specified from time to time in Psychemedics SOPs. Once cocaine is ingested, it travels through the blood stream and is converted in the liver to a series of derivative substances, or metabolites, that eventually are expelled through the urine, a process

15

that takes about 72 hours to complete. The key metabolites, in order of their abundance, are benzoylecgonine ("BE"), cocaethylene ("CE"), and norcocaine ("NCOC"). If the requisite cocaine metabolite threshold is met, Psychemedics would report the officer's test results as positive for cocaine (COC).

12.     During the relevant timeframe, an officer who initially tested positive for an illicit drug was offered an opportunity to provide a new hair sample, in the same manner as the initial sample, for another test by Psychemedics. Although that follow-up test, referred to as "safety net" tests, used the same wash procedures and mass spectrometry method of analysis as the initial test, Psychemedics criteria for confirming the mass spectrometry "safety net" test result as positive for cocaine (COC) was significantly different than the criteria cut-off applied to the initial sample. Rather, the Psychemedics test was deemed positive if any quantity of cocaine (COC) was detected in the "safety net" sample (*i.e.*, a concentration at or above the limit of detection ("LOD") or limit of quantification ("LOQ") capability of the mass spectrometry equipment and without regard to the presence or absences of any cocaine metabolites.

### The Civil Service Commission Appeals

13.     Between 2001 and 2006, BPD officers Preston Thompson, Rudy Guity, Oscar Bridgeman, William Bridgeforth, Richard Beckers, Ronnie Jones, Jacqueline McGowan, Shawn Harris, Walter Washington, and George Downing each submitted hair samples to the department that Psychemedics reported as testing positive for cocaine (COC). Because Psychemedics reported those ten officers as having tested positive for cocaine (COC), the BPD terminated their employment.

14.     Those ten officers appealed the terminations to the Civil Service Commission ("Commission"). The Commission held hearings, over eighteen days between October, 2010,

16

and February, 2011, in those appeals (the "Civil Service Commission Appeals"). On February

28, 2013, the Commission issued its lengthy Decision upholding the terminations of four officers

(Officers Thompson, Guity, Bridgeman, and Bridgeforth), and overturning the terminations of

six officers (Officers Beckers, McGowan, Harris, Washington, Downing, and Jones). The

Pscyhemedics hair tests of the six officers whose terminations were overturned by the

Commission were conducted during 2001 through 2003

15.     A threshold issue before the Commission was the scientific reliability of Psychemedics

hair drug testing, and its ability to distinguish between voluntary ingestion and environmental

exposure. The ten officers and the BPD held competing views as to whether the testing alone

was reliable enough to establish just cause supporting the officers' terminations. In support of

their position, the ten officers called two expert witnesses, while the BPD opposed with its own

experts, including Dr. Cairns, a long-time employee and scientist at Psychemedics. Ultimately,

the Commission found that Psychemedics' hair drug testing methodology was not sufficiently

reliable to be the sole basis for an officer's termination.

### Psychemedics' Negligent And Wrongful Conduct Part 1: Failure To Account For The Variability Of Its Test Results

16.     As the Commission found, hair drug testing allows for some degree of variability, both

with respect to reproducibility (*i.e.* the precision with which the testing the same specimen

multiple times will produce comparable results) and accuracy (*i.e.*, obtaining the expected result

for a control specimen with a known or established quantity). The Commission found that the

"generally accepted standard of variability in forensic chemistry expects that, to be considered

reliable, results produced by a particular analytic methodology must fall within a range of +/-

20%."

17

17.     There are no universal industry standards controlling the performance of hair testing,
except for general agreement that a level of 5ng/10mg of cocaine, plus some level of metabolite,
is the minimum concentration indicative of a low-level user. There are no uniform benchmarks
for interpreting test results. Of the several laboratories that now offer hair testing to employers,
the testing methods vary from laboratory to laboratory. While some parameters are described
generally in published literature, substantial parts of the laboratory methodologies, including
Psychemedics, are hidden behind claims of competitive proprietary interest.

18.     Psychemedics testing of five of the six officers whose terminations were overturned by
the Commission (Officers Beckers, McGowan, Washington, Downing and Jones) showed
dramatic, and scientifically significant, variations in the officers' initial test results as compared
with their safety net test results. Psychemedics SOPs in place when those officers were tested
ignored the variability of the initial test results as compared to the test results in the subsequent
"safety net" test.

19.     The Commission found that, "while some degree of variation can be explained by the
time delay between initial sampling and subsequent follow-up safety net and/or independent tests
of the [officers], the difference in most of the test results for many of the [officers] greatly
exceeds the 20% variability allowed in forensic chemistry, as well as the 30% variability" limit
provided by the BPD rules after 2007. The Commission noted the "large discrepancies" in the
officers' Psychemedics hair drug test results and concluded that "[c]learly, this degree of
variability and potential difference in outcome is not indicative of a mature, stable and reliable
methodology."

18

### Psychemedics' Negligent And Wrongful Conduct Part 2:
### Changing The SOP Applicable To The "Safety Net" Test Threshold

20.     In the Commissions view, "[a]nother troubling aspect" of the Psychemedics hair drug testing methodology was the so-called follow-up "safety net" test purportedly used by Psychemedics to rule out any possible false positive.

21.     Under Psychemedics initial SOPs the concentration level cocaine (COC) needed for the "safety net" test to be deemed positive was originally 2.0ng COC/10mg hair.  However, in 2001, Psychemedics reduced the concentration level for a positive safety-net test was reduced to 0.2ng COC/10mg hair.

22.     The Commission found that "[n]o satisfactory explanation was provided (and probably none can be provided) to justify why, on the one hand, an initial confirmatory hair test…would be declared positive if, and only if, after decontamination, the drug concentration exceeded 5ng/10mg (plus a metabolite), but that a safety net sample taken a few days or weeks later would be declared positive from the same donor and after the same decontamination procedures were applied, even if only as little as 0.2ng/10mg of COC could be detected."

### Psychemedics' Negligent And Wrongful Conduct Part 3:
### Changing The SOP Applicable To The Percentage Of BE

23.     The Commission was also influenced by another of the many changes to Psychemedics SOPs. When the hair drug testing of BPD officers began, Psychemedics specified a minimum quantity of 0.5ng of CE or a ratio of BE/COC of at least 10%. In November of 2001, Psychemedics changed its SOPs by reducing the BE concentration ratio to 5% and added NCOC (in gross concentrations above 1.1 ng, and net concentration of 0.5ng after deducting any NCOC found in the last wash, by further mass spectrometry testing of the last wash), if accompanied by some BE.

19

24. The Commission found that "Psychemedics's frequent changes to its 'BE Rule' (the quantity and/or ratio of BE/COC that must be found to confirm a result as positive for ingestion) are largely matters of judgment than accepted scientific analysis." More fundamentally, the Commission found "no scientific consensus about the concentrations of BE/COC, if any, that reliably and conclusively confirms a hair test as positive for cocaine ingestion."

25. The Commission summarized its criticisms of Psychemedics methodology as follows:

> In sum, Psychemedics's use of shifting and problematic metabolite criteria applied to the Appellants, the use of an illusory so-called follow-up LOD/LOQ safety net despite the availability of the more rational option of double confirmation testing, as well as the arbitrary effect that the level of instrumentation variability allows in reading test results, leaves the Psychemedics hair tests short of being an acceptable and reliable method that is entitled to be given, in effect, such irrefutable weight, that, in every case, standing alone, it may be used to conclusively distinguish an officer who has used cocaine from a non-user who has been environmentally contaminated.

### *Officer Beckers*

26. As the Commission found, "Officer Beckers tested positive on his initial [April] 2002 hair test at 11.63ng/10mg COC, with BE at 5.5% (0.64ng) and NCOC at 0.32ng."

27. As the Commission found, had Officer Beckers' test been administered six months earlier, it would have been reported negative, because the BE in the initial test result was below 10%, which was the minimum metabolite present needed to confirm a test positive for ingestion before November 2001, when Psychemedics reduced the amount of BE percentage required to test positive down to 5%. His test was declared positive only because of this change to the Psychemedics SOPs.

28. The Commission also noted the -77.5% variability between Psychemedics initial test and the "safety net" test.

29.     As the Commission explained, it overturned Officer Beckers' termination, because of the

negligent administration and methodology of Psychemedics hair drug testing: "The short

window between his three Psychemedics tests, the consistency of the follow-up and negative

independent tests, the presence of only a minute amount of NCOC (compare the present BPD

standard requiring 1ng), the questionable use of a 5% BE cutoff to declare the initial test as

positive, and the lack of convincing evidence that good avoidance techniques could account for

the [variability, *i.e.*, the] differences in test results, all add to the conclusion that the

preponderance of evidence supports his denial of cocaine use." (Emphasis added)

### *Officer McGowan*

30.     As the Commission found, Officer McGowan's Psychemedics "hair test was borderline

positive: 5.76ng/10 mg COC with BE at 21.7%, (1.25ng), CE at 43% (2.48ng) and a trace of

NCOC."

31.     The Commission concluded that "Officer McGowan's two subsequent 'safety net' tests

add further doubt about any inference to be drawn that her cocaine concentrations exceeded the

levels that could reasonably be attributed solely to ingestion." Under Psychemedics procedures,

these follow up results could have been reported as negative, but, instead Psychemedics elected

to call for a third sample, which was taken two weeks later and showed 0.2ng/10mg COC with a

"trace" of BE and COC in the new growth, and 1.4ng/10mg COC with BE at 28.5% (0.4ng) and

CE at 71% (1.4ng) and no NCOC in the old growth.

32.     As the Commission found, had Officer McGowan's second 2002 follow up test been

evaluated under the SOPs effective until November 2001, it, too, would have been reported

negative, as it fell below the 2.0ng LOD/LOQ. Her test was positive solely because the follow up

cutoff was lowered to the LOD/LOQ of 0.2ng. As explained earlier, whatever machine-driven

21

LOD/LOQ is applied, that level has no scientifically-based value, on its own, to prove cocaine ingestion.

33.     The Commission found that Officer McGowan's follow-up safety net tests were "nearly 100% lower than the initial test, and would fail...industry variability standard [of] +/- 20%." The Commission concluded that "[v]ariations to this degree...leave enough uncertainty about the results in her case to justify that they be given diminished weight. Psychemedics' Dr. Cairns's efforts to explain the nearly 100% variation in test results were found by the Commission to be "unpersuasive."

34.     The Commission overturned Officer McGowan's termination because of the negligent administration and methodology of Psychemedics hair testing.

### *Officer Harris*

35.     As the Commission found, "Officer Harris tested positive on his 2002 hair test with COC of 8.18ng/10mg and BE at 8.99% (0.73ng).

36.     As the Commission found, his test results "turn[ed] on the difference between applying a 10% versus a 5% BE ratio." The significant and critical aspect of the Commission's ruling in Officer Harris's favor was the fact that had he been tested under the Psychemedics' protocols in effect until November 2001, he would have tested negative, since he had less than 10% BE/COC. As the Commission found, "[t]here is well-established scientific uncertainty that either ratio BE carries any definitive weight as a marker of ingestion."

### *Officer Washington*

37.     As the Commission found, "Officer Washington tested positive on his initial test with 6.13ng/10mg COC and BE of 5.5% (0.37ng), no CE and a trace of NCOC," and "[h]is follow-up

22

test, two weeks later showed 3.79ng/10mg COC, with BE at 11.3% (0.43ng), CE at 7.5% (0.6ng) and a trace of NCOC."

As the Commission found:

> Officer Washington's initial test result would have been reported
> as negative under the prior SOP in effect until November 2001,
> since it showed less than 10% BE/COC. He would have tested
> negative under the SOP change that went into effect in 2004
> because the BE result was less than 0.5ng. Thus, his test was
> declared positive only because he was tested within the window
> between the effective dates of those two SOP protocols.

38.     The Commission also noted "the 39% variation between the hair tests performed by Psychemedics," and gave Psychemedics this stinging rebuke: "This is a classic illustration of the effect of the shifting landscape and a lack of uniformity in testing protocols that, in this case, made the unfortunate difference between an officer's continued employment and his termination, a result that is unacceptable under merit principles."

39.     The Commission overturned Officer Washington's termination because of the negligent administration and methodology of Psychemedics hair testing.

### *Officer Downing*

40.     As the Commission found, "Officer Downing tested positive for cocaine in May 2002 with 5.86ng/10mg COC and BE at 11.8% (0.69ng), barely above the then applicable cutoff levels and within 15% variability of testing negative."

41.     The Commission further found that his "Psychemedics safety net confirmed 1.94ng/10mg COC," and that "[a]t these levels, Officer Downing would have tested negative under the pre-2001 safety net cut of 2ng COC." It also noted "the large variability in results (67%)" before concluding that "Mr. Downing presented a compelling case that he was wrongfully accused of using cocaine."

23

### *Officer Jones*

42.     As the Commission found, "Officer Jones tested positive on his initial 2002 hair test at

5.12ng/10mg COC, which is just barely positive, and within 2% of being declared negative,

which is well within the industry-accepted standard of +/-20% variability as well within even

Psychemedics own professed variability levels of 5% to 10%."

43.     In finding for Officer Jones, the Commission emphasized the "analytic variability" in the

initial Psychemedics hair drug test and the follow-up safety net test, which the Commission

found to be -52.9%. That variability led the Commission to conclude that Officer Jones initial

Psychemedics hair drug test "results, standing alone, are not conclusive." And given

Psychemedics' scientists inability to persuasively explain that analytic variability, the

Commission ruled that there was not just cause to terminate him.

### *The Superior Court Affirms The Commission's Decision*

44.     On April 3, 2013, the ten officers and the City, through the BPD, filed separate

complaints in the Superior Court, pursuant to M.G.L. c. 30A, § 14, seeking judicial review of the

Commission's Decision. The City, through the BPD, sought relief on the contentions that (1) the

Commission had incorrectly found that positive hair tests alone were insufficient to support a

termination, (2) the Commission had ignored the language of the CBA in reaching its conclusion,

and (3) the Commission's decision as to the six officers was unsupported by substantial

evidence. The four officers whose terminations were upheld by the Commission challenged the

Commission's authority to act on any ground other than the hair test results, and also claimed

that the Decision was not supported by substantial evidence. The six officers whose terminations

the Commission overturned argued in the Superior Court that they were entitled to back pay and

benefits commencing from the date of their individual terminations.

24

45.    On October 16, 2014, Superior Court Justice Judith Fabricant affirmed the Commission's

Decision, except that she increased the award of back pay and benefits for the six prevailing

officers. Judge Fabricant's Memorandum Of Decision included the following analysis:

> [E]ach of the officers denied use of cocaine. The Commission was
> thus called upon to consider whether the hair test alone was
> sufficient to outweigh the officer's denial, so as to meet the [City's
> Boston Police] Department's burden to prove misconduct by a
> preponderance of the evidence. The Commission properly
> recognized that, if the scientific basis for the hair test were so well-
> grounded that its results would be unimpeachable in every
> instance, then a positive hair test would necessarily outweigh any
> other evidence. But if the scientific basis for the hair test was not
> so well-grounded – that is, if the hair test was subject to false
> positive results in some significant percentage of instances – then
> the hair test could not by itself carry the Department's burden in
> the face of an officer's credible denial. In such instances,
> evaluation of the preponderance of the evidence would have to
> depend on other factors. As set forth *supra*, the Commission
> concluded that the scientific basis for hair testing was not so well-
> grounded. The Commission's conclusion in this regard was fully
> supported by its evaluation of the evidence before it, including its
> credibility judgments of the expert testimony.

### *The Appeals Court Affirms The Superior Court*

46.    The City, through the BPD, and the four officers whose terminations were upheld by the

Commission appealed to the Massachusetts Appeals Court.

47.    On October 7, 2016, the Appeals Court affirmed the Commission's Decision and the

Judgment entered by the Superior Court, *Thompson v. Civil Service Commission,* 90 Mass. App.

Ct. 462 (2016). The Appeals Court's analysis included the following criticism of Psychemedics

hair drug testing and methodology:

> Here, after an exhaustive inquiry on the scientific reliability of the
> Psychemedics hair testing methodology, the commission reached
> the conclusion that a positive test was not conclusive on the
> question of voluntary ingestion, as the positive test may also
> represent sample contamination by environmental exposure. In
> other words, the commission found that the risk of a false positive

25

test was great enough to require additional evidence to terminate an officer for just cause. In its decision, the commission states: "given the uncertainty about the efficacy of current decontamination strategies and metabolite criteria to rule out all real-world contamination scenarios, hair test results cannot be used in rote fashion as a conclusive and irrefutable means to terminate a [department] officer on the premise that such testing is 'generally accepted' as reliable." That conclusion is well supported by the record, which includes evidence of shifting cutoff levels through the years since the testing had been implemented, a lack of general acceptance in the scientific and law enforcement communities, and a lack of universally recognized industry standards.

48.     The City is now liable for back pay and benefits to Officers Beckers, McGowan, Harris, Washington, Downing, and Jones in the Civil Service Commission Appeals in amounts that have yet to be fully determined. On February 16, 2018, the City made partial payments to four of the officers in partial satisfaction of that liability. The payments to, or for the benefit, of the officers, which included required payroll withholding amounts, were as follows:

| Date | Officer | Gross Payment Amount |
|------|---------|---------------------|
| February 16, 2018 | Harris | $498,792.05 |
| February 16, 2018 | Washington | $311,705.14 |
| February 16, 2018 | Downing | $391,867.83 |
| February 16, 2018 | Jones | $577,123.44 |
| | TOTAL | $1,779,488.46 |

49.     Psychemedics was negligent in its administration of its hair drug testing for the City during the period with 1998 to 2003 and specifically with regard to the administration of that testing as it applied to Officers Beckers, McGowan, Harris, Washington, Downing and Jones. But for Psychemedics' negligent and wrongful conduct, the City would not have been found liable to those six officers in the Civil Service Commission Appeals.

26

### *The Jones Case*

50.     The City, the BPD and one other defendant were sued for civil rights violations by

several African–American officers as well as two other plaintiffs that had been fired for testing

positive for cocaine (COC) through the Psychemedics hair test. That case was removed to the

United States District Court for the District of Massachusetts under Case Number 1:05–cv–

11832 (the "*Jones* Case").

51.     The plaintiffs in the Jones Case ("*Jones* Case Plaintiffs") pled and pursued a so-called

disparate impact claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.*

The determination of whether a municipal employer is liable under such a claim requires a three-

prong, sequential inquiry. *Jones v. City of Boston* ("*Jones II*"), 845 F. 3d 28, 30 (1st Cir. 2016);

*Lopez v. City of Lawrence*, 823 F.3d 102, 110–11 (1st Cir. 2016); *Jones v. City of Boston* ("*Jones*

*I*"), 752 F.3d 38, 60 (1st Cir. 2014). In *Lopez*, the First Circuit explained the three-prong inquiry:

> In a nutshell, litigation of such a claim in a case challenging hiring
> or promotion decisions focuses on three questions: Do the
> plaintiffs show by competent evidence that the employer is
> utilizing an employment practice that causes a disparate impact on
> the basis of race; If so, does the employer show that the challenged
> employment practice creating this disparate result is nevertheless
> job-related for the position in question and consistent with business
> necessity; If so, do the plaintiffs show that the employer has
> refused to adopt an alternative practice that equally or better serves
> the employer's legitimate business needs, yet has a lesser disparate
> impact? To prevail, plaintiffs require a "yes" answer to the first
> question, and either a "no" to the second question or a "yes" to the
> third question.

*Id.,* at 110-111 (emphasis added), *citing Jones I,* 752 F.3d at 46. Accordingly, if the City is

ultimately found liable in the *Jones* Case, it will mean that the *Jones* Case Plaintiffs will have

proven that Pyschemedics hair testing causes disparate impact on the basis of race.

52.     Summary judgment has twice entered in favor of the City in the *Jones* Case, but the action is currently pending in the United States District Court on remand from the First Circuit. Among the issues on remand is whether the Psychemedics hair test causes a disparate impact on the basis of race within the meaning of 42 U.S.C. § 2000e-2k.

53.     If, at the conclusion of the *Jones* Case, the City is found liable to one or more of Jones Case Plaintiffs, the City's liability will be based on a determination that the Psychemedics hair drug testing produced false positives with a disparate impact based on race, despite Psychemedics repeated and emphatic representations that its hair drug testing neither produced false positives nor had a racial bias. In such a circumstance, the City's liability in the *Jones* Case, if any, would (i) arise from the negligent and wrongful acts and omissions of Psychemedics in its performance under the Contracts; and (ii) constitute damages sustained by the City resulting from such negligence and wrongful acts and omissions.

54.     In 2017, Psychemedics informed the City that its position was that under its interpretation of the parties' Contracts, Psychemedics had no financial responsibility to the City for the City's liability in the Civil Service Commission Appeals or its liability, if any, in the *Jones* Case.

**COUNT I**
**Action For Declaratory Judgment**

55.     The City incorporates by reference each and every allegation in the preceding paragraphs.

56.     An actual controversy has arisen within the meaning of G.L. c. 231A, § 1, under which this Court has jurisdiction to make binding declarations of right, duty, status, and other legal relations.

57.     The disputes between the parties are whether under the City and Psychemedics' Contracts, Psychemedics is liable to the City: (i) under Article 7.3 of the Contracts, for the City's liability and costs in the Civil Service Commission Appeals; (ii) under Article 8.2 of the

28

Contracts, for the City's liability and costs in the Civil Service Commission Appeals; (iii) under

Article 7.3 of the Contracts, for City's liability, if any, and costs in the *Jones* Case; and (iv)

under Article 8.2 of the Contracts, for the City's liability, if any, and costs in the *Jones* Case.

58.      Pursuant to G.L. c. 231A, the City is entitled to a binding declaration that Psychemedics

is liable to the City: (i) under Article 7.3 of the Contracts, for the City's liability and costs in the

Civil Service Commission Appeals; (ii) under Article 8.2 of the Contracts, for the City's liability

and costs in the Civil Service Commission Appeals; (iii) under Article 7.3 of the Contracts, for

City's liability, if any, and costs in the *Jones* Case; and (iv) under Article 8.2 of the Contracts,

for the City's liability, if any, and costs in the *Jones* Case.

59.      The City and the Psychemedics are the necessary parties to this action under G.L. c.

231A, § 8.

60.      This Court has authority to award a declaration pursuant to G.L. c. 231A, § 1.

## COUNT II
### Breach of Contract

61.      The City incorporates by reference each and every allegation in the preceding paragraphs.

62.      Psychemedics has disavowed and refused to satisfy its contractual obligations to the City

under Articles 7.3 and 8.2 of the parties' Contracts.

63.      Psychemedics has breached its Contracts with the City.

64.      The City has sustained damages resulting from Psychemedics' wrongful and negligent

acts or omissions, which exceeds the sums due or to become due to Psychemedics under the

parties' Contracts.

65.      The City has sustained damages resulting from Psychemedics' breaches of the parties'

Contracts.

29

**WHEREFORE**, the City prays that this Court grant the following relief:

A.      Enter Judgment for the City and against Psychemedics on Count I of the Counterclaim and make a declaration that Psychemedics is liable to the City: (i) under Article 7.3 of the Contracts, for the City's liability and costs in the Civil Service Commission Appeals; (ii) under Article 8.2 of the Contracts, for the City's liability and costs in the Civil Service Commission Appeals; (iii) under Article 7.3 of the Contracts, for City's liability, if any, and costs in the *Jones* Case; and (iv) under Article 8.2 of the Contracts, for the City's liability, if any, and costs in the *Jones* Case.

B.      Enter Judgment for the City and against Psychemedics on Count II of the Counterclaim and award the City its damages, in an amount to be determined at trial, together with its attorneys' fees and costs.

C.      Such other and further relief as it considers just and proper.

## JURY DEMAND

The City respectfully demands a trial by jury on all issues and claims so triable.

Respectfully submitted,

Defendant/Plaintiff-In-Counterclaim

**CITY OF BOSTON,**

By its attorneys,

Thomas S. Fitzpatrick BBO # 556453
tfitzpatrick@davismalm.com
Kimberly Maruncic BBO # 696234
kmaruncic@davismalm.com
Davis, Malm & D'Agostine, P.C.
One Boston Place
Boston, MA  02108
(617) 367-2500

Dated:  February 20, 2018

## CERTIFICATE OF SERVICE

I, Thomas S. Fitzpatrick, hereby certify that on this 20th day of February, 2018, I have caused a true and accurate copy of the foregoing document to be served by e-mail upon all counsel of record.

Thomas S. Fitzpatrick | BBO# 556453

31

850649.1